REBECCA SPIVAK
128 NE 51st STREET
SEATTLE, WA 98105
(617) 519-1100
Email: rebeccaspivak@outlook.com

UNITED STATES DISTRICT COURT

for the

Western District of Washington

Seattle Division

| | |
|---|---|
| RIVKA ("REBECCA") SPIVAK, | Case No. |
| Plaintiff, | |
| vs. | |
| | COMPLAINT FOR DAMAGES |
| ALPHABET INC, FACEBOOK INC, BRIAN LEE JOHNSRUD, SHAWN JASON BAYERN, RAYMOND LESLIE BLESSEY, AYAN RAY KAYAL, DAVID ANDREW RUSSCOL, DIANA RUTH SHERMAN, MAX RAYMOND CHO; | 1. CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS |
| | 2. RACKETEERING |
| DOES I THROUGH X, AND ROE BUSINESSS ENTITIES I THROUGH X. | 3. INVASION OF PRIVACY |
| Defendants | |

COMPLAINT FOR DAMAGES - 1

**COMPLAINT**

For this Complaint, Plaintiff Rivka ("Rebecca") Spivak ("Plaintiff")

alleges as follows:

## I.      NATURE OF COMPLAINT

1.      Plaintiff is a former Google employee who previously raised allegations that Google and their lawyers obstructed justice in a federal EEOC Investigation and in other legal proceedings. This action arises from a Google-led conspiracy to intimidate Plaintiff, to induce her to abandon her Title VII claims, to discredit her criminal allegations, and to have her disqualified as a potential witness in any future criminal prosecutions of Google's obstruction.

## II.      JURISDICTION AND VENUE

2.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1343 because this action arises in substantial part under the laws of the United States, and 42 U.S.C. § 1985, because this action alleges conspiracy to interfere with civil rights.

3.      This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises in substantial part under the laws of the

United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

4.      This Court has original jurisdiction under 28 U.S.C. § 1332(a) because the parties' citizenship is completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper because a claim under 18 U.S.C. § 1964 can be brought in any federal district court.

6.      Venue is also proper in this District under 28 U.S.C. § 1391 because substantial parts of the events or omissions giving rise to the claims occurred in this District.

7.      This Court has personal jurisdiction over defendants under 18 U.S.C § 1965a because one or more RICO defendants, including Alphabet, Inc. and Facebook, Inc., have presence, agents, and/or conduct business in this District.

8.      This Court also has personal jurisdiction over defendants under FRCP Rule 4(k)(1)(A) and Washington State RCW 4.28.185 because tortious actions and/or injuries occurred in this State and District.

9.      This Court also has personal jurisdiction because defendants purposefully directed their activities at this forum. (Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801 (9th Cir. 2004) (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).)

### III.    **PARTIES**

10.    PLAINTIFF Rivka "Rebecca" Spivak ("Plaintiff") is a citizen of the United States and a resident of Seattle, Washington.  Plaintiff was employed by Google from April 2010 until November 2015 as a Senior Product Manager, and for most of that time she worked on Google's display and video advertising products.  In addition to working for Google, Plaintiff has worked for Microsoft, Expedia, Roubini Global Economics, and Amazon.  She has held roles in Product Management, Engineering, and Data and Applied Science, and at individual, management, and senior leadership levels. Plaintiff graduated *Magna Cum Laude* from Yale University with a B.S. and M.S. in Computer Science.  She holds two additional graduate degrees, including an MBA from Harvard Business School and a J.D. from Concord Law School.  She is a member of the State Bar of California (# 263866).

8    Defendant ALPHABET, INC ("Google") is a Delaware corporation headquartered in Mountain View, California.  Google operates one or more satellite offices, owns and/or leases real property, employs workers, has agents, and conducts business in Seattle, Washington.

9    Defendant FACEBOOK is a Delaware Corporation headquartered in Menlo Park, California.  Facebook operates one or more satellite offices, owns and/or leases real property, employs workers, has agents, and conducts business in Seattle, Washington.

COMPLAINT FOR DAMAGES - 4

10      Defendant BRIAN LEE JOHNSRUD ("Johnsrud") is a citizen of the United States, a resident of California, and a partner at the law firm Curley, Hessinger, and Johnsrud LLP.  Johnsrud was outside counsel for Google on the federal case *Google v. Spivak*, in the EEOC investigation of Plaintiff's claims, and in the JAMS arbitration *Spivak v. Google*.

11      Defendant RAYMOND LESLIE BLESSEY ("Blessey") is a citizen of the United States, a resident of the state of California, and a senior partner at the law firm Reback, McAndrews, and Blessey LLP.

12      Defendant SHAWN JASON BAYERN ("Bayern") is a citizen of the United States, a resident of the State of Florida, and a law professor at Florida State University. Bayern and Plaintiff were classmates at Yale in the graduating class of 1999. They stayed in close contact through a small and active/engaged alumni email group ("Plusmail") and through countless hours of private chats that were often personal and private in nature.

13      Defendant AYAN RAY KAYAL ("Kayal") is a citizen of the United States, a resident of the State of California, and Associate General Counsel, Product & Privacy at Facebook. Kayal is also an alumnus of Yale and was another member of the Plusmail email group.

14      Defendant DAVID RUSSCOL ("Russcol") is a citizen of the United States, a resident of the State of Massachusetts, and an associate at the law firm Zalkind, Duncan & Bernstein LLP. Russcol is also an alumnus of Yale and was another member of the Plusmail email group.

15      Defendant DIANA SHERMAN ("Sherman") is a citizen of the United States, a resident of the State of California, and a coordinator with the Oakland Unified School District in Oakland, CA.  She is also an alumna of Yale and was another member of the Plusmail email group.

16      Defendant MAX RAYMOND CHO ("Cho") is a citizen of the United States, a resident of the State of New York, and a Product Manager at Google.  He is also an alumnus of Yale and was another member of the Plusmail email group.

## IV.    RELATED CASES AND INVESTIGATIONS

17      Spivak v. Google: EEOC Charge No. 551-2015-00827:  On March 2, 2015, Plaintiff completed an intake questionnaire with the EEOC laying out a complaint against Google. Plaintiff completed an intake interview on May 15, 2015.  The EEOC received Plaintiff's signed Charge of Discrimination on June 23, 2015.  The EEOC conducted an investigation and issued a Notice of Right to Sue on January 27, 2017.

18      Google v. Spivak, Civil Action No. 15-CV-02981-HRL: On June 26, 2015, Google filed a Petition to Compel Arbitration against Plaintiff in the United States District Court for the Northern District of California.  Plaintiff

was given notice on July 6, 2015 and waived Service of Summons. The case was dismissed on July 14, 2015.

19    Spivak v. Google – JAMS Ref No. 1110018238:  On July 28, 2015, Plaintiff filed for arbitration with JAMS. The arbitrator was Hon. Robert A. Baines (Ret.). On October 19, 2015, the arbitration was stayed pending the EEOC investigation. The stay was lifted March 21, 2017.  The arbitration was dismissed with prejudice on July 22, 2019.

20    Gonzalez v. Spivak, Case No. BC635130:  This is an apparently unrelated medical malpractice case filed in Superior Court of the State of California, County of Los Angeles. *Gonzalez* is relevant to this complaint because this complaint raises allegations tied to the fact that Blessey, the lead defense attorney in *Gonzalez*, repeatedly sent Plaintiff privileged emails purportedly meant for his own client. A review of the docket shows that *Gonzalez* was filed on September 22, 2016 and that over the subsequent three years, the majority of scheduled proceedings were not held.  The Register of Actions shows the following action on November 5, 2019: "Jury Trial - Not Held - Vacated by Court."

21    Bayern v. Spivak Case No. 2019 DR 003189: On October 23, 2019, Bayern filed a Petition for Injunction for Protection Against Stalking against Plaintiff in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida. A hearing was held on November 7, 2019 and judgement was ordered in favor of Bayern.

22     State of Florida v. Spivak:  On February 21, 2020, Bayern filed additional complaints against Plaintiff and had Plaintiff charged with Aggravated Stalking (3rd Degree Felony) under Florida Criminal Statute 784.048(4).  The probable cause affidavit states the following: "Bayern believes Spivak suffers from significant delusions in which she thinks Bayern has engaged in a bizarre set of actions; as a result, she has developed a very concerning hostility towards Bayern."  These charges are pending.

## V.     POINTS OF REFERENCE

23     Plusmail:  Plusmail was a small but high-volume alumni email group that Plaintiff was a member of for approximately 20 years.  It was originally formed as an offshoot social email list for a group of students who worked a technical-support job at Yale University. In recent years, Bayern, Kayal, and Plaintiff were the three most active participants on Plusmail, accounting for close to half of all activity in the email group.  Plusmail was not a large distribution list but rather a vehicle for a couple dozen long-time friends to talk to each other every day about all sorts of personal, professional, and cultural topics.

24     "Gaslighting": Plaintiff uses the term "gaslighting" in this complaint. As of September 28, 2020, "gaslighting" was defined by Wikipedia as follows:

**Gaslighting** is a form of psychological manipulation in which a person or a group covertly sows seeds of doubt in a targeted individual or group, making them question their own memory, perception, or judgment, often evoking in them cognitive dissonance and other changes, including low self-esteem. Using denial, misdirection, contradiction, and misinformation, gaslighting involves attempts to destabilize the victim and delegitimize the victim's beliefs. Instances can range from the denial by an abuser that previous abusive incidents occurred, to belittling the victim's emotions and feelings, to the staging of bizarre events by the abuser with the intention of disorienting the victim.

25      "The Backchannel": This references the various off-the-record communications that Plaintiff had with Google. At times Google contacted Plaintiff using an anonymous email and invited her to join an anonymous chat. Through these off-the-record chats, Google attempted to negotiate with Plaintiff, and also aggressively harassed and threatened her. Plaintiff participated in these chats because Google refused to have any meaningful conversations with her on the record. For the sake of this complaint, it is not practical to set the entire context for how each off-the-record chat was initially established. To distinguish off-the-record communications from those that happened more transparently, this complaint will use language along the lines of "Google told Plaintiff […] via the Backchannel." Plaintiff asserts that when she attributes anonymous communications to Google, she does so with evidentiary support and on good faith belief. Plaintiff will provide this

evidence in discovery and at trial as appropriate, and also expects that forensic

experts will be able to provide tracing and further proof.



## VI.    FACTUAL ALLEGATIONS

### 2010 – 2015: Plaintiff Experienced Gender Discrimination at Google

26      Plaintiff was employed by Google from April 2010 through

November 2015 as a Senior Product Manager.

27    During her employment, Plaintiff drove, devised, and invented strategies, algorithms, and data technologies that grew Google's display and video advertising business by billions of dollars in annual revenue.

28    Plaintiff experienced pregnancy discrimination and gender discrimination during her employment.

29    Plaintiff was retaliated against when she complained.

30    Plaintiff complained of pregnancy discrimination in 2012.

31    Plaintiff repeatedly complained of gender discrimination and retaliation throughout 2014.

32    Google's internal files and communications show that by mid-2014, Google's senior leadership was aware that Plaintiff was complaining of gender discrimination and was anticipating litigation.

33    In May 2015, an internal investigation of Plaintiff's complaints conducted by Human Resources Business Partner Ariana Tortorici concluded "it does appear that Rebecca was being treated differently based on gender" and it appeared to be "unfair."  Tortorici emailed these findings to Plaintiff's former manager, also telling him, "For the future, please make sure to treat males/females the same with their upcoming/return from parental leave …"

34    On June 18, 2015, Plaintiff's lawyers sent Google a demand letter laying out her discrimination claims.

35    On June 23, 2015, the EEOC received Plaintiff's signed charge of Discrimination.

COMPLAINT FOR DAMAGES - 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>June 26, 2015: Google Responds to Plaintiff's Demand Letter by Filing a</u>

<u>Dishonest Petition Against Plaintiff in Federal Court</u>

36    On June 26, 2015, Google filed a Petition to Compel Arbitration alleging that Plaintiff was refusing to honor the arbitration agreement.

37    Plaintiff had not refused to honor the arbitration agreement and had not done anything that justified Google filing the petition against her.

38    Google filed the petition without first responding to Plaintiff's letter to explore whether any alleged disagreement could be resolved.

39    The case law that Google cited to justify the petition was not applicable to the facts.

40    In the unwarranted petition, Google made public unnecessary and misleading detail that was prejudicial to Plaintiff.

41    As part of the petition, Tortorici submitted a declaration containing the following statement: "I and another Human Resources Employee based in Mountain View have reviewed Spivak's various allegations and have concluded that they are without merit."

42    Tortorici's declaration contained false statements and contradicted her own internal documentation of the investigation.

43    Google submitted Tortorici's declaration as part of *Google v. Spivak* knowing that it contained false statements.

COMPLAINT FOR DAMAGES - 12

44      After a few short exchanges between the attorneys, *Google v. Spivak* was dismissed and Plaintiff filed for arbitration on July 28, 2015.


