FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

June 18, 2015

*Via Email & U.S. Postal Service*
*kwalker@google.com*

**This Letter Contains An Offer Of Compromise And Is Not Admissible In Evidence Under ER 408.**

Kent Walker
Sr. Vice President & General Counsel
Google
1600 Amphitheatre Parkway
Mountain View, CA 94043

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

RE: *Rivka Spivak and Google*

Dear Mr. Walker,

I represent Rebecca Spivak. I am writing to set out my client's complaints of pregnancy and gender discrimination, retaliation, FMLA interference[1]; and to discuss possible early resolution of these claims.

## I. Facts

Google hired Ms. Spivak in 2010 for a position as Product Manager in New York. Ms. Spivak has both an undergraduate and master's degrees from Yale in computer science and an MBA from Harvard. Throughout her career she has been a technology innovator, leading company-critical strategies involving complex data.

STEVEN B. FRANK
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX

### 1. Ms. Spivak's Work in New York.

As an employee of Google in New York, Ms. Spivak was assigned to lead the Admeld Integration project in December 2011. In January 2012, she told her manager, Scott Spencer, Director of Product Management, that she was pregnant. A few weeks after that conversation, Mr. Spencer assigned Jarid Magid, a 25-year-old male, to the project. My client was soon eased out of the project. Admeld proved very successful. *See* RS-216.[2] Mr. Magid was ultimately promoted because of Admeld. *Id.*

---

[1] This letter focuses on my client's claims for gender discrimination. If these claims are not resolved, Ms. Spivak reserves the right to claim interference with her FMLA rights.

[2] Exhibits referred to as RS-# are in Attachment A hereto.

From February to August 2012, Mr. Spencer did not give Ms. Spivak any meaningful product ownership. As a result she had no chance to launch new products, which is critical to career success at Google.

From August 2012 until January 2013, Ms. Spivak was on maternity leave. Before she went on leave, Mr. Spencer told her on numerous occasions that, once she looked at her newborn baby, she would not be returning from maternity leave. Although Ms. Spivak protested, Mr. Spencer told her he had seen it many times before.

Employees are normally notified of stock grants in July of each year. Ms. Spivak received no stock grant for 2012 or 2013, probably because Mr. Spencer had not assigned her any meaningful work. When Ms. Spivak asked Mr. Spencer about the stock grant, he said that she was already well paid and that not everyone gets stock grants. Google positions stock grants to encourage employee retention and as a reward for an employee's "future potential." It is our understanding that all employees receive a stock grant each year unless their manager overrides the default assignment and secretly assigns a low performance indicator that the employee is unable to see.

Ms. Spivak's career at Google in both New York and Seattle shows that when given the opportunity to perform meaningful work, she comes through in a spectacular fashion.

In February 2013, my client was assigned AdX Buyside. This product was thought not to matter, had low customer engagement, and had not been staffed in two years. Ms. Spivak was supposed to make cosmetic (as opposed to functional) changes. She talked to the customers and learned that the AdX Buyside platform *did* matter, but hadn't been built right. Customers were not using AdX Buyside because they could not see the inventory that they were supposed to buy. They also could not tell what had gone wrong if their ads did not produce the results expected. Ms. Spivak formulated multiple strategies from her research and had three huge and successful AdX Buyside launches in the fourth quarter of 2013 (all praised as revenue-generating).

Google promoted the male engineers with whom my client worked on AdX Buyside. Noam Wolf was running the front end of AdX Buyside with one or two engineers reporting to him, doing cosmetic work. After AdX Buyside took off because of Ms. Spivak's efforts, Mr. Wolf's career also took off. Mr. Wolf was twice promoted and now manages 55 employees. Nir Margalit, who praised my client for driving the work he did, was also twice promoted because of these product launches. After Ms. Spivak transferred to Seattle, Drew Bradstock, a co-worker of my client who was hired at about the same time and for approximately the same position (PM, Level 6), took credit for AdX Buyside, listing my client's 2013 accomplishments on his 2014 performance review. Mr. Spencer promoted Mr. Bradstock twice.

In November 2013, Mr. Spencer rated Ms. Spivak as "Meets Expectations." RS-219-21. The evidence will show that Mr. Spencer's evaluation of Ms. Spivak was colored by the fact that he assumed she would not return to Google once she became a mother and stopped giving her meaningful work until after she proved him wrong and did return. By that time, Mr. Spencer had come to see Ms. Spivak as a short-term

female employee with low output and low potential. In fact, when Mr. Spencer did give Ms. Spivak meaningful work to do, it was excellent. Ms. Spivak should have been rated "Exceeds" in November 2013.

**2. Ms. Spivak Transfers to Seattle and Exposes AMP/Quicksilver Failings.**

Ms. Spivak transferred to Seattle at the end of 2013. She was assigned to work as a Product Manager on the Pitchable Insights and Estimates ("PIE") team with Michael English, an Engineering Manager. My client's supervisor was Jens Skakkebaek, the manager of Sales Tools, including Frontline and PIE. Mr. English's supervisor was Doug Bengtson, Engineering Manager for Frontline. Mr. Bengtson oversaw the teams. Vince Lacey was the PM assigned to AMP.

Ms. Spivak's assignment was to identify the needs of Google account managers, create an approach to meet those needs, validate that the approach would be successful, and help the PIE team develop insights that would be helpful to Sales and customers.

In January 2014 customers were provided campaign performance estimates through AMP and Quicksilver. Quicksilver is an algorithm-based program that integrates with AMP, a work flow program. Together they produced a "pitch" with estimates for Google's salespeople to give to customers that purported to predict the number of clicks, impressions, cost etc. per advertising-dollar spent by the customer in a particular medium.

Starting in January 2014, Ms. Spivak interviewed the salespeople about AMP/Quicksilver, and learned that its predictions were completely inaccurate. The sales group did not use it, and some reported losing sales and customers because of AMP/Quicksilver's inaccurate predictions. Ms. Spivak met with Global Product Expert Amanda Nowak on February 4, 2014. Ms. Nowak confirmed what my client had been hearing about AMP/Quicksilver estimates – namely, that the estimates were inaccurate and therefore not useful to Sales.

Beginning on February 5, 2014, Ms. Spivak tried to discuss her findings with Engineering (Doug Bengtson). Mr. Bengtson was unhelpful and defensive. Ms. Spivak invited Engineering to sit in on the interviews with Sales. Mr. English agreed and sat in on several interviews. Mr. Bengtson did not. Ms. Spivak asked for data to assist her, and Engineering (Bengtson) refused to supply the data.

On February 19, 2014, Ms. Spivak met with John Maletis, Director of Sales Operations, who was senior to Mr. Skakkebaek. She told him that incremental improvements to Quicksilver could never approach the 20% accuracy that Sales wanted, and that she had confirmed this with the internal Statistics teams. Mr. Bengtson later confirmed this conclusion stating, "There is way, way more variance than 20% … let's just say we shouldn't count on that happening." Ms. Spivak shared her idea, which ultimately became Interactive Benchmarks. Mr. Maletis was surprised to learn the limits of Quicksilver and was receptive to her ideas, promising to encourage Amanda Nowak to investigate further.

