**INTRODUCTION**

Ayan Kayal is an in-house lawyer at Facebook. I know him because he and I were both members of a small social email group called "Plusmail" - the members of which are alumni of Yale University who, as students, once held the campus job of "computing assistant." For context, there are perhaps ~50 active members (and additional inactive members) in this email group, and over the decades it became not just a casual social group, but a forum for individuals to share personal details of their lives.

I have been in a 5-year legal battle with Google and previously submitted multiple complaints to the State Bar. I believe that because of the strong merits of my claims, Google attorneys (both in-house and outside counsel) engaged in substantial misconduct and also pulled in multiple other attorneys to help Google try to shut down my claims. I also believe that certain attorneys that I know personally recognized the strength of my case, understood (or were told directly) the extent to which Google would be willing to settle it (well into the 8-figures), and were opportunistic in ways that violated the Rules of Professional Conduct as well as criminal law.

I believe that Ayan Kayal is one of those attorneys. For the past five years, I actively discussed my legal claims on the "Plusmail" email list, so he had a lot of context. I also had extended conversations with Ayan and two other attorneys where they provided me legal advice and guidance on my claims and motions. I have provided some of those emails so that the State Bar can make a determination over whether there was an attorney-client relationship. I believe there was. I also believe that sometime in 2019, Ayan, along with a number of other individuals I know, colluded with Google to gaslight me and drive me to do the following things:

1. withdraw the bar complaints I had submitted against Brian Johnsrud
2. Hand over power of attorney over to one of them
3. Get myself diagnosed with a psychiatric disorder[1]

I believe they were reassured by Google that once I did so, whoever had Power of Attorney would be able to settle with Google on my behalf for $20 million, and that that person would manage the settlement, along with the others, who would form an advisory group. I believe there was an expectation that those who were tasked with providing this guidance would be given 5% (or more) of the settlement as a tip or service fee. I believe those involved were also driven by ego/narcissm (swooping in as "closers" to get the "win" for my case – and have a story to tell) as well as for the professional connections (helping powerful Google attorneys settle a very problematic case). I do not know if those details are all correct – and I'm not trying to prove all of those things, but that is my best understanding of what was going on. At no point did I agree or consent to any of this, and I only came to this understanding after the fact. It is also not a settlement I would agree to, and certainly not under those invalidating circumstances.

---

[1] For the record, have not been diagnosed with any delusional psychiatric disorder despite the intense pressure to do so, and I did not and do not take any anti-psychotics or anti-depressants or any similar medication. I was subjected to a tremendous amount of gaslighting by these individuals, and then pressured by the same to go to the hospital and get a diagnosis for my own protection. Since I have cut myself off from Ayan and others, my subsequent evaluation included statements like this: "**Thought form**: Normal: logical, coherent, goal-directed. **Insight/Judgement**: Good Insight and Judgment" and I was quickly exited from any further "treatment" without any diagnosis beyond non-specified anxiety, and without any suggestion that I was delusional in any way. There was, rather, acknowledgement that I had experienced trauma and been manipulated.

I acknowledge that I cannot know for certain that this is what happened, but my complaint is not dependent on that. Through this complaint I believe I can show that Ayan, through his actions and emails violated the rules of Professional Conduct regardless of whether there was collusion with Google. So while I strongly believe in collusion based on overwhelming circumstantial evidence – it is not the thing that needs to be proven to support this complaint.

I can show that regardless of anything else, Ayan violated the rules of Professional Conduct and that there may have been many other violations based on an Attorney-Client Relationship. Core to one of the complaints is an email that Ayan sent to our email group on July 28. I will revisit this at the end of this document, but I am laying it out here first for framing.

On July 28, 2019, Ayan made multiple assertions about me to a large group of individuals - discrediting me, and asserting specific knowledge of and facts about my medical records.

---------- Forwarded message ---------
From: **Ayan Kayal** <[redacted]
Date: Sun, Jul 28, 2019 at 2:56 PM
Subject: Re: UNSUBSCRIBE ME
To: Plusmail <+[redacted]

Rebecca has stated previously that she thinks Shawn and I are conspiring with Google - two of the least likely people to do so, of course.

In the interest of transparency, a few of us have discussed offlist how, at this point, she needs more than even outpatient care. Rebecca thinks that any email sent to her includes coded messages about her Google case, but fundamentally refuses to believe that she's having massive delusions and finds the mere idea that that could be the case insulting.

That's why even the psych and other ER visits haven't been particularly productive. She does have a helpful friend who works in the field and her mom visiting, so hopefully that will help her.

On Sun, Jul 28, 2019, 10:43 AM Rebecca Spivak <rebeccaspivak@outlook.com> wrote:

> Shawn and Ayan and whoever ... are NOT acting in my best interests. Do not believe otherwise.

## <u>There Was an Attorney-Client Relationship</u>

Over the years, Ayan provided legal advice to me, and this may be material to my complaints. I had lengthy legal-advice conversations with Ayan and two other attorneys, as well as general conversations with the broader email group. I certainly came to trust and believe that Ayan was acting in my best interests and providing me sound legal advice.

Here are some of the emails that Ayan sent to me, giving me direct legal advice on my legal claims against Google, that I believe justify the conclusion that there was an attorney-client relationship.

Note the multiple instances where there can be no doubt that he was providing me legal advice.

**Ayan Kayal**
Monday, September 21, 2015 at 1:49 PM
David Russcol; Rebecca Spivak; Shawn Bayern; Vladimir Coho; Ken Stern
Show Details

On Mon, Sep 21, 201 at 10:54 AM, David Russcol <[redacted] wrote:

> #1 I agree is egregious, though criminal is a bit strong (since I imagine they will claim it was an "oversight") but perhaps theoretically possible. I would pound the table on that, especially if the EEOC doesn't have access to the original emails. At the least it should undermine their credibility, and it is sanctionable though perhaps unlikely to be sanctioned.

+1 -- it's pretty transparent lying and could be sanctionable (even if unlikely), but not criminal. And definitely pound the table on that one. It was stupid if they thought they could just get it kicked with that, but I bet a lot of people don't fight back.

> #2 is fair game. You can argue with them about what you meant, and we know what you meant, but they can take the language they've got and make of it what they can.

Agree, this is what I mentioned before (probably a few months ago) when I said that everything is up for scrutiny, regardless of what you think the context is and that a lot of things aren't very black and white to a factfinder. They're also within reason to present things in the best light to themselves, obviously, without going overboard as in case #1. In-house counsel should really benchslap those morons for that one.

---

**Ayan Kayal <ayan.kayal@gmail.com>**
Friday, October 19, 2018 at 4:51 PM
Rebecca Spivak; Shawn Bayern; David Russcol
Show Details

You replied to this message on 10/19/18, 5:29 PM. Show Reply

Damn, it took long enough for this to get traction. I'm glad it finally did, as this was always the most egregious thing to me and completely out of the realm of what normal lawyers do. It's certainly bar complaint-worthy.

Was the brief before ediscovery the one you posted a few days ago?

