Rebecca Spivak
128 NE 51st Street, Seattle WA 98105
617.519.1100
rebeccaspivak@outlook.com

December 13, 2018
**VIA ELECTRONIC DELIVERY**

## Hon. Judge Robert Baines (Ret.)

Re: Spivak's Responsefor sanctions against Google and their Attorneys
Spivak v. Google - JAMS Ref. No. 1110018238

Dear Judge Baines,

In his opposition to my motion for sanctions, Mr. Johnsrud/Google makes additional seriously misleading and false statements and fails to address even one cause with something stronger than a strawman argument. I recognize that there are a lot of details and many false claims and assertions to track. In attempt to make it easier to keep the details in context and framed within a more holistic view, I've created a "worksheet" which I request be used alongside my brief. Each detail/issue/fact is presented as a question to be answered (often with yes/no). My hope is that this structure will be helpful to all parties.

Google is very good at writing briefs that include so many layers of false facts and allegations that it's difficult to know what to address first. They introduce false facts, replace actual claims and arguments with strawmen, and then bury those strawmen and falsehoods under heaps of quotes from irrelevant case law. After setting up a false factset, Google disingenuously and forcefully argues as though the point in contention and matter to be decided is whether their cited case (no matter how irrelevant it is) asserts the thing they claim it asserts – which, of course, it does. But that's smoke and mirrors and not the actual dispute. The difficulty in responding to this is that if I challenge the facts, Google trumpets that I failed to respond to or address the case law. If I address the case law and explain why it might not even apply to the strawman, it would appear to concede Google's false facts/strawman and let them control the narrative of what we're even disagreeing about.

Burying a strawman and false facts under misapplied case law is one half of Google's standard approach to litigating. The other half involves concurrently setting up a distracting character-assassination with forced, altered, mischaracterized, and misrepresented evidence. This setup attempts to offer the adjudicator some relief, an "easy way out" - and an excuse to rule in Google's favor without having to deal with a critical review of the tedious and contentious details.

I beg for your attention to details under Google's smoke and mirrors. I beg you to recognize Google's template and question why they introduce strawmen. This attention is all my case needs. It is what I have been holding out for almost 5 years… that at some point in this journey … someone with authority will actually pay attention. Please be that someone. I have been unwaveringly honest and authentic in every claim and assertion I have made. Perhaps I've been too personal in a process that is meant to be sterile. But that is because this **is** personal. This is my life. Google's provable bad faith both during my employment and in this legal process has ripped my life apart, and I won't ever be able to stop fighting back until the truth is recognized. It's the only way I can get some semblance of my life back.

### I. Credibility is at Issue

Google argues that I brought this motion in bad faith. But the truth is, no matter what arguments Google may make regarding my performance … no matter how they twist or alter the record, what is consistent across all the feedback I

received at Google is that I am fact-driven, detail-oriented and passionate/authentic – that I make the effort to really understand a situation and that I am driven by my conviction in what I believe to be true. Perhaps I sometimes favor truth over pragmatism to a fault[1]. But dishonesty is not part of my playbook. For whatever other faults I'm accused of, my authenticity and focus on truth and details has repeatedly been recognized by the same individuals that Google discloses as defense witnesses.

In Google's motion for a protective order against me, they listed individuals that they claimed to represent. The quotes below come from the performance feedback and EEOC interviews of those listed on Google's motion for a protective order[2] - individuals that Google asserts are not on my side. So their feedback on my authenticity and credibility should carry a lot of weight.

**Drew Bradstock, Lead PM**
Customer and fact driven. Makes her decision based on facts and direct feedback rather than just listening to Googlers She has actively searched out our more difficult clients to get honest feedback such as NBC to ensure that she doesn't make decisions based on just the pubs who love AdX

Relationship builder with engineering. Works hard to be respected by engineering, Rivka then leverages that respect to improve how effectively the engineering team she works with operate such as team fixes she made with the minCPM engineering group

Deals with problems head on. Rivka doesn't shirk away from issues that face at AdX and instead works on correcting them.