September 2015 – January 2017:  Google is Dishonest in the EEOC
Investigation of Plaintiff's Claims


45      The EEOC asked Google to respond to Plaintiff's charge.

46      To avoid parallel proceedings, Plaintiff's pending arbitration was stayed pending the conclusion of the EEOC investigation.

47      On September 21, 2015, Google filed a response to Plaintiff's EEOC charge, urging the EEOC to dismiss the charge without investigating and to issue a No Cause finding.

48      Google centered their argument on an allegation that Plaintiff had not complained of gender bias prior to February 2, 2015. They claimed she only complained then as a strategic move to avoid being fired after a conflict with her manager.

49      Plaintiff had a conflict with her manager after he told her he would be reducing her performance rating because she had taken time off for her daughter's surgery. Plaintiff knew this was pretext and that it was ongoing retaliation because she had complained of discrimination.

50      Below is an excerpt from the EEOC response submitted on September 21, 2015 by Google attorney Brian Johnsrud.

COMPLAINT FOR DAMAGES - 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> **3.    February 2, 2015:   Spivak Complains For The First Time About Alleged Gender Discrimination, Admitting She Did So Because She Believed It Made Her "Unfireable."**
>
> On Monday, February 2, 2015, Spivak complained for the first time about alleged gender discrimination. (Exhibit 15). In doing so, she threw many successful women at Google under the bus by claiming that they "were rewarded for being submissive or coy." She then went on to fault HR saying "I know that HR's first reaction is likely to be to discredit this assertion rather than consider it."

51    The allegation that Plaintiff did not complain of discrimination before February 2, 2015 was both false and material to Google's argument.

52    By May 4, 2014, Google had already internally documented that Plaintiff had raised complaints that were classified as "EEO."

53    On October 6, 2014, Human Resources emailed Senior Vice President Neal Mohan warning him that Plaintiff was complaining of gender bias and that there was an "continued concern that she is litigious."

> From:     Lauren Thomas
> To:       Neal Mohan
> Sent:     Mon, 6 Oct 2014 10:10:40 -0700
> Subject:  TIME SENSITIVE: Info for your meeting with rivka@
>
> Hi Neal,
>
> "There is continued concern that she's litigious and she's very quick to attribute much of the feedback she receives to gender bias …"

54    In February 2015, Google Engineering Manager Michael English, who worked closely with Plaintiff, was questioned by Employee

Relations. English confirmed to Employee Relations that Plaintiff had

previously complained to him many times of gender bias.

55     Employee Relations warned English to never tell anyone that

he had told them that Plaintiff had previously complained of gender bias.

56     Google had multiple internal documents confirming that

Plaintiff had complained of gender bias well before February 2, 2015.

57     Google was intentionally lying when they told the EEOC that

Plaintiff had not complained of gender discrimination before February 2, 2015.

Google Knowingly Submits Altered Evidence to the EEOC

58     As part of their response, Google gave the EEOC emails that

they claimed that Plaintiff had sent. The emails, as submitted by Google, were

materially excised without any indication that they had been altered.

59     Google also submitted those altered emails in the parallel

arbitration proceeding as part of their Motion to Stay the arbitration.

60     The alterations materially changed the meaning of the emails

in a way highly prejudicial to Plaintiff.

61     Google later claimed that those emails had been forwarded to

them by an "anonymous sender" and that the anonymous sender must have

made the alterations before sending them to Google.

62      Google submitted those emails to the EEOC as evidence, without disclosing that the emails were unverified and had been received from a questionable anonymous source.

63      Google had reason to be suspicious of the emails beyond the fact that they were forwarded anonymously.  The anonymous sender had forwarded Google what seemed to be the same email multiple times. A review of those duplicate emails shows that an email forwarded a second time by the anonymous sender was different than when it had been forwarded the first time.  Emails sent a second time had missing paragraphs, sentences, and sentence-fragments compared to the first time they were forwarded.

64      Given that the anonymous sender had sent Google conflicting versions of what otherwise seemed like the same email, Google must have known that the anonymous sender was sending them altered emails.

65      Google could have accessed the original unaltered emails because Plaintiff had sent the original emails from her Gmail account on her corporate-issued laptop while she was still a Google employee.

66      As a condition of her employment with Google, Plaintiff had accepted Google's Code of Conduct, which provided the following:

> Google reserves the right to monitor, access and disclose communications made on or information stored in any and all of its work areas, work product and equipment, including technological resources. […] This also means that for legitimate business purposes (such as the need to access business records, to administer electronic facilities, to investigate suspected misconduct or to prevent

misconduct from occurring), we monitor, access, and
disclose information or communications, including
personal information and communications, made or
stored on Google facilities or premises.

67      When Google received the forwards from the anonymous
sender, there was an active investigation of Plaintiff's discrimination
complaints. By policy, Google could have, and would have, been monitoring
and reviewing the emails Plaintiff sent from her corporate device.

68      Before giving the EEOC emails that Google had reason to know
were altered, Google could have reviewed the original emails sent by Plaintiff
from her corporate device to check which, if any, of the anonymous sender's
conflicting versions was authentic.

69      Google knowingly submitted altered emails in the federal
investigation of Plaintiff's EEOC charge without disclosing that they had
reason to know the emails were altered.

70      Google also apparently failed to make a reasonable inquiry into
the authenticity of those altered emails by cross-checking them against the
originals, even though by policy they would have already been monitoring and
reviewing Plaintiff's emails.

Google Further Alters the Anonymous Sender's Altered Emails

Case 2:20-cv-01480-MJP    Document 3    Filed 10/07/20    Page 18 of 90

71      Exhibit 13 to Google's EEOC Position Statement is one of the altered emails forwarded to Google by the anonymous sender.

72      In that email, Plaintiff reflects on the conflict that she had had with her manager earlier that day after he penalized her for taking too much time off for her two-year-old daughter's surgery.

73      On page 12 of Google's Position Statement, Google purports to quote that same Exhibit 13 email to support their allegations of Plaintiff's state-of-mind. Specifically, Google introduces the email as evidence that "Spivak then sent an email bragging about her unprofessionalism."

74      As included in Exhibit 13, the email contains the following sentence in the middle of the opening paragraph: "I wasn't planning on it, and don't mean to be melodramatic, but losing the baby and all has also made me go more into 'not gonna deal with shit' mode."

75      As included on page 12, the email's opening paragraph does not contain that sentence.  The sentence is inexplicably missing.

76      The fact that Plaintiff was mourning a recently-lost pregnancy and the fact that Plaintiff directly attributed her loss of composure to her distress over losing the baby was material to her state of mind.

77      The missing sentence would have contradicted Google's allegation that Plaintiff was "bragging."  Plaintiff was mourning a recently lost pregnancy and was caring for her toddler who had just had surgery.  It is true that, for these reasons, she had a reduced ability to turn-the-other-cheek to the

COMPLAINT FOR DAMAGES - 18

ongoing illegal retaliation she had been subjected to.  She wasn't bragging about it.  She was distressed and upset.

78    Because the sentence is not missing in Exhibit 13 to Google's EEOC Position Statement, and because Google submitted the Position Statement and the Exhibits at the same time, Google must have intentionally removed the sentence from the middle of the email on page 12 but forgotten to also remove it from Exhibit 13.

79    Google altered evidence in a material way and knowingly submitted that altered evidence in the federal investigation of Plaintiff's EEOC charge to support their argument that the EEOC should close Plaintiff's charge and issue a No Cause finding.

Google Fails to Take Any Remedial Action on Notice of the Alterations

80    Google had also submitted those altered emails in the parallel arbitration of *Spivak v. Google* as part of their Motion to Stay.

81    On September 28, 2015, one week after Google had submitted those altered emails to the EEOC, Plaintiff alerted Google and the arbitrator that the emails Google had submitted as part of their Motion to Stay were altered. Plaintiff provided Google and the arbitrator with the originals.

82      Despite having sent those same emails to the EEOC and now being on notice that the emails were materially altered, Google took no remedial action to correct and rectify their previous submission to the EEOC.

83      The EEOC investigation remained open for more than one year after Plaintiff alerted Google that the emails were altered. During that year Google had multiple interactions with the EEOC, but Google never let the EEOC know that they had since learned that the emails they had previously submitted were altered.

84      Throughout the EEOC's attempt to investigate Plaintiff's claims, Google made additional material misrepresentations and withheld the pay-data requested by the EEOC to establish Plaintiff's damages.

85      On December 2, 2016, nearly eighteen months after she signed her charge of discrimination, Plaintiff requested that the EEOC close the investigation and issue a Notice of Right to Sue.

86      On March 21, 2017, the stay of arbitration in *Spivak v. Google* was lifted.

May 2018: Arbitration of Spivak v. Google is in the Discovery Stage, and Plaintiff Represents Herself Pro Se

87      In May 2018 Plaintiff proceeded with her arbitration Pro Se.

88     Google told Plaintiff that they would not have a phone conversation with her and that all communication would be done via email.

89     Google was uncooperative with Plaintiff throughout discovery and made false material statements in their discovery pleadings.

August 2018: Google Intimidates Potential Plaintiff-Side Witnesses

90     On August 21, 2018, Google's legal team sent out a mass email to a group of Google employees encouraging them to "reply all" and request that Plaintiff be prohibited from contacting them.  The email was highly prejudicial to Plaintiff and significantly misrepresented the status of the case and the arbitrator's recent order.  The email also employed intimidating psychological and social tactics that pressured employees to make the "no contact" request even if they otherwise supported Plaintiff.

On Tue, Aug 21, 2018 at 10:08 AM Natalie Parker <████████████████ wrote:
Hello,

As you may know, a former Google employee, Rebecca Spivak, filed claims against Google and those claims are currently pending in arbitration.
During the proceedings, Ms. Spivak has sent a number of communications to former and current Googlers through various platforms, including social media sites.  Based on the content and tone of these communications, the arbitrator has ordered that we furnish Spivak with a list of employees who have requested not to be contacted by her. Spivak is to honor those requests.
Please reply all to this email if you do not want Spivak to contact you.

If you have any questions, please email Michael Pfyl or Peter Cooper, both included on this email.
Thank you,
Natalie Parker

Natalie Parker | Sr. Employment Paralegal ████████████████ █████████████
1 Market Street, Spear Tower, Suite 400, San Francisco, CA 94105

COMPLAINT FOR DAMAGES - 21

91      Multiple employees who received this email were potential Plaintiff-side witnesses.

92      Multiple potential Plaintiff-side witnesses were biased against Plaintiff by the content and tone of this communication.

93      At least one Google employee who was otherwise a strong supporter of Plaintiff and a strong potential Plaintiff-side witness replied and requested that Plaintiff not contact him. He later explained that he did so because he felt intimidated and pressured to do what the lawyers asked.

94      As a result, Plaintiff was prohibited from contacting one or more Plaintiff-side witnesses and multiple Plaintiff-side witnesses were blocked or dissuaded from being available to testify on Plaintiff's behalf.


September 2018: Facebook Helps Google Create Misleading Evidence


95      By September 2018, Facebook had been actively recruiting Plaintiff to interview for a job.  Plaintiff had not been interested, but finally agreed to interview after being contacted by her former manager, who was then a director at Facebook, with promises of high compensation.

96      Google's lawyers were aware that Plaintiff was interviewing and specifically told her to make sure that she preserved all evidence related to her interview process.

97     At the conclusion of the interview process, Facebook sent Plaintiff a written offer for less than half the compensation she had been told to expect when she agreed to interview.

98     In violation of their own protocols, Facebook sent the written offer to Plaintiff without extending it verbally first.

99     The offer also contained terms that Plaintiff had already told Facebook were "deal-breakers." Facebook violated their own protocols in extending a written offer that Plaintiff had already effectively rejected.

100     Plaintiff turned down the offer without attempting to negotiate. She felt that Facebook had been intentionally offensive in forcefully sending her a written offer with terms that she had specifically told them she would consider degrading and that she didn't want to receive.

101     Plaintiff understood that the offer she received could be used by Google to support various allegations that they had made about Plaintiff's fair pay and level.

102     Plaintiff's former manager told Plaintiff that he was surprised that she had been given such a low offer and even more surprised that there had been no verbal offer first. He also told Plaintiff that there were additional things about Plaintiff's interview process that struck him as odd, including the fact that he had been told he had to stay out of the process.

103     Plaintiff alleges, and the circumstantial evidence strongly supports, that Facebook baited Plaintiff with promises of high compensation

and then forcefully sent Plaintiff an unwanted written offer because they had agreed to help Google create misleading evidence in Plaintiff's case.

### November-December 2018: Plaintiff Brings a Motion for Sanctions

104    While in arbitration, Google continued to lie, mislead, submit false evidence, and make material misrepresentations of fact.

105    Google's misconduct led to Plaintiff losing a discovery motion where she had asked for access to promotion data for the display advertising division under Neal Mohan. Plaintiff had considered this data critical to issues of liability and damages, and she was devastated when the arbitrator ruled in Google's favor based on outright lies in Google's discovery brief.