**3. Ms. Spivak Designs Interactive Benchmarks to Replace AMP/Quicksilver.**

AMP/Quicksilver was problematic because the programs were not transparent, the customer could not see how the estimate was produced, and the customer was being asked to rely on the accuracy of "black box" formulas that were neither available nor verifiable. But my client determined from her interviews and statistical research that Quicksilver' estimates were usually off by a factor of two or more. Sales repeatedly told Ms. Spivak that a black box estimate needed to reliably be within 80% to 120% of reality to be useful and fair to customers. Analyses performed by Mr. English and others confirmed that AMP/Quicksilver were unreliable. Ms. Spivak designed a solution, Interactive Benchmarks, which took a different approach to advising customers how to spend their advertising dollars.[3]

That same month, Mr. Skakkebaek promoted Ms. Spivak's peer, Vince Lacey, to be the Interim Frontline lead. Ms. Spivak, not Mr. Lacey, should have been promoted to Interim Lead. Ms. Spivak was a Level 6 with 12 years of PM experience, four of them at Google. Mr. Lacey was a Level 5. My client had hugely successful launches on AdX. Issues were surfacing about AMP, Mr. Lacey's project. He had recently transferred from Sales to PM.[4]

On February 28, 2014, Ms. Spivak asked for a one-on-one meeting with Mr. Skakkebaek. RS-260. Her concern was that feedback from sales on Quicksilver was extremely negative and that she was in a tricky situation with respect to Engineering, which had built the product. She characterized the feedback as "pretty harsh," but "consistent with the issues she had been raising over the last month" and asked Mr. Skakkebaek, her supervisor, for help. Mr. Skakkebaek never met with Ms. Spivak.

On March 6, 2014, Mr. Skakkebaek sent an email noting that John Maletis, a sales leader to whom Mr. Skakkebaek answered, had emphasized that estimates had become a big problem, that he was not sure why, that account managers had confirmed that a launch of Unified Estimates[5] would help, and that my client's ideas for transparency (that is, Interactive Benchmarks) would be a good step forward. RS-048-49. Mr. Skakkebaek suggested it made sense to more heavily invest in Unified Estimates.

Ms. Spivak replied that she did not believe the launch of Unified Estimates "will address the core issue behind estimates – which is that we shouldn't be providing 'estimates.'" RS 48-49. She explained:

> We need a fairly substantial shift in thinking away from estimates, and on to exposing an interactive sandbox of historical information. The core

[3] Ms. Spivak is recognized as the creator of Interactive Benchmarks in the Q2/Q3 2014 Performance review, RS-071-75. See the comment of Michael English at RS-073 ("[s]he formulated a product vision and strategy, now what we call Interactive Benchmarks.")

[4] Mr. Lacey was not a good choice for lead. It soon became apparent that he could not handle the position, and Mr. Skakkebaek allowed the position to become vacant. Later, Mr. Skakkebaek filled it with Aaron Rothman.

[5] "Unified Estimates" was an attempt to identify which algorithm produced the estimate. It failed because it did not provide the customer with verifiable information.

> issue is that 'estimates' is the wrong paradigm. We can't be successful because no one can reach the accuracy necessary in a sales situation…and it's setting everyone up for failure to expect that we (or anyone) can.

*Id.* Ms. Spivak advocated that Google enable Sales to interact with historical data. That proposal ultimately became Interactive Benchmarks. RS-048. Mr. Bengtson told her that, unless she had the perfect solution, she could not criticize the existing system (AMP/Quicksilver).

On March 20, 2014, Ms. Spivak sent out a Product Requirements Document ("PRD") on benchmarks, and how to move forward. The next day she emailed Engineering and Mr. Skakkebaek a roadmap and asked for feedback. She received none. The next day, Ms. Spivak told Mr. Skakkebaek that she had been trying to get access to data from Engineering to prioritize features, but that Engineering refused to share its data. Mr. Skakkebaek told her to "make things right" with Engineering and offered no other assistance.

On March 25, 2014, Ms. Spivak was facing mounting hostility from Mr. Bengston and emailed Mr. Skakkebaek. RS-653-55. In the subject line of the email she wrote, "If you read one doc, please read this one." Her email stated the "current estimate functionality does not solve the business problem" and that "[w]hat sales needs for estimates is not what Quicksilver is structured to do." Ms. Spivak's email sought to create a common understanding to deal with changing priorities as the limitations of Quicksilver became better understood by Sales. She sought to discuss solutions including starting from scratch. Mr. Skakkebaek did not respond to Ms. Spivak's email. Google ultimately adopted this very solution, starting from scratch with Interactive Benchmarks.

On April 2, 2014, Ms. Spivak reached out to Google Human Resources Representatives Caroline Bremner and Paul Higson for help because Mr. Bengtson was becoming hostile and Mr. Skakkebaek would not help her. RS-009. She told Ms. Bremner that her voice was being drowned out by the men on the engineering team.

On or about April 3, 2014, Mr. Skakkebaek informed Ms. Spivak that Interactive Benchmarks would be staffed. Initially, the staff consisted of Mr. English and Ms. Spivak. By August, as Interactive Benchmarks's reputation as a critical and exciting project grew, engineers flocked to the team. Interactive Benchmarks' team grew to 10 people in subsequent months, as the AMP team shrank. Everyone wanted to join Interactive Benchmarks.

**4. April 2014 Summit Meeting.**

On April 9, 2014, Ms. Spivak participated in a Summit meeting sponsored by Judy Hsu from Sales Ops to showcase Interactive Benchmarks and contrast it with AMP/Quicksilver. Ms. Spivak had worked closely with Sales Ops preparing the data-driven case for Interactive Benchmarks. In preparation for the Summit, Ms. Spivak created spreadsheets and compiled data from dozens of interviews she had conducted. Ms. Hsu and Sales Ops felt the Summit was a great success. Ms. Hsu described the summit presentation as a paradigm shift from the "black box methodology in

AMP…which users don't understand or trust" to Interactive Benchmark's increased transparency and quality of estimates. RS-011-12. Ms. Hsu described the essence of Ms. Spivak's idea which was to "focus on providing historical data (benchmarks) in an interactive environment that gives the user full control of inputs they care about…." *Id.* Ms. Hsu also reported that Anas Osman, Mr. Maletis' then-manager, was "thrilled that we as a team are thinking about a step change in our approach". RS-011. Ms. Spivak forwarded this laudatory email to Mr. Skakkebaek.

Barbara Stanley rated the meeting as the "best and most productive summit I have ever attended. I'm really happy with our plan for pushing ahead with interactive benchmarks while using Eng resources most efficiently." In contrast, Mr. Bengtson attended the summit meeting and sat with his arms folded in disapproval.