Re: Spivak, Rivka vs. Google Inc. - JAMS Ref No. 1110018238

AK

**Ayan Kayal <ayan.kayal@gmail.com>**
Monday, October 22, 2018 at 1:03 PM
Rebecca Spivak; Shawn Bayern; David Russcol
Show Details

On Fri, Oct 19, 2018 at 5:29 PM Rebecca Spivak <rebeccaspivak@outlook.com> wrote:

> I only posted a short snip of that brief. The full brief was quite long.
>
> As to this stock issue ... you know, I'm not sure it's most egregious thing.
>
> There's been so much doctored evidence. "Pee on my leg and tell me it's raining" sort of evidence. The thing is that 9 times out of 10, I haven't had access to the originals. I think Google's problem is that they are doctoring evidence so freely, that they've lost any sense for which things I can catch and prove. To plusmail, I can prove the altered emails that I sent to plusmail. And I can prove the doctored code of conducts, because I also have those originals. I have a few other provable things that I haven't shared with plusmail. But beyond that there's still piles more that I would bet my right arm on, but that I can't prove with a smoking gun, because I don't have access to it.

I don't mean that the stock issue is the most egregious thing. The general doctoring of evidence is the most egregious thing. And that's certainly not customary within the profession or even excused. No Big Firm lawyer would risk their career with that shite.

And even if sanctions are not granted, this is bar complaint-worthy regardless if they were really falsifying evidence, as what you sent in the past seemed to indicate (no ellipses, no brackets, no notes that these were isolated quotes, etc.). Duty of candor to the tribunal.

If sanctions are granted, the arbitrator himself may have a duty to report it to the bar, btw. Judges, even Article I judges, do that sometimes in certain scenarios. Marie's been in the courtroom when one judge suggested that that might be an appropriate remedy for far less than this (it was basically unethical behavior to frustrate normal processes and make the client re-file and pay new filing fees and wait much longer to get relief, and increase burden on the court or the service, due to a sour grapes for losing).

Re: Spivak, Rivka vs. Google Inc. - JAMS Ref No. 1110018238

AK

**Ayan Kayal [redacted]>**
Monday, October 22, 2018 at 1:10 PM
Rebecca Spivak; David Russcol; Shawn Bayern
Show Details

image001.png
371.4 KB

Download All Preview All

Based on what you've shown of the actual investment policy (which I assume is probably pretty damn close to FB's policy), this seems like a gross mischaracterization. If they've had the opportunity to give more context within the tribunal, as David suggested, and chose not to do so even when you questioned this, that could be problematic for them. But it's possible, depending on how this happened, that the burden shifted to you to introduce the entire policy and show why they mischaracterized it -- hard to see this without having way more context.

And the doctoring of Plusmail emails in the past, well, that seemed pretty damn clearly malfeasance unless I'm misremembering this. They completely changed the meaning of literally every sentence they quoted and left out every sentence that would show that meaning. Again, if they've had the opportunity to respond to this and haven't fixed it appropriately, that could be problematic. I seem to remember that you did a side-by-side comparison, on Plusmail, of the doctored emails vs. the actual emails, and it looked pretty damning to me.

They can show evidence in the most favorable light to them, but they cannot mislead while doing so.

Re: Spivak, Rivka vs. Google Inc. - JAMS Ref No. 1110018238

**Ayan Kayal <ayan.kayal@gmail.com>**
Monday, October 22, 2018 at 1:13 PM
Rebecca Spivak; David Russcol; Shawn Bayern
Show Details

Doctored.jpg
127.3 KB

Download All Preview All

You replied to this message on 10/22/18, 2:10 PM.

Btw, this is what I was thinking of.

If they literally submitted that with that Message-ID: header, the arbitrator should throw the motherfucking book at them.

---

Re: Spivak, Rivka vs. Google Inc. - JAMS Ref No. 1110018238

**Ayan Kayal <ayan.kayal@gmail.com>**
Friday, December 7, 2018 at 2:43 PM
shawn.bayern@law.northwestern.edu; Rebecca Spivak; David Russcol
Show Details

image001.png
74.1 KB

Download All Preview All

You replied to this message on 12/7/18, 3:02 PM. Show Reply
You replied to this message on 12/8/18, 12:11 PM. Show Reply

On Mon, Nov 12, 2018 at 8:38 AM Shawn Bayern <shawn.bayern@law.northwestern.edu> wrote:

> I just read it over, but it's extremely hard to give you a confident decision about whether to delay or not from the outside; I don't know what you'd be doing with the extra time, etc. The document isn't embarrassingly incomprehensible to me or anything like that. I'd think that the extra time would be useful if you have particular arguments that you haven't yet had a chance to write up, but it seems obvious to say that. Sorry not to be more helpful, but I don't see any good way to give advice about the tradeoffs here.

Obviously, I'm way after the fact here, but yeah -- I think this was fine and wasn't incomprehensible.

As David mentioned, I'd be curious about their opposition to a lot of this. The tinfoil hat shit about anonymous forwards is amazing. Did they get Alex Jones to be their legal consultant?

Re: Spivak, Rivka vs. Google Inc. - JAMS Ref No. 1110018238

AK

**Ayan Kayal** [redacted]

Monday, December 10, 2018 at 10:30 AM

Rebecca Spivak; shawn.bayern@law.northwestern.edu; David Russcol

Show Details

I feel like your strongest requests for sanctions are probably 2, 3, and 4. If the arbitrator doesn't really believe 1, 5, and 6 should be sanctionable, I'd still see it as a massive win. For #6, the arbitrator could just order discovery on that issue in lieu of sanctions. For #5, because their request eventually got denied, I see this as less likely to get sanctions (like I mentioned before, if you wanted to add a bunch of those people on the list as parties, I guarantee you Johnsrud would not be representing them all as individuals). For #1, I could see a potential remedy being that the arbitrator lets you add that as a claim in your lawsuit somehow in lieu of sanctions. And I do think for #3, the arbitrator could also order discover on that issue, but it feels more bad faith than the other stuff inherently because it's fabricating a paper trail.

Re: reply if you get this?

AK

**Ayan Kayal <ayan.kayal@gmail.com>**

Tuesday, December 18, 2018 at 1:17 PM

Rebecca Spivak; shawn.bayern@law.northwestern.edu; David Russcol

Show Details

On a few of these, the arbitrator could just order discovery. The obvious one seems all the altered evidence...

The Code of Conduct thing might be your grounds for appeal, to be honest. I would make your statements here to get them into the record so that you can appeal on it, but not press the arbitrator, because it's clearly a hot button.

---

**Something Changed in Spring/Summer 2019**

Sometime in Spring or Summer of 2019, Ayan started sending very strange emails and seemed to be on a mission to discredit me and my concerns and to defend Google. We all knew that my case was a very big deal to Google and that Google had engaged in very serious misconduct, which Ayan had previously ranted about, supporting my position. But suddenly he completely changed his tune and was trying to convince me that Google had done nothing wrong and that my case was barely on Google's radar. [2] He also seemed to suggest he had first-hand knowledge of Google's perspective on my case.

Here is says Google wouldn't do anything illegal because my case is just a "mundane middle manager case." I imagine the State Bar knows nothing could be further from the truth and that no reasonable attorney familiar with the case could think that. But also, how would Ayan know what Google thought?

---

[2] Additionally, in a way that's too hard to compile and prove here, he repeatedly (indirectly) nudged me to withdraw my bar complaint against Brian Johnsrud.

Re: Malware for mac

AK **mail@preter.essentially.net <mail@preter.essentially.net>** on behalf of **Ayan Kayal <ayan.kayal@gmail.com>**
Tuesday, July 16, 2019 at 2:04 PM
Plusmail
Show Details

On Tue, Jul 16, 2019 at 1:49 PM Brian Carp <brian.carp@aya.yale.edu> wrote:

> I've used Sophos for firwewalling but not for individual workstation; I can confirm that the software is pretty good though. My feeling about computer security is that you can take steps to protect yourself against the routine malware that you might accidentally download off of a dodgy link, but if a government or large corporate entity is interested in monitoring you, you're probably outgunned. If you're serious about avoiding snoops, get a burne phone and use Signal perhaps. :-/

"outgunned" is really the wrong direction here -- I'm *extremely* skeptical of any claim that Google would care enough to do something illegal here, especially when they are in active litigation on what's (to them!) a mundane middle manager case.