**Jacob Baskin, Engineering Leader**
Rivka does great job of gaining clear-eyed and comprehensive understanding of any area she works in. When she started working on AdX inventory discovery this was not an area that she was previously familiar with, yet she quickly became domain expert and learned more about our buyers in few weeks than some PMs have learned ever. This allowed her to develop insights and plans that led to much more useful finished product than we would otherwise have built

She gained deep understanding of the needs of our buyers and of our sales team in order to push eng to build the right product and she framed the work in way that really helped everyone involved to understand the value we were adding for our customers and to stay on track in the face of incipient feature creep

**Dustin Jackson, Engineering Director**
She was clearly very smart. Clearly she cared lot about the project She really wanted to see it be successful She was strong advocate for the project. From what remember the work product she produced was good

She is very focused on building the products that matter for our users and using her own knowledge and investigations to decide on exactly what that is rather than relying solely on the opinions of others

**Judy Hsu, Sales Leader**
Her work is solid. She brings technical competence to each conversation and passion I like to see

**Jens Skakkebaek, Group Product Manager, former Manager**
Rebecca has good ideas, passion, and ability to synthesize it into new product direction.
Rebecca is great at getting deep in her subject matter, setting good vision for where it should go, and communicating this

**Scott Spencer, Direct of Product Management, former Manager**
Rivka is very smart and able to dig into the weeds with engineering She has unblocked some very technically thorny issues
Rivka is liked by engineering for her ability to ensure development is focused on impactful changes

---

[1] That these traits around conviction/passion are penalized in women but rewarded in men is provable and is material to my case, but that's not why I raise it in this response. My point here is that I did not become a different person at the age of 42 for the purpose of bringing this motion for sanctions. This case would not have happened at all if I wasn't so committed to only doing and saying things that I believed in. In 2014 I realized that Google was cheating advertisers by giving them false promises about how their ads would perform. I realized that this had to stop and that there actually was an ethical alternative. If we gave them a system that would give them truthful and factual data to help them make better decisions, they would actually spend more because they'd know how to spend their advertising budgets effectively. I invented this product and launched it with great success. It was ethical and profitable. Google wanted me to simply champion the existing system because they didn't expect someone like me to be an innovator. It would have been better for my career if I did that – if I accepted that my role was to be a cheerleader rather than an innovator. But I couldn't champion an unethical product. I was not just protecting advertisers – I was protecting Google – and at my own expense.

[2] There are many more data points on this from my performance record. For example, Engineering Director Eyal Manor said "She is careful to get the data right and dive to the core issue. She does not jump to conclusions." But this list of quotes comes specifically from individuals that Google claims are my detractors.

When looking at the buy-side UI she did not take the conventional view that static buying needed to be maintained – a controversial view. Based on her research and discussions, this is now view widely held by the team. In addition, Rebecca put in the time to meet with clients and gather fundamental feedback that has significantly impacted the buy-side roadmap and features many of which she devised

**Michael English, Engineering Manager**
After talking with users and understanding the domain she recognized that there was actually much more fundamental and far reaching need that wasn't being met This is pretty significant to uncover need this big as Sales Tools is well trodden area She formulated product vision and strategy from these fundamental needs and managed to work with Sales Ops and Eng to align on this new product vision now what we call Interactive Benchmarks This new promising direction has really helped the teams morale recover from the low created by the Quicksilver bake-off

Rebecca has shown that she can follow complex and detailed discussions of data backend issues and formulate good resolution to product questions which is coherent within the larger context of the product vision Recently we had such discussion about how to capture geo dimensions The product decision she arrived at allowed us to narrow down our handling of geo from potentially huge cross-product of different features to only total options The larger context that she couched her decision in was that users want to see both what advertisers were trying to do and what happened in specific locations The combination of being able to work through the low level details with the engineers and contextualize those discussions within the larger product vision is very valuable to my teams success

In Contrast, Mr. Johnsrud has been inauthentic and dishonest forgets what's already on the record. For example, on page 3 of his Opposition, he makes the following false claim:

> "Spivak complained for the first time about alleged gender discrimination on February 2, 2015. She did so because she believed that it made her "unfireable"
>
> [accompanied by this footnote] … The true fact is that she did not make any complaint about gender discrimination to anyone at Google until February 2, 2015, and only then after engaging in misconduct

Mr. Johnsrud asserts this as "true fact" despite knowing that it is false. Mr. Johnsrud was present when the EEOC interviewer interviewed Google Engineering Manager Michael English. [Exhibit B]. Michael admitted that I complained to him of gender discrimination approximately ten times between January 2014 and March 2015, at which point I went on medical leave. Michael was clear in the interview that I made these complaints to him while the project was still in the proposal phase, which was the first half of 2014. Michael acknowledged that he should have reported this to HR but didn't think about it at the time.