106    Because Google's misconduct was blocking Plaintiff from pursuing her claims on their merits, Plaintiff requested permission to bring a motion for sanctions. Permission was granted.

107    In her sanctions motion, Plaintiff documented Google's dishonesty in the arbitration and in the prior EEOC investigation. She pointed out that Google was in possession of multiple conflicting versions of emails that they claimed to not know were altered.  She pointed out that Google made statements of facts in briefs when the record in their possession shows that they knew those statements were false. She alleged that Google was resting

arguments on quotes from inapplicable case law that they must have known was inapplicable.

108    The arbitrator ruled against Plaintiff, saying the following: "Although not currently a practicing attorney, Spivak has a law degree and for a period of time was a member of the California State Bar.  She also has other advanced degrees and obviously understands the nature of the tactics in which she has engaged."

109    Plaintiff believes the order is open to various interpretations.[1]

110    One way to interpret the ambiguous phrasing of "nature of the tactics" is as an implication that the allegations that Plaintiff had made in her motion were criminal, not civil, by nature, and that they therefore were not appropriate for a sanctions motion in a civil arbitration.

111    Plaintiff alleges that although the arbitrator apparently ruled against her, the order seemed to take effort to intentionally validate many of Plaintiff's underlying allegations.

112    As one example, the following excerpt from the order could be interpreted to validate that when Google submitted the altered emails to the EEOC, they had reason to know those emails were altered. It could be

---

[1] On May 3, 2019, the arbitrator noted "I have to admit my orders are never 100 percent clear.  There's usually always room for interpretation."

interpreted as also purposely calling out Google's failure to candidly inform the

EEOC of the questionable "anonymous source" of those emails.

> Spivak has retained copies of her original emails. This has made it possible to determine that the emails submitted in the EEOC investigation and in this arbitration indeed had portions missing. However, Spivak's contention that Google obtained these emails by monitoring her email accounts and that Google made the deletions is based solely on suspicions and suppositions. This is insufficient to support a finding that Skakkebaek did not receive the emails from an anonymous source (as he has declared under penalty of perjury), or that it was Google that made deletions before submitting them to the EEOC and this Arbitrator.
>
> Spivak points out that Skakkebaek received copies of the same emails on two different days (February 12[th] and 13[th], 2015), and that there were modest differences between the contents of some of the duplicate ones, i.e., portions that appear on one day were absent on the other. From this she argues that Google should have realized that the anonymous sender had made deletions and thus Google should have had doubts about the authenticity of what it received and not submitted them to the EEOC or to this Arbitrator. However, when submitting these emails, Google did not make any representations other than that they appeared to be authored by Spivak. As it does not appear that Google did anything other than submit the emails it received, the fact that Google should have been more suspicious does not mean that Google knowingly altered those emails.

113     Plaintiff believes that the allegations validated between-the-

lines in the above excerpt are likely sufficient to support an indictment against

Google for obstruction of justice in the federal EEOC investigation.  The

distinction drawn in the last sentence may have been the logic used to deny

sanctions, but it's not material to whether Google's actions were criminal.

114     As another example, the order could be interpreted to validate

Plaintiff's allegation that the Petition to Compel Arbitration that Google filed

against her in 2015 was frivolous and brought to intimidate her.  Plaintiff

asked for Rule 11 sanctions against Google for filing that petition, and called

the petition "frivolous, without evidentiary support, and vexatious."  In

denying sanctions on that claim, the order says the following:

> In sum, Google had reason to believe that Spivak would file for arbitration in Kings County, Washington, and Google's effort to prevent that filing was successful. It was an appropriate response to Spivak's demand letter, and cannot be considered "frivolous, without evidentiary support and vexatious."

115    What's notable is that the thing that Google "had reason to

believe" was fully consistent with Plaintiff complying with the arbitration

agreement.[2] There would be no material difference if the sentence had instead

said: "In sum, Google had reason to believe that Spivak was planning to file for

arbitration in compliance with her arbitration agreement …"  That is

significant because Google's Petition to Compel Arbitration was based on an

allegation that Plaintiff was refusing to comply with the arbitration

agreement.  The order notes the opposite – that Google knew that Plaintiff

planned to file for arbitration in compliance with the agreement.

116    One could interpret the denial of sanctions as being based on

the following logic: Since Google's goal was to try to intimidate Plaintiff and

prevent her from filing for arbitration and pursuing her claims, Google's filing

of the petition was "appropriate" to that goal. Google had evidence and reason

---

[2] By JAMS policy, an employee filing for arbitration is to file with the JAMS location nearest to them (for Plaintiff that is King County, Washington). Venue is set later, by order of the arbitrator and after review of any applicable employment agreement. The location of filing has no effect.

to believe that Plaintiff would file for arbitration. Therefore, Google's lawsuit may have been frivolous and vexatious, but it wasn't all three of "frivolous, without evidentiary support, and vexatious" as Plaintiff had alleged.

117    A third example where the order is open to interpretation involves Plaintiff's allegation that Google fabricated a paper trail to cover up retaliation. On September 24, 2014, Plaintiff's manager, Jens Skakkebaek, had sent out retaliatory emails about her. Plaintiff found out and complained on September 29, 2014.  Plaintiff alleges that Employee Relations then told Skakkebaek to send out similarly-worded emails about others to cover up the retaliatory nature of the emails he had previously sent only about Plaintiff. Skakkebaek sent out a flurry of emails, all within minutes, early in the morning on September 30, 2014. When the EEOC asked Google if the September 24, 2014 email was retaliatory, Google denied it and gave the EEOC those September 30, 2014 emails. Plaintiff argued that Google had submitted a "fabricated paper trail" and requested sanctions on that basis.

118    Sanctions were denied with the following explanation:

> Even if Spivak's suspicions about Google's monitoring of her emails were shown to be true, and even if what was learned by that monitoring became the motivation for Skakkebaek's September 30th emails, that does not mean those emails were "fabricated;" there is no dispute the emails in question were sent out by Skakkebaek, as represented by Google.
>
> What Spivak is actually contending is that these September 30th emails should not have been given any evidentiary weight by the EEOC because of the allegedly improper motivation for Skakkebaek to include the "be honest" language.  This is very different from claiming that Google "fabricated" those emails.

119     One could interpret the order's reasoning as, again, validating Plaintiff's allegations even as it denied sanctions. Generating evidence for the specific purpose of misleading the EEOC and then submitting that misleading evidence to support a false statement is obstruction, regardless of whether Plaintiff could have used the word "staged" instead of "fabricated" to describe it. One could interpret the denial of sanctions on the semantics of the word "fabricated" as an implied validation of the substance of the allegation.

120     The above are just a few examples of different ways that parts of the order on sanctions could be interpreted. Plaintiff believes that there is nothing wrong or disrespectful in not taking the arbitrator's order at face value given that on May 3, 2019, the arbitrator stated "my orders are never 100% clear.  There's usually always room for interpretation."

121     Plaintiff believes that her motion for sanctions may have been denied, at least in part, for one or more of the following three reasons: (1) Plaintiff made multiple procedural mistakes in her motion that could later be used as a basis to challenge any sanctions award. (2) The arbitrator did not have jurisdiction, legal basis, or intent to rule on or grant sanctions for criminal allegations. (3) The arbitrator had already seen enough evidence to know both that Plaintiff wanted to win on the merits and that Plaintiff deserved to win on the merits, and so awarding sanctions that would likely have to be terminating sanctions would not be in the interests of justice.

122     Plaintiff believes that Google understood well before Plaintiff did that, despite appearances, Plaintiff had actually won on the sanctions motion, and that Google was now facing the possibility of some kind of criminal referral or future prosecution at the conclusion of the arbitration.

123     Even before Plaintiff had raised these allegations, Google had already spent years attempting to discredit Plaintiff. Google was facing significant liability on the merits of her claims and Google also had a class-based animus against women who raised discrimination claims.[3]  It was for these reasons that the stakes were high enough for Google to lie, mislead, and alter evidence in the first place.

124     Plaintiff believes that the stakes skyrocketed after her sanctions motion because Google and their lawyers now faced the possibility of future criminal prosecution.

125     Plaintiff believes that Google and Johnsrud became determined to extinguish the threat that she posed. They had to make her unavailable to testify as a witness. They schemed to find a way to have it be documented that Plaintiff had been legally insane and suffering from schizophrenia or some other previously undiagnosed psychiatric delusional disorder.

126     The following point must be stressed to support the factual allegations that follow in this complaint: After Plaintiff's sanctions motion, it

---

[3] This is a well-established allegation against Google.  Note the November 2019 "Google Walkout."

was no longer just about defeating Plaintiff's discrimination claims or about public-relations damage control if Plaintiff made her allegations public. With the evidence Plaintiff had presented, and with the arbitrator, a respected retired judge, already tacitly confirming in his order that Google had committed obstruction of justice, Google's lawyers were facing personal criminal liability and the likelihood of eventual prosecution and conviction. As a trillion-dollar corporation, Google was facing significant possible financial and regulatory consequences.

127    If there was formal proof that Plaintiff was delusional, she could be subsequently challenged as a witness on the grounds that she was being called to testify about events that had happened at a time when she lacked capacity to understand reality.

January 2019: Google Conspires with Plusmail

To Pay Plaintiff Off to Become Legally Insane

128    Prior to bringing her sanctions motion, Plaintiff had, for years, actively discussed her claims against Google with the Plusmail email group, via her Gmail account.

129    While Plusmail was originally formed through an affiliation of students working a technical-support job, a significant number of group members had since found their way to legal careers. The top two contributors

COMPLAINT FOR DAMAGES - 31

to the group, Bayern and Kayal, were respectively a law professor at Florida State University and a corporate attorney at Facebook.

130    In addition to discussing her claims with the group at large, Plaintiff had multiple private side conversations about her claims with Kayal, Bayern, and Russcol (another lawyer in the group).

131    Google was well aware that Plaintiff had been discussing her legal claims with Kayal and others, and Google had reviewed and was in possession of many of those email conversations.  Google had previously specifically requested that Plaintiff preserve her Plusmail emails.

132    Kayal, as a Silicon Valley corporate lawyer, ran in the same circles as Google's lawyers, and would have many shared connections. He would also benefit professionally from helping Google defuse a potentially explosive situation.

133    Plaintiff believes that after she brought her sanctions motion, Google's lawyers reached out to Kayal to have him help broker a deal where Plaintiff would receive a large payoff for formal legal proof of her insanity.

134    Plaintiff believes, based on evidence and on being additionally informed, that as part of the deal, Kayal and others in the Plusmail group would receive a money-laundered bribe for their role in the conspiracy.

135    Based on evidence and information, Plaintiff believes that the plan was something along the following lines:  Plaintiff would first have to

COMPLAINT FOR DAMAGES - 32

became legally incapacitated and have a legal guardian named.[4] Google would then quickly settle with that legal guardian. Due to Plaintiff's legal incapacity at the time of settlement, the settlement funds would be placed in trust, with Bayern, Kayal and others as trustees. The management fee they would receive as trustees would serve as the laundered bribe they had been promised.

136    Plaintiff believes that Kayal agreed to the plan and pulled Bayern and Russcol into the effort by early 2019. Plaintiff believes that others in the group, including Sherman and Cho, were pulled in by Spring 2019.

137    Plaintiff does not specifically allege that all Plusmail participants in the conspiracy had malicious intent.  Plaintiff believes that many of them may have been convinced that this deal was both a win and a windfall for Plaintiff. Plaintiff believes that Google told them that Plaintiff would be grateful for their help.

138    By January 2019, Kayal began making insidious comments and taking small invalidating jabs at Plaintiff and her claims. Many of the invalidating statements that Kayal made directly contradicted the strongly validating statements he had made about Plaintiff's claims months earlier.

139    For example, in advance of Plaintiff's motion in late 2018, and in regard to the altered evidence, Kayal said: "I'd be curious about their opposition to a lot of this.  The tinfoil hat shit about anonymous forwards is

---

[4] The plan was to convince Plaintiff to first give Bayern or Russcol durable power of attorney

amazing.  Did they get Alex Jones to be their legal consultant?"  He also said, "If they literally submitted that with that Message-ID: header, the arbitrator should throw the motherfucking book at them."

140     By mid 2019, Kayal had completely changed his tune, saying, about that same altered evidence, "What you're talking about is maybe – did someone on Plusmail actually send that one email to Google, or was that via the tap.  Either one is frankly plausible ...."  He also said "I'm *extremely* skeptical of any claim that Google could care enough to do something illegal here, especially when they are in active litigation on what's (to them) a mundane middle manager case."

141     Plaintiff noticed Kayal's seeming "180 degree" turn and found it disturbing and disorientating.  Plaintiff was too wary to confront him.

142     Bayern seemed to be set on weakening Plaintiff's confidence in the case in a more subtle and deceptive way. Bayern repeatedly offered "backhanded reassurances"[5] and overly-qualified statements that seeded doubt and fear and that were anything but reassuring.  For example, when Plaintiff suggested that a point worked in her favor, Bayern rejected Plaintiff's perspective and continued with the backhanded reassurance "that doesn't on its own mean that you don't have any shot in the rest of the arbitration."