On April 11, 2014 – just nine days after her report to Human Resources and two days after the Summit – Ms. Spivak met with Mr. Skakkebaek, eager to discuss her recent success. Remarkably, Mr. Skakkebaek told Ms. Spivak to take two weeks of leave, and that she would be getting a PIP when she returned. RS-059. Ms. Spivak protested that a PIP did not make any sense. She was in charge of estimates, and determined that Google's current solution to estimates, AMP/Quicksilver, was not being used. She identified the core issue and proposed a solution that was the right product and the right strategy. Mr. Skakkebaek responded by saying, "PM isn't a strategy role."[6]

On April 14, 2014, Ms. Spivak complained to Human Resources Representative Higson but, once again, got nowhere.

**5. Ms. Spivak's May 2014 Performance Review and PIP.**

On May 1, 2014, Mr. Skakkebaek gave Ms. Spivak a poor performance review and a performance improvement plan. RS 17-20; 36-37. While Mr. Skakkebaek was Ms. Spivak's manager during the period covered by the PIP, she did not work with him. Mr. Bengtson was leading the project. The available performance ratings were Needs Improvement, Meets Expectations, Exceeds, Strongly Exceeds, and Superb. "Exceeds" is average. Approximately 1/3 of Google employees rated are below "Exceeds" and approximately 1/3 are above "Exceeds." Mr. Skakkebaek rated Ms. Spivak as "Consistently Meets Expectations," but was inclined to rate her even lower, as "Needs Improvement" *Id.*

The evidence will show Mr. Bengtson drove the negative review and that a fair assessment of her work would have rated Ms. Spivak as "Strongly Exceeds." Mr. Skakkebaek criticized Ms. Spivak in communication, leadership and "googlelyness." The PIP warns that Ms. Spivak's verbal communication with other PMs and the Engineering team needed to be clear and compelling, accurate and complete. These criticisms are not well taken. The PIP does not give any examples of unclear or inaccurate communications with other PMs or Engineering.

[6] Based on the job description prepared by Mr. Skakkebaek, the PM job is clearly a strategy role. RS-249-50.

In sharp contrast to Mr. Skakkebaek's unsupported criticisms, Ms. Spivak received peer feedback recognizing her as "true visionary" (Margalit RS-019), "just short of genius" (Feldman RS-017), "clever" (Woodlee, RS-017), a "great partner with sales" (*id.*), "strong PM with amazing potential to do big things" (Feldman RS-019). The peer feedback credited Ms. Spivak with having created or produced products that was really needed (Baskin, RS-017), and which received universally positive customer feedback (Feldman, RS-018). Ms. Spivak's peers routinely complimented her clear and effective communications. Senior Staff Software Engineer Baskin said "Rivka does a great job of gaining a clear-eyed and comprehensive understanding of any area she works in," and "speaks her mind clearly and persuasively." RS-019.

Remarkably, Mr. Skakkebaek stated that Ms. Spivak needed to "make statements that are based on thorough understanding and well-founded in use cases that are backed by more than just a few data points." RS-036. Once again, the PIP gives no examples. The evidence will show that Ms. Spivak's research into AMP users was far more thorough than any other comparable research relating to advertising. Her statements were not unsupported. The questions she raised in early 2014 about AMP/Quicksilver proved to be precisely right. Quicksilver was "deprecated," that is, abandoned in June or July 2014. Ms. Spivak's project, Interactive Benchmarks, has taken off. AMP is struggling.

The PIP stated that Ms. Spivak needed to improve being seen as a proactive leader within the Engineering Department. At the time the PIP was written, Ms. Spivak's advocacy for Interactive Benchmarks engendered the wrath of Mr. Bengtson and other men who were spearheading a failed technology. Ms. Spivak had reached out to Mr. Skakkebaek for help and he simply did not respond. The PIP offers no explanation as to how she could be perceived as a leader by Engineering under these circumstances, or why it is her failing that she was not.

The PIP listed as an area of improvement that my client should "listen more and expect to learn from [her] colleagues." In other words, keep quiet and defer to your male colleagues. At the time of the PIP, Ms. Spivak had created Interactive Benchmarks, which was taking a totally different approach to estimating than AMP/Quicksilver had taken. Google adopted her approach, but then disciplined her for offering it.[7]

Google policy, "Managing Low Performance 2015," (RS-021-34) requires that a PIP should have been preceded by "previous discussions." (RS-025.) The fact is that there were no discussions between Ms. Spivak and Mr. Skakkebaek or anyone else about the criticisms first raised in the PIP. On May 2, Ms. Spivak told Ms. Hsu that she had been placed on a PIP. Ms. Hsu managed a team and held a senior role, and was the person in Sales who most closely knew Ms. Spivak's work firsthand. Ms. Hsu was "stunned." Mr. Skakkebaek had specifically asked her if Ms. Spivak was a problem and should receive a PIP. Ms. Hsu had told Mr. Skakkebaek that a PIP was not justified, that Ms. Spivak was a strong performer, that Google and Sales needed her, and that the

[7] The PIP also faults Ms. Spivak for using her laptop in meetings. In fact, everyone at Google uses his or her laptop in meetings, but only Ms. Spivak was singled out for discipline.

work she was doing was critical. Ms. Hsu told my client that in addition to being stunned, she was insulted and confused that Mr. Skakkebaek had proceeded with the PIP despite her feedback.

**6. Ms. Spivak Continues to Raise Gender Discrimination Complaints to No Avail.**

On about May 5, Ms. Spivak made an internal complaint about the gender discrimination she had been experiencing. Cindy Treolar of Employee Relations was assigned to investigate, but ignored Ms. Spivak's request to interview Mr. English. One month later, Ms. Treolar told Ms. Spivak that her concerns were not valid.

Ms. Spivak also discussed the PIP directly with Mr. Bengtson. When she asked why she was given a PIP in her first quarter in Seattle, Mr. Bengtson said that sometimes someone is so problematic that they need to be pushed out right away. When she protested that things were going well and that the Summit had been a success, Mr. Bengtson claimed "everyone" was against her. He said she should question whether she was the problem, and asked whether she really wanted to be on the PIE team if everyone was against her. Mr. Bengtson ignored the fact that Ms. Spivak had staunch supporters including Mr. English in Engineering, Ms. Hsu in Sales, and Mr. Maletis in Sales Ops. Ms. Spivak replied that Interactive Benchmarks was a good project and was going to be a big deal. She had already done a lot of work on it, and that it would earn her a promotion. Mr. Bengtson responded, "You don't need a promotion. Level 6 is a perfectly acceptable plateau for a PM. I don't see you as a Level 7."

When Ms. Spivak told Mr. English about the PIP, he expressed surprise and anger. He told her things were going well and had not been consulted or informed about the PIP even though Ms. Spivak was Mr. English's PM. He was most familiar with her work, as they worked closely together. It is astonishing that he was neither consulted nor informed about the PIP.

Mr. Skakkebaek wanted Ms. Spivak to address the concerns raised in the PIP. On May 9, 2014, she emailed Mr. Skakkebaek and reiterated that the PIP was unjustified. RS-056-57. Ms. Spivak pointed out that she had been doing a good job and would continue to do so. She asked Mr. Skakkebaek to review her Q1 work so he could see for himself. He refused. When she mentioned that the Summit had gone very well, Mr. Skakkebaek asked if she thought Mr. Bengtson would say things were going well.