The other interesting part is that back in the day the way to avoid a virus was "just use a Mac" because no one cared enough to create a Mac virus. Now that they are considered the A-Team, more malware is targeted towards things like iOS than was ever the case many years ago.

---

Later that day, he continued to dismiss me and my claims, and completely changed his previous perspective on the altered evidence (where Google submitted an altered version of an email that I had sent to plusmail to the EEOC). Whereas he had previously been aggressively telling me that that alteration/submittion was sanctionable and bar-complaint worthy, he now suddenly suggested maybe someone in our email group sent it in in altered state. He also, again, seemed to assert first-hand knowledge of how Google felt about my case (and how trivial it was to them).

Re: Malware for mac

AK **mail@preter.essentially.net <mail@preter.essentially.net>** on behalf of **Ayan Kayal <ayan.kayal@gmail.com>**
Tuesday, July 16, 2019 at 4:58 PM
Plusmail
Show Details

> As for companies doing sketchy stuff, I doubt any top-down orders would be so explicit, but I don't doubt that low-level employees who have a manager breathing down their neck saying "I'm getting pressure from up top... make this go away, I don't care how" might engage in some sketchy behavior in a way that provides plausible deniability for higher ups. Now, that doesn't mean that every spam message is realistically generated by an orchestrated gaslighting campaign, or that a random exterminator is a corporate spy, but I wouldn't apply too heavy of a skepticism either. We live in a sketchy world. People do dumb illegal shit all the time. It's not that unusual.

Sure, but what's the easy way and what's the hard way -- Occam's Razor and what not. If I was a fucking idiot, would I essentially "wiretap" a Gmail account without permission? Or send insurance salespeople in an orchestrated scheme?

What you're talking about is maybe -- did someone on Plusmail actually send that one email to Google, or was that via the tap. Either one is frankly plausible, and the latter would have been largely kosher on company resources. There are definitely Google employees on Plusmail, and there are definitely hyper-rule-followers on Plusmail, and there are definitely people who aren't fans of other people on Plusmail.

But really it comes down to being a mundane middle manager thing. I'm not saying that's right, but that's the level at which Google looks at this.

After Ayan wrote this, someone else in the email group responded, telling Ayan not to incite distrust (i.e. not to make me wonder if anyone in the group was working against me and helping Google – which would be bad if there was, in fact the collusion/conspiracy I suspect). Ayan immediately retracted the

idea that it came from someone in the email group – as if any of his argument were tactical/strategic/manipulative. And so Ayan immediately switched his perspective again.

**Subject:** Re: Malware for mac
**Date:** Tuesday, July 16, 2019 at 6:38:55 PM Pacific Daylight Time
**From:** Ayan Kayal
**To:** Plusmail

Ahh yes, and vampires.

But yes, the editing in the alleged "anonymous" note was way too targeted to actually be for a purpose other than litigation. It was too obviously one-sided. Whether it was an overzealous Google HR person or an overzealous person in Johnsrud's office is the only question.

On Tue, Jul 16, 2019, 5:20 PM Brian Carp <brian.carp@aya.yale.edu> wrote:

> On Tue, Jul 16, 2019, 7:58 PM Ayan Kayal wrote:
>
>> There are definitely Google employees on Plusmail, and there are definitely hyper-rule-followers on Plusmail, and there are definitely people who aren't fans of other people on Plusmail.
>
> MAYBE EVEN COMMUNISTS...?!
>
> (I think "the tap" is the simpler answer in that case, Ayan. Let's not incite distrust among plusmailers.)

Just general continued dismissal/invalidation of any idea that Google would have done anything wrong

Re: Malware for mac

AK **mail@preter.essentially.net <mail@preter.essentially.net>** on behalf of **Ayan Kayal <ayan.kayal@gmail.com>**
Thursday, July 18, 2019 at 10:37 AM
Plusmail
Show Details

On Wed, Jul 17, 2019 at 8:57 PM Alvaro Gutierrez <[redacted]rote:

> On Tue, Jul 16, 2019 at 5:19 PM Max Cho [redacted] wrote:
> >
> > Yeah I am against feeding Rebecca's paranoia. "No doubt everything I'm doing is tracked and logged" is a paranoid delusion, unless you mean in the superficial sense of "the web uses cookies" kind of "tracked and logged", in which case malware protection won't help much.
>
> Hoping to contribute something useful for once, here's a bit of anecdata: I had dinner the other night with my old <colleague of higher corporate stature>, who's had more than his share of run-ins and other unpleasantness throughout the years involving <a corporation of relevance>--though he's still there. He's also been in or still in either litigation or arbitration related to cases with other other people/entities (an accident in one case, I forget what the other things were) -- so not a stranger to legal drama, would seem to me. I asked him whether he could envision <their employer> going to the extents discussed and hypothesized in some of the more recent threads about this and he said no, and that if anything it'd be vanilla digital dirt collection, nothing to the point of like psychological warfare and espionage. So there you go.

It'd be way cheaper to just cough up money. There's a reason the Andy Rubin thing went down like it did.

The onslaught of gaslighting was too much, and I was sufficiently afraid and overwhelmed, so on or around July 20, 2019 I caused my case to be dismissed with prejudice with no settlement.

**<u>July 28, 2019 – A Turning Point</u>**

Some Additional Background Here is Needed:

Throughout July, I had been in private chats with Shawn Bayern (a law professor as Florida State University), who was one of the three lawyers on those email conversations where Ayan repeatedly gave me advice. I believe Ayan and Shawn were working together, even if these chats were officially with Shawn. (Ayan subsequently asserted knowledge of things I had discussed only with Shawn). During these chats, Shawn planted the idea that I had exposed a corruption network and that my life was in danger and that I needed to go to the hospital to be safe and/or to kick off some kind of law-enforcement process. He convinced me to have my case dismissed from arbitration. He urged me to broadcast my mental health situation to everyone I knew locally so that they could support my family while I was in the hospital (which Shawn insisted had to be for a full week – he was sure of it – despite having no medical training, and despite the fact that my chats with him were coherent and logical. I was also getting an onslaught of marketing and spam mail pushing the idea of my needing a guardian. Throughout the chats with Shawn I pushed back on him and told him that if this was about settlement, it needed to stop, because all the indirect/gaslighting stuff was unbearable. When I talk about being declared incompetent in these chats, it's never strategic or for the purpose of winning or anything – it's because I'm being assaulted with the message that I have to do that, and I don't know how to escape from it. I'm in survival mode here trying to understand what anyone wants of me. While Shawn seems to say I'm not incompetent, he keep reinforcing the idea and pushing me to give him power of attorney and get a delusional diagnosis. You can see whether I'm generally coherent here in a way that would not justify checking in for a 7-day psychiatric stay that I was being pushed into. I'm including some sections of the chat here.

Shawn Bayern in Gray, I'm in Blue.