> She said something along the lines that because she had proposed change and was woman and that was seen as negative thing whereas if she was man that was positive thing.
> At some point she started saying this
> Asked how often Michael had difficulty guessing and finally estimated that it was around 10 times
> Asked if CP made the same comment each time. She did

In an email I sent to my friends on August 2014 – that Google has certainly seen and that they received in eDiscovery - I summarized one of the conversations I had with Michael [Exhibit C]

> One google coworker told me on friday "yeah, I can see how it's a male/female thing, and it's not fair, but you gotta work with the reality of the world ..."

Furthermore, Michael also told me that he was questioned by HR in February 2015 and that he confirmed to them that I had been complaining about gender discrimination to him for a long time. He told me that HR immediately ended the conversation and sharply warned him to not tell me that the conversation happened. Michael was concerned about retaliation if HR found out that he told me about the conversation.

So, despite making a claim otherwise, Mr. Johnsrud is very well aware that I complained of gender discrimination prior to February 2015. He is aware of this not because I say so, and not just because the record in Google's possession shows it, but because a Google Manager central to my case unambiguously confirmed this under oath in an interview with an EEOC investigator where Mr. Johnsrud was present.

I request that Mr. Johnsrud clarify and explain this false statement at the start of our hearing.

# I. **Response to Opposition of Individual Arguments** (Please Reference Worksheet)

---

## A. Google Makes Additional False Claims and Introduces Inapplicable Case Law to Defend Against Its Illegal and Frivolous Lawsuit Against Me

1. Google false asserts that I refused to honor the agreement and was attempting to arbitrate it elsewhere, and that its response was reasonable

See [Exhibit D] for the unaltered last page of my demand letter, which is the only basis for Google asserting that I was attempting to arbitrate this elsewhere.

There is no standard at all under which it is reasonable for Google to respond immediately by filing a suit against me in federal court. Google simply repeats the argument that, yes, it was reasonable.

2. Google introduces off-point case law and asserts that if I had filed in Washington, it would have had important consequences under the federal first-filed rule. Yet, Google fails to cite the "important consequences" that would result if I somehow filed first in Washington State.

> Google was **not** required to wait for Spivak to bring an action in Washington, which could have had important consequences under the federal first-filed rule. See Google v. Microsoft 415 F.Supp.2d 1018 (N.D. Cal. 2005) (granting Microsoft's motion to stay or dismiss an employment case filed by Google in California based on Microsoft filing first in Washington.

This case is irrelevant. Even with my case filed in California, it is New York and Washington state laws that apply. In the case Google cited, the primary issue was governing state laws.

> Google and Lee note that this court, sitting in diversity, must apply (1) federal law to the issue of whether to honor the forum selection clause[4] and (2) California law to the issues of whether the choice-of-law clause and covenant not to compete are enforceable.[5] According to Google and Lee, the Washington state court will apply Washington law to all these questions.

Furthermore, regardless of where I filed, the arbitrator could have changed the location , according to the JAMS Employment minimum standards of Procedural Fairness

> (a) The Arbitrator, after consulting with the Parties that have appeared, shall determine the date, time and location of the Hearing. The Arbitrator and the Parties shall attempt to schedule consecutive Hearing days if more than one day is necessary.
>
> (c) The Arbitrator, in order to hear a third-party witness, or for the convenience of the Parties or the witnesses, may conduct the Hearing at any location. Any JAMS Resolution Center may be designated a Hearing location for purposes of the issuance of a subpoena or subpoena *duces tecum* to a third-party witness.

And lastly, JAMS policy is to defer administrating arbitrations if any party seeks judicial ruling on the enforceability of a pre-dispute arbitration agreement.

### C. Questions about Enforcement and Arbitrability

> If a party contests the enforceability of a pre-dispute arbitration agreement that was required as a condition of employment, and if compliance with the Minimum Standards is in question, JAMS will, if given notice of the dispute, defer administering the arbitration for a reasonable period of time to allow the contesting party to seek a judicial ruling on the issue. JAMS will comply with that judicial determination. If there is no judicial determination within a reasonable period of time, JAMS will resolve questions of arbitrability under the applicable JAMS Arbitration Rules and Procedures for Employment Disputes.