---

[5] As used in this complaint, a "backhanded reassurance" is a statement pretending to be "reassurance" that actually introduces fear and doubt. Bayern used this tactic frequently with Plaintiff, proactively offering faint reassurance that something awful (that Plaintiff had not even been worried about) wasn't *necessarily* true. This is, in large part, how Bayern seeded and reinforced fear and ultimately led Plaintiff to believe she was the target of a murder plot.

<u>The Gaslighting of 2019</u>

143    As Kayal, Bayern, and others worked to disorient her, Plaintiff received other harassment that suggested that she was being watched and monitored. As part of this, Plaintiff received anonymous messages that referenced what her children were doing in the moment. Plaintiff interpreted those messages as threats against her children.

144    It was especially frightening because Plaintiff did not understand how it was happening or how far it could reach into her family's private seclusion. In hindsight Plaintiff came to understand some of it.

145    As one example, one day Plaintiff had an extended discussion about giving her children grapes and apples as a snack. Shortly afterward, Plaintiff received an anonymous message from someone claiming to be snacking on grapes and apples. Plaintiff now thinks that that likely happened through her refrigerator's integrated technology. Plaintiff's Samsung "Family Hub" refrigerator has a large interactive screen powered by Android (i.e. Google).  It is also voice activated with an integrated microphone and multiple interior cameras. Plaintiff had been in front of the refrigerator sorting through grapes and apples when the "grapes and apples" conversation happened.

146    On another occasion, Plaintiff received an alert on her phone via the app Blind that repeated the phrase that had just been said on the cartoon that her children were watching on their Amazon Echo Show.  Plaintiff

guesses that Google either had knowledge of what was playing on the device (either directly or by hacking Plaintiff's home network) or could hear what was being said through the microphone on some other device (Plaintiff's laptop, or maybe the smart refrigerator in the nearby room).

147   On another occasion, as her children were watching "My Little Pony" on Netflix, Plaintiff received a My-Little-Pony-themed pornographic email that seemed specific to the episode her children were watching.

148   On another occasion, Plaintiff purchased underwear online via her Chrome browser.  Not long after that, she was flooded with demeaning pornographic messages that made reference to the specifics of her purchase.

149   Plaintiff believes that, at one point, Bayern and Kayal tried to tell her that she needed to stop bringing her phone into the bathroom.

150   In addition to the "we know what your children are doing right now" sort of harassment, Plaintiff received many highly disturbing emails, some of which crossed the line from harassing to directly threatening. Plaintiff received a flood of explicit and degrading "porn spam" emails that used the name of her 6-year-old daughter.  Plaintiff received the life insurance ad below and many others like it.  The emails often contained no link to any actual business that sold life insurance.



151     Plaintiff is confident that these emails were intentionally sent to harass, intimidate, and disorient her.[6]

152     Plaintiff was not looking for "secret coded messages in her spam folder" as Kayal and others tried to allege.  She also never believed that every email she received was about her Google case.

153     Instead, Plaintiff alleges that over the course of a contentious and hostile legal situation in which she had made credible accusations that the other side had engaged in criminal misconduct, Google sent Plaintiff harassing emails, loosely disguising them as spam or marketing messages.[7]

154     Plaintiff has substantial specific career experience in the data science behind digital advertising. She designed and invented analytics and

---

[6] Plaintiff does not claim to be able to identify the source or intent of every email with 100% accuracy.
[7] Plaintiff notes that it would be very easy to discredit anyone as delusional if all you needed to do was show that they believed they were being harassed with anonymous "spam" emails. All you would have to do is actually harass them via anonymous "spam" emails.  As a non-random example, you could send them an onslaught of graphic and demeaning pornographic emails using their 6-year-old daughter's name.

COMPLAINT FOR DAMAGES - 37

targeting systems at multiple leading technology companies[8].  Plaintiff would be especially qualified to serve as an expert witness in some other case on how targeted advertising works and how different tracking and automation systems can make otherwise "innocuous" marketing seem incredibly creepy. The emails that Plaintiff received were not automated or innocuous.

155   Plaintiff attempted to discuss some of the unusual or harassing emails that she was receiving with Plusmail but found the responses to her concerns disconcerting.  Plaintiff sensed an over-eagerness from Kayal, Cho, and others to tell Plaintiff that she was delusional, as if they had been waiting for the opportunity.

156   Plaintiff "sanity checked" her interpretation of these emails with multiple individuals who were not part of Plusmail. They agreed with Plaintiff's interpretation that the emails seemed like intentional harassment.

157   Plaintiff knew from her professional experience working on targeted marketing that these were not normal marketing emails. She could not imagine that Plusmail would genuinely think otherwise or be so immediately dismissive of the idea that Google could be harassing her in this way.  The emails she was sharing were unusual at least, and certainly strange enough to be suspicious, even if Plaintiff was wrong about their origin or intent.  Being wrong is not the same thing as being delusional.

---

[8] Specifically, at Google and Amazon.  Additionally, Plaintiff's work at Expedia was highly related.

COMPLAINT FOR DAMAGES - 38

158     Plaintiff could not understand why people she considered friends were responding to her in this way, in an abrupt turnaround from months and years of supportive engagement. She did not understand their motivations or goals. Plaintiff was afraid because she could not identify a reasonable explanation for the collective behavior of the Plusmail group.

159     Conversations on Plusmail seemed to be increasingly baiting her to make paranoid-sounding accusations. Specific or unusual phrasing related to Plaintiff's legal case started appearing in unexpected or nonsensical ways in seemingly unrelated Plusmail conversations.

160     Plaintiff purposely avoided acknowledging what they were doing or calling anyone out on it.  She didn't understand it and was afraid to confront it. The more Plaintiff avoided "taking the bait," the more over-the-top the references became.

### May 3, 2019: Plaintiff Considers Withdrawing from Arbitration

161     Plaintiff knew that her discrimination and retaliation claims were very strong and well-supported by evidence, but she was growing increasingly distressed and panicked by the threats and gaslighting.

162     On May 3, 2019, during an arbitration call, Plaintiff made the following statements: "Your Honor, Google is threatening me. I don't know what else to say." Plaintiff also said "Every single –every – the intimidation

and the threats, I don't know how to explain it. I can't survive this." She also said "I'm going to have to withdraw from arbitration. I can't. I can't."

163    The arbitrator did not accept Plaintiff's request to withdraw, and instead encouraged her to stick with the case. The arbitrator said "I can tell you truly feel you have some very important claims here, and it's an important legal issue in terms of gender discrimination by a company such as Google. I encourage you to pursue those matters." The arbitrator also said, "I'm not accepting your representation that you want to withdraw."

164    The arbitrator made repeated statements encouraging Plaintiff to stick with the case and see it through. The arbitrator ordered a stay so that Plaintiff could consider her options.

### May 2019 – The Question of *Gonzalez v. Spivak*

165    On multiple occasions throughout 2018 and 2019, Law Firm Partner Ray Blessey sent Plaintiff emails, sometimes with attached settlement offers or discussions, that were purportedly intended for his client, Dr. Ryan Spivak, in regard to the case *Gonzalez v. Spivak*.

166    Plaintiff alleges that regardless of anything else, it would be highly unusual and unexpected, and also a basis for lawyer discipline, for a partner in a law firm to repeatedly send privileged communications to the wrong email address, without ever realizing it.

167     Plaintiff found the emails that Blessey sent her disconcerting. First, they were inherently odd, with preambles and context-setting that wouldn't have been necessary for ongoing communication between an attorney and client.  Second, after reviewing the public record of the case, Plaintiff noted that the specific details of the case itself (a liposuction injury with a television personality as the expert medical witness and three years of no case progress) also seemed surreal.  Third, the emails Plaintiff received seemed to discuss matters that paralleled Plaintiff's case. And, again, it made no sense that a law firm partner could repeatedly be so careless in sending privileged emails to the wrong person.

168     Plaintiff alleges that Blessey agreed to help Google intimidate and gaslight Plaintiff in a plausibly deniable way and that Blessey did not send her those emails by accident.

169     Plaintiff was distressed by *Gonzalez*.  It involved at least four law firms and a judge. If the case was "fake" or somehow otherwise connected to her, it would mean that Plaintiff was in the middle of something much bigger than the arbitration of her gender discrimination claims.

170     Plaintiff raised concerns about the case with Plusmail and in separate threads with Russcol and Bayern.  Plaintiff felt that Russcol and others purposely implied that they knew something about the case that they weren't telling her.

COMPLAINT FOR DAMAGES - 41

171    On May 17, 2019, Plaintiff asked Russcol to tell her what was going on, saying, "I really need someone else to sanity check whether the thing seems fake[9]." Russcol responded equivocally, "it seems quite plausibly real."

172    Plaintiff was incredibly distressed that people she trusted were using qualified and equivocal language in their communications and seemed to be intentionally refusing to give her clear answers to basic questions.

173    As her distress increased, Plaintiff raised her concerns about *Gonzalez* in an email sent to both the arbitrator and Google's attorneys.

174    On May 31, 2019, Plaintiff again begged Russcol for a normal answer that she wouldn't have to parse. The fact that everyone was talking to her in riddles scared Plaintiff more than the case itself did and she tried to tell Russcol how distressed she was that no one was being direct with her. Plaintiff wanted assurances that she could trust and depend on her friends. Russcol was equivocal and evasive, telling Plaintiff, "I'm not convinced it's a fake case."

175    The same day that Plaintiff discussed her concerns about *Gonzalez* privately with Russcol, she also shared them with the broader Plusmail group. The responses there were also strange, evasive, and equivocal.

176    Instead of offering her own opinion on whether the case was real or otherwise responding normally, Sherman said the following: "the

---

[9] Plaintiff notes that when people are delusional, they don't generally ask others to tell them what's going on.  To Plaintiff's best understanding, a delusion is a fixed and bizarre belief that completely disregards evidence to the contrary.  Plaintiff wasn't telling people what was true – she was begging them to tell her what was true, and growing increasingly distressed as no one would give her a direct answer.

number of people who would need to have been paid off to fabricate an entirely imaginary case history here is extraordinary, and most of them have nothing whatsoever to gain from the outcome of your case. Some of them are public officials, so have a great deal to lose."

177    Sherman also said  "We are, of course, talking about someone who is suing an already-disciplined surgeon for a liposuction injury in a case in which the defendant's expert witness is a Newport Beach plastic surgeon best known for his roles on E! television's series "Botched" and "The Real Housewives of Orange County." I mean, it would be hard to make this stuff up!"

178    Plaintiff read Sherman's response several times to understand the meaning.  Sherman's reference to "public officials" and the nuance in the change in tense made Plaintiff's thoughts and fears spiral. Was Sherman implying that Plaintiff had outed a corrupt judge who had a "lot to lose" because of Plaintiff?  What was she saying?

179    Plaintiff's terror became unbearable as her trusted friends talked to her in riddles and refused to provide straight answers to basic questions when she was already in a heightened state of alert because of the threats and relentless harassment.

180    Plaintiff felt that Sherman's emails were some kind of wink that she could not understand.   Plaintiff ached for a clear response that could not be interpreted in multiple competing ways.

COMPLAINT FOR DAMAGES - 43

181     This pattern of receiving confusing responses from Plusmail to Plaintiff's requests for advice and support was unbearably disorienting and felt more ominous than anything about *Gonzalez.*

182     Later that evening, Plaintiff sent Sherman a text begging Sherman to be direct with her and trying to convey how frightened she was.

183     Thinking more about the implications she believed Sherman had made in mentioning "public officials" having a "lot to lose," Plaintiff wanted to know how she could recover from having made herself a target.

184     Sherman remained evasive. She instead insisted that Plaintiff forget about the case, drop everything, and get to the ER, "now."



185     With the context of other messages that Sherman and others had sent, Plaintiff interpreted that urgency as a confirmation that *Gonzalez* involved organized corruption, and that she needed to quickly discredit herself

to be safe.  Plaintiff felt more afraid than she had ever felt before in her life and was genuinely worried that she might have a heart attack.

186     Plaintiff arranged for childcare and went to the Emergency Room, as Sherman insisted.

187     If there was no conspiracy set on having Plaintiff declared as delusional, Sherman could have responded to Plaintiff's obvious panic in many other ways.  Instead of evading Plaintiff's request for a direct answer and intentionally terrifying her that she needed emergency care, Sherman easily could have said something like "Calm down. I don't know if the case is fake or not, but I never meant to suggest you were in danger." Sherman could have made an effort to offer Plaintiff some kind of reassurance that she was safe. Sherman did the opposite.

188     When Plaintiff went to the Emergency Room, she was very afraid about the range of possible implications of having complained to Google and the arbitrator about *Gonzalez*, and the fact that she was losing any kind of sense of who the "bad guys" were.  Plaintiff's blood pressure was dangerously high and was itself a basis for hospitalization.