Ms. Spivak met Human Resources Representative Bremner on May 27, 2014. Ms. Spivak reiterated the concerns she had raised in April about the unfair and biased treatment she experienced whenever she spoke up, and the discriminatory performance review she had received. Ms. Bremner dissuaded Ms. Spivak from making a formal gender discrimination complaint at that time.

In July 2014, Mr. Skakkebaek notified Ms. Spivak that she had successfully completed the PIP, but warned that any future recurrence of unsatisfactory performance may result in further corrective action. RS-328-31. My client did nothing differently between May 1 and July 8, 2014, when the PIP was completed. She understands that Mr. Skakkebaek interviewed Ms. Hsu and Mr. English to support taking her off the PIP.

Mr. Skakkebaek did not include Ms. Hsu or Mr. English as reviewers on Ms. Spivak's original performance review, even though they were the Sales and Engineering leads who knew my client's work best. Mr. Skakkebaek knew Ms. Hsu and Mr. English would support Ms. Spivak. He had spoken informally to Ms. Hsu, received a good report about my client, and had specifically avoided Mr. English, who was known to be a strong supporter.

**7. Aaron Rothman Promotion and Media Review.**

In July 2014, Mr. Skakkebaek informed Ms. Spivak she would be reporting to a new lead, Aaron Rothman. Mr. Rothman had never been a manager before. In contrast, Ms. Spivak had previous management experience, but apparently was not considered for the position of lead.

In August 2014, Mr. Rothman scheduled himself to present Interactive Benchmarks to Neal Mohan, the Vice President in Charge of Display, in a Media Review the next month. Mr. Mohan has the power to fund or kill projects that were presented during the Review, and to significantly reward the product managers who impressed him. Mr. Rothman had not been involved in the creation or implementation of Interactive Benchmarks. Ms. Spivak had to intercede to ensure that she – not Mr. Rothman – present Interactive Benchmarks. (In contrast, Mr. Rothman had scheduled Vince Lacey, a male peer of my client, to present on his project, AMP).

While Ms. Spivak was ultimately permitted to make the presentation, Mr. Rothman imposed strict limits on what she was could present. Less than 24 hours before the Media Review, Mr. Rothman changed the presentation to say that Interactive Benchmark's only purpose was to allow Sales to compare an advertiser to its competition. That statement framed Interactive Benchmarks as a redundant tool serving a secondary business need and minimized its importance as a critical pitching tool that would generate substantial revenue for Google. Mr. Rothman also instructed my client not to address the planning/future uses of Interactive Benchmarks – its most promising and compelling use – unless she was directly asked to do so.

Mr. Rothman's attempt to silence my client and minimize Interactive Benchmarks is deeply troubling. Mr. Rothman knew or should have known that Interactive Benchmarks, not AMP, should have been given prominence on the issue of forward-looking performance metrics/estimates. It was well known at that time that AMP's estimates were off the mark and that Interactive Benchmarks was addressing this forward looking need. At that time, Interactive Benchmarks had progressed far enough that Ms. Spivak would have been able to show that Interactive Benchmarks could be used for pitching to customers and creating insights, but Mr. Rothman did not permit her to demonstrate Interactive Benchmark's full capabilities.

Ms. Spivak's presentation could have been important to Interactive Benchmarks. She could have shown Mr. Mohan that Interactive Benchmarks solved the problems presented by the inaccuracies in AMP/Quicksilver (and other black box tools that estimated clicks per advertising dollar). The presentation could have been extremely important to Ms. Spivak, because it would have showcased her efforts to Mr. Mohan.

Instead, as a result of Rothman's changes in her presentation, Interactive Benchmarks became seen as a tool for counting clicks as part of a pitch that depended on black box estimates rather than a powerful tool that could be used to examine relevant historical sales data to predict the efficacy of future spends of advertising dollars. Mr. Rothman's changes allowed Mr. Lacey, who was presenting on AMP, to be seen as working on the powerful strategic planning tool.

Later that week, after Ms. Spivak had been prevented from presenting her work to Mr. Mohan, she independently reached out to Principal Business Analyst David Goodman, with whom she had collaborated in New York. RS-362. Mr. Goodman also reported to Mr. Mohan and held a senior role in driving Google's Display strategy. Ms. Spivak presented Mr. Goodman with the same demonstration that she had prepared to give to Mr. Mohan. Mr. Goodman was extremely impressed and told Ms. Spivak, "We need this. We've needed someone to build this. This is big. You should also talk to Michelle Sarlo and the Online Publishers Group at Google. This is game-changing."

Mr. Goodman directly encouraged Ms. Spivak to share Interactive Benchmarks' progress with the sell-side of the business. Ms. Spivak continued to prioritize Frontline as the primary use of Interactive Benchmarks, and also shared status with other interested teams at Google.

Mr. Rothman continued to dismiss Ms. Spivak's views on Interactive Benchmarks just as one of several opinions, and suggested that her opinions were not "data-driven plans." In fact, Ms. Spivak was the subject-matter expert on benchmarks and estimates.

In September 2014, Ms. Spivak approached Mr. Bengtson and asked if he would support giving her an "Exceeds Expectations" because she was hoping to be promoted. Mr. Bengtson replied he would not. He said Ms. Spivak did not need to worry about getting an "Exceeds Expectations" because Level 6 was perfectly acceptable as a plateau.

**8. Ms. Spivak's Q2/Q3 Review.**

On September 24, 2014, Mr. Skakkebaek proactively contacted the peers slated to write feedback for Ms. Spivak's Q2/Q3 review. Managers do not typically contact peer reviewers once they have been scheduled. Mr. Skakkebaek's message urged reviewers "to be completely honest." RS-069. The reviewers reached out to Ms. Spivak and told her they had never seen such a request. They understood Mr. Skakkebaek was asking them to give Ms. Spivak a negative review. Gautam Sawhney reported that he was "offended" by the request and had told his manager, Ms. Hsu. Paul McClinton told my client that it was "very weird."

On October 3, 2014, Ms. Spivak met with Mr. Jackson, Mr. Bengtson and Mr. Rothman to present the 2015 vision for Interactive Benchmarks. During the meeting, Ms. Spivak communicated the long-term applicability of Interactive Benchmarks. RS-386. She shared the comments and feedback from Mr. Goodman and others. She also demonstrated how Interactive Benchmarks could have uses in more than one line of

business. Mr. Bengtson and Mr. Jackson did not want her to mention more than one line of business.

Ms. Spivak's male colleagues vacillated between minimizing the importance of Interactive Benchmarks and claiming credit for her vision and work. In his October 2014 performance review, Mr. Bengtson took credit for the birth of Interactive Benchmarks, barely crediting my client. Mr. Bengtson claimed he "[w]orked with Sales Ops to define need for more comprehensive benchmark solution in AMP, Interactive Benchmarks was borne of these discussions."