July 17, 2019

- well I just asked for an indefinite stay that I don't actually want
- Yeah, I think that's a positive thing.
- what's a positive thing
- Doing it even though you don't want it because you know it's important for your health.
- Like, I'd at least consider putting medical treatment in the same category. Even if you don't want it and it doesn't seem like it can do any good. Maybe that's just a leap of faith that's required, sort of.
- plusmail chose you to be my gal
- jesus

- Well, Vladi, at least. I feel like Vladi's never really paying attention to plusmail though.
- and what do you think
- I'm happy to help however I can, but I still think I don't fully understand the question: First, I don't think there are "guardians" for individual cases for adults, just a general "guardian" who takes over on a general incapacity determination Second, I don't see how that general guardian could do it from far away; all the examples I'm aware of are local guardians, who find someone local even if they have to leave town for the weekend. Because a general incapacity determination would mean you couldn't pay bills, etc., without the guardian.
- I thouought you can have one just in a civil case
- It's not something I'm aware of. I don't think you can be represented in a civil case by someone who isn't a lawyer, unless it's just your general "legal guardian."
- so need someone to be my general legal guardian?
- There's no one
- I've actually only seen the phrase "guardian ad litem" in the context of people who represent children to courts.
- what do I need, shawn. I don't understand.
- Yeah, if you became fully legally incompetent, you'd need someone to act for you. I think the court would appoint someone. I've never seen that up close. I would be willing to advise that person, etc., but I think it would have to be someone local -- at least as I understand it.
- Maybe your mother could stay out there? I don't know if that' s possible.
- my mom couldn't handle this
- But also, you're not incompetent - and there's certainly been no declaration of that. I think if you were getting treatment and the case were stayed, the only real question would be taking care of your kids. Everything else is relatively minor and probably automated (bill payments and so on).
- I don't think that would have to progress to any incompetency hearing or anything like that.
- I if I can help with particular things like Amazon paperwork or whatever, I'd be happy to do that, although again I think local people are usually better.
- Yeah, I don't think I'm incompetent in that way. I think I'm not functional in some areas
- I looked it up, and I think anyone can represent someone in an arbitration
- I didn't think they had to be a practicing attorney
- Interesting - that's right there in the JAMS rules.
- would you be willing to represent me?
- I don't know what I'd do there, though. If you were really headed for an incompetency hearing, I suppose I could do it, but I'd think of that as a last resort. And you'd have to be sure I was the right person - I may be too willing to settle if I thought, for example, your health were at stake.
- But if I wasn't incompetent and you represented me, I would still have decision making

- And you're still your own best advocate, as you noticed when trying out other representatives. I wouldn't be quick to give that up - that's why a stay seems like the right thing.
- Yeah, but there's no reason for that unless they were threatening to take away your formal power to make decisions.
- no reason for what
- Like, you don't need someone to do what you're directing them to do; you can just do that yourself.
- no reason to have a representative.
- Shawn, I don't know what I'm doing
- I just need this to end
- I already put enough out there to show that my case has tremendous merit, that Google did a bunch of awful stuff, and that it's killing me
- I deserve to have this end now
- My advice is still clear: get treatment -- a full physical and mental evaluation -- and worry about everything else AFTER that.
- it's not fair that i have to drag this out
- I agree. I completely empathize with that feeling of impatience.

JUL 17 7:48 AM

- is the idea that I will be declared incompetent
- As you know, the law just cares about the procedures, etc. Formal proof, etc.
- I know
- I haven't seen anything to suggest you'll be declared incompetent.
- That's a high bar. It's not about particular diagnoses.
- I mean, look: a diagnosis will help you know what you're facing, and it could help you with Amazon and with other things (extending a stay in the case, for example)
- If the stay is granted and that's really all that happens, nothing will change
- And most importantly it could make you feel better, even if that doesn't seem likely.
- If it ever came to incapacity, you could instruct a guardian to talk to a few of us. I would be more than happy to help in that capacity.
- But I wouldn't want plusmail to be my guardian.JUL 17 1:57 PM
- gah, right

- it can be temporary, right?
- This is dumb to ask because you'd already be aware of it, but is there like someone in your circle of donor-sibling parents who has some legal experience and is closer to Seattle, just in case you need to name a temporary guardian?
- I mean, I still don't see anything to suggest it's heading that way, specifically. I don't think it's easy to be declared totally incopmetent.
- hah.
- jeez
- I think it's more likely that you'd recognize that you're having problems and take a break from the case during a stay, or something.

Shawn also repeatedly tried to crack the door open on me giving him power-of-attorney. He kept proactively offering to help with the Amazon (temporary disability) paperwork, and playing dumb on the fact that that would entail giving him power-of-attorney

Like here

- Your health really is the most important thing here. I don't know what the arbitrator can or can't do, but if he has the power to grant an indefinite stay for medical reasons, I don't see why he wouldn't do that now - or even, say, a 6-month stay (or whatever) just as a start.
- I don't know what happens now though. I really can't just go back to amazon
- Did you end up filing the paperwork?
- I'd be happy to help with that if I could - I don't really know how it works.

And here

- I'm happy to help with the Amazon paperwork. You might need to tell them I'm helping or else they might not talk to me.

And here

- Again, if there are deadlines with Amazon, I can try to help with that as much as they'll let me. You might need to tell them that I'm authorized to file the paperwork, etc.

Here's part of the chat with Shawn where he tries to convince me that I need inpatient psychiatric care because I'm seeing patterns in my spam email. For reference, no one needs to be in inpatient psychiatric care because they think Google is harassing them with messages disguised as spam. Even if I was completely wrong about that. People are wrong about all sorts of conspiracy theories. That is not the

basis for a $20,000+ 7-day inpatient psychiatric stay. I was right about my suspicions – at least the essence of them. But even if I was wrong – throughout all this I was taking care of my kids. Making their lunch. Bringing them to school. Cooking, Eating, drinking, showering. I was coherent. I was stressed but not insane or psychotic. I was stressed and anxious about gaslighting emails, but I was not having any kind of psychotic break or showing any signs of psychosis. I wouldn't have needed ANY kind of inpatient psychiatric hospital stay even if I was completely wrong. But Shawn, a law professor, is so fully convinced and opinionated that I need to go for a week. And he pushes me to get a diagnosis even if it doesn't apply, based on the fact that I'm saying I feel overwhelmed by the gaslighting.

- I'm just afraid that could cycle as you continue to process information. There's just so much information in the modern world, and so many connections to draw.
- Like, there's so much in today's world that simply doesn't make sense anyway.
- I think most people without cognitive overload simply live with that - the uncertainty, the mess.
- We ignore most of the possibilities because they don't matter to us.
- I process all my own spam manually, because I use my own server. I go through 50 junk-mail messages a day quickly and see no patterns in them. Now, obviously, I don't think anyone's targeting me as you do. But if I really focused on them, I could start to see all sorts of connections, right?
- But my brain doesn't try to do that - I don't feel like anything forces me to do that.
- Your brain does, for whatever reason - the inputs you've been given by adversaries, or the stress of the whole litigation, or some combination of all these reasons.
- It seems to me like you need a way to make that stop - to reverse the damage that this whole process has caused. That's the only way to win against the forces that have been affecting you, whoever or whatever they turn out to be.
- ok, but you're pushing me into a medical process that doesn't exist
- or is hard to find
- True.
- if I went into inpatient psych and they gave me a diagnosis and prescription, I'd exit with invalidation of everythign
- and the blame for all of it would be "undiagnosed bipolar"
- How do you mean "invalidation"?
- Like, who cares what the label is? Say it's 2% accurate.
- that's what these institutional things are set up to do
- "It wasn't rape - it was untreated schitzophrenia"
- Maybe the talk therapy + drug they give you goes 4% of the way toward helping you. That's still something.
- that is not helpful

- if it was actually rape

Just constantly pushing me to get a diagnosis that I was delusional, regardless of whether it was true.