3. Google asserts that negotiating concessions was proof that I was refusing to arbitrate in Santa Clara.

> Spivak's counsel entered into negotiations with Google, seeking concessions from Google in exchange for Spivak honoring her agreement to arbitrate in Santa Clara

Google demanded that we agree that we would not raise issue with the arbitrator that we felt the location was prohibitive due to my being a single mother to a toddler who could not simply be packed in a suitcase and left in a hotel room. There is no way to just find two weeks of childcare in a new location, or even at home. I have no local family and no one who could come with me to Santa Clara. I had told my attorneys that I could not actually go through with arbitration because there would be no way I could move [redacted] and myself to Santa Clara for two weeks. What would happen to [redacted]? We explained this to Google. We did not ask Google for a "concession." We discussed how to get past the fact that the location was prohibitive. Once Google agreed that they would make their corporate childcare services available for [redacted], I agreed that I would not need to raise the issue with the arbitrator. And for what it's worth, I still don't really know how I will manage to bring [redacted] (6) and [redacted] (2) down to Santa Clara for two weeks in late 2019 or find a way to leave them here(?). But back in 2015, under substantial duress, I agreed to not raise this issue.

4. Google introduces off-point case law to argue that it was entitled to include the details of my PIP, compensation, distress, and gender complaints in the public lawsuit

   Google cites Cohn v Petsmart to argue that it was entitled to include this information to establish the amount in controversy. This is ridiculous. Google could have simply asserted that my letter explicitly demanded an amount in excess of $75,000. In the Cohn v. Petsmart case, the Plaintiff did not explicitly specify damages, and then appealed when the case was removed, arguing that the amount in controversy requirement wasn't met. Only THEN did Petsmart introduce the letter to establish that the amount in controversy was reasonably over $75,000. I certainly do not contest that the amount in controversy is over $75,000, and if I did, the only fact that Google would need to reference is the fact that my letter specifically asks for damages in excess of this amount.

5. In Mr. Johnsrud's Declaration @ 4 he asserts "Spivak's Counsel Does Not Seek To Seal The Petition, And Does Not Claim It Was Frivolous." In the opposition itself, Johnsrud repeats the same assertion that my attorneys did not claim it was frivolous. This is not true. In the EEOC file that Mr. Johnsrud has, he is fully aware that my attorneys told the EEOC "This is death-knell for Ms. Spivak's future employment prospects and Google knows it. Indeed, it is hard not to conclude that that is exactly why Google filed the lawsuit in the first place"

The impact that this lawsuit has had on my life is immeasurable. And the bad faith involved is unforgivable. Google did not reasonably believe that I was attempting to arbitrate this elsewhere. And the issue was not ripe, as JAMS would have simply deferred administration to allow Google to bring the claim. Regardless of where I filed the arbitration, the governing law would not have changed. Regardless of where I filed the claim, the arbitrator could change the physical location of the hearing. Google did not need to include all the shaming details in order to establish an amount in controversy. There is only one reason they filed this suit – to shame and harass me, and to make me fearful over what else they could do if I pursued this further. I ask is there any remotely reasonably way to believe that this was filed with anything but extreme bad faith in violation of Rule 11? Every one of Google's arguments falls flat.

Google paid $90 million to prevent a scandal. Rule 11 requires that the sanctions be sufficient to deter future such frivolous lawsuits. I ask the arbitrator to form a genuine opinion as to what Google's purpose in filing this lawsuit against me was, and to consider that Sanctions in excess of $90 million are warranted here.

**B. Google Introduces a Strawman to Defend Against Their Alteration of Evidence, While Included Further Evidence That They Knew of the Alteration**

1. Google Defends with a strawman argument about whether JENS altered the emails

Google argues that Jens Skakkebaek was NOT altering my emails and did not know about my plusmail account. I agree. At no point in this arbitration did I believe or suggest that Jens Skakkebaek was altering evidence. As anyone with any knowledge of corporate processes knows, any monitoring of employee communication would be done by a division tied to HR/Legal/IT.

Google's carefully worded denial argues that I have no evidence that Google altered these emails and that Jens didn't alter the email. There are many other ways that Google could have (and did) monitor and alter my personal communications. The use of a strawman argument is revealing.