189     Based on her best understanding of what Sherman and Russcol had told her she needed to do, Plaintiff asked to be admitted to psychiatric hospitalization. Plaintiff knew she was not suffering from psychosis and had not had any kind of psychotic break.  She was trying to do what people she trusted told her she needed to do to be safe.

COMPLAINT FOR DAMAGES - 45

190   Plaintiff was afraid and panicking because people she trusted had purposely terrified her and told her that she needed to go to the emergency room. She assumed that she was being told that a hospital stay could undo whatever damage she had done with her recent comments.

191   Plaintiff now believes that some of those involved in scaring her and convincing her to go to the hospital assumed that she understood that she needed to receive a (false) delusional diagnosis. Plaintiff did not understand that. She certainly didn't understand that she was expected to cooperate in generating a paper trail so that she could be disqualified from testifying in future criminal prosecutions against Google.  She thought she was in the hospital to protect herself from an immediate threat to her life.

192   Plaintiff did not take antipsychotics or demonstrate psychosis while in the hospital.  An internal medicine doctor was assigned to treat her hypertension. Plaintiff was discharged once her blood pressure had stabilized.

193   Plaintiff was discharged with a prescription for high blood pressure, and without any psychiatric diagnosis.  Plaintiff's discharge papers explicitly asserted that it was highly unlikely that she had any kind of bipolar/schizoaffective/delusional disorder, and that her admission may have been stress related.

194   Plaintiff's discharge papers also noted that over her five-day stay, Plaintiff showed no signs of alcohol withdrawal. Plaintiff's labwork showed no evidence of substance abuse or alcoholism or related vitamin

deficiencies. In short, Plaintiff was discharged from psychiatric hospitalization with an endorsement that she did not have a psychiatric illness and that she was not physically dependent on alcohol or any other substance.

### July 2019: Bayern Convinces Plaintiff to Abandon Her Case

195    To some extent, Plaintiff assumed that because she had spent five days in psychiatric hospitalization, she had done damage control for having raised concerns about *Gonzalez*.

196    Despite this, Plaintiff was still actively terrified from the harassment and gaslighting, which continued to escalate.

197    In July 2019, Bayern proactively initiated direct chats with Plaintiff, encouraging her to install the app Signal so that their chats would be encrypted.  He told Plaintiff that she was suffering poor mental health and urged her to abandon her case by requesting an "indefinite stay."  Plaintiff pushed back on Bayern. She didn't want a stay as she didn't want to drag the arbitration out any further.  Plaintiff felt she needed resolution and validation of her claims and she wanted to see the case through to verdict.  She had spent nearly five years of her life in that pursuit.

198    Bayern was insistent, and talked cryptically, implying that there was something Plaintiff didn't understand. Plaintiff tried to understand

what Bayern was trying to tell her and was frustrated that she couldn't get him to speak plainly and clearly, without qualified, riddling language.

199    Bayern pushed Plaintiff to discredit her prior accusations against Google in her motion, and to imply that she didn't have the evidence to support those accusations.  Plaintiff pushed back that she did have proof for her allegations.   Nevertheless, Bayern pushed her to add specific language to her "indefinite stay" motion (which was his idea in the first place).

- Along lines like: "I have of course raised several significant ways that Google has tried to intimidate me and deal harshly with me in this case. Whether or not those can be proved as a matter of legal procedure is beside the point; medically what's important is the stress they have caused me and that needs to be treated before I can properly continue the case."

JUL 16 5:24 PM

200    Plaintiff repeatedly told Bayern that she was fighting her case on principle, that she didn't want to settle, and that she wanted to make it to verdict and win – even if she won a small fraction of what she could have otherwise settled for.

201    When Bayern continued to push Plaintiff to abandon her case and to tell the arbitrator that she was suicidal, Plaintiff's fears and concerns about a bigger plot resurfaced. Bayern made it clear that he knew something that he could not tell her.

202    Bayern repeatedly and specifically pressured Plaintiff to establish "formal proof" that she was incompetent.

COMPLAINT FOR DAMAGES - 48

> • it's not fair that i have to drag this out
> JUL 17 7:47 AM
> • I agree. I completely empathize with that feeling of impatience.
> JUL 17 7:48 AM
> • is the idea that I will be declared incompetent
> JUL 17 7:48 AM
> • As you know, the law just cares about the procedures, etc. Formal proof, etc.
> JUL 17 7:48 AM

203    Bayern's response that "the law just cares about the procedures, etc.  Formal proof, etc." is not consistent with any kind of genuine concern that Plaintiff was actually delusional and in need of treatment.  It is fully consistent with the idea that this was about disqualifying Plaintiff as a witness or otherwise generating documentation for some legal purpose.

204    While in retrospect it may seem obvious, Plaintiff did not understand what was going on and couldn't see the conspiracy at the time.

205    Like many scientists, Plaintiff is direct and fact-based by nature.  During this time, she was living in a heightened state of fear, perpetuated by the threats and intrusions into her personal life, by the surreal absurdity and evasiveness happening on Plusmail, and by Bayern's doublespeak. Plaintiff had relied on this group of friends for camaraderie for twenty years.  They wouldn't cause her this much distress if they had a choice.

Plaintiff concluded that the only logical and justifiable explanation for their behavior was that Plusmail was trying to protect her life.

206     Throughout July 2019, Bayern continued seeding Plaintiff's fears, for example, repeatedly cryptically telling Plaintiff that he would be really afraid if he was in Plaintiff's shoes.  Bayern's sympathetic validation that Plaintiff's fear was justified coupled with his refusal to say why the fear was justified fed Plaintiff's escalating terror.

207     Even as she realized that talking to Bayern made her more afraid, Plaintiff attributed altruistic motives to Bayern's actions. She believed he was trying to protect her. They were good friends. She rationalized that if he was talking cryptically it was because he was somehow constrained.

208     Bayern repeatedly planted the idea that the arbitrator was corrupt and that it was the arbitrator, and not Google, who posed the threat to Plaintiff.  Bayern planted the idea that Google's lawyers were trying to help her get out of a corrupt situation and that the arbitrator was trying to keep Plaintiff in the arbitration out of greed and self-interest.[10] Google brought a Motion to Dismiss for Failure to Prosecute that made similar implications.

---

[10] Plaintiff does not believe this and does not allege this. Plaintiff believes Google needed to make Plaintiff afraid of the arbitrator because the arbitrator wasn't afraid of Google.

July 20, 2019 Plaintiff Causes Dismissal of Her Case

and Gaslighting Continues

209    On July 19, 2019, the arbitrator granted Plaintiff a ninety-day stay to give her time to decide whether she wanted to continue with her case.

210    Plaintiff was still terrified for her life and she was paralyzed by that fear and by unbearable disorientation. For a short period of time, Bayern and Johnsrud managed to convince Plaintiff that it was the arbitrator who was threatening her and who wanted to hurt her.  They convinced Plaintiff that she had been wrong about the source of the corruption and that Google's lawyers were the heroes trying to help her.

211    On July 20, 2019, the day after she had been granted a ninety-day stay, Plaintiff requested that her case be dismissed with prejudice.

212    When Plaintiff told Bayern that she had requested that her case be dismissed with prejudice, Bayern was congratulatory.  He told Plaintiff he was happy for her and now all she needed to do was go get a delusional diagnosis and prescription for antipsychotics.

213    At the time that Bayern congratulated Plaintiff, she could have retracted her request, as the arbitrator had not yet ordered the dismissal.

214    Even if Bayern had truly believed that Plaintiff was delusional, it would not make sense for him to support Plaintiff dropping her case. Plaintiff had been fighting the case for nearly 5 years and had spent more than

$300,000 out-of-pocket on legal fees. She had just been given a ninety-day stay. She had also recently received a settlement offer from Google (that appeared to be worth $100,000[11]) that she likely could have still accepted.

215    In the days after Plaintiff dropped her case, Bayern continued to scare Plaintiff as he pressured Plaintiff to give him durable power of attorney and then reenter psychiatric hospitalization. Bayern continued making cryptic references to threats against Plaintiff's life.

216    Because of the gaslighting and threats over the prior seven months, and because of the new things that Bayern was implying, Plaintiff genuinely believed that there were active threats against her life and that she was in danger of immediate harm. Plaintiff had come to depend on Bayern, and she looked to him for guidance on how to stay safe.

217    Whenever Plaintiff asked Bayern about specific threats, he responded with disconcerting ambiguity.  For example, Bayern often qualified his statements with words like "usually" or "ordinarily" in a way that could be interpreted as either suggestive of the rule or the exception to the rule.

218    The following is one example where Bayern purposely scared Plaintiff with gratuitous, unnecessary, and strange qualifiers.  He could have answered with just the last sentence and further reassurance.

---

[11] Plaintiff now knows that Google was expecting her to understand that they were actually offering her $100 million.  She did not understand that at the time.

COMPLAINT FOR DAMAGES - 52

- have there been attempts on mylife
JUL 24 4:35 PM
- external attempts
JUL 24 4:35 PM
- I would have no way to know. But if you're asking for my guess as just a random person in the world whose judgments generally are considered smart and adaptive (sorry for the self-praise!), my answer is: I very strongly doubt it.

219     The following is another example. At the time, Plaintiff was at the Seattle FBI Field Office, panicked, because Bayern had convinced her that there was an imminent threat to her life.  Plaintiff was afraid to leave the FBI building.  Bayern's response is another example of his use of unnecessary qualifiers and faint reassurances that served to terrify Plaintiff.[12]

- If they send me away I'm going to die
JUL 24 9:48 AM
- I think you're safer than that, although of course I don't have all the information. I think there are probably other ways you can make yourself feel safer.

220     Bayern told Plaintiff that she needed a seven-day inpatient hospital stay, and that she should plan to be discharged with a prescription for antipsychotics. He did not encourage therapy. Bayern also repeatedly tried to

_____

[12] Because of Bayern's response, as Plaintiff eventually walked out of the FBI building, she believed she was seconds away from being shot.  Plaintiff identifies this event as the single most traumatic moment in her life. She has recurrent flashbacks and nightmares related to it, and those fueled many of the aggressive emails she subsequently sent Bayern.

COMPLAINT FOR DAMAGES - 53

induce Plaintiff to give him power of attorney over her estate by proactively

offering to help her with paperwork that would have required it.

- I do think a hospital is probably the easiest and safest choice, rather than finding a specific appointment time, etc.

JUL 21 12:05 PM

- Being in a hospital doesn't trigger a competence hearing. You'll have time to sort out any legal affairs, etc.

JUL 21 12:06 PM

- Again, if there are deadlines with Amazon, I can try to help with that as much as they'll let me. You might need to tell them that I'm authorized to file the paperwork, etc.

221    Plaintiff kept trying to get Bayern to tell her what was going

on, but he kept scaring her and pushing her into a psychiatric diagnosis.

- would I be safer if it turned out that I was delusional after all

JUL 24 5:07 PM

- or would I be safer if it was documented that I wasn

JUL 24 5:07 PM

- Maybe just reach a state where you think "Okay, I've worked this out" and then move onto completely unrelated things. You could say "My life's in danger. Nothing I can do - life is always a risk. Let's play with my kids."

JUL 24 5:07 PM

- As to your question, I would just hope that you can find a psychiatrist who can give you effective treatment, whatever the truth is.

JUL 24 5:08 PM

- Hypothetically, why would be being delusional be such a bad thing if it can be treated? It would be a medical issues like any other.

JUL 24 5:09 PM

COMPLAINT FOR DAMAGES - 54

222    The chat history shows that Bayern did not actually believe that Plaintiff was delusional.

> • I mean, say hypothetically you are delusional. Why not just treat that as a problem to solve? Nobody would blame you for it, particularly if it was partly or completely induced by adversaries.
>
> JUL 24 5:12 PM
>
> • Or say, again hypothetically, you have a condition that isn't literally "delusional" but can be treated by a psychiatrist who classifies it that way because our procedures and technology are imperfect?
>
> JUL 24 5:13 PM
>
> • In either case, getting treatment would be the best option.
>
> JUL 24 5:13 PM

223    Plaintiff believes that on one or more occasions, as it seemed that purposely terrifying Plaintiff wasn't producing the results Bayern wanted, Bayern tried to switch tactics and tell Plaintiff that she would receive a large payout if she went along with the plan to be diagnosed as delusional.  For example, at one point Bayern told Plaintiff "If treatment is successful you can do whatever you want … "

224    On July 28, 2019, as Plaintiff still wasn't cooperating with the pressure to pursue a delusional diagnosis, Bayern finally admitted, in a way that Plaintiff could finally understand, that the gaslighting had been about driving a settlement.[13]

---

[13] Even though Plaintiff's case in arbitration had been dismissed, Plaintiff had options to appeal or bring other claims, including the ones in this complaint.

COMPLAINT FOR DAMAGES - 55

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

225    Plaintiff was furious.  The gaslighting had been acutely traumatic and she had desperately begged for it to stop, telling Bayern and others that what they were doing was killing her. They had made her believe she was going to be murdered and that her children would be brutalized.