Based on Ms. Spivak's achievements through November 2014, she should have been rated "Strongly Exceeds," and promoted to a Level 7. However, Ms. Spivak's male supervisors devalued her contributions as a woman. In her November 2014 Q2/Q3 performance review, Ms. Spivak was rated "Consistently Meets Expectations." RS 71-75. Once again, peer reviewers uniformly lauded her vision, insight and understanding of benchmarking. Dustin Jackson, a director of Software Engineering, wrote, "[s]he is very focused on building the products that matter for our users and using her own knowledge and investigations to decide on exactly what that is (rather than relying solely on the opinions of others). Paul McClinton, a Principal Account Manager, said that she met Google's need for "accurate and insightful projections." Gautam Sawhney, Sales Operations Manager, commented on Ms. Spivak's "amazing ability to visualize the success of a product from an end user's perspective."

In sharp contrast, Mr. Rothman damned Ms. Spivak with faint praise. He cited her key strength as "effectively prioritizes tasks" – marginalizing her accomplishments to those of a follower, contradicting the years of consistent feedback from those who worked most closely with Ms. Spivak that acknowledged her strength as a strategic leader. Mr. Skakkebaek, Mr. Rothman and Mr. Jackson criticized her "soft skills." Mr. Skakkebaek said my client "needs to be sensitive to the audience and tailor the message accordingly." Mr. Jackson said she should "modulate her message to the appropriate audience." Mr. Rothman made unsupported and untrue statements such as that "the data does not necessarily align with'' Ms. Spivak's views. But the data *did* align with her views. Both Ms. Stanley and Ms. Hsu specifically recognized my client's conclusions as "data driven."

**9. Google Downgrades Ms. Spivak for Taking Approved FMLA Leave.**

Ms. Spivak is a single parent who chose to have a child without a partner. Mr. Rothman openly questioned that decision and told her he did not understand why she would do that. Ms. Spivak's two-year-old daughter had surgery on December 26, 2014, and she took an approved two-week leave to care for her daughter. Ms. Spivak followed all of the right policies and protocols. She gave Google advance notice, offered to provide Mr. Rothman documentation from her daughter's surgeon supporting the leave, and was available to colleagues by email during the leave. Ms. Spivak's leave was legitimate and authorized. Nonetheless, Mr. Rothman told Ms. Hsu that my client was not at work during the leave to care for her child because she was "petulant and temperamental."

Ms. Spivak took a second leave later in January because she was having a second baby through a surrogate mother, and the surrogate lost the baby. Ms. Spivak properly filed her leave in Google's leave system, notified Mr. Rothman and others about the leave, and designated a primary contact person in her absence. Ms. Spivak specifically coordinated the leave time with Mr. English, with whom he worked most closely. On January 14, 2014, Mr. English took four days of vacation on short notice to go to Hawaii. With English's encouragement, Ms. Spivak decided to use her saved vacation days for leave to grieve for her lost baby.

In early February, Mr. Rothman informed Ms. Spivak that he was downgrading her performance review to "Low Meets" because of the two leaves of absence. *See* RS-434.

**10. Ms. Spivak Renews Her Gender Discrimination Complaints and Google Relocates Frontline to Los Angles.**

In February 2015 , Mr. Rothman told Ms. Stanley that Mr. English needed to be "harder" on Ms. Spivak (even though he was her peer, not her supervisor) and that Mr. Rothman hoped Ms. Spivak would "just leave" Google. From February 3 to February 26, 2015, Ms. Spivak made a number of specific written complaints about the discrimination, FMLA interference, and unfair treatment she was experiencing and Google's previous failure to intervene.[8]

On February 11, 2015 – only eight days after Ms. Spivak's February 3 discrimination complaint – Google announced that Interactive Benchmarks and the other projects in Frontline were being transferred to LA. The email was signed by Mr. Jackson, Scott Silver, and Mr. Skakkebaek. They offered the Frontline team the option of moving to L.A. with their project or remaining in Seattle and transitioning to another project. The email was delivered to the Frontline team in an all-hands meeting. However, Mr. English had been given advance notice by Mr. Bengtson and Mr. Jackson so he would not be caught off guard. Neither Mr. Skakkebaek, Mr. Rothman, Mr. Bengtson, nor Mr. Jackson made any attempt to give Ms. Spivak the same advance notice offered to Mr. English.

Two days later, Ms. Spivak met with Mr. Jackson, Mr. Skakkebaek and Mr. Rothman. She officially accepted the offer to transfer to L.A. The men reacted with visible surprise and told Ms. Spivak that they preferred that she stay in Seattle rather than continuing with Interactive Benchmarks. When Ms. Spivak insisted she wanted to remain with Interactive Benchmarks and was willing to move, Google took a series of steps to force her hand by making the offer to relocate impossible to accept. Relocation costs for home selling/closing costs were capped at $15,000. My client had just bought

---

[8] *See* February 3, 2015 email to Ewing, Sakellariou and Hazenfield titled "Prescriptive Gender Discrimination at Google" complaining about discrimination (RS-426-28); February 9 email to Rothman about leaves taken by my client, including the leave for her daughter's surgery (RS-434); February 11, 2015 email to Sakellariou about the hostile work environment, and leaves (RS-439), and previous complaints to which HR did not respond; February 23, 2015 email to Tortorici about legal and code-of-conduct violations (RS-470, 468).

a house. Her calculations show it would have cost her $100,000 to sell her home and buy another in LA. Initially, Ms. Spivak was given only 23 days to accept the offer to relocate, and 90 days to have completed the relocation and be working from LA. There would not have been sufficient time for her to find a new home and day care (most with long waiting lists) for her daughter under the terms of the relocation offer, and Google knew it.

On March 3, 2015, Ms. Spivak reported she was experiencing high blood pressure, and asked to be allowed to work from home. On March 6, she was told she could not work from home for an extended period of time. Subsequently, Ms. Spivak went on a medical leave of absence.

In the end, Ms. Spivak was the *only* PM who was forced to choose between relocating to L.A. with Frontline or remaining in Seattle to transition to another project. Mr. Bengtson had previously transferred to the Cloud team. Mr. Rothman and Mr. Lacey were allowed to continue working on Interactive Benchmarks from Mountain View. Google arranged for Mr. English and the engineers working below him to take on a prestigious new project working directly for a Vice President and Mr. English now filled a Level 8 role, which he considered a promotion.

On March 20, 2015, Google informed Ms. Spivak that she could have until May 18 to decide about moving to L.A. However, between February 13 and March 20, Ms. Spivak had learned that HR, not Engineering or Product Management, had decided to move Interactive Benchmarks to L.A.; that her management did not want her to remain with Interactive Benchmarks, and that she was the only PM in Frontline who was being forced to either give up her project or move to L.A. Ms. Spivak came to realize that Google and the Frontline Team were pushing her out.

The men who were involved in Interactive Benchmarks are now thriving at Google. After Interactive Benchmarks was transferred to L.A., Mr. English was moved to a promising position because of Interactive Benchmark's success. He now joined Mr. Bengtson in reporting directly to Vice Presidents (where they had not been before). Despite being a Level 6, Mr. English is filling a Level 8 position and has been told that the success of Interactive Benchmarks played a role in this level of confidence in his ability.