- would I be safer if it turned out that I was delusional after all?
- or would I be safer if it was documented that I wasn't?
- Maybe just reach a state where you think "Okay, I've worked this out" and then move onto completely unrelated things. You could say "My life's in danger. Nothing I can do - life is always a risk. Let's play with my kids."
- As to your question, I would just hope that you can find a psychiatrist who can give you effective treatment, whatever the truth is.
- Hypothetically, why would be being delusional be such a bad thing if it can be treated? It would be a medical issues like any other.
- Anyway, I've got to go to sleep now (or soon). After tomorrow, I can stay up later -- my teaching schedule changes each week.
- I'm probably delusional
- my kids are on a fixed camp schedule
- for pickup/dropoff
- I mean, say hypothetically you are delusional. Why not just treat that as a problem to solve? Nobody would blame you for it, particularly if it was partly or completely induced by adversaries.
- Or say, again hypothetically, you have a condition that isn't literally "delusional" but can be treated by a psychiatrist who classifies it that way because our procedures and technology are imperfect?
- In either case, getting treatment would be the best option.
- i see
- I mean
- The stuff Google did to me made me nuts
- So, the point is, you have SOME condition now.
- I have no idea how to treat it.
- But someone does - some doctor.
- Or they can at least give it their best shot, which may require an imprecise label or "diagnosis."
- and what do I do with that diagnosis
- Follow their treatment for it.
- do I then go back to google

- or whatever
- I'd deal with that later. If treatment is successful, you can do whatever you want - stay at Amazon, start a company, do whatever you think is best with your case, etc.

I didn't want to be delusional for a settlement. I was being gaslit. I was genuinely paralyzed and afraid. And here's the sort of thing that Shawn did to stoke the fear. Look at the ambiguity he plays up in the "I don't know if they'll succeed" wording. There was a ton of this. Note that Shawn was telling me many obviously false and contradictory things, so I couldn't take anything he said at face value and was left believing (by his suggestion) that I needed to analyze and interpret everything he was saying and read between the lines. He'd say things like "I usually wouldn't think xyz" or whatnot. Everything was qualified with suggestions that I interpret things hyper-literally, so that it was setting me up to doubt everything. He doubts that there have been attempts on my life "if you're asking for my guess as just a random person in the world" but he's also repeatedly shown me that he has very specific knowledge of my case. What do I do with that? He plays that over and over again over weeks in a way that seeded and stoked fears. Again, I was being gaslit and vulnerable. A real friend trying to offer reassurance would say "Of course not, Rebecca, why would you think that?" They wouldn't continually talk in ambiguous riddles. And even if I let the ambiguity and answers-that-refuse-to-be-direct mess with me, that's still not being delusional. That's being too-easily manipulated while vulnerable.

- have there been attempts on my life?
- external attempts
- I would have no way to know. But if you're asking for my guess as just a random person in the world whose judgments generally are considered smart and adaptive (sorry for the self-praise!), my answer is: I very strongly doubt it.
- I'm not asking you in that context
- I'm asking you as a non-random person
- There isn't any other context. I know you've sometimes thought I've orchestrated codes or what not, but none of that is correct. I am just a friend.
- As a friend, based on my knowledge of the world and everything you've told me, I strongly doubt you're in any physical danger. I think the biggest physical danger to you is your own blood pressure.
- I think you would agree with that without the overload. For example, I think you'd reach the same conclusion, on the same data, two years ago.
- I think you have to let go of particular conclusions and almost of a particular worldview, at least speculatively, and allow a psychiatrist to evaluate you and do their best.
- I don't know if they'll succeed. I hate to say that, but I'm trying to be completely honest and not give you false hope or make it sound easy.
- so help me find that psychiatrist

- But I think that's the only chance.
- Yeah, I've done some searching, but as I mentioned the other day, finding doctors online is hard. Did the ER give you any list of outpatient psychiatrists?
- you don't know if they'll succeed
- but they'll try, given the chance?
- The technology/technique may just be too limited.
- But I think it's worthwhile for you to try treatment.
- Even if it's not perfect, and even if takes a "wrong" diagnosis that only slightly overlaps with what you have.
- Should I tell lots of people what I believe, or only the doctors
- For example, maybe you'd trust your own conclusions more after an off-label use of a pill that happens to be labeled an "antipsychotic." I wouldn't treat that label as an insult.
- I don't know.
- But my instinct is that telling more people what you believe will probably be good overall. For example, maybe you tell someone and it leads them to recommend a doctor who could help.

Now, at the same time Shawn was pushing me to go to inpatient care for a week, to get a diagnosis that didn't apply, and to give him power of attorney (with the pretext that it was so he could help with my amazon paperwork), I was receiving death-threats masked as life-insurance spam. I have shown this compiled screenshot (of my email – the life insurance "spam" and some of the accompanying images) to a dozen people, and each and every one of them agreed with me that this seemed targeted and an intentional scare tactic. No one told me that this seemed normal. So Shawn and Ayan etc are telling me I'm delusional and need inpatient psychiatric care because I think emails like this are targeted and because I'm letting their gaslighting get to me. But a dozen others agreed with me that these emails were off. So if I needed inpatient psychiatric care because of an undiagnosed delusional disorder, so did every other person (off plusmail) I asked. And if I was distressed – it's because this is SCARY when it's happening to you and you're being gaslit from all sides.




Also happening at the same time: individuals on plusmail seemed to be going out of their way to use words/phrases/numbers important to my case in increasingly absurd subjects. There seemed to be a game of how creative people could be in finding ways to use the word "bar" – so suddenly people were talking about "rebar and barbed wire" and calling things "baroque" and saying "bar your door" instead of "lock your door." The contexts were absurd, and the density/frequency of the specific terms was too many standard deviations away from average to attribute it to coincidence. I understood these things to be pressure for me to withdraw the bar complaint. It's hard to go through what was happening on plusmail because it's not the sort of thing that can be explained linearly. It's the sort of thing that comes together when you're in the middle of all of it and it's all happening at once.

There were also conversations that weren't "coded" but that were almost certainly directed at me. In late June, I tentatively agreed to settle with Google for $20 million through one of our indirect channels of communication (which also served to gaslight me). That agreement happened after I believe Google

made me a settlement offer through one of their "Gonzalez vs. Spivak" bogus "wrong email address" messages (see prior complaints I raised).

On June 23, 2019 I received this message

**From:** Ray Blessey
**Sent:** Sunday, June 23, 2019 2:56 PM
**To:** Ryan Spivak; Sara Hersh
**Cc:** Jocel Negrette
**Subject:** FW: Gonzalez v. Spivak, et al.

Dr. Spivak and Attorney Hersh,

**Brief Status Report:**

Since my email below of April 1, 2019, the trial date was vacated due to plaintiff's attorney amending the Complaint to add a Lack of Informed Consent claim. It is my opinion this was done because her attorney's are concerned they will not prevail on the claim that it was below the standard of care to cause internal organ injuries while performing liposuction. Dr. Dubrow, the defense expert, was very strong at his deposition defending Dr. Spivak on this issue and had a plausible explanation why it occurred in this case.