2. Jens "Received" Conflicting Versions of the Same Email And Forwarded These all to HR, Yet Google Claims They Had No Reason to Suspect Alteration

But there's more than that. In Jens' declaration he includes the emails he received. Google argues they had no reason to believe they were altered. The problem is that Jens included two different versions of each of three different emails. These are altered versions of the original, but they are also different from each other. How can Google claim to have had no reason to believe these emails were altered when they were directly in possession of conflicting versions? At the VERY least, Google should have cross-checked these with the corporate logs. And certainly they should have been transparent with the EEOC and my attorneys that they had received these emails anonymously and also received conflicting versions of them! But Google did not, and continues with the ridiculous assertion that they were simply received anonymously and they had no reason to doubt their authenticity (even as it's now established they "received" multiple versions).

See [Exhibit E] for conflicting versions of the same email that Jens declares he received anonymously. Note, these emails are all excised and altered, except for the bottom right one.

3. Even if Google Had No Reason To Suspect Alteration, They Certainly Would Have Review Plusmail To Investigate What ELSE I was Saying

Even if one accepts the absurd argument that Google received these emails from an anonymous source, and even if we accept that they had no reason to question them because my attorney didn't challenge them immediately upon receiving them months later, and even if we get past the fact that they had multiple conflicting versions, wouldn't Google have wanted to see what ELSE I was sending to plusmail? Google had the authority and free access to email sent from my corporate device. Upon receiving evidence suggesting that the gender discrimination complaint that I had just made was made in bad faith[3], wouldn't Google have fully investigated and retrieved the emails I sent to plusmail?

Google was certainly monitoring my personal communications. They have offered and referenced many other emails that I sent, and they did so prior to receiving my corporate laptop. The argument that Jens wasn't doing it is an incredibly transparent attempt to mislead, and and their argument that they had no reason to suspect alteration or cross-reference with their logs of my personal communication doesn't hold any water. Google was monitoring and altering my emails. The alterations that I have been able to detect are nothing compared to the alterations that Google has made to my performance record.

---

[3] Which, of course, it wasn't. I had been complaining of gender discrimination to this group of friends for many, many months. Any review of the whole conversation makes it clearly obvious that that this was a sarcastic joke in response to someone accusing me of being too idealistic and not pragmatic. Mr. Johnsrud repeatedly cites this one sarcastic line out of context, even though he's certainly seen it in context and understands that he's misrepresenting it.

## C. Google Introduces Yet Another Strawman to Defend Against Their Fabrication of Evidence to the EEOC

Google again tries to defend against this fabrication by arguing that Jens did not hack into my personal email and knew nothing of it. That's not the accusation. Jens has never been a mastermind, and has acknowledged that he has taken direction from HR and Legal, and that it was HR that advised him to put me on the PIP. I do not think Jens made the decision to fabricate a paper trail.

Jens was first encouraged to solicit negative feedback on me and that is why he sent the completely honest emails. Individual Google employees recognized that these were attempts to solicit negative feedback on me, and that's how I came to learn that they even existed. It was a "conspiracy theory" that three other Google employees brought to me.

After I complained about this solicitation, Jens was instructed or directed to send out a paper trail, and he did so. The timing of the emails, the way they were presented to the EEOC, the fact that Google was certainly monitoring my email at the time, and now Google's carefully worded strawman denial are all clear evidence that this was a purposeful fabrication and introduction of a paper trail.

## D. Google Continues to Misrepresent the Code of Conduct and Falsely Claims That I Have Not Previously Raised This Issue (Despite Having Frequently Complained That I Never STOP Raising This Issue)

1. Mr. Johnsrud falsely argues that I never raised this before, despite complaining when I raised it in the past

Google misrepresented its code of conduct in a desperate attempt to cut off my damages. Mr. Johnsrud argues that this is a new accusation.

> After reviewing the declaration and even agreeing to its contents, Spivak now apparently realizes the magnitude of her misconduct and the impact on her case. So she now falsely accuses Google of misrepresenting its Code of Conduct

Mr. Johnsrud is well aware that I am not first now accusing Google misrepresenting its Code of Conduct. On page 5 of my discovery letter dated June 28, 2018 I made the same accusation [emphasis added]. Mr. Johnsrud is certainly aware that I have been arguing this before.