226    Plaintiff suffered and continues to suffer from many symptoms of Post-Traumatic Stress Disorder (PTSD).

227    As a way to try to document the acute fear and disorientation that she felt, Plaintiff assembled this collage containing the actual chats and messages she sent while begging the people she trusted to stop gaslighting her.



228     In the months subsequent to Plaintiff learning that it was all a manipulation, Plaintiff sent Bayern many angry emails, telling him of the PTSD flashbacks she suffered because of what he did.  With nowhere to flee, Plaintiff often had to visualize "fight" just to breathe. Bayern had been the one terrifying her and making her believe that her own murder was imminent. He did it at the same time that he had Plaintiff convinced that he was the one guiding her and the only one keeping her safe.

October 2019:  The Bar Complaint and the Injunction against Stalking

229     In or before October 2019, Plaintiff let it be known that she would be filing a bar complaint against Kayal and potentially pursuing civil remedies against Kayal and Bayern for what they had done.

230     On October 10, 2019, Russcol sent Plaintiff a thinly veiled threat, suggesting that if she did anything to hurt their reputations, they would get a restraining order against her based on the emails she had sent Bayern the month prior.  Russcol admitted that he knew that Plaintiff's emails did not actually contain credible threats.

231     Plaintiff told Russcol that she was glad that they knew that she had no intention to physically hurt anyone and noted that Russcol was the one threatening her.

232     Despite the threat from Russcol, Plaintiff filed the planned bar complaint implicating Bayern and Kayal.

233     A few days after Plaintiff filed the bar complaint, Bayern followed through on the threat and filed for an emergency Injunction Against Stalking, based on emails sent to him by Plaintiff (nearly a month earlier, and from 3,000 miles away) that, as Russcol had already acknowledged, contained no credible threats.


<u>Bayern Lies in His Declaration About Plaintiff's</u>
<u>Reasoning to Make Her Sound Delusional</u>


234     Bayern's declaration in support of the injunction seemed intent on presenting Plaintiff as delusional. It also contained false and misleading statements.

235     For example, in his declaration, Bayern wrote "she repeatedly expressed the belief that an unrelated legal case involving an unrelated party named Spivak was 'fake' and designed to fool her because she believed dates and numbers in that case corresponded to dates and numbers that were significant to her."

236     Bayern knew that Plaintiff was actually concerned about *Gonzalez* because Blessey kept "accidentally" emailing her, and because the

COMPLAINT FOR DAMAGES - 58

emails were highly unusual, as was the underlying case itself. Bayern knew

because Plaintiff had previously explained these things to him and others with

supporting evidence and solid reasoning for her suspicions.



**Rebecca Spivak**
Wednesday, May 15, 2019 at 9:37 AM
Shawn Bayern;  David Russcol
Show Details

Go here http://www.lacourt.org/casesummary/ui/

And look up this case:
BC635130

It is a case titled "Gonzalez vs. Spivak"

I have a certain suspicion, based on information I can't share, that this case, or some parts of it,  might possibly be a fiction.
To what extent could this sort of case exist in the records without an actual plaintiff?

I mean, there's just weirdness. To the extent that there are interesting similarities between the cases in the timing of certain things, like changes in attorney
and other things, it must be a coincidence. To the extent that any communications regarding potential settlement of that case were sent to me over the past
year (with all caps subject line GONZALES vs. SPIVAK), I would have assumed those attorney sending those emails was just not careful about checking that the
email address was right, and that's why I would not have read or paid attention to those unusual emails.

But, if I wanted to check if the plaintiffs in the case were real ... if they ever actually appeared ... how would I do that?

**Rebecca Spivak**
Thursday, May 16, 2019 at 4:02 PM
David Russcol;  Shawn Bayern
Show Details

 You replied to this message on 5/16/19, 4:24 PM.                                     Show Reply 

I spent a bunch of money buying some of the case images.  It's totally fake.  It's crazy that they built up a 3-year paper trail of a case.  The documents are all
nonsense with substance.  Clerical corrections, uncontroversial jury instructions, etc.
There is no appearance or declaration by the actual parties.  It's all lawyers pushing things around for 3 years without any meaningful dispute about anything.

Also, the documents that were sent to my email address "accidentally" have a bogus proof of service.  The lawyer for Dr. Ryan Spivak is supposedly forwarding
Dr. Spivak a settlement offer that they received from the plaintiff.
But notice how it never says it was actually mailed or put anywhere where it would be picked up.  Also, the quotes on "readily familiar"

**Rebecca Spivak** <rspivak@gmail.com>                          May 31, 2019, 8:44 AM   ☆   ↩   ⋮
to Plusmail, vlad ▾

Of course he's a real person.  He's the defendant.  He's got a history with the California medical board for fraud and is on a 7-
year probation.
The plaintiff is fake.
The case has a 3 year history of lawyers pushing paperwork around and no actual disputes.  And the emails I received from the
lawyers are nonsense.  For example, in one email, the lawyer is supposedly talking to his client, and only mentioned halfway
into the email that, by the way, he just heard that one of the plaintiff's had died.
You would think if a lawyer was emailing his client, that would kinda be the first thing you'd mention.  Not a by-the-way thing that
you say towards the end.
⋯

237    Whether or not Plaintiff's suspicions were correct, Bayern knew that Plaintiff's suspicions about the case were rational and supported by evidence, and not because of "dates and numbers that were significant to her."

238    Plaintiff continues to believe that many aspects of *Gonzalez* seem highly unusual, improper, and not likely legitimate.  Plaintiff's belief is not based on dates and numbers that are significant to her.  Plaintiff believes that as a legal professional, Bayern could look at the case docket and come to that same conclusion.

Bayern Lied in His Declaration About Plaintiff's Support Network

239    On July 21, 2019, as part of their chats, Bayern told Plaintiff that he was jealous of her support network.  Specifically, Bayern said "I'm almost envious :) - I don't think I'd have that sort of network to support me locally."

240    On July 22, 2019, as dozens of Plaintiff's local friends rallied to support her, Bayern told Plaintiff, "I'm very glad to see how many friends you have who care about you in Seattle."

241    On July 23, 2019, Bayern told Plaintiff "many people on plusmail are your friends!" and "I was glad to see you had such a good local group of friends"

242     As part of his declaration, in justifying why he personally spent so much time talking to Plaintiff, Bayern said "Rebecca did not, and does not, appear to have other significant social or familial support."

243     Bayern's statement "Rebecca did not, and does not, appear to have other significant social or familial support" directly contradicted many of his stated observations and assertions regarding his perceptions of Plaintiff's support network for the relevant time period.

Bayern Lied in His Declaration about His Relationship with Plaintiff

244     In the years prior to July 2019, Bayern and Plaintiff had spent countless hours in private chats discussing all sorts of personal matters.

245     In one-on-one private chats, Bayern shared with Plaintiff many highly personal details of his life, including dating, sex, friendships, and Bayern's personal insecurities.

246     Over the years, Bayern and Plaintiff had many long private conversations on all sorts of topics that were indicative of close friendship.

247     In one conversation, Bayern specifically appealed to his "close friendship" with Plaintiff to justify why he was spending so much time obsessing to her about an interpersonal issue.

**me**: shawn, you have just spent 20 minutes talking to me about this
and I BET
or I'm pretty confident
that you've done the same with another half dozen people
**bayern@gmail.com**: actually, no, not this time
i did ask the general questions (the other day) of a few other people, but i'm not talking to anyone else today about it
why is 20 minutes too much time?
i mean, for you it is, so sorry :)
**me**: no that's not the point
it's 20 minutes of obsessing on something
hat you've been obsessing on for days
**bayern@gmail.com**: that's not normal for a close friendship?

248     On November 4, 2014, Plaintiff had asked Bayern to be

executor of her will, as he had previously offered.  Bayern agreed and was so

named.

249     In past years, Bayern and Plaintiff spent many hours talking

about Bayern's wardrobe, with

Bayern specifically seeking

Plaintiff's advice.  Plaintiff gave

Bayern shopping tips and bought

him sweaters as gifts.

250     After Plaintiff's

daughter was born, Bayern visited

Plaintiff and gave Plaintiff's

daughter a signed book in which he

inscribed "You're lucky to have the

mother you do!  Say hi to her for me (once you start talking!).  Love, Shawn."



251    As part of his declaration, Bayern described Plaintiff as merely an acquaintance and also made the specific statement "Rebecca and I were not close friends."

252    Bayern's statement about his historical relationship with Plaintiff as an "acquaintance" was misleading, and Bayern's statement that they "were not close friends" was false.  Bayern and Plaintiff had countless hours of private and highly personal chats.  Bayern had given Plaintiff's daughter a book that he signed with "Love, Shawn."  He had been named as executor of Plaintiff's will. He had specifically referred to their friendship as "close friendship."

November 2019: Plaintiff is Convinced to

Fly to Tallahassee for the Hearing

253    After the temporary emergency injunction was granted, a hearing was scheduled in Tallahassee to determine whether the injunction would be made permanent. Plaintiff originally had no plans to make an appearance at the hearing in Tallahassee.

254    Over the summer, Plaintiff had been contacted by a man named Luke Adams, who was purportedly in sales, but who Plaintiff quickly assumed and understood was working for Google.

255     Adams eventually told Plaintiff that he ran a company called iBond Consulting and that he was a high-stakes negotiator.

256     Over the course of multiple months, often during business hours, Adams spent many hours on the phone talking with Plaintiff about her thoughts and plans regarding her Google case.

257     Adams canceled and rescheduled his work meetings to have social conversations with Plaintiff. The conversations between Plaintiff and Adams focused almost exclusively on Plaintiff's case and claims and on Plaintiff's resentment of the gaslighting.

258     Plaintiff understood that Adams was an agent of Google, but she liked talking to him because he didn't pretend that the gaslighting hadn't happened and he didn't talk to Plaintiff in riddles.

259     At one point, in regard to Bayern, Adams told Plaintiff "you'd think if someone was going to try to pull off this sort of plan, they'd tell you about it rather than trick you into it, right? So … look. Shawn thought he *did* tell you.  He claims he thought he told you."

260     Adams also told Plaintiff that Google needed her to be a "Nutter and a Stalker and a Criminal."

261     Adams told Plaintiff that she should consider going along with that idea long enough for it to make it to settlement.  Adams told Plaintiff that every time it seemed that she was starting to go along with it, she sabotaged it and didn't see the process through long enough for it to work.

262     Plaintiff told Adams that after all the gaslighting and manipulation, she cared most about getting answers and psychological peace.

263     Adams encouraged Plaintiff to go to Tallahassee for the hearing.  "Maybe nothing will happen. But maybe this whole injunction is about getting you down there so that this can settle in person. Maybe you will get all your answers and the peace you are looking for. You have nothing to lose.  Don't waste this opportunity at what might be waiting for you."

264     Plaintiff allowed Adams to convince her to go to Tallahassee because Adams told her that going might get her answers and closure.


November 6, 2019: Plaintiff is Arrested in Tallahassee


265     Through the backchannel, Plaintiff had been told that Bayern would meet her in a park near her hotel and tell her everything. Plaintiff was wary, but still blinded by a hope for answers and closure.

266      Plaintiff went to the park and waited.  No one showed up.

267     Over the course of the next couple of hours, Plaintiff was convinced (via the backchannel) to run around to various places. Plaintiff was played and worn down. She had wanted so much to believe that she'd get answers and peace that she pushed aside the obvious fact that they were just playing her. No one ever met her.

268     After Plaintiff had spent hours being manipulated into thinking someone would meet her, Google, through the backchannel, pushed Plaintiff to call Bayern or send him a text message.

269     Plaintiff came to realize that she had been tricked into taking the trip so she could violate the injunction locally and be arrested.

270     At that point, Google and Bayern had destroyed whatever hope or resilience Plaintiff had left. Without seeing any other escape from the relentless harassment and ongoing threats, Plaintiff decided to surrender and give Google what they wanted.  As Adams had told Plaintiff, she needed to be "a Nutter, a Stalker, and a Criminal."

271     Plaintiff believed that sending Bayern a text and having him have her arrested for that text could provide the proof that Google and Bayern needed to establish that she was delusional.

272     Plaintiff sent Bayern a text telling him she was sorry for the emails she had sent him. She added multiple gratuitous statements asserting psychosis.  It was an attempt at a complete surrender.

273     There was nothing threatening or aggressive in the text message that Plaintiff sent Bayern. The text message was intentionally self-incriminating in an over-the-top way.

Shawn, I don't want to cause you any distress.  I wish we could talk before the hearing tomorrow.  I was drunk when I sent those emails and I never intended for you to take them as threats.  I just wanted to express the pain I was feeling, and had no impulse control because I was drunk.  I would never do any of those things and I'm sorry I sent those emails.  I was drunk and hurting from 3000 miles away.  Anyway I hope you take this email as intended and not as any kind of harassment.  I really wish we could talk.