In sharp contrast to her male colleagues, after Interactive Benchmarks was transferred to L.A., Ms. Spivak was recruited to work under a Level 5. By this time Interactive Benchmarks had achieved a customer satisfaction score of an unprecedented 93% compared with AMP's troublesome and unsatisfactory score of 42%.

### 11. Ms. Spivak's Final Performance Review While on FMLA Leave.

On or about May 14, 2015, while she was out on FMLA leave, Mr. Rothman gave Ms. Spivak her Q1 performance review. RS-651-52. The 2015 Q1 performance review make statements that are demeaning, false and misleading. The review also completely omits Ms. Spivak's accomplishments during the period.

Interactive Benchmarks has become a huge success with high engagement by Mr. Reardon, Mr. Skakkebaek, Mr. Jackson and others. Ms. Spivak invented Interactive Benchmarks and led it to successful launch. Rothman does not even mention Ms. Spivak's hugely successful product launch of Interactive Benchmarks in December 2014. It is incredibly demeaning to say my client had a "good understanding" of Interactive Benchmarks. She invented it, and was a core decision maker on its technical design, as Mr. English acknowledged in her Q3/Q4 2014 Performance Review. Amazingly, Mr. Rothman purports to comment on my client's overall performance during this period without even mentioning her huge and successful launch of Interactive Benchmarks with its unambiguous success indicators, including a 93% C-Sat. This performance review is further evidence of the gender discrimination Ms. Spivak has endured at Google.

## Legal Analysis

Ms. Spivak's career at Google has been hampered by insidious gender discrimination both in New York and more recently in Seattle. When she complained about her treatment, Ms. Spivak faced swift and certain retaliation. The gender discrimination and retaliation Ms. Spivak has endured at Google violates both state and federal law.

### A. Gender Discrimination in New York.

Scott Spencer took Ms. Spivak off Admeld Integration because she was pregnant and he believed she would not return to Google after her pregnancy leave. Mr. Spencer did not provide Ms. Spivak with any meaningful work to do until after her return from leave in January 2013. As a result of that discrimination, Ms. Spivak received a poor performance rating and did not receive the 2012 stock grant. Mr. Spencer's conduct was discriminatory. Ms. Spivak's list of accomplishments demonstrates that when she is given meaningful work to do, her performance is excellent. An arbitrator would reasonably conclude that Mr. Spencer's pregnancy discrimination caused my client not to receive a stock grant in July 2012.

Google violated New York's law against discrimination (McKinney's Executive Law, Section 296) when it denied Ms. Spivak a stock grant in July 2012. The New York statute of limitations is three years. Unless Google is willing to enter into a tolling agreement, my client will initiate arbitration or file her claims in court before July 1, 2015 to preserve this claim.

### B. Gender Discrimination in Seattle.

After Ms. Spivak transferred to Seattle, the hostility and discrimination against her intensified. Google then retaliated against her when she complained about the discrimination. Under RCW 49.60, the Washington Law Against Discrimination, Ms. Spivak need only show that the hostility against her was based in part on gender.[9]

---

[9] This letter focuses on the WLAD with respect to Ms. Spivak's Washington claims. If this matter goes to arbitration or litigation, she reserves the right to claim a violation of Title VII as well.

*Mackay v. Acorn Custom Cabinetry*, 127 Wn. 2d 302 (1995); *Allison v. Housing Authority*, 118 Wn. 2d 79 (1991). She easily meets this burden.

**1. Initial PIE Assignment.**

Ms. Spivak's initial assignment on the PIE team was to identify the needs of Google account managers, create an approach to meet those needs, validate that the approach would be successful, and lead the PIE team to develop insights that would be helpful to Sales and the customers. This assignment required vision, expertise and the exercise of discretion. The fact that she invented Interactive Benchmarks, and that Interactive Benchmarks went viral, is strong evidence that Ms. Spivak exceeded all expectations in performing her mission.

After discovering that AMP/QS estimates were so inaccurate that Sales would not use it, Ms. Spivak developed Interactive Benchmarks as an alternative. Unlike AMP/QS, Interactive Benchmarks was transparent and accurate, meeting the needs of Sales. Mr. Bengtson did everything in his power to prevent Ms. Spivak from developing Interactive Benchmarks. He denied her data. He insisted that she should keep quiet unless she had the perfect solution to AMP/QS's shortcomings. He fed Mr. Skakkebaek, my client's direct supervisor, false information for her performance review. He criticized Ms. Spivak because she attacked the AMP/QS estimates as inaccurate, but did not criticize Mr. English for the same conduct. He told Ms. Spivak she should be satisfied with a Level 6 position. He told Ms. Spivak not to highlight the multiple uses for Interactive Benchmarks that made it so revolutionary and valuable.

There is ample evidence that Mr. Bengtson was biased against Ms. Spivak because of her gender. Even if an arbitrator were to conclude that he was motivated in part by a desire to protect his turf (AMP) that will not be a defense. Under Washington law, Ms. Spivak need only prove that Mr. Bengtson was "substantially motivated" by gender bias for his actions to be found unlawful. *Mackay, supra*; *Allison, supra.* Ms. Spivak easily meets that standard.

**2. Selection of Vince Lacey For Interim Lead.**

Ms. Spivak had far more qualifications for the temporary lead position than Mr. Lacey did. Mr. Skakkebaek's selection of Mr. Lacey over Ms. Spivak is clear evidence of gender bias.

**3. May 2014 Performance Review and PIP.**

Mr. Skakkebaek wrote Ms. Spivak's May 2014 Performance review and PIP. But he did not work directly with Ms. Spivak. Instead, the evidence shows that he was relying on Mr. Bengtson for his negative comments about my client. Mr. Skakkebaek did not ask Mr. English or Ms. Hsu, who worked closely with Ms. Spivak and were known as supporting my client and Interactive Benchmarks, to review her before the PIP. During a subsequent investigation, Mr. English apparently told HR that he believed Ms. Spivak was the victim of gender discrimination.

Mr. Skakkebaek made a number of false statements in the PIP. He suggested Ms. Spivak's communications were not clear or compelling, that she made statements that were not based on a thorough understanding, were not well-founded, not based on data, and that she misrepresented the opinions of others. No examples were given of conduct by Ms. Spivak supporting these criticisms. The record will not support these criticisms.

The PIP set goals for Ms. Spivak that were impossible to achieve. Mr. Skakkebaek instructed her to listen more and learn more from her (male) colleagues. Ms. Spivak discovered a flaw in the way AMP/QS provided estimates and came up with the solution. Mr. Bengtson met her achievement with total hostility and tried to shut her down. In the end, QS failed and Interactive Benchmarks thrived. In short, Mr. Bengtson should have been criticized for not listening to my client. But instead, Mr. Bengtson was promoted, Ms. Spivak was placed on a PIP, had Interactive Benchmarks taken away from her, and has been offered an opportunity to interview for a job reporting to a Level 5.