Since April 1, 2019, plaintiff has dropped her demand to $195,000 and we countered with $150,000 which was rejected. I will be appearing in Court tomorrow on a hearing of our Demurrer challenging the claim that Lack of Informed Consent is a separate cause of action and to set a new trial date. The Court has proposed 9/28/19 as the new trial date but it conflicts with Dr. Dubrow's schedule.

I am going to have my assistant Jocel Negrette contact you both to set up a conference call. I would like both your input on whether or not there is interest in taking this case to trial and if so, the possible implications for the Medical Board matter.

Best,
Ray

Based on history and my being "trained" to interpret these sorts of emails, I understood this to be a suggestion that I demand $19.5 million and that they would settle at $15 million.

A couple of days later (and also while under duress from lots of gaslighting) I sent the following response through another indirect channel

RS

**Rebecca Spivak <rebeccaspivak@outlook.com>**
Tuesday, June 25, 2019 at 10:27 AM
Chris
Show Details

Ok to $19.5 with the following conditions

1. During the process moving forward, I am treated well. If you treat me kindly it will pay off with goodwill that you can't buy. If that's not possible from an optics perspective, then the insults need to be so over-the-top absurd ("it's like a totally different format") that I understand that they aren't real. I think you have seen how I have treated former coworkers who I think ultimately treated me fairly, even if they were originally against me.

2. The damages are attributed to physical injury (mini strokes and brain damage - supported by MRI evidence) or whatever it needs to be done to be non-taxable. If it can't be non-taxable, then someone else has to be responsible for the tax on it or the number isn't something I can agree to. $19.5 doesn't get me to where I need to be if it's taxable.

If a counter was made for $15 with the above conditions, I would accept it if the following were also offered with it

3. Substantial support in getting a startup up and running with initial funding. Through GV or other. Cloud services, etc. The specifics don't need to be figured out right now. We can agree to figure it out after settling, and if we can't agree on something, then we revert to the $19.5 figure.

My agreement was based on being treated with respect and acknowledgement, etc. Not on being discredited and being forced to hand over power of attorney after getting a delusional diagnosis. But ok, we seemed to have agreed on $20 million. But it wasn't official in any way, and I very quickly didn't feel good about it and didn't follow up. I strongly doubt Google will ever admit to this backchannel communication.

So, $20 million. A few weeks later there was this absurd conversation on plusmail. One person said that his aunt just died and he needed some financial advice. Shawn responds making reference to the advice he would give in the event that this was $20 million. That's an absurd thing to even question when someone (a schoolteacher with no obvious connection to wealth) makes a casual request for financial advice based on a pending inheritance from an Aunt. You don't say "well if it's $20 million, here's what you should do." But again, this is Shawn, pushing me to give him power of attorney, now positioning himself as an expert on how to manage $20 million – the amount I supposedly agreed to settle with Google for. (I should note I have a Harvard MBA and don't need Shawn Bayern to give me any financial advice. I trust myself far more than I trust him, and I don't value his opinions or perspective on the best way to manage money, and have vocally disagreed with him in the past). But he and Ayan are sexist and egotistical narcissists in addition to being morally corrupt).

Re: Financial Advisors (Abusing our Relationship)

**mail@preter.essentially.net <mail@**[redacted]**>** on behalf of
**Shawn Bayern <**[redacted]**>**
Monday, July 22, 2019 at 2:12 PM
[redacted]
Show Details

```
  (3) There's a difference between ongoing financial management, which you
may not need, and one-time paid financial advice, which can set you on a
path that's manageable for you; you might try the latter first.  I don't
want to pry, but if you give me a rough sense (perhaps off-list) of the
scale of the funds, there may be particular options I could recommend.  I
don't want details, but even just knowing the order of magnitude could be
helpful.  For example, if it's less than $1 million vs. more than $1
million, certain things are paid vs. free at Vanguard; if it's like $20
million, I can talk to you offlist about particular service providers that
could help you get things under control.
```

Then on July 25 (one month after I "agreed" to settle with Google for $20 million through an indirect channel) there's in another absurd email exchange that makes no sense, where Ayan and others express frustration that "it's been almost a month" and how it should have been resolved by now.

Re: Your transfer is complete

AK

**mail@preter.essentially.net <mail@**[redacted]**>** on behalf of
**Ayan Kayal <**[redacted]
Thursday, July 25, 2019 at 11:11 AM
Plusmail
Show Details

On Thu, Jul 25, 2019 at 11:01 AM Shawn Bayern <bayern@mail.essentially.net> wrote:

> On Thu, 25 Jul 2019, Ayan Kayal wrote:
>
> \> Maybe you missed the dates below -- but it's been almost a month! It
> \> hasn't been worth my time to call them yet, but maybe I will in the next
> \> few days.
>
> Yeah, wow, I glossed over them because I assumed a delay that long couldn't even be possible. :)
>
> It's like, in a message saying "I've been waiting on hold since 10:00 a.m.," I'd probably ignore the specific time and think "maybe an hour," but never "maybe 14 hours."

I saw some complaints to this effect on Bogleheads. It seemed like most people had it resolved within a week or two. I allowed for slightly more time because of the July 4 holiday, but it's sort of ridiculous now.

I can't tell whether the above examples are compelling, but with full context there's really no doubt that in July 2018 Ayan and plusmail engaged in substantial efforts to capture my attention and manipulate me to take certain discrediting actions and hand over control (none of which I agreed to). So by late July 2018, I'm getting email death threats that I believed were coming from Google's lawyer. Shawn Bayern is planting fear with ambiguity and telling me I must go get diagnosed and hospitalized immediately (after giving him power of attorney), and my email group has turned into a surreal twilight zone with everyone upping the game and the absurdity in making references to my case. By July 26, 2019 I stopped talked to Shawn and started pushing back on plusmail to stop the "coded"/indirect stuff. I didn't know what it was or how it was happening, but I knew that I didn't want it. I had to push back in an indirect way as well, for fear of being called crazy. In the exchange below, it seems like we're talking about Amazon Product Descriptions (for products sold on Amazon), but we're really talking about all the coded emails on plusmail. I first push back on it essentially saying that I'm being bombarded with gaslighting and I don't want this, that I'm in cognitive overload, and I shouldn't have to process it. Ayan responds that the messages are obvious – not hard to figure out. I still push back that I didn't and don't want it.

Re: Threatening Lightly

RS

**Rebecca Spivak <rebeccaspivak@outlook.com>**
Friday, July 26, 2019 at 6:37 PM
+@[redacted]
Show Details

I'm all for the obvious.
Such as "no means no" and "STOP means stop."

These fundamentals are no less true in gang rape, no matter how well-intentioned with the belief that "she wanted it."

**From:** <mail@preter.essentially.net> on behalf of Ayan Kayal <ayan.kayal@gmail.com>
**Reply-To:** "+@essentially.net" <+@essentially.net>
**Date:** Thursday, July 25, 2019 at 4:32 PM
**To:** Plusmail <+@essentially.net>
**Subject:** Re: Threatening Lightly

On Thu, Jul 25, 2019 at 4:25 PM Rebecca Spivak <rebeccaspivak@outlook.com> wrote:

> It's not that they are stupid. It's that some sellers think they're a special snowflake that can fully capture the buyer's attention. They write "clever" product descriptions thinking that they can capture the shopper's full attention and appreciation. That's not how it works. They don't understand that shoppers are bombarded with countless products, product descriptions, and decisions.
> It is NOT the shopper's fault that they didn't get through all the nuanced details in the product description, while being impossibly bombarded.