> 6. Google demands my Entire Financial Record (Pretext and Overreaching)
>
> Google now claims that investments I made in Facebook while employed at Google constitute after acquired-evidence. This is a pretext and is irrelevant overreaching. However, if it is somehow considered relevant, I would consider agreeing to stipulating specific facts or to having a third party audit my financial records for specific, relevant concerns.
>
> Still, all of that should be unnecessary, because Google's claims here are groundless, desperate pretext
>
> 1. There was no policy at Google that prevents employees from owning competitor stock absent an actual conflict of interest. It is beyond surprising that Google attempts to assert this.
>
> 2. There is no action or inaction at Google that I could possibly have taken that would have positively impacted the value of my Facebook investments, nor does Google claim this. The conflict of interest rule was aimed to prevent employees from (for example) convincing Google to buy out their friend's startup. There is no remotely plausible conflict where my Facebook investments could interfered with my obligations to Google.

I have raised this issue so many times that Mr. Johnsrud had repeatedly protested that I raise issue of Google's bad faith on every call. And it's true. I have. The misrepresented code of conduct is an issue I have raised on almost every opportunity since Google first argued it.

2. Mr. Johnsrud misrepresented the code of conduct leading to Prer-hearing order #6, and cannot justify misrepresenting the code of conduct to the arbitrator by arguing that he independently decided that the missing requirements were met anyway

To explain away their very clear misrepresentation, Google both attempts to argue that the missing test doesn't apply, while also arguing that it certainly was met. First, Mr. Johnsrud cannot leave an element out of an argument and then subsequently defend doing so by arguing "Oh, yeah, we left out Mens Rea requirement in our First-Degree Murder instructions to the Jury, but really, it applies anyway, so no big deal."

| **Actual Code of Conduct** | **Google's misrepresentation of It in their eDiscovery Brief** |
|---|---|
| [preamble]<br><br>III. Avoid Conflicts of Interest<br><br>In working at Google, we have an obligation to always do what's best for the company and our users. When you are in a situation where competing loyalties could cause you to pursue a personal benefit for you or your friends or family at the expense of Google or our users, you may be subject to a conflict of interest. All of us should avoid circumstances that present even the appearance of such a conflict.<br><br>[investment section]<br><br>a. Personal Investments<br><br>A common conflict of interest involves a Googler's personal investment in a customer, supplier, partner or competitor of Google, where the investment is significant enough (either in absolute value or in relation to the Googler's net worth) that someone might reasonably think it could cause the Googler to act in a way that benefi that personal investment at the expense of Google. When considering whether such an investment creates a conflict of interest, ask yourself:<br><br>• Is the investment in a competitor?<br>  ◦ If the answer is yes, the investment creates a conflict of interest.<br>• If the investment is not in a competitor, but is in a customer, supplier, or partner of Google, do you have job or responsibilities at Google that let you affect Google's actions in ways that could help your investment at the expense of Google? (Google officers -- VP and above -- have particularly broad influence in this regard.)<br>  ◦ If the answer is yes, the investment creates a conflict of interest. | Within weeks of Spivak's termination, Google obtained after-acquired evidence of Spivak's misconduct during her employment that cuts off her alleged damages. Specifically, in connection with Spivak's termination, she returned the Google laptop she had been using during her employment. In reviewing the contents of that laptop, Google learned that Spivak had been day-trading Facebook options during her employment with Google, with the value of Spivak's Facebook options holdings exceeding $1 million. Facebook is identified by name as one of Google's biggest competitors in each of its SEC Annual Reports since at least 2010. (At one point, Spivak bragged in writing that her complaint at Google made her "unfireable" long enough for her to get a job at Facebook.) Spivak's Facebook options trading plainly violated Google's Code of Conduct in effect at the time, which states:<br><br>**Is the investment in a competitor?**<br>**If the answer is yes, the investment creates a conflict of interest.**<br><br>**If you are considering making an investment that creates a conflict of interest, don't make the investment.** (Emphasis added).<br><br>The Code further mandates: "if you face a potential conflict of interest, review the situation with your manager and Ethics & Compliance and get their approval." (Emphasis original.) Spivak **never** disclosed her trades to her manager or with Ethics & Compliance, and never sought their approval, in violation of both requirements. Thus, under the after-acquired evidence doctrine, Spivak's misconduct cuts off her alleged damages from the date Google discovered the misconduct (within weeks of her termination). |

3.Mr. Johnsrud **Continues** to Brazenly Misrepresent the Code of Conduct

Still, even as Google attempts to cover up that they misrepresented the code, and even as they now try to argue that the test of the missing element is met, they STILL misrepresent the code.
Amazingly, Google continues to misrepresent the code of conduct, even in its defense that it didn't.