I've been diagnosed by my doctor with alcoholism and alcohol-induced psychotic disorder with delusions.  I'm on medical leave from work and have started substance abuse treatment.  My doctor says she believes I'm not a threat and that I would never have acted on the things I wrote about.  I could show you that paperwork.  I have it with me.  I just want you to know that I really don't want to hurt or scare you, and I'm getting treatment.  My only goal in sending you these messages is to try to make amends in done way or make you feel less afraid of me.  I need help,and I'm getting it.

Anyway, there's a 5:00 am flight back to Seattle and I think I'm going to take it.  If you want the injunction to be permanent, I won't contest it.  I just wanted to show you that even my doctor doesn't think I'd act on any of it in case that helped you feel less afraid.  But maybe the best thing form e to do is to just go back home and not fight the injunction.  I wish you well and will probably spare you the pain of having to see me tomorrow.

274    Plaintiff sent the text under duress, and while despondent, after an incessantly brutal campaign of gaslighting, harassment, and psychological manipulation. In the moment, Plaintiff felt that purposely getting arrested and giving herself a criminal record, as Google wanted, was her only chance at safety.

275    After sending Bayern the text, Plaintiff sat on the ground in the park and waited to be arrested. No one came to arrest Plaintiff in the park.

276    Plaintiff returned to her hotel room.  Shortly after that, the front desk called to tell her that a deputy was there for her. When the deputy arrived at Plaintiff's hotel room, Plaintiff waived her Miranda rights and proactively confessed to sending Bayern a text, explaining to the deputy that she needed to be arrested for her own safety.  Plaintiff was arrested and taken to the Leon County Detention Center.

277    While Plaintiff had a surreal expectation that she would probably be arrested after sending the text, it's notable that Bayern went through with it. Bayern had reported Plaintiff's text message and had her arrested despite the fact that Plaintiff's text was non-threatening and conciliatory, and despite the fact that they had a hearing the next day where Bayern would have had the chance to raise the fact that Plaintiff had texted him in violation of the injunction. There was no legitimate reason or purpose for Bayern to have Plaintiff arrested that night.

278    After a few hours in jail, Plaintiff was released on bond.

279    Plaintiff learned that while she was in jail, her children's nanny had been trying and unable to reach her because Plaintiff's 3-year old daughter was sick, and the nanny did not know what to do.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>November 7, 2019:  The Hearing is Held in Tallahassee, Florida</u>

280    The hearing on the injunction was held the next day and Plaintiff attended. Plaintiff found it painful to be in the courtroom with Bayern, who had terrorized her, and she spent much of the hearing crying.

281    At one point during the hearing, Bayern testified as though he was describing his reaction to Plaintiff's emails and said, "I was terrified" but then, barely audibly and in Plaintiff's direction, Bayern added "for her."

282    Plaintiff believes that Bayern was attempting to defend himself to her with the excuse that he had been acting out of concern for her.

283    Plaintiff is hopeful that audio from the hearing, which Plaintiff believes was recorded until the end, can be enhanced to capture the words Bayern added under his breath. Plaintiff believes they serve as a confession that the injunction was frivolous, and also that Bayern had, in fact, gaslighted her and otherwise acted in furtherance of the conspiracy.

284    At the end of the hearing, the Judge told Plaintiff that Plaintiff needed to go into rehab and that it needed to be *inpatient*.

285    Plaintiff had previously repeatedly been pressured, by Bayern and also via the backchannel, to enter inpatient psychiatric treatment for seven days.   Plaintiff had been threatened with death if she did not comply. She had also been promised that her case would settle if she did.

286     Under duress, Plaintiff had tried to negotiate the terms of her hospitalization. Plaintiff suggested that they allow her to have some kind of substance-induced psychosis and to spend the time in inpatient rehab instead of psychiatric hospitalization.

287     When the Judge told Plaintiff that she needed *inpatient* rehab, no evidence had been presented that Plaintiff needed inpatient rehab.  There had been no substance abuse evaluation recommending inpatient rehab. Plaintiff was fully sober in the courtroom and had told the judge that it had been a couple of days since she had had any kind of alcoholic drink.

288     Without any supporting medical evidence, the Judge stressed the same "inpatient" requirement that Google had been so adamant about and that Plaintiff had previously proposed via the backchannel.

289     After the hearing. Plaintiff was facing the possibility that Google had unduly influenced a judge in a jurisdiction where Plaintiff was now facing criminal charges.

290     As she prepared to return to Seattle, Plaintiff had additional phone calls with Adams where she cried about the cruelty of what happened to her in Tallahassee.  Plaintiff noticed that Adams seemed genuinely upset and disturbed at what happened to her.

291     After the events in Tallahassee, Adams no longer found time to talk to Plaintiff.  Plaintiff believes, or at least hopes, that Adams decided to stop helping Google with what they were doing to her.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>November 2019 – Present:  Ongoing Harassment</u>

292    In the months subsequent to her arrest, and while receiving death threats, Plaintiff made additional attempts to appease Google.

293    At times Google told Plaintiff via the backchannel that she had done enough to placate them and that they were ready to settle. They would tell Plaintiff to send them a high demand, promising that it would be quickly accepted.  On multiple occasions Plaintiff complied and sent the requested demand to Johnsrud.

294    Google never accepted those demands. Plaintiff now understands that she was tricked into sending those demands to make her seem erratic or unreasonable.

295    Plaintiff's efforts to discredit herself never seemed to satisfy Google and Plaintiff did not understand why.  At the same time, Google did not seem to believe her when she told them that she didn't understand what else they wanted from her. They accused her of pretending to not know.

296    Plaintiff made appointments and told doctors that she had abused stimulants and experienced psychosis. She obtained and filled prescriptions for antipsychotics, which she did not take. She made multiple failed attempts to be admitted into psychiatric hospitalization. She tried to appease Google - to stop the harassment and maybe have the chance to move on with her life.  Wasn't there enough on record at this point to call her a

COMPLAINT FOR DAMAGES - 71

"Nutter, Stalker, and Criminal?"  Plaintiff was getting death threats but did not understand what else she was supposed to do.

297    Plaintiff still did not understand that it wasn't about having a dossier against her if she went public, but about having her legally disqualified as a witness. Plaintiff had never provided that level of proof.

298    Plaintiff didn't understand because no one was knocking on Plaintiff's door asking her to be a witness.  It didn't seem like anyone cared about her allegations.

299     As Plaintiff remained clueless as to why what she had given Google still wasn't enough, the threats increased in frequency and included escalating threats of killing Plaintiff's children.

## 2020:  Plaintiff is Charged with Felonies and is Fired from Her Job

300    Plaintiff never contacted Bayern again after the November 2019 events in Tallahassee, but she continued to suffer from PTSD flashbacks. She had unbearable "fight or flight" adrenaline surges and dealt with them by sending emails about Bayern to individuals from the Plusmail email group. Based on those emails, Bayern made additional misleading statements to law enforcement and had Plaintiff baselessly charged with felonies.

301    Plaintiff was told through the backchannel that she was prolonging her own suffering and had wasted so many opportunities to resolve the situation.  If she had just cooperated and established legal proof that she had been psychotic, she would have gotten everything and anything she could ever want.  She'd have endless amounts of money, power, and luck - and doors would magically open for her wherever she went.  Google would help her start a company (as she had planned) and ensure that it succeeded. She's been told that Google continues to give her opportunities to get all of this, but she keeps messing up. The criminal charges were another opportunity to put her insanity on record. She didn't need to figure anything out. They were doing all the work and she just needed to cooperate.

302    Plaintiff was told through the backchannel that she could get admitted to psychiatric hospitalization if she tried harder and took more extreme measures that gave the doctors no choice from a liability perspective. She was told that her concern that a schizophrenia diagnosis would have implications for her children and their future medical care was ridiculous, because a fake diagnosis wasn't genetic.

303    Google has repeatedly told Plaintiff, through the backchannel, that they have the power to control what happens with the criminal charges she is facing. Plaintiff has been repeatedly threatened that if she doesn't plead insanity to those charges, Google will ensure that she serves prison time.  She has been taunted and told to enjoy whatever free time she has left.

COMPLAINT FOR DAMAGES - 73

304     Plaintiff's criminal defense attorney gently encouraged Plaintiff to get documentation for an insanity defense. Plaintiff chose to proceed Pro Se and sent the Prosecutors in Florida evidence of the conspiracy, the history with Bayern, and proof of his gaslighting and perjury.

305     In August 2020, not long after Plaintiff sent additional evidence to Florida prosecutors, three Seattle Police Department officers arrived at Plaintiff's house. Plaintiff thought they were there to arrest her on the outstanding felony warrants.

306     Instead of arresting her, the Seattle Police Officers were compassionate and reassuring. They told Plaintiff that they had come to check on her and to see if she was ok. They told her that they were proactively contacted by Florida and told that Florida did not want Plaintiff to be arrested on the outstanding warrants. They asked Plaintiff how they could help her.

307     Plaintiff continues to suffer the effects of PTSD.

308     Plaintiff has flashback episodes and nightmares and has been driven at times to despair or anger.  While experiencing flashbacks, Plaintiff has sent some terrible emails. Doing so gave Plaintiff an outlet for the choking fight-or-flight response that comes with the flashbacks.  She finds that when she can't breathe, little else matters. While defendants may try to use these emails to discredit or intimidate Plaintiff, Plaintiff also intends to introduce them into evidence as proof of her trauma. Prior to the events in these claims, Plaintiff had no psychiatric or criminal history, and no history of aggression.

309    Defendants pushed Plaintiff to the edge with their harassment, gaslighting, betrayal, manipulation, and threats of killing and brutalizing her children.  On top of that, the worst of it was carried out by people who Plaintiff trusted and considered friends.  The very people who Plaintiff turned to for reassurances that she and her children were physically safe were the ones who were purposely terrifying her. Plaintiff wasn't just harassed, she was tortured.

310    On September 9, 2020, Plaintiff was fired from her job.  The official reason given was that she had failed a background check because of the felonies that Plaintiff is facing in Florida.

## VII.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

Conspiracy to Interfere with Civil Rights

Against All Defendants

42 U.S.C. § 1985 allows civil action to recover damages for injury to person or property caused by actions taken in furtherance of a conspiracy to Interfere with Civil Rights.

Plaintiff has claims under three separate clauses: **(1)** 42 U.S.C. § 1985(2)(i) which covers conspiracies to prevent witnesses from testifying in Federal

Court **(2)** 42 U.S.C. § 1985(2)(ii) which covers class-based animus

conspiracies to prevent witnesses from testifying in State Court and **(3)** 42

U.S.C. § 1985(3) which covers conspiracies to interfere with Civil Rights.

Under each and any of these clauses, if any action in furtherance of the

conspiracy causes injury to person or property or deprivation of rights or

privileges,  "the party so injured or deprived may have an action for the

recovery of damages occasioned by such injury or deprivation, against any

one or more of the conspirators."

311    Plaintiff Incorporates by Reference all Paragraphs Above.

312    As alleged above, the conspiracy was formed by explicit

agreement between Google, Johnsrud, Kayal, Bayern, and other defendants.

313    As alleged above, the conspiracy had two primary goals:  **(1)** to

intimidate Plaintiff and prevent her from pursuing her Title VII claims to

their conclusion **(2)** to have Plaintiff diagnosed with a delusional disorder and,

by force, be disqualified as a future witness in subsequent criminal

prosecutions or civil actions.

314    The conspiracy also aimed to interfere with Plaintiff's due

process rights in the criminal charges filed against her.

315    Plaintiff can recover under 42 U.S.C. § 1985(2)(i) because

defendants conspired, through force and intimidation, to prevent Plaintiff from

COMPLAINT FOR DAMAGES - 76

continuing to serve as a witness in her arbitration, which was applying Federal law under the Civil Rights Act.  In furtherance of this conspiracy, Bayern, Plusmail, and Google purposely scared and gaslighted Plaintiff. Bayern pressured Plaintiff to request an indefinite stay and abandon her case. Bayern made Plaintiff believe that the arbitrator in the case was corrupt. Facebook created purposely-misleading evidence prejudicial to Plaintiff. Google intimidated potential Plaintiff-side witnesses. Kayal made multiple invalidating statements about Plaintiff's claims to weaken her resolve.

316    Plaintiff can also recover under 42 U.S.C. § 1985(2)(i) because defendants conspired to force Plaintiff to receive a delusional diagnosis so she would be disqualified as a future witness in a federal prosecution of obstruction of justice. In furtherance of this conspiracy, Bayern, Russcol, and Sherman pressured Plaintiff to enter psychiatric hospitalization. Google threatened and harassed Plaintiff. Blessey sent Plaintiff troubling emails. Cho and Kayal told others that Plaintiff was delusional. Bayern brought criminal charges against Plaintiff to try to force an insanity plea.