In just three months, Ms. Spivak did user research, surfaced critical issues while simultaneously presenting an achievable vision, engaged sales ops, and achieved broad buy-in for a new and achievable direction for the team. Rather than lauding Ms. Spivak's accomplishments, Google slapped her with a PIP. A number of factors combine to show that the May 2014 PIP was the product of gender bias. The evidence will show that Mr. Bengtson was the driving force behind the PIP. As outlined above, Mr. Bengtson was motivated in substantial part by gender bias. He could not believe that a woman could rise above a Level 6. And he did everything he could to block Interactive Benchmarks and prevent Ms. Spivak from receiving credit for it.

Google's own policy requires that there be conversations with employees who have performance issues before a PIP is issued. Neither Mr. Skakkebaek nor Mr. Bengtson nor any other manager ever said a word to Ms. Spivak about performance issues prior to placing her on the PIP. The lack of prior warnings or discipline is further evidence of gender discrimination.

Mr. Skakkebaek had ample opportunity to speak to Ms. Spivak about any concerns he may have had about her performance. She asked Mr. Skakkebaek for help but he simply did not respond to her request for assistance. Instead, he cooperated with Mr. Bengtson and placed my client on a PIP for reasons that will not stand up to scrutiny. The review and PIP he gave Ms. Spivak in May 2014 show that Mr. Skakkebaek would have rated her as "Needs Improvement" when her accomplishments warranted an "Exceeds."

Part of Ms. Spivak's claim of gender discrimination is that she should have been promoted but, because she is a woman and a single parent, she was not. Failure to promote a qualified employee because of her gender is sex discrimination. Male employees associated with Ms. Spivak's success on AdX Buyside (Noam Wolf and Drew Bradstock) received promotions. Mr. Bradstock even used my client's successes to gain his promotion.

In Ms. Spivak's first 1:1 with Mr. Bengtson after the PIP, he encouraged her to leave the PIE team. When Ms. Spivak said she wanted to stay on PIE because Interactive Benchmarks was a good project, and she wanted a promotion, Bengtson told her that a Level 6 was a perfectly acceptable plateau for a (female) PM.

Ms. Spivak repeatedly alerted Google that she was the victim of gender discrimination. Those complaints went unheeded time and time again.

**4. Aaron Rothman Promotion Above Ms. Spivak.**

In July 2014, Google and Mr. Skakkebaek promoted Mr. Rothman into a position over Ms. Spivak. Mr. Rothman had tried for a promotion and failed several times before July 2014. Ms. Spivak had relevant experience as a manager at several companies. She had achieved with AdX Buyside and Interactive Benchmarks. She should have been promoted, not Mr. Rothman. Failure to promote her instead of Rothman was bias and retaliation.

**5. September 2014 Media Review.**

At the time of the September 2014 presentation to Mr. Mohan, Ms. Spivak was the Interactive Benchmarks Product Manager and was recognized as the subject-matter expert on the data, metrics, and insights that sales needs to support customers and drive revenue. She had done extensive interviews of users and sales people. Mr. Rothman's attempts to sideline Ms. Spivak and minimize the impact of her work are evidence of gender bias.

Mr. Rothman was dismissive of Ms. Spivak's work and even questioned her decision to have a baby on her own, without a male partner. He and other managers repeatedly instructed Ms. Spivak not to publicly highlight the important uses of Interactive Benchmarks beyond just post-campaign analysis. Mr. Rothman scheduled himself rather than Ms. Spivak to present Interactive Benchmarks to Mr. Mohan at the Media Review. When Ms. Spivak insisted that she be the presenter, Mr. Rothman used his authority to minimize her presentation to highlight Vince Lacey's presentation on AMP, changing her slides to denigrate Interactive Benchmarks and promote AMP – despite the fact that that AMP was floundering and Interactive Benchmarks was flourishing.

**6. November 2014 Performance Review.**

Ms. Spivak's Q2/Q3 2014 Performance Review from Mr. Skakkebaek is further evidence of gender bias and unfair treatment. The review lauds my client's vision, insight and understanding of benchmarking. However, it criticizes Ms. Spivak's communication skills. The review states that she should have been sensitive to the males whose work was being challenged by Interactive Benchmarks. Why should the males not have been receptive, even grateful, to Ms. Spivak's invention of a better, more accurate way to help customers with their advertising needs? Why were the males not criticized for erecting roadblocks in front of Interactive Benchmarks? The answer is clear. Institutional gender bias.

Ms. Spivak took the risk of communicating that AMP/QS was deeply flawed and that her invention, Interactive Benchmarks, was better. The males whose work was criticized by her joined ranks and attacked her by claiming she was lacking in the "soft skill" of communication. In light of the success of Interactive Benchmarks, which Ms. Spivak created, Mr. Rothman's criticisms are reminiscent of the criticisms of the male partners in the *Price Waterhouse* case. They are also ill-founded. Those who worked closely with Ms. Spivak opined that she excelled in communicating about her work. *See* May and November 2014 Performance Reviews.

**7. Ms. Spivak's January 2015 Leaves of Absences.**

Mr. Rothman's decision to downgrade Ms. Spivak's performance review because of her two leaves of absence in January 2015 violates the Family Medical Leave Act and is further evidence of gender bias, hostility, and retaliation. First, Mr. Rothman penalized Ms. Spivak for taking approved FMLA leave for her two-year-old daughter's surgery in direct violation of the FMLA and also further evidence of gender bias. Remarkably, Mr. Rothman then told Ms. Hsu that Ms. Spivak was on her first leave because "she is just being temperamental." Second, Mr. Rothman penalized Ms. Spivak for taking four days of leave to grieve the loss of her baby while Mr. English took the same leave for a four-day trip to Hawaii. Ms. Spivak will be able to prove that Google is very flexible regarding leave time, and that her leaves were a pretext for Mr. Rothman to continue to discriminate against her and try to push her out.

Using the taking of FMLA leave as a negative factor in employment actions is also unlawful interference. 29 C.F.R. § 825.220(c). *See Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1122-23 (9th Cir. 2001). In order to prevail on a FMLA claim, Ms. Spivak need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to downgrade her performance. *Id.* at 1125. Mr. Rothman's admission that he downgraded her performance due to her FMLA leave establishes this element.

**8. Relocation of Interactive Benchmark and Effort to Push Ms. Spivak Out.**

After Interactive Benchmarks was relocated, Google forced Ms. Spivak to choose between relocating to L.A. and remaining with Interactive Benchmarks. She was the only PM in Frontline who was forced to make such a choice. And the relocation terms Google offered Ms. Spivak were a disincentive to move to LA. When she accepted relocation, her supervisors responded with surprise and tried to dissuade her from doing so. Google then offered Ms. Spivak relocation terms that made her relocation untenable. The message was clear: Google wanted Ms. Spivak gone. This behavior is retaliatory.

If Ms. Spivak had been a man, she would have been hailed as a genius for her work on Interactive Benchmarks. Instead, she was placed on a PIP for her poor communication, her accomplishments were minimized, and she was eventually pushed out.