Nah, I'm not even talking about nuanced details -- we're talking about obvious things that are in the name of the product, e.g. "this sucks because I needed a 5V charger instead of 3.3V. Amazon sent me the wrong one.". And sometimes things that are in 2 short bullets about the product.

Or read Yelp reviews about restaurants that are about the *customer* being a special snowflake and have nothing to do with food or anything else meaningful about the restaurant.

After that exchange, I think Shawn Bayern realized he had to try to pull me back in by acknowledging that it was about settlement. It may be hard for the investigator at the Bar to have context, but here is where Shawn admits that it's about settlement. The question itself is absurd because he's asking how he would teach something that he (as a law professor) wouldn't actually have any reason to teach, and it strongly aligns with the work I've done. It's basically "If I ever had to teach this stuff that Rebecca is good at (not that I'll have to) I don't know how I would do it. But you have to push it to settle well." The whole question is structured to catch my attention, and it seems like he's finally decided to clarify that, yes, this is about settlement. Maybe to draw me back in with a little more clarity on what's going on – since they've otherwise completely lost me and I've expressed anger at what they were doing.

Re: CS

**mail@preter.essentially.net <mail@[redacted]>** on behalf of
**Shawn Bayern <bayern@[redacted]**
Sunday, July 28, 2019 at 9:32 AM
+@essentially.net
Show Details

Yeah, one thing that made me ask is that I'm not immediately sure how to teach it (not that I'll have to—just as a mental exercise).

I've run into a bunch of problems like this administratively, recently, and found that I enjoyed solving them myself and was good at it, but even the selection of the underlying algorithm felt largely heuristic — like I was playing a game against nature that involved intuition more than "math." Fundamentally, there are a bunch of greedy algorithms you can choose from (it may not even matter which) and you have to push the program in such a way that the results settle well. The main skill just seems to be something like "knowing where to push."

On Jul 28, 2019, at 4:40 PM, Benjamin Collier <[redacted]wrote:

> In a business setting I'd go to the data science team somewhere that had one and ask for an answer and a repeatable approach (eg i want to do this again on a regular basis) or just the engineer who likes these type of problems the most somewhere small.
>
> Not really sure what course this corresponds to in CS — I'd actually expect folks with a math or hard sciences background to be good at this too even with less "formal" CS training.
>
> On Sat, Jul 27, 2019 at 9:55 AM Shawn Bayern <bayern@[redacted]> wrote:
>
>> What would you say is the right CS course/level for an assignment like this: Say you're assigning the 1400 students in a Yale freshman class to 14 residential colleges and (unlike the actual practice) you want all the colleges to be "balanced" along, say, 20 student variables (gender, SAT score, home region, public vs. private high school, legacy status, and other things like that).
>>
>> I think the "right" way to solve this — or if not this, something 500 times as complex — requires sensitivity to heuristics and patterns (roughly as Rebecca often said about her work in ads). Even if the algorithm is as simple as a pruned search tree with static evaluators, you need the right intuition to create the right static evaluators. Where do people learn that today? Which sort of people are capable of it in a business setting?
>>
>> I'm reminded vaguely of how hard I used to think it was to teach "simplification of regular expressions" to people. Teaching "regular expressions" was easy, but people either saw or didn't see how to "reduce" them.

Once I saw this email, I immediately demanded that I be "unsubscribed" from the list. I only stayed somewhat engaged because Shawn and others repeatedly showed signs that they knew details of my case that they shouldn't otherwise know, and Shawn kept stirring the Fear/Uncertainty/Doubt. I didn't know what to believe. I thought maybe it was that I needed to be a key witness in some corruption

thing, and that's why everything was being done indirectly. And again, this is all happening while I'm getting death threats and an onslaught of gaslighting. So while I wasn't delusional, I was stressed and vulnerable to suggestion from people I trust. I don't know if any of the above is compelling – because it's really hard to paint a full picture when it's really hours a day for weeks and months and you need to see the full picture of all of it. There was more. Creepy people knowing at my door. Robocalls on my phone. Weird app notifications on my laptop and phone that make reference to the things that my kids and I are doing in that very moment. It was a surreal twilight zone.

Anyway, now we come down to Ayan's email on July 28, 2019. After I was unsubscribed. If nothing else warrants a bar complaint, this email does, even if none of my suspicions or interpretations are accurate.

Here is what Ayan emailed to the entire group after I demanded that I be unsubscribed.

---------- Forwarded message ---------
From: **Ayan Kayal** <[redacted]
Date: Sun, Jul 28, 2019 at 2:56 PM
Subject: Re: UNSUBSCRIBE ME
To: Plusmail <+[redacted]

Rebecca has stated previously that she thinks Shawn and I are conspiring with Google - two of the least likely people to do so, of course.

In the interest of transparency, a few of us have discussed offlist how, at this point, she needs more than even outpatient care. Rebecca thinks that any email sent to her includes coded messages about her Google case, but fundamentally refuses to believe that she's having massive delusions and finds the mere idea that that could be the case insulting.

That's why even the psych and other ER visits haven't been particularly productive. She does have a helpful friend who works in the field and her mom visiting, so hopefully that will help her.

On Sun, Jul 28, 2019, 10:43 AM Rebecca Spivak <rebeccaspivak@outlook.com> wrote:

> Shawn and Ayan and whoever ... are NOT acting in my best interests. Do not believe otherwise.

I never shared my medical records with Ayan. And some of the things he says are patently false. He also has no medical training to know who "needs more than even outpatient care." Conspiracy "theorists" with far less basis for their suspicions freely walk the streets and don't need to be put into inpatient psychiatric treatment because of what they believe. The majority don't even need outpatient psychiatric care. It's not a psychiatric illness to believe in this sort of conspiracy, even if you're wrong about it. Google pulled some unbelievably unethical stuff during my legal case. They committed perjury. They submitted altered evidence. The retaliation was brutal and beyond some of the stuff found in legal thrillers. They broke laws and rules left and right. And they are very powerful and carry a lot of influence. Even if I was wrong, it wasn't the stuff delusions are made from. I believed that a couple of corporate/employment lawyers that I know socially got recruited to (or otherwise agreed to) help Google settle their case with me, maybe even forcing themselves to believe it was in my interests and win-win-win all around. Ayan's email "in the interest of transparency" is wholly unwarranted, even if my conclusions were fully false (which they weren't). Ayan's email is meant to discredit me. It is not just defamation, it is obstruction. It's planted evidence asserting things that are completely false

that is arguably discoverable a later date. Even if it wasn't collusion, and even if it wasn't a violation of an attorney client privilege, it was tampering and obstruction.

Ayan suggests he has direct knowledge of what happened at certain hospital visits. (also, he says "other ER visits" – as if plural, but there was only one. I went because Shawn demanded I go and check in for a week, and they sent me home because I had no symptoms or presentation at all to warrant hospitalization).

Some questions:

1. If Ayan had access to my medical records, how did he have access, because I didn't give it to him?
2. If he did have access, what made him think he could share that with others? That's a huge violation of healthcare privacy?
3. Also, if he did have access, why are some of the things he says plainly false and completely unsupported?
4. If he didn't have access, why is he making claims as if he had specific knowledge?

Nothing justifies Ayan doing this. He was creating evidence to discredit me and stating things that were false, defamatory, and that he also had no basis to know even if they were true.

For reference, this is what my medical record actually looks like as of August 2019, and without any psychiatric medication.

**CURRENT PRESENTATION AND MENTAL STATUS**:
General appearance: casually dressed
Behavior/Activity: calm and cooperative
Speech: clear, coherent, fluent.