> First, Spivak traded in the stock and options of Google's largest competitor, Facebook, for her own benefit, during the workday. She thus pursued a personal benefit for herself at the Expense of Google.

This is not the standard. The standard is whether I can take actions at Google that would

"ACT IN A WAY THAT BENEFITS THAT PERSONAL INVESTMENT AT THE EXPENSE OF GOOGLE."

(direct quote)

Could I do something at Google that would cause the underlying facebook stock or options to increase in value? Google knows I could not have done so, but is scared of the substantial frontpay damages they are facing. Google continues to attempt to cover-up the cover-up with misleading wordplay
"She thus pursued a personal benefit for herself." ← That's not the test.

It's also worth noting that Mr. Johnsrud is certainly aware that Google's hallways are lined with video games, beer kegs, and Nap Pods. Google employees can take a nap, get a massage, or play video games during "work hours." I was not an hourly employee, and if I made a stock trade while the guys played shoot-up games and drank beer during "work hours" it would not constitute doing it at Google's "expense"

## E. Abuse in the Protective Order Process / Pre-Hearing Order #8

1. Mr. Johnsrud Falsely Argues that I mischaracterized a Protective Order as a Restraining Order

It wasn't a protective order. It was a no-contact (i.e. restraining) order.
Mr. Johnsrud argues that the arbitrator ordered that he MUST provide me a list of individuals requesting no-contact. Pre-hearing order #8 says that Mr. Johnsrud MAY do so. Pre-hearing Order #8 explicitly rejects that a protective order is justified. Mr. Johnsrud was allowed to convey "No Contact" requests to me. A No-Contact order is much more severe than a protective order and it is consistent with a restraining order. Mr. Johnsurd did not tell me to not discuss my case with the individuals on the list, but rather asserted that they were not to be contacted. I did not mischaracterize it.

> A **no-contact order** is also called a restraining **order**, and prohibits a person from being in physical or verbal **contact** with another person. The court must **order** the **no-contact** agreement, and usually specifies how many feet, or yards, away the individuals must stay from one another.
>
> What Is A No-Contact Order? - Black's Law Dictionary
> https://thelawdictionary.org/article/what-is-a-no-contact-order/

2.Paul McClinton Did NOT Request No Contact, despite Mr. Johnsrud's assertion and inclusion in his No-Contact List

I get updates about Paul McClinton's kids on Facebook. We are still facebook friends, which enables us to freely chat with each other. Our last conversation prior to Mr. Johnsrud tell me that Paul wanted no contact was years ago, and involved Paul asking me to let him know how he could help. I could not believe that Paul McClinton could possibly have told Google's legal team that he wanted a no-contact order against me. Paul confirmed this – that he told Google's legal team that he had only positive experiences with me, and that he would rather not be involved in the legal case. That is not the same as no-contact.

3. Mr. Johnsrud's inclusion of an email response from Emily Rapp, and a message I sent her BEFORE the no-contact order is completely irrelevant and off point

In defending an accusation that he improperly placed Paul McClinton on the do-not-contact list, Mr. Johnsurd includes emails related to Emily Rapp. Why? Where's the email from Paul McClinton? Mr. Johnsrud is attempting to deceive the arbitrator by hoping that the

## F. Google Attempts to Defend Their False Statements Regarding the FACTS of Neal Mohan's Role by Arguing that Were Simply Addressing Claims

In Google's brief on eDiscovery, Google falsely claimed

```
Mohan is a senior leader who was several levels above Spivak. He had little if any
interaction with Spivak.
```

This is not true. In December 2014, I had a meeting with Neal Mohan where I asked to be promoted. I attempted to show him my work, and had prepared slides for him. He turned down my request and asserted that I did not get along with engineers. I followed up with evidence that this was not true, and repeated my request to be recognized with a promotion. [Exhibit G]

In Google's opposition to sanctions on this issue, Johnsrud argues:

```
There is no basis for Spivak to attempt to turn Google's legal argument (based on her
allegations) into sanctionable conduct.
```

While it is true that it is appropriate for Google's legal argument to address the allegations on point, Google made false statements of fact regarding my interactions with Neal Mohan in order to shut down a discovery request. Google could have limited their objection to the argument that it wasn't relevant to my specific allegations. But that's not what Google did. Google has asserted on multiple occasions that Neal Mohan did not interact with me or have any role in the decisions made about me. Google has also repeatedly argued that I never asked for a promotion. These are both false and Google certainly knows this.