317    Plaintiff can recover under 42 U.S.C. § 1985(2)(ii) because Plaintiff's Arbitration was also partially governed by State Law.  42 U.S.C. § 1985(2)(ii) is similar to 42 U.S.C. § 1985(2)(i) except it covers State Courts and adds in a class-based animus requirement.  Google has been repeatedly publicly accused of a class-based animus against women who complain of discrimination and Plaintiff has also previously accused Google of the same.

Google's effort to shut down Plaintiff's arbitration was not about money. Google was willing to settle Plaintiff's claims for more than they otherwise believed them to be worth in arbitration, on the condition that Plaintiff be utterly discredited and humiliated in the process.

318    Plaintiff can recover under 42 U.S.C. § 1985(3) because the defendants conspired to deny Plaintiff her rights under the Civil Rights Acts of 1964 and 1991.   In furtherance of this conspiracy, Bayern, Plusmail, and Google purposely scared and gaslighted Plaintiff. Bayern pressured Plaintiff to request an indefinite stay and abandon her case. Bayern made Plaintiff believe that the arbitrator in the case was corrupt. Google intimidated potential Plaintiff-side witnesses. Kayal made multiple invalidating statements about Plaintiff's claims to weaken her resolve.

319    Plaintiff can also recover under 42 U.S.C. § 1985(3) because defendants conspired to deny Plaintiff her Fourteenth Amendment Due Process Rights in attempting to control and influence the criminal justice process in Tallahassee, Florida.

320    As a result of acts taken in furtherance of the conspiracy, Plaintiff has suffered injury to her physical health and substantial emotional distress.

321    As a result of acts taken in furtherance of the conspiracy, Plaintiff has been injured in her property in that her claims in arbitration were dismissed with prejudice.

322    As a result of acts taken in furtherance of these conspiracies, Plaintiff has been injured in her business in that she was fired from her job because of the criminal charges filed against her in furtherance of the conspiracy.

## SECOND CAUSE OF ACTION

Racketeering - RICO 18 U.S.C. § 1964(c) and (d)

Against All Defendants

323    Plaintiff incorporates by reference all paragraphs above.

324    Plaintiff asserts claims under the Racketeering Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1964.

325    Federal Rule 18 U.S.C § 1964(c) provides:  "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee"

326    18 U.S.C. §1962(c) provides that: "It shall be unlawful for any person employed by or associated with any enterprise  engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's  affairs through a pattern of racketeering activity or collection of unlawful debt."

327    18 U.S.C. § 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

328    18 U.S.C. § 1961(1) provides:

329    "'racketeering activity' means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion […], which is chargeable under State Law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), […], section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), […], section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), […] section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity)."

330    18 U.S.C. § 1961(5) provides that a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred

within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;"

331    <u>There was a RICO Enterprise:</u>  As alleged above, the named defendants associated in fact through a number of agreements and formed an enterprise with the purpose of covering up Google's past and ongoing misconduct in multiple legal proceedings and investigations.  The enterprise schemed to intimidate Plaintiff, to obstruct justice, and to attempt to have Plaintiff diagnosed as delusional and be disqualified as a future witness.

332    The enterprise was longstanding, with initial explicit agreements dating back to no later than September 2018 (Facebook), and quite probably to 2016 (Blessey). The enterprise is ongoing and continues to pose a threat to Plaintiff and others.

333    The enterprise affected interstate commerce in countless ways including the following:  The purpose of the enterprise was meant to protect a multinational corporation and allow them to continue operating their interstate-commerce business without government scrutiny into their dealings. The purpose of the enterprise also included shutting down a California-based arbitration of New York and Washington State economic claims, with a plaintiff based in Washington. The enterprise planned to distribute substantial bribes to enterprise associates across multiple states. An award in the case would be partially taxable by the state of New York and would have included a transfer from a Delaware-incorporated and California-based company to a

Washington State resident who planned to use it to start a company and create hundreds, if not thousands, of jobs in Washington and provide services to all 50 states.  The scheme also involved manipulating Plaintiff into taking a commercial flight from Washington to Georgia to Florida (on an airline headquartered in Georgia and incorporated in Delaware), and staying in a Florida-based hotel.  Plaintiff believes that the enterprise engaged in other acts of interstate commerce, including the hiring of private investigators and consultants across multiple states.

334    Plaintiff suffered injury to both her business and her property as a result of defendant's pattern of racketeering.  Plaintiff suffered injury to her business in that she was involuntarily terminated from her job because of the false criminal charges that the enterprise corruptly had filed against her. She will also be limited in future employment and business opportunities. Plaintiff suffered injury to her property in that her Title VII and State Claims were dismissed with prejudice as a result of the enterprise's harassment, extortion, and obstruction.

335    As a first predicate act of racketeering, and as alleged above, and in furtherance of the enterprise's purpose, Google corruptly bribed one or more public officials in *Gonzalez vs. Spivak*, in violation of California Penal Code 92, and punishable as a felony with imprisonment of up to four years under State Law, and qualifying as a racketeering activity under 18 U.S.C. § 1961(1)(A).

336    As a <u>second predicate act of racketeering</u>, and as alleged above, and in furtherance of the enterprise's purpose, Facebook corruptly assisted Google in generating false or misleading evidence in violation of 18 U.S.C. § 1512(c)(2) against obstruction, and qualifying as a racketeering activity under 18 U.S.C. § 1961(1)(B).

337    As a <u>third predicate act of racketeering</u>, and as alleged above, and in furtherance of the enterprise's purpose, Blessey sent Plaintiff misleading emails to influence or delay Plaintiff's involvement and testimony in her arbitration, in violation of 18 U.S.C. § 1512(b)(1) against witness tampering, and qualifying as a racketeering activity under 18 U.S.C. § 1961(1)(B).

338    As a <u>fourth predicate act of racketeering</u>, as alleged above, and in furtherance of the enterprise's purpose,  Kayal made multiple misleading and discouraging representations to Plaintiff to weaken her resolve in pursuing her claims and to convince her to withdraw her bar complaint against Johnsrud, in violation of 18 U.S.C. § 1512(b) against witness tampering and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

339    As a <u>fifth predicate act of racketeering</u>, and as alleged above, and in furtherance of the enterprise's purpose, Sherman corruptly frightened Plaintiff and urged her to check into psychiatric hospitalization, in order to have Plaintiff become disqualified as a witness, in violation of 18 U.S.C. §

1512(b) against witness tampering, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

340     As a sixth predicate act of racketeering, as alleged above, and in furtherance of the enterprise's purpose, Bayern corruptly induced Plaintiff to request an "indefinite stay" in her arbitration, in violation of 18 U.S.C. § 1512(b) against witness tampering, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

341     As a seventh predicate act of racketeering,  as alleged above, and in furtherance of the enterprise's purpose, Johnsrud/Google threatened to murder Plaintiff's 3-year-old child if Plaintiff did not agree to go along with a delusional diagnosis, in violation of Washington Criminal Code 9A.46.020(2)(b)(ii) against harassment, and punishable under State Law by imprisonment for up to 5 years as a Class C Felony, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(A).

342     As an eighth predicate act of racketeering,  as alleged above, and in furtherance of the enterprise's purpose, Google threatened to murder Plaintiff in order to induce Plaintiff to not be available as a witness in future legal proceedings, in violation of Washington Criminal Code 9A.72.110(1)(a-c) against witness intimidation, and punishable under State Law by imprisonment for up to 10 years as a Class B Felony, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(A).

343    As a <u>ninth predicate act of racketeering</u>,  as alleged above, and in furtherance of the enterprise's purpose,  Johnsrud/Google made additional repeated death threats against Plaintiff, in violation of Washington Criminal Code rule 9A.46.110(5)(b)(vi) against retaliatory stalking of a current, former, or prospective witness in an adjudicative proceeding, and punishable under State Law by imprisonment for up to 10 years as a Class B Felony, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(A).

344    As a <u>tenth predicate act of racketeering</u>, as alleged above, and in furtherance of the enterprise's purpose,  through false representations, Bayern attempted to obtain power of attorney over Plaintiff's estate in order to obtain and launder the illegal bribes that were to be paid to certain associates in the enterprise (as trustee or advisory fees), in violation of 18 U.S.C. § 1956 against attempted money laundering and 18 U.S.C. § 1343 against wire fraud, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

345    As an <u>eleventh predicate act of racketeering</u>, as alleged above, and in furtherance of the enterprise's purpose, Russcol threatened Plaintiff with a frivolous restraining order if she spoke up about the conspiracy, in violation of 18 U.S.C. § 1512(b) against witness tampering, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

346    As a <u>twelfth predicate act of racketeering</u>, Bayern submitted false material statements in his declaration in Bayern v. Spivak, in violation of Florida Statute 837.02 against perjury, and punishable under State Law by

imprisonment for up to 5 years as a third degree felony, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(A).

347    As a thirteenth predicate act of racketeering, as alleged above, and in furtherance of the enterprise's purpose, Bayern corruptly had Plaintiff charged with felonies, to try to induce her to file an insanity defense so she would be disqualified as a witness, in violation of 18 U.S.C. § 1512 against witness tampering, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

348    As a fourteenth predicate act of racketeering, as alleged above, and in furtherance of the enterprise's purpose, Google may have unduly influenced the judge in *Bayern v. Spivak*, and if not, otherwise arranged to unduly influence one or more Florida Judges (as they threatened they could do if Plaintiff did not plead insanity), in violation of Florida Criminal Statute 838.015 against bribery, and punishable as a second degree felony under Florida State Law with imprisonment of up to 15 years, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(A).

349    As a fifteenth predicate act of racketeering, as alleged above, and in furtherance of the enterprise's purpose, Google influenced and intimidated Google employees who were potential Plaintiff-side witnesses in *Spivak v. Google*, in violation of 18 U.S.C. § 1512 against witness tampering, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

350    As a <u>sixteenth predicate act of racketeering</u>, as alleged above, and in furtherance of the enterprise's purpose, Johnsrud engaged in multiple repeated acts of obstruction in Plaintiff's arbitration, in violation of 18 U.S.C. § 1512(c) against witness tampering/obstruction, and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

351    As a <u>seventeenth predicate act of racketeering</u>, Johnsrud threatened Plaintiff with physical violence to induce her to abandon her arbitration, in violation of 18 U.S.C. § 1951 against extortion and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

352    As an <u>eighteenth predicate act of racketeering</u>, as alleged above, and in furtherance of the enterprise's purpose, Johnsrud engaged in multiple repeated acts of harassing Plaintiff in order to prevent her from causing a criminal prosecution to be instituted against him, in violation of 18 U.S.C. § 1512(d)(4) against witness tampering and qualifying as racketeering activity under 18 U.S.C. § 1961(1)(B).

353    As <u>predicate acts 19– 20</u>:  Plaintiff alleges multiple additional gaslighting communications, each meant to confuse and disconcert Plaintiff, and in violation of 18 U.S.C. § 1512, sent in 2019 by members of the enterprise who are not named as defendants, but who were part of the enterprise and who were directed by the defendants.

354    As <u>predicate acts 21– 30</u>:  Plaintiff alleges multiple additional acts  obstruction, that will be surfaced through discovery.

## **THIRD CAUSE OF ACTION**

Invasion of Privacy

Against Google and Johnsrud

355    Plaintiff Incorporates by Reference all paragraphs above

356    By "hacking" Plaintiff's home network and devices, and otherwise monitoring Plaintiff's private activity, Google committed countless acts of Invasion of Privacy through Intrusion into Seclusion, as alleged above, and with the specifics of each act to be proven at trial.

**WHEREFORE,** Plaintiff prays judgement be entered in her favor against Defendants, and each of them, as follows:

## **AS TO THE FIRST CAUSE OF ACTION**

Conspiracy to Interfere with Civil Rights

a.    For Economic Damages for the loss of Plaintiff's Claims in Arbitration:  $90,000,000.00 or as established by proof.

b.    For Economic Damages for the loss of Plaintiff's employment

c.    For legal fees and costs of suit

COMPLAINT FOR DAMAGES - 88

d.   For General Damages

e.   For Exemplary and Punitive Damages

f.   For any such Declaratory Judgement validating Plaintiff's allegations as the Court may deem just and proper

g.   For such other and further relief as the Court may deem just and proper

## AS TO THE SECOND CAUSE OF ACTION

<u>Racketeering</u>

a.   For Treble Damages on Injury to Property for the loss of Plaintiff's arbitration – $270,000,000.00 – or three times the value of Plaintiff's claims in arbitration.

b.   For Treble Damages on Injury to Business for the loss of Plaintiff's employment and harm to her professional reputation, according to proof.

c.   For such other and further relief as the Court may deem just and proper.

## AS TO THE THIRD CAUSE OF ACTION

<u>Invasion of Privacy</u>

a.    For General Damages

b.    For Exemplary Punitive Damages

c.    For such other and further relief as the Court may deem just

and proper

Dated this  <u>5</u><sup>th</sup> day of <u>October</u> 2020

*RSpivak*
_____
Rivka ("Rebecca") Spivak

Plaintiff, Pro Se

COMPLAINT FOR DAMAGES - 90