Google is a male-dominated workplace where few women rise to true leadership positions. Ms. Spivak was the only woman in her PM chain of command. At the higher levels in the Display PM organization, there are 32 men and just one woman. Together Mr. Skakkebaek and Mr. Rothman supervise eight men and four women. Of those four women, Ms. Spivak is the only Level 6. The others are Level 5 or below. We believe the evidence will show that there are only a minimal number of women in Google at the higher levels, where opportunity and compensation are much greater. Even those few women who have ascended to higher positions report that they are not being treated fairly at Google, and that they are not included in important decisions affecting their work, and were not evaluated fairly.

**C. Google's Unlawful Retaliation.**

Ms. Spivak began complaining to Google about gender discrimination in May 2014. By July 2014, her complaints were well-known to her supervisors. Mr. Rothman admitted he knew Ms. Spivak felt the PIP was the product of bias. Ms. Spivak's opposition to her efforts on Interactive Benchmarks after May 5, 2014, the performance reviews in November 2014 and May 2015, and her removal from Interactive Benchmarks in February 2015 were each unlawful retaliation for her complaints.

**Damages**

Google's exposure in this case is huge. Ms. Spivak's achievements, including AdX Buyside and Interactive Benchmarks, should have put her on the same path as Neal Mohan or Sundar Pichai. Her achievements and Mr. Mohan's are strikingly similar. Google paid Mr. Mohan $100 million. Ms. Spivak has been given multiple negative reviews for speaking up and advocating path breaking and successful strategies. Her only real opportunity to continue working at Google involved substantial demotion, reporting into a Level 5 Junior PM in a field outside her expertise and career experience.

**A. Back Pay.**

Ms. Spivak was hired at Google's New York Office as a Level 6 at a salary of $155,000 in 2010. She was first discriminated against in 2012 when Mr. Spencer removed her from the Admeld migration project. Ms. Spivak then developed meaningful work on AdX Buyside in February 2013, and performed excellently. At the end of 2013, Ms. Spivak transferred to Google's Seattle office, did outstanding work and again encountered discrimination.

Because of the discrimination, Ms. Spivak's compensation, including stock grants and bonuses, have been substantially impacted since July 2012. Ms. Spivak received a stock grant of 500 shares in 2010 when she was hired. She received no stock grants for 2012 and 2013 because of the gender discrimination she faced. Furthermore, Ms. Spivak's bonus multiplier was at the lowest part of the range for a Level 6 based on unfair performance scores. Had she been fairly rated, Ms. Spivak would have received much higher bonuses.

**B. Front Pay.**

It is probable that Ms. Spivak's employment with Google will end before her medical leave and vacation runs out. Ms. Spivak will still be entitled to front pay if she resigns. Washington law is clear that a plaintiff need not claim constructive discharge in order to recover front pay. *Martini v. Boeing*, 137 Wn. 2d 357, 367 (1999). Under *Martini,* Ms. Spivak need only show that the discrimination was the proximate cause of her damages. Because Ms. Spivak is claiming damages on account of discrimination she need only prove that the discrimination was a "substantial factor" causing the damages she suffered. See WPI 15.02 and the cases cited, especially *Mackay v. Acorn Custom Cabinetry*, 127 Wn. 2d 302 (1995) and *Allison v. Housing Authority*, 118 Wn. 2d 79 (1991). Here, Ms. Spivak was not promoted as a man with the same achievements would have been. Instead, she was disciplined, undervalued and criticized. Had Google treated her fairly, she would have been promoted and rewarded financially. *See e.g.*, *Blaney* (front pay for employee who was not selected for promotion); *Passantino* (claim by employee who was not promoted).

Ms. Spivak will be entitled to front pay from the date of her separation from Google through the "likely duration" of her employment. The duration and amount of front pay are for the trier of fact. *Lords v. Northern Automotive Corp.*, 75 Wn. App. 598, 605 (1994). *Blaney v. IAM*, 151 Wn. 2d 203, 210 (2004). Ms. Spivak will testify that, had she been treated fairly, she would have remained with Google for at least another 15 years, or until age 55.

Attached is a spreadsheet (see enclosed CD) that estimates what Ms. Spivak would have received in salary, bonuses, and stock options in the absence of discrimination or retaliation. The spreadsheet recognizes that stock grants vest over time and provides an offset based on what we estimate Ms. Spivak will be able to earn in a job in IT working for another employer.

Had Google treated Ms. Spivak fairly, she would be leading one of the most company-critical initiatives, which was also her creation. This would be a springboard for rapid advancement. Even without Interactive Benchmark, this 4-year promotion rate is supported. Ms. Spivak is a top performer. Per Google's own statistics, the top 40-45% of Level-7's and Level-8's are promoted to the next level after three or four years. Ms. Spivak rightfully belongs in the top 25% who are promoted within three years, but we use four years (top 40-45%) as the conservative calculation.

We estimate Ms. Spivak's damages because of the discrimination and retaliation from 2012 until 2031, when she will be 55 years old, are $628,868 in back pay and $16,835,723 in front pay, for a total of $17,464,591. She will also recover emotional distress damages and attorney fees and costs. *See* RCW 49.60.030(2).

**C. Emotional Distress Damages.**

Ms. Spivak will be entitled to substantial emotional distress damages. Ms. Spivak's confidentiality agreement will prevent her from working in the advertising space where she has built her career. As a 39-year-old female in technology, it is not very likely that she will have the opportunity to succeed in her area of experience and expertise as she could have succeeded at Google absent discrimination. Ms. Spivak bet

her future on fairness at Google. If she had not been discriminated against, Ms. Spivak would have had a rewarding career at Google, ultimately progressing to a Level 9. Google failed her by refusing to put a stop to gender discrimination[10] notwithstanding her repeated complaints. The trier of fact will award her substantial damages for the pain and suffering she experienced when Google destroyed her career.

We are confident Ms. Spivak will prevail on her legal claims before a jury or in arbitration.[11] However, she also recognizes the value of reaching a fair resolution of her claims now without the expense and delay of arbitration. To that end, she is willing to settle her claims now for $10,000,000 in exchange for a mutually agreed-upon complete release. Ms. Spivak is willing to negotiate an acceptable settlement, and would also consider mediation.

Please let me know within 10 days of the date of this letter how your client would like to proceed

Sincerely,

Steven B. Frank

SBF/JMC/sar
Enclosures
cc: Client (via email, w/o enclosures)

---

[10] Google's duty to promptly and adequately remedy discrimination is well settled.

[11] I have reviewed the At-Will, Employment, Confidential Information, Invention Assignment and Arbitration Agreement ("Agreement") Ms. Spivak signed when she was hired. We note that the Agreement provides for arbitration with JAMS pursuant to the JAMS Employment Arbitration Rules and Procedures. Our position is that the Agreement does not comply with JAMS Minimum Standards Nos. 1 and 6 because it requires my client to arbitrate in Santa Clara County instead of King County, Washington, provides for an award of attorney fees to the prevailing party, and requires Ms. Spivak to pay any fees or costs of the arbitrator (not including the initial filing fee). We will raise these issues with the arbitrator.