---

Affect: normal affect
Mood: normal mood and slight anxiety as we talked about prior employer.
Thought form: normal: logical, coherent, goal-directed.
Thought content: normal
Attention/concentration: alert
Memory: no apparent deficit
Insight/Judgment: good insight and judgment

**ASSESSMENT**: (note response to treatment/effectiveness of therapeutic intervention, reasons to continue or change tx plans, counseling/coordination of care)

Patient has been active in address self-care by going to her primary PCP to discuss HTN. Patient plans to keep scheduled appointment with neurologist as it is a primary concern of hers. Patient continues to be open and engaged in session. Patient agrees that coping and relaxations skills could be helpful when she's ready to move forward with a plan to settle with Google and explore a career path she'd thrive in.

**DIAGNOSES**:
5-digit DSM IV Code: (F41.9) Anxiety

On August 30, 2019, as part of a potential settlement discussion, I asked Google Attorney Brian Johnsrud if he represented Ayan Kayal. I also shared my psychiatric record showing that I was not delusional and had no such diagnosis.

RS
**Rebecca Spivak**
Friday, August 30, 2019 at 11:55 AM
Brian Johnsrud
Show Details

UW Medicine eCare... 88.9 KB | UW Medicine eCare... 87.7 KB | Form .xlsx 215.8 KB

Download All   Preview All

You replied to this message on 8/30/19, 12:25 PM.   Show Reply

I plan to bring these claims against Google, and also against others who are not current or former Google employees. If you happen to represent Ayan Kayal, Shawn Bayern, or Andrew Smith, you should let me know as soon as possible, as I plan to file claims against them next week (I was originally planning on filing those claims today). Furthermore, I believe I have a claim against both Google and Facebook for the circumstances surrounding my September 2018 job offer, though I plan to prepare those claims after discovery in my claims against the above-named individuals.

If Google denied representing Ayan, then any settlement wouldn't cover the claims I had against Ayan, which, even without collusion, would include prima-facie defamation and invasion of privacy. If Google admitted that it did represent Ayan, then it would be admitting to the collusion, since Ayan is officially a Facebook employee.

On September 5, 2019 Google's Attorney seemed to dodge the question, asserting he didn't represent "Mr. Katal" – denying association with "Katal" instead of "Kayal"

BJ
**Brian Johnsrud <BJohnsrud@chjllp.com>**
Thursday, September 5, 2019 at 9:53 AM
Rebecca Spivak
Show Details

You replied to this message on 9/5/19, 6:51 PM.   Show Reply

Hi Rebecca,
Hope you had a good Labor Day weekend.
I wanted to let you know that Google declines your settlement demand.
You previously signed a settlement agreement with Google that reflected its best offer to you and you then timely revoked that agreement.
The claims you now threaten against Google are barred by a number of reasons and Google respectfully reserves all of its rights in connection with your threatened claims.
I represent Google and not Mr. Katal, Mr. Bayern, or Mr. Smith, who you indicate are not current or former employees of Google.
Best regards,

Brian

Later that day I asked Google's attorney to clarify whether he represented Ayan Kayal, pointing out the "typo" in the name. Google never responded to this with any kind of clarification.


RS

**Rebecca Spivak**
Thursday, September 5, 2019 at 6:51 PM
Brian Johnsrud
Show Details
EARLY DRAFT - Fac...
961.7 KB
Download All Preview All

Hi Brian,

Thank you for your response.

As a point that is presumably inconsequential (though you should let me know if it is not), Ayan's last name is "Kayal" - with a "y" not a "t."

Knowing that Google managed to pull in some of the people closest to me to help discredit me and force me into a settlement was devastating.

I can only imagine how Ayan and others must have rationalized it. "Yes, we're messing with her, but once she sees how much money 'we' got her, she'll be grateful.

The idea that this might have happened – that they might have convinced me to get diagnosed with a mental illness I don't have, to hand over power of attorney to them, and to have them settle for $20 million for me is the most loathsome and horrifying part of all of this.

In one fell swoop they would have destroyed everything. They would be invalidating the truth behind my claims by boxing me in as delusional – discrediting any memory or truth I've held on to – the whole reason I've been fighting this. Suddenly it would be a reality based on the memory of someone suffering from a delusional disorder, and completely discredited. My accomplishments and career talents and very real past suffering would become a figment of my imagination. They'd also be taking credit for the legal win, believing that they are the ones who got this settlement. I am proud of how I've conducted myself and stood up for truth and ethics, and how I've fought this case. Despite my law degree, I am a pro-se. I have had no opportunity to practice law or be mentored or clerk or anything prior to my case. I think I held my own. I think I accomplished something with my case as well, and that's why any settlement would be in the 8-figures, if not 9-figures. They would be usurping the credit for that – swooping in to take credit for what *they'd* be able to get for me. As if they did it. And not only that, they'd be locking me into settlement terms that I wouldn't agree to – settlement terms that are far less than the ones I've rightfully earned. They've be invalidating me, taking credit for my work, and selling me off for pennies on the dollar and at unconscionable terms – while taking "credit" for it.

Maybe it's easy for men to think this is ok. Maybe they can't imagine why a 43-year-old woman wouldn't agree to a little discrediting for a large payout. Maybe they wouldn't understand what it

means to be robbed of everything. To be marginalized and humiliated and never given credit for your work. Maybe they don't understand what it's like to be robbed of peers, friends, reputation, self-esteem, and self/identity – to have everything you've accomplished dismissed with a slap on the face and a check on the nightstand. Maybe they're so used to getting more credit than they deserve (someone is getting credit for all the credit that women deserve but don't get) that they can't understand why I don't want their deal. It's easy for them. They haven't been a woman in tech. No one is asking them to wipe out 20 years of their career and start over as a pathetic and unaccomplished mentally-unstable middle-aged woman who happens to have a well-funded bank account (secured for her and managed for her by male friends). They have no right. They have no perspective. And they have no shame. But they should.

They would broker this and it would morally corrupt in all ways. But how could I ever object in the future? No one with a diagnosis that they suffered from a previously-undiagnosed delusional disorder would have any chance of proving abuse when their "friends" stepped in with Power of Attorney securing them a $20 million settlement when they were otherwise mentally unstable. I'd be left with nothing but rage as everything I stood for and fought for was destroyed, and I wouldn't even have any standing to mourn for that as a loss. I'd be discredited at every layer. Delusional, unreasonable, ungrateful. I'm not allowed to expect recognition, validation, truth or any of those things. I should be grateful that I was given a large check, even with my face in the mud with everything I've ever done or accomplished discredited.

I know I can't prove all of the collusion. I know it, and I believe that the investigator at the Bar will know it too. But no matter what, there is still the email that Ayan sent on July 28. He cannot justify the statements he made about my mental health, even if there wasn't an attorney-client relationship, which there almost certainly was. This violates multiple rules of professional conduct and is also grounds for a criminal charge of obstruction.

I wanted truth and validation and peace. I might not have brought this complaint if someone had given that to me and admitted to what happened. But that didn't happen. And I need the truth. I deserve it. Please. I know Google is powerful. It's almost 2020. We're well into the metoo etc era. Something needs to happen. This isn't ok. I could send in another 50 pages of evidence. I could show you where through indirect channels Google's lawyers repeatedly insist that they will only settle with me if I agree to a public record that I'm mentally unstable. Ayan played a part in that. It's not ok. Please do something.