551-2015-00827
Spivak, Rivka (Rebecca) v. GOOGLE

TAB C+
PLUS TAB D
BROWN ENVELOPE

Date closed/reports end
OK to retire
FOIA Response date 9-19-05
OK To retire

P

| | Initials | Date |
| --- | --- | --- |
| File Closed | BRM | 1/27/17 |
| Destroy Date | | |

551-2015-00827
Spivak, Rivka (Rebecca) v. GOOGLE

# CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 551-2015-00827 | Google - 223087 | Spivak, Rivka |

| Date | Action | Entered By | Reviewed/ Approved |
|---|---|---|---|
| 8/18/15 | RA IMS CODE TO LEGAL | | AB |
| 9/18/15 | LM + emailed R's atty re PS due 9/25/15 | TA | |
| 9/29/15 | TCW CP atty; Steve Frank re CP interv | TA | |
| | He's working w/ Julian Cutler | | |
| 10/16/15 | Interv'd CP | TA | |
| 10/16/15 | Call R's atty Schloud re Michael English interv | TA | |
| 10/20/15 | Sched'd Michael English interv 10/30/15 2pm | TA | |
| 10/30/15 | Inter'd Michael English 10/30/15 | TA | |
| 11/6/15 | Interv'd CP; | TA | |
| 5/9/16 | LM w CP's atty | | |
| 9/2/16 | LM w R's atty re Skaatbech interv + indiv | | |
| | who made dec re PMS relocating (under Skaatbeck) | | |
| | | | |
| 12/02/16 | RA to legal | | MO |
| 01/23/17 | concur | | MO |
| 1/27/17 | NRTS | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

1/6/16

LM w Loeser; charge not yet closed. Will get letter denying request. Can resubmit it + when file closed

TA

EEOC Form 159 (10/94)

# CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 551-2015-00827 | Google - 223087 | Spivak, Rivka |

| Date | Action | Entered By | Reviewed/ Approved |
|---|---|---|---|
| 8/18/15 | RA MS GONE TO LEGAL | | AB |
| 9/18/15 | LM + emailed R's atty re PS due 9/25/15 | JA | |
| 9/29/15 | TCW CP atty, Steve Frank re CP interv | JA | |
| | He's working w/ Jullian Cutler | | |
| 10/16/15 | Interv'd CP | JA | |
| 10/16/15 | Call R's atty Schbroud re Michael English interv | JA | |
| 10/20/15 | Sched'd Michael English interv 10/30/15 2pm | JA | |
| 10/30/15 | Inter'd Michael English 10/30/15 | JA | |
| 11/6/15 | Interv'd CP; | JA | |
| 5/9/16 | LM w CP's atty | | |
| 9/2/16 | LM w R's atty re Skaatbeck interv + indiv | | |
| | who made dec re; PMS relocating Carden Skaatbeck) | | |
| | | | |
| 12/02/16 | RA to legal | | MO |
| 01/23/17 | concur | | MO |
| 1/27/17 | NRTS Issued / mailed | BRM | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EEOC Form 159 (10/94)

CASE LOG

Page

| Charge No. | Respondent | Charging Party | |
|---|---|---|---|
| 551-2015-00827N | GOOGLE-223087 | Spivak, Rivka | |
| **Date** | **Action** | **Entered By** | **Reviewed/ Approved** |
| 3/2/15 | PCP WALKED IN FOR INTAKE - IQ REC'D | RKE | |
| 3/2/15 | CP scheduled for phone intake on 3/24/15 @ | | |
| | 10:00 am. Need to serve 131 | RH | |
| 3/2/15 | Served Notice, No Action, G1 to MA | ES | |
| 031615 | G1 to Elizabeth for Intake | [illegible] | |
| 3/23/15 | In person intk resched for | CAM | |
| | Tues Apr 14 @ 10am w Bell | [illegible] | |
| | Deleted G1 to EC | CAM | |
| 040615 | G1 to TH | [illegible] | |
| 4/10/15 | Returned CP's call | TH | |
| 4/13/15 | Rescheduled for 5/15 @ 10 am | | (w/ Eurgene) |
| | CP has an Attorney - CP's will be sending us | | |
| | notice of Rep. | | [illegible] |
| 5.5.15 | G1 to EF Intake | [illegible] | |
| 5/15/15 | Conducted In-Person Intake Interview | EF | |
| 5/18/15 | Emailed charge Form to CP's Atty | EF | |
| 5/18/15 | Packet to Supervisor | EF | |
| 5/19/15 | T7, RH, ADR - Hold Drawer | AB | |
| 06/23/15 | Charge in | MW | |
| 7/21/15 | Served Charge, Notice & sent 212 B4, G1 to ADR | CAM | |

EEOC Form 159 (10/94)

8/6/15 Per R.I., B4 G1 to RIL — CAM

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

January 5, 2017

**SECTION 83 DISCLOSURE REQUEST**

***Via Facsimile: 206-220-6911***


HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401


Nancy Sienko
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104

***Re:*** ***Rivka "Rebecca" Spivak v. Google***
***Charge No:*** ***551-2015-00827***

Dear Ms. Sienko:

I am writing on behalf of our client, Rebecca Spivak, to request a full and complete copy of all materials contained within the above referenced charge file, Charge No. 551-2015-00827. We agree to pay reasonable duplication fees for the processing of this request.

Please contact me if you have any questions or concerns. Thank you for your assistance.

Sincerely,

Dave Loeser
Paralegal to Jillian Cutler


STEVEN B. FRANK
*of Counsel*
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

EEOC Form 161-B (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: **Rivka (Rebecca) Spivak**
**c/o Jillian Cutler**
**FRANK FREED SUBIT & THOMAS LLP**
**Hoge Building, Suite 1200**
**705 Second Ave.**
**Seattle, WA 98104**

From: **Seattle Field Office**
**909 First Avenue**
**Suite 400**
**Seattle, WA 98104-1061**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| **551-2015-00827** | **Toni C. Haley, Investigator** | **(206) 220-6854** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Meiju Oz for

**Nancy A. Sienko,**
**Director**

JAN 27 2017
*(Date Mailed)*

Enclosures(s)

cc: GOOGLE-223087
c/o Brian Johnsrud
Curley, Hessinger & Johnsrud LLP
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025

Enclosure with EEOC
Form 161-B (11/16)

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits and other provisions of State law may be shorter or more limited than those described below.)*

### PRIVATE SUIT RIGHTS -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

# INVESTIGATIVE CASE FILE

## TABLE OF CONTENTS


A. Field Office Work Product
1. Conciliation/Settlement Agreement
2. Form 161, Notice of Right to Sue, or Form 256, Transmittal to DOJ
3. Charging Party's request for Notice of Right to Sue
4. Letter informing Charging Party that case is being forwarded to DOJ
5. Investigator's Memorandum and LOD/Decision
6. Form 291, Recommendation for Dismissal, and dismissal documents
7. Form 154, Request for Withdrawal of Charge, and written reply to request
8. Form 411-A, Substantial Weight Review
9. Intra- and inter-agency memoranda and letters
10. Form 136, Subpoena
11. Form 378, Summary of Relief, and computations of backpay, monetary benefits

B. Jurisdictional Items
1. Form 5, Charge of Discrimination, and any prior correspondence
2. Form 151, Third Party Certification of Charge
3. Form 212-A, Charge Transmittal, and other deferral/referral documents
4. Title VI/IX/Rehab. Act federal agency referral documents
5. Form 131/131-A, Notice of Charge
6. Respondent Coverage and Exemption Documentation

C. Charging Party's/Complainant's Evidence (Include notes of all CP contacts)
1. Notes of Pre-Determination Interview
2. Copies of correspondence (except closure documents) with CP or attorney
3. CP's Affidavit, Form 283, Charge Questionnaire, and documents submitted
4. Affidavits, interview notes, documents from witnesses identified by CP

D. Respondent's Evidence
1. Notes of Pre-Determination Interview
2. Position Statement and documentary and statistical evidence submitted
3. Copies of RFIs and notes of in-person and telephonic data requests
4. Other corresp. (except closure documents), notes of discussions with R, R's atty.
5. Affidavits, interview notes, documents from witnesses identified by respondent

E. Other Evidence/Miscellaneous Materials
1. Affidavits, interview notes, documents from witnesses identified by investigator
2. Notes of on-site investigative activity, investigator's observations
3. Investigator's charts, graphs, diagrams, and statistical analyses.
4. EEO and labor market data, Respondent's compliance history

Left Side of File
1. Form 159, Case Log
2. Form 379, Receipt for Benefits,
3. Form 167, Non-disclosure Agreement
4. Form 341, Agreement to Represent or other evidence of payment
5. Case management review documents

A

## CHERYL MILNER - Fwd: RESCHEDULED INTAKE

| | |
|---|---|
| **From:** | ELIZABETH CANNON |
| **To:** | CHERYL MILNER |
| **Date:** | 3/23/2015 2:35 PM |
| **Subject:** | Fwd: RESCHEDULED INTAKE |
| **Attachments:** | Fwd: RESCHEDULED INTAKE |

Hi Cheryl,

Here is the email about the intake I just gave you.

Thanks!

Elizabeth

**CHERYL MILNER - Fwd: RESCHEDULED INTAKE**

**From:** MARY HAMMOCK
**To:** CANNON, ELIZABETH
**Date:** 3/23/2015 2:26 PM
**Subject:** Fwd: RESCHEDULED INTAKE

Hi,
Could you just give the file back to the front desk, they will put in back in the drawer for April 14th for the next investigator assigned.
Thanks,
Mary

>>> REBECCA EATON 3/23/2015 2:18 PM >>>
551-2015-00827

Spivak, Rivka (Rebecca) v GOOGLE

is now on 4/14 @ 10am

Previously scheduled for 3/24 @ 10am with Elizabeth

B

RECEIVED
SEA EEOC
2015 JUN 23 AM 8:20

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: Agency(ies) Charge No(s): |
|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | € FEPA<br>X EEOC 551-2015-00827 |

**Washington State Human Rights Commission** and EEOC
*State or local agency, if any*

| Name *(Indicate Mr. Ms. Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Rivka (Rebecca) Spivak** | **(617) 519-1100** | [redacted] |

Street Address City, State and Zip Code

**128 NE 51st Street, Seattle, WA 98105**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **GOOGLE-223087** | **500 or more** | **(206) 632-1183** |

Street Address City, State and Zip Code
**501 N 34th Ave., Seattle, WA 98103**

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| € RACE € COLOR X SEX € RELIGION € NATIONAL ORIGIN | Earliest **02-2012** Latest **03-02-2015** |
| X RETALIATION € AGE € DISABILITY € OTHER *(Specify below.)* | X CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*
I began working for Respondent on or around April 2010, as a Product Manager. During the course of my employment, I performed my duties in an exemplary manner.

I am one of a few female Product Managers who reports to Jens Skakkebaek on my work team. In or around May 2014, I was put on a performance improvement plan and given negative reviews. I was also left in place and/or not promoted while a similarly-situated male employee was promoted around July 2014. In addition, in or around September 2014, I was prohibited from presenting a major and important product and invention that I had created to higher management, while similarly-situated male co-workers were allowed to present their products and inventions they had been working on. Moreover, in or around November 2014, I was given another negative performance review that was gender-biased while similarly-situated male employees were treated better. Additionally, in or around January 2015, I was criticized for taking leave that was medically necessary, as my 2-year old daughter was scheduled to receive surgery. Also, I was criticized for taking a four-day leave that my similarly-situated male co-worker was allowed to take, and he was not subjected to the same treatment as me. In or around March 2015, Furthermore, on or around May 14, 2015, I was given another gender-biased and unjustified negative review. Moreover, the impact that I suffered from receiving these low scores on my performance reviews disqualified me from the promotionaltrack and/or receiving promotions.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements.* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>6/17/2015 [signature]<br>*Date* *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented to:<br>€ FEPA<br>X EEOC | Agency(ies) Charge No(s):<br><br>**551-2015-00827** |
|---|---|---|

**Washington State Human Rights Commission** and EEOC
*State or local agency, if any*

Respondent favors similarly-situated male employees over female employees by giving male employees better evaluation scores leading to more promotions, allows male employees to take leave without questioning or disciplining them, holds them to different standards with regard to assignments and/or projects, whereas females are subjected to worse treatment, which I consider unfair terms and conditions of employment. In addition, I was subjected to more discipline for having conducted similar practices as compared to my male counterparts, and they were not subjected to the same treatment as me. Additionally, in or around May 2014 and early-February 2015, I had complained to upper management about this gender bias and unfair treatment, but nothing became of my complaints. Around mid-February 2015, I was notified by Respondent that I would have to relocate to California in order to stay employed, which I believe was retaliation for opposing discrimination. To my knowledge, similarly-situated male employees were not subjected to this same treatment.

I believe I have been subjected to unfair terms and conditions of employment, discipline, and denied promotions, because of my sex, female in violation of Title VII of the Civil Rights Act of 1964, as amended. Furthermore, I believe I have been subjected to retaliation for opposing discrimination.

RECEIVED SEA EEOC
2015 JUN 23 AM 8 20

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements.* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>6/17/2015 [signature]<br>*Date* *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 5 (5/01)

EEOC Form 212-A (3/98)

# U.S. Equal Employment Opportunity Commission

TO: **Washington State Human Rights Commission**
**711 South Capitol Way**
**Suite 402**
**Olympia, WA 98504**

Date **July 20, 2015**
EEOC Charge No.
**551-2015-00827**

FEPA Charge No.

CHARGE TRANSMITTAL

SUBJECT:

| **Rivka (Rebecca) Spivak** | v. | **GOOGLE-223087** |
|---|---|---|
| *Charging Party* | | *Respondent* |

Transmitted herewith is a charge of employment discrimination initially received by the:

☒ EEOC ☐ ____________ *Name of FEPA* on **Mar 02, 2015** *Date of Receipt*

☒ Pursuant to the worksharing agreement, this charge is to be initially investigated by the EEOC.

☐ Pursuant to the worksharing agreement, this charge is to be initially investigated by the FEPA.

☐ The worksharing agreement does not determine which agency is to initially investigate the charge.

☐ EEOC requests a waiver ☐ FEPA waives

☐ No waiver requested ☐ FEPA will investigate the charge initially

*Please complete the bottom portion of this form to acknowledge the receipt of the charge and, where appropriate, to indicate whether the Agency will initially investigate the charge.*

| Typed Name and Title of EEOC or FEPA Official | Signature/Initials |
|---|---|
| **Nancy A. Sienko, Director** | Nancy A. Sienko |

| **Rivka (Rebecca) Spivak** | v. | **GOOGLE-223087** |
|---|---|---|
| *Charging Party* | | *Respondent* |

TO WHOM IT MAY CONCERN:

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to initially investigate the charge.

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention not to initially investigate the charge.

☐ This will acknowledge receipt of the referenced charge and request a waiver of initial investigation by the receiving agency.

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to dismiss/close/not docket the charge for the following reasons:

| Typed Name and Title of EEOC or FEPA Official | Signature/Initials |
|---|---|
| **Sharon K. Ortiz, Director** | |

TO: **Seattle Field Office**
**909 First Avenue, Suite 400**
**Seattle, WA 98104-1061**

Date **July 20, 2015**
EEOC Charge No.
**551-2015-00827**
FEPA Charge No.

EEOC FORM 131 (11/09)

# U.S. Equal Employment Opportunity Commission

GOOGLE-223087
ATTN: Personnel Administrator
501 N. 34th Ave.
Seattle, WA 98103

PERSON FILING CHARGE

**Rivka (Rebecca) Spivak**

THIS PERSON *(check one or both)*

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**551-2015-00827**

## NOTICE OF CHARGE OF DISCRIMINATION

*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII) [ ] The Equal Pay Act (EPA) [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA) [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.
2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.
3. [ ] Please provide by a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
4. [X] Please respond fully by **19-AUG-15** to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **04-AUG-15** to **Cheryl Milner, ADR Program Assistant, at (206) 220-6937**
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Hattie Y. Reed,
Office Automation Asst

*EEOC Representative*

*Telephone* **(206) 220-6921**

**Seattle Field Office**
**909 First Avenue, Suite 400**
**Seattle, WA 98104-1061**

**Fax: (206) 220-6911**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race [ ] Color [X] Sex [ ] Religion [ ] National Origin [ ] Age [ ] Disability [X] Retaliation [ ] Genetic Information [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| July 20, 2015 | Nancy A. Sienko, Director | [signature] |

Enclosure with EEOC
Form 131 (11/09)

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14 Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

C

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

*Via Email and U.S. Mail*

December 2, 2016

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION RECEIVED
DEC 05 2016
900 1ST AVE SUITE 400 SEATTLE WA 98104-1061

Toni Haley
Investigator
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

**Re:** ***Rivka (Rebecca) Spivak v. Google***
**EEOC Charge No. 551-2015-00827**

Dear Ms. Haley:

I am writing to request that the EEOC close its investigation and issue Notice of Right to Sue in the above referenced matter. We will request a copy of the charge file under separate cover.

Please let me know if you have any questions or need additional information. Thank you for your work investigating Ms. Spivak's charge.

Sincerely,

Jillian M. Cutler

STEVEN B. FRANK
*of Counsel*
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

JMC/nef
Enclosures
cc: Rebecca Spivak

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798

SEATTLE
WA 980
07 DEC '16
PM 4 L

UNITED STATES POSTAGE
PITNEY BOWES
02 1P $ 000.46[5]
0000868618 DEC 06 2016
MAILED FROM ZIP CODE 98104

TONI HALEY
INVESTIGATOR
EEOC
FEDERAL OFFICE BLDG
909 FIRST AVE STE 400
SEATTLE WA 98104-1061

98104-106199

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

*Via Email and U.S. Mail*

October 31, 2016

Toni Haley
Investigator
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION/RECEIVED
NOV 01 2016
FEDERAL OFFICE BUILDING
909 1ST AVE SUITE 400 SEATTLE WA 98104-1061

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

STEVEN B. FRANK
*of Counsel*
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

**Re:** ***Rivka (Rebecca) Spivak v. Google***
**EEOC Charge No. 551-2015-00827**

Dear Ms. Haley:

Thank you for your recent call regarding Ms. Spivak's gender discrimination and retaliation claims that are pending with the EEOC. As we discussed, I am writing to provide you with additional information regarding: (1) the launch of Interactive Benchmarks; (2) Ms. Spivak's downgraded performance review following her family medical leaves in December 2015 and January 2016; and (3) the ongoing retaliation Ms. Spivak has experienced since February 2015 when she was forced to decide between relocating from Seattle to California or abandoning the Interactive Benchmarks project she conceptualized and spearheaded.

**A. Ms. Spivak's Performance Downgraded Following Family Medical Leave, Despite Successful Launch of Interactive Benchmarks.**

In November 2014, Ms. Spivak was one month away from launching Interactive Benchmarks, which proved to be a revolutionary approach to selling ad space that we believe earned Google at least a $100 million in its first year, and possibly much more. In November 2015, Ms. Spivak received a mixed review from Mr. Skakkeback and a "consistently meets expectations" rating, which was particularly disappointing given her documented successes with Interactive Benchmarks. On the one hand, Mr. Skakkeback lauded Ms. Spivak for "getting deep in her subject matter, setting a good vision of where it should go, *and communicating this*" (emphasis supplied). He acknowledged (as he must) that Ms. Spivak "has gotten Interactive Benchmarks really going in development and set a great vision for its use ..."

Although Google targets Ms. Spivak's "soft skills" and argues she had difficulty communicating effectively and working with other people, Mr. Skakkeback's comments demonstrate otherwise. He notes that "[s]he has a close working relationship with Sales Ops," has "established herself as a credible partner and thought leader," and is getting good feedback from them. The feedback from the engineering team members – with whom Ms. Spivak worked most directly – was even more positive. Mr. Skakkeback acknowledged that she had "earned the trust of the engineering team" and that "Eng[ineering] likes her insights, vision, and ability to work at a detailed technical level as well." He acknowledged that "the team is working well now" and "has good deliverables: We are looking forward to seeing IB Launch in Q1." The people who worked with Ms. Spivak on a daily basis recognized that she was smart, visionary, and hard-working. Like so many of her male colleagues, she was direct, confident, and assertive. She established close and trusting working relationships with peers who appreciated that she not only had the vision to conceptualize Interactive Benchmarks, but the "ability to work at a detailed technical level" to execute that vision.

In the fall of 2014, Mr. Skakkeback and others suggested that Ms. Spivak would finally get professional (and financial) recognition when Interactive Benchmarks launched. Indeed, as Google's attorneys wrote in its September 2015 position statement: "As Spivak headed into 2015, she was poised for greater recognition assuming her main product, Interactive Benchmarks, fully launched and was well-received, as long as she continued to improve her communications with peers and other soft skills." (Google Position Statement at 12).

Interactive Benchmarks launched the next month, on December 18, 2014. This initial launch generated tremendous excitement and the product was universally well-received. Indeed, by April 2014, its use had grown by 700% and it customer rating was an extraordinary 93%. All indications were that Ms. Spivak's star was rising and that she would finally get the recognition she earned. That did not happen.

Instead, Ms. Spivak had two family-related leaves in late December and early January. The first was for her 2-year-old daughter's surgery and the second was for pregnancy loss, when a surrogate lost Ms. Spivak's second child. During the first leave, Mr. Rothman told Ms. Spivak's co-workers that she was away from work because she was being "temperamental and petulant." That comment was gendered, offensive, and false.

On or about January 28, 2015, shortly after Ms. Spivak returned from her second leave, Mr. Rothman told her he was going to do a "midpoint check-in" to discuss her performance. Mr. Rothman did not conduct a "midpoint check-in" with his other direct report, Vince Lacey. During that meeting, rather than recognizing the Interactive Benchmarks launch and its terrific success, Mr. Rothman informed Ms. Spivak that she was on-track to receive a *lower* performance rating in March 2015 than she had in November 2014. (When you and I spoke on the phone, I

misremembered this sequence. Mr. Rothman did not give Ms. Spivak a written evaluation in January 2015; he told her she was on-track for a poor performance rating in March 2015). Specifically, Mr. Rothman said she would have been on track for a "solid meets" *if only she had not been out so much.* Mr. Rothman's comment is direct evidence of discrimination and FMLA retaliation.

Mr. Rothman's decision to downgrade Ms. Spivak's performance below a solid meets for taking time off for her daughter's surgery and subsequent pregnancy loss is indefensible and illegal. It defies reason that, absent discrimination, Ms. Spivak would be lauded for having the vision, trust from colleagues, and technical skills to bring Interactive Benchmarks to fruition in November and December 2014, only to have her performance downgraded to a less than a solid meets rating weeks later for attending to family medical needs.

After *months* of being undervalued but believing that Google would *finally* recognize the value of her work and contributions once Interactive Benchmarks launched, the meeting with Mr. Rothman was a devastating blow. Even after all she had done to conceptualize and launch Interactive Benchmarks, Google refused to recognize Ms. Spivak. Indeed, one month after the product launched, Mr. Rothman informed her that her March performance rating would be *worse* than prior ratings because she missed work for her daughter's surgery and her own pregnancy loss. Ms. Spivak finally broke down. She told-off Mr. Rothman.

She also reported Mr. Rothman's explicitly discriminatory decision to downgrade her performance to Google's Human Resources Department. Later that month, Google announced that Interactive Benchmarks was moving to Los Angles. The company gave Ms. Spivak an ultimatum that she must relocate with the project or find another position in Google, despite permitting other Product Managers in the same organization to continue working on their projects remotely.[1]

The discrimination and retaliation Ms. Spivak experienced caused her debilitating stress and her blood pressure rose to dangerously-high levels. Ms. Spivak was admitted to the emergency room and prescribed medication to stabilize her blood pressure. After Google refused her request to work from home, Ms. Spivak went on a medical leave of absence beginning March 3, 2015.

### B. Google's Continued Retaliation After the Relocation of Interactive Benchmarks.

1. <u>Google Filed an Unnecessary Federal Lawsuit Against Ms. Spivak to Compel Arbitration</u>.

Ms. Spivak filed a charge with the EEOC on June 17, 2015, while she was

[1] We have submitted detailed information about this retaliation in my October 22, 2015 letter to you, which I am enclosing here for ease of reference. Exhibit A.

still on medical leave. She alleged a continuing violation of gender discrimination and retaliation. Our firm sent a demand letter to Google on June 18, 2015. The letter contained a footnote in which we questioned whether the arbitration clause in Ms. Spivak's employment contract complied with the JAMS minimal standards and questioned whether the arbitration would go forward in California or Washington. Based solely on that footnote, and without prior notice to Ms. Spivak, Google filed a federal lawsuit against Ms. Spivak petitioning the court to compel arbitration in California. The petition makes public the fact that Ms. Spivak has asserted claims of gender discrimination and retaliation against Google based on unfair performance evaluations, a performance improvement plan, the denial of promotions, and the relocation of her role to California. Exhibit B at ¶ 8.

Google filed the lawsuit on June 26, 2015 and voluntarily dismissed it approximately two weeks later, on July 14, 2015.[2] Exhibit C. But the damage to Ms. Spivak was already done. If you google "Rebecca Spivak Google," the first substantive entry is "Google Inc. v. Spivak (5:15-cv-02981), California Northern District Court." As a result, the first three things any prospective employer learns about Ms. Spivak are: (1) she was sued by her former employer; (2) she asserted gender discrimination and retaliation claims; and (3) she received poor performance reviews, was placed on a PIP, and denied promotions. This is a death-knell for Ms. Spivak's future employment prospects, and Google knows it. Indeed, it is hard not to conclude that that is exactly why Google filed the lawsuit in the first place.

2. <u>Ms. Spivak Returns From Medical Leave and Is Given 60 Days to Find a New Position or Be Terminated</u>.

Ms. Spivak returned to work on September 22, 2015. She returned to Google with no position and was told she had 60 days to find another position at Google or be terminated. Given that she had hired a lawyer and asserted gender discrimination and retaliation claims against the company – and that Google had responded by filing a lawsuit against her – Ms. Spivak's odds that Google would allow her to remain at the company were low. Nonetheless, Ms. Spivak made a diligent effort to find another suitable internal position. This goal became all the more important after Google filed the lawsuit in the Northern District of California. Ms. Spivak justifiably feared she would now be blackballed by any potential employer who googled her.

Ms. Spivak committed herself to finding a new role at Google. A human resources representative was assigned to assist her search. She was given a short list of openings, which were mostly junior roles that did not relate to her experience and expertise. She immediately inquired about one of the listed positions that would have been a good fit, and was told the position was no longer available.

---

[2] The applicability of the arbitration clause is not a live issue in this matter. In order to preserve her New York state claims before the statute of limitation ran, Ms. Spivak submitted her demand for arbitration on July 28, 2015. However, the arbitrator stayed the arbitration proceeding to allow the EEOC to investigate her charge.

Then, on or about September 29, Ms. Spivak was presented with a promising opportunity. Nicolas Weng Kan, the CEO of Google Compare, contacted Ms. Spivak regarding a Lead Product Manager position in his organization. Mr. Kan met with Ms. Spivak and they seemed to hit it off. He asked her to take two weeks to review Google Compare and make a proposal about how to improve the Compare product. He told her that he would decide whether to give her the lead PM role based on her proposal. Ms. Spivak enthusiastically accepted the challenge and the opportunity to work with Mr. Kan on Compare. She spent the next two weeks analyzing the existing Compare product, conducting industry research, interviewing sales people who would benefit from the product, and preparing a comprehensive presentation on revamping the product. Mr. English recommended Ms. Spivak for the position and expressed his confidence that she was well-positioned to get the job.

Two weeks after her first meeting with Mr. Kan, Ms. Spivak met with Mr. Kan and Peter Wilson, Compare's Engineering Director on October 14. Her presentation was extremely well-received by Mr. Wilson who called it "amazing." Mr. Kan was more muted and swiftly pulled Mr. Wilson out of the meeting. When Ms. Spivak followed up with Mr. Kan about the position shortly after the interview, he did not respond.

On or about November 5, Ms. Spivak contacted human resources and explained that she had a strong presentation and had been hopeful she would be selected for the Compare Lead PM role, but that Mr. Kan had not responded. Ms. Spivak expressed concern that other Google teams were not hiring in the end of the year and requested that Google pause her clock to find a new position until January when more positions opened up. Google denied Ms. Spivak's request and reiterated that she would be terminated at the end of the 60 days and would be terminated on November 20 if she had not secured another internal role.

On November 9, Mr. Kan emailed Ms. Spivak and told her Compare was not moving forward with her application and that "my priority at this stage is to recruit a lead PM". This was odd, because that was exactly the position for which Ms. Spivak had interviewed. On November 20, Google terminated Ms. Spivak.

**C. Ms. Spivak's Current Status and Job Search.**

At the time of her termination, Ms. Spivak was undergoing in vitro fertilization to try to have a second child on her own. There were complications and the first several rounds of treatment failed, but she eventually became pregnant. Due to her medical history and age, it was a high-risk and hard-fought pregnancy. Following her termination, Ms. Spivak focused on maintaining her pregnancy and did not want to begin a new role as a pregnant mom who would not qualify for maternity leave. Fortunately, Ms. Spivak had a healthy baby at the end of July and is now searching for work outside of Google. Her efforts are hampered by having

to explain her termination from Google and the lawsuit that the company filed against her.

We believe the evidence will show that Google's actions following the relocation of Interactive Benchmarks, including her termination in November, are continued retaliation for reporting and challenging gender discrimination.

Please let me know if you have any questions, need more information, or would like to discuss Ms. Spivak's claims further.

Sincerely,

Jillian M. Cutler

JMC/nef
Enclosures
cc: Rebecca Spivak

# EXHIBIT A

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

*Via Email and U.S. Mail*
Email to: toni.haley@eeoc.gov

October 22, 2015

Toni Haley
Investigator
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

STEVEN B. FRANK
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

**Re:** ***Rivka (Rebecca) Spivak v. Google***
**EEOC Charge No. 551-2015-00827**

Dear Ms. Haley:

Thank you for taking the time to speak with Ms. Spivak and me on Friday. I am writing to provide you with additional information regarding Ms. Spivak's claims that Google retaliated against her by relocating IB to California and by requiring her – but not other Product Managers – to physically relocate in order to continue overseeing her project.

At Google, a Product Manager (PM) is the business leader for a project. The Engineers write the code and build the software. The PM and Engineering organizations are independent of each other, and PMs and Engineers working on the same product do not report to the same organization. The PMs work with customers, develop deep expertise, and set product strategy. In essence, the PM is the project architect and the engineers are the construction team. The PMs tend to be more deeply invested in the specific products they develop, whereas engineers tend to transfer between teams since the technical inner workings of all products are similar.

As the Product Manager, Ms. Spivak had conceptualized and developed IB. She was the architect of this immensely successful and lucrative project. She was committed and excited to lead IB's continued growth, and to receive professional and financial recognition for her efforts. Then, in February 2015, Google announced that: (1) it was relocating IB to California, and (2) Ms. Spivak had to

choose between moving to California or abandoning IB, an initiative *she* created and spearheaded.

Both aspects of the announcement were surprising and unusual. Google typically allows Product Managers to work from a different location than the one where the product engineers work. For example, PM Vince Lacey, who also reported to Aaron Rothman, was based in California even though his engineering team was based in Seattle. There was never any concern expressed over Mr. Lacey working as a "remote PM." In keeping with this practice, after announcing the February 2015 relocation of five teams under Mr. Skakkebaek, Google proceeded to permit all of the effected Product Mangers *except Ms. Spivak* to work remotely from their engineering teams. *Only Ms. Spivak* was given the ultimatum to relocate or leave her project.

After Human Resources Representative Paul Higson informed Ms. Spivak that she would have to relocate to L.A., she reached out to Engineering Manager Bill Reardon. She specifically asked if she could continue as the IB Product Manager working remotely from Seattle. Mr. Reardon responded, "Sure, I love remote PMs." When Ms. Spivak told Mr. Higson that Mr. Reardon had given her the green light to remain in Seattle, Mr. Higson told Ms. Spivak that she had "misunderstood" Mr. Reardon. Ms. Spivak did not misunderstand. In fact, as the table below shows, only *one* of the PMs who worked on products with Mr. Reardon's engineering team was in the same physical location as the engineers. As set forth in the chart below, in February 2015, Ms. Spivak was the *only* PM working with Mr. Reardon's engineers who was told she must relocate to remain on her project. She was also the only PM who had repeatedly complained about gender discrimination.

| **Reardon's PMs** | **PM Location** | **Engineering Location** | **Required to Move** |
|---|---|---|---|
| Vince Lacey | MTV | LAX | No |
| Carlos Facanha | MTV | LAX | No |
| William Kunz | MTV | LAX | No |
| Emily Rapp | SEA | LAX | No |
| Rebecca Spivak | SEA | LAX | Yes |
| Matt Jones | LAX | LAX | N/A |

Shortly after Ms. Spivak spoke to Mr. Reardon, she had a Google "chat" with Product Manager Emily Rapp regarding the reorganization. I have enclosed a copy of the chat for your review. In it, Ms. Rapp told Ms. Spivak that the engineering directors in LA (including Thomas Williams) were upset that the reorganization was done with "very little warning." Ms. Rapp wrote, "Thomas Williams is super not happy" about the reorganization. In response to Ms. Spivak asking, "Who made the decision not to let them [the PMs] be remote?," Ms. Rapp responded, "HR, according to Aaron. 'Policy.'" However, as set forth above, that was not Google's "policy." Indeed, Ms. Rapp confirmed that she was not being required to relocate. Ms. Spivak asked, "How did you get the exception?" Ms. Rapp replied, "No exception" and explained Google was only requiring the PMs under Mr. Skakkebaek to relocate. Ms. Spivak asked, "What did [D]ustin [Jackson] think about you being a remote PM?" Ms. Rapp replied, "He was for it. thaw [Thomas Williams] was apparently also pissed the PMs weren't given the opportunity to remote from the start."

Please let me know if you have any questions or need additional information.

Sincerely,

Jillian M. Cutler

JMC/nf
Enclosure
cc: Rebecca Spivak

# EXHIBIT A

**Jillian Cutler**

---------- Forwarded message ----------
From: **Rebecca Spivak** <rspivak@gmail.com>
Date: Fri, Feb 27, 2015 at 7:36 PM
Subject:
To: Rebecca Spivak <rspivak@gmail.com>

hey!
Did you get the role?
yt?
3:56 PM





am now what's up?
and yes! 

Emily

•

4:06 PM
Yay!!!
4:06 PM





officially will start on tues
Emily

•

4:06 PM
Congrats
woo hoo!
4:06 PM





so excited
Emily

•

4:06 PM
Excited for you too
what a great fit
and you get to stay in SEA?

long term?
4:06 PM




yep!
well kir
heh
but yea
Emily
•
4:07 PM
That's so awesome
4:07 PM




indefinitely
lol
Emily
•
4:07 PM
ok - well, very glad to know it's a real option for me too then
4:07 PM




definitely
Emily
•
4:07 PM
you rock in laying that foundation
4:07 PM




btw, talked with tom yesterday, and dustin today
Emily
•
4:08 PM
yeah?
4:08 PM




tom = super not happy with how doug handled the transition
apparently he basically said I'm leaving, and left no foundation for someone in seattle to take it over with very little warning
Emily
•
4:08 PM
ugh
4:09 PM




and dustin is really not happy with jens/aaron
btw don't mention this around
Emily
•
4:09 PM
really?
4:09 PM




ya
Emily
•
4:09 PM
that's great that he confides in you
4:09 PM




communication wise especially
he asked me about my work vs. vince's with pitchx
apparently didn't know that it was all me
Emily
•
4:10 PM
wow - that's great he's investing himself in finding that stuff out
4:10 PM




and asked who should run it
and if I trusted vince to

Emily
•
4:10 PM
eep - that must have been an interesting conversation
4:10 PM




I brought up gautam, and he said that that would actually be a real possibility
I mostly talked about how vince might not be a great fit as a remote pm
Emily
•
4:11 PM
ah
4:11 PM




and motivation behind the project
Emily
•
4:11 PM
what did dustin think about you being a remote PM
4:11 PM




he was for it
thaw was apparently also pissed that pms weren't given the opportunity to remote from the start
Emily
•
4:11 PM
really??
4:11 PM




ya
Emily
•
4:11 PM
who made the decision to not let them be remote
4:11 PM




especially because with samir, etc.
there's been a history of good remote pms
hrbp, according to aaron
"policy"
that does mean though that going remote under jason is a real possibility
Emily
•
4:12 PM
interesting. How did you get the exception?
4:12 PM




it wasn't 

it's because it's under jason
lol
it's only under jens that it isn't
Emily
•
4:13 PM
I see
well, there's hope then
thank you
4:14 PM




yep totally
dustin has really impressed me lately
Emily
•
4:14 PM
He's a good guy
4:15 PM




he went in depth over transition plans for me, but solely because he wanted to make sure that for my career I was getting credit for work I was doing
aka, if I was fully under sanaz
Emily
•
4:15 PM
it sucks that HRBP overrode his intent
4:15 PM




and still doing a good percentage of work on pitchx
then that wouldn't reflect properly on my review
Emily
•
4:15 PM
I'm really glad he supports you
you deserve it
and you're working on a great project
did my name come up at all?
4:17 PM





not these past two days
I think the best step now for you
because bill also has power
and because of thaw's views
is to work really hard with bill
do things like get him in front of sellers
michael and michael both really appreciated that today (we did user walk-throughs with pitchx mocks)
and I don't think everyone knows how much user interaction you do
then you can also position to get under jason
they need more strong pms
definitely plenty of work
Emily
•
4:19 PM
awesome. Meeting with Jason on Tuesday.
4:19 PM





perfect
ya, so he's super into the idea of getting the data in front of sellers
and then letting them use their skills
definitely strategic
as is thaw
I think you should also meet with him, if you haven't already
Emily
•
4:20 PM
thanks emily :



4:21 PM





totally
oh man, did you see that link I sent you in the fb message?
Emily
•
4:21 PM
no - didn't log into fb
4:22 PM




you should, it's great

oh and other thing I would recommend
plan a number of trips down to LA if you can
being here in person will not only get you seen
but will show that you care enough about the project to remote pm
Emily
•
4:23 PM
I will

yay
4:23 PM




I think we can both come out on top out of this

also probably start working with me in kirkland

get your face in front of sanaz
lol
Emily
•
4:25 PM
thank you emily
really appreciate your support

4:26 PM




totally
I'm not about to lose the only other woman pm

haha

and now we no longer are competing for jobs 

lol

Emily

•

4:26 PM



that's true



I'm really glad you've landed so well
not sure what will happen to me
but you deserve to have landed in the right spot

5:12 PM



# EXHIBIT B

BRIAN L. JOHNSRUD, State Bar No. 184474
PATRICK SHERMAN, State Bar No. 229959
CURLEY, HESSINGER & JOHNSRUD LLP
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
Telephone: 650.600.5300
Facsimile: 650.323.1002
E-mail: bjohnsrud@curleyhessinger.com
psherman@curleyhessinger.com

Attorneys for Petitioner
GOOGLE INC.

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION/RECEIVED
NOV 01 2016
FEDERAL OFFICE BUILDING
909 1ST AVE SUITE 400 SEATTLE WA 98104-1061

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

GOOGLE INC.,

Petitioner,

v.

RIVKA SPIVAK,

Respondent.

Case No. ______________

**GOOGLE INC.'S PETITION TO COMPEL ARBITRATION PURSUANT TO WRITTEN AGREEMENT TO ARBITRATE**

[Hearing Date/Time/Dept to be determined after assignment to Judge or Magistrate]

Supporting Documents:
Memorandum of Points and Authorities; Declarations of Ariana Tortorici and Michael Pfyl; Certificate of Interested Parties

**TO RESPONDENT RIVKA SPIVAK AND HER COUNSEL:**

**PLEASE TAKE NOTICE THAT** on ______________, 2015, at ___:___m., or as soon thereafter as the matter may be heard before this Court in Department/Courtroom No. ________, located at Robert F. Peckham Federal Bldg, 280 S 1st St., San Jose, California, 95113, Petitioner Google Inc. will and hereby does petition the Court to compel to arbitration in Santa Clara County, California all threatened claims of Respondent Rivka Spivak ("Respondent" or "Spivak") against Petitioner that are subject to the parties' written, pre-dispute arbitration agreement. This Petition is made pursuant to 9 U.S.C. § 1 *et seq.* and is based on this Petition, the accompanying Memorandum of Points and Authorities in support hereof, the declarations of Ariana Tortorici (and the exhibits attached thereto) and Michael Pfyl and any further evidence and argument that

may be presented in support of this Petition.

**PETITION TO COMPEL ARBITRATION**

In support of its Petition to Compel Arbitration pursuant to the Federal Arbitration Act, Google states as follows:

**I. THE PARTIES**

1. Petitioner Google Inc. is incorporated under the laws of Delaware and its principal place of business is in Mountain View, California. It is thus a citizen of Delaware and California for diversity jurisdiction purposes. 28 U.S.C. § 1332(c)(1).

2. Respondent Rivka Spivak is an individual who is a citizen of and domiciled in the State of Washington.

**II. JURISDICTION AND VENUE AND INTRADISTRICT ASSIGNMENT**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). Under 9 U.S.C. § 4, a federal court should "look through" the Petition to confirm that there is an independent basis for federal jurisdiction. *Vaden v. Discover Bank*, 556 U.S. 49, 58 (2009). In this case, this Petition involves an underlying dispute between citizens of different states, as Petitioner is a corporation incorporated in the State of Delaware with its principal place of business in the State of California, while Respondent is a citizen of the State of Washington. The amount in controversy associated with the claims threatened by Spivak far exceeds $75,000 exclusive of interest and costs. Respondent is threatening various claims under the Washington Law Against Discrimination and the New York New York State Human Rights Law and has demanded millions of dollars in claimed damages from Petitioner. (Declaration of Michael Pfyl Decl. ¶ 3.) Respondent's settlement demand confirms that the case satisfies the amount in controversy requirement. *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) (affirming admission of settlement offer to establish amount in controversy requirement and rejecting argument that settlement offer was inadmissible under FRE 408).

4. This Court has personal jurisdiction over the parties because Petitioner resides in this District and because Respondent has expressly consented to personal jurisdiction in this District. The written agreement between Petitioner and Respondent provides that "[t]o the extent

that any lawsuit is permitted under this Agreement, I hereby expressly consent to the exclusive personal jurisdiction of the state and federal courts located in California for any lawsuit filed against me by the Company." (Declaration of Ariana Tortorici, ¶ 3, Exhibit C at § 16(a).)

5. In terms of venue, a petition to compel arbitration may be filed in any United States District Court with jurisdiction over the dispute. 9 U.S.C. § 4. Venue is proper in this District because the arbitration agreement between Petitioner and Respondent provides that "[t]o the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the exclusive personal jurisdiction of the state and federal courts located in California for any lawsuit filed against me by the Company" and because Respondent agreed to arbitrate in Santa Clara County, California, which is in this District. (Tortorici Decl., ¶ 3, Exhibit C at § 16(a).) Under Civil Local Rule 3-2(e), venue is proper in the San Jose Division of this District for civil actions otherwise arising in Santa Clara County to be assigned to the San Jose Division.

## III. BASIS FOR ARBITRATION

6. When Spivak joined Google in April 2010, she agreed to an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement ("Agreement"). A true and correct copy of this written agreement is attached as Exhibit C to the Declaration of Ariana Tortorici filed in support of this Petition and it is incorporated herein by reference as though fully set forth herein verbatim and in full. Spivak accepted the Agreement through her electronic signature on April 12, 2010. (Tortorici Decl. ¶ 3, Exhibits C and D.) The Agreement includes a plainly labeled arbitration provision, set forth in Section 15 of the Agreement. (Tortorici Decl. ¶ 3, Exhibit C.) The arbitration provision covers all claims arising out of or relating to Spivak's employment. It provides:

> I agree that any and all controversies, claims, or disputes with anyone (including the Company and any employee, officer, director, shareholder or benefit plan of the Company in their capacity as such or otherwise) … arising out of, relating to, or resulting from my employment with the Company … shall be subject to binding arbitration administered by Judicial Arbitration and Mediation Services, Inc. ("JAMS"), pursuant to its Employment Arbitration Rules & Procedures (the "JAMS Rules"). (Tortorici Decl. ¶ 3, Exhibit C, §15(a).)

7. The Agreement became part of the terms and conditions of the employment

relationship between Google and Spivak. The Agreement is subject to the Federal Arbitration Act (9 U.S.C. §§ 1-12) because the employment relationship between Google and Spivak affects "commerce" within the meaning of 9 U.S.C. § 1. The Agreement is part and parcel of the employment relationship by which Google hired Spivak as a Product Manager to help develop and work on versions of software products and tools used by Google and its customers across the country and throughout the world, including advertising optimization platforms that allow publishers and customers to interact and conduct business. (Tortorici Decl. ¶ 4.) And, the Agreement requires a California citizen (Google) to arbitrate disputes with a citizen of Washington (Spivak), through JAMS, a nationwide provider of arbitration services. (Tortorici Decl. ¶ 3, Exhibit C, §15(a).) In short, the FAA applies to the instant Petition.

8. A controversy has arisen between Petitioner and Respondent regarding claims subject to the arbitration agreement. Specifically, Spivak has threatened claims, both internally, and externally through her legal counsel, and as recently as June 18, 2015. (Pfyl Decl. ¶ 3.) Those claims include allegations of gender discrimination and retaliation under the Washington Law Against Discrimination and the New York State Human Rights Law. (*Id.*) Spivak claims she received allegedly unfair performance evaluations, was placed on a Performance Improvement Plan, was denied promotion and stock grants, and denied a transfer (to a role in Los Angeles, California). (Tortorici Decl. ¶ 5.) Spivak's allegations regarding her employment in the State of Washington are attributed primarily to two different managers, both of whom live in the San Francisco Bay Area and both of whom work in Google's headquarters in Mountain View, California. (*Id.*) Spivak has demanded millions of dollars from Google in claimed economic damages, as well as substantial emotional distress damages. (Pfyl Decl. ¶ 3.) Google denies Spivak's allegations and monetary demands. (*Id.*)

9. Notwithstanding the Agreement, Spivak (through her legal counsel) has stated her position that the arbitration of her claims should proceed in Kings County, Washington, where she currently resides and where her legal counsel is based, instead of the agreed-upon forum of Santa Clara County. (Pfyl Decl. ¶ 4.) "If the written agreement contains a place-of-arbitration clause, then logically, a party's attempt to arbitrate elsewhere is a refusal to arbitrate under the

agreement." *In re Cintas Corp. Overtime Pay Arbitration Litig.*, 2007 U.S. Dist. LEXIS 5479, *43-44 (N.D. Cal. Jan. 9, 2007). Spivak's threatened claims arise under New York and Washington state law, neither of which require the exhaustion of administrative remedies, so she is free to commence her threatened claims at any time, and most recently asserted them through her legal counsel on June 18, 2015. (Pfyl Decl. ¶ 3.) Moreover, Spivak has averred that her New York claims are at risk under a soon-to-expire statute of limitations and thus by agreement the parties tolled the New York limitations period through only July 31, 2015. (Pfyl Decl. ¶ 3.) She continues to fail to demand arbitration in the agreed-upon location of Santa Clara County, where the designated alternative dispute resolution provider, JAMS, has an office (San Jose). This Petition is therefore ripe for review.

## IV. PRAYER

WHEREFORE, Petitioner prays:

(a) That the Court GRANT Google's Petition to Compel Arbitration and order Respondent Spivak to arbitrate in Santa Clara County, California all threatened claims and causes of action subject to the arbitration agreement;

(b) That the Court order Respondent Spivak to comply with all other terms of the arbitration agreement with Google; and

(c) For such other and further relief as the Court may deem proper.

Dated: June 26, 2015

CURLEY, HESSINGER & JOHNSRUD LLP

By [signature]
BRIAN L. JOHNSRUD
Attorneys for Petitioner
GOOGLE INC.

# EXHIBIT C

RECEIVED

JUL 17 2015

FRANK FREED SUBIT & THOMAS LLP

909 1ST AVE SUITE 400 SEATTLE WA 98104-1061
FEDERAL OFFICE BUILDING
NOV 01 2016
RECEIVED/ENFORCEMENT
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

BRIAN L. JOHNSRUD, State Bar No. 184474
PATRICK SHERMAN, State Bar No. 229959
CURLEY, HESSINGER & JOHNSRUD LLP
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
Telephone: 650.600.5300
Facsimile: 650.323.1002
E-mail: bjohnsrud@curleyhessinger.com
psherman@curleyhessinger.com

Attorneys for Petitioner
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE INC.,<br>Petitioner,<br>v.<br>RIVKA SPIVAK,<br>Respondent. | Case No. 15-CV-02981 HRL<br>NOTICE OF VOLUNTARY DISMISSAL |

TO THE HONORABLE COURT, ALL PARTIES HEREIN AND THEIR RESPECTIVE COUNSEL OF RECORD:

Petitioner Google Inc. voluntarily dismisses this lawsuit pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). Such dismissal shall be without prejudice, with each side to bear its own costs and fees.

Dated: July 14, 2015

CURLEY, HESSINGER & JOHNSRUD LLP

By [signature]
BRIAN L. JOHNSRUD
Attorneys for Petitioner
GOOGLE INC.

## PROOF OF SERVICE

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 4400 Bohannon Drive, Suite 230, Menlo Park, California 94025.

On July 14, 2015, I served the within document(s):

**NOTICE OF VOLUNTARY DISMISSAL**

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Menlo Park, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Federal Express agent for delivery.

☐ by causing the document(s) listed above to be personally delivered to the person(s) at the address(es) set forth below.

☐ by transmitting via electronic mail the document(s) listed above to each of the person(s) as set forth below.

Steven B. Frank, Esq.
Frank Freed Subit & Thomas LLP
705 Second Avenue, Suite 1200
Seattle, WA 98104

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on July 14, 2015, at Menlo Park, California.

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

LYNETTE POLA

**TONI HALEY - Rivka (Rebecca) Spivak v. Google**

| | |
|---|---|
| **From:** | David Loeser <dloeser@frankfreed.com> |
| **To:** | "TONI.HALEY@EEOC.GOV" <TONI.HALEY@EEOC.GOV> |
| **Date:** | 11/18/2015 3:58 PM |
| **Subject:** | Rivka (Rebecca) Spivak v. Google |
| **CC:** | Jillian Cutler <jcutler@frankfreed.com> |
| **Attachments:** | mjonesdecl Signed.pdf |

Dear Ms. Haley,

Attached please find a signed declaration from Matt Jones regarding the gender discrimination Ms. Spivak experienced at Google. Please let me or Ms. Cutler know if you have any questions or need more information.

Best regards,

*David Loeser*
Paralegal
Frank Freed Subit & Thomas
705 Second Ave., Suite 1200
Seattle, WA 98104
206.682.6711 / 682-0401 (fax)
dloeser@frankfreed.com
*******************************************

This message may be protected by the attorney-client privilege and/or work-product doctrine. If you believe this message has been sent to you in error, then please reply to the sender that you received the message in error and then delete the message. Thank you.

**DECLARATION OF MATT JONES**

I, Matt Jones, declare and state as follows based on my personal knowledge:

1. I worked as a Product Manager at Google from January 2014 until August 2015. I was assigned to the Content Ad Words Front End ("CAWFE") team and reported to Sales Tools Manager Jens Skakkebaek.

2. I have known, and worked closely with, Rebecca Spivak since I joined Google in January 2014. We both reported to Mr. Skakkebaek. Ms. Spivak and I were working on designing complementary systems. Ms. Spivak was developing Interactive Benchmarks ("IB") and I was developing a product called Display Planner. Although she was located in Seattle and I was in Los Angles, we had weekly one-on-one meetings (via video conferencing) to discuss our work and share ideas. I also traveled to Seattle on a regular basis to meet with Ms. Spivak and related engineering teams in person.

3. Ms. Spivak and I participated in all-team video conferences approximately once per week. Mr. Skakkebaek, ~~Aaron Rothman,~~ and the PMs who reported to Mr. Skakkebaek participated in these weekly calls.

4. Google Product Managers are expected to generate innovative ideas, prove the need for, and value of the idea, navigate the organization and develop support for the idea, work with engineering to test and execute the product. Based on my observations and experiences working with her, Ms. Spivak did an excellent job conceptualizing IB and executing at each of these

stages. She has great ideas, supports them with data, and is detail oriented when implementing them.

5. Google routinely encouraged its Product Managers to speak up and share bold ideas. Ms. Spivak did so. She is very smart, had valuable ideas and contributions, and was not afraid to speak up about them. Ms. Spivak had strong opinions and expressed them in the same strong tone as her male colleagues.

6. In team meetings, I observed that some male PMs were well-received when they expressed strong opinions, but Ms. Spivak was not. Ms. Spivak often had the best ideas in the group, but she was stonewalled. Indeed, I participated in meetings in which Mr. Skakkebaek or Mr. Rothman rejected an idea when it was expressed by Ms. Spivak but then accepted the very same idea when it was raised by a male PM or Technical Lead.

7. I observed that Ms. Spivak received negative reactions from Mr. Skakkebaek and Mr. Rothman. It seemed as though no matter what she said to them, it was the wrong thing. Mr. Rothman was especially dismissive of Ms. Spivak and her ideas. He told me and other PMs that Ms. Spivak was "throwing a tantrum."

8. In approximately Q2 2014, I was asked to give performance feedback on Ms. Spivak as part of Google's 360 performance review process. My feedback was positive.

9. In June or July 2014, Mr. Skakkebaek and I met to discuss my own performance review. In that meeting, Mr. Skakkebaek expressed displeasure

that I had given Ms. Spivak a positive review. I told him I thought Ms. Spivak was performing well in her role and had really good ideas. Mr. Skakkebaek insisted that her ideas were "off-base" and not supported with data. I told him I disagreed.

10. After I defended Ms. Spivak's performance, my relationship with Mr. Skakkebaek cooled markedly. Mr. Skakkebaek began soliciting negative feedback about me from my peers, stopped meeting with me, and placed me on a PIP even though I fulfilled all of the work goals that were identified for me. I told Mr. Skakkebaek and Google Human Resources that I was concerned that I was placed on the PIP because I defended Ms. Spivak. Google never responded to my concerns.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

1/17/18
Dated

Matt Jones

[redacted]

Brenda

[redacted]

[redacted]

[redacted]

## TONI HALEY - Re: Rivka (Rebecca) Spivak v. Google

**From:** TONI HALEY
**To:** Cutler, Jillian
**Subject:** Re: Rivka (Rebecca) Spivak v. Google

---

That's fine.

>>> Jillian Cutler <jcutler@frankfreed.com> 11/16/2015 1:09 PM >>>
Dear Ms. Haley,

I spoke to Matt Jones today. He explained that he has been delayed with family obligations and asked for an extra day or two to provide his declaration. I hope to have the declaration to you tomorrow.

Best regards,

Jillian M. Cutler
Frank Freed Subit & Thomas LLP
705 Second Avenue, Suite 1200
Seattle, WA 98104-1798
(206) 682-6711 (Telephone)
(206) 682-0401 (Facsimile)
jcutler@frankfreed.com (E-mail)
www.frankfreed.com (Web)
******************************************

This message may be protected by the attorney-client privilege and/or work-product doctrine. If you believe this message has been sent to you in error, then please reply to the sender that you received the message in error and then delete the message. Thank you.

**TONI HALEY - Rivka (Rebecca) Spivak v. Google**

**From:** Jillian Cutler <jcutler@frankfreed.com>
**To:** "TONI HALEY (TONI.HALEY@EEOC.GOV)" <TONI.HALEY@EEOC.GOV>
**Date:** 11/5/2015 5:10 PM
**Subject:** Rivka (Rebecca) Spivak v. Google

Dear Ms. Haley,

Ms. Spivak and I are looking forward to talking with you in the morning.

I wanted to let you know about one more witness we have identified. Matt Jones is a former Product Manager who worked with Ms. Spivak at Google and also reported to Jens and Aaron. He has information about the high caliber of her work and the ways in which Jens and Aaron treated Ms. Spivak differently, and worse, than her male peers.

If you want to interview Mr. Jones, his current phone number is [redacted] Alternatively, please let me know if you would prefer he provide you with a written statement.

Best regards,

Jillian M. Cutler
Frank Freed Subit & Thomas LLP
705 Second Avenue, Suite 1200
Seattle, WA 98104-1798
(206) 682-6711 (Telephone)
(206) 682-0401 (Facsimile)
jcutler@frankfreed.com (E-mail)
www.frankfreed.com (Web)
******************************************

This message may be protected by the attorney-client privilege and/or work-product doctrine. If you believe this message has been sent to you in error, then please reply to the sender that you received the message in error and then delete the message. Thank you.

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

*Via Email and U.S. Mail*
Email to: toni.haley@eeoc.gov

October 22, 2015

Toni Haley
Investigator
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061

2015 OCT 28 PM 2 30

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

STEVEN B. FRANK
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

**Re: *Rivka (Rebecca) Spivak v. Google***
**EEOC Charge No. 551-2015-00827**

Dear Ms. Haley:

Thank you for taking the time to speak with Ms. Spivak and me on Friday. I am writing to provide you with additional information regarding Ms. Spivak's claims that Google retaliated against her by relocating IB to California and by requiring her – but not other Product Managers – to physically relocate in order to continue overseeing her project.

At Google, a Product Manager (PM) is the business leader for a project. The Engineers write the code and build the software. The PM and Engineering organizations are independent of each other, and PMs and Engineers working on the same product do not report to the same organization. The PMs work with customers, develop deep expertise, and set product strategy. In essence, the PM is the project architect and the engineers are the construction team. The PMs tend to be more deeply invested in the specific products they develop, whereas engineers tend to transfer between teams since the technical inner workings of all products are similar.

As the Product Manager, Ms. Spivak had conceptualized and developed IB. She was the architect of this immensely successful and lucrative project. She was committed and excited to lead IB's continued growth, and to receive professional and financial recognition for her efforts. Then, in February 2015, Google announced that: (1) it was relocating IB to California, and (2) Ms. Spivak had to

choose between moving to California or abandoning IB, an initiative *she* created and spearheaded.

Both aspects of the announcement were surprising and unusual. Google typically allows Product Managers to work from a different location than the one where the product engineers work. For example, PM Vince Lacey, who also reported to Aaron Rothman, was based in California even though his engineering team was based in Seattle. There was never any concern expressed over Mr. Lacey working as a "remote PM." In keeping with this practice, after announcing the February 2015 relocation of five teams under Mr. Skakkebaek, Google proceeded to permit all of the effected Product Mangers *except Ms. Spivak* to work remotely from their engineering teams. *Only Ms. Spivak* was given the ultimatum to relocate or leave her project.

After Human Resources Representative Paul Higson informed Ms. Spivak that she would have to relocate to L.A., she reached out to Engineering Manager Bill Reardon. She specifically asked if she could continue as the IB Product Manager working remotely from Seattle. Mr. Reardon responded, "Sure, I love remote PMs." When Ms. Spivak told Mr. Higson that Mr. Reardon had given her the green light to remain in Seattle, Mr. Higson told Ms. Spivak that she had "misunderstood" Mr. Reardon. Ms. Spivak did not misunderstand. In fact, as the table below shows, only *one* of the PMs who worked on products with Mr. Reardon's engineering team was in the same physical location as the engineers. As set forth in the chart below, in February 2015, Ms. Spivak was the *only* PM working with Mr. Reardon's engineers who was told she must relocate to remain on her project. She was also the only PM who had repeatedly complained about gender discrimination.

| **Reardon's PMs** | **PM Location** | **Engineering Location** | **Required to Move** |
|---|---|---|---|
| Vince Lacey | MTV | LAX | No |
| Carlos Facanha | MTV | LAX | No |
| William Kunz | MTV | LAX | No |
| Emily Rapp | SEA | LAX | No |
| Rebecca Spivak | SEA | LAX | Yes |
| Matt Jones | LAX | LAX | N/A |

Shortly after Ms. Spivak spoke to Mr. Reardon, she had a Google "chat" with Product Manager Emily Rapp regarding the reorganization. I have enclosed a copy of the chat for your review. In it, Ms. Rapp told Ms. Spivak that the engineering directors in LA (including Thomas Williams) were upset that the reorganization was done with "very little warning." Ms. Rapp wrote, "Thomas Williams is super not happy" about the reorganization. In response to Ms. Spivak asking, "Who made the decision not to let them [the PMs] be remote?," Ms. Rapp responded, "HR, according to Aaron. 'Policy.'" However, as set forth above, that was not Google's "policy." Indeed, Ms. Rapp confirmed that she was not being required to relocate. Ms. Spivak asked, "How did you get the exception?" Ms. Rapp replied, "No exception" and explained Google was only requiring the PMs under Mr. Skakkebaek to relocate. Ms. Spivak asked, "What did [D]ustin [Jackson] think about you being a remote PM?" Ms. Rapp replied, "He was for it. thaw [Thomas Williams] was apparently also pissed the PMs weren't given the opportunity to remote from the start."

Please let me know if you have any questions or need additional information.

Sincerely,

Jillian M. Cutler

JMC/nf
Enclosure
cc: Rebecca Spivak

# EXHIBIT A

**Jillian Cutler**

---------- Forwarded message ----------
From: **Rebecca Spivak** <rspivak@gmail.com>
Date: Fri, Feb 27, 2015 at 7:36 PM
Subject:
To: Rebecca Spivak <rspivak@gmail.com>

hey!
Did you get the role?
yt?
3:56 PM





am now what's up?
and yes! 

Emily
•
4:06 PM
Yay!!!
4:06 PM





officially will start on tues
Emily
•
4:06 PM
Congrats
woo hoo!
4:06 PM





so excited
Emily
•
4:06 PM
Excited for you too
what a great fit
and you get to stay in SEA?

long term?
4:06 PM




yep!
well kir
heh
but yea
Emily
•
4:07 PM
That's so awesome
4:07 PM




indefinitely

lol
Emily
•
4:07 PM
ok - well, very glad to know it's a real option for me too then

4:07 PM




definitely
Emily
•
4:07 PM
you rock in laying that foundation
4:07 PM




btw, talked with tom yesterday, and dustin today
Emily
•
4:08 PM
yeah?
4:08 PM




tom = super not happy with how doug handled the transition
apparently he basically said I'm leaving, and left no foundation for someone in seattle to take it over with very little warning
Emily
•
4:08 PM
ugh
4:09 PM




and dustin is really not happy with jens/aaron
btw don't mention this around
Emily
•
4:09 PM
really?
4:09 PM




ya
Emily
•
4:09 PM
that's great that he confides in you
4:09 PM




communication wise especially
he asked me about my work vs. vince's with pitchx
apparently didn't know that it was all me
Emily
•
4:10 PM
wow - that's great he's investing himself in finding that stuff out
4:10 PM




and asked who should run it
and if I trusted vince to

Emily

•

4:10 PM

eep - that must have been an interesting conversation

4:10 PM





I brought up gautam, and he said that that would actually be a real possibility

I mostly talked about how vince might not be a great fit as a remote pm

Emily

•

4:11 PM

ah

4:11 PM





and motivation behind the project

Emily

•

4:11 PM

what did dustin think about you being a remote PM

4:11 PM





he was for it

thaw was apparently also pissed that pms weren't given the opportunity to remote from the start

Emily

•

4:11 PM

really??

4:11 PM





ya

Emily

•

4:11 PM

who made the decision to not let them be remote

4:11 PM





especially because with samir, etc.
there's been a history of good remote pms
hrbp, according to aaron
"policy"
that does mean though that going remote under jason is a real possibility
Emily
•
4:12 PM
interesting. How did you get the exception?
4:12 PM




it wasn't

it's because it's under jason
lol
it's only under jens that it isn't
Emily
•
4:13 PM
I see
well, there's hope then
thank you
4:14 PM




yep totally
dustin has really impressed me lately
Emily
•
4:14 PM
He's a good guy
4:15 PM




he went in depth over transition plans for me, but solely because he wanted to make sure that for my career I was getting credit for work I was doing
aka, if I was fully under sanaz
Emily
•
4:15 PM
it sucks that HRBP overrode his intent
4:15 PM




and still doing a good percentage of work on pitchx
then that wouldn't reflect properly on my review
Emily
•
4:15 PM
I'm really glad he supports you
you deserve it
and you're working on a great project
did my name come up at all?
4:17 PM




not these past two days
I think the best step now for you
because bill also has power
and because of thaw's views
is to work really hard with bill
do things like get him in front of sellers
michael and michael both really appreciated that today (we did user walk-throughs with pitchx mocks)
and I don't think everyone knows how much user interaction you do
then you can also position to get under jason
they need more strong pms
definitely plenty of work
Emily
•
4:19 PM
awesome. Meeting with Jason on Tuesday.
4:19 PM




perfect
ya, so he's super into the idea of getting the data in front of sellers
and then letting them use their skills
definitely strategic
as is thaw
I think you should also meet with him, if you haven't already
Emily
•
4:20 PM
thanks emily :

4:21 PM




totally
oh man, did you see that link I sent you in the fb message?
Emily
•
4:21 PM
no - didn't log into fb
4:22 PM





you should, it's great

oh and other thing I would recommend
plan a number of trips down to LA if you can
being here in person will not only get you seen
but will show that you care enough about the project to remote pm
Emily
•
4:23 PM
I will

yay
4:23 PM





I think we can both come out on top out of this

also probably start working with me in kirkland

get your face in front of sanaz
lol
Emily
•
4:25 PM
thank you emily
really appreciate your support

4:26 PM





totally
I'm not about to lose the only other woman pm

haha

and now we no longer are competing for jobs

lol

Emily

•

4:26 PM



that's true

I'm really glad you've landed so well

not sure what will happen to me

but you deserve to have landed in the right spot

5:12 PM



**TONI HALEY - Rivka (Rebecca) Spivak v. Google**

**From:** Janet Francisco <jfrancisco@frankfreed.com>
**To:** "toni.haley@eeoc.gov" <toni.haley@eeoc.gov>
**Date:** 10/22/2015 2:36 PM
**Subject:** Rivka (Rebecca) Spivak v. Google
**CC:** Jillian Cutler <jcutler@frankfreed.com>
**Attachments:** 2015-10-22 Haley ltr.pdf

Dear Ms. Haley:

Attached please find correspondence from Jillian M. Cutler.

Janet Francisco
Legal Assistant
Frank Freed Subit & Thomas LLP
705 Second Avenue, Suite 1200
Seattle, WA 98104
(206) 682-6711 (Telephone)
(206) 682-0401 (Facsimile)
jfrancisco@frankfreed.com (Email)
www.frankfreed.com (Web)

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

*Via Email and U.S. Mail*
Email to: toni.haley@eeoc.gov

October 22, 2015

Toni Haley
Investigator
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

STEVEN B. FRANK
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

**Re: *Rivka (Rebecca) Spivak v. Google***
**EEOC Charge No. 551-2015-00827**

Dear Ms. Haley:

Thank you for taking the time to speak with Ms. Spivak and me on Friday. I am writing to provide you with additional information regarding Ms. Spivak's claims that Google retaliated against her by relocating IB to California and by requiring her – but not other Product Managers – to physically relocate in order to continue overseeing her project.

At Google, a Product Manager (PM) is the business leader for a project. The Engineers write the code and build the software. The PM and Engineering organizations are independent of each other, and PMs and Engineers working on the same product do not report to the same organization. The PMs work with customers, develop deep expertise, and set product strategy. In essence, the PM is the project architect and the engineers are the construction team. The PMs tend to be more deeply invested in the specific products they develop, whereas engineers tend to transfer between teams since the technical inner workings of all products are similar.

As the Product Manager, Ms. Spivak had conceptualized and developed IB. She was the architect of this immensely successful and lucrative project. She was committed and excited to lead IB's continued growth, and to receive professional and financial recognition for her efforts. Then, in February 2015, Google announced that: (1) it was relocating IB to California, and (2) Ms. Spivak had to

choose between moving to California or abandoning IB, an initiative *she* created and spearheaded.

Both aspects of the announcement were surprising and unusual. Google typically allows Product Managers to work from a different location than the one where the product engineers work. For example, PM Vince Lacey, who also reported to Aaron Rothman, was based in California even though his engineering team was based in Seattle. There was never any concern expressed over Mr. Lacey working as a "remote PM." In keeping with this practice, after announcing the February 2015 relocation of five teams under Mr. Skakkebaek, Google proceeded to permit all of the effected Product Mangers *except Ms. Spivak* to work remotely from their engineering teams. *Only Ms. Spivak* was given the ultimatum to relocate or leave her project.

After Human Resources Representative Paul Higson informed Ms. Spivak that she would have to relocate to L.A., she reached out to Engineering Manager Bill Reardon. She specifically asked if she could continue as the IB Product Manager working remotely from Seattle. Mr. Reardon responded, "Sure, I love remote PMs." When Ms. Spivak told Mr. Higson that Mr. Reardon had given her the green light to remain in Seattle, Mr. Higson told Ms. Spivak that she had "misunderstood" Mr. Reardon. Ms. Spivak did not misunderstand. In fact, as the table below shows, only *one* of the PMs who worked on products with Mr. Reardon's engineering team was in the same physical location as the engineers. As set forth in the chart below, in February 2015, Ms. Spivak was the *only* PM working with Mr. Reardon's engineers who was told she must relocate to remain on her project. She was also the only PM who had repeatedly complained about gender discrimination.

| **Reardon's PMs** | **PM Location** | **Engineering Location** | **Required to Move** |
|---|---|---|---|
| Vince Lacey | MTV | LAX | No |
| Carlos Facanha | MTV | LAX | No |
| William Kunz | MTV | LAX | No |
| Emily Rapp | SEA | LAX | No |
| Rebecca Spivak | SEA | LAX | Yes |
| Matt Jones | LAX | LAX | N/A |

Shortly after Ms. Spivak spoke to Mr. Reardon, she had a Google "chat" with Product Manager Emily Rapp regarding the reorganization. I have enclosed a copy of the chat for your review. In it, Ms. Rapp told Ms. Spivak that the engineering directors in LA (including Thomas Williams) were upset that the reorganization was done with "very little warning." Ms. Rapp wrote, "Thomas Williams is super not happy" about the reorganization. In response to Ms. Spivak asking, "Who made the decision not to let them [the PMs] be remote?," Ms. Rapp responded, "HR, according to Aaron. 'Policy.'" However, as set forth above, that was not Google's "policy." Indeed, Ms. Rapp confirmed that she was not being required to relocate. Ms. Spivak asked, "How did you get the exception?" Ms. Rapp replied, "No exception" and explained Google was only requiring the PMs under Mr. Skakkebaek to relocate. Ms. Spivak asked, "What did [D]ustin [Jackson] think about you being a remote PM?" Ms. Rapp replied, "He was for it. thaw [Thomas Williams] was apparently also pissed the PMs weren't given the opportunity to remote from the start."

Please let me know if you have any questions or need additional information.

Sincerely,

Jillian M. Cutler

JMC/nf
Enclosure
cc: Rebecca Spivak

# EXHIBIT A

**Jillian Cutler**

---------- Forwarded message ----------
From: **Rebecca Spivak** <rspivak@gmail.com>
Date: Fri, Feb 27, 2015 at 7:36 PM
Subject:
To: Rebecca Spivak <rspivak@gmail.com>

hey!
Did you get the role?
yt?
3:56 PM





am now what's up?
and yes!

Emily
•
4:06 PM
Yay!!!
4:06 PM





officially will start on tues
Emily
•
4:06 PM
Congrats
woo hoo!
4:06 PM





so excited
Emily
•
4:06 PM
Excited for you too
what a great fit
and you get to stay in SEA?

long term?
4:06 PM




yep!
well kir
heh
but yea
Emily
•
4:07 PM

That's so awesome
4:07 PM




indefinitely

lol
Emily
•
4:07 PM
ok - well, very glad to know it's a real option for me too then

4:07 PM




definitely
Emily
•
4:07 PM
you rock in laying that foundation
4:07 PM




btw, talked with tom yesterday, and dustin today
Emily
•
4:08 PM
yeah?
4:08 PM




tom = super not happy with how doug handled the transition
apparently he basically said I'm leaving, and left no foundation for someone in seattle to take it over with very little warning
Emily
•
4:08 PM
ugh
4:09 PM




and dustin is really not happy with jens/aaron
btw don't mention this around
Emily
•
4:09 PM
really?
4:09 PM




ya
Emily
•
4:09 PM
that's great that he confides in you
4:09 PM




communication wise especially
he asked me about my work vs. vince's with pitchx
apparently didn't know that it was all me
Emily
•
4:10 PM
wow - that's great he's investing himself in finding that stuff out
4:10 PM




and asked who should run it
and if I trusted vince to

Emily
•
4:10 PM
eep - that must have been an interesting conversation
4:10 PM




I brought up gautam, and he said that that would actually be a real possibility
I mostly talked about how vince might not be a great fit as a remote pm
Emily
•
4:11 PM
ah
4:11 PM




and motivation behind the project
Emily
•
4:11 PM
what did dustin think about you being a remote PM
4:11 PM




he was for it
thaw was apparently also pissed that pms weren't given the opportunity to remote from the start
Emily
•
4:11 PM
really??
4:11 PM




ya
Emily
•
4:11 PM
who made the decision to not let them be remote
4:11 PM




especially because with samir, etc.
there's been a history of good remote pms
hrbp, according to aaron
"policy"
that does mean though that going remote under jason is a real possibility
Emily
•
4:12 PM
interesting. How did you get the exception?
4:12 PM




it wasn't

it's because it's under jason
lol
it's only under jens that it isn't
Emily
•
4:13 PM
I see
well, there's hope then
thank you
4:14 PM




yep totally
dustin has really impressed me lately
Emily
•
4:14 PM
He's a good guy
4:15 PM




he went in depth over transition plans for me, but solely because he wanted to make sure that for my career I was getting credit for work I was doing
aka, if I was fully under sanaz
Emily
•
4:15 PM
it sucks that HRBP overrode his intent
4:15 PM




and still doing a good percentage of work on pitchx
then that wouldn't reflect properly on my review
Emily
•
4:15 PM
I'm really glad he supports you
you deserve it
and you're working on a great project
did my name come up at all?
4:17 PM




not these past two days
I think the best step now for you
because bill also has power
and because of thaw's views
is to work really hard with bill
do things like get him in front of sellers
michael and michael both really appreciated that today (we did user walk-throughs with pitchx mocks)
and I don't think everyone knows how much user interaction you do
then you can also position to get under jason
they need more strong pms
definitely plenty of work
Emily
•
4:19 PM
awesome. Meeting with Jason on Tuesday.
4:19 PM




perfect
ya, so he's super into the idea of getting the data in front of sellers
and then letting them use their skills
definitely strategic
as is thaw
I think you should also meet with him, if you haven't already
Emily
•
4:20 PM
thanks emily :



4:21 PM




totally
oh man, did you see that link I sent you in the fb message?
Emily
•
4:21 PM
no - didn't log into fb
4:22 PM





you should, it's great

oh and other thing I would recommend
plan a number of trips down to LA if you can
being here in person will not only get you seen
but will show that you care enough about the project to remote pm
Emily
•
4:23 PM
I will

yay
4:23 PM





I think we can both come out on top out of this

also probably start working with me in kirkland

get your face in front of sanaz
lol
Emily
•
4:25 PM
thank you emily
really appreciate your support

4:26 PM





totally
I'm not about to lose the only other woman pm

haha

and now we no longer are competing for jobs

lol
Emily
•
4:26 PM

that's true

I'm really glad you've landed so well
not sure what will happen to me
but you deserve to have landed in the right spot
5:12 PM


FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

SEE BROWN ENVELOPE
FOR FULL LETTER

*Via Email and U.S. Mail*

October 15, 2015

Toni Healy
Investigator
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061

2015 OCT 16 PM 12 45
RECEIVED
SEA EEOC

**Re: *Rivka (Rebecca) Spivak v. Google***
**EEOC Charge No. 551-2015-00827**

Dear Ms. Healy:

Steve Frank and I represent Ms. Spivak in the above claim.

Ms. Spivak experienced years of both implicit and explicit gender bias as a female Product Manager in Google's male-dominated workplace. She was disciplined, downgraded, marginalized, and ultimately pushed out of projects *she* created for failing to comply with gender stereotypes and complaining about her mistreatment. I am writing in advance of your upcoming phone interview with Ms. Spivak to provide you with additional information and evidence demonstrating that Google discriminated and retaliated against Ms. Spivak.

First, enclosed please find an excerpt (pages 1-19, with attachments) of Mr. Frank's June 18, 2015 letter to Kent Walker, Senior Vice President General Counsel of Google, setting forth the factual and legal bases for Ms. Spivak's gender discrimination and retaliation claims. Exhibit A. This letter provides the EEOC with a more detailed picture of the insidious gender discrimination and retaliation Ms. Spivak experienced at Google.

Second, Google has provided us with a copy of the position statement it submitted to the Agency on September 14, 2015. That letter deeply distorts Ms. Spivak's experience at Google. Indeed, Google has gone as far as to submit altered evidence to the Agency. Exhibits 13 and 14 of Google's position statement include emails Ms. Spivak sent using her personal Gmail account to a group email list of

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

STEVEN B. FRANK
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

# RECORD OF INTERVIEW

| | |
|---|---|
| Case Name: | Spivak v. Google Inc. |
| Charge No: | 551-2015-00827 |
| Witness: | Rebecca Spivak |
| Investigator: | Toni Haley |
| Date of Interview: | 10/16/15, follow up for clarification/corrections 11/6/15 |

Emily Rapp, a coworker who had a prof'l working relationship with multiple engineering directors, initially told CP in writing over chat that HR forced the PM for the relocation to relocate to LA and that Thomas Williams and Dustin Jackson were really upset about it. Both were male and didn't agree with the decision and know why it was happening. Thomas William and Dustin were already in LA. Nobody relocated. None of the projects relocated other than IB. No people actually moved. R generally doesn't require Product Mgrs to be in the same city as the engineers.

Thomas was upset because HR was forcing the product mgrs to move to LA. He wanted the continuity of having project mgrs continue to work on the projects. They knew the project and were experts. He didn't expect anyone to move. When Dustin and Jens made the announcement they said they didn't think anyone would actually move.

Were the 5 projects that moved all under 1 individual? They were all going to be under 1 engineering director. Every project has an engineering leader and a PM. All were reworked under Bill Reardon. He had 5 pm under his products. He was in LA, not of his PM were. Including Emily, Vince Lacey.

CP's project was IB. It was extremely successful and the only team that actually moved. No individual on the team moved. The product got reassigned to engineers in LA

Prior to the relocating announcement, the other 4 projects were deprioritized and people on the team started to leave. A project doesn't have to stick with the same engineers. A project can be moved to LA and the people in LA will work on it. When they made the announcement, they sunset them (they went on life support and weren't staff, there may be 1-2 engineers supporting them, but they were not longer further. Ads MEDIA ADS was absolutely sunsetted and officially announced it had to be replaced. They took IB and moved it to LA and got engineers to continue to work on it. CP was the project manager (PM) for IB. No engineers moved, R staffed IB with engineers in LA. They didn't staff the other 4 projects at all. The 4 projects had proved to be failures and weren't working.

Emily was quoting Aaron Rothman, CP's and Emily's mgr, and Thomas Williams, Engineering Director in LA. That HR forced CP to relocate. She believes HR made the decision to move IB.

Business leaders were Rothman, Scott Skakkebeck, and Thomas Williams, Engineering Director.

Rothman was CP's mgr since July 2014. CP thinks that Williams primarily made the decision to move the IB project with another Engineering Director. CP didn't have difficulties with Williams and didn't know him. Williams didn't retaliate against her.

R has a lot of perf ratings. Consistently meets expectations is the lowest rating you can get. The average rating is exceeds, which is above expectation. 30% get a meets, 50% get exceeds, 30% gets a strongly exceeds. Exceeds is the middle score. Meets/consistently meets is 1 ranking. The middle get exceeds and top get strongly exceeds. . It's the same as meets expectations (which is the bottom 20 or so % rating). There's needs improvement (1%), meets expectations, exceeds, strongly exceeds and superb. To be promoted you need 2-3 quarters of exceeds/strongly superb.

CP never got a rating over consistently meets. For most of it she had a single VP who gave the ranking. Aaron Rothman, Skattkeback and Scott Spencer. Prior to that she was on a different team, she didn't have a mgr, Jen Fitzpatrick was nominally her mgr.

Jen wasn't actually her mgr. They put her under Jen because she wasn't on a project and the team wasn't staffed. She didn't have any direct knowledge of her work. As to what happened after that, what I do well is setting a vision and being bold and launching product and being ambitious. I believe that bold women in tech companies that have strong opinions are discriminated. When I saw that my coworkers were doing the same thing, they were promoted, seen as a leader. My feedback is you're too confident. It's something that Michael English her engineering mgr, and discussed his advance is it would have been rec'd differently if you were a guy. But he'd be pragmatic and say that's the way the world is. It's Google. He also told me that I realize you're not being treated fairly you're getting pushed down because of Gender. But when people see what this project does, things will change. English is the main engineering mgr she worked with her entire time in Seattle.

Bengston was an engineering mgr in SEA, he wasn't happy with me. He told me directly he thought I was too ambitious. He made a lot of accusation v. me that weren't true. He didn't like me because I came in and made a bold statement that he was wrong.

Judy Hsu is based in CA. CP got along great with her in the beginning, then late in the game her attitude toward CP cooled I never knew why. In the end she told me that I was really a huge fan, then you started throwing a temper tantrum and stopped coming in. She said Rothman said this. When CP asked why, Hsu said you were out in Jan. Rothman said you were temperamental. CP forwarded her the surgeon note and she said I have no idea what's going on. The relationship cooled a couple months before the project was moved to LA. She said you were doing so well, why did you start throwing temper tantrums?. Her only evidence was Eric told her that directly. She was surprised when I showed her the emails. Judy told me that Aaron told her that an em'ee who doesn't show up for a week because they're petulant is unreliable, when at that time CP was out for her daughter's surgery..

The relationship cooled when CP took FMLA leave. Rothman was CP's supv'or who approved her leave. He told people that CP was out because she was being petulant. That was her understanding of the situation until CP was relocated to LA and then they talked about it.

IB was moved to LA. At first she was told she had to move if she wanted to stay on IB. or given and option to find another job. She had just bought a house and wanted to stay on the project. She looked for alternatives. Vince in SF office was allowed to cont working on a proj moving to LA, He didn't have to move. He didn't have to fly to LA. They met by video conference. His project was destaffed. There's a new PM in LA. For the IB. Vince is still working with the team in LA for Ads Media Planner, which failed. He's still in LA working on a replacement for Ad Media. They made the announcement in Feb an shortly after that she went on medical leave. She came back in Sept and given 60 days to find a new role. She's been pursing that. She just did a presentation and will hear about it in a week or so.

The IB engineer team were given a promotion and put on a new project. Michael English team were all given the oppty to go on a new team and will likely get a promotion. They all moved up 2-3 levels up the organization chart, where they're more likely to be promoted. A few were promoted immediately, Michael believes he'll be promoted in a few months. They were offered very prestigious positions. I asked about moving with them and was told there wasn't a role for me in this organization. ,That didn't happen to me. Ibis going to make Google a billion dollars a year. It was something I put my heart and sole into. It was 1 of my biggest career accomplishments and the reason I stayed with Google. When people have good projects that succeed they get promoted. I felt IB would lift me up. R's philosophy is pay for performance. It would have cost me $150K out of pocket to do the move. I had to do it in 60 days. I have a daughter in preschool. They didn't offer to cover the expenses or time to find a preschool.

Every other PM was given an exception and not forced to leave their project. Emily Rapp a female in the Seattle office. Vince knew his project was failing. Emily has team staffed in LA with LA engineers, she has a new project that wasn't part of the relocation. Her project is al so staffed by Reardon, but she's in LA. She was given me the option to stay in Seattle I wasn't. This was 8 days after I made the complaint. She made the discrimination complaint Feb 2-3. They made the announcement Feb 11th.

Before that she complained many many times of gender discrimination. The first complaint with mgmt was April 2014. CP had a conversation with HR that she felt she was being bullied and accused of being too ambitious and too pushy. I don't believe I said this is gender discrimination.

Michael English, and I had conversations frequently starting in May 2014. He wasn't my direct mgr but a Google mgr. I also filed a complaint with R's Global Compliance in May 5, 2014. It was over the phone. She tried to get the transcript, but R switched the company that took the complaint, but R has a written copy. She believes she mentioned gender discrimination. R routed it as gender discrimination. To a team handling Title VII. CP was contacted by Cindy Trelor, who handles investigation. She met with her and told her the same thing. She claimed

she investigated. Treale (?) went away for a month and came back and said we decided there was no validity. I begged her to speak to Michael English, she didn't.

PC was on a PIP prior to filing with Global. In April she first talked to HR and they didn't do anything about it. Then she was put on a PIP, then filed the Global compliance complaint in May 2014.

After the relocation announcement and only CP forced, Paul HIckson said R wouldn't cover cost of her move. Emily said that HR forced CP's relocation. CP was pretty devastated and sent Paul Hickson, HR, and email Blamed HR and sent email In Feb you're a bad person. HE was the main person telling CP she had to relocate.

In Jan 29, 2015, I walked in to a meeting with Rothman. He said I want to tell you how you're doing. I understand work life balance, but you've taken excessive leave and you're on the low end. I was expecting strongly exceeds and all the work I'd done was impactful. He said my leave was the reason for taking me down. That's when I lost it. I'd been holding on to the idea that once my work was launched all this discrimination would go away.

There was a big launch in Dec and a small launch the prior August 2014.

The next day I went to HR. They pulled me in a meeting with Rothman. HR said you need to get along. I didn't know what to do. In devastation, I wrote this email entitled, prescriptive gender discrimination to the upper echelon of HR. I sent it to HR because I'd already tried to talk to the lower level Hr

He said my daughter's surgery was the reason. He said that leave that I wasn't going to get the strong exceeds or recognition for the work I'd done. They pulled Aaron into the room and he said you should have given more notice. Hr did nothing about it.

**TONI HALEY - Spivak v. Google**

| | |
|---|---|
| **From:** | Steve Frank <sfrank@frankfreed.com> |
| **To:** | "toni.haley@eeoc.gov" <toni.haley@eeoc.gov> |
| **Date:** | 9/11/2015 2:03 PM |
| **Subject:** | Spivak v. Google |
| **Attachments:** | Agreement (4).docx |

Toni, I have attached my client's employment agreement. See sec. 15 regarding the agreement to arbitrate claims.

Steven B. Frank
Frank Freed Subit & Thomas LLP
705 Second Ave., Suite 1200
Seattle, WA 98104
Phone: 206-682-6711 Fax: 206-682-0401
Email: sfrank@frankfreed.com

Google Inc.
At-Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement

As a condition of my employment with Google Inc., its subsidiaries, affiliates, successors or assigns (together the â€œCompanyâ€), and in consideration of my receipt of confidential information, my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:
At-Will Employment. I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES â€œAT-WILLâ€ EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE CHIEF EXECUTIVE OFFICER OF THE COMPANY. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE.
Confidential Information.
(a) Company Information. I understand that, as a result of my employment with the Company, I will obtain extensive and valuable Confidential Information belonging to the Company. I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Chief Executive Officer or the Board of Directors of the Company, any Company Confidential Information, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that â€œCompany Confidential Informationâ€ means any Company non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans, or other information regarding Company's products or services and their marketing, the identity of the Companyâ€™s customers (including, but not limited to, customer lists and the identity of customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information. I further understand that Company Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

(b) Former Employer Information. I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by

such employer, person or entity.
(c) Third Party Information. I recognize that the Company may have received and in the future may receive from third parties associated with the Company, e.g., the Companyâ€™s customers, suppliers, licensors, licensees, partners, or collaborators, their confidential or proprietary information (â€œAssociated Third Party Confidential Informationâ€□). By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use or to disclose to any person, firm or corporation any Associated Third Party Confidential Information, except as necessary in carrying out my work for the Company consistent with the Companyâ€™s agreement with such Associated Third Parties. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information during my employment will lead to disciplinary action, up to and including immediate termination and legal action by the Company.
(d) User Data. User Data consists of information directly or indirectly collected by Google from users of its services.Â User Data includes individual log files related to any user session or use of Google services or log files in the aggregate. User Data also includes personally identifiable information, which is information that can be directly associated with a specific person or entity, such as a name, address, telephone number, e-mail address, or information about activities that can be directly linked to a user, such as an IP address or cookie information.Â I agree to treat User Data as Company Confidential Information under this Agreement and to access, use and disclose User Data only as authorized by and in accordance with this Agreement and Company policies.
Inventions.
(a) Inventions Retained and Licensed. I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, and trade secrets which were conceived in whole or in part by me prior to my employment with the Company to which I have any right, title or interest, which relate to the Companyâ€™s business, products, or research and development (collectively referred to as "Prior Inventions"), which are not assigned to the Company hereunder; or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that none of the Prior Inventions listed on Exhibit A of this Agreement will materially affect my ability to perform my obligations under this Agreement. If, in the course of my employment with the Company, I incorporate any Prior Invention into, or use any Prior Invention in connection with, any product, process, service, technology or other work by or on behalf of the Company, I hereby grant to the Company a nonexclusive, royalty-free, fully paid, irrevocable, perpetual, worldwide license, with the right to grant and authorize sublicenses, to make, have made, modify, use, import, offer for sale, and sell such Prior Invention as part of or in connection with such product, process, service, technology or other work and to practice any method related thereto.
(b) Assignment of Inventions. I agree that I will promptly make full

written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under patent, copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time that I am in the employ of the Company, or with the use of the Companyâ€™s equipment, supplies, facilities, or Company Confidential Information,(collectively referred to as â€œInventionsâ€) except as prohibited by the law of the State in which I am employed by the Company and as otherwise set forth in Section 3(e) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectable by copyright are â€œworks made for hire,â€ as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions developed by me solely or jointly with others is within the Companyâ€™s sole discretion and for the Companyâ€™s sole benefit and that no royalty or other consideration will be due to me as a result of the Companyâ€™s efforts to commercialize or market any such Inventions.

(c) Maintenance of Records. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. The records are and will be available to and remain the sole property of the Company at all times.

(d) Patent and Copyright Registrations. I agree to assist the Company, or its designee, at the Companyâ€™s expense, in every proper way to secure the Companyâ€™s rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions and any rights relating thereto, and testifying in a suit or other proceeding relating to such Inventions and any rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature with respect to any Inventions including, without limitation, to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering such Inventions, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any papers, oaths and to do all other lawfully permitted acts with

respect to such Inventions with the same legal force and effect as if executed by me.
(e) Exception to Assignments.Â I understand that the provisions of this Agreement requiring assignment of Inventions to the Company shall not apply to any invention that I have developed entirely on my own time without using the Companyâ€™s equipment, supplies, facilities, trade secret information or Confidential Information except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention to the Companyâ€™s business, or actual or demonstrably anticipated research or development of the Company or (ii) result from any work that I performed for the Company.Â I will advise the Company promptly in writing of any inventions that I believe meet the foregoing criteria and not otherwise disclosed on Exhibit A.
Conflicting Employment .
(a) Current Obligations. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, or consulting directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities, including, but not limited to, employment outside of the Company, membership on Boards of Directors or Advisory Boards other than the Companyâ€™s, personal investments or establishing, maintaining or servicing business relationships with family or friends that conflict with my obligations to the Company.
(b) Prior Relationships. Without limiting Section 4(a), I represent that I have no other agreements, relationships or commitments to any other person or entity that conflict with my obligations to the Company under this Agreement or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices and documents), I have returned all property and confidential information belonging to all prior employers, and that failure to do so may result in my termination. Moreover, in the event that the Company or any of its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor or successor corporations, or assigns is sued based on any obligation or agreement to which I am a party or am bound (other that my agreements with the Company), I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by the Company (the indemnitee), as well as any reasonable attorneysâ€™ fees and costs if the plaintiff is the prevailing party in such an action, in the event that the Company is the subject of any legal action based on factual allegations that, if true, would conflict with my obligations under this Agreement.
5. Returning Company Documents. Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company, and will not keep in my possession, recreate or deliver to anyone else,Â any and all Company property, including, but not limited to, Confidential Information, User Data,

Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, photographs, charts, all documents and property, and reproductions of any of the aforementioned items that were developed by me pursuant to my employment with the Company, obtained by me in connection with my employment with the Company, or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to SectionÂ 3(c). I also consent to an exit interview to confirm my compliance with this SectionÂ 5.

6. Termination Certification. Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the â€œTermination Certificationâ€ attached hereto as Exhibit B. I also agree to keep the Company advised of my home and business address for a period of one (1) year after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

7. Notification of New Employer. In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

8. Solicitation of Employees. I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Companyâ€™s employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

9. Export Statement of Assurance. I recognize that, in the course of my employment, the Company may release to me items (including, but not limited to, software, technology, or systems, equipment and components) subject to the Export Administration Regulations ("EAR") or the International Traffic in Arms Regulations ("ITAR").Â I herby certify that I will not export, re-export or release these items in violation of the EAR or ITAR.Â In order to comply with this certification, I will not disclose/export/re-export these items to any person other than the persons in my working group as required in the performance of the job responsibilities assigned to me by the Company.Â I understand that if I have any question regarding whether a given disclosure/export/re-export is or would be contrary to this certification, I should immediately contact the Legal Services Department before taking any actions.

10. Code of Conduct Acknowledgement. I acknowledge that I have read the Companyâ€™s Code of Conduct, which is available on the Companyâ€™s public website and can be found by clicking â€œAbout Googleâ€ and looking on the â€œInvestor Relationsâ€ page of the site. I agree to adhere to the terms of the Code of Conduct and to report any violations of the Code.

11. Acknowledgment of Employee Handbook. I acknowledge that I have read the Companyâ€™s Employee Handbook which is available on the Companyâ€™s internal website. I agree to abide by the policies and guidelines set forth in the Employee Handbook, as they may be revised from time to time.

12. Representations. I agree to execute any proper oath or affirmation or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all terms of the Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

13. Audit. I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, or documents that are used to conduct the business of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Companyâ€™s devices in compliance with the Companyâ€™s software licensing policies, to ensure compliance with the Companyâ€™s policies, and for any other business-related purposes in the Companyâ€™s sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized or non-compliant applications to the Companyâ€™s technology systems and that I shall refrain from copying unlicensed software onto the Companyâ€™s technology systems or using non-licensed software or web sites. I understand that it is my responsibility to comply with the Companyâ€™s policies governing use of the Companyâ€™s documents and the internet, email, telephone and technology systems to which I will have access in connection with my employment.

14. Permission for Use of Images. I understand that during my employment with Google, agents of the company may take film, digital or other images of me, for subsequent use in non-commercial materials or collateral, including, but not limited to, the Company website (external and internal), annual reports, press day materials, internal presentations, analyst presentations, company, lobby or reception area stagings or productions, etc., without my prior consent, approval or review. My name may or may not be included along with my image. I hereby grant advance permission for such use of my image(s) by the Company, both during and after my employment, and I understand that I will not receive any royalties or other compensation for this use and I further agree to release and hold harmless any agent, employee, officer, director or other individual affiliated or working on behalf of the Company with respect to such use of my image(s).

15. Arbitration and Equitable Relief.

(a) Arbitration. IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION ADMINISTERED BY JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC. (â€œJAMSâ€□), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE â€œJAMS RULESâ€□). IN THE EVENT THERE IS NOT A CONVENIENT JAMS LOCATION FOR ARBITRATION, THE

PARTIES MAY MUTUALLY AGREE TO ANOTHER ARBITRATION PROVIDER. DISPUTES WHICH I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE FAMILY AND MEDICAL LEAVE ACT, CLAIMS OF HARASSMENT, DISCRIMINATION AND WRONGFUL TERMINATION, ANY STATUTORY CLAIMS, AND CLAIMS UNDER ANY OTHER APPLICABLE LAWS OF THE STATE OF MY EMPLOYMENT WITH THE COMPANY, TO THE EXTENT ALLOWED BY LAW. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

(b) Procedure. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS OR TO STRIKE, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYSâ€™ FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. I UNDERSTAND THAT THE COMPANY AND I WILL SPLIT ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS, EXCEPT THAT I SHALL PAY THE ENTIRE FILING FEE ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN ACCORDANCE WITH THE LAWS OF THE STATE in WHICH I AM EMPLOYED, AND THAT THE ARBITRATOR SHALL APPLY THE SUBSTANTIVE AND PROCEDURAL LAWS OF THAT STATE, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH THE LAWS OF THE STATE in which i AM EMPLOYED, THE JAMS RULES SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

(c) Remedy. EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW. NOTHING IN THIS AGREEMENT OR IN THIS PROVISION IS INTENDED TO WAIVE THE PROVISIONAL RELIEF REMEDIES AVAILABLE UNDER THE RULES.

(d) Availability of Injunctive Relief. I UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF THE AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT WITH THE COMPANY REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NON-COMPETITION OR NON-SOLICITATION WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR. ACCORDINGLY, BOTH PARTIES SHALL BE ENTITLED, AS A MATTER OF RIGHT, TO SEEK AND OBTAIN, IN ANY COURT OF COMPETENT JURISDICTION WITH RESPECT TO ANY ACTUAL OR THREATENED BREACH OF ANY PROVISION OF THIS AGREEMENT OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NON-COMPETITION OR NONSOLICITATION: (I) A DECREE OR ORDER OF SPECIFIC PERFORMANCE TO ENFORCE THE OBSERVANCE

AND PERFORMANCE OF THE PARTIESâ€™ OBLIGATIONS; AND (II) AN INJUNCTION RESTRAINING SUCH BREACH OR THREATENED BREACH. IN THE EVENT THAT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER ITS REASONABLE ATTORNEYS FEESâ€™ AND COSTS.

(e) Administrative Relief. I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, THE WORKERSâ€™ COMPENSATION BOARD, OR OTHER AGENCY OF THE STATE IN WHICH I AM EMPLOYED BY THE COMPANY. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

(f) Voluntary Nature of Agreement. I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT I AM WAIVING MY RIGHT TO A JURY TRIAL. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

16. General Provisions.

(a) Governing Law; Consent to Personal Jurisdiction. This Agreement will be governed by the laws of the State in which I am employed, without giving effect to any choice of law rules or principles that may result in the application of the laws of any jurisdiction other than that of the State in which I am employed. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the exclusive personal jurisdiction of the state and federal courts located in California for any lawsuit filed against me by the Company.

(b) Entire Agreement. This Agreement, together with the Exhibits herein and my offer letter from the Company, set forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersede all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Chief Executive Officer of the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

(c) Severability. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d) Successors and Assigns. This Agreement will be binding upon my heirs, executors, assigns, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

(e) Waiver. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

(f) Survivorship. The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date:

Signature

Name of Employee (typed or printed)

Date:

Signature

Name of Company Representative (typed or printed)

Exhibit A
GOOGLE INC.
LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

Title
Date
Identifying Number or Brief Description

___ No inventions or improvements
___ Additional Sheets Attached
Signature of Employee:
Print Name of Employee:
Date:
Exhibit B
Google Inc.
Termination Certification

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Google Inc., its subsidiaries, affiliates, successors or assigns (together, the â€œCompanyâ€□).
I further certify that I have complied with all the terms of the Companyâ€™s At Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.
I have informed the Company in the event I am subject to any litigation holds or similar request for record retention.

I further agree that, in compliance with the At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement, I will adhere to my obligations to the Company contained in Section 2 (Confidential Information), Section 3 (Inventions), and Section 8 (Solicitation of Employees).
After leaving the Companyâ€™s employment, I will be employed by ______________________ in the position of: ____________________________________________. I am / am not (crcle one) subject to a litigation hold/request for record retention.

Signature of Employee

Print Name

Date

____________________________________________________

Address for Notifications

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Seattle Field Office**

Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061
Seattle Direct Dial: (206) 220-6884
FAX (206) 220-6911

May 18, 2015

*Sent via email*: sfrank@frankfreed.com

Rivka Spivak
C/o: Frank Freed Subit & Thomas LLP
Attn: Steven B. Frank
705 Second Avenue, STE 1200 - Hoge BLDG.
Seattle, WA 98104-1798

Re: Respondent: Google
EEOC Charge No. 551-2015-00827

Dear Ms. Spivak:

Enclosed is a charge I drafted, based on your Intake Questionnaire/materials sent to EEOC and your intake interview. Please sign and date the charge in the lower left hand corner **or if the employer is in Oregon or Montana, in the lower right hand corner before a notary because Oregon/Montana law requires it.** Please return the charge to our office by mail, in the enclosed pre-paid envelope or to the address on this letterhead, promptly and within 33 days from the date of this letter. If you fail to sign and return the charge of discrimination to our office within 33 days, we will dismiss your charge and issue you a 90-day Notice of Right to Sue, which will authorize you to file a private lawsuit, if you wish to pursue your claims in court.

The Commission's regulations require that you notify this office of any change in your address and telephone number, and that you keep us informed of any prolonged absence from your current address.

If you have any questions or comments, do not hesitate to contact me at (206) 220-6862. Thank you.

Sincerely,

J.E.F.

J. Enrique Frias
Investigator

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

[ ] FEPA

[X] EEOC 551-2015-00827

**Washington State Human Rights Commission** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Rivka (Rebecca) Spivak** | [redacted] | |

Street Address City, State and ZIP Code

**128ne 51st Street, Seattle, WA 98105**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **GOOGLE-223087** | **500 or More** | **(206) 632-1183** |

Street Address City, State and ZIP Code

**501 N 34th Ave, Seattle, WA 98103**

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN

[X] RETALIATION [ ] AGE [ ] DISABILITY [ ] GENETIC INFORMATION

[ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| **05-06-2014** | **03-02-2015** |

[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I began working for Respondent on or around April 2010, as a Product Manager. During the course of my employment, I performed my duties in a satisfactory manner.**

**I am one of a few female Product Managers who reports to Jens Skakkebaek on my work team. In or around May 2014, I was put on a performance improvement plan and given negative reviews. I was also left in place and/or not promoted while a similarly-situated male employee was promoted around July 2014. In addition, in or around September 2014, I was prohibited from presenting a major and important product and invention that I had created to higher management, while similarly-situated male co-workers were allowed to present their products and inventions they had been working on. Moreover, in or around November 2014, I was given another negative performance review that was gender-biased while similarly-situated male employees were treated better. Additionally, in or around January 2015, I was criticized for taking leave that was medically necessary, as my 2-year old daughter was scheduled to receive surgery. Also, I was criticized for taking a four-day leave that my similarly-situated male co-worker was allowed to take, and he was not subjected to the same treatment as me. In or around March 2015, I was hospitalized for medical conditions that my doctor said was related to work stress. Furthermore, on or around May 14, 2015, I was given another gender-biased and unjustified negative review. Moreover, the impact that I suffered from receiving these low scores on my performance reviews disqualified me from the promotional track and/or receiving promotions.**

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

*Date* *Charging Party Signature*

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA | |
| | ☒ EEOC | **551-2015-00827** |

**Washington State Human Rights Commission** and EEOC

*State or local Agency, if any*

**Respondent favors similarly-situated male employees over female employees by giving male employees better evaluation scores leading to more promotions, allows male employees to take leave without questioning or disciplining them, holds them to different standards with regard to assignments and/or projects, whereas females are subjected to worse treatment, which I consider unfair terms and conditions of employment. In addition, I was subjected to more discipline for having conducted similar practices as compared to my male counterparts, and they were not subjected to the same treatment as me. Additionally, in or around May 2014 and early-February 2015, I had complained to upper management about this gender bias and unfair treatment, but nothing became of my complaints. Around mid-February 2015, I was notified by Respondent that I would have to relocate to California in order to stay employed, which I believe was retaliation for opposing discrimination. To my knowledge, similarly-situated male employees were not subjected to this same treatment.**

**I believe I have been subjected to unfair terms and conditions of employment, discipline, and denied promotions, because of my sex, female; in violation of Title VII of the Civil Rights Act of 1964, as amended. Furthermore, I believe I have been subjected to retaliation for opposing discrimination.**

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br><br>*Date* *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

EEOC FORM 131 (11/09)

# U.S. Equal Employment Opportunity Commission

GOOGLE-223087
Attn: Personnel Administrator
501 N 34th Ave
Seattle, WA 98103

PERSON FILING CHARGE

**Rivka (Rebecca) Spivak**

THIS PERSON *(check one or both)*

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**551-2015-00827**

## NOTICE OF CHARGE OF DISCRIMINATION

*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII) [ ] The Equal Pay Act (EPA) [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA) [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.
2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.
3. [ ] Please provide by a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
4. [ ] Please respond fully by to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by to
   If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Mary R. Hammock,**
**Investigator Support Asst**

*EEOC Representative*

*Telephone* **(206) 220-6860**

**Seattle Field Office**
**909 First Avenue**
**Suite 400**
**Seattle, WA 98104**
**Fax: (206) 220-6911**

Enclosure(s): [ ] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race [ ] Color [X] Sex [ ] Religion [ ] National Origin [ ] Age [ ] Disability [X] Retaliation [ ] Genetic Information [ ] Other

**ISSUES: Benefits, Constructive Discharge, Demotion, Discipline, Exclusion, Harassment, Intimidation, Promotion, Qualifications, Terms/Conditions**

**DATE(S) (on or about): EARLIEST: 05-06-2014 LATEST: 03-02-2015 And Continuing**

**A perfected charge (EEOC Form 5) will be mailed to you once it has been received from the Charging Party.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **March 2, 2015** | **Nancy A. Sienko,** **Director** | Nancy A Sienko |

Enclosure with EEOC
Form 131 (11/09)

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14 Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

**ENRIQUE FRIAS - FW: Spivak v. Google - Cover Letter & Charge Form**

**From:** Steve Frank <sfrank@frankfreed.com>
**To:** "ENRIQUE.FRIAS@EEOC.GOV" <ENRIQUE.FRIAS@EEOC.GOV>
**Date:** 6/17/2015 12:58 PM
**Subject:** FW: Spivak v. Google - Cover Letter & Charge Form
**CC:** "Rebecca Spivak <rebeccaspivak@outlook.com> (rebeccaspivak@outlook.com)"...
**Attachments:** EEOC Signed.pdf

---

Mr. Frias, here is Rebecca Spivak's EEOC charge. Thanks for your help.

Steven B. Frank
Frank Freed Subit & Thomas LLP
705 Second Ave., Suite 1200
Seattle, WA 98104
Phone: 206-682-6711 Fax: 206-682-0401
Email: sfrank@frankfreed.com

---

**From:** ENRIQUE FRIAS [mailto:ENRIQUE.FRIAS@EEOC.GOV]
**Sent:** Monday, May 18, 2015 10:50 AM
**To:** Steve Frank
**Subject:** Spivak v. Google - Cover Letter & Charge Form

**RE:** Rivka Spivak **v.** Google
EEOC Case No.: 551-2015-00827

Good Morning Mr. Frank:

Attached to this email is the cover letter and charge form for Ms. Spivak's review and signature. Please have her sign, date, and send it back to our office either by U.S. Mail, fax, or email. If you have any questions, please let me know.

Thank you.

J. Enrique Frias
Federal Investigator
U.S. Equal Employment Opportunity Commission
Seattle Field Office - Federal Office Building
909 1st AVE | Suite 400 | Seattle, WA 98104-1061
Office: 206.220.6862
Main: 206.220.6884
Fax: 206.220.6911
email: enrique.frias@eeoc.gov

50TH ANNIVERSARY
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
1965 2015

CONFIDENTIALITY NOTICE

**This communication is official government business and is intended for the sole use of the person(s) to whom it is addressed and may contain information that is privileged, confidential, and, or exempt from disclosure. Any dissemination, distribution or copying of this communication by anyone other than the intended recipient, or the person responsible for its delivery, is strictly prohibited. If you have received this communication in error, please call this office immediately and either destroy the communication or return it to the above address.**

## ENRIQUE FRIAS - Spivak v. Google - Cover Letter & Charge Form

**From:** ENRIQUE FRIAS
**To:** sfrank@frankfreed.com
**Date:** 5/18/2015 10:49 AM
**Subject:** Spivak v. Google - Cover Letter & Charge Form
**Attachments:** Spivak v. Google - Cover Letter & Charge Form.pdf

---

**RE:** Rivka Spivak **v.** Google
EEOC Case No.: 551-2015-00827

Good Morning Mr. Frank:

Attached to this email is the cover letter and charge form for Ms. Spivak's review and signature. Please have her sign, date, and send it back to our office either by U.S. Mail, fax, or email. If you have any questions, please let me know.

Thank you.

J. Enrique Frias
Federal Investigator
U.S. Equal Employment Opportunity Commission
Seattle Field Office - Federal Office Building
909 1st AVE | Suite 400 | Seattle, WA 98104-1061
Office: 206.220.6862
Main: 206.220.6884
Fax: 206.220.6911
email: enrique.frias@eeoc.gov

50TH ANNIVERSARY U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION 1965 2015

CONFIDENTIALITY NOTICE
This communication is official government business and is intended for the sole use of the person(s) to whom it is addressed and may contain information that is privileged, confidential, and, or exempt from disclosure. Any dissemination, distribution or copying of this communication by anyone other than the intended recipient, or the person responsible for its delivery, is strictly prohibited. If you have received this communication in error, please call this office immediately and either destroy the communication or return it to the above address.

# RECORD OF INTERVIEW

## Charge #:551-2015-00827

**Charge No.:** 551-2015-00827
Ms. Rivka "Rebecca" Spivak v. Google

**Witness**: [X] **Charging Party** [] CP-Attorney [] Respondent [X] **CP-Attorney** [] CP / R -Witness

**Method of Contact**: Telephone [] number:
In Person [X] location: Seattle Field Office
**Formalized**: 3/2/2015 **Timely After**: 5/6/2014

**Investigator**: Enrique Frias
**Purpose of Interview**: Intake Interview
**Date and Time of Interview**: Friday, May 15, 2015; **TIME**: 10:55 AM – 12:30 PM

**Dual Filing:** I have not contacted any other agency. **Attorney**: Mr. Steve Frank is my attorney.

**BASES & ISSUES: Sex** (Female) / **Discipline** & **Terms and Conditions** (Unfair Evaluations & PIPs & Assignments & Leave) & **Promotion** & **Retaliation**

**Employer:** It's Google, the internet company. There are over 500 employees.

**Employment History & Job Duties or Assignments:**
I began working there on April 2010, as a Senior Product Manager ("PM"). I'm a level 7, and I was hired in this level in 2010. I was a level 6 and PM3, but my official title is Senior Product Manager. It's a strategic and technical role, where I'm responsible for making decisions; what products Google should build and other things. I do technical and product designs and I help to launch these products for Google. I help to understand the customer's needs and I have to think about what will bring in more money and understand business schemes. For all intents and purposes, I would consider myself a Product Manager.

**Supervisor – Chain of Command:**
**Aaron Rothman – Senior Product Manager**: He was my supervisor as of July 2014. He's the PM for frontline, which assess sales tools to sell to large customers. He can issue performance reviews, which can be used to fire people. He can also assign me work. He would be a bad actor in my situation.

**Jens Skakkebaek – Group Product Manager**: He's the PM in charge of all sales tools, not just for large customers. He can provide input for hiring and firing employees. He could conduct evaluations and he put me on a performance improvement plan ("PIP"). He follows Doug's lead about giving me negative evaluations against me. Jens and Doug are the bad actors in my situation.

**Doug Bengtson – Engineering Manager**: I work with him in the same office. He's the manager for all the front line tools, which helped sales to be efficient when selling to large advertisers. He could provide input about hiring and firing, but I'm not too sure how far this would go. He authorized most of my PIP and Jens did what Doug told him to do when it came to negative actions happening against me.

**DISCIPLINE:**
**2) Charging Party was disciplined**; I was placed on a PIP between May and July 2014. This went on for 60 days. We can get you a copy for you, but these PIPs criticized my communication skills, even

though they recognized me for my work. They didn't even tell me what it was for and nobody would tell me. It included details about me being on my laptop during meetings, but all employees are on their laptops during meetings, it's normal practice; and all the males were on their laptops as well.

**3) Others not of Charging Party's group were not disciplined or were not disciplined in the same manner although they committed the same or similar infractions**; I'm not sure of any other male employees who were put on PIPs working under Jens. I'm not sure of any others that were disciplined for any other reason.

**4) Respondent cannot explain the different treatment or Respondent's articulated reason is in fact pretext for discrimination**. They mentioned that I needed to work on my communication and that my research was unfounded regarding a project I was working on. They also said that my research was biased in my results, but I think they did this because my research attacked Doug's project.

**Progressive Disciplinary Policy**: If you get multiple negative scores in a row, its grounds for firing, and if you're put on a PIP, you can't be promoted for a long time.

**<u>Evidence & Comparators:</u>**

There are 10-15 Product Managers that report to Jens Skakkebaek. I'm in Seattle, but these other PMs who reported to Jens, are located in other remote areas, but we all reported to Jens. Michael English was an Engineering Manager, but we were equal peers; for the purposes of comparison, we worked closely together. We worked on the same team, yet he was treated better than me. We both worked on a product called Interactive Benchmarks ("IB") that generated a lot of money, but he was treated better than me regarding a four-day leave that occurred around Jan. 2015. Michael was not reprimanded for taking leave while I was, and we were both on the same team working on this same project. All the PMs work remotely, and most meetings are done via video conference.

**<u>DISCHARGE:</u>** I am still employed by the company, but I am on leave for the moment.

**<u>TERMS AND CONDITIONS</u>** (Unfair Evaluations & PIPs & Assignments & Leave)

**2) Charging Party was denied equal terms or conditions of employment**; I was placed on a PIP on May 6, 2014 and in Nov. 2014, I had a negative performance review and then yesterday May 14, 2015, I was given another negative review. For some they gave me reasons that I disagreed with and for others, they wouldn't even tell me what they were for, or they wouldn't give me direct examples. There are about four main issues that I felt were unfair, but there are others also:

**The presentation of my project**: This was Sept. 2014, Vince Lacey was allowed to present on his project, and I was not allowed to give a full presentation on Interactive Benchmarks (my project). The key thing is that these presentations were done in the presence of a high-ranking person, and the success of your presentation determines the future of your career; this would either make or break my future success with the company, and I was not allowed to present my project. When my product launched, it showed promise to generate a lot of revenue for the company, but Vince's Project, "AMP," didn't have as high of a promise as mine, and yet he was allowed to present his project to this high-ranking individuals whereas I wasn't allowed. The person who made this decision for who could present their projects was Aaron Rothman, my supervisor.

**My leave was scrutinized & Michael's leave wasn't**: This was in late Jan. 2015, it was a four-day leave. Michael decided to take a trip to Hawaii, but because we both worked on this project together,

and we both needed each other to work, I also decided to put in for my leave. So I put in my leave, and he put in his leave, but I was reprimanded and he wasn't. Aaron said I was reprimanded because I didn't give enough advance notice, and both Michael and I put in our leave at the same time. Michael was never reprimanded. I still took my leave. Google doesn't have any kind of leave policy regarding this.

**Being penalized for certain issues while male employees were not subjected to the same treatment:** I was criticized around Nov. 2014, for integration issues. Around Sept./Oct 2014, Aaron gave me a low score which affected my stock grants, bonuses, and promotion potential, but Vince Lacey, a PM was put in for a promotion. AMP was his project which had a potential rate of 42%, which was a low score showing low promise whereas, my project, Interactive Benchmark, was rated at 93%, showing high promise and potential, and yet I was given low evaluations which affected my promotions.

**Relocating my Project location & requiring me to move whereas male employees were not**: When they announced that they were moving both projects AMP and IB, they didn't make Vince move, even though he lived in Mountain View, which is the Bay Area in CA, but they were moving both projects to Los Angeles ("LA"), and I was told that I had to move, but they didn't make Vince move, they said that he could work remotely and they wouldn't allow me to work remotely.

I had created many inventions which helped to sell and/or advertise Google services, but I didn't credit for my inventions and the males did. If we worked on teams, the males received credit for these inventions whereas I didn't. I was also penalized for something that my male counterpart should have also been penalized for, but instead I was given a negative review, which occurred around Nov. 2014, and this male employee was put up for a promotion and received a positive review. These male employees could challenge their peers and superiors; they were allowed to challenge the structure and status quo and wouldn't get in trouble, and in fact they were rewarded or got rich, whereas when I speak up, I was reprimanded and placed on PIPs for presenting my opinions or questions certain moves.

**3) Others similarly situated but not of Charging Party's group were extended the terms or conditions denied Charging Party**; Google has a very formulaic structure for assessing people; you have to get certain scores on your evaluations in order to be promoted and if you don't get these scores, you can't be promoted. Other males on my work team were given more preferable scores than me and it was not fair. I'm not sure of anybody else who was given low evaluation scores.

**4) Respondent is unable to explain the difference in treatment or Respondent's explanation is in fact pretext for discrimination**. The reasons they gave me: Aaron said that I didn't do the integration, but this wasn't my task to do for the project; also that I criticized other projects during a presentation by saying that they weren't working, but Vince had done the same and he was not penalized like I was for doing the same action.

**PROMOTION**

**2) Respondent had a vacant position**; Michael English was promoted for our IB project, whereas I wasn't, even though we both worked on it. You can't apply for promotions at Google; your manager presents you for promotion, you have to be put in for it. Your managers propose you for promotion and it's based on your evaluation scores. So I had conversations with Jens, Aaron, and Doug, and I was repeatedly discouraged and they wouldn't support positive ratings for me and didn't want to promote me. The position I could have been promoted to would have been a level 7 Senior Product Manager.

**3) Charging Party applied for or expressed an interest in the position**; I expressed my interest to my managers repeatedly, from May 2014, to the present. I've asked for higher ratings on performance

evaluations at least a dozen times, to all my managers, and this was all verbal, but I do have emails as well showing that I had requested higher scores, since these higher scores lead to promotions, but because they denied me my higher scores, I couldn't receive my promotions, so they were in essence, denying me my promotions.

**4) Charging Party was qualified for the position**; I was very qualified to be a level 7 manager, and I have experience in being in higher roles than what I'm currently in. So I am qualified.

**5) Charging Party was not selected but a lesser qualified person not of Charging Party's group was selected.** Aaron was promoted to level 7, and other males have been promoted. Vince had been referred for a promotion, but he was rejected because he failed it, or something happened.

**RETALIATION**

I complained about discrimination on May 27, 2014; I complained to Carolyn Bremner, HR-Business Partner, and I talked to her while I was on a PIP. Taking me off a PIP wasn't going to solve my problem, and I said that there's a bias against women and that my department favored men, and this was done over a video conference. When I told her this, she started saying that *I was using a very particular word and that I needed to be very careful because otherwise I would be implying something* – so at this point I felt very intimidated by her, and she made me feel like I had to change my wording, like I wasn't allowed to say discrimination or that I would get in trouble if I was using the wrong words. So I started using words like *bullying*, instead of gender-bias or discrimination, and later I sent her an email stating the same things, but I stated an "*unfair dynamic*" was occurring, but not that it was due to sex. Around Feb. 2015, I sent emails to HR and employee relations, and this was after Aaron told me that I was going to get a low score for being absent while I was taking care of my daughter. So I sent a very detailed email to HR about gender bias and discrimination. When they received this email, they replied by saying *thank you for the email* and *they would assigned me a person to investigate my claims*, and they asked me some questions, but nothing really happened. These meetings occurred in early Feb. 2015, so around Feb. 2-3, 2015, I sent the email, and a few days later I was connected with someone in employee relations and they asked me questions that only seemed to *attack me* or *trap me* in contradictions, but they were very small and marginalized examples. It just seemed like she didn't really care about my issues and that she only wanted to remind me about my company's EEO policy by saying, "*You know Google as an EEO policy,* " or "*You know that you've received training on this right?*" Then, around Feb. 11, 2015, I was notified that they were moving my IB project, my invention to LA. They told me that they were going to move my project because Doug was moving to another team, and so they wanted to move the project. I was told that I needed to move to LA in order to keep my job. They notified me of this via an all-hands meeting. They told me that if I wanted to keep my project, I would have to move to LA or take a severance, but this applied to everyone on the team; it's what they said at the meeting. So at first, it applied to everybody, but then later, Aaron, Jens, and Vince told me that they would not be expected to move. I also learned from another PM that Aaron said that HR was the one that wanted to move my project to LA, and multiple people stated that this move didn't make any sense. The project was moved under Shift Supervisor: Bill, and he also said that he didn't mind for PMs to work remotely. So in other words, I didn't need to move, but they made it seem like I had to or I would lose my job. One last thing, in all my prior conversations with HR, after I complained they'd ask me "*Why do I stick around if I don't like it here?*" and I felt it was very dismissive and rude.

I want to file a charge.

**-END INTERVIEW**

RECEIVED
SEA EEOC
2015 APR 13 PM 4 44

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

April 13, 2015

*Via Facsimile*
206.220.6911

U.S. Equal Employment Opportunity Commission
Seattle Field Office
909 First Avenue, Suite 400
Seattle, WA 98104-4000

Hoge Building
705 Second Avenue
Suite 1200
Seattle, Washington
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

RE: Rivka Spivak
EEOC Case No. 551-2015-00827 00827

Dear Sir/Madam:

I am entering my appearance as the attorney for Rivka Spivak in the above-referenced case number. Please serve me with all correspondence and pleadings except for original process.

Thank you for your cooperation.

Sincerely,

Steven B. Frank

SBF/sar
cc: Client (via email)

Steven B. Frank
Clifford Freed
Michael C. Subit
Joyce L. Thomas
Sean Marshall Phelan
Beth Barrett Bloom
Jillian M. Cutler
Christie J. Fix

Steven B. Frank
Attorney at Law

Frank Freed
Subit & Thomas LLP
Attorneys at Law

Suite 1200 Hoge Building
705 Second Avenue
Seattle, Washington
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401
*E-mail sfrank@frankfreed.com*
*www.frankfreed.com*

# FACSIMILE TRANSMISSION

**FRANK FREED SUBIT & THOMAS LLP**
1200 Hoge Building
705 Second Avenue
Seattle, WA 98104
Telephone: (206) 682-6711 / Facsimile: (206) 682-0401

**TO:** U.S. Equal Employment Opportunity Commission

**DATE:** April 13, 2015

**FAX NO:** 206.220.6911

**FROM:** Steven B. Frank

**CODE:** 6162

**RE:** Riva "Rebecca" Spivak

---

Please see the attached letter regarding Ms. Spivak.

# CONFIDENTIAL

**The information contained herein is confidential and intended only for the use of the person or entity identified above. If the reader of this telecopied transmission is not the intended recipient or the agent or employee thereof, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us, by collect telephone call if necessary. Your assistance and courtesies are appreciated. Thank you.**

This transmission consists of ___2___ pages, including this cover page.
Please call Sheila at (206) 682-6711 if there are any transmittal problems.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. **Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)**

**1. Personal Information**

Last Name: SPIVAK First Name: RIVKA MI: ______

Street or Mailing Address: 128 NE 51st Street Apt or Unit #: ______

City: Seattle County: KING State: WA Zip: 98105

Phone Numb[redacted] Work: (____) ______

Cell: ([redacted]ss: ______

Date of Birt[redacted] Sex: ☐ Male ☒ Female Do You Have a Disability? ☐ Yes ☒ No

**Please answer each of the next three questions.** i. Are you Hispanic or Latino? ☐ Yes ☒ No

ii. What is your Race? Please choose all that apply. ☐ American Indian or Alaskan Native ☐ Asian ☒ White ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? U.S Born - ancestry Eastern Europe

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: ______ Relationship: ______

Address: ______ City: ______ State: ______ Zip Code: ______

Home Phone: (____) ______ Other Phone: (____) ______

Received
MAR 02 2015
EEOC SEATTLE

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

☒ Employer ☐ Union ☐ Employment Agency ☐ Other (Please Specify) ______

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

**Organization Name:** Google

Address: 501 N 34th St County: KING

City: Seattle State: WA Zip: 98101 Phone: (206) 632 1183

Type of Business: int tech Job Location if different from Org. Address: ______

Human Resources Director or Owner Name: Laszlo Bock Phone: (____) ______

**Number of Employees in the Organization at All Locations:** Please Check (✓) One

☐ Fewer Than 15 ☐ 15 – 100 ☐ 101 – 200 ☐ 201 – 500 ☒ More than 500

**3. Your Employment Data** (Complete as many items as you are able.) **Are you a federal employee?** ☐ Yes ☐ No

Date Hired: 4/2010 Job Title At Hire: SR Product Manager

Pay Rate When Hired: 150 + bonuses Last or Current Pay Rate: 215,000 + bonus etc (~$400,000)

Job Title at Time of Alleged Discrimination: ______ Date Quit/Discharged: ______

Name and Title of Immediate Supervisor: Aaron Rothman Sr. Product Manager

**If Job Applicant,** Date You Applied for Job ______ Job Title Applied For ______

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to* Race. *If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to* Retaliation.

☐ Race ☒ Sex ☐ Age ☐ Disability ☐ National Origin ☐ Religion ☒ Retaliation ☐ Pregnancy ☐ Color (typically a difference in skin shade within the same race) ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing ii. family medical history iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: ______

If you checked genetic information, how did the employer obtain the genetic information? ______

______

Other reason (basis) for discrimination (Explain): ______

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. **Please attach additional pages if needed.**
*(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

Many instances

**A. Date:** 5/7/14 **Action:** Placed on Performance Plan in retaliation for asking HR for help with gender bias

**Name and Title of Person(s) Responsible:** Caroline Bremner, HR ~~Jens Skakkebaek~~ - Group PM

**B. Date:** ~~Cindy Treloar~~ 5/7/14 **Action:** Employee Relations did not investigate claims - stalled for 2 months. Did not talk to requested references

**Name and Title of Person(s) Responsible** Cindy Treloar

**6. Why do you believe these actions were discriminatory? Please attach additional pages if needed.**

Most of them were ongoing retaliation to justify initial PIP response. Processes were bypassed and actions in conflict with perf feedback

**7. What reason(s) were given to you for the acts you consider discriminatory? By whom? His or Her Job Title?**

no reasons - "focus on future - not past" or "communication" - with no details. HR - multiple. Jens Skakkebaek Group PM

**8. Describe who was in the same or similar situation as you and how they were treated. For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.**

**Of the persons in the same or similar situation as you, who was treated *better* than you?**

| | Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|---|
| A. | Vince Lacey | Male, Asian | | High Performance Ratings |
| | Michael English | Male, White | | no penalty for absence |
| B. | | | | |

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment

**A.** NONE

**B.** ______

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment

**A.** NONE

**B.** ______

**Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.**

**9. Please check all that apply:**

- ☐ Yes, I have a disability
- ☐ I do not have a disability now but I did have one
- ☐ No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

______

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
☐ Yes ☐ No
If "Yes," what medication, medical equipment or other assistance do you use?

______

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
☐ Yes ☐ No

If "Yes," when did you ask? ______ How did you ask (verbally or in writing)? ______

Who did you ask? (Provide full name and job title of person)

______

Describe the changes or assistance that you asked for: ______

How did your employer respond to your request? ______

**13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| | Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|---|---|---|---|---|
| A. | Michael English | Eng Manager | | Good performance. He was never consulted for P.I.P. Feedback is Bizarre. |
| B. | | | | |

**14. Have you filed a charge previously on this matter with the EEOC or another agency?** ☐ Yes ☒ No

**15. If you filed a complaint with another agency, provide the name of agency and the date of filing:** ____________

**16. Have you sought help about this situation from a union, an attorney, or any other source?** ☒ Yes ☐ No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?
Steve Frank - attorney (guidance)

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. **If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.**

R.S.

**BOX 1** ■ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. **I also understand that I could lose my rights if I do not file a charge in time.**

**BOX 2** ☑ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

[signature]
**Signature**

3/2/15
**Today's Date**

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:

**1) FORM NUMBER/TITLE/DATE.** EEOC Intake Questionnaire (9/20/08). **2) AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)

**3) PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. **4) ROUTINE USES.** EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.

**5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

IN Jan 2014 I joined a new team at Google. I discovered that our product was misrepresenting information to customers, Giving them false estimates. I spoke up and asked questions, but was shut down by a male-heavy team. I felt that it was related to my being a woman and challenging their product.

I asked Caroline Bremner in HR for help. She did nothing, but 3 weeks later I was placed on a PIP - without proper process and despite strong performance. I raised this through internal grievance — they stalled for 2 months and did no investigation.

Many instances of retaliation over the next year - including penalty for being out with a sick child. I have strong performance and peer support.

HR's last action is to force me to move to LA to keep my job - using a rule that applies to no one else. so I have effectively been fired

D

**TONI HALEY - Rivka Spivak / Google - Follow Up On Jens Skakkebaek Interview**

**From:** Brian Johnsrud <BJohnsrud@chjllp.com>
**To:** 'TONI HALEY' <TONI.HALEY@EEOC.GOV>
**Date:** 10/21/2016 2:12 PM
**Subject:** Rivka Spivak / Google - Follow Up On Jens Skakkebaek Interview
**Attachments:** Perf Feedback Requests.pdf

Hi Toni,

Hope it's been a good week.

You had asked whether Jens Skakkebaek had other email messages requesting "honest" feedback on other employees and the answer is certainly "yes," see attached. These emails requesting "completely honest" feedback were sent regarding male and female employees and were sent during the same performance review cycle about which Rivka Spivak now complains. Once again, therefore, the contemporaneous documentation forecloses her gender bias theory.

Separately, Jens asked me to let you know that he misspoke on whether he had ever placed another employee on a Performance Improvement Plan (PIP). He actually placed a male Product Manager on a PIP in 2015, that male employee did not satisfy the PIP, and his employment with Google was thus terminated. By contrast, Jens concluded that Spivak, a female employee, satisfied her PIP, which was prompted by the serious feedback from several male and female employees in her new role and as reflected in part in her performance review for Q1 - 2014. Jens sincerely regrets this honest mistake; he simply did not remember it on the spot.

Please let me know if you have any further questions and please let me know available dates for your interviews of Ms. Stanley and Ms. Hsu and the anticipated amount of time for them. Thank you.

Best regards,

Brian

Brian Lee Johnsrud
**Curley, Hurtgen & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
(d) 650.600.5310
(c) 650.722.2733
bjohnsrud@chjllp.com
www.chjllp.com

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 8:43 AM
Subject: Re: feedback
To: Judy Hsu <judyhsu@google.com>

btw, I urge you to be honest -- but that goes without saying.

thanks!
Jens

On Tue, Sep 30, 2014 at 8:41 AM, Jens Skakkebaek <jskakkebaek@google.com> wrote:
Hi Judy,

We are doing calibration on Thursday and would like to get your quick feedback on Vince, Rebecca and Emily, if you have any.

Thanks,
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 8:46 AM
Subject: feedback for calibration
To: Barbara Stanley <bstanley@google.com>

Hi Barbara,

We are doing calibration on Thursday and would like to get your quick feedback on Rebecca and Emily, if you have any. Also on Vince, if you have additional thoughts for Q2/3.

I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:09 AM
Subject: feedback for calibration
To: Gregory Block <gblock@google.com>

Hi Greg,

We are doing calibration on Thursday and would like to get your quick feedback on my PMs. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ---------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 8:59 AM
Subject: feedback for calibration
To: Philip Stephens <pstephen@google.com>

Hi Phil,

We are doing calibration on Thursday and would like to get your quick feedback on Matt. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ---------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:12 AM
Subject: feedback for calibration
To: Jon Krafcik <jkrafcik@google.com>

Hi Jon,

We are doing calibration on Thursday and would like to get your quick feedback on Roy. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:13 AM
Subject: feedback for calibration
To: John Maletis <maletis@google.com>

Hi John,

We are doing calibration on Thursday and would like to get your quick feedback on Vince. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:12 AM
Subject: feedback for calibration
To: Vishal Goenka <vgoenka@google.com>

Hi Vishal,

We are doing calibration on Thursday and would like to get your quick feedback on Roy. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:12 AM
Subject: feedback for calibration
To: Dan Stone <danstone@google.com>

Hi Dan,

We are doing calibration on Thursday and would like to get your quick feedback on Roy. I urge you to be completely honest, as always.

Thanks!
Jens

Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:11 AM
Subject: feedback for calibration
To: Aitan Weinberg <aweinberg@google.com>

Hi Aitan,

We are doing calibration on Thursday and would like to get your quick feedback on Roy. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ---------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:10 AM
Subject: feedback for calibration
To: Vivek Rao <vivekrao@google.com>

Hi Vivek,

We are doing calibration on Thursday and would like to get your quick feedback on Tris. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:09 AM
Subject: feedback for calibration
To: Megan Kacholia <mnance@google.com>

Hi Megan,

We are doing calibration on Thursday and would like to get your quick feedback on Tris. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:08 AM
Subject: feedback for calibration
To: Vince Lacey <vincel@google.com>

Hi Vince,

We are doing calibration on Thursday and would like to get your quick feedback on Matt. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:08 AM
Subject: feedback for calibration
To: Kathryn Shih <kshih@google.com>

Hi Kathryn,

We are doing calibration on Thursday and would like to get your quick feedback on Matt. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:07 AM
Subject: feedback for calibration
To: Hratch Mangassarian <hratch@google.com>

Hi Hratch,

We are doing calibration on Thursday and would like to get your quick feedback on Matt. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Tue, Sep 30, 2014 at 9:06 AM
Subject: Feedback for calibration
To: Joe Vanderwaart <joev@google.com>

HI Joe,

We are doing calibration on Thursday and would like to get your quick feedback on Matt. I urge you to be completely honest, as always.

Thanks!
Jens

---------- Forwarded message ----------
From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Fri, Oct 3, 2014 at 12:20 PM
Subject: feedback for calibration
To: Barney Pierce <barnaby@google.com>

Hi Barney,

We are doing calibration on Monday and would like to get your quick feedback on Roy. I urge you to be completely honest, as always.

Thanks,
Jens

**RECORD OF INTERVIEW**

Spivak v. Google
551-2015-00827

| | |
|---|---|
| Witness: | Jens Skakkebaek |
| Others Present: | Brian Johnsrud, R's atty |
| FI: | Toni Haley |
| Date: | 10/11/16 and 10/14/16 |

Do you swear or affirm that the testimony you're about to give is true and correct to the best of your knowledge? Jens Skakkebeck: Yes

Jens currently is Group PM. He's been that for 9 yrs. He's now in Mt. View and been there since his hire. He's never worked in the same location as CP. He visits the office in Seattle, but doesn't have an office there. Jens left Frontline responsibilities about a yr ago, Nov 2015.

**CP's hire.** CP was product mgr. Jens had a position open and hired her. She started the beginning of Jan 2014. He did the hiring. He met CP when he was in NY. He believes he asked the tech leads to talk to her as well: Doug Bengston and Barbara Stanley. Jens ran the decision by Brad Benger, who led the overall area. At the time Jens managed the Frontline area, but that was part of a bigger effort, Display Networks. No one had any reservation about hiring CP that he recalls. It was an internal transfer, not an actual hiring practice that they'd go thru if it was an outside hire. .

CP was assigned to work as a PM for Pitchable Insights, part of the Frontline effort. At that time, Jens had 1 other PM on the Frontline project and Jens also started another proj as well, Cawfe, where he had 5-6 PMs. Other than CP, there was two other females PMs: Jane Kim, who started in Dec 2014, and Ashley Jaing. He hired Jaing, but not Ashley.

Jens had 2 responsibilities: Frontline and Cawfe. Once CP came on he had 7-8 PMs, of which 3 were female.

CP duties as PM: they have end to end responsibility for a particular product/product area. They're responsible to build the right product and understand the needs of the users; to find the right product to solve those problems; get the product built and get it to market; work cross-functionally. PMs have a leadership role where you work both with engineering and other PMs, sales, and marketing. It all depends on what kind of product a PM is on, but this is the general piece of it. PM responsibilities are to also set the direction for the product, where it's going, help with execution, get milestones with engineers/counterparts, track progress and help the team overcome any roadblocks. PMs help out engineering be as efficient as possible and build the right thing. The most impt relationship is between PM and engineering counterpart.

Initially the plan was for CP was to own responsibilities for Pitchable Insights and a couple other projects. Doug Bengston was overseeing those projects and Barbara Stanley, who was kind of the uber tech lead. Michael English owned Quicksilver.

The PM needs to exhibit leadership. Part of that is working with various members to help drive a direction. Part of it is to be a good communicator. Part is also to be a good listener, to know cross fn'l core teams when they drive products forward, and communicate by influencing. It's a key thing to bring the team along as a leader. Make sure everybody drives to one vision.

CP identified issues with Quicksilver? CP was of the opinion that estimates for solving use case wasn't as useful. But I don't think she had any trouble with the calculations or the underlying system was not working as intended.

Was Quicksilver replaced by IB? At first Doug split out QS estimates from what became IB. Over time, QS was stopped to be used. That team and those estimates, there was another effort in LA, they were also doing estimates. At some point, the 2 teams under the Eng'ing leadership looked at and tried to consolidate the 2 efforts. The work on QS was enfolded and redone in another product done in LA. At that point, the estimated functionality came to LA. My recollection is that it was the TEA product.

Did CP have the vision for IB? I think that is correct. She was the PM on it and decided that that was a good model for sales users to have to solve some use cases they had. It made sense to me.
Her insight was opening up and let the user be more part of it, rather than let the system determine on their behalf.
Who did CP work most directly with? Michael English, Barbara Stanley, Judy Hsu on the sales ops side. She was interfacing with the engineers and also, Vince Lacey. He as the other PM on my team. A peer. She was supposed to help him on the Ads Media Planner. The idea is that they'd had Pitchable Insights sales could pitch. She would also own the QS estimates team and take on some of Vince's' features to help him out. Vince was her peer on the Ad Media Product, not her lead.

Bengston – what is his position? Tech lead mgr (TLM) or Frontline Engineering Efforts in Seattle. Was he above English? Yes. English reported to him.

IB ended up being a product she came up with , she kind of developed, we thought was a good idea to build. QS estimates in gen'l, as the team looked at the accuracy, it couldn't get w/i 20%, but that doesn't mean it wasn't useful. In my mind, it's not either/or. The functionality is still living today, it's just not called QS. We have it as part of a back end product called TEA.

How are PMs promoted? That's made by a hiring committee composed of other PMs, usually at 2 levels or higher than the person. Twice a yr is a promotion process where individuals can nominate themselves, individuals or mgrs. Peer reviews go thru the hiring committee processes where there' a primary and secondary committee who review. A promotion can also be appealed if there's not sufficient evidence in the packet.

As far as selection of a lead, Jens had 2 areas and decides who will be the lead for the particular product. Rebecca was the lead for her product, it's really about who owned the product. We tend not to use the term lead, but product owners, so in that sense she's the lead for it.

All 6-8 under him owned 1 or more product or parts of a product.

Rebecca was the PM of what became IB. Aaron Rothman became the PM for Frontline, the role I had had and he reported into me. I wasn't promoted up, but I made the agreement with my mgr, when I took on the CAWFE team that I'd get somebody to be the PM owner of Frontline. Aaron Rothman was Sr PM and became the lead on Frontline. By virtue of that he became CP's supv'or. Jens left Frontline responsibilities about a yr ago, Nov 2015.

Evaluations - what is meets? Now it's known as consistently meets. That means the person is operating as expected at their level, given a ladder of responsibilities at each level. The next one up is exceeds. Which means, if you eval the person, eval the PM against the categories, that they'll exceed in 1 or more categories but not all. Then strongly exceeds. Which mean the person is operating at the next level, across all the different categories of skills and scope. Above, we have superb. I've never given that. Then we have below: needs improvement, which basically is a signal to the person that they need to work on things they're responsible for. There's one below I think but we never really talk about it.

If meets, is one likely to get a promotion? It does happen, but probably not very often

To get a promotion, what do you need? You need to demonstrate that you're operating at the next level and have impact, the things you're doing have an impact on Google. And you have done that thru you're personnel impact as well. You have to be able to demonstrate that the product you've work on has gotten a lot of revenue or happy users and you were a big part of making that happen and in addition you have the skills ability and scope to fn at the next level.

Looking at CP's 2014 Q1 eval, what does each block of the eval mean? As part of the performance evaluation, we have people rank people they work with against each other. They stack rank them. In this case, Drew stack ranked as a peer reviewer or he wanted to. It doesn't mean it was a peer reviewer for her, it could be other people listed here. Then they say, how do the people I work with stack v. each other. He may not have been asked to provide peer review feedback. Generally people only put in names for people they worked with over the past 6 months. Is it possible for someone to rank someone they hadn't worked with for years? It might be possible for Drew not to have worked with Ari for a couple of years. I don't know if there's any checks for how recently they've worked with them. He doesn't know what Drew worked with CP on. But knows they both worked on the same team in NY.

What's the value of stack ranking? In addition to written reviews, it's an add'l sign, e.g., Drew had been writing 2 reviews for any 2 people on this last, it's a signal to people on promotion committees which one he thinks is more effective than the other. It's also a signal to the mgr on how people view people on your team. I don't know if they'd look at these only. I don't get

consistently these number. I'd take a look and see if there's a pattern and who the person is whose ranking. Some have more insight into the person's work and some less. The people who ranked will have more working relationship with them.

The stack ranking is provided as a part of the performance evaluation process. Mgmt sends out an email that the performance evaluation season has now started, you can go in to the system and start the process. You can provide other type of info as well. For this type of info it's twice a year. There's an internet portal where they log in and can see who requested peer feedback from them. They can go into any Google em'ee and provide feedback? There's a process for unsolicited feedback. I believe you can go in and say I want to provide feedback on a particular person. There are 2 ways you can get feedback from peers, solicited and unsolicited.

FI asked about the IB lead. Vince had been working on Frontline for a while, at that time, Rebecca had just started. I asked him to be the lead in the sense that he was to work with sales ops. Our users/customers, we build tools with. To have conversations with sales op as leadership and report on how things are going. I don't know if he ended up doing it that much. He was not meant to be the mgr of anyone else. At that point, it was just Rebecca. It was more take some of these conversations and giving him the oppty to step up and try that. Aaron ended up being hired. It didn't result in promotion to Vince. I think he's still a level 5 I'm not completely sure. I don't' own the team anymore

We don't have an official term at R "lead" People are PMs. All PMs are leaders in their area. With Vince, I asked him to be the interim lead for stepping up to have a point of contact for sales op for Frontline to answer questions. I don't know precisely what he did, but he would help out and I would step in when needed. It was never intended to have him somehow oversee Rivka's work. That wasn't part of the plan at all. He wasn't the lead for IB, just the interim lead until I found a level 7. I'd been looking for a while since fall 2013. I remember telling Rivka at some point we'd have somebody come in as her mgr so she wasn't surprised by it. I think I even told her before she started, but I can't remember. I think so.

Why wasn't CP chosen as lead? She had just started and wasn't up to speed on Front line. She had just started and was working to get her feet wet and dive into the material. Since Vince had been there for a while, and there since it started, I felt he could do that I felt that Rebecca was pretty busy and new to everything. What about that CP was higher level, 6 v. 5, is it typical for the lower level person to be a lead over a higher level em'ee? I don't know what's typical. I didn't see this as a way as being above anyone on the team. Vince had been there since the start of the project. He knew it well.

PMs own their product. They're the main pt of contact for the product. Think of it more as a right hand man. Just because I had this other team and a lot of responsibilities as well. I was also interviewing and trying to find the permanent person. This was a way to get extra help. Any extra Pay? No. Pay follows levels your performance in general. Was it a title he could put on his resume? No it's not a title. What's key to understanding, it was a day to day person to answer? He's not a mgr. I was the mgr.

Was there a time period that IB started becoming more critical/getting more attn.? Doug split the eng'ing team in 2 part. Rebecca didn't want to work on QS even tho that was her original responsibilities. She wasn't paying attn. to it. He decided to split out as a special project. An eng'ing team was established. At that time. They started working with Rebecca's and we got engineers added to it. I don't remember when. The product plan was more in place and we had milestones.

It was kind of a ramp up over time as they were building the product. Who took on QS? I don't remember. I think it was mainly eng'ing. Vince might have stepped in and helped it along, I just don't remember.

**IB Ramp Up.** I think the team was split in 2 in Feb 2014. When did you start adding people to the team? I don't remember when we started adding people to the team.

Was IB a viable product in Feb? It's not an external product. It's an internal tool. I don't think anyone at that point would know it was a viable product or not. They were still talking to sales users ad defining what it would be. They also were doing an eng'ing feasibility I felt and sales ops we were partnering with felt there was something worth pursuing.

**Evaluations.** When is Q1? The performance evaluations used to be a single quarter cycle. Now it's 2 times a year. QI and Q4.

CP's eval. Q1, you gave CP consistently meet expectations, why? Yeah, that was based on talking to HR because she had only worked on my team for ½ the period. It was a balance betw 4th quarter 2013 and Q1 because she switched jobs. Did you talk to anyone from CP's last quarter? I believe I talked to her former mgr, Scott Spencer. I think he said that she had generally performed as a meets/responsibility of job. I forget if she said she was upward trending. His feedback is not in there. I put it in, but I don't know, he's not really the mgr, I am. I put how well she did in her role and put how she was in the ADX role.

**PIP**. When was the eval given? I don't know precise date, but usually shortly after the ¼ has ended. The process starts in March and ends ½ of April. This Q1 ends at end of March. Eval given around being of April 2014? Yeah, I think. But then on 5/1/14, you placed CP on a PIP, why? Generally she wasn't performing well on Frontline on Q1. I put that in here. The meets was given weighing her position on Q4 and Q1. I talked to HR about that and that's what they recommended. From my perspective it's wasn't meets expectations if she had been on Frontline the whole time. That's what I was trying to say in the balance.

How could she not meet expectations if she was getting IB going? There were a lot of expectations that she wasn't. The IB was just one project. It was still early and still an idea and paperwork and trying to work thru things. I received feedback from the sr engineering mgr. Who? Stanley, Bengston and the sales side Hsu. I talked to the other PM Vince Lacey as well. From engineering I heard she wasn't communicating well and wasn't doing written documentation and w/holding things till the last minute. In terms of writing things down, I heard from user interviews that she was biasing what people were saying. As a PM it's very impt to

listen and be unbiased even tho you may have an opinion about where the product is going. It's really impt not to push on the people you talk to because it's very important and very often you learn from the people. I heard feedback she wasn't doing that but more imposing her opinion on people she talked to. She wasn't representing what other people thought accurately. She was dominating meetings with her own way of doing things. Then of course, we had to let QS go and she didn't take on the full scope of what she had been hired for. If there was something she didn't want to do, she'd sort of clam up, which I sort of witnessed myself. I had to go to Seattle because she couldn't work with Michael English on the goals for the team. That was not happening. As a PM it's not just about having a vision and a new idea. It's also about bringing people along, executing, writing docs, going thru the process of getting things approved. It's a combination of leadership, execution and having impact. On a lot of these soft skill things she was not performing well. That's what I wrote on my feedback. "You have lost trust in eng'ing team, you can turn it around." Verbal communication I mentioned. If you need to convince someone at Google, because it's engineering organization, you need to use data. She wasn't doing that. She had kind of her own notion of where she wanted to go. She sort of formed a notion and wasn't trying to help engineering to go along. She didn't become the unified leader of things she was leading on. Resolving road blocks along the way, she wasn't.

Communication well, withholding docs – Michael English. I have that in the calibration notes as well.

Doug Bensgston- she needs to write things down. Poor judgment on when to share. I solicited some feedback from him that I don't have right in front of me. Influence from Bengston as well, which was also in I the calibration.
Form Hsu, I heard that she, I'm trying to recall, she was going to do a survey, which Judy had to step in and help or do it basically. I have some input from her as well. I forget how much of this precisely she said at this time, so I have to go back my notes.
FI asked for all notes that formed the basis for evaluation and PIP.

04/11/14 CP met with Jens who tells her to take 2 weeks leave and she'd get a PIP upon her return - this around the same time she got a consistently meets

Gen'ly the way we think about eval'ing PMs we have a rubric we value people against. The elements in there were things I heard.

- Jacob Baskin –I think he's from NY.
- Woodlee – I don't know him so I assume he's also from NY
  Nir Margalit – I think must also be from NY

CP misrepresented the opinions of others? I heard several times that she would sort of say that someone said something and it turned out they had not said. I heard some of that from Vince. And I think Barbara also told me. I forget who precisely it was, Michael, I forget.

Talk with CP about any of these issues before giving her a PIP. I told her before about some of these issues. Like documentation one, also the communication one, we had conversations about. I think we also talked about the biasing part. I don't quite remember. I was also in SEA in early Feb and I forget precisely what the conversations were, but I did also at 1 point, sort of say it's not, because you do very well on one doesn't mean you can't do well on the other one. It sorts of balances out, you have to cover the various ones. I have some notes form that. But it's been so long. FI asked for those notes. He's try to dig those up. But I certainly did. I clearly remember the documentation.

Talk to anyone b4 placing CP on PIP? I collected input form Stanley and Doug. I think they knew. I don't remember Judy. Vince didn't know. It was a very small group and the mgr level only. A PIP is between you and the mgr and company, not something that people will know about. It doesn't even go in the internet portal we have.

How much do you know about her work? We had one on ones. Generally a PM3 is supposed to work independently. That was the level she was at. I asked people to set up 1 on 1 as they need. I learned thru 1 on 1 and docs she started producing. I went to SEA a couple of times and relied on the feedback I heard from sales and so one. I got a demo in March or so.

Describe rest of performance outside Soft skills? It depends on the time period you're thinking. Around the PIP.? The documents once produced were okay. I thought the direction/vision she had for IB was good. I put in her PE, she had good idea, passion. That was always good.

CP had been there for 5 months, why a PIP. Every placed anyone else on a PIP that's been there for such a short period of time? NO. Every placed anyone else on a PIP? NO, which is why I talked to HR about it. After I got really strong feedback in early April form Bengston and Stanley. Barb or Doug used the word toxic. They were basically saying we have to cut her loose, that sort of thing. That's when I met with HR and summarized what I had heard from them. With HR, we decided that a PIP was the right thing. It was clear to me that she wasn't understanding the feedback I had given her along the way. She did take in the do the writing documentation more. She stated to that , but she basically lost trust with engineering at that point. My experience also from people is that things approved a lot which is why she existed out of the PIP. By that time, I think things were at a much different place. She was listening and following along.

Is a PIP - Disciplinary action - see last page of pip, further unsatisfactory performance can lead to further CA. Yes, it's my understanding.

HSU tells Jens that CP shouldn't proceed with PIP? No, I never heard that. Anyone disagree? I don't remember anybody saying that they disagreed. It's also something I didn't discuss much. It's a private matter. I really didn't discuss it outside HR and mymgr.my mgr

Aware If CP complained of discrimination? I was told about it later, but that was when Aaron was there. A year later. I don't remember, it was Aaron or Arianna. I honestly don't understand it.

Is there a process for mgrs to contact em'ees about doing reviews? What I would do is I'd ask if you have any input good or bad for a person on my team. I combine that with my own observations and create an evaluation.

Did you email CP's peers about evaluating CP and ask them to be honest? I used that with other em'ees as well. [FI asked R's atty to provide email where he asked other em'ees to be honest.]

2014 Q3, evaluated CP as? Meets, which is same as consistently meets. Was IB getting more attn. by this point? I don't think it was becoming a big deal, At that point, they had their prototype out. They were working on the next milestone. IT's hard to know how product works when you're still in the middle of developing it. At that point, the eng'ing team and sales felt that the direction was good. She had kind of won people back and execution was going well.

Why not rate her higher? To get to that level, generally, you have to have impact. We hadn't launched yet. How did you rate Lacy? I don't member. He was also at a different level. He was a level lower. Ever rated him higher? I believe I have given him exceeds, then again at the lower level. I'd have to go back and see.. FI asked Brian for that info.

Did Frontline projects move to LA? All moved to LA. Options given to PMs? Either move to LA to be with engineers or MT View and close to the sales office. Have any involvement in decision to move to LA? No this was an engineering decision. Sales ops was always in Mt. View. Anyone on Frontline in Seattle allowed to cont'ue working on IB and not transfer to SEA? No, they were all given the same option.

Did CP accepted transfer? I'm not aware.

Is IB a success? I think it's become a well like product and used by sales.

What happened to Rebecca after the move? After move, I don't know. I sent her a couple of emails I crafted with HR to ask what her decision was. I think I might have heard back once, the 2d time I didn't hear anything, so I don't really know.

## RECORD OF INTERVIEW

Spivak v. Google
551-2015-00-827

| | |
|---|---|
| Witness: | Dustin Jackson |
| Others Present: | Brian Johnsrud, R's atty |
| FI: | Toni Haley |
| Date: | 10/11/16 |

Do you swear or affirm that the testimony you're about to give is true and correct to the best of your knowledge? Dustin Jackson: I do.

Brian has worked for R for about 10 ½ yrs and been an Eng'ing Director for about 3 ½ yrs. In that time, he's always been located in LA. As Eng'ing Director, he manages an eng'ing organization and a number of eng'ing mgrs report to him. He works closely with Prod Mgmt to determine the overall direction for the products he is responsible. "We try to build software and get launched and make money for the company."

He's responsible for a long list of products that help with the planning of advertising campaigns, including Frontline, for which he's been responsible since around the summer 2014.

The relocation happened in first quarter of 2015.

Familiar with CP's work? Somewhat. She did not report into me. The Prod Mgr (PM) had a different reporting chain. She was 1 of the PMs part of the team responsible for those projects in Seattle. We would have occasional proj reviews I'd sit on. I would try to meet with her and other Prod Mgr when I was in Seattle. She worked on IB. What was your understanding of her involvement of IB? The proj existed when I took over. She was already the PM . She continued to be the PM until the time she left. Did she create IB? I don't really know. I'm pretty confident there wasn't another PM before her. The way these things go, there's a jt collaboration between eng'ing and product to start a project. He hadn't heard of her involvement initiating the project.

Know anything about her perf? I was involved in conversations. This was quite some time ago. What were those conversations? I'm located in LA, so I'm not chatting with anyone in SEA on a day to day basis. During my trips to SEA, one-on-one is where these conversations would come up. The first conversation I had is when I met her for the first time. She brought up she had been on a PIP. Then over the course of the next 6 months, I can remember having conversations with other, Doug Bensgston, Barbara Stanley where they were expressing their frustration with her perf and the pace she was getting work done.

Were they the only ones who expressed frustration to you? No. I spoke with Michael English. He would have brought it up as well. He was the direct mgr for IB. I also would have had conversations with Aaron Rothman, who was effectively her mgr. I believe he asked me for my feedback.

Anything frustration other than pace? There were certainly issues in terms of her interpersonal interactions with the people I mentioned. I don't remember the details. It seemed like there were conflicts fairly regularly.

Who indicated this conflict? I believe I can say with confidence Doug, Barbara, Michael English all told me there were conflicts. I don't think I can remember the specific details.

This was definitely irregular. Was IB a type of project you'd expect no conflict? Yes. There was nothing unusual about this project that would lead the PM to have more conflicts with other people.

Did CP have conflict on Quicksilver? Her involvement on QS predated my involvement. On these projects. I do remember having conversation with Rebecca about whether or not we should use numbers like a system like IB or QS. That definitely.

Conflicts unusual on projects? These were definitely unusual. This level of discord within a team is quite rare. Did you experience any of that discord? It's not like Rebecca and I ever got into any conflict, if that's what you mean. My recollection is - I would try to steer her in the proj to focus on the short term deliverables that were w/i the project's charter and Rebecca kind of insisted on going another direction. I wouldn't characterize it as conflict. It wasn't discord in the same vein as what others in SEA seemed to be experiencing.

Sense that discord was due to CP being a strong female? No. One of the people who I mentioned is Barbara Stanley who's a strong female type leader in engineering team.

Do you remember what Barbara said about her? No, I don't remember the specifics.

How about anyone in sales ops? No, I don't remember. It's possible someone like Judy Hsu would have said something to me, but I don't remember. She was charge of sales op team for the Frontline proj worked with.

Dustin indicated that he never witnessed any discord himself. He just heard about it.

What did Michael English say? My general recollection was, when I first became involved in the proj, Michael said something along the lines that Rebecca can be somewhat difficult to work with; but I need a PM, we're getting things done, so I'm okay. Toward the end, 6 months after I started, the conversations were "we're unable to make progress. It feels like we're fighting all the time. The PRDs I need aren't getting done. This is a blocking issue." Did Michael indicate it was only Rebecca that was responsible for this? Yes.

Would you expect some resistance from team members when CP was trying to change the course they were on? I wasn't involved in the project during this period of time. How about any other project? Would I expect to be some resistance when you change direction - maybe. It really depends on how things are going up to that point. For something like QS, it wasn't going so well. By the time I was involved, the eng'ing team was quite happy with IB as a project and

direction and it gave them something specific and exciting to work on. I'm saying this was when I first got involved. They thought IB was a good proj and excited to be working on it. Were they happy with working with Rebecca? The only person I spoke to directly was Michael English. When I first got involved it was clear there were issues, but he was confident that he was able to work thru them; and, by 6 months later, that wasn't the case. That would be at the end of 2014.

Did you talk to Hsu about CP? I don't remember having a conversation with her about Rebecca.

My primary concerns is the eng'ing on my team.

When you got there, English was telling you? He was telling me there were issues but they were manageable. Six months later, he was telling me they were unmanageable.

Barbara Stanley – I can't remember the specifics of those conversations beyond remembering that Barbara was frustrated with Rebecca.

What did you hear from Bengston? It's sort of the same category as Barbara Stanley. I remember his expressing frustration, but at this point, I can't remember the specifics.

Had Bengston ever reported like communication issues with anyone else? No this was unique to Rebecca.

How about Barbara? Same answer, this was unique to Rebecca.

Soft skills – what does that term mean to you? It's more the interpersonal skills/communication than the analytic. What had you heard about CP's soft skills? I heard she was coming into conflict with the folks she worked with. If CP was male would this still be described as soft skill issues? Sure, absolutely.

Did you have any of those issues? From what I recall, my interactions with her were around proj reviews which we could discuss the direction of the product. She and I never came into direct conflict. I remember sort of getting pulled into when she put together some form of documents that laid out a division for the project that had a functionality w/i another project. Rebecca put together a document putting together where they'd cover benchmarks for search ads, that team reached out to me to express their displeasures. That sort of is an eg of a soft skill issue. It was a question of which product searched benchmarks. Is that unusual? It's quite common for projects to have overlaps and for these types of questions to come up. It was quite unusual the way Rebecca handled it. I've never seen another PM put together a presentation saying this proj is going to do something that is so obviously a course of conflict with another team. Instead, you'd have a conversation one-on-one and come to an understanding and escalate thru your mgmt. team. This led to one of a lot of bad feelings.

Were you involved in CP's reviews? I was not her mgr, but I believe she asked me to write one peer review. I would have done that. Remember what you said? No. Remember if it was positive? I feel fairly confident, knowing myself as a peer reviewer, it would have certainly been

a mix of positive and constructive feedback. You never just want to give someone negative things. I don't remember the specifics but am sure I would have included some constructive feedback.

Feel that she needed to improve in some areas:? Oh yes, everything we've talked about already. This was quite unusual. She was having too many interpersonal conflicts with so many people. It was a clear area for development. Every piece of evidence I saw is that this was caused by issues on Rebecca's' side.

Aware if CP made any complaints/reports of gender discrimination? No, I wasn't aware at all until now, this proceeding.

Would you say that IB is a success? Yeah. Absolutely. Is Rebecca seen as the person who created and developed it? I don't know if I can say yes or no to that question. It's sort of a strange question. I can't think of many projects at Google, where you'd ever point to 1 person who developed it. The nature of things is so collaborate. The team working on it now knows that Rebecca was the original PM and part of shaping that vision.

Can you say positive things about CP? She was clearly very smart. Clearly she cared a lot about the project. She really wanted to see it be successful. She was a strong advocate for the project. From what I remember the work product she produced was good. The pace at which the work was getting done I remember eng'ing saying we need this document and Rebecca still hasn't done it yet. That was about the pace of it. But I remember the quality of the work that was done was good.

Typical for eng's to complain that things aren't going fast enough? Sure I think that's a fair statement.

**Relocation**

Who made the decision to move projects to LA? Ultimately it was my decision. I consulted with my mgr at the time, but it was my dec to make. Who was your mgr? Scott Silver at the time.

What projects were moved? There were 5:

- AMP Media Planner. Was that staffed in LA? Yes. How many? About 7. Were all physically located in LA? Yes. That includes living in LA, versus commuting? Yes.
- Athena: Physically staffed in LA? Yes. How many? About 8. All physically located in LA? Yes.
- IB. About 6 engineers all in LA. Who's PM? Romana Eawar. How long? A year. She was the first PM. It took a while to staff the role.

- Display Oppty Center. Is on hold. When did it go on hold? I don't remember exactly. It's been a while now, I would guess around the end of 2015. At one point was it staffed in LA? Yes. Same PM from Seattle move to LA? No they did not. When it was staffed was everyone on the proj physical located in LA? Yes. How many on project? Approximately 3.

- Display Bid Landscapes.

I am responsible for all, but Display Bid Landscapes. All other still ongoing project, except DOC which is in maintenance mode, not active. The other 3 are in active development.

Did all get moved down to LA and staffed? With exception of DBL, that moved to Mt View.

Display Bid Landscapes: Know who Prod Mgr is? No, we transitioned that to a team in Mt View, It was never in LA. Why was it transitioned to Mt. View? It overlaps with existing Mt View projects. There was a team already working in a closely related area.

Relocation people told Mt. View or LA? Yes. Told which proj was going to LA v. Mt. View? Display Bid Landscapes was very small it had 2-3 engineer working on it.

Know Jens? Yes. Was he involved in any project that moved to LA? Yes. He was responsible for the Frontline project, he was already responsible for AMP and Anthena. Continue to have any responsibility for any project once they transferred to LA? Yes, for all of them. The set of projects Jens was responsible for didn't change. ADP and Athena were still his responsibility.

As far as the eng's, if an eng decided to move to Mt. View, they would need to find a different project to work on. The answer is different for a product mgr.. All eng are her in LA. The offer to Mt. View was the company would pay for relocation, but you have to find a new project.

Why couldn't CP stay in Seattle? For a prod mgr to be effective you need to either be relocated with your engineers or your clients, In this case, sales ops. That's why Mt. View or LA would work. There's one sales op team we worked with on AMP, Athena and IB. There were many members of the team, but one mgr. That was Judy.

When the projs were in SEA, engineers were here and Sales Ops were in Mt. View.

Aware of any proj where PM isn't physically located where sales op or engineers are? No

Relocation offer for PMs? That wasn't my team, but my general recollection is the same offer extended to engineers was extended to PMs as well.

Any PM decide to move? No. Rebecca? I don't remember having any conversation directly with Rebecca about accepting the relocation offer or any details about the project relocation. Everything I heard was 2nd hand thru Jens or Aaron. What did they tell you, by name? I can't remember which I had a conversation with but my recollection was I was told Rebecca didn't give an answer either way.

Did Google want CP to move? [He can't speak for Google.] Did you want CP to move? Sure.

Did Jens? I don't know, all I can say is from an eng'ing perspective, when you move projects everyone gets the same offer. You're not differentiating at all based on someone's perf.

Jens is responsible for IB as a project. Did he ever indicate to you that he preferred that CP not accept the transfer? No.

[CP indicated that she accepted, but was given the impression/indication that R preferred that she not transfer.] I don't remember anything along those lines and that would be a very strange thing to happen. Why? We take these proj moves seriously at Google. On the eng'ing side, if you're moving someone's project, that's a pretty big deal. Someone's put their blood and sweat into it. Never in my wildest dream would I have told an eng I'd prefer that you don't come. I'd be shocked if Jens did.

Where did CP go after the transfer? My recollection is that Rebecca went on leave. I mainly remember that because it became difficult to get an answer if she was going to move with the project. That's all I remember. I don't remember hearing if she came back to Google or found another project.

Before the EEOC charge, were you interviewed by HR about any discrimination issue raised by CP? I don't know when she filed. The only time I talked to HR was after she filed a complaint. I never was interviewed prior to that. I wouldn't even call it an interview. If I recall it was just a meeting to discuss the details of the proj. When was that? It was after the move decision was made.

Did Rothman continue to work on IB from Mt. View? For some period of time after this. Neither Rothman nor Jens are involved in the project at this point. Some number of months after the move, Aaron Rothman left. FB friend with Aaron? I do not have a FB account. Why did Aaron leave? I remember he found a project he thought was more exciting at Google. What was his level at the time he left? I had no idea. While he was on the project with you, had he rec'd any kind of promotion? Not that I recall.

Lacey worked in IB from Mt. View? Vince is still on the project. Know what his level is? I don't.

Michael English? No he didn't opt to move to LA. To the best of my knowledge he's working on another proj in LA.

**TONI HALEY - Re: Rivka Spivak v. Google, 551-2015-00827**

**From:** TONI HALEY
**To:** Johnsrud, Brian
**Date:** 9/30/2016 10:09 AM
**Subject:** Re: Rivka Spivak v. Google, 551-2015-00827

Brian,

I'm currently available Oct 5, 6, 7, 11, (13th before noon), 18, 20, 21, 25, 27, and 28. Please provide a preferred and alternate time and date as my schedule fills up.

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)

>>> Brian Johnsrud <BJohnsrud@chjllp.com> 9/30/2016 8:54 AM >>>

Hi Toni,

I hope all is well. We have traded voicemails on scheduling interviews in the Rivka Spivak matter. I wonder if you could email me available dates in October so that I may coordinate with the witnesses?

Best regards,

Brian

Brian Lee Johnsrud
**Curley, Hurtgen & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
(d) 650.600.5310
(c) 650.722.2733
bjohnsrud@chjllp.com
www.chjllp.com

**TONI HALEY - RE: Rivka Spivak v. Google, 551-2015-00827**

**From:** Brian Johnsrud <BJohnsrud@curleyhessinger.com>
**To:** 'TONI HALEY' <TONI.HALEY@EEOC.GOV>
**Date:** 10/23/2015 4:50 PM
**Subject:** RE: Rivka Spivak v. Google, 551-2015-00827

Hi Toni,

Yes, the telephone numbers are as follows:

Brian Johnsrud: [redacted]

Michael English [redacted]

Have a good weekend,

Brian Lee Johnsrud

**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

**From:** TONI HALEY [mailto:TONI.HALEY@EEOC.GOV]
**Sent:** Tuesday, October 20, 2015 12:01 PM
**To:** Brian Johnsrud
**Subject:** Re: Rivka Spivak v. Google, 551-2015-00827

Brian,

That date and time works fine. I can set up the conference call if you give me numbers to call.

Toni Haley
Investigator
EEOC

909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)
>>> Brian Johnsrud <BJohnsrud@curleyhessinger.com> 10/20/2015 11:59 AM >>>

Hi Toni,

As a follow up to our call this past Friday, Michael English is available for a telephone interview on Friday, October 30 at 2 pm Pacific time. We are happy to use our firm's conference call system or perhaps you have call-in details that you can share?

Best regards,

Brian

Brian Lee Johnsrud
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

**TONI HALEY - Re: Rivka Spivak v. Google, 551-2015-00827**

**From:** TONI HALEY
**To:** Johnsrud, Brian
**Date:** 10/20/2015 12:01 PM
**Subject:** Re: Rivka Spivak v. Google, 551-2015-00827

---

Brian,

That date and time works fine. I can set up the conference call if you give me numbers to call.

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)
>>> Brian Johnsrud <BJohnsrud@curleyhessinger.com> 10/20/2015 11:59 AM >>>

Hi Toni,

As a follow up to our call this past Friday, Michael English is available for a telephone interview on Friday, October 30 at 2 pm Pacific time. We are happy to use our firm's conference call system or perhaps you have call-in details that you can share?

Best regards,

Brian

Brian Lee Johnsrud
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

Curley, Hessinger & Johnsrud LLP
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
**TEL**: 650.600.5300
**FAX**: 650.323.1002
www.curlleyhessinger.com

# Curley, Hessinger & Johnsrud

COUNSELORS AT LAW

## FAX MESSAGE

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENTS NAMED HERE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

**SEND TO**

| | | | |
|---|---|---|---|
| Name: | Hattie Y. Reed | Company: | U.S. Equal Employment Opportunity Commission |
| FAX #: | 206.220.6921 | Telephone #: | 206.220.6921 |

**FROM**

| | | | |
|---|---|---|---|
| Name: | Brian L. Johnsrud | | |
| Telephone #: | 650.600.5310 | FAX #: | 650.899.1998 |
| Date Sent: | August 13, 2015 | Number of Pages: *(including cover page)* | 1 |

**COMMENTS**

Dear Ms. Reed:

We are legal counsel to Google Inc. in connection with the charge filed by Rivka Spivak, No. 551-2015-00827.

The charge is dated July 20, 2015, though not received by Google until August 3, 2015.

Due to the summer vacation season and intervening Labor Day Holiday, we intend to respond as necessary to the charge by no later than September 18, 2015. (We have requested administrative closure of the charge due to Ms. Spivak's pending arbitration where she makes the same allegations.)

Thank you for your attention to this matter and please contact me if you have any questions.

Very truly yours,

CURLEY, HESSINGER & JOHNSRUD LLP

Brian L. Johnsrud

**TONI HALEY - Rivka Spivak - EEOC Charge No. 551-2015-00827**

**From:** Lynette Pola <LPola@curleyhessinger.com>
**To:** "'hattie.reed@eeoc.gov'" <hattie.reed@eeoc.gov>
**Date:** 8/14/2015 7:29 AM
**Subject:** Rivka Spivak - EEOC Charge No. 551-2015-00827
**Attachments:** Spivak - Fax Ltr Reed.pdf

---

Dear Ms. Reed,

Please see the attached correspondence regarding the above-referenced matter.

If you have any questions or comments, please contact Brian Johnsrud directly at either bjohnsrud@curleyhessinger.com or 650.600.5310.

Thank you.

Sincerely,

**Lynette Pola**
Legal Assistant
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
Direct: 650.600.5301 | Main: 650.600.5300 | Fax: 650.323.1002
Email: lpola@curleyhessinger.com
Assistant to: Brian L. Johnsrud, Victoria R. Carradero, Patrick Sherman, Lindsey K. Schroeder, & Emilie Smith Petirs

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

**TONI HALEY - RE: Rivka Spivak v. Google, 551-2015-00827**

**From:** Brian Johnsrud <BJohnsrud@chjllp.com>
**To:** 'TONI HALEY' <TONI.HALEY@EEOC.GOV>
**Date:** 10/7/2016 4:14 PM
**Subject:** RE: Rivka Spivak v. Google, 551-2015-00827

---

Hi Toni,

Here are the dial in details for our calls next week:

Toll free: 1-800-714-9581
Passcode: 650 617 3268

Have a good weekend,

Brian

Brian Lee Johnsrud
**Curley, Hurtgen & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
(d) 650.600.5310
(c) 650.722.2733
bjohnsrud@chjllp.com
www.chjllp.com

---

**From:** TONI HALEY [TONI.HALEY@EEOC.GOV]
**Sent:** Wednesday, October 05, 2016 10:39 AM
**To:** Brian Johnsrud
**Subject:** RE: Rivka Spivak v. Google, 551-2015-00827

Brian,

The date and times work fine. Let's go ahead and use your firm's conference line. Let me know what number to call.

Thank you,

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400

Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)

>>> Brian Johnsrud <BJohnsrud@chjllp.com> 10/5/2016 10:36 AM >>>

Hi Toni

Jens Skakkebaek can talk with you on Tuesday, October 11 at 11:30 am.

Dustin Jackson, who can speak to the relocation of several projects, including the one worked on by Spivak, can talk on October 11 at 3 pm.

Please confirm those times work. We can use our firm's conference line unless you have another conference line you prefer.

Just let me know,

Brian

Brian Lee Johnsrud
**Curley, Hurtgen & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
(d) 650.600.5310
(c) 650.722.2733
bjohnsrud@chjllp.com
www.chjllp.com

---

**From:** TONI HALEY [mailto:TONI.HALEY@EEOC.GOV]
**Sent:** Tuesday, October 04, 2016 11:23 AM
**To:** Brian Johnsrud
**Subject:** RE: Rivka Spivak v. Google, 551-2015-00827

Great, let me know as soon as you can.

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)

>>> Brian Johnsrud <BJohnsrud@chjllp.com> 10/3/2016 1:53 PM >>>

Thank you, Toni. I'm working to confirm October 11 for both witnesses and should be able to confirm later today. Brian

Brian Lee Johnsrud
**Curley, Hurtgen & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
(d) 650.600.5310
(c) 650.722.2733
bjohnsrud@chjllp.com
www.chjllp.com

**From:** TONI HALEY [mailto:TONI.HALEY@EEOC.GOV]
**Sent:** Friday, September 30, 2016 10:10 AM
**To:** Brian Johnsrud
**Subject:** Re: Rivka Spivak v. Google, 551-2015-00827

Brian,

I'm currently available Oct 5, 6, 7, 11, (13th before noon), 18, 20, 21, 25, 27, and 28. Please provide a preferred and alternate time and date as my schedule fills up.

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)

>>> Brian Johnsrud <BJohnsrud@chjllp.com> 9/30/2016 8:54 AM >>>

Hi Toni,

I hope all is well. We have traded voicemails on scheduling interviews in the Rivka Spivak matter. I wonder if you could email me available dates in October so that I may coordinate with the witnesses?

Best regards,

Brian

Brian Lee Johnsrud
**Curley, Hurtgen & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
(d) 650.600.5310
(c) 650.722.2733
bjohnsrud@chjllp.com
www.chjllp.com

**TONI HALEY - RE: Spivey v. Google, 551-2015-00827**

**From:** Brian Johnsrud <BJohnsrud@curleyhessinger.com>
**To:** 'TONI HALEY' <TONI.HALEY@EEOC.GOV>
**Date:** 9/21/2015 8:58 AM
**Subject:** RE: Spivey v. Google, 551-2015-00827
**Attachments:** Rivka Spivak - EEOC Charge No. 551-2015-00827

---

Hi Toni,

It was good speaking briefly with you last week regarding the Spivak charge. I checked our files and we had emailed Ms. Reed some time ago about responding on September 18, see attached. Nevertheless, we apologize for any confusion on the timing of Google's position statement. As I mentioned this past Friday, Google's position statement should be received by your office today by Federal Express. We believe we have thoroughly addressed Ms. Spivak's allegations, though certainly let me know if you have any follow up questions.

Very truly yours,

Brian Lee Johnsrud
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

---

**From:** TONI HALEY [mailto:TONI.HALEY@EEOC.GOV]
**Sent:** Friday, September 18, 2015 10:36 AM
**To:** Brian Johnsrud
**Subject:** Spivey v. Google, 551-2015-00827

Mr. Johnsrud,

I am the investigator assigned to the above-referenced charge. This is to advise you that the EEOC change will not administratively close the charge and will continue with its investigation. Please provide Google's response to the charge directly to me by next Friday, September 25, 2015. You may send the response by US mail, email or fax.

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)

**CURLEY, HESSINGER & JOHNSRUD LLP**
COUNSELORS AT LAW
4400 BOHANNON DRIVE
SUITE 230
MENLO PARK, CA 94025
www.curleyhessinger.com

Telephone: 650.600.5300
Facsimile: 650.898.1998

**Brian L. Johnsrud**
**650.600.5310**
**bjohnsrud@curleyhessinger.com**

see full letter in brown file

September 14, 2015

**VIA FEDERAL EXPRESS**

Hattie Y. Reed
U.S. Equal Employment Opportunity Commission
Seattle Field Office
909 First Avenue, Suite 400
Seattle, WA 98104-1061

SEP 21 2015
EEOC SEATTLE

Re: *Rivka (Rebecca) Spivak v. Google Inc.*
EEOC Charge No.: 551-2015-00827

Dear Ms. Reed:

The following position statement is submitted on behalf of Google Inc. ("Google") in response to the above-referenced complaint of alleged discrimination and retaliation filed by complainant Rivka (Rebecca) Spivak ("Spivak"). As set forth below, there is no factual nor legal merit to her claims.

Spivak is a Product Manager at Google. This means she helps develop new products. To do so, she has to work effectively with software engineers (who build the products) and sales operations employees (who rely on the products). These employees thus become key contributors to Spivak's performance reviews.

Spivak's performance history is uneven and inconsistent. She has very good product ideas. Turning those ideas into products, however, has not gone well or smoothly. Spivak has regularly failed to build productive relationships with engineers and sales operations employees. She also has failed to consistently produce the documentation necessary to drive product development. These concerns are shared by male and female employees alike.

As a result of her performance shortcomings, Spivak was demoted in 2011 by a female Vice President. Spivak does not claim that demotion was discriminatory. Following that demotion, Spivak's performance has generally met expectations, albeit on the low end at times, which at one point resulted in her being placed on a Performance Improvement Plan, which she satisfied.

Spivak disagrees with her "meets expectations" rating and believes she should be rated as "exceeds expectations." Spivak has not received that higher rating because she continues to

## TONI HALEY - Spivey v. Google, 551-2015-00827

**From:** TONI HALEY
**To:** bjohnsrud@curleyhessinger.com
**Date:** 9/18/2015 10:35 AM
**Subject:** Spivey v. Google, 551-2015-00827

---

Mr. Johnsrud,

I am the investigator assigned to the above-referenced charge. This is to advise you that the EEOC change will not administratively close the charge and will continue with its investigation. Please provide Google's response to the charge directly to me by next Friday, September 25, 2015. You may send the response by US mail, email or fax.

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)

**TONI HALEY - RE: Spivey v. Google, 551-2015-00827**

**From:** Brian Johnsrud <BJohnsrud@curleyhessinger.com>
**To:** 'TONI HALEY' <TONI.HALEY@EEOC.GOV>
**Date:** 9/21/2015 8:58 AM
**Subject:** RE: Spivey v. Google, 551-2015-00827
**Attachments:** Rivka Spivak - EEOC Charge No. 551-2015-00827

Hi Toni,

It was good speaking briefly with you last week regarding the Spivak charge. I checked our files and we had emailed Ms. Reed some time ago about responding on September 18, see attached. Nevertheless, we apologize for any confusion on the timing of Google's position statement. As I mentioned this past Friday, Google's position statement should be received by your office today by Federal Express. We believe we have thoroughly addressed Ms. Spivak's allegations, though certainly let me know if you have any follow up questions.

Very truly yours,

Brian Lee Johnsrud
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

**From:** TONI HALEY [mailto:TONI.HALEY@EEOC.GOV]
**Sent:** Friday, September 18, 2015 10:36 AM
**To:** Brian Johnsrud
**Subject:** Spivey v. Google, 551-2015-00827

Mr. Johnsrud,

I am the investigator assigned to the above-referenced charge. This is to advise you that the EEOC change will not administratively close the charge and will continue with its investigation. Please provide Google's response to the charge directly to me by next Friday, September 25, 2015. You may send the response by US mail, email or fax.

Toni Haley
Investigator
EEOC
909 First Avenue, Suite 400
Seattle, WA 98104-1061
(206) 220-6854
(206) 220-6911 (fax)

Curley, Hessinger & Johnsrud LLP
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
**TEL**: 650.600.5300
**FAX**: 650.323.1002
www.curlleyhessinger.com

# Curley, Hessinger & Johnsrud

COUNSELORS AT LAW

## FAX MESSAGE

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENTS NAMED HERE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

**SEND TO**

Name: Hattie Y. Reed
Company: U.S. Equal Employment Opportunity Commission
FAX #: 206.220.6921
Telephone #: 206.220.6921

**FROM**

Name: Brian L. Johnsrud
Telephone #: 650.600.5310
FAX #: 650.899.1998
Date Sent: August 13, 2015
Number of Pages: *(including cover page)* 1

**COMMENTS**

Dear Ms. Reed:

We are legal counsel to Google Inc. in connection with the charge filed by Rivka Spivak, No. 551-2015-00827.

The charge is dated July 20, 2015, though not received by Google until August 3, 2015.

Due to the summer vacation season and intervening Labor Day Holiday, we intend to respond as necessary to the charge by no later than September 18, 2015. (We have requested administrative closure of the charge due to Ms. Spivak's pending arbitration where she makes the same allegations.)

Thank you for your attention to this matter and please contact me if you have any questions.

Very truly yours,

CURLEY, HESSINGER & JOHNSRUD LLP

Brian L. Johnsrud

**RODERICK USTANIK - RE: Spivak's EEOC charge - No. 551-2015-00827**

**From:** Brian Johnsrud <BJohnsrud@curleyhessinger.com>
**To:** "'nancy.sienko@eeoc.gov'" <nancy.sienko@eeoc.gov>, "'roderick.ustanik@ee...
**Date:** 8/5/2015 4:31 PM
**Subject:** RE: Spivak's EEOC charge - No. 551-2015-00827
**CC:** Jillian Cutler <jcutler@frankfreed.com>

+ Mr. Ustanik

Yes, I believe Mr. Frank's email below confirms why this charge should be administratively closed: the charging party has subsequently commenced arbitration proceedings on the underlying allegations and "intends to pursue her Title VII claims in arbitration." The claimant is represented by legal counsel and thus has the benefit of being fully advised of the administrative process versus the arbitration process. Google thus respectfully requests the administrative closure of Charge No. 551-2015-00827.

Very truly yours,

Brian

Brian Lee Johnsrud
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

**From:** Steve Frank [mailto:sfrank@frankfreed.com]
**Sent:** Wednesday, August 05, 2015 3:15 PM
**To:** Brian Johnsrud; 'nancy.sienko@eeoc.gov'
**Cc:** Jillian Cutler
**Subject:** RE: Spivak's EEOC charge - No. 551-2015-00827

Mr. Johnsrud and Ms. Sienko, I just received a phone call from Rod Ustanik of the EEOC about the email string below.

In the conversation with Mr. Ustanik I made it clear that, in my email to Mr. Johnsrud below, it was my assumption that the EEOC would administratively close my client's EEOC charge when it learned that she had filed for arbitration with JAMS.

Mr. Ustanik told me that the EEOC's administrative closure policy might or might not apply to a case where the charging party had filed for arbitration.

I would like to make it clear that my client is not asking the EEOC to administratively close her case. She intends

to pursue her Title VII claims in arbitration, along with her New York and Washington state law claims.

If, as I assume, Google is asking the EEOC for administrative closure, then our position is that the EEOC will need to deal with that request pursuant to its normal procedures, understanding that my client is bound by her employment agreement with Google to arbitrate her claims.

Steven B. Frank
Frank Freed Subit & Thomas LLP
705 Second Ave., Suite 1200
Seattle, WA 98104
Phone: 206-682-6711 Fax: 206-682-0401
Email: sfrank@frankfreed.com

---

**From:** Brian Johnsrud [mailto:BJohnsrud@curleyhessinger.com]
**Sent:** Wednesday, August 05, 2015 8:06 AM
**To:** 'nancy.sienko@eeoc.gov'
**Cc:** Steve Frank
**Subject:** Spivak's EEOC charge - No. 551-2015-00827

Dear Ms. Sienko,

We are counsel to Google Inc. in the above-referenced charge, a copy of which is attached for ease of reference.

Subsequent to the execution of the charge, the charging party commenced an arbitration before JAMS regarding the same allegations. A copy of her Arbitration Notice of Claims and Remedies Requested is attached.

In light of these pending arbitration proceedings, we request that the EEOC administratively close the charge. My email exchange with the charging party's counsel on this matter is set forth below and I have copied him on this email.

Please let me know if you have any questions.

Best regards,

Brian

Brian Lee Johnsrud
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

---

**From:** Steve Frank [mailto:sfrank@frankfreed.com]
**Sent:** Tuesday, August 04, 2015 6:03 PM
**To:** Brian Johnsrud
**Subject:** RE: Spivak's EEOC charge

Brian, I think if you notify the EEOC, they will close the case administratively.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------
From: Brian Johnsrud <BJohnsrud@curleyhessinger.com>
Date: 08/04/2015 10:32 AM (GMT-08:00)
To: Steve Frank <sfrank@frankfreed.com>
Subject: Spivak's EEOC charge

Hey Steve –

Hope all is well. It looks like Ms. Spivak signed her administrative charge before she commenced the arbitration proceedings. My assumption is that you have (or will shortly) let the EEOC know about the underlying proceedings so that a right to sue letter is issued? Please let me know.

Best regards,

Brian

Brian Lee Johnsrud
**Curley, Hessinger & Johnsrud LLP**
Counselors at Law
4400 Bohannon Drive, Suite 230
Menlo Park, CA 94025
direct: 650-600-5310
cell: 650-722-2733
fax: 650-899-1998
bjohnsrud@curleyhessinger.com
www.curleyhessinger.com

Equal Employment Opportunity Commission

**REQUEST FOR INFORMATION**

**Charging Party**: Rivka Spivak
**Respondent**: Google
**Charge No.**: 551-2015-00827

1. Give the correct name and address of the facility named in the charge along with a point of contact for further correspondence.

2. Submit a written position statement on each of the allegations of the charge, accompanied by documentary evidence and/or written statements, where appropriate. Also include any additional information and explanation you deem relevant to the charge.

3. Submit copies of all written rules, policies and procedures relating to anti-discrimination, including sex discrimination and retaliation. If such does not exist in written form, explain the rules, policies, and procedures.

4. Provide a copy of all performance documentation maintained on Charging Party, including performance evaluations, disciplinary actions, counselings, and commendations.

5. Explain why you disciplined Charging Party and/or provided low-scoring evaluations regarding her performance, providing a copy of all documentation that supports those reasons.

6. Provide a list in Excel Spreadsheet format, from May 1, 2013 to the present, of all those disciplined and/or given poor evaluations by the same individual(s) that made the recommendation and/or decision to discipline and/or evaluate Charging Party by full name, sex/gender, dates of employment, and job title, in addition to the full name, sex/gender, dates of employment, and job title of supervisor(s) and/or decision maker(s), and date(s) and reason(s) for discipline and/or poor evaluations.

7. Document and explain why Charging Party needed to relocate to California, as it is stated in the charge, providing a copy of all documentation that supports those reasons. Provide a list of all those who were expected to relocate for similar reasons as Charging Party by full name, sex/gender, dates of employment, and job title, in addition to the full name, sex/gender, dates of employment, and job title of supervisor(s) and/or decision maker(s), and date(s) and reason(s) for the relocation.

8. State whether Charging Party sought the promotion(s) described on the Charge of Discrimination. Provide a statement from the selecting official(s) that explains the reasons for not promoting Charging Party and the reason(s) you promoted the successful candidate(s).

9. Submit a copy of applications, tests, evaluations, if applicable, and all other documents which set forth or contribute to the determination of qualifications for the position described in the charge for Charging Party and the person(s) selected.

10. Provide the full name, sex/gender, date of promotion, and job title of the successful candidate(s).

11. Provide records or descriptions of all complaints made by Charging Party. Explain your response to the complaint[s] and provide copies of written records of your inquiry, including but not limited to complaint statements, a description of all verbal complaints, e-mail correspondence, witness statements, interviews with employees, and investigative notes, interviews, reports, and/or memoranda, and the result(s) of each complaint.

RECORD OF INTERVIEW

Case Name: Spivak v. Google
Charge Number: 551-2015-00827

Witness: Michael English
Others Present: Brian Johnsrud, R's atty
Telephone No. [redacted]
Investigator: Toni Haley
Date: 10/30/15

Do you swear or affirm that the testimony you're about to give is true and correct to the best of your knowledge? Michael English: I do.

Michael is a software engineer for R. He directly manages about 20 people. He has been with R about 10 ½ yrs. When he started, Jen Skaateback was managing the Project Mgrs (PM) engaged with Mike's team.

Starting about Jan 2014, he worked very closely with CP, a PM. A PM's role is to try to develop a vision for what R should be building, what the business justification for that is, why they should be building. PMs work closely with engineering, who take the high level ideas and determine what they're going to build to solve the problem. It becomes a back and forth between PMs and engineers.

He worked with CP on a project from Jan 2014 to March 2015 which eventually got the name Interactive Benchmarks (IB). It didn't have a name initially; they were trying to figure out what to do.

**I asked about CP's technical skills.** "She did a great job helping us figure out what to do. She helped up figure out that direction. Another aspect of that is documenting that and making the idea more concrete. Initially, we had difficulty seeing eye–to-eye on that. You need to come up with a vision. Your work product is communication, providing the groundwork for that. Getting everyone on the same page, communicating that to the end team. She was reluctant to do that initially. Eventually, she did quite well at documenting things." He doesn't remember the timing, but at some point she started producing real documentation. It was early on. They eventually had a summit where they brought in sales ops people and engineers and a lot of documentation was produced at that time – he'd guess this was around spring 2014.

I asked if the difficulties he had with CP's documentation created difficulties. It created some difficulty for him, he wanted to figure out which direction they were going to go. There were also other people on his team that were reluctant to change w/o first understanding what was being proposed.

The positives and negatives boil down to that. We had lot of brainstorming and lots of arguments about whether she should produce the detailed documentation. Jens wasn't involved the arguments.

When there was a performance review, Jens asked for his feedback. Michael gave Jens approximately the same feed back as he just gave to the EEOC. They didn't talk about it, it was an email exchange. There was only 1 email exchange about CP between Jens and Michael. When he talked to Jens, he thinks he

made it clear that CP"s documentation was a problem. I asked how closely did he work with Jens Skaakebaek. Not closely. Jens came to me because I worked closely with CP.

I asked how he would rate CP's performance. Michael wasn't CP's mgr and doesn't know what her rating was. He doesn't have the expertise to determine how much this or that is worth.

I asked CP what "Googleyness" meant. It's not super well defined. People can interpret it different ways. He would interpret it as a person is kind and respectful to teammates, interested and excited about getting things done.

As for Rivka's Googleyness, "I need a while to think about it. It's strange to slot that in. I guess it is reasonable. She certainly is interested in learning and going after big ideas. The degree she didn't want to do things everyone thought was as important is not as Googley.'

I asked for his impression about Jen's and CP's working relationship. "At some point, she started complaining. I don't remember specifics, just that she didn't think she had a good working relationship with him. She obviously told me that she was put on a PIP. I don't know if she told me why specifically. I want to say because of documentation, but I don't remember if it was documentation." He's just assuming that that's what it was related to.

I asked if CP complained to him that she believed she was being treated differently because of her sex. "At some point she started talking about that. I don't remember the time frame. She said something along the lines that because she had proposed a change and was a woman, and that was seen as a negative thing, whereas if she was a man, that was a positive thing. At some point, she started saying this." I asked how often. Michael had difficulty guessing and finally estimated that it was around 10 times. I asked if CP made the same comment each time. She did.

At some point, he understood that she was complaining about discrimination. He didn't understand her complaints to be sex discrimination. "She was clearly complaining to me." I asked if it was his obligation as a mgr to report discrimination? "I probably should have, but there wasn't any specific person that was a target she was complaining of. I didn't think about it at the time."

"We had conversations and maybe around 10 occasions, she talked about this. All the conversations pretty much took that form."

I asked if he was aware of whether CP complained to anyone else in mgmt. "I don't know if she complained, but at some point she indicated she was talking to HR about being treated differently because she a female." Michael doesn't remember anything else. He doesn't remember if she told him what she said to HR. He doesn't think she told him who in HR she was talking to.

I asked if he told CP to talk to HR. Michael doesn't remember if he did.

I asked how much training he had about discrimination. Managing within the law, unconscious basis and a follow up on how to prevent situation. Managing within the law is every 2 yrs. He doesn't know if the other 2 trainings have a recurring schedule. He doesn't remember any other training.

I asked if he had any reason to believe that Jens was discriminating v. CP because she was female. No.

He never saw any of CP's evaluations.

I asked if it was different to work with CP versus males. "She was different to work with than males. The best way to describe it is we would have discussions and they were more like discussion as equals than other previous PMs." He and CP were both the same level (6). Before that, PMs would defer to his opinion more. I asked if deferring to his opinion was a good thing. "I don't think that 's a great thing." I asked if it was good that CP challenged him. It was.

He's worked with 2 other female PMs. 1 challenged him; the other didn't.

Of the male PM's, he's worked with 2 male PM. The current PM challenges him; the other did not so much.

He didn't have any reason to believe that any implicit bias was happening with CP. The reason is they were having success.

I asked if CP was critical to the IB project. "She was ultimately critical to the success of the project. Initially she did a great job coming up with the idea. She convinced me the idea was good. The next thing was we got to get this down and make sure we go in the right direction, this was difficult, and slowed things down but we ultimately got over it and the project was a success.

I asked if it would have been a problem had they lost CP. Had they lost CP and not been able to replace her with someone that would have been a problem. His personal opinion was most people are not unique and had they been able to find a replacement, the product would have been okay.

The key insight from a products perspective was it was much more focused on what the user needed. Previous efforts had been missing the mark. Before CP joined, he was starting to have the realization that some things they were doing weren't going to be successful and they needed to switch direction. The PM on previous stuff was focusing more and more on different things, so a large part of his team was left without a PM.

There was no IB project before CP came. There was just this realization. His team was doing a variety of different things. He was realizing they weren't a great path to go down. And they needed to find something different. I asked if any PM would do. Not just any PM would do.

I asked if he would he expect CP to get high evaluation if the project was successful. Not until it launches. Once you're [level] 6, your eval is tied to your measurable successful. I noted that he said they were having success and asked if the project was successful. We had an alpha launch in Dec 2014, then a Beta launch in March 2015. Realistically that launch is the one we're seeing lots of usage. Viral. Beyond the ones we released it to. That's the subjective measure of success.

I asked about his evaluations from 2013-15. He was meet expectations once he got promoted to 6 until the spring 2015, where he got an "exceeds." He was promoted to 6 when he was on the team. It might have been early 2013.

I asked that, since the project was seen as successful, would he expect CP to have the same increase. He would.

He had a team of people who worked on projects. Some projects weren't great. He asked for ideas on different things they could do. They brought CP in. She came in Jan 2014. Both were a level 6.

**Feb relocation announcement.** Doug Bankson, his mgr and an engineer, at the time was moving to a different part of R and all the projects under him were moving to LA. He'd say 5 projects were under him.

All projects were relocated. He doesn't think any of the PMs relocated. Most moved on to something different. A couple PMs stayed on in a transitory role for a time and moved onto something different. 1 stayed with the project, Vince Lacey. He's located in Mt. View. He doesn't think Vince relocated. He thinks CP went on medical leave.

Vince was a PM of a product that transferred to LA. Vince reported to Jens, then changed to Aaron. He never reported to Doug

I asked if PMs need to be with project or if they were allowed to work a different location that where the project engineers worked. They're definitely allowed to work remotely. He personally thinks it's more effective when they're right there, but they're allowed to.

He has no idea if CP was allowed to work remotely.

Of the 5 projects, the only projects he knows for sure that's still going is IB and Ads Media Planner. He doesn't know who the PM on the IB is.

Aaron Rothman was the PM brought in to lead the PM for all of the sales tools under Doug.
That was most , but not all of Doug's projects.

**Leave**. I asked if he took a 4-day leave in Jan 2015 to go to Hawaii and how much advance notice he gave. He did, but he doesn't remember how much advance notice he gave.

He doesn't know if here's a policy on how much advance time is needed to request.

**Misc.** I asked if he believed CP created inventions which led to sell/advertise Google services and she did not get credit for it. He thinks the IB project certainly helped advertisers. I don't know she didn't get credit for that though.

I asked how likely was for R to change PMs when a product is believed to be successful. It happens and is called defragged (defragmentation). It happens, he doesn't know how often.

**Promotions.** 2 engineering on his team rec'd promotion while working on project: Serhiy Tykhansky and Yamcheng LNU

Michael has since moved to a new organization. He's in supply chain. HE thinks he could get promoted.

Generally, the key to being promoted is you put together a promotion packet, provide all background info on the projects you worked on, how impactful they were. If your rated meet expectation, it's not likely you'll get a promotion, but not impossible. I asked if him being rated as exceeds in March make it more likely that he'll be promoted. Having a rating in March 2015, doesn't have much impact. He's done a number of things since then which will help -- he joined the supply chain organization, joined a team and grew a nonexistent team and built out a new planning product for the service supply chain for R . Those accomplishments are likely why he can get promoted soon.

**CP's complaints of sex based discrimination.** At some point in time, CP came to him and said I'm proposing a change and think that's a negative, but if I was male, that it would be a positive. Largely, his response was, "We're meeting with success. These changes you proposed, people are open to them, we just need to be more specific about what you're suggesting."

He didn't have similar documentation problems with other PMs, male or female.

551-2015-00827

551-2015-00827
SPIVAK, Rivka (Rebecca) v.
Google (Tabs C & D)

551-2015-00827
SPIVAK, Rivka (Rebecca) v.
Google (Tabs C & D)

551-2015-00827
SPIVAK, Rivka (Rebecca) v.
Google (Tabs C & D)

Use pending statement

genuine each issue of material fact

• [illegible]
• [illegible]
• [illegible]


**OfficeMax®**

| Item No. | Size | Expansion |
|---|---|---|
| F10M01560 | Letter | 1.75" |
| F10M01559 | Letter | 3.5" |
| F10M01551* | Letter | 3.5" |
| F10M01561 | Letter | 5.25" |
| F10M01562 | Legal | 3.5" |
| F10M01533 | Legal | 5.25" |

*2/5 Cut Tab

Minimum 10%
Post-Consumer
Recycled Content
MADE IN MEXICO

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

*Via Email and U.S. Mail*

October 15, 2015

Toni Healy
Investigator
Equal Employment Opportunity Commission
Federal Office Building
909 First Avenue, Suite 400
Seattle, WA 98104-1061

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

2015 OCT 15 PM 12 RECEIVED

**Re:** ***Rivka (Rebecca) Spivak v. Google***
**EEOC Charge No. 551-2015-00827**

Dear Ms. Healy:

Steve Frank and I represent Ms. Spivak in the above claim.

Ms. Spivak experienced years of both implicit and explicit gender bias as a female Product Manager in Google's male-dominated workplace. She was disciplined, downgraded, marginalized, and ultimately pushed out of projects *she* created for failing to comply with gender stereotypes and complaining about her mistreatment. I am writing in advance of your upcoming phone interview with Ms. Spivak to provide you with additional information and evidence demonstrating that Google discriminated and retaliated against Ms. Spivak.

STEVEN B. FRANK
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX
MUNIA F. JABBAR

First, enclosed please find an excerpt (pages 1-19, with attachments) of Mr. Frank's June 18, 2015 letter to Kent Walker, Senior Vice President General Counsel of Google, setting forth the factual and legal bases for Ms. Spivak's gender discrimination and retaliation claims. Exhibit A. This letter provides the EEOC with a more detailed picture of the insidious gender discrimination and retaliation Ms. Spivak experienced at Google.

Second, Google has provided us with a copy of the position statement it submitted to the Agency on September 14, 2015. That letter deeply distorts Ms. Spivak's experience at Google. Indeed, Google has gone as far as to submit altered evidence to the Agency. Exhibits 13 and 14 of Google's position statement include emails Ms. Spivak sent using her personal Gmail account to a group email list of

her college friends. However, Google has selectively redacted certain emails to convey the false impression that Ms. Spivak was not devoted to her job. Google's decision to alter evidence and submit it as authentic is not only deeply troubling but also exposes the weakness of its position. *See, e.g.,* Exhibit B (comparing redacted and full versions of emails cited by Google).[1] I am writing to correct the record regarding Google's distortions of the factual record in this case.

In an effort to defeat Ms. Spivak's failure to promote claim, Google asserts that Ms. Spivak was "demoted" in 2010 and that "even Spivak agreed she was not ready to be promoted in 2013." Neither claim is accurate. First, Ms. Spivak was not demoted. Rather, she was "down-slotted" shortly after arriving at Google. Approximately half of Google employees are "down-slotted" from the level for which they were recruited. Those employees routinely go on to ascend Google's promotional ladder. In Ms. Spivak's case, she was down-slotted despite wide-spread recognition that it was too soon to "slot" her, she had not yet been assigned to a team, and, as a result, was not in a position to demonstrate her true capability and value. As one of her peers aptly put it, "Although she'd never say it out loud, Rivka appears to be between a rock and a hard place. She has no engineers and no clear product mandate (yet). Until this situation is resolved, it's hard to assess her effectiveness in the typical Google PM sense." *See* Exhibit 3 at 7 of Google's Position Statement.

Second, Ms. Spivak never indicated she was not ready for promotion. Employees at Google submit one of two on-line forms for their annual performance reviews. The first is the standard review form and the second is for employees who are initiating the promotion process with their managers' support. Ms. Spivak asked her then-supervisor, Scott Spencer, to support her for promotion in 2013 and he refused. Mr. Spencer expressly instructed Ms. Spivak not to select the "promotion" review option. Complying with Mr. Spencer's direction does *not* mean Ms. Spivak "agreed she was not ready to be promoted."

Next, Google goes to great lengths to present Ms. Spivak as a person with "big ideas," who fails to document and execute those ideas. The historical record belies this claim. It is true that Ms. Spivak had the "big idea" to replace Google's floundering AMP/Quicksilver program with Interactive Benchmarks ("IB"). Ms. Spivak developed IB after participating in countless meetings with Google sales teams who were dissatisfied with the existing system, responding to their concerns, and carefully documenting the case for IB with extensive data. Ms. Spivak will make her documentation of IB available to the Agency upon request. Google's claim that Ms. Spivak could not execute on her big ideas is a red herring. It is indisputable that Ms. Spivak successfully launched IB and that it swiftly overtook the AMP/Quicksilver platform.

---

[1] We also suspect that Exhibit 3 of Google's position statement is selectively edited, but do not have access to the original document at this time.

Google's claim that Ms. Spivak failed to collaborate effectively with her colleagues also misses the mark. Ms. Spivak worked most directly with Engineering Manager Michael English and his team of 12 engineers. Mr. English quickly became one of her greatest champions. Similarly, the engineers who reported to Mr. English – and who worked directly with Ms. Spivak – reported widespread satisfaction with Ms. Spivak's work and leadership. In January of each year, Google administers "Goolegeist," a survey given to each employee allowing them to provide feedback about their work and coworkers. The survey responses are anonymous. Based on the information available to us, we believe that data will show that Ms. Spivak's team registered higher ratings than any of the teams led by her male colleagues for (1) overall satisfaction with the Product Manager performance; (2) satisfaction with the documentation related to their work; (3) satisfaction with the speed of product launches; and (4) the high impact of the team's work. Moreover, in his first performance review of Ms. Spivak, in the fall of 2014, Mr. English stack-ranked Ms. Spivak higher than her predecessor, Vince Lacey.

We encourage the EEOC to interview Mr. English and to request the Googlegeist data that his engineering team submitted about Ms. Spivak.

Google's suggestion that Ms. Spivak manufactured a gender discrimination complaint for job protection is entirely unwarranted. Ms. Spivak complained about gender discrimination *repeatedly* in the year prior to the relocation of her IB team to California. Ms. Spivak complained about discriminatory treatment on or about April 2, April 4, and May 5, 2014. She complained formally to Human Resources and to Global Compliance. The latter complaint was routed to Employee Relations and treated internally as a gender discrimination complaint. Ms. Spivak reported that Engineering Manager Doug Bengston was unfairly criticizing her and trying to drown out her voice. In addition to challenging her discriminatory PIP, Ms. Spivak complained that Mr. Bengston told her she was "too ambitious," criticized her for "pushing ideas," and warned her she did not fit in Google's (overwhelmingly male) engineering culture. These are gendered complaints. Indeed, it is hard to imagine Mr. Bengston would fault a male PM for the same conduct. Mr. English will confirm that Ms. Spivak raised concerns about experiencing gender discrimination – including the April 2014 PIP – with him and others long before the February 2015 discrimination complaint highlighted in Google's position statement.

In defense against Ms. Spivak's retaliation claim, Google asserts that five teams and 31 software managers were "impacted" by the February 2015 relocation. In fact, IB was the *only* team that was actually relocated from Seattle to California. It is our understanding that the four other teams were decommissioned and de-staffed. Therefore, while those teams were "moved" to California on paper, they were never staffed, and the engineers who had been working on them were reassigned to other teams.

Google makes much of Ms. Spivak's heated exchange with Mr. Rothman in January 2015. Understanding the full context of their exchange is critical. Mr. Rothman and Ms. Spivak were meeting to discuss her performance review. By that time, IB had successfully launched. However, Mr. Rothman told Ms. Spivak that he was downgrading her performance rating to a "low meets" because of her "excessive leave." Ms. Spivak had taken two leaves in December and January. The first was an approved FMLA leave for her 2-year-old daughter's surgery. When Ms. Spivak's colleagues asked Mr. Rothman why she was out of work during that time, he told them, "She is just being petulant and temperamental." The second leave was personal time she took after learning that a surrogate mother lost Ms. Spivak's second child. Even though she had vacation time available, Mr. Rothman insisted Ms. Spivak did not provide sufficient advanced notice. Mr. English took the same time off, with the same amount of notice, and was not reprimanded. Ms. Spivak cursed at Mr. Rothman after enduring months of discrimination and in direct response to being told her performance rating was being down-graded because she took approved FMLA leave for her daughter's surgery and vacation days to grieve her pregnancy loss.

We believe the EEOC's investigation will reveal that Mr. Rothman is a misogynist who has no place managing Google employees. Mr. Rothman routinely uses social media to publicly demean women in the tech industry and working mothers. Exhibit C is a sampling of material Mr. Rothman has posted on his Facebook page.[2] For example, he posted a parody of the iPad called "ePad Femme" with the tagline "Finally a tablet simple enough for a woman to use." The screen features aps on women's fitness, weight loss, clothes, shopping, and cooking. Mr. Rothman has commented, "Perfect gift for the little woman in your life." *Id.* at 3. A second example is a link to an article entitled, "Study: Men secretly feel terrible when the women they love succeed." Mr. Rothman, suggests: "Ladies: better to lean out?" *Id.* at 4. In response to a comment asking, "Does the same hold true for gay couples?" Mr. Rothman states, "I think it's easier to consider each other as equals in a gay relationship." *Id.* An example of Mr. Rothman's anti-working-mother posts includes a link to an article entitled, "Are you too clever to be a mother? Maternal urge decreases by a QUARTER for every 15 extra IQ points." *Id.* Another post pictures two women wearing headscarves, to which Mr. Rothman comments, "Back in the kitchen, women!" We are confident these publicly-available posts are just the tip of the iceberg and that Mr. Rothman's Google emails and/or Facebook page will uncover further evidence of gender bias.

///

///

///

[2] Mr. Rothman uses the pseudonym "Baron Von Roth" on Facebook. Ms. Spivak can confirm that the content and photographs posted are Mr. Rothman's. *See* Exhibit C at 1-2 (Mr. Rothman profile picture and cover photo).

Ms. Spivak and I look forward to speaking with you tomorrow.

Sincerely,

Jillian M. Cutler

JMC/nf
Enclosures
cc: Rebecca Spivak

A

# EXHIBIT A

FRANK FREED
SUBIT & THOMAS LLP
ATTORNEYS AT LAW

June 18, 2015

*Via Email & U.S. Postal Service*
*kwalker@google.com*

**This Letter Contains An Offer Of Compromise And Is Not Admissible In Evidence Under ER 408.**

Kent Walker
Sr. Vice President & General Counsel
Google
1600 Amphitheatre Parkway
Mountain View, CA 94043

HOGE BUILDING
705 SECOND AVENUE
SUITE 1200
SEATTLE, WASHINGTON
98104-1798

*Phone* (206) 682-6711
*Fax* (206) 682-0401

RE: *Rivka Spivak and Google*

Dear Mr. Walker,

I represent Rebecca Spivak. I am writing to set out my client's complaints of pregnancy and gender discrimination, retaliation, FMLA interference[1]; and to discuss possible early resolution of these claims.

## I. Facts

STEVEN B. FRANK
CLIFFORD FREED
MICHAEL C. SUBIT
JOYCE L. THOMAS
SEAN MARSHALL PHELAN
BETH BARRETT BLOOM
JILLIAN M. CUTLER
CHRISTIE J. FIX

Google hired Ms. Spivak in 2010 for a position as Product Manager in New York. Ms. Spivak has both an undergraduate and master's degrees from Yale in computer science and an MBA from Harvard. Throughout her career she has been a technology innovator, leading company-critical strategies involving complex data.

### 1. Ms. Spivak's Work in New York.

As an employee of Google in New York, Ms. Spivak was assigned to lead the Admeld Integration project in December 2011. In January 2012, she told her manager, Scott Spencer, Director of Product Management, that she was pregnant. A few weeks after that conversation, Mr. Spencer assigned Jarid Magid, a 25-year-old male, to the project. My client was soon eased out of the project. Admeld proved very successful. *See* RS-216.[2] Mr. Magid was ultimately promoted because of Admeld. *Id.*

[1] This letter focuses on my client's claims for gender discrimination. If these claims are not resolved, Ms. Spivak reserves the right to claim interference with her FMLA rights.
[2] Exhibits referred to as RS-# are in Attachment A hereto.

From February to August 2012, Mr. Spencer did not give Ms. Spivak any meaningful product ownership. As a result she had no chance to launch new products, which is critical to career success at Google.

From August 2012 until January 2013, Ms. Spivak was on maternity leave. Before she went on leave, Mr. Spencer told her on numerous occasions that, once she looked at her newborn baby, she would not be returning from maternity leave. Although Ms. Spivak protested, Mr. Spencer told her he had seen it many times before.

Employees are normally notified of stock grants in July of each year. Ms. Spivak received no stock grant for 2012 or 2013, probably because Mr. Spencer had not assigned her any meaningful work. When Ms. Spivak asked Mr. Spencer about the stock grant, he said that she was already well paid and that not everyone gets stock grants. Google positions stock grants to encourage employee retention and as a reward for an employee's "future potential." It is our understanding that all employees receive a stock grant each year unless their manager overrides the default assignment and secretly assigns a low performance indicator that the employee is unable to see.

Ms. Spivak's career at Google in both New York and Seattle shows that when given the opportunity to perform meaningful work, she comes through in a spectacular fashion.

In February 2013, my client was assigned AdX Buyside. This product was thought not to matter, had low customer engagement, and had not been staffed in two years. Ms. Spivak was supposed to make cosmetic (as opposed to functional) changes. She talked to the customers and learned that the AdX Buyside platform *did* matter, but hadn't been built right. Customers were not using AdX Buyside because they could not see the inventory that they were supposed to buy. They also could not tell what had gone wrong if their ads did not produce the results expected. Ms. Spivak formulated multiple strategies from her research and had three huge and successful AdX Buyside launches in the fourth quarter of 2013 (all praised as revenue-generating).

Google promoted the male engineers with whom my client worked on AdX Buyside. Noam Wolf was running the front end of AdX Buyside with one or two engineers reporting to him, doing cosmetic work. After AdX Buyside took off because of Ms. Spivak's efforts, Mr. Wolf's career also took off. Mr. Wolf was twice promoted and now manages 55 employees. Nir Margalit, who praised my client for driving the work he did, was also twice promoted because of these product launches. After Ms. Spivak transferred to Seattle, Drew Bradstock, a co-worker of my client who was hired at about the same time and for approximately the same position (PM, Level 6), took credit for AdX Buyside, listing my client's 2013 accomplishments on his 2014 performance review. Mr. Spencer promoted Mr. Bradstock twice.

In November 2013, Mr. Spencer rated Ms. Spivak as "Meets Expectations." RS-219-21. The evidence will show that Mr. Spencer's evaluation of Ms. Spivak was colored by the fact that he assumed she would not return to Google once she became a mother and stopped giving her meaningful work until after she proved him wrong and did return. By that time, Mr. Spencer had come to see Ms. Spivak as a short-term

female employee with low output and low potential. In fact, when Mr. Spencer did give Ms. Spivak meaningful work to do, it was excellent. Ms. Spivak should have been rated "Exceeds" in November 2013.

**2. Ms. Spivak Transfers to Seattle and Exposes AMP/Quicksilver Failings.**

Ms. Spivak transferred to Seattle at the end of 2013. She was assigned to work as a Product Manager on the Pitchable Insights and Estimates ("PIE") team with Michael English, an Engineering Manager. My client's supervisor was Jens Skakkebaek, the manager of Sales Tools, including Frontline and PIE. Mr. English's supervisor was Doug Bengtson, Engineering Manager for Frontline. Mr. Bengtson oversaw the teams. Vince Lacey was the PM assigned to AMP.

Ms. Spivak's assignment was to identify the needs of Google account managers, create an approach to meet those needs, validate that the approach would be successful, and help the PIE team develop insights that would be helpful to Sales and customers.

In January 2014 customers were provided campaign performance estimates through AMP and Quicksilver. Quicksilver is an algorithm-based program that integrates with AMP, a work flow program. Together they produced a "pitch" with estimates for Google's salespeople to give to customers that purported to predict the number of clicks, impressions, cost etc. per advertising-dollar spent by the customer in a particular medium.

Starting in January 2014, Ms. Spivak interviewed the salespeople about AMP/Quicksilver, and learned that its predictions were completely inaccurate. The sales group did not use it, and some reported losing sales and customers because of AMP/Quicksilver's inaccurate predictions. Ms. Spivak met with Global Product Expert Amanda Nowak on February 4, 2014. Ms. Nowak confirmed what my client had been hearing about AMP/Quicksilver estimates – namely, that the estimates were inaccurate and therefore not useful to Sales.

Beginning on February 5, 2014, Ms. Spivak tried to discuss her findings with Engineering (Doug Bengtson). Mr. Bengtson was unhelpful and defensive. Ms. Spivak invited Engineering to sit in on the interviews with Sales. Mr. English agreed and sat in on several interviews. Mr. Bengtson did not. Ms. Spivak asked for data to assist her, and Engineering (Bengtson) refused to supply the data.

On February 19, 2014, Ms. Spivak met with John Maletis, Director of Sales Operations, who was senior to Mr. Skakkebaek. She told him that incremental improvements to Quicksilver could never approach the 20% accuracy that Sales wanted, and that she had confirmed this with the internal Statistics teams. Mr. Bengtson later confirmed this conclusion stating, "There is way, way more variance than 20% … let's just say we shouldn't count on that happening." Ms. Spivak shared her idea, which ultimately became Interactive Benchmarks. Mr. Maletis was surprised to learn the limits of Quicksilver and was receptive to her ideas, promising to encourage Amanda Nowak to investigate further.

**3. Ms. Spivak Designs Interactive Benchmarks to Replace AMP/Quicksilver.**

AMP/Quicksilver was problematic because the programs were not transparent, the customer could not see how the estimate was produced, and the customer was being asked to rely on the accuracy of "black box" formulas that were neither available nor verifiable. But my client determined from her interviews and statistical research that Quicksilver' estimates were usually off by a factor of two or more. Sales repeatedly told Ms. Spivak that a black box estimate needed to reliably be within 80% to 120% of reality to be useful and fair to customers. Analyses performed by Mr. English and others confirmed that AMP/Quicksilver were unreliable. Ms. Spivak designed a solution, Interactive Benchmarks, which took a different approach to advising customers how to spend their advertising dollars.[3]

That same month, Mr. Skakkebaek promoted Ms. Spivak's peer, Vince Lacey, to be the Interim Frontline lead. Ms. Spivak, not Mr. Lacey, should have been promoted to Interim Lead. Ms. Spivak was a Level 6 with 12 years of PM experience, four of them at Google. Mr. Lacey was a Level 5. My client had hugely successful launches on AdX. Issues were surfacing about AMP, Mr. Lacey's project. He had recently transferred from Sales to PM.[4]

On February 28, 2014, Ms. Spivak asked for a one-on-one meeting with Mr. Skakkebaek. RS-260. Her concern was that feedback from sales on Quicksilver was extremely negative and that she was in a tricky situation with respect to Engineering, which had built the product. She characterized the feedback as "pretty harsh," but "consistent with the issues she had been raising over the last month" and asked Mr. Skakkebaek, her supervisor, for help. Mr. Skakkebaek never met with Ms. Spivak.

On March 6, 2014, Mr. Skakkebaek sent an email noting that John Maletis, a sales leader to whom Mr. Skakkebaek answered, had emphasized that estimates had become a big problem, that he was not sure why, that account managers had confirmed that a launch of Unified Estimates[5] would help, and that my client's ideas for transparency (that is, Interactive Benchmarks) would be a good step forward. RS-048-49. Mr. Skakkebaek suggested it made sense to more heavily invest in Unified Estimates.

Ms. Spivak replied that she did not believe the launch of Unified Estimates "will address the core issue behind estimates – which is that we shouldn't be providing 'estimates.'" RS 48-49. She explained:

> We need a fairly substantial shift in thinking away from estimates, and on to exposing an interactive sandbox of historical information. The core

[3] Ms. Spivak is recognized as the creator of Interactive Benchmarks in the Q2/Q3 2014 Performance review, RS-071-75. See the comment of Michael English at RS-073 ("[s]he formulated a product vision and strategy, now what we call Interactive Benchmarks.")

[4] Mr. Lacey was not a good choice for lead. It soon became apparent that he could not handle the position, and Mr. Skakkebaek allowed the position to become vacant. Later, Mr. Skakkebaek filled it with Aaron Rothman.

[5] "Unified Estimates" was an attempt to identify which algorithm produced the estimate. It failed because it did not provide the customer with verifiable information.

> issue is that 'estimates' is the wrong paradigm. We can't be successful because no one can reach the accuracy necessary in a sales situation...and it's setting everyone up for failure to expect that we (or anyone) can.

*Id.* Ms. Spivak advocated that Google enable Sales to interact with historical data. That proposal ultimately became Interactive Benchmarks. RS-048. Mr. Bengtson told her that, unless she had the perfect solution, she could not criticize the existing system (AMP/Quicksilver).

On March 20, 2014, Ms. Spivak sent out a Product Requirements Document ("PRD") on benchmarks, and how to move forward. The next day she emailed Engineering and Mr. Skakkebaek a roadmap and asked for feedback. She received none. The next day, Ms. Spivak told Mr. Skakkebaek that she had been trying to get access to data from Engineering to prioritize features, but that Engineering refused to share its data. Mr. Skakkebaek told her to "make things right" with Engineering and offered no other assistance.

On March 25, 2014, Ms. Spivak was facing mounting hostility from Mr. Bengston and emailed Mr. Skakkebaek. RS-653-55. In the subject line of the email she wrote, "If you read one doc, please read this one." Her email stated the "current estimate functionality does not solve the business problem" and that "[w]hat sales needs for estimates is not what Quicksilver is structured to do." Ms. Spivak's email sought to create a common understanding to deal with changing priorities as the limitations of Quicksilver became better understood by Sales. She sought to discuss solutions including starting from scratch. Mr. Skakkebaek did not respond to Ms. Spivak's email. Google ultimately adopted this very solution, starting from scratch with Interactive Benchmarks.

On April 2, 2014, Ms. Spivak reached out to Google Human Resources Representatives Caroline Bremner and Paul Higson for help because Mr. Bengtson was becoming hostile and Mr. Skakkebaek would not help her. RS-009. She told Ms. Bremner that her voice was being drowned out by the men on the engineering team.

On or about April 3, 2014, Mr. Skakkebaek informed Ms. Spivak that Interactive Benchmarks would be staffed. Initially, the staff consisted of Mr. English and Ms. Spivak. By August, as Interactive Benchmarks's reputation as a critical and exciting project grew, engineers flocked to the team. Interactive Benchmarks' team grew to 10 people in subsequent months, as the AMP team shrank. Everyone wanted to join Interactive Benchmarks.

**4. April 2014 Summit Meeting.**

On April 9, 2014, Ms. Spivak participated in a Summit meeting sponsored by Judy Hsu from Sales Ops to showcase Interactive Benchmarks and contrast it with AMP/Quicksilver. Ms. Spivak had worked closely with Sales Ops preparing the data-driven case for Interactive Benchmarks. In preparation for the Summit, Ms. Spivak created spreadsheets and compiled data from dozens of interviews she had conducted. Ms. Hsu and Sales Ops felt the Summit was a great success. Ms. Hsu described the summit presentation as a paradigm shift from the "black box methodology in

AMP...which users don't understand or trust" to Interactive Benchmark's increased transparency and quality of estimates. RS-011-12. Ms. Hsu described the essence of Ms. Spivak's idea which was to "focus on providing historical data (benchmarks) in an interactive environment that gives the user full control of inputs they care about...." *Id.* Ms. Hsu also reported that Anas Osman, Mr. Maletis' then-manager, was "thrilled that we as a team are thinking about a step change in our approach". RS-011. Ms. Spivak forwarded this laudatory email to Mr. Skakkebaek.

Barbara Stanley rated the meeting as the "best and most productive summit I have ever attended. I'm really happy with our plan for pushing ahead with interactive benchmarks while using Eng resources most efficiently." In contrast, Mr. Bengtson attended the summit meeting and sat with his arms folded in disapproval.

On April 11, 2014 – just nine days after her report to Human Resources and two days after the Summit – Ms. Spivak met with Mr. Skakkebaek, eager to discuss her recent success. Remarkably, Mr. Skakkebaek told Ms. Spivak to take two weeks of leave, and that she would be getting a PIP when she returned. RS-059. Ms. Spivak protested that a PIP did not make any sense. She was in charge of estimates, and determined that Google's current solution to estimates, AMP/Quicksilver, was not being used. She identified the core issue and proposed a solution that was the right product and the right strategy. Mr. Skakkebaek responded by saying, "PM isn't a strategy role."[6]

On April 14, 2014, Ms. Spivak complained to Human Resources Representative Higson but, once again, got nowhere.

**5. Ms. Spivak's May 2014 Performance Review and PIP.**

On May 1, 2014, Mr. Skakkebaek gave Ms. Spivak a poor performance review and a performance improvement plan. RS 17-20; 36-37. While Mr. Skakkebaek was Ms. Spivak's manager during the period covered by the PIP, she did not work with him. Mr. Bengtson was leading the project. The available performance ratings were Needs Improvement, Meets Expectations, Exceeds, Strongly Exceeds, and Superb. "Exceeds" is average. Approximately 1/3 of Google employees rated are below "Exceeds" and approximately 1/3 are above "Exceeds." Mr. Skakkebaek rated Ms. Spivak as "Consistently Meets Expectations," but was inclined to rate her even lower, as "Needs Improvement" *Id.*

The evidence will show Mr. Bengtson drove the negative review and that a fair assessment of her work would have rated Ms. Spivak as "Strongly Exceeds." Mr. Skakkebaek criticized Ms. Spivak in communication, leadership and "googlelyness." The PIP warns that Ms. Spivak's verbal communication with other PMs and the Engineering team needed to be clear and compelling, accurate and complete. These criticisms are not well taken. The PIP does not give any examples of unclear or inaccurate communications with other PMs or Engineering.

---

[6] Based on the job description prepared by Mr. Skakkebaek, the PM job is clearly a strategy role. RS-249-50.

In sharp contrast to Mr. Skakkebaek's unsupported criticisms, Ms. Spivak received peer feedback recognizing her as "true visionary" (Margalit RS-019), "just short of genius" (Feldman RS-017), "clever" (Woodlee, RS-017), a "great partner with sales" (*id.*), "strong PM with amazing potential to do big things" (Feldman RS-019). The peer feedback credited Ms. Spivak with having created or produced products that was really needed (Baskin, RS-017), and which received universally positive customer feedback (Feldman, RS-018). Ms. Spivak's peers routinely complimented her clear and effective communications. Senior Staff Software Engineer Baskin said "Rivka does a great job of gaining a clear-eyed and comprehensive understanding of any area she works in," and "speaks her mind clearly and persuasively." RS-019.

Remarkably, Mr. Skakkebaek stated that Ms. Spivak needed to "make statements that are based on thorough understanding and well-founded in use cases that are backed by more than just a few data points." RS-036. Once again, the PIP gives no examples. The evidence will show that Ms. Spivak's research into AMP users was far more thorough than any other comparable research relating to advertising. Her statements were not unsupported. The questions she raised in early 2014 about AMP/Quicksilver proved to be precisely right. Quicksilver was "deprecated," that is, abandoned in June or July 2014. Ms. Spivak's project, Interactive Benchmarks, has taken off. AMP is struggling.

The PIP stated that Ms. Spivak needed to improve being seen as a proactive leader within the Engineering Department. At the time the PIP was written, Ms. Spivak's advocacy for Interactive Benchmarks engendered the wrath of Mr. Bengtson and other men who were spearheading a failed technology. Ms. Spivak had reached out to Mr. Skakkebaek for help and he simply did not respond. The PIP offers no explanation as to how she could be perceived as a leader by Engineering under these circumstances, or why it is her failing that she was not.

The PIP listed as an area of improvement that my client should "listen more and expect to learn from [her] colleagues." In other words, keep quiet and defer to your male colleagues. At the time of the PIP, Ms. Spivak had created Interactive Benchmarks, which was taking a totally different approach to estimating than AMP/Quicksilver had taken. Google adopted her approach, but then disciplined her for offering it.[7]

Google policy, "Managing Low Performance 2015," (RS-021-34) requires that a PIP should have been preceded by "previous discussions." (RS-025.) The fact is that there were no discussions between Ms. Spivak and Mr. Skakkebaek or anyone else about the criticisms first raised in the PIP. On May 2, Ms. Spivak told Ms. Hsu that she had been placed on a PIP. Ms. Hsu managed a team and held a senior role, and was the person in Sales who most closely knew Ms. Spivak's work firsthand. Ms. Hsu was "stunned." Mr. Skakkebaek had specifically asked her if Ms. Spivak was a problem and should receive a PIP. Ms. Hsu had told Mr. Skakkebaek that a PIP was not justified, that Ms. Spivak was a strong performer, that Google and Sales needed her, and that the

[7] The PIP also faults Ms. Spivak for using her laptop in meetings. In fact, everyone at Google uses his or her laptop in meetings, but only Ms. Spivak was singled out for discipline.

work she was doing was critical. Ms. Hsu told my client that in addition to being stunned, she was insulted and confused that Mr. Skakkebaek had proceeded with the PIP despite her feedback.

**6. Ms. Spivak Continues to Raise Gender Discrimination Complaints to No Avail.**

On about May 5, Ms. Spivak made an internal complaint about the gender discrimination she had been experiencing. Cindy Treolar of Employee Relations was assigned to investigate, but ignored Ms. Spivak's request to interview Mr. English. One month later, Ms. Treolar told Ms. Spivak that her concerns were not valid.

Ms. Spivak also discussed the PIP directly with Mr. Bengtson. When she asked why she was given a PIP in her first quarter in Seattle, Mr. Bengtson said that sometimes someone is so problematic that they need to be pushed out right away. When she protested that things were going well and that the Summit had been a success, Mr. Bengtson claimed "everyone" was against her. He said she should question whether she was the problem, and asked whether she really wanted to be on the PIE team if everyone was against her. Mr. Bengtson ignored the fact that Ms. Spivak had staunch supporters including Mr. English in Engineering, Ms. Hsu in Sales, and Mr. Maletis in Sales Ops. Ms. Spivak replied that Interactive Benchmarks was a good project and was going to be a big deal. She had already done a lot of work on it, and that it would earn her a promotion. Mr. Bengtson responded, "You don't need a promotion. Level 6 is a perfectly acceptable plateau for a PM. I don't see you as a Level 7."

When Ms. Spivak told Mr. English about the PIP, he expressed surprise and anger. He told her things were going well and had not been consulted or informed about the PIP even though Ms. Spivak was Mr. English's PM. He was most familiar with her work, as they worked closely together. It is astonishing that he was neither consulted nor informed about the PIP.

Mr. Skakkebaek wanted Ms. Spivak to address the concerns raised in the PIP. On May 9, 2014, she emailed Mr. Skakkebaek and reiterated that the PIP was unjustified. RS-056-57. Ms. Spivak pointed out that she had been doing a good job and would continue to do so. She asked Mr. Skakkebaek to review her Q1 work so he could see for himself. He refused. When she mentioned that the Summit had gone very well, Mr. Skakkebaek asked if she thought Mr. Bengtson would say things were going well.

Ms. Spivak met Human Resources Representative Bremner on May 27, 2014. Ms. Spivak reiterated the concerns she had raised in April about the unfair and biased treatment she experienced whenever she spoke up, and the discriminatory performance review she had received. Ms. Bremner dissuaded Ms. Spivak from making a formal gender discrimination complaint at that time.

In July 2014, Mr. Skakkebaek notified Ms. Spivak that she had successfully completed the PIP, but warned that any future recurrence of unsatisfactory performance may result in further corrective action. RS-328-31. My client did nothing differently between May 1 and July 8, 2014, when the PIP was completed. She understands that Mr. Skakkebaek interviewed Ms. Hsu and Mr. English to support taking her off the PIP.

Mr. Skakkebaek did not include Ms. Hsu or Mr. English as reviewers on Ms. Spivak's original performance review, even though they were the Sales and Engineering leads who knew my client's work best. Mr. Skakkebaek knew Ms. Hsu and Mr. English would support Ms. Spivak. He had spoken informally to Ms. Hsu, received a good report about my client, and had specifically avoided Mr. English, who was known to be a strong supporter.

**7. Aaron Rothman Promotion and Media Review.**

In July 2014, Mr. Skakkebaek informed Ms. Spivak she would be reporting to a new lead, Aaron Rothman. Mr. Rothman had never been a manager before. In contrast, Ms. Spivak had previous management experience, but apparently was not considered for the position of lead.

In August 2014, Mr. Rothman scheduled himself to present Interactive Benchmarks to Neal Mohan, the Vice President in Charge of Display, in a Media Review the next month. Mr. Mohan has the power to fund or kill projects that were presented during the Review, and to significantly reward the product managers who impressed him. Mr. Rothman had not been involved in the creation or implementation of Interactive Benchmarks. Ms. Spivak had to intercede to ensure that she – not Mr. Rothman – present Interactive Benchmarks. (In contrast, Mr. Rothman had scheduled Vince Lacey, a male peer of my client, to present on his project, AMP).

While Ms. Spivak was ultimately permitted to make the presentation, Mr. Rothman imposed strict limits on what she was could present. Less than 24 hours before the Media Review, Mr. Rothman changed the presentation to say that Interactive Benchmark's only purpose was to allow Sales to compare an advertiser to its competition. That statement framed Interactive Benchmarks as a redundant tool serving a secondary business need and minimized its importance as a critical pitching tool that would generate substantial revenue for Google. Mr. Rothman also instructed my client not to address the planning/future uses of Interactive Benchmarks – its most promising and compelling use – unless she was directly asked to do so.

Mr. Rothman's attempt to silence my client and minimize Interactive Benchmarks is deeply troubling. Mr. Rothman knew or should have known that Interactive Benchmarks, not AMP, should have been given prominence on the issue of forward-looking performance metrics/estimates. It was well known at that time that AMP's estimates were off the mark and that Interactive Benchmarks was addressing this forward looking need. At that time, Interactive Benchmarks had progressed far enough that Ms. Spivak would have been able to show that Interactive Benchmarks could be used for pitching to customers and creating insights, but Mr. Rothman did not permit her to demonstrate Interactive Benchmark's full capabilities.

Ms. Spivak's presentation could have been important to Interactive Benchmarks. She could have shown Mr. Mohan that Interactive Benchmarks solved the problems presented by the inaccuracies in AMP/Quicksilver (and other black box tools that estimated clicks per advertising dollar). The presentation could have been extremely important to Ms. Spivak, because it would have showcased her efforts to Mr. Mohan.

Instead, as a result of Rothman's changes in her presentation, Interactive Benchmarks became seen as a tool for counting clicks as part of a pitch that depended on black box estimates rather than a powerful tool that could be used to examine relevant historical sales data to predict the efficacy of future spends of advertising dollars. Mr. Rothman's changes allowed Mr. Lacey, who was presenting on AMP, to be seen as working on the powerful strategic planning tool.

Later that week, after Ms. Spivak had been prevented from presenting her work to Mr. Mohan, she independently reached out to Principal Business Analyst David Goodman, with whom she had collaborated in New York. RS-362. Mr. Goodman also reported to Mr. Mohan and held a senior role in driving Google's Display strategy. Ms. Spivak presented Mr. Goodman with the same demonstration that she had prepared to give to Mr. Mohan. Mr. Goodman was extremely impressed and told Ms. Spivak, "We need this. We've needed someone to build this. This is big. You should also talk to Michelle Sarlo and the Online Publishers Group at Google. This is game-changing."

Mr. Goodman directly encouraged Ms. Spivak to share Interactive Benchmarks' progress with the sell-side of the business. Ms. Spivak continued to prioritize Frontline as the primary use of Interactive Benchmarks, and also shared status with other interested teams at Google.

Mr. Rothman continued to dismiss Ms. Spivak's views on Interactive Benchmarks just as one of several opinions, and suggested that her opinions were not "data-driven plans." In fact, Ms. Spivak was the subject-matter expert on benchmarks and estimates.

In September 2014, Ms. Spivak approached Mr. Bengtson and asked if he would support giving her an "Exceeds Expectations" because she was hoping to be promoted. Mr. Bengtson replied he would not. He said Ms. Spivak did not need to worry about getting an "Exceeds Expectations" because Level 6 was perfectly acceptable as a plateau.

**8. Ms. Spivak's Q2/Q3 Review.**

On September 24, 2014, Mr. Skakkebaek proactively contacted the peers slated to write feedback for Ms. Spivak's Q2/Q3 review. Managers do not typically contact peer reviewers once they have been scheduled. Mr. Skakkebaek's message urged reviewers "to be completely honest." RS-069. The reviewers reached out to Ms. Spivak and told her they had never seen such a request. They understood Mr. Skakkebaek was asking them to give Ms. Spivak a negative review. Gautam Sawhney reported that he was "offended" by the request and had told his manager, Ms. Hsu. Paul McClinton told my client that it was "very weird."

On October 3, 2014, Ms. Spivak met with Mr. Jackson, Mr. Bengtson and Mr. Rothman to present the 2015 vision for Interactive Benchmarks. During the meeting, Ms. Spivak communicated the long-term applicability of Interactive Benchmarks. RS-386. She shared the comments and feedback from Mr. Goodman and others. She also demonstrated how Interactive Benchmarks could have uses in more than one line of

business. Mr. Bengtson and Mr. Jackson did not want her to mention more than one line of business.

Ms. Spivak's male colleagues vacillated between minimizing the importance of Interactive Benchmarks and claiming credit for her vision and work. In his October 2014 performance review, Mr. Bengtson took credit for the birth of Interactive Benchmarks, barely crediting my client. Mr. Bengtson claimed he "[w]orked with Sales Ops to define need for more comprehensive benchmark solution in AMP, Interactive Benchmarks was borne of these discussions."

Based on Ms. Spivak's achievements through November 2014, she should have been rated "Strongly Exceeds," and promoted to a Level 7. However, Ms. Spivak's male supervisors devalued her contributions as a woman. In her November 2014 Q2/Q3 performance review, Ms. Spivak was rated "Consistently Meets Expectations." RS 71-75. Once again, peer reviewers uniformly lauded her vision, insight and understanding of benchmarking. Dustin Jackson, a director of Software Engineering, wrote, "[s]he is very focused on building the products that matter for our users and using her own knowledge and investigations to decide on exactly what that is (rather than relying solely on the opinions of others). Paul McClinton, a Principal Account Manager, said that she met Google's need for "accurate and insightful projections." Gautam Sawhney, Sales Operations Manager, commented on Ms. Spivak's "amazing ability to visualize the success of a product from an end user's perspective."

In sharp contrast, Mr. Rothman damned Ms. Spivak with faint praise. He cited her key strength as "effectively prioritizes tasks" – marginalizing her accomplishments to those of a follower, contradicting the years of consistent feedback from those who worked most closely with Ms. Spivak that acknowledged her strength as a strategic leader. Mr. Skakkebaek, Mr. Rothman and Mr. Jackson criticized her "soft skills." Mr. Skakkebaek said my client "needs to be sensitive to the audience and tailor the message accordingly." Mr. Jackson said she should "modulate her message to the appropriate audience." Mr. Rothman made unsupported and untrue statements such as that "the data does not necessarily align with'' Ms. Spivak's views. But the data *did* align with her views. Both Ms. Stanley and Ms. Hsu specifically recognized my client's conclusions as "data driven."

**9. Google Downgrades Ms. Spivak for Taking Approved FMLA Leave.**

Ms. Spivak is a single parent who chose to have a child without a partner. Mr. Rothman openly questioned that decision and told her he did not understand why she would do that. Ms. Spivak's two-year-old daughter had surgery on December 26, 2014, and she took an approved two-week leave to care for her daughter. Ms. Spivak followed all of the right policies and protocols. She gave Google advance notice, offered to provide Mr. Rothman documentation from her daughter's surgeon supporting the leave, and was available to colleagues by email during the leave. Ms. Spivak's leave was legitimate and authorized. Nonetheless, Mr. Rothman told Ms. Hsu that my client was not at work during the leave to care for her child because she was "petulant and temperamental."

Ms. Spivak took a second leave later in January because she was having a second baby through a surrogate mother, and the surrogate lost the baby. Ms. Spivak properly filed her leave in Google's leave system, notified Mr. Rothman and others about the leave, and designated a primary contact person in her absence. Ms. Spivak specifically coordinated the leave time with Mr. English, with whom he worked most closely. On January 14, 2014, Mr. English took four days of vacation on short notice to go to Hawaii. With English's encouragement, Ms. Spivak decided to use her saved vacation days for leave to grieve for her lost baby.

In early February, Mr. Rothman informed Ms. Spivak that he was downgrading her performance review to "Low Meets" because of the two leaves of absence. *See* RS-434.

**10. Ms. Spivak Renews Her Gender Discrimination Complaints and Google Relocates Frontline to Los Angles.**

In February 2015 , Mr. Rothman told Ms. Stanley that Mr. English needed to be "harder" on Ms. Spivak (even though he was her peer, not her supervisor) and that Mr. Rothman hoped Ms. Spivak would "just leave" Google. From February 3 to February 26, 2015, Ms. Spivak made a number of specific written complaints about the discrimination, FMLA interference, and unfair treatment she was experiencing and Google's previous failure to intervene.[8]

On February 11, 2015 – only eight days after Ms. Spivak's February 3 discrimination complaint – Google announced that Interactive Benchmarks and the other projects in Frontline were being transferred to LA. The email was signed by Mr. Jackson, Scott Silver, and Mr. Skakkebaek. They offered the Frontline team the option of moving to L.A. with their project or remaining in Seattle and transitioning to another project. The email was delivered to the Frontline team in an all-hands meeting. However, Mr. English had been given advance notice by Mr. Bengtson and Mr. Jackson so he would not be caught off guard. Neither Mr. Skakkebaek, Mr. Rothman, Mr. Bengtson, nor Mr. Jackson made any attempt to give Ms. Spivak the same advance notice offered to Mr. English.

Two days later, Ms. Spivak met with Mr. Jackson, Mr. Skakkebaek and Mr. Rothman. She officially accepted the offer to transfer to L.A. The men reacted with visible surprise and told Ms. Spivak that they preferred that she stay in Seattle rather than continuing with Interactive Benchmarks. When Ms. Spivak insisted she wanted to remain with Interactive Benchmarks and was willing to move, Google took a series of steps to force her hand by making the offer to relocate impossible to accept. Relocation costs for home selling/closing costs were capped at $15,000. My client had just bought

---

[8] *See* February 3, 2015 email to Ewing, Sakellariou and Hazenfield titled "Prescriptive Gender Discrimination at Google" complaining about discrimination (RS-426-28); February 9 email to Rothman about leaves taken by my client, including the leave for her daughter's surgery (RS-434); February 11, 2015 email to Sakellariou about the hostile work environment, and leaves (RS-439), and previous complaints to which HR did not respond; February 23, 2015 email to Tortorici about legal and code-of-conduct violations (RS-470, 468).

a house. Her calculations show it would have cost her $100,000 to sell her home and buy another in LA. Initially, Ms. Spivak was given only 23 days to accept the offer to relocate, and 90 days to have completed the relocation and be working from LA. There would not have been sufficient time for her to find a new home and day care (most with long waiting lists) for her daughter under the terms of the relocation offer, and Google knew it.

On March 3, 2015, Ms. Spivak reported she was experiencing high blood pressure, and asked to be allowed to work from home. On March 6, she was told she could not work from home for an extended period of time. Subsequently, Ms. Spivak went on a medical leave of absence.

In the end, Ms. Spivak was the *only* PM who was forced to choose between relocating to L.A. with Frontline or remaining in Seattle to transition to another project. Mr. Bengtson had previously transferred to the Cloud team. Mr. Rothman and Mr. Lacey were allowed to continue working on Interactive Benchmarks from Mountain View. Google arranged for Mr. English and the engineers working below him to take on a prestigious new project working directly for a Vice President and Mr. English now filled a Level 8 role, which he considered a promotion.

On March 20, 2015, Google informed Ms. Spivak that she could have until May 18 to decide about moving to L.A. However, between February 13 and March 20, Ms. Spivak had learned that HR, not Engineering or Product Management, had decided to move Interactive Benchmarks to L.A.; that her management did not want her to remain with Interactive Benchmarks, and that she was the only PM in Frontline who was being forced to either give up her project or move to L.A. Ms. Spivak came to realize that Google and the Frontline Team were pushing her out.

The men who were involved in Interactive Benchmarks are now thriving at Google. After Interactive Benchmarks was transferred to L.A., Mr. English was moved to a promising position because of Interactive Benchmark's success. He now joined Mr. Bengtson in reporting directly to Vice Presidents (where they had not been before). Despite being a Level 6, Mr. English is filling a Level 8 position and has been told that the success of Interactive Benchmarks played a role in this level of confidence in his ability.

In sharp contrast to her male colleagues, after Interactive Benchmarks was transferred to L.A., Ms. Spivak was recruited to work under a Level 5. By this time Interactive Benchmarks had achieved a customer satisfaction score of an unprecedented 93% compared with AMP's troublesome and unsatisfactory score of 42%.

**11. Ms. Spivak's Final Performance Review While on FMLA Leave.**

On or about May 14, 2015, while she was out on FMLA leave, Mr. Rothman gave Ms. Spivak her Q1 performance review. RS-651-52. The 2015 Q1 performance review make statements that are demeaning, false and misleading. The review also completely omits Ms. Spivak's accomplishments during the period.

Interactive Benchmarks has become a huge success with high engagement by Mr. Reardon, Mr. Skakkebaek, Mr. Jackson and others. Ms. Spivak invented Interactive Benchmarks and led it to successful launch. Rothman does not even mention Ms. Spivak's hugely successful product launch of Interactive Benchmarks in December 2014. It is incredibly demeaning to say my client had a "good understanding" of Interactive Benchmarks. She invented it, and was a core decision maker on its technical design, as Mr. English acknowledged in her Q3/Q4 2014 Performance Review. Amazingly, Mr. Rothman purports to comment on my client's overall performance during this period without even mentioning her huge and successful launch of Interactive Benchmarks with its unambiguous success indicators, including a 93% C-Sat. This performance review is further evidence of the gender discrimination Ms. Spivak has endured at Google.

**Legal Analysis**

Ms. Spivak's career at Google has been hampered by insidious gender discrimination both in New York and more recently in Seattle. When she complained about her treatment, Ms. Spivak faced swift and certain retaliation. The gender discrimination and retaliation Ms. Spivak has endured at Google violates both state and federal law.

**A. Gender Discrimination in New York.**

Scott Spencer took Ms. Spivak off Admeld Integration because she was pregnant and he believed she would not return to Google after her pregnancy leave. Mr. Spencer did not provide Ms. Spivak with any meaningful work to do until after her return from leave in January 2013. As a result of that discrimination, Ms. Spivak received a poor performance rating and did not receive the 2012 stock grant. Mr. Spencer's conduct was discriminatory. Ms. Spivak's list of accomplishments demonstrates that when she is given meaningful work to do, her performance is excellent. An arbitrator would reasonably conclude that Mr. Spencer's pregnancy discrimination caused my client not to receive a stock grant in July 2012.

Google violated New York's law against discrimination (McKinney's Executive Law, Section 296) when it denied Ms. Spivak a stock grant in July 2012. The New York statute of limitations is three years. Unless Google is willing to enter into a tolling agreement, my client will initiate arbitration or file her claims in court before July 1, 2015 to preserve this claim.

**B. Gender Discrimination in Seattle.**

After Ms. Spivak transferred to Seattle, the hostility and discrimination against her intensified. Google then retaliated against her when she complained about the discrimination. Under RCW 49.60, the Washington Law Against Discrimination, Ms. Spivak need only show that the hostility against her was based in part on gender.[9]

[9] This letter focuses on the WLAD with respect to Ms. Spivak's Washington claims. If this matter goes to arbitration or litigation, she reserves the right to claim a violation of Title VII as well.

*Mackay v. Acorn Custom Cabinetry*, 127 Wn. 2d 302 (1995); *Allison v. Housing Authority*, 118 Wn. 2d 79 (1991). She easily meets this burden.

**1. Initial PIE Assignment.**

Ms. Spivak's initial assignment on the PIE team was to identify the needs of Google account managers, create an approach to meet those needs, validate that the approach would be successful, and lead the PIE team to develop insights that would be helpful to Sales and the customers. This assignment required vision, expertise and the exercise of discretion. The fact that she invented Interactive Benchmarks, and that Interactive Benchmarks went viral, is strong evidence that Ms. Spivak exceeded all expectations in performing her mission.

After discovering that AMP/QS estimates were so inaccurate that Sales would not use it, Ms. Spivak developed Interactive Benchmarks as an alternative. Unlike AMP/QS, Interactive Benchmarks was transparent and accurate, meeting the needs of Sales. Mr. Bengtson did everything in his power to prevent Ms. Spivak from developing Interactive Benchmarks. He denied her data. He insisted that she should keep quiet unless she had the perfect solution to AMP/QS's shortcomings. He fed Mr. Skakkebaek, my client's direct supervisor, false information for her performance review. He criticized Ms. Spivak because she attacked the AMP/QS estimates as inaccurate, but did not criticize Mr. English for the same conduct. He told Ms. Spivak she should be satisfied with a Level 6 position. He told Ms. Spivak not to highlight the multiple uses for Interactive Benchmarks that made it so revolutionary and valuable.

There is ample evidence that Mr. Bengtson was biased against Ms. Spivak because of her gender. Even if an arbitrator were to conclude that he was motivated in part by a desire to protect his turf (AMP) that will not be a defense. Under Washington law, Ms. Spivak need only prove that Mr. Bengtson was "substantially motivated" by gender bias for his actions to be found unlawful. *Mackay*, *supra*; *Allison, supra*. Ms. Spivak easily meets that standard.

**2. Selection of Vince Lacey For Interim Lead.**

Ms. Spivak had far more qualifications for the temporary lead position than Mr. Lacey did. Mr. Skakkebaek's selection of Mr. Lacey over Ms. Spivak is clear evidence of gender bias.

**3. May 2014 Performance Review and PIP.**

Mr. Skakkebaek wrote Ms. Spivak's May 2014 Performance review and PIP. But he did not work directly with Ms. Spivak. Instead, the evidence shows that he was relying on Mr. Bengtson for his negative comments about my client. Mr. Skakkebaek did not ask Mr. English or Ms. Hsu, who worked closely with Ms. Spivak and were known as supporting my client and Interactive Benchmarks, to review her before the PIP. During a subsequent investigation, Mr. English apparently told HR that he believed Ms. Spivak was the victim of gender discrimination.

Mr. Skakkebaek made a number of false statements in the PIP. He suggested Ms. Spivak's communications were not clear or compelling, that she made statements that were not based on a thorough understanding, were not well-founded, not based on data, and that she misrepresented the opinions of others. No examples were given of conduct by Ms. Spivak supporting these criticisms. The record will not support these criticisms.

The PIP set goals for Ms. Spivak that were impossible to achieve. Mr. Skakkebaek instructed her to listen more and learn more from her (male) colleagues. Ms. Spivak discovered a flaw in the way AMP/QS provided estimates and came up with the solution. Mr. Bengtson met her achievement with total hostility and tried to shut her down. In the end, QS failed and Interactive Benchmarks thrived. In short, Mr. Bengtson should have been criticized for not listening to my client. But instead, Mr. Bengtson was promoted, Ms. Spivak was placed on a PIP, had Interactive Benchmarks taken away from her, and has been offered an opportunity to interview for a job reporting to a Level 5.

In just three months, Ms. Spivak did user research, surfaced critical issues while simultaneously presenting an achievable vision, engaged sales ops, and achieved broad buy-in for a new and achievable direction for the team. Rather than lauding Ms. Spivak's accomplishments, Google slapped her with a PIP. A number of factors combine to show that the May 2014 PIP was the product of gender bias. The evidence will show that Mr. Bengtson was the driving force behind the PIP. As outlined above, Mr. Bengtson was motivated in substantial part by gender bias. He could not believe that a woman could rise above a Level 6. And he did everything he could to block Interactive Benchmarks and prevent Ms. Spivak from receiving credit for it.

Google's own policy requires that there be conversations with employees who have performance issues before a PIP is issued. Neither Mr. Skakkebaek nor Mr. Bengtson nor any other manager ever said a word to Ms. Spivak about performance issues prior to placing her on the PIP. The lack of prior warnings or discipline is further evidence of gender discrimination.

Mr. Skakkebaek had ample opportunity to speak to Ms. Spivak about any concerns he may have had about her performance. She asked Mr. Skakkebaek for help but he simply did not respond to her request for assistance. Instead, he cooperated with Mr. Bengtson and placed my client on a PIP for reasons that will not stand up to scrutiny. The review and PIP he gave Ms. Spivak in May 2014 show that Mr. Skakkebaek would have rated her as "Needs Improvement" when her accomplishments warranted an "Exceeds."

Part of Ms. Spivak's claim of gender discrimination is that she should have been promoted but, because she is a woman and a single parent, she was not. Failure to promote a qualified employee because of her gender is sex discrimination. Male employees associated with Ms. Spivak's success on AdX Buyside (Noam Wolf and Drew Bradstock) received promotions. Mr. Bradstock even used my client's successes to gain his promotion.

In Ms. Spivak's first 1:1 with Mr. Bengtson after the PIP, he encouraged her to leave the PIE team. When Ms. Spivak said she wanted to stay on PIE because Interactive Benchmarks was a good project, and she wanted a promotion, Bengtson told her that a Level 6 was a perfectly acceptable plateau for a (female) PM.

Ms. Spivak repeatedly alerted Google that she was the victim of gender discrimination. Those complaints went unheeded time and time again.

**4. Aaron Rothman Promotion Above Ms. Spivak.**

In July 2014, Google and Mr. Skakkebaek promoted Mr. Rothman into a position over Ms. Spivak. Mr. Rothman had tried for a promotion and failed several times before July 2014. Ms. Spivak had relevant experience as a manager at several companies. She had achieved with AdX Buyside and Interactive Benchmarks. She should have been promoted, not Mr. Rothman. Failure to promote her instead of Rothman was bias and retaliation.

**5. September 2014 Media Review.**

At the time of the September 2014 presentation to Mr. Mohan, Ms. Spivak was the Interactive Benchmarks Product Manager and was recognized as the subject-matter expert on the data, metrics, and insights that sales needs to support customers and drive revenue. She had done extensive interviews of users and sales people. Mr. Rothman's attempts to sideline Ms. Spivak and minimize the impact of her work are evidence of gender bias.

Mr. Rothman was dismissive of Ms. Spivak's work and even questioned her decision to have a baby on her own, without a male partner. He and other managers repeatedly instructed Ms. Spivak not to publicly highlight the important uses of Interactive Benchmarks beyond just post-campaign analysis. Mr. Rothman scheduled himself rather than Ms. Spivak to present Interactive Benchmarks to Mr. Mohan at the Media Review. When Ms. Spivak insisted that she be the presenter, Mr. Rothman used his authority to minimize her presentation to highlight Vince Lacey's presentation on AMP, changing her slides to denigrate Interactive Benchmarks and promote AMP – despite the fact that that AMP was floundering and Interactive Benchmarks was flourishing.

**6. November 2014 Performance Review.**

Ms. Spivak's Q2/Q3 2014 Performance Review from Mr. Skakkebaek is further evidence of gender bias and unfair treatment. The review lauds my client's vision, insight and understanding of benchmarking. However, it criticizes Ms. Spivak's communication skills. The review states that she should have been sensitive to the males whose work was being challenged by Interactive Benchmarks. Why should the males not have been receptive, even grateful, to Ms. Spivak's invention of a better, more accurate way to help customers with their advertising needs? Why were the males not criticized for erecting roadblocks in front of Interactive Benchmarks? The answer is clear. Institutional gender bias.

Ms. Spivak took the risk of communicating that AMP/QS was deeply flawed and that her invention, Interactive Benchmarks, was better. The males whose work was criticized by her joined ranks and attacked her by claiming she was lacking in the "soft skill" of communication. In light of the success of Interactive Benchmarks, which Ms. Spivak created, Mr. Rothman's criticisms are reminiscent of the criticisms of the male partners in the *Price Waterhouse* case. They are also ill-founded. Those who worked closely with Ms. Spivak opined that she excelled in communicating about her work. *See* May and November 2014 Performance Reviews.

**7. Ms. Spivak's January 2015 Leaves of Absences.**

Mr. Rothman's decision to downgrade Ms. Spivak's performance review because of her two leaves of absence in January 2015 violates the Family Medical Leave Act and is further evidence of gender bias, hostility, and retaliation. First, Mr. Rothman penalized Ms. Spivak for taking approved FMLA leave for her two-year-old daughter's surgery in direct violation of the FMLA and also further evidence of gender bias. Remarkably, Mr. Rothman then told Ms. Hsu that Ms. Spivak was on her first leave because "she is just being temperamental." Second, Mr. Rothman penalized Ms. Spivak for taking four days of leave to grieve the loss of her baby while Mr. English took the same leave for a four-day trip to Hawaii. Ms. Spivak will be able to prove that Google is very flexible regarding leave time, and that her leaves were a pretext for Mr. Rothman to continue to discriminate against her and try to push her out.

Using the taking of FMLA leave as a negative factor in employment actions is also unlawful interference. 29 C.F.R. § 825.220(c). *See Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1122-23 (9th Cir. 2001). In order to prevail on a FMLA claim, Ms. Spivak need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to downgrade her performance. *Id.* at 1125. Mr. Rothman's admission that he downgraded her performance due to her FMLA leave establishes this element.

**8. Relocation of Interactive Benchmark and Effort to Push Ms. Spivak Out.**

After Interactive Benchmarks was relocated, Google forced Ms. Spivak to choose between relocating to L.A. and remaining with Interactive Benchmarks. She was the only PM in Frontline who was forced to make such a choice. And the relocation terms Google offered Ms. Spivak were a disincentive to move to LA. When she accepted relocation, her supervisors responded with surprise and tried to dissuade her from doing so. Google then offered Ms. Spivak relocation terms that made her relocation untenable. The message was clear: Google wanted Ms. Spivak gone. This behavior is retaliatory.

If Ms. Spivak had been a man, she would have been hailed as a genius for her work on Interactive Benchmarks. Instead, she was placed on a PIP for her poor communication, her accomplishments were minimized, and she was eventually pushed out.

Google is a male-dominated workplace where few women rise to true leadership positions. Ms. Spivak was the only woman in her PM chain of command. At the higher levels in the Display PM organization, there are 32 men and just one woman. Together Mr. Skakkebaek and Mr. Rothman supervise eight men and four women. Of those four women, Ms. Spivak is the only Level 6. The others are Level 5 or below. We believe the evidence will show that there are only a minimal number of women in Google at the higher levels, where opportunity and compensation are much greater. Even those few women who have ascended to higher positions report that they are not being treated fairly at Google, and that they are not included in important decisions affecting their work, and were not evaluated fairly.

**C. Google's Unlawful Retaliation.**

Ms. Spivak began complaining to Google about gender discrimination in May 2014. By July 2014, her complaints were well-known to her supervisors. Mr. Rothman admitted he knew Ms. Spivak felt the PIP was the product of bias. Ms. Spivak's opposition to her efforts on Interactive Benchmarks after May 5, 2014, the performance reviews in November 2014 and May 2015, and her removal from Interactive Benchmarks in February 2015 were each unlawful retaliation for her complaints.

# Attachment A

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

## Fwd: HRBP for me?

**Rebecca Spivak** <rivka@google.com>
To: Rebecca Spivak <rspivak@gmail.com>

~~Thu, Mar 5, 2015~~ at 7:36 PM

---------- Forwarded message ----------
From: **Caroline Bremner** <cbremner@google.com>
Date: Wed, Apr 2, 2014 at 10:56 AM
Subject: Re: HRBP for me?
To: Rebecca Spivak <rivka@google.com>
Cc: Paul Higson <paulhigson@google.com>

Hi Rebecca

I'd be happy to help. Feel free to schedule some time.My calendar is up to date.

Regards

Caroline

On Wed, Apr 2, 2014 at 10:55 AM, Rebecca Spivak <rivka@google.com> wrote:

Hi -

I see that Caroline is my functional HRBP and Paul, you're my geographical one.
Caroline, I've been in Ads for a while. Are you still the right person for me?

I'd like to set up some time with someone for some general and specific guidance on a few things. Ideally an hour.
But I'm not sure who to schedule this with.

Thanks,
Rebecca

--

Caroline Bremner
HRBP - Google Wallet
Cell: (415) 310 7756

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

# Fwd: ACTION REQUIRED: Key Decisions, Notes & Action Items from Today

**Rebecca Spivak** <rivka@google.com> Wed, Apr 30, 2014 at 4:12 AM
To: Rebecca Spivak <rspivak@gmail.com>

---------- Forwarded message ----------
From: **Judy Hsu** <judyhsu@google.com>
Date: Thu, Apr 10, 2014 at 3:16 PM
Subject: Fwd: ACTION REQUIRED: Key Decisions, Notes & Action Items from Today
To: Doug Bengtson <dbengtson@google.com>, Barbara Stanley <bstanley@google.com>, Michael English <menglish@google.com>, Rivka Spivak <rivka@google.com>, Vince Lacey <vincel@google.com>, Amanda Nowak <akohen@google.com>, Gautam Sawhney <sawhney@google.com>, Patrick Davin <pdavin@google.com>, Natasha Sant <natsant@google.com>, Kathryn Shih <kshih@google.com>

Hi team,

Wanted to let you know I've given MEC, Anas and John a heads up about the direction we're exploring with interactive benchmarks today - see my note below. Anas and I spoke this morning and he is thrilled that we as a team are thinking about a step change in our approach. His guidance: don't shy away from asking for lots of storage resources to make this happen. Also, he volunteered to help take the battle up with Legal/Compliance once we know we are asking for (we will still do leg work to figure out their rough boundaries) -- he says he's done this successfully before for Americas region.

Overall, he's quite excited, so everyone keep up the good work.

Judy

---

Judy Hsu, PhD | OE Cross-Media Tools | judyhsu@google.com | [redacted]

---------- Forwarded message ----------
From: **Judy Hsu** <judyhsu@google.com>
Date: Thu, Apr 10, 2014 at 9:21 AM
Subject: Fwd: ACTION REQUIRED: Key Decisions, Notes & Action Items from Today
To: Mary Ellen Coe <mecoe@google.com>, Anas Osman <anasosman@google.com>, John Maletis <maletis@google.com>
Cc: Amanda Nowak <akohen@google.com>, Gautam Sawhney <sawhney@google.com>

Hi Mary Ellen, Anas and John

FYI below. Yesterday, Amanda, Gautam and I led an all-day AMP summit in Seattle with PM/Eng team focused on increasing transparency / quality of estimates in Q3/Q4 timeframe. Essence of the idea is to focus on providing historical data (benchmarks) in an interactive environment that gives the user full control of inputs they care about, including accounting for seasonality -- e.g., *"what did peers in retail vertical who targeted online shoes consumers in NY achieve in CPC, CTR, in display etc around black Friday last year?"* We conducted 23 sales interviews in last 1.5 weeks to draft preliminary business requirements and played this back with the Eng team.

This is a paradigm shift from the current black box methodology in AMP that is a combination of benchmarking



RS-011

and probabilistic modeling based on data from the last 30 days, which users don't understand or trust. Here is the full deck and session notes.

In the next few weeks, Doug and his eng team are exploring the feasibility of storing massive amounts of big data to make this happen (it turns out storing data going back 1 year is much harder / more costly than 30 days). My team is also ironing out any compliance and legal restrictions on level of granularity of data we can provide.

@MEC/Anas - Once we know what's feasible technically and legally, we'll come back to you in a few weeks' time with output of our diagnostic / design work. Will likely need your help with (a) balancing compliance restrictions with sales' needs for data cuts and (b) explore making interactive benchmarking available as a service to other tools, e.g., Athena, Green Tea, etc and pros/cons of Ads Eng leading this vs. MIS.

Judy

Judy Hsu, PhD I OE Cross-Media Tools I judyhsu@google.com [redacted]

[Quoted text hidden]



RS-012

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

**perf**

Rebecca Spivak <rspivak@gmail.com>
To: Rebecca Spivak <rspivak@gmail.com>

Thu, May 1, 2014 at 6:27 PM

Rating

Consistently Meets Expectations

Project/Achievement

List up to 5 projects. If needed, you can add a 6th project to include community contributions (e.g., interviewing, mentoring).

For non-promo candidates: List projects/achievements since your last review.
For promo candidates: Include the projects/achievements that best demonstrate your readiness for promotion to the next level. You can include projects/achievements from any time period that best demonstrate performance at the next level. Promotion committees will have access to your full Perf packet from previous cycles.

Need help writing your assessment?

1

Launch: AdX Inventory Discovery

PM

Impact: Critical

Summary of my key contributions: This was a great launch of something that was immediately impactful as a much-needed sales tool, but also foundational for the core marketplace strategy and vision. * Conducted thorough research on use cases * Set product vision and priorities according to impact * Shifted focus from "Forecasting" to "Discovery" * When the project kept slipping to Q1, I helped maintain focu so we could cut functionality without cutting usefulness * Created popular tutorial and documentation * Helped set the vision for discovery as the foundation of Marketplace As much as this launch exceeded expectations and delighted sales, it was also energizing for engineering the sit in on user testing and see that the product had been built to exactly anticipate the use cases. There was a substantial eng-initiated element to this initiative and those projects can often become science experiments not vetted with real world cases. Here, I was most impactful by directing without controlling. It was a great and productive dynamic that would do well across google!

| Reviewer/Role | Feedback |
|---|---|
| Ari Feldman (Unsolicited) 5 / Product Manager II | This was a huge initiative that could not have been realized without Rebecca's involvement. Although not directly involved with the project, I shared an office with her and recall all of the buyer calls she had to obtain the necessary research and inputs. Her push to change the focus of the project from forecasting to discovery was just short of genius. The alpha version she shipped at the end of Q4 was incredibly refined given its nascency and the quality of her training materials was simply top-notch. |
| Jacob Baskin (Unsolicited) Senior Staff Software Engineer | Rivka made many critical contributions to the vision and design of AdX inventory discovery. She gained a deep understanding of the needs of our buyers and of our sales team in order to push eng to build the right product, and she framed the work in a way that really helped everyone involved to understand the value we were adding for our customers and to stay on track in the face of incipient feature creep. Ultimately, this launch delighted sales and is sure to delight customers when it launches next week. |
| Jeremy Woodlee (Unsolicited) Sales Manager | Rivka was a great partner with sales on defining the real needs of sales and our clients for this product. There were a lot of preconceptions about what Inventory Discovery should be, and she really dug into the details to understand what was really required. And then she did a great job getting that developed and into the commercialization process. She was interested in meeting regularly to gather sales feedback and provide updates. Really a very very good partner for sales. |

2

Launch: RTB Graphs

PM

Impact: Large

Summary of my key contributions: * Successful Rapid Launch ahead of Schedule * Addressed Top gTech Need - 20% of support load shifted to Self-Service! * Repeatedly focused project to keep it from slipping from Q4 * Impactful release with no feature bloat This project was repeatedly pushed from Q4 because we were already doing so much on AdX Buyside! The Eng and Ux leads were both Nooglers. I championed to keep this project prioritized given the impact I knew it would have. I worked closely with engineering and UX so that we wouldn't slip. I worked within the resource constraints and helped strip the project down to something immensely useful but still valuable. The launch was not seen at all as a stripped down version - it was more than anyone expected. It addressed the core needs and delivered before anyone believed it could. It was a rockstar team of Eng and UX nooglers, and we made a great team!

| Reviewer/Role | Feedback |
|---|---|
| Ari Feldman (Unsolicited) | This feature was another major boon for the AdX buy-side by providing buyers with crucial diagnostic information that can help them troubleshoot and diagnose issues that they could not do before. Furthermore, she cleverly integrated this feature with her Buyer Alerts initiative, which helped drive end-to-end usage. In talking with buyers for my own projects, I learned that this feature is very well regarded by them. |



RS-017

5 / Product Manager II

3

**Launch AdX Alerts V1 & V2**

Summary of my key contributions: * Major Self-Service Launch * I did research and discovered a core issue - Buyers are reactive but we expected otherwise * Buyer unawareness of issues was causing loss of ~10% of total spend * I proposed vision and we launched useful functionality in just 1 quarter! * We actually launched twice (both times useful!) in Q4 * Launch and Iterate/Lean --> V2 was based on the feedback from V1 * Product was very well received by customers This project was born out of customer research I did in prior quarters where I discovered the opportunity we had to be "proactive" on behalf of our customers. It was not easy to shift general perceptions.("I have a great idea! Let's build an email alert system") but this eventually found broad buy-in and was a successful launch - from idea to launch in 1 quarter! We launched very quickly and used feedback from that launch to guide future direction and launch again.

PM

Impact: Critical

| Reviewer/Role | Feedback |
|---|---|
| Ari Feldman (Unsolicited) 5 / Product Manager II | This feature addresses a major need in unblocking buyer spend by helping buyers become of aware of issues and anomalies that could impact their buying on the AdX platform. Some of our biggest buyers are currently beta users and virtually all beta participants are universally positive in their feedback on this feature. In addition to realizing this feature, Rebecca also invested a considerable effort into devising a solid vision and product roadmap, which if executed successfully, will dramatically increase AdX serviceability and increase the volume of spend on the exchange. |
| Jacob Baskin (Unsolicited) Senior Staff Software Engineer | Rivka was the driving force behind alerts, which launched remarkably quickly and to great fanfare. I am very excited to see the benefits this brings to the AdX buy side. |

4

**Set Vision/Priorities for QuickSilver Estimates**

Summary of my key contributions: * Set a compelling product strategy within first 2 months in the role * Ramped up quickly with direct customer research * Identified gaps and a big opportunity for impact! * Championed a shift in focus and vision - "Empower sales with transparency and interaction" * Achieved general buy-in (Eng, PM, and Sales Ops) for this new direction * Set actionable plan for useful launches in Q2 in the path to long term vision * This new approach resolves most of the Tea vs Quicksilver "duplication of effort" concerns and distraction * (Tested ideas with sales by coding lightweight clickable prototypes) As I joined the PIE team in January, I set about understanding the customer needs and use cases. After substantial iterative research, I came to believe that empowering the sales team to interact with the data was our most powerful opportunity for real business impact. I shared this knowledge and vision across teams, and proposed a shifted focus. Interactive estimates, with transparency and controls that support (rather than replace) the existing sales estimation process will help the modeling work done by the team reach its full potential. The next step in the model is to let the sales team be an input to it. I championed the vision and achieved general buy-in. We also have a good plan for how to launch incrementally and quickly on a path towards the broader vision. Furthermore, with this new charter, some of the distractions and noise around duplicate efforts and "Tea vs Quicksilver" have become irrelevant. An interactive model is impactful and also distinct. Shifting priorities can be challenging, but there is now broad buy-in around the new idea and approach. It has only been one quarter (and part of that was ramping up) but I am very excited about what we can do here. I believe that sales interaction with the data behind estimates is the right approach and that it can have huge impact. We can launch powerful and useful products in the coming quarters.

PM

Impact: Critical

5

**Successful Transition of AdX Responsibilities**

PM

Impact: Critical

| Reviewer/Role | Feedback |
|---|---|
| Ari Feldman (Unsolicited) 5 / Product Manager II | I inherited Rebecca's Buyer Alerts project when she transitioned off AdX. She supplied me with complete documentation and made herself available to me with any questions. The collateral and product vision were clear, which made is very easy for me to pick up this project from where she left off. |

How well does Rebecca Spivak perform in their role (6 / Product Manager III)?

| Reviewer/Role | Feedback |
|---|---|
| Jens Skakkebaek (Manager) | Rebecca was on the AdX team throughout Q4 until she joined my Frontline team in early January. So the feedback is split in two parts for this reason. On AdX, Rebecca had a great quarter with the multiple launches mentioned above. On Frontline, she has done less well so far and overall, her performance needs improvement. In fact, I will be working to help Rebecca make these improvements according to a performance improvement plan that I will share with her. A PM3 is [illegible] |



RS-018

| | |
|---|---|
| (Manager) Group Product Manager | expected to be well rounded and function independently. Overall for this cycle, her performance bucket "meets expectations" was arrived at by weighing her positive performance on AdX with her lower performance on Frontline. |

What's one thing you do really well that you plan to continue doing?

| Reviewer/Role | Feedback |
|---|---|
| Rebecca Spivak (Self) 6 / Product Manager III | I understand the customer and will take initiative, even when risky, to shift strategy and prioritize/launch products with real impact. I can launch substantial functionality quickly by staying focused and stripping down products to what is most impactful. Examples: ADX Alerts: I began my role as PM on Buyside by getting to know customers. I discovered that unlike sell-side customers, buyers are reactive and not motivated to live within the tool. A proposed a proactive alert system. This was a new idea at the time and controversial ("let's build email"). I also set out for a simplified first launch - alerting buyers when their creatives failed. The initiative went from idea to launch in one quarter! Although it seemed like a small launch, the impact was large and it addressed the biggest issue. And it validated the idea. Buyers were receptive, and the priorities for the next quarter were shaped by feedback from the first launch. 2. Inventory Discovery: This project began as Forecasting, and I redirected it to be about understanding inventory and changes over time. I understood the direct use cases and refocused the priorities. When this launched, it was very well received, as it exactly addressed all the important use cases. The user testing was great for everyone involved because it showed the the product was truly built to anticipate all the user needs (and no one asked about the things we cut). 3. Deprecating Static Buying on AdX: Static buying did not just take up eng time - it limited new functionality as we always had to consider this limited (and decreasing) use case. I initiated the conversation (also originally controversial) and eventually it became the accepted idea. |
| Jens Skakkebaek (Manager) Group Product Manager | Rebecca has good ideas, passion, and ability to synthesize it into a new product direction. For instance, in her work on Frontline in Q1, she has been driving towards more interactive GDN benchmarks that allows the Sales user to explore and understand what estimates the client can realistically get. This is in contrast to more automated estimates that AMP has today. Keep up you passion for the user! |
| Ari Feldman (Unsolicited) 5 / Product Manager II | She should continue believing in herself and her abilities! Rebecca took over the AdX buy-side product from another PM that left a big mess. Once she found her footing, she shipped a lot of high-impact features in a very short amount of time, which is a testament to her Product Management prowess. In short, she's a strong PM with amazing potential to do big things. |
| Jacob Baskin (Unsolicited) Senior Staff Software Engineer | Rivka does a great job of gaining a clear-eyed and comprehensive understanding of any area she works in. When she started working on AdX inventory discovery, this was not an area that she was previously familiar with, yet she quickly became a domain expert, and learned more about our buyers in a few weeks than some PMs have learned ever. This allowed her to develop insights and plans that led to a much more useful finished product than we would otherwise have built. Rivka also speaks her mind clearly and persuasively. This has helped her, and the engineers who work with her, build successful and helpful products rather than engage on Quixotic campaigns to build systems that may be very pretty and fun to work on but that are ultimately of marginal benefit. |
| Nir Margalit (Unsolicited) Software Engineer | Rivka is a true visionary - Rivka's vision is still guiding us in what we do, although she is no longer on AdX. For example, when Rivka envisioned the Inventory Discovery Tool and the Alerts project, one of the things that she kept telling us was that we have to be proactive with our users, and that the next step will be discovery alerts. That was in Q4 2013 and we are still using that as a guideline. Rivka encouraged us to release and iterate - I find that approach super useful as in AdX we have savy users and their feedback makes a difference. By releasing and iterating we were able to get solid feedback from our buys and shift our prioritize. Both the merits mentioned above led to an epic Q4 - we had 3 product releases (BuySide alerts, RTB graphs and inventory discovery), all for the BuySide and all with an impact on our buyers spend. |

What's one thing you plan to improve in order to have more impact?

| Reviewer/Role | Feedback |
|---|---|
| Rebecca Spivak (Self) 6 / Product Manager III | I need to believe I can make a difference in order to stay engaged, so I will continue with my recent commitment to takes risks when needed. I haven't always done this. A few years ago I was the PM for AdX Reserve Price Optimization. I did not believe the project could have impact (it was counter to the way publishers wanted to run their business), but it was an established project with a large senior engineering team. I spent my entire time on that project uninspired, which wasn't good for anyone - especially me. I don't know if I would have been successful attempting to deprioritize it, but I wish I had tried. I've committed to taking whatever risks are needed to believe that the work I'm doing will have impact. This is nearly impossible to do painlessly. It ultimately worked very well for AdX in Q3/Q4 where I drove the new vision for AdX Buyside with great launches. Nearly every initiative I took was controversial and I was tempted to back down, but they were all eventually successful. This may seem idealistic, and it's often exhausting. But I will continue to take risk when needed so that I never find myself uninspired and disengaged again. I so |
| | A number of areas need improvement. The details can be found in the Performance Improvement Plan, but the big picture is here: Communication / Org: You have lost trust with the engineering team and need to turn it around. Verbal communication with other PMs and the engineering team needs to be clear and compelling, accurate and complete. Your |



RS-019

| | |
|---|---|
| Jens Skakkebaek (Manager) Group Product Manager | Ideas need to be documented better. Bring well-founded data to the table. Be fully engaged in every meeting. Execution: you need to take complete ownership of the team's activities and drive them forward - even if you don't agree. If you disagree, you need argue to change direction. Disengaging is not the right approach. Leadership: I expect you to be observed as being proactive by Engineering and Cross-Functional team members and be seen as the clarifying leader who solves problems and defines a path forward without need for escalation. Googleyness: Listen more and expect to learn from your colleagues. Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve. |
| Ari Feldman (Unsolicited) 5 / Product Manager II | She should communicate more with different stakeholders. Rebecca does not grandstand so some engineers and sales people can sometimes confuse her approach and visibility with lack of progress, which is definitely not the case. If she over communicates, she can avoid any such confusion in the future. |
| Jacob Baskin (Unsolicited) Senior Staff Software Engineer | Sometimes, being right isn't the most important thing. In particular, even if an engineering team is building the wrong thing, it can be very demotivating for them to hear about the ways in which they are building the wrong thing without hearing a vision or a path forward towards a better state. I noticed this in particular with Rivka's work with the AdX reserve price optimization team -- she had a clear and persuasive argument that they were building the wrong feature, but because she didn't give them a motivating vision to build something better, the team wound up languishing and ultimately building more of the same thing, only slower. There's nothing like telling a positive and motivating story to make a team build something great -- even if you're not 100% sure yet that it's the right story. |

## Intros

**Please share with us:**

- Your name
- The group you support
- The number of Googlers you manage






Google Confidential & Proprietary

PeopleDev

# Managing Low Performance 2015

Cindy Treloar
Human Resources Business Partner

Google Confidential & Proprietary

## Philosophy



Google Confidential & Proprietary

## Agenda

**Let's Talk About...**

- Google's philosophy on managing low performance
- Taking action
- Tips on delivering feedback
- Navigating common low performance scenarios
- How to write and deliver a plan
- FAQs, resources, & advice

**Please log your attendance at goto/iamhere**



Google Confidential & Proprietary

RS-021

## What About TVCs?

- TVCs are not employees of Google
- Any performance management would need to come from their employer

PeopleDev

## Why manage low performance?

- **Headcount** is a limited resource & everyone needs to be performing
- To help that person **do better** in their job
- Can negatively impact the **team**
- If unaddressed, becomes **credibility** issue for the manager
- 2013 **Googlegeist survey** revealed that only 55% of Googlers feel that their group deals effectively with low performers
- **"Silence guarantees nothing will change"** - ***Alan Eustace.*** It's the manager's responsibility to deliver timely and actionable feedback, even when it's tough.

PeopleDev

## Taking Action

PeopleDev

## Philosophy - We want them to succeed

- We've invested in hiring and training to get them this far, don't give up
- A PIP at Google does not mean the person is being managed out, as is often the case at other companies.
- Data...
  - In a study of Googlers who received bottom performer **feedback of any kind,**1 year later*:
  - 52% were performing within expectations (not "needs improvement")
  - 40% terminated (69% voluntary, 31% involuntary)
  - 8% were still performing on the low end
- "Sleep at night" test

PeopleDev

RS-022

## Is a PIP mandatory for all low performers?

# Nope

- Every situation is unique - work with your HRBP to determine what's best in your situation
- A PIP is one of our options. Sometimes just taking the time to talk through the issues with your low performer can fix the problem.



## Identifying Low Performance

**Questions to ask yourself**

- Would you rather have a Noogler instead of him/her?
- Where would this person be in a stack rank of the team?



## Communication Options

*These are general guidelines. Every situation is unique, so please work with your HR Business Partner.*



## Stagnant or Not Trajecting ...

If someone is on a path that may result in a "needs improvement" rating how should we handle it?

- Coaching
- Written feedback

Coach Wooden of UCLA, one of the most celebrated coaches ever said...

"A coach is someone who can give correction, without causing resentment."





RS-023

## Scenario #2: Personal Problems Peggy

A long-time low performer on your team tells you that her husband was recently diagnosed with cancer. You need to manage her performance issues.

How should you proceed?

***Possible Solutions:***

- Empathize! This is a difficult time for your Googler!
- Recommend our EAP (Employee Assistance Program) as a resource
- Offer different types of leaves of absence (refer to Benefits team)
- Vacation donation program (peers can donate their vacation hours)
- We cannot lower the standards of the job. She still needs to perform acceptably when at work.



## Scenarios

*What would you do if...*



## Scenario #3: No Longer Exceeding Ernie

Ernie received rave reviews and always got "exceeds expectations" ratings from his previous manager. Since he joined your team 6 months ago, you've been wondering how that's possible given the low quality and quantity of his work. It's September and you need to write his review and assign a rating.

How should you proceed?

***Possible Solutions:***

- One of the first things you need to do is communicate your expectations. Obviously they are very different from Ernie's previous manager.
- If he hasn't already received specific feedback from you about these differing expectations, you should give him time to adjust before dropping his score dramatically.



## Scenario #1: Grumpy Greg

Grumpy Greg puts down others' ideas, interrupts you a lot, takes credit for the work of his colleagues, and has on occasion stormed out of meetings. Other team members are complaining that they don't want to work with him. He's a subject matter expert and his productivity is the highest of anyone's in your group.

What should you do?

- Poor behavior is part of overall performance and needs to be managed!
- Give him specific examples of what he does that is unacceptable and explain the impact of those behaviors. (Use SBI)
- A good way to present this is to say "The perception others have of you is ..." It's hard to argue perception.



RS-024

## Anatomy of a PIP – Part 3: Plan Duration / Signatures

**Plan Duration**

This performance improvement plan will last for 60 days, effective October 1, 2009 through November 29, 2009.

**Concluding Paragraph**

I hope this action will result in the required improvement in your performance. I am here to support you in your development and your team lead or I will meet with you periodically during the plan to discuss your progress and provide feedback. Please note that the expectations stated above need to be met during the plan period and sustained after the successful completion of the plan. Failure to correct this unsatisfactory performance now and in the future may result in further corrective action, up to or including termination. A higher level of performance is expected now as well as going forward.

______________________
Manager Signature

______________________
Low Performer's Signature

______________________
HRBP Signature



## Anatomy of a PIP – Part 1: History/Background

**Performance Improvement Plan**

***Confidential***

Date: Today's Date

To: Low-performing Googler

From: Manager

CC: HR

Re: Performance Improvement Plan (PIP)

**History/Background Summary**

"This letter is to recap our previous discussions on May 13 as well as during your mid-year review concerning your performance and to initiate a performance improvement plan. The reason this is necessary is that there has been a consistent decline in your level of performance and productivity over the last 3 months. Your current trajectory is not acceptable, and you and I need to work together to raise your level of performance, productivity, and attention to detail." You can view what is expected of someone in your job family and at your job level here: <Link to the Job Ladder Description>



## Giving Feedback!



## Anatomy of PIP – Part 2: Expectations & Deliverables

**Areas of Improvement/Expectations**

| Job Description/Activity-Areas of Improvement | Actions for Improvement | Due Date |
|---|---|---|
| **Productivity** - A Software Engineer at your level should be able to complete a project like x in about 4 weeks. It took you 10 weeks to complete. | Complete and deploy a working version of project Y. | October 28 |
| **Not willing to accept constructive criticism** - For example, when I talked with you about project X, you folded your arms, and argued with me about how I was wrong rather than listening to the suggestions I was trying to make. | Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve. | Immediate and ongoing<br><br>Measurement: Success to be determined by your TL and me |
| **Lack of commitment to quality** – Your code has caused several customer-visible failures due to lack of adequate testing prior to deployment. A perfect example of this was project B. | Provide a complete test plan that ensures the quality of this service before deployment. | November 15 |



RS-025

## SBI

Situation - Describe the situation (where / when)
Behavior - Describe the behavior (what, how)
Impact - Describe the impact the behavior had on you or others




PeopleDev

## Giving Feedback

What makes it hard to give constructive feedback?



Think of a time when someone delivered constructive feedback to you successfully. What factors made the experience a positive one?

PeopleDev

## Examples of SBI

| Situation | Behavior | Impact |
| --- | --- | --- |
| On Friday | You arrived 15 minutes late to your presentation | Two of your peers mentioned that you did not appear prepared |

PeopleDev

## Characteristics of Good Feedback

- Specific
- Thoughtful/Sensitive
- Timely

PeopleDev

RS-026

## When writing a plan

- Have the same **expectations** you would for anyone performing solidly in that same job level
- How long should the plan be?
  - Usually ~60 days – Long enough to determine if there's improvement
  - Shorter plans for more simple issues i.e. attendance, or if there's been a lot of feedback already
- Be **supportive** – "I'm here to help you"
- Include **all issues** – behavior is a part of performance
- Consider **collaborating** with the low performer on determining deliverables
- Deliverables should be **measurable** to determine success at the end of the plan period
- Keep an **open mind** that the person can improve





## Giving Constructive Feedback

**Problem:** Googler hears your feedback as "friendly advice" instead of realizing there's a serious performance concern.



**Possible Solutions:**

- Mention that the issue has been discussed before (if that is the case)
- Speak about how performance is trajecting downward

(Stress the impact the specific issue is having on overall performance)

- Say that "you are really concerned about x"
- Mention peer feedback/perception in addition to your own



## Common Plan-Writing Pitfalls

- **Deliverables are not measurable**
  - Poor: "Improve productivity"
  - Better: "Complete projects x & y by November 15"
- **Specific examples not given**
  - Poor: "Your communication skills need improvement"
  - Better: "Please email me a status update every Friday by noon. If you ever encounter a hurdle or feel that the project timeline is slipping, please let me know immediately so I can help."
- **Everything due on the last day**
  - Poor: Having all deliverables due at the end of the PIP
  - Better: Assigning more frequent due dates to deliverables. This will allow you to see how the low performer is tracking throughout the plan, enabling you to provide valuable feedback.



## Writing a Plan



RS-027

## Video: "Bad Manager" (What Not To Do)

Video link:
https://drive.google.com/a/google.com/file/d/0BxKu4KD7MlnjTEtlVkRoS2RZSTQ/view?usp=sharing

PeopleDev

## Delivering & During a Plan

PeopleDev

## TakeAways from "Bad Manager" Video

**Don'ts:**

- Start the meeting all cheerful, compliments employee's scarf, invites her to go out shopping, then bam! PIP!
- Admits she was pressured in a calibration session to lower her rating
- Says she can't say who the calibration folks are
- Low performer asks "Will I lose my job?" Manager says "You might" - That response could make her fearful instead of feeling supported.
- Manager is unprepared – "I don't know when I'll have the PIP done."
- Speaks in the collective "we," no manager responsibility
- HR is already involved (makes HR sound evil and biased)
- Manager almost has a threatening tone.
- Manager didn't provide specific examples of how the person was missing expectations.
- Employee was surprised. She mentions "Last time we spoke, you said I was doing great."

*Do consult your HRBP for help in planning your conversation*

PeopleDev

## Let's watch a couple videos




RS-028

## Delivering the Plan

- Give the low performer **advance notice** of the meeting
- Reserve a **private conference room**, free of interruptions. Possibly away from the person's work area & peers.
- You may want to give the low performer the plan that morning so they can **absorb it**. Then go over it together in the meeting.
- Don't shy away from discussing the **possibility of termination** as a consequence of a failed PIP. We want to be transparent.
- If the low performer **refuses to sign** the PIP, do not force it
  - Just write on the plan the date it was presented, that he/she refused to sign, and notify your HRBP



## Video: Failed PEP, Initiating PIP

Video Link: https://docs.google.com/a/google.com/file/d/0B9GuiUDZKXpzSHUyZl1BS3FTbzQ/edit



## Disaster Meeting?

*What should I do if the meeting isn't going well and emotions are running high?*

- Take a timeout for 5-10 minutes & then try to reconvene
- Reschedule for another time
- Allow for emotions, but be careful not to argue or commiserate
- Notify your HRBP (if they're not in the room)
- Encourage the person to talk with your group's HRBP





## TakeAways from "Failed PEP, Initiating PIP" Video

- "Deliverables on PEP not completed, therefore considered unsuccessful"
- Note the manager mentions the regular feedback meetings that have been held.
- Addresses employee's concerns about this being a paper trail to fire her. It is okay to let the person know that you want to see them succeed, and that you are trying to be as clear as possible by providing them with written, very clear objectives and expectations.
- It's important to explain that if the PIP is not successful, termination is one possibility.
- Supportive tone: "We're going to work together"
- Manager acknowledges what low performer is saying, but focuses on output i.e. "I know you work hard, but at the end of the day what matters is what is produced."
- Plan is fair for anyone at this level, expectations are the same
- Acknowledging employee's objections: "I'm sorry you feel that way"
- Supportive: "I know this is hard to hear and I want to work with you to make sure you're successful"
- Refusal to sign: Plan is still in place, and will be held accountable to the plan. Manager will write a note that the plan was delivered and the date.
- Will meet each week to go over progress
- The low performer may be much more angry than in the video, but manager should keep a calm and confident tone.

*Consult your HRBP for help in planning your conversation*



RS-029

## Your HRBP Helps You By...

- Determining the right calibration score and its impact
- Recognizing poor performance warning signs
- Serving as a gut check for you
- Navigating potential legal issues
- Identifying the source of the problem
- Locating training resources
- Consulting on when to do a plan or when to consider transferring a low performer to a new team
- Meeting with the Googler to understand their perception of the situation
- Determining course of action i.e. verbal discussion, written feedback, PIP, etc.
- Preparing you for a difficult performance conversation with the low performer by writing talking points for you, role playing, anticipating possible reactions
- Providing PIP examples & review your drafts
- Documenting the success or failure of a PIP after its conclusion
- Conducting the termination conversation with you at end of a failed PIP



PeopleDev

## During the Plan – Very Important!

- **Have regular feedback sessions with the low performer**
  - Weekly or biweekly at a minimum
- **Document & <u>share</u> feedback with your low performer**

"The palest ink is better than the best memory" Chinese Proverb

- **Option 1:** Email follow up from discussions
  - "As a follow up to our meeting on October 8, I wanted to summarize what we discussed...."
- **Option 2:** Shared doc with summary of feedback given
  - *Deliverable #1:* Only 70% of the goal was met this week. Try and shadow Dan who is strong in this area and ask him for advice
  - *Deliverable #2:* Was late to both staff meetings. What can we do to help with promptness going forward? Do you need to make a calendar entry to block time to travel between buildings?

PeopleDev

## A Few FAQ's

Q. Soft skills like teamwork for instance, are hard to measure. How do I determine success on these types of deliverables?

A. You can put in the PIP that the measurement will be peer feedback.

Q. Can I inform the Team Lead that this person is on a PIP?

A. If overseeing the plan. Keep as confidential as possible. Peers do not need to know about the plan to be able to provide feedback.

PeopleDev

## Resources & FAQs

PeopleDev

RS-030

## But What If There's No Chance For Improvement?

"Fork in the Road" approach (more common in Tech)
Choice btwn. PIP or severance package
Low Performer decides

Consider using a fork approach and consult with your HRBP IF any of the following apply....

- The low performer has been on a plan before or has been given specific written feedback that didn't result in improved performance;
- There's a history of low ratings;
- You can provide a good rationale regarding why a PIP likely won't fix the employee's performance issues; and/or
- You can articulate to your HRBP & leadership why a PIP would cause hardship for the business



## FAQ's (continued)

Q. I think my low performer can be more successful in another group. Can I transfer him or her?

A. Transfers should be considered when there's a role misfit and we think the person is "good for Google". If this isn't the case, we don't want to pass a problem around.

Q. Should my low performer continue to be involved in interviewing candidates, 20% projects, mentoring, etc?

A. Sure, so long as you think they can represent Google in a positive light and that extracurricular activities like this will not harm their ability to execute on the plan's deliverables.



## If You Remember Nothing Else ...

- **Don't wait!** Act early - as soon as you notice a problem!
- Use your **HRBP** - often
- Give **specific** examples
- **Document** and share it
- Be a **good coach** - do everything you can to help them



## Resources

**Online site: Goto/managingperformance**
- PIP Templates & Samples
- FAQ's
- Videos on having difficult conversations

**Learning resources:**
- go/HighAchievement - Live training on recognizing & rewarding high performance
- go/Grow - Learning opportunities that may benefit your low performer
- go/DeliveringFeedback (for managers)
- "Giving and Receiving Feedback" (for individual contributors)

**People Who Can Give You Good Advice:**
- Your HRBP
- Your manager (In Tech talk to your HRBP re: the PIP buddy program)
- Peer managers

**Advice for Your Low Performer:**
- Rachel Grey - PIP survivor ;)

**This Preso:**
- *go/LowPerformance*



RS-031

## Storytime

**What it's like on the "other side" of a PIP...**




https://docs.google.com/a/google.com/file/d/0B4MvemohyOXYZ016dVVRbVoyRGc/edit ("Rachel Video for MLP")



## Thank You!

This deck: goto/LowPerformance
Questions? Please contact

**Please log your attendance at goto/iamhere**



## Scenario #1: Demotivated Dan

Demotivated Dan recently began work on a new project for which you know he has the skills. He is coming in later than he used to, & not participating as much in meetings. He used to be a strong performer, but ever since he switched projects, productivity is low.

What are some possible causes of his motivational issue?

What would you do if Dan told you he doesn't like the current project as much as he thought he would so he's not wanting to give it 100%?

***Possible Solutions:***

- Identify the problem. Are there personal issues outside of work impacting his performance? Talk to him to try and uncover the issue i.e. motivational issue (doesn't like work), skill set mismatch or deficit, personal issues, team dynamic problems, etc.
- Feasible to transfer to another project? If not, even though this isn't his favorite work, he needs to perform at acceptable levels. If he does, try to support a transfer when one becomes available.
- Performance manage. He needs to be performing.



## OLD SLIDES

## Scenario #3: Java Jenny

Java Jenny is a Software Engineer on your team who is motivated & cares a great deal about her work. But Jenny is struggling with programming in C++ since her background is mostly in Java.

What can you do to help her?
What if she still doesn't improve?

***Possible Solutions:***

- Transfer to Java projects
- Training: PeopleDev, engEDU, outside resources, mentor
- If neither of the above helps, performance manage (verbal/written feedback or PIP)

## Advantages of Written Feedback

- Helps to ensure common understanding
- Gives Googler time to digest & respond
- Highlights important points of the conversation
- Easy to reference going forward
- Good for visual learners
- Documents what was said



PeopleDev

## Accommodating Health Issues

*You may hear things like:*

- "I get easily distracted and I'm having trouble focusing at work."
- "I'm having trouble getting to work in the morning because of the medical treatments I am undergoing."
- "I've been feeling really sad/depressed and I'm not sleeping at night."

You should <u>not</u> investigate the situation on your own, ask the Googler to provide you with information about their medical condition, or accommodate the Googler on your own without involving your HR Business Partner!!!

PeopleDev

## GOALS of a PIP

1. Clearly articulate the issues using **<u>specific examples</u>**
2. Clarify expectations
3. Establish a plan for improvement which includes measurable goals



PeopleDev

## About PIPs

PeopleDev

RS-034

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

# pip

**Rebecca Spivak** <rspivak@gmail.com>
To: Rebecca Spivak <rspivak@gmail.com>

Thu, May 1, 2014 at 4:37 PM

**Performance Improvement Plan**

***Confidential***

Date: May 1, 2014
To: Rebecca Spivak
From: Jens Skakkebaek
CC: Caroline Bremner, Paul Higson
Re: Improvement Plan

**Summary & Background**
As mentioned in our recent discussion on April 11, 2014 your performance needs improvement on the Frontline team. This letter is to recap our subsequent conversation on May 1, 2014, where I summarized the areas where your performance needs to improve: communication/org, execution, leadership, and Googleyness and the need to initiate a performance improvement plan. Your current trajectory and impact is not acceptable and we need to work together to raise your performance level. Expectations for a PM III (L6) can be found at go/pmcareerladder.

**Areas of Improvement/Expectations**

Performing the tasks below will require significant work from you and result in full support of the Frontline engineering team in your efforts and vision.

| Area of Improvement | Action | Due Date | Method of evaluation |
|---|---|---|---|
| Communication / Org | - Verbal communication with other PMs and the engineering team needs to be clear and compelling, accurate and complete. Make statements that are based on thorough understanding and well-founded in use cases that are backed by more than just a few data points. In conversations, make sure that you represent other peoples' opinions/actions accurately without interpretation. Effective communication is needed to build trust and credibility within the team.<br><br>- Be transparent in your thinking by keeping key stakeholders in the loop.<br><br>- You need to document your ideas, results, requirements in PRDs for use by engineering. The portfolio of documents needs to be logically consistent.<br><br>- In situations where your opinions are different than others on important topics, you should be persistent and bring data to the table to convince your team members. Make sure that you are specific in your arguments. If you | throughout the plan | I will ask key members of the PM and Engineering team how they have observed your performance over the period of the performance improvement plan. In parallel, I will review what I have observed over the duration of the plan. |

| | | | |
|---|---|---|---|
| | reach agreement, communicate and trust that your team members are aligned. If you are still not able to reach agreement, escalate. Don't give up and position yourself as being in opposition.<br><br>Be fully engaged in team meetings instead of being on your laptop.<br>In Account Manager interviews, do not provide your own opinion, as you risk biasing the conversation and hearing only what you want to hear. | | |
| Execution | Ownership: take complete ownership of the PIE team's responsibilities and be proactive in driving its activities incl. Interactive Benchmarks, even if you don't agree with the direction on some of them. It's not enough to just own part of the activities.<br><br>- Do what you promise to do, incl. administrative tasks<br><br>- Engage and lead the core team meetings | throughout plan | We will ask key members of the PM, Engineering and Sales Ops teams how they have observed your performance over the period of the PIP days. In parallel, I will review what I have observed over the duration of the plan. |
| Leadership | - I expect you to be observed as being proactive by Engineering and Cross-Functional team members and be seen as the clarifying leader who solves problems and defines a path forward without need for escalation. | by end of plan | We will ask key members of the PM, Engineering and Sales Ops teams how they have observed your performance over the period of the PIP days. In parallel, I will review what I have observed over the duration of the plan. |
| Googleyness | Listen more and expect to learn from your colleagues.<br><br>Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve. | throughout plan | We will ask key members of the PM, Engineering and Sales Ops teams how they have observed your performance over the period of the PIP days. In parallel, I will review what I have observed over the duration of the plan. |

**Success criteria**
The goal of this plan is to demonstrate your ability to deliver results and raise your contributions to the level expected. This includes owning and delivering significant features with a significant impact on the product, working in harmony with the rest of engineering team with minimal supervision, or need for escalation, and communicating effectively with the team and third parties.

**Plan Duration**

This performance improvement plan will last for 60 days, effective May 1, 2014 through July 1, 2014

**Conclusion**

I hope this action will result in the required improvement in your performance. I am here to support you in your development and your team lead or I will meet with you periodically during the plan to discuss your progress and provide feedback. Please note that the expectations stated above need to be met during the plan period and sustained after the successful completion of the plan. Failure to correct this unsatisfactory performance now and in the future may result in further corrective action, up to and including termination without the need to undertake a further plan. A higher level of performance is expected now as well as going forward.

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

## Fwd: Estimates

**Rebecca Spivak** <rivka@google.com> Sun, May 4, 2014 at 9:34 AM
To: Rebecca Spivak <rspivak@gmail.com>

---------- Forwarded message ----------
From: **Rebecca Spivak** <rivka@google.com>
Date: Thu, Mar 6, 2014 at 9:48 PM
Subject: Re: Estimates
To: Jens Skakkebaek <jskakkebaek@google.com>
Cc: Vince Lacey <vincel@google.com>, Barbara Stanley <bstanley@google.com>, Doug Bengtson <dbengtson@google.com>

Although the launch of unified estimates will help bring clarity to certain things, I do not believe that it will address the core issue behind estimates - which is that we shouldn't be providing "estimates." I don't think speeding up the unified estimates work makes sense. Especially if it's at the expense of the transparency work.

We need a fairly substantial shift in thinking away from estimates, and on to exposing an interactive sandbox of historical information. People may call that "benchmarks" but I don't want the idea to get lost in semantics or internal politics. That's what will be useful to sales. And I still think this fits squarely with out team.

The core issue is that "estimates" is the wrong paradigm. We can't be successful because no one can reach the accuracy necessary in a sales situation ... and it's setting everyone up for failure to expect that we (or anyone) can. But we still fight it with quarterly OKRs around 10% here or there.

What we can do is show restricts on historical information, layered with various assumptions ... as a tool, not as a magic 8 ball ... "Show me historical impressions/CTR/CPC/CPA for this peer group, with this targeting, and guide me into finding a multiplier to account for seasonality and year over year price increases." This is the way that sales fundamentally wants to interact with the data. It follows their offline process. It gives them the story to tell, which is fundamentally part of the pitch. It's natural and intuitive for them and gets us away from the idea of "magical numbers" which will just never work. Every estimates team at Google chases the magical numbers, and that's why no one has ever succeeded.

There is so much we can do. The idea of a cool way to interact with historical information layered with trends is really powerful. And there's lots of visualization we can do with it as well to make it engaging - heat maps, tag clouds and other easy-to-digest UIs that bring insights. We can create tools that are not only useful for sales, but for PM, Eng, Legal, Policy, and Execs across all of ads. We could build tools that would help the user understand the current dynamics of the ads space on any dimension, including product, geography,seasonality ... I wonder if there's anyone at Google who actually understands the dynamics of the ads space fully. We could build things that sales would use to sell and that would also end up powering earnings calls. There is HUGE opportunity to model and expose data useful to sales and lots of other people too. But even if not for others, definitely there's huge opportunity for sales. For LCS.

We should take a big step and invest in a new approach. It's certainly not easy to push such a strong opinion as the new person. I mean, it really hasn't been easy or particularly fun, even though I'm excited for what we could do. I also think that a substantial shift in approach can't happen with a gentle message.

On Thu, Mar 6, 2014 at 4:55 PM, Jens Skakkebaek <jskakkebaek@google.com> wrote:
All,

**RS-048**

I had my 1:1 with John and he reiterated that estimates have become a big, big problem for AMs over the past month (not sure why it would have gotten worse particularly lately, but anyways... ).

The good news is that he says that AMs have confirmed that the Unified Estimates launch will be a good step forward. Rivka's ideas for transparency as well.

His main concern is that Unified Estimates are supposedly delayed to mid Q2 and he's worried that "patience is wearing thin".

1. what's the target launch date now?
2. does it make sense to try and speed up the work?
3. if yes, what are the options?

Jens

---------- Forwarded message ----------
From: **Rebecca Spivak** <rivka@google.com>
Date: Fri, May 9, 2014 at 9:05 PM
Subject: 1:1 Recap
To: Jens Skakkebaek <jskakkebaek@google.com>, Caroline Bremner <cbremner@google.com>

Jens - here is my recap of our 1:1. Please let me know if there's anything here that you think is not representative of our conversation. I'd like to have a shared understanding of what we discussed.

J: So, let's discuss how you will address the concerns in the PIP

R: Well, as you know, I don't agree with the PIP. I plan on continuing to do a good job. I don't know what else I can say.

J: So you are not planning on addressing the concerns. This attitude will not help you succeed.

R: I am planning to continue doing a good job. I am doing a great job. I do not agree with the PIP and you will not give me any examples. How can I address a problem that we can't discuss? I'm just going to do a good job, and if you fire me for it what else could I have done? You won't take the time to have first hand knowledge of my work. Can I show you the things I've done in Q1 that show that the accusations in the PIP make no sense? Let me just show you all the work I did - my documentation and research was thorough. I reached out to engineering repeatedly. Look -Can we review these things I sent ... look here where I introduced tracking of eng-to-pm requests so I could make sure none slipped through ... and here where I sent the roadmap and features and research summary and asked for feedback .... You didn't respond, eng didn't respond. The accusations suggest I didn't do these things, but here - I did them. You never let me tell you what I was doing. You didn't respond to many of my emails. Can we look at these things?

J: No. This is about what you are going to do moving forward.

R: We had the huge summit on April 9. I did thorough and complete research and documentation. It was outstanding and complete. It was possibly the most rigorous research and documentation across sales tools. I could not have done better. That was a month before the PIP.

J: So you think everything is swell. Do you think Doug would say that?

R: I've said I think the accusations were unfounded and that this was retaliation because user research conflicted with things Doug's team was doing. I said I was being bullied for surfacing user research. You never considered that that might have merit. You never gave me the chance to present the work I've done. I wish you would have an opinion that wasn't whatever Doug says. I sent you emails that you didn't answer. Even in this perf/pip process you haven't let me go through my work. It would take an hour to review the work I did over the quarter. Why can't we do this?

J: I am trying to help you succeed and work through these issues but you are not helping yourself.

R: But .. even if the accusations were true - you don't PIP someone you are trying to help as the first step of addressing issues. If you were trying to help me, why was Perf/Pip the first time we discussed this? Why not take an hour sometime *before* it got to a PIP and discuss this with me? I had a strong Q4 and moved cross country with my young kid to join your team. 4 months later you PIP me without any serious conversation before that. I'm in temp housing and you're going to fire me for things you won't even let me defend or discuss.

J: So you are angry at me. So if you want another manager, maybe that's what you should do

R: That could have been a conversation before you PIP'ed me. You could have said "Hey, this is not a fit, but you're coming of a strong performance in ADX, maybe you can bounce to a new team quickly." But now I'm on a PIP and I can't switch teams on a PIP.

J: I don't know. Is that true? That's an HR issue ... Are you working on anything right now?

R: Yes, I am on 3 projects that are going well and I am very busy with them. I was pulled in to be the PM for peer groups. I'm on interactive benchmarks and compliance.

J: Can you send that to me?

R: Yes. I am doing good work.

J: Well, ask Doug for feedback and see what he thinks and if he says you're fine you have nothing to worry about.

R: I did - on Monday. I asked him if I checked in with him every week and he had no issues, then I expected to pass the pip. He said it wasn't his decision and he was just one person. So I asked how I was doing anyway ... that a pip on May 1 makes no sense given the summit on April 9 ... and he said he heard I wasn't happy with the summit and that I wanted a bigger role and that I slowed things down. That's totally unfounded and invented. The accusation is that I was unhappy ... when I was happy. That's the level of accusation now. I am doing a good job and there is no basis to fire me.

J: Well I will get feedback and we'll see what others think.

R: Can I have the chance to face the specific allegations? Can we have a joint conversation with anyone who says they have issue with my work so I can address it directly?

J: No.

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

## Fwd: 1:1 Recap

**Rebecca Spivak** <rivka@google.com>
To: Caroline Bremner <cbremner@google.com>
Bcc: rspivak@gmail.com

Thu, May 15, 2014 at 1:12 PM

I am surprised if this is your understanding. I was inquiring about unpaid leaves because the situation at work was impossible. Not about vacation.

---

On April 11 when Jens told me he was rating me as Needs Improvement and I objected, he told me to take off while he was on paternity leave. I told him that there was a lot to do with the Summit's recent success and that I had deliverables and deadlines. He told me to take off anyway since he was going to be gone. I asked him if I could at least come in on Monday to hand some things over and wrap up. He said ok, but that I should see if that wasn't necessary. I let Judy Hsu know that this was the situation shortly afterwards.

When Paul met with me on April 14 (his initiative, presumably to find something concrete for the PIP) , I asked him directly if I was *allowed* to come into the office during those two weeks. He either said yes or was noncommittal. But either way, Paul would certainly have had the context that I knew I wasn't taking the 2 weeks off by choice.

On Thu, May 15, 2014 at 12:53 PM, Caroline Bremner <cbremner@google.com> wrote:

> Hi Rebecca
>
> Apologies, I was fwd'ing to Paul Higson is fully up to date and can provide assistance locally when he returns from leave next week.
>
> Just trying to make sure we are being as responsive as possible to your requests.
>
> I'm confused by the involuntary vacation concern. I understood you wanted to take some time off in April per our discussion back in early April?
>
> Regards
>
> Caroline

---

[Quoted text hidden]

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

## completely honest jens email

**Rebecca Spivak** <rivka@google.com>
To: Rebecca Spivak <rspivak@gmail.com>

Mon, Dec 8, 2014 at 12:57 PM

**To Michael**

Hi Michael,

Thanks for being a peer reviewer for Rebecca.

Please note, in your feedback, I urge you to be **completely honest** with your feedback -- that will be very helpful in theperf process.

Thanks!

**To Paul**

From: **Jens Skakkebaek** <jskakkebaek@google.com>
Date: Wed, Sep 24, 2014 at 3:08 PM
Subject: peer review
To: Paul McClinton <paulmcclinton@google.com>

Hi Paul,

Thanks for being a peer reviewer for Rebecca Spivak.

Please note, in your peer review, **I urge you to be completely honest** with your feedback -- that will be very helpful in the perf process.

Thanks!
Jens

Gmail by Google

Rebecca Spivak <rspivak@gmail.com>

**Q2/Q3 2014 Perf**

Rebecca Spivak <rspivak@gmail.com>
To: Rebecca Spivak <rspivak@gmail.com>

Grow

Home

Learning & Jobs

Starred & Recent

Real-Time Feedback

**Perf**

Help & Tools

File a Bug

Feedback for 2014 Q3

**Rebecca Spivak (rivka)** | 6 / Product Manager III OKRs Snippets Resume Feedback for 2014 Q3

## Rating

Consistently Meets Expectations

**Project/Achievement**

List up to 5 projects. You can add a 6th project for community contributions (e.g., mentoring, ERG participation) if they don't fit in those five.

**For non-promo candidates:** List projects/achievements since your last review; remember to consider the *entire* review period.

**For promo candidates:** Include the projects/achievements that best demonstrate your readiness for promotion to the next level. You can include projects/achievemen any time period that best demonstrate performance at the next level. Promotion committees will have access to your full Perf packet from previous cycles.

Need help writing your assessment?

1

**Interactive Benchmarks**

Originator / Lead

Impact: Critical

**Summary of my key contributions:**

What is it? Understanding ad and inventory performance is fundamental - For the account managers who are trying to sell the ads, to the tools that could offer insig and suggestions, to anyone trying to set an ad product strategy. This project (which I devised) is the data platform to understand historical ad inventory and perform across advertisers, verticals, and any relevant dimensions. It has many applications - from internal pitching and planning to insights in user-facing tools. Although s new, this project has already been proven in concept through an AMP prototype, has proactive interest coming in from many other teams, and is now widely consid the primary viable candidate for substantial sales tool consolidation. History As a new member of the team, I quickly developed domain expertise and conducted us research, I identified many underserved (yet critical) business needs. I synthesized these needs into a new product vision and strategy - and started laying a founda which eventually became Interactive Benchmarks. Although this was a shift in existing strategy, I achieved broad buy-in within just a few months. I did this by worki closely with engineering and sales ops to document the research, the opportunity, the product vision, and an achievable set of meaningful and useful milestones la clear path forward Specific Accomplishments * Conducted unprecedented user research, bringing in sales ops, to fully document and reference the opportunity anc Synthesized the need into product strategy * Developed and championed the vision and new product direction, navigating the natural resistance to strategic shifts, energized many teams around this project * Brought the team to full buy-in and excitement in less than one quarter * Created strong shared repository of document Worked closely with engineering through all stages of execution * Collaborated with and presented vision/plan to cross functional teams (they're all on-board and w

**What's one thing you do really well that you plan to continue doing?**

| Reviewer/Role | Feedback |
|---|---|
| Rebecca Spivak<br>(Self)<br>6 / Product Manager III | Great vision and insight - I increase the impact of Google engineering teams by helping them work on the things t most. I am able to do this as I enter a new space by quickly developing domain expertise, "focusing on the user", product challenges and opportunities, setting achievable and high-impact product strategies, partnering across te functions, and driving through successful execution. To connect this strength to something specific on the PM lad strength most closely matches this (level 7) PM description: "Has product insight and vision about where the prod go, what's going to be successful, and has a record of making good bets on the future of a product" (go/pmladder I am a level 6, that is where I excel most. This strength has been repeatedly recognized throughout my career anc consistently throughout my 4+ years at google. For the current period, I propose Interactive Benchmarks quickly a developing domain expertise. Even though it included a substantial shift in direction, I was able to achieve broad I excitement. In a short period of time, we have already launched an impressive prototype (on real data), presentec senior leadership, and now have this same senior leadership across functional and product groups joining in on th Interactive Benchmarks is one data point, though many are noted in perf in my 4 years here. To support the trend below for prior peer feedback taken directly from past reviews. ..... "Rivka is a doer, she is focused on things that r drives forward." (Director of Engineering) "Liked by engineering for her ability to ensure development is focused o impactful changes" (Director of PM) "Does a great job of gaining a clear-eyed and comprehensive understanding area she works in ... this was not an area that she was previously familiar with, yet she quickly became a domain and learned more about our buyers in a few weeks than some PMs have learned ever. This allowed her to develo and plans that led to a much more useful finished product than we would otherwise have built. Rivka also speaks clearly and persuasively. This has helped her, and the engineers who work with her, build successful and helpful rather than engage on Quixotic campaigns to build systems that may be very pretty and fun to work on but that ar ultimately of marginal benefit." (Senior Staff Engineer/ L7) "A true visionary - Rivka's vision is still guiding us in wh although she is no longer on AdX. ... encouraged us to release and iterate ... we were able to get solid feedback f buyers and shift our priorities ... led to an epic Q4 - we had 3 product releases ... all with an impact on our buyers (Eng TL) "Vision - Rivka possesses and communicates a clear vision where the Local Enhanced Product should e the short, mid, and long term ... goes beyond a standard PRD and has been extremely helpful as I understand wh working towards within this product ... also on a broader, partner-centric level where I am able to answer critical p questions with clarity and authority ... Having been at Google for 4.5 years and worked on AdWords, AdSense, GDN/Display, and YouTube, I can say this is the first genuine "vision" paper I've seen that wasn't written by a VP level Googler. Great work Rivka." (Strategic Partner Manager) Strength: "Vision/insight: Rivka is outspoken and a for ways to improve" (Vice President of PM) Strength: "Strong product insight Good long term / big picture thinking and energy" (Another Vice President of PM) Strength: "Product/Strategy - Rivka is able to think about overall proc strategy from end to end - mixing partner, product and eng insights" (Group PM) Strength: "You can't lead silently from the sidelines ... Rivka dives into brainstorming sessions and PM meetings and provokes discussion that chal assumptions." (Director of PM) "She did not take the conventional view .... [Now] based on her research and discu this is now a view widely held by the team ... put in the time to meet with clients and gather fundamental feedback significantly impacted the buy-side roadmap and features -- many of which she devised." (PM Director) "There we preconceptions ... She really dug into the details to understand what was really required. And then she did a great getting that developed and into the commercialization process ... Really a very very good partner for sales" (Head "heavily customer driven versus look[ing] at what was technically easiest ... This will lead to reporting being more and more effective." (Senior PM) |
| Jens Skakkebaek<br>(Manager)<br>Group Product Manager | Rebecca is great at getting deep in her subject matter, setting a good vision for where it should go, and communic An example of this was in the Frontline Brainstorm in October, where Rebecca did a great job. |
| Aaron Rothman<br>(Peer)<br>Product Manager | Effectively prioritize tasks/features: I think Rebecca has done a good job at understanding what key workflows n benchmarking solution and making sure those features are appropriately bundled/prioritized. |
| Dustin Jackson<br>(Peer)<br>Director, Software Engineering | Rebecca's assessment is consistent with my observations thus far. She is very focused on building the products t for our users and using her own knowledge and investigations to decide on exactly what that is (rather than relyin the opinions of others). |
| Gautam Sawhney<br>(Peer)<br>Sales Operations Manager | Setting Vision -- Rebecca has amazing ability to visualize the success of a product from an end user's perspective works backwards to outline the path and vision towards making that a reality. She brings forward creative and bol help solve problems and up-level solutions that have been tried and tested in the past. For example, during a rece discussion around benchmarking tools defragmentation, Rebecca brought forth great insights and a clear vision fo Interactive Benchmarks could succeed at consuming / deprecating the many other tools currently out there. She w quick to realize the risks of recommending deprecation of certain large and very popular tools and put forth a plan balanced these risks, while still helping achieve an ideal longer term vision in this area. |
| | I agree with the Rebecca's self-assessment about vision and insight (see section on IB), she has strong insight ar good product direction. However, I would like to call out a different strength which I have found to be surprisingly r |

RS-072

involvement) Presented to cross functional senior leadership - receiving strong positive feedback Helped support the onboarding of 4 new engineers for this pro
With a milestone approach, we have already launched a functional prototype (on a real infrastructure) that continues to _prove_ out the approach and product. Initi
feedback on the prototype exceeds all expectations With Quicksilver being deprecated, this project has been an energizing source of excitement across engineerin

| Reviewer/Role | Feedback |
|---|---|
| Aaron Rothman (Peer) Product Manager | Benchmarking is a key piece in the pitching process and Rebecca has produced a solid set of milestones to delive version. There are many complexities involved (data sparsity, compliance, etc.) that Rebecca has clearly thought and (so far) effectively incorporated into her product plan. |
| Dustin Jackson (Peer) Director, Software Engineering | There's no question that IB is filling a significant product gap and has produced a great deal of excitement both wi and the engineering team. Rebecca has done an impressive job turning this from an idea to a real project in a shc of time. |
| Michael English (Peer) 6 / Staff Software Engineer | Rebecca originally came in as PM to help my team with the "Pitchable Insights" idea. After talking with users and understanding the domain she recognized that there was actually a much more fundamental and far reaching nee wasn't being met. This is pretty significant to uncover a need this big, as Sales Tools is a well trodden area. She fi a fundamental vision and strategy from these fundamental needs and managed to work with Sales Ops and Eng to alig new product vision, now what we call Interactive Benchmarks. This new promising direction has really helped the morale recover from the low created by the Quicksilver bake-off. |

2
**PM for Benchmarks and Peer Set Policy**

**Summary of my key contributions:**
Google places high value on protecting our customer data, and on ensuring that we don't release company sensitive data. But having clear product directic policy is hard, because policy application is complex. Both the peer sets and Benchmarks projects generated concerns over policy issues. I took this over a it from a point of substantial Fear/Uncertainty/Doubt and brought it to a point of shared understanding and clarity. Worked cross team with legal and policy identified parallel use cases in similar products to set precedence Unblocked major functionality by removing policy confusion Worked closely with enginee details and design docs We have clear answers and direction for all policy related issues now, and the FUD is gone.

PM
**Impact:** Critical

3
**PM For Peer Sets**

**Summary of my key contributions:**
This project was blocked for many quarters over some tricky cross team issues * The project (conceived 2 years ago) assumed a dependency on GreenTea * However GreenTea's priorities do not align with our timeline * Rather than let cross-team frustration build and have the project stall, I set an alternate plan * ach buy-in on the alternate approach - from the Frontline and GreenTea teams * The project is now UNBLOCKED and progressing Set the PRD and short/long tem Coordinated across MIS, Wildcat, and Athena Worked Closely with _Engineering_ on all details and assisted in development of design doc

PM
**Impact:** Critical

4
**PIE PM Lead**

**Summary of my key contributions:**
Domain expert for multi-faceted group of products Collaborate with and maintain relationships across teams, including * Video Reservation (ZRH) * CAWFE / AW MIS * Search * GreenTea Maintain Close and Collaborative working relationship with my TLM and a growing engineering team Helped onboard and inspire new t team membersLead team direction, help keep engineering inspired, make the right calls on priorities Maintain centralized repository of documentation Keep stakeholders informed with clear status updates Set clarity around intersecting PM Roles Set clarity around Unified Estimates/ Interactive Benchmarks interactior

PM
**Impact:** Critical

**How well does Rebecca Spivak perform in their role (6 / Product Manager III)?**

| Reviewer/Role | Feedback |
|---|---|
| Jens Skakkebaek (Manager) Group Product Manager | Things are on the up and going well on the project. Over the past 6 months, Rebecca has gotten Interactive Benc really going in development and set a great vision for the use of Benchmarks within Sales, and Sales Ops is excit the prospects of getting these capabilities in the hands of AMs. A sign of this is that Interactive Benchmarks is a c as an anchor tool in the future sales tools landscape. She has a close working relationship with Sales Ops, has es herself as a credible partner and thought leader with them, and is getting good input from them. Rebecca has ean trust of engineering, which is great. Eng likes her insights, vision, and ability to work at a detailed technical level a (e.g., pulling together a future-system architecture drawing). The team is executing well now - is working closely w engineering to push things forward and has good deliverables. We look forward to seeing IB launch in Q1! To be c collaboration within the cross-functional team and with other teams, Rebecca still needs to work on her soft-skills particular around communication) and her ability to receive and synthesize constructive feedback. |

| Reviewer/Role | Feedback |
|---|---|
| Michael English (Peer) 6 / Staff Software Engineer | Google. Rebecca has shown that she can follow complex and detailed discussions of data / backend issues and I good resolution to product questions which is coherent within the larger context of the product vision. Recently we a discussion about how to capture geo dimensions. The product decision she arrived at allowed us to narrow dow handling of geo from a potentially huge cross-product of 4 different features to only 4 total options. The larger con she couched her decision in was that users want to see both "what advertisers were trying to do" and "what happe specific locations". The combination of being able to work through the low level details with the engineers and cor those discussions within the larger product vision is very valuable to my teams success. |
| Paul McClinton (Peer) Principal Account Manager | One thing that has plagued the sales/services org at Google is the need for accurate and insightful projections an benchmarks. While a few product folks would say "eh, it's good enough", Rebecca came into her role and said "hc make the best possible tool for our sales teams that exceeds all expectations?". She met with me on a weekly ba: discuss my pain points and to better understand how I use our internal tools to build proposals or provide insights clients. I learned quickly how smart and forward thinking she was. Within each of those meetings, Rebecca would concerns and then make suggestions that were 10x what I could ever think of. It has been a real pleasure collabo her. Large companies need people like Rebecca who continually push for "better than good". She doesn't want to expectations, she wants to blow your mind. And quite frankly, the work she's done is doing just that. The sales org to have her. |

**What's one thing you plan to improve in order to have more impact?**

| Reviewer/Role | Feedback |
|---|---|
| Rebecca Spivak (Self) 6 / Product Manager III | The PM Ladder lists "Good Relationships and Comfortable working with VPs" as part of the requirements for the r With the growing scope of Interactive Benchmarks and with a goal of achieving the next PM level, I plan to develo relationships with Senior Leadership by finding opportunities for more direct interaction, including quarterly check- relevant VPs. |
| Jens Skakkebaek (Manager) Group Product Manager | Communication: To be an effective product leader and influence others, negotiate well, and be the product leader needs to be sensitive to the audience and tailor the message accordingly. This is equally true within the core tearr feedback below) as well as with other teams in the PA, to negotiate and get buy-in for her ideas. Rebecca tends tc push the merit of her own ideas and use (what is perceived as) hyperboles by peers. An example I received was i media review, her deck used strong language that was pretty declarative ("Estimates are not what sales needs" et tone in the presentation was to show that everything was going great. By making sure that she's being more trans about what's going well and what's not, she can build more trust and credibility. Admitting issues/challenges is not weakness, but rather a sign of good judgment and honesty - and strength. All of this is important to bring pe on the journey with her (rather than assume that they are not interested and have other motives). * Ability to recei feedback without being defensive: personal growth comes from being able to take feedback and get stronger. Use as a powerful tool to help understand how you are perceived by others and think about what you can change in th interactions to avoid these perceptions. |
| Aaron Rothman (Peer) Product Manager | Presentation and packaging of ideas. I believe Rebecca has good ideas but often positions these ideas as 'I'm rig everyone else is wrong', when the situation is often more complex and the data doesn't necessarily align with her This makes it difficult to get support/consensus from peers and leadership. For example, she positioned her work her Media Reviews presentation) on Interactive Benchmarks (IB) as the answer to how estimations are a failed pr also used selective customer feedback to drive this point. The reality is that IB seems ideal for some use cases bu estimates is better for others. Both peers and senior team members had a negative reaction to this positioning, wt required some serious edits before the actual Media Reviews event. Strategy. Recently, Rebecca has stepped-up but I think she needs to flesh this out more, specifically in the areas of consolidation and integration. Receiving fee I've attempted to provide feedback, especially on presentation and packaging of ideas, and I found Rebecca to be defensive and not open to receiving it. |
| Dustin Jackson (Peer) Director, Software Engineering | Rebecca is in a tricky position on a project outside of MTV with a lot of internal stakeholders (sales, in particular). savvy is going to be a real asset. Rebecca should try to operate with a long-term plan and modulate her message appropriate audience. With IB, for example, while there may be wide-ranging applications down the road it's going more effective to message one particular use case you're going after for now. That's sufficient to get the necessar in the near-term. And you'll find the audience much more receptive to widening the scope once the team has prov capable owner within the domain. |
| Gautam Sawhney (Peer) Sales Operations Manager | Rebecca has really great ideas and often delivers them to the team with conviction and passion. On certain occas have noticed that her passion and opinions can overwhelm the group during discussions. Rebecca would greatly I from more actively recognizing the mood in the room and tailoring her delivery accordingly to help make more of a from her messages. Her creative ideas would be extremely well received via a combination of presentation, influe persuasion abilities / styles. |
| Michael English (Peer) 6 / Staff Software Engineer | Rebecca has shared ideas about a larger vision for Interactive Benchmarks which includes sell side and business users. In our discussions about this she has been cautious about sharing these ideas more widely. I think our tear have even more impact if she pursues these ideas more fully. |

| | |
|---|---|
| (Manager)<br>Group Product Manager | tone in the presentation was to show that everything was going great. By making sure that she's being more transparent about what's going well and what's not, she can build more trust and credibility. Admitting issues/challenges is not a sign of weakness, but rather a sign of good judgment and honesty - and strength. All of this is important to bring bring people along on the journey with her (rather than assume that they are not interested and have other motives). * Ability to receive feedback without being defensive: personal growth comes from being able to take feedback and get stronger. Use this also as a powerful tool to help understand how you are perceived by others and think about what you can change in the personal interactions to avoid these perceptions. |
| Aaron Rothman<br>(Peer)<br>Product Manager | Presentation and packaging of ideas. I believe Rebecca has good ideas but often positions these ideas as 'I'm right and everyone else is wrong', when the situation is often more complex and the data doesn't necessarily align with her views. This makes it difficult to get support/consensus from peers and leadership. For example, she positioned her work (draft of her Media Reviews presentation) on Interactive Benchmarks (IB) as the answer to how estimations are a failed product. She also used selective customer feedback to drive this point. The reality is that IB seems ideal for some use cases but estimates is better for others. Both peers and senior team members had a negative reaction to this positioning, which required some serious edits before the actual Media Reviews event. Strategy. Recently, Rebecca has stepped-up this effort, but I think she needs to flesh this out more, specifically in the areas of consolidation and integration. Receiving feedback: I've attempted to provide feedback, especially on presentation and packaging of ideas, and I found Rebecca to be very defensive and not open to receiving it. |
| Dustin Jackson<br>(Peer)<br>Director, Software Engineering | Rebecca is in a tricky position on a project outside of MTV with a lot of internal stakeholders (sales, in particular). Political savvy is going to be a real asset. Rebecca should try to operate with a long-term plan and modulate her message to the appropriate audience. With IB, for example, while there may be wide-ranging applications down the road it's going to be more effective to message one particular use case you're going after for now. That's sufficient to get the necessary funding in the near-term. And you'll find the audience much more receptive to widening the scope once the team has proven to be a capable owner within the domain. |
| Gautam Sawhney<br>(Peer)<br>Sales Operations Manager | Rebecca has really great ideas and often delivers them to the team with conviction and passion. On certain occasions, I have noticed that her passion and opinions can overwhelm the group during discussions. Rebecca would greatly benefit from more actively recognizing the mood in the room and tailoring her delivery accordingly to help make more of an impact from her messages. Her creative ideas would be extremely well received via a combination of presentation, influencing, and persuasion abilities / styles. |
| Michael English<br>(Peer)<br>6 / Staff Software Engineer | Rebecca has shared ideas about a larger vision for Interactive Benchmarks which includes sell side and business analyst users. In our discussions about this she has been cautious about sharing these ideas more widely. I think our team can have even more impact if she pursues these ideas more fully. |

On Tuesday, November 6, 2012 at 7:30:37 PM UTC-8, Scott Spencer wrote:
Team,

I wanted to share some great news about two of our AdX product management team members:

**Atul Bhandari – promoted to PM III**
Atul has done a tremendous job managing the enture buy-side of the DoubleClick Ad Exchange. In addition, he has taken responsibility for all of AdX mobile enabling full integration of both web-based and in-app mobile inventory throughout the exchange. And, most recently, he has brought the DoubleClick Compute Engine product with OpenBidder to market.

**Jarid Magid – promoted to PM I**
Jarid has taken the AdX world by storm, tackling the incredibly complex migration and development effort required to move clients from the Admeld platform to the improved AdX platform. He has jumped into complicated cross-functional discussions and helped coordinate the global migration effort. Thanks to Jarid's efforts, we are in great shape to provide clients a true best-of-breed solution and move clients in the first half of the year.

Please join me in congratulating Atul and Jarid!

**Rebecca Spivak (rivka)** | 6/Product Manager III — Feedback for 2013 Q3

**Rating**

Meets Expectations

**Contributions**

1

**Extensive Buyer research and client calls**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

2

**Buyside Vision and strategy**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

3

**AdX migration to Display Planner and sunset of Placement Tool**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

4

**Buyside Alerts Initiative**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

RS-219

5

**Inventory Discovery**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

**How well does Rebecca Spivak perform as a Product Manager III**

| Reviewer/Role | Feedback |
|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | Rebecca has had a relatively strong 6 months, steadily improving in her output and engagement. While earlier, many engineers were frankly unimpressed with her output, she has stepped up her work effort and brought key projects significantly forward. |

**What's one thing you do really well that you plan to continue doing?**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) Product Manager III | I don't just shepherd existing ideas - I bring big original ideas to the table and convince others that they're the right things to do.<br><br>- Buyer Alerts as a primary interface was a new idea I developed after proactive research, and is now broadly accepted as the right direction<br>- Focus on RTB and spend, not on "fixing" the UI<br>- Inventory discovery instead of forecasting as the primary use for the system |
| **Scott Spencer** (MANAGER) Director, Product Management | Rebecca did much better when she took a step back and looked at the problems to be solved. For example, when looking at the buy-side UI, she did not take the conventional view that static buying needed to be maintained (a controversial view) and, based on her research and discussions, this is now a view widely held by the team. In addition, Rebecca put in the time to meet with clients and gather fundamental feedback that has significantly impacted the buy-side roadmap and features – many of which she devised. |

RS-220

**What's one thing you plan to improve on to have more impact?**

| Reviewe‹ ›le | Feedback |
|---|---|
| **Rebecca Spivak**<br>(SELF)<br>Product Manager III | I would like to improve on promoting my projects<br><br>- Send out more status emails, more PR<br>- Overall be more visible to Eng Leads |
| **Scott Spencer**<br>(MANAGER)<br>Director, Product Management | Rebecca can get emotional about certain situations and can sometimes miss-communicate / misinterpret other's communications. She is overly reliant on IM and email communications rather than speaking with people face to face. More joint meetings to get people on the same page would improve her ability to create consensus and avoid confusion. |

**Promotion**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Rebecca Spivak**<br>(SELF)<br>Product Manager III | No | |

**Promotion**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Rebecca Spivak**<br>(SELF)<br>Product Manager III | No | |

RS-221

---------- Forwarded message ----------
From: **Rebecca Spivak** <rivka@google.com>
Date: Fri, Feb 28, 2014 at 11:58 AM
Subject: Fwd: Regional AMP Feedback
To: Jens Skakkebaek <jskakkebaek@google.com>

Hi Jens -

FYI, we kicked off more AMP feedback directly from Amanda (it was a bit exhausting being the messenger) and if you skim through it, you will see that it's pretty harsh, but it's also consistent with the issues I've been raising





over the last month.

I have a thick skin, but the situation is definitely tricks. There are some big questions, dynamics, and strategies to think about. Let's 1:1 soon?

---------- Forwarded message ----------

**Pitchable Insights PM Job Description**
January 2014

**Background**
A. When putting together a pitch and/or proposal, AMs/pods appear to be facing:

- Fragmentation: AMs today go to multiple sources to get insights to substantiate their pitch: ICS, go/mitool, go/ytbenchmarks, Wildcat, Analytical Lead vertical analysis, 3rd party industry analysis, ExtraReach, Brand Insights, other?
- Insufficient data: they don't have all the data they want. E.g., for Brand pitches, the Sales team is asking for de-duped R&F numbers for planning. The Brand Insights team is working on Trends4Marketers and other insights. What else is missing?
- Lack of guidance for what they should pitch: Campaign Selling insights have low acceptance rates. On self-initiated pitches, there's no place today where they can go to get well-founded ideas for what to pitch for the client. Nikesh wants to pitch Solutions/"Priority Revenue Plays", but we don't have a tool that provides these recommendations.
- Missed opportunities for leveraging existing data: the SEA eng team has ideas for unexplored insights derived from past campaign performance data.

This results in loss of AM efficiency and makes them less effective than the could be.

B. There is interest in providing a single Pitch/media planning user experience based on AMP. However, AMP today does not provide any insights or guidance for what/how much an AM should pitch to clients.

**Role and Responsibilities**

- Own and drive vision, requirements, prioritization, execution and launch of a new "Pitchable Insights" UI in AMP
- document the use cases, identify the requirements of insights that AMs require
- Work with Sales Ops to estimate the opportunity for efficiency savings that can contribute to Frontline
- Ensure we support the Brand use case well -- it's a top priority for Display this year
    - Work with SEA, LAX, ZRH teams to create an integration strategy such that AMP can provide de-duplicated reach & frequency planning estimates by mid 2014.
    - Determine what other cross-media brand insights need to be prioritized. Assess opportunity of partnering with ExtraReach team for data. Develop a strategy for exposing the Brand Insights from Jason Miller's team.
- Work with Green Tea PM/Eng team, Mike Schulman (Search Opps) and Yan (DOC) to identify, understand and resolve overlaps between insights being provided both in GreenTea and in AMP.
- Work with owners of benchmark tools (incl. go/mitool, go/ytbenchmark, benchmarks from ZHR team, other) to identify what benchmarks should be surfaced in AMP to assist the AM in deciding what to pitch. What use cases that are valid? Potential sunset plan for go/mitool (if/when appropriate).
- Create the right user experience with UX and work with the current AMP Platforms PM to integrate Pitchable Insights into the overall AMP workflow.
- Work with the Pitchable Insights Eng team in SEA to identify, validate the business impact, commercialize, and launch new insights for AMs.

- Media Planning Product/Budget Recommendation
    - Work with Sales Ops/GSLs to build in the right Solutions/product recommendations. Identify the right timing for this. Does the PitchBuilder team have good ideas that we should be leveraging?

- o With Search/Survey lift off the ground, can we finally provide media-mix recommendations for Brand? This could be a big deal.

- Own and drive vision, requirements, execution and launch of improved Quicksilver estimate capabilities.
  - o **[Later -- timing: suggest May 1. After the conversation with TEA team and future of Quicksilver estimates is far enough along. Let's discuss on Monday if there are smaller areas that will be universally useful and fits with the role, that are relevant to take on now]**
  - o Improve quicksilver estimates by 10-15% and craft sales story to improve confidence and celebrate win
  - o Provide quicksilver estimates to CAWFE, define and meet quality bar, and work with CAWFE team to determine impact on construction flow.

- PM for select AMP features, as needed to ensure an adequate, shared workload across the PMs.
  - o TBD - to be discussed in SEA on Monday

**From:** Rebecca Spivak <rspivak@gmail.com>
**Date:** July 8, 2014 at 3:02:17 PM PDT
**To:** Rebecca Spivak <rspivak@gmail.com>
**Subject: pip**

## Rebecca Spivak Successful Completion of PIP

***Confidential***

| | |
|---|---|
| Date: | July 8, 2014 |
| To: | Rebecca Spivak |
| From: | Jens Skakkebaek |
| CC: | Caroline Bremner, Paul Higson |
| Re: | PIP Completion |

Congratulations on having successfully completed your PIP.

A summary of this follows:

| Area of | Item Needing Improvement | Status |
|---|---|---|

| Improvement | | |
|---|---|---|
| Communication / Org | | |
| | - Verbal communication with other PMs and the engineering team needs to be clear and compelling, accurate and complete. Make statements that are based on thorough understanding and well-founded in use cases that are backed by more than just a few data points. In conversations, make sure that you represent other peoples' opinions/actions accurately without interpretation. Effective communication is needed to build trust and credibility within the team. | Since the April summit, you have been clearer in your asks/status communication with eng, incl. in regular updates in core team meetings.<br><br>Your peers recognize that you are no longer making bold statements without having evidence and having high confidence in the evidence.<br><br>It's positive that you are no longer taking over/dominating meetings, as I understand there were instances of that before, where you were perceived as doing so.<br><br>Input from Sales Ops that you are more organized and with incremental communication. They appreciate a central document to keep track of information.<br><br>Remaining concern: representing other people's opinions accurately. |
| | - Be transparent in your thinking by keeping key stakeholders in the loop. | The regular email updates that you started have been effective at keeping stakeholders up to speed. Also, the regular 1:1s you have with Eng, PM, and Sales Ops have had good effect as well. |
| | - You need to document your ideas, results, requirements in PRDs for use by engineering. The portfolio of documents needs to be logically consistent. | Big improvement. Eng likes the system you put in place with a master PRD and links to sub PRDs. Your documentation is well organized in go-link and each document has the necessary level of granularity and accuracy. |
| | - In situations where your opinions are different than others on important topics, you should be persistent and bring data to the table to convince your team members. Make sure that you are specific in your arguments. If you reach agreement, communicate and trust that your team members are aligned. If you are still not able to reach agreement, escalate. Don't give up and position yourself as being in opposition. | No significant disagreements since summit to test this.<br><br>Your ability to properly manage disagreement and conflict is a concern that remains for me and an important area for you to master and work on going forward. |
| | Be fully engaged in team meetings instead of being on your laptop. | In the PIE team meetings, you are engaging appropriately and letting people have their sections. Your status updates are fine.<br><br>In the Display Workflow summit, you engaged well in the broader session with good comments and similarly in the breakout session. It felt like you were a part of the team. |
| | In Account Manager interviews, do not provide your own opinion, as you risk biasing the conversation and hearing only what you want to hear. | No customer interviews during the period to test this<br><br>Interviewing customers/users in an unbiased |

| | | |
|---|---|---|
| | | way is a key PM skill. In this area, it's particularly important, since there's high degree of variability of the AM use cases. Until proven otherwise, it still remains a concern to work on. |
| **Execution** | | |
| | Ownership: take complete ownership of the PIE team's responsibilities and be proactive in driving its activities incl. Interactive Benchmarks, even if you don't agree with the direction on some of them. It's not enough to just own part of the activities. | With reduced scope (QuickSilver moved out), you have taken full ownership of Peer Sets and compliance issues around size of peer sets across all products (not just for your own), in addition Interactive Benchmarks. Great.<br><br>As you get your current projects under way, we should make sure to keep an eye on your scope and expand appropriately. |
| | - Do what you promise to do, incl. administrative tasks. | No situations observed here for feedback.<br><br>Make sure that this does not come up again. This should be an easy one to work on. |
| | - Engage and lead the core team meetings. | You are driving your section of PIE leads meetings well with preset agenda and letting team members own their sections appropriately. By doing this, your PM leadership is manifesting itself.<br><br>If you haven't already, you should step up and drive the full leads meeting (agenda, etc), not just a section. |
| **Leadership** | | |
| | - I expect you to be observed as being proactive by Engineering and Cross-Functional team members and be seen as the clarifying leader who solves problems and defines a path forward without need for escalation. | Engineers feel like you are now the go-to person for questions.<br><br>You need to keep building your leadership in your team and area. Being proactive is a core part of that. |
| **Googleyness** | | |
| | Listen more and expect to learn from your colleagues. | Eng feels that there has been a significant change to the better -- you are listening more to your colleagues and are receptive to their ideas/suggestions. |
| | Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve. | No observations here during the period.<br><br>This is a core skill that's truly important to growing. The concern remains valid -- it's up to you to demonstrate improvements in this area going forward. |

I must caution you that any recurrences of unsatisfactory performance in the future may result in further corrective action up to and including termination without the need to undertake a further plan. Please note that the expectations from the PIP need to be met and sustained after the successful completion of the plan. A higher level of performance is expected now and going forward in the future.

I'll wrap this up by saying I'm happy to see the improvements you've made, and I'm excited that we are moving forward in a positive manner.

Jens

---------- Forwarded message ----------
From: **Rebecca Spivak** <rivka@google.com>
Date: Thu, Sep 4, 2014 at 10:28 AM
Subject: Invitation: Rebecca/David @ Thu Sep 4, 2014 15:30 - 15:55 (David Goodman)
To: "davidgoodman@google.com" <davidgoodman@google.com>

**more details »**

**Rebecca/David**

I have something cool to show you that I think you will want to use ... last minute, but hopefully you can spare a few minutes!

| | |
|---|---|
| When | Thu Sep 4, 2014 15:30 – 15:55 Eastern Time |
| Video call | https://plus.google.com/hangouts/_/google.com/rsdg |
| Calendar | David Goodman |
| Who | • Rebecca Spivak - organizer<br>• David Goodman |

Going? **Yes** - **Maybe** - **No** more options »

Invitation from Google Calendar
You are receiving this email at the account davidgoodman@google.com because you are subscribed for invitations on calendar David Goodman.
To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

RS-386

Philosophy



# Framing This Deck

This deck was created for a "Brainstorming" session, with the mandate to "Think Big"

**Trying to do this ...**

- Communicate the long-term IB vision
- Discuss the high level product plan for 2015
- Surface strategic questions to this limited brainstorming group
- Proactively consider broader Google needs that may lead to efforts that duplicate the work IB is doing
- Start the conversation around what we should do (from a process/collaboration approach) to try to prevent future fragmentation

**Not trying to do this ...**

- Suggest mature expertise on the specific use cases beyond LCS
- Propose that the PIE/AMP team support all cross-team uses cases

Rebecca Spivak <rivka@google.com>

# Prescriptive Gender Discrimination at Google

Rebecca Spivak <rivka@google.com> Tue, Feb 3, 2015 at 10:33 AM
To: Craig Hazenfield <hazenfield@google.com>
Cc: Lauren Thomas Ewing <laurenth@google.com>, "Nina R. Sakellariou" <ninarc@google.com>, Becky Bucich <beckybucich@google.com>, Rebecca Spivak <rspivak@gmail.com>

Thank you.

I know that I am far more in the details than others, so I want to share this table of excerpts from my past few performance reviews. I took excerpts from the primary "strength" and development area listed.

I hope that seeing this side-by-side is useful for understanding the situation.

| Q3 2014 | | |
|---|---|---|
| Jens (PM) | Rebecca is great at getting deep in her subject matter, setting a good vision for where it should go, and communicating this. | Rebecca tends to strongly push the merit of her own ideas |
| Dustin (Eng) | She is very focused on building the products that matter for our users and using her own knowledge and investigations to decide on exactly what that is (rather than relying solely on the opinions of others). | Rebecca should try to operate with a long-term plan and modulate her message to the appropriate audience |
| Gautam (Sales Ops) | Setting Vision – Rebecca has amazing ability to visualize the success of a product from an end user's perspective and works backwards to outline the path and vision towards making that a reality. She brings forward creative and bold ideas to help solve problems | her passion and opinions can overwhelm the group during discussions. Rebecca would greatly benefit from more actively recognizing the mood in the room and tailoring her delivery accordingly |
| ~~Michael (Eng)~~ | ~~She formulated a product vision and~~ strategy from these fundamental needs and ~~managed to work with Sales Ops and Eng to~~ align on this new product vision, now what we call Interactive Benchmarks. This new promising direction has really helped the team's morale recover<br><br>... she can follow complex and detailed discussions of data / backend issues and formulate a good resolution to product questions which is coherent within the larger context of the product vision. ... The combination of being able to work through the low level details with the engineers and contextualize those discussions within the larger product vision is very valuable to my teams success. | ~~Rebecca has shared ideas about~~ a larger vision for Interactive ~~Benchmarks which includes sell~~ side and business analyst users. In our discussions about this she has been cautious about sharing these ideas more widely. I think our team can have even more impact if she pursues these ideas more fully. |
| Paul (Sales) | Large companies need people like Rebecca who continually push for "better than good". She doesn't want to meet expectations, she wants to blow your mind. And quite frankly, | • None - |

| | | |
|---|---|---|
| | the work she's done is doing just that. The sales org is lucky to have her. | |
| | Q1 2014 | |
| Jens (PM) | Rebecca has good ideas, passion, and ability to synthesize it into a new product direction. | Listen more and expect to learn from your colleagues. |
| Jacob (Eng) | Rivka does a great job of gaining a clear-eyed and comprehensive understanding of any area she works in. ... she quickly became a domain expert, and learned more about our buyers in a few weeks than some PMs have learned ever. This allowed her to develop insights and plans that led to a much more useful finished product than we would otherwise have built. Rivka also speaks her mind clearly and persuasively. This has helped her; and the engineers who work with her, build successful and helpful products rather than engage on Quixotic campaigns to build systems that may be very pretty and fun to work on but that are ultimately of marginal benefit. | Sometimes, being right isn't the most important thing. In particular, even if an engineering team is building the wrong thing, it can be very demotivating for them to hear about the ways in which they are building the wrong thing |
| Jeremy (Sales) | There were a lot of preconceptions about what Inventory Discovery should be, and she really dug into the details to understand what was really required. And then she did a great job getting that developed and into the commercialization process. She was interested in meeting regularly to gather sales feedback and provide updates. Really a very very good partner for sales. | • None - |
| Ari (PM) | she shipped a lot of high-impact features in a very short amount of time, which is a testament to her Product Management prowess | She should communicate more with different stakeholders. |
| Nir (eng) | Rivka is a true visionary - Rivka's vision is still guiding us in what we do, although she is no longer on AdX. For example, when Rivka envisioned the Inventory Discovery Tool and the Alerts project, one of the things that she kept telling us was that we have to be proactive with our users, and that the next step will be discovery alerts. That was in Q4 2013 and we are still using that as a guideline. Rivka encouraged us to release and iterate - I find that approach super useful as in AdX we have savy users and their feedback makes a difference. By releasing and iterating we were able to get solid feedback from our buys and shift our prioritize. Both the merits mentioned above led to an epic Q4 - we had 3 product releases (BuySide alerts, RTB graphs and inventory discovery), all for the BuySide and all with an impact on our buyers spend. | • None - |
| | Q3 2013 | |
| Scott (PM) | based on her research and discussions, this is now a view widely held by the team. In addition, Rebecca put in the time to meet with | Rebecca can get emotional about certain situations and can sometimes miss-communicate / |

| | | |
|---|---|---|
| | clients and gather fundamental feedback that has significantly impacted the buy-side roadmap and features – many of which she devised.. | misinterpret other's communications |

[Quoted text hidden]

**Rebecca Spivak** <rivka@google.com> Mon, Feb 9, 2015 at 10:56 AM
To: Aaron Rothman <aarothman@google.com>
Bcc: rspivak@gmail.com

Aaron - When we met, you initiated it with "I understand work-life balance, but ... " and then told me that these leaves were taking me down to low-meets ... even in a perf cycle where I am launching a high-impact successful product. Which did not make any sense. Especially since Google's culture in practice is not at all rigid or formal when it comes to things like this. Google prizes productivity and impact... not time-stamps on cards.

However, as to the two leaves ...

For my daughter's surgery, I did let the team know - via email in December, in PIE leads, in 1:1 with you, and on my calendar. I also responded to email while I was out. Michael and the team were fully informed and no one on the IB team was confused. Additionally, as I have clarified a few times, this wasn't a vacation, but a sick leave, according to Google policy.

For the second trip, I put it in workday, on my calendar, discussed it with Michael, and immediately told you with as much advanced notice as was possible.

Furthermore, with respect to the second trip - it coincided with Michael's last minute trip. In fact, Michael encouraged me to take it. Why did Michael received no negative feedback for the identical behavior?

As you know, Michael and I have a strong relationship, and together we produce excellent products. Yet, I have heard that you are telling people that you wish "Michael would be harder on Rebecca." Why is this? What does he need to be "harder" on me for? He thinks I'm the strongest PM on the team. I have also heard that you are telling people that you believe/hope I will "Just leave." You can imagine that this would be devastating to me. IB is going to have amazing positive impact for Google and I have a strong working relationship with my engineering team. Why would you want me to leave?

2015-02-10 23:05 GMT-08:00 Rebecca Spivak <rivka@google.com>:

Hi Nina

Thank you. The thing I need most from Google is simply a fair work environment. Like everyone, I get a personal-life curve ball now and then... and like many others I have been able to perform well and work around personal situations even when that happens. So recently, even as I was mourning a lost baby, I took the 4 days off only after assessing the impact with my Eng Manager, who was also planning to be out. Life happens. It happens to everyone ... and to me too. But that's not the problem here.

I'm glad that Google makes resources like CONCERN available for those who need it to cope with the things they are "going through personally." For that I am lucky that I have an amazing support network. My 4 days off after the lost baby was spent with my close friends and family - they can fix almost anything and I'm glad I could go be with them for this curve ball.

But they can't fix the work situation.

That's where I have needed HR ... For help with the bullying/retaliation/bias issues I've been raising for a year now.

In my year of asking HR for help and falling flat, I've seen some patterns. I don't want to ... but I would like to share why your email has me particularly worried and hope you can offer some reassurance ...

This Happened in April 2014.

- I met with Caroline Bremner because I needed help with the hostile and unfair situation on my team
- 4 days later she sent me links to internal resources on coping with stress, but did not address my actual legitimate concern
- 4 days after that - and I never saw it coming - Jens told me to stay away for 2 weeks and that when I returned, there would be a PIP

This Happened in Feb 2015

- I met with Ariana and Nina because I needed help with the ongoing hostile and biased/retaliatory/unfair situation
- 4 days later, I'm again receiving links to internal resources on coping, but with no one addressing the actual legitimate concern
- ... ?

What's the third bullet?

On Fri, Feb 20, 2015 at 11:26 PM, Rebecca Spivak <rivka@google.com> wrote:

On Fri, Feb 20, 2015 at 4:29 PM, Ariana Tortorici <abiute@google.com> wrote:
Hi Rebecca,
I'm following up again as I'd like to understand if there are additional details we should be aware of.

Hi Ariana -

My concerns cannot be captured via ER's approach of repeatedly refusing my request to discuss patterns of discrimination and retaliation. We both know that my concern can't be captured if I have to state it as a short list of isolated details stripped of all context. Which is why you continually directed the conversation that way as I repeatedly tried to show you the pattern, and why I continually objected.

You never let me discuss my actual concern. And here you offer "Either add another isolated detail, stripped of all context to the list or declare the list to be a complete representation of your concerns." I'm objecting - on record - and assert no-confidence in ER. It's a false premise that my concern is about context-stripped isolated details.

I have also been made aware of an external email chain that I need to discuss with you.

Naturally. When you can't disarm, intimidate.
As I've learned over the past year, ER's promise of "no retaliation" is offered so aggressively because the actual retaliation is, in reality, just as aggressive.

On Mon, Feb 23, 2015 at 2:12 PM, Ariana Tortorici <ablute@google.com> wrote:

> Hi Rebecca,
> You mentioned you didn't have a chance to share your concerns. I want to be clear that we encourage you to share all of your concerns with us and I'm happy to take whatever time you need to do so. Unless you tell me what these additional concerns are, we can only look into them based on the information we have available to us. We want to hear everything and are not trying to limit what you have to say. Please share the full context of your concerns including the patterns of discrimination and retaliation you mentioned in your email. We follow up on specifics when they're brought up, but also want to understand the complete picture.
>
> I still have a meeting on calendar so I look forward to discussing tomorrow. However, please also feel free to send more information via email.
>
> Thanks,
> Ariana

| Rebecca Spivak (rivka) \| 6/Product Manager III | Feedback for 2015 Q1 |
|---|---|

**Rating**

Consistently Meets Expectations

**What's one thing you do really well that you plan to continue doing?**

| Reviewer/Role | Feedback |
|---|---|
| **Aaron Rothman** (MANAGER) Product Manager | Technical knowledge: Rebecca has demonstrated a good understanding of the infrastructure and the way IB operates to more effectively contribute to product design and decisions. Given that IB works with many different product data sources, this is a critical skill. |

**What's one thing you plan to do to have more impact?**

| Reviewer/Role | Feedback |
|---|---|
| **Aaron Rothman** (MANAGER) Product Manager | Clear/consistent vision: It is understandable that visions evolve over time but Rebecca has made quite diverse claims about the direction of IB. For example, she claimed it was going to be the pitch tool (like AMP) and then went back to just being the ads benchmarking solution, but for all of Google (now including Pub).<br><br>Communication/Documentation: Rebecca continues to make hand-wavy claims and withholds documentation which should be reviewed prior to development. For example, the M3 PRD was only partially complete well into the development of the release. |

**Overall how has Rebecca Spivak performed in their role (Product Manager III) since their last review?**

| Reviewer/Role | Feedback |
|---|---|
| **Aaron Rothman** (MANAGER) Product Manager | I do think there are areas where Rebecca has excelled, such as better cross-team collaboration (e.g. engaging with the Wildcat team) but elements key to productivity: clear, well-documented, and vetted plans/PRDs/presentations, should be priorities and need more focus. These elements are both important to the team and getting leadership support. I know there was a lot of pressure to get the M3 launch to happen this cycle, but future success depends on Rebecca's focus on key product skills and and stepping-up her |

productivity.

Attorney-Client Privilege

[redacted]

**From:** **Rebecca Spivak** <rivka@google.com>
Date: Wed, Mar 26, 2014 at 9:19 AM
Subject: If you read one doc, please read this one
To: Jens Skakkebaek <jskakkebaek@google.com>

https://docs.google.com/a/google.com/document/d/17U-eVUV18YjsMVoFXnbZP4SEJcg1SoznFBTmGruF8Og/edit

# STATUS: PIE and Interactive Estimates

PM: rivka@google.com
March 25, 2014


- Document Purpose
- History & Issue Summary
- Agreement /Assumptions
- Now What?
  - Option 1: PIE adopts Hyrbid Model / Maintain the Model
  - Option 2: PIE team embraces benchmark approach
  - Option 3: Interactive Benchmarks built by another team
- PM Challenges


## Document Purpose

The PIE charter for estimates has changing priorities and dependencies. The purpose of this doc is to create a common understanding across PM, Eng, and Sale Ops

## History & Issue Summary

- The current estimate functionality does not solve the business need (Rebecca's Interviews, Centralized Trix)
- "Transparency and Control" have surfaced as a new priority and focus for estimates
- "Transparency" means different things to different teams
- Quicksilver Transparency would not deliver what Sales is asking for

## Agreement / Assumptions

Some of the terms being used carry differing assumptions by team. This risk conversations where there is the appearance of agreement on requirements but there is a disconnect on intent.

Example Agreement: "Account Impact Transparency is the highest priority feature for estimates"
What sales expects and what eng would deliver may substantially differ even after alignment on priorities.

| | **Sales Need** | **Quicksilver Approach** |
|---|---|---|
| "Estimate" | Interactive Benchmarks | Advanced Statistical Modeling |
| "Transparency" | Controllable benchmarks based on small sets of data - 5 accounts, 8 geos, etc | Surface the model. It may be 50 or 100 elements, but that's what we used in the model. |
| "Accuracy" | Accurate enough to be **useful**. Eventually should be within 30% accuracy most of the time. (*) | More accurate than a **naive guess**. 30% most of the time is not realistic. (*) |

## Now What?

Here's What's Hard: The case being built on sales feedback is that the ideal solution is an interactive benchmark. With this goal, What sales needs for estimates is not what Quicksilver is structured to do. That doesn't mean the PIE team cannot do it and do it well, but recognizing this matters for multiple reasons

- It might mean starting from scratch. Those implications are important
- Eng Expertise / Interest / Personnel impact
- General resources planning
- Options if the project needs to move teams

**Here are some potential options:**

### Option 1: PIE adopts Hybrid Model / Maintain the Model

PIE team incorporates more benchmarks into the quicksilver model, but retains the model at the core. Need to understand the long term implications and whether this can solve the business need

### Option 2: PIE team builds out the benchmark approach

PIE team expands beyond statistical modeling and is repurposed on building true interactive benchmarks...

**Option 3: Interactive Benchmarks built by another team, PIE team Supports Layered Intelligence.**

PIE team has a charter and priorities that do not include building the benchmark interface. Another team builds interactive benchmarks. PIE team can still build intelligence into it. For example, users can explicitly choose all keywords, or choose the suggestions from the model.

## PM Challenges

This ecosystem is challenging for everyone. PM is a stakeholder too.

- **Sales** has unmet expectations around functionality and an urgency for improvement
- **Eng** has shifting requirements and at-risk product ownership/focus
- **PM** caught challenging existing plans and causing unpleasant disruption

**PM Timeline**

- Jan 2014:
  - Customer Research and Ramp up.
  - Researched insights, conversions
  - Identified/Surfaced current dissatisfaction with Estimates
  - Early suggestion that sales wants benchmarks, not predictions
- Feb 2014:
  - Identified Transparency & Control as a powerful functionality
  - Worked to achieve broad buy-in around Transparency
  - But can PIE model can deliver? ...Let's see the data ...
- March 2014:
  - Fleshing out Interactive Benchmark Tool
  - Q2 Prioritization and planning - long term and short term
  - Surfacing the disconnects around data assumptions
  - Conclusions: current PIE estimates cannot meet core sales need.
  - Gathering proof / escalating

**This Is the Right Thing ... But Why the Challenges?**

- **Prioritization is Mismatched With Eng Allocation & Interest:** New priorities - necessary to address business need - do not align well with QS focus, specialties, and interest.

- **PM Blocking Progress:** Sales expectations were that current work would address issues. PM raised the disconnect, which can be taken as being a blocker.

- **PM Causing Churn across teams:** The right approach included a substantial shift in existing priorities. No one likes churn.

- **Burden of Proof:** PM bears the burden of proof, but doesn't always have the access to the hard data necessary, even when the soft data is conclusive.

B

# EXHIBIT B

From: Rebecca Spivak <rspivak@gmail.com>
Date: Thu, 29 Jan 2015 20:24:07 -0800
Message-ID: <CAGPcRB94ocpLio5GwV1StkhmGDYEM3vmR+Baso=jS8H_jTo_zQ@mail.gmail.com>
Subject: Re: Ah, Google
To: Plusmail <+@essentially.net>

I told my boss off today. And not in a glory-filled comedy way, but at the same time, probably in the "stuff people dream of saying" way. I wasn't planning on it, and don't mean to be melodramatic, but losing the baby and all has also made me go more into "not gonna deal with shit" mode. I mean, really, really told him off. As in, some direct quotes

'Oh, just shut up and stop making an idiot of yourself."
"You are a horrible manager and incompetent as a PM"
"I'm glad I haven't submitted googlegeist yet, because I'm going to skewer you"
"I have nothing else to say to you - you're not worth my time - just go to your next meeting"

His response was "Well I really respect you and want you to be happy, if you want to reorg, let's discuss that. Would you rather report to X or Y (1 level up). We can make that happen if it's what you want. Tell me what you want."

I really said enough to warrant getting fired for insubordination or something. Every third word was "fuck" And getting fired might still happen I suppose.

And yes, it felt good to do the epic telling off of my manager, even though I should be too old to care about that shit.
I still give a ~20% chance of getting fired over this.

From: **Rebecca Spivak** <rspivak@gmail.com>
Date: Thu, Jan 29, 2015 at 8:24 PM
Subject: Re: Ah, Google
To: Plusmail <+@essentially.net>

I told my boss off today. And not in a glory-filled comedy way, but at the same time, probably in the "stuff people dream of saying" way. I wasn't planning on it, and don't mean to be melodramatic, but losing the baby and all has also made me go more into "not gonna deal with shit" mode. I mean, really, really told him off. As in, some direct quotes

'Oh, just shut up and stop making an idiot of yourself."
"You are a horrible manager and incompetent as a PM"
"I'm glad I haven't submitted googlegeist yet, because I'm going to skewer you"
"I have nothing else to say to you - you're not worth my time - just go to your next meeting"

His response was "Well I really respect you and want you to be happy, if you want to reorg, let's discuss that. Would you rather report to X or Y (1 level up). We can make that happen if it's what you want. Tell me what you want."

I really said enough to warrant getting fired for insubordination or something. Every third word was "fuck" And getting fired might still happen I suppose.

But I laughed it off with a senior coworker later in the day, and he said this

"Oh, you're unfire-able and basically untouchable. Don't worry about that. You were the topic of conversation in a meeting with senior people, and the consensus is that you are insanely brilliant and effective but don't know when to shut up. People ask why you have so many engineers when they keep leaving other teams, and the only answer is that you're the only PM who gives good enough direction to keep them - and that your projects succeed while others fail. So that's power ... everyone's afraid of you and no one wants to be your manager. So they can't fire you, but they want someone else to adopt you."

I'm probably more proud of "doesn't know when to shut up" than I am about "insanely brilliant"
And yes, it felt good to do the epic telling off of my manager, even though I should be too old to care about that shit.

I still give a ~20% chance of getting fired over this.

From: Rebecca Spivak <rspivak@gmail.com>
Date: Thu, 29 Jan 2015 21:11:53 -0800
Message-ID:
<CAGPcRB_ckoFowWNn5nb7sSyZMg4C9WPoWMdo_k1dVPa6H1Vxwg@mail.gmail.com>
Subject: Re: Ah, Google
To: Plusmail <+@essentially.net>

So .... if you consider why I'm "afraid" to leave Google ...

I make north of $300k. I probably work a 30 hour week at most, because the bulk of my work is in communicating strategic direction that I know is right. In april I will hit my 5-year tenure and then have 5 weeks vacation in addition to company holidays.

My organization sucks. The politics suck. My biggest battle involves things like "No fucktards - I'm not going to position things about how we can reduce the sales staff by 10% even though that's easy to measure

From: **Rebecca Spivak** <rspivak@gmail.com>

Date: Thu, Jan 29, 2015 at 9:11 PM
Subject: Re: Ah, Google
To: Plusmail <+@essentially.net>

So .... if you consider why I'm "afraid" to leave Google ...

I make north of $300k. I probably work a 30 hour week at most, because the bulk of my work is in communicating strategic direction that I know is right. In april I will hit my 5-year tenure and then have 5 weeks vacation in addition to company holidays. I have engineers who want to do whatever I say, and I absolutely know that my decisions and actions are making a huge difference. So I get a feeback loop that what I'm doing matters. Yesterday I had confirmation of many millions of dollars tied to a specific decision that I made.

My organization sucks. The politics suck. My biggest battle involves things like "No fucktards - I'm not going to position things about how we can reduce the sales staff by 10% even though that's easy to measure - I'm going to realize that we have absolutely no competitive standing when it comes to brand or video, and I'm going to change that and here's how we're going to crush that. In fact, it will require us to hire MORE sales staff, because we'll have something to sell. You are betting wrong if you think the idea is to reduce the sales force. You think the pie is done and it's all about efficiency now. Suck it. If you want the company to focus on reducing sales staff as the ultimate OKR, just send them all home - that will do that. thanks, ok, bye." I may think Google is headed to the toilet but I am doing my best to rage against the dying of the light and feel like I'm the only one.

Ok, well. So that. So it feeds my ego too. But I'm right. And I'm right where everyone around me is wrong ... but they are realizing they're wrong. That's an interesting place to be.

C

# EXHIBIT C



**Baron Von Roth** at Sherwood Forest
October 3 at 8:35am · Edited ·

Freedom!



1



**Baron Von Roth** updated his cover photo.
October 3 at 1:56pm ·



2



**Baron Von Roth**

March 12, 2013 · Friends+Me ·

Perfect gift for the little woman in your life




Finally, a tablet simple enough for a woman to use < /sarcasm>

Do iPads or Nexus 7s scare and confuse you? ePad Femme is here to help!

ARSTECHNICA.COM

1 Comment

**Baron Von Roth**
September 1, 2013

Ladies: better to lean out?



**Study: Men secretly feel terrible when the women they love succeed**

A woman's success also makes a man less interested in their relationship, researchers found

SALON.COM | BY KATIE MCDONOUGH

5 Comments

Like · Comment · Share

**Dan Malis** Not me. I'm dying to be a kept man, Carolyn Edwards ...
September 1, 2013 at 12:08pm · Like · 2

**Kate Clugston** Does the same hold true for gay couples?
September 1, 2013 at 3:58pm · Like

**Baron Von Roth** I think it's easier to consider each other as equals in a gay relationship
September 1, 2013 at 4:00pm · Like

**Dan Malis** Well, then, gay marriage will NEVER work ... ;-p
September 1, 2013 at 6:33pm · Like · 1

**Baron Von Roth** lol
September 2, 2013 at 7:13am · Like · 1

**Baron Von Roth**
August 6, 2013

I guess all our moms be stupid



**Are you too clever to be a mother? Maternal urge decreases by a QUARTER for every 15 extra IQ points**

Researchers at the London School of Economics have...

DAILYMAIL.CO.UK

7 Comments

Like · Comment · Share

4



**Baron Von Roth**
November 22, 2012 ·

Get back in the kitchen, women! Karen Baumgartner Marnie Roach



1 Like 2 Comments

Like Comment Share

**CURLEY, HESSINGER & JOHNSRUD LLP**
COUNSELORS AT LAW
4400 BOHANNON DRIVE
SUITE 230
MENLO PARK, CA 94025
www.curleyhessinger.com

Telephone: 650.600.5300
Facsimile: 650.898.1998

**Brian L. Johnsrud**
**650.600.5310**
**bjohnsrud@curleyhessinger.com**

September 14, 2015

**VIA FEDERAL EXPRESS**

Hattie Y. Reed
U.S. Equal Employment Opportunity Commission
Seattle Field Office
909 First Avenue, Suite 400
Seattle, WA 98104-1061

SEP 21 2015
EEOC SEATTLE

Re: *Rivka (Rebecca) Spivak v. Google Inc.*
EEOC Charge No.: 551-2015-00827

Dear Ms. Reed:

The following position statement is submitted on behalf of Google Inc. ("Google") in response to the above-referenced complaint of alleged discrimination and retaliation filed by complainant Rivka (Rebecca) Spivak ("Spivak"). As set forth below, there is no factual nor legal merit to her claims.

Spivak is a Product Manager at Google. This means she helps develop new products. To do so, she has to work effectively with software engineers (who build the products) and sales operations employees (who rely on the products). These employees thus become key contributors to Spivak's performance reviews.

Spivak's performance history is uneven and inconsistent. She has very good product ideas. Turning those ideas into products, however, has not gone well or smoothly. Spivak has regularly failed to build productive relationships with engineers and sales operations employees. She also has failed to consistently produce the documentation necessary to drive product development. These concerns are shared by male and female employees alike.

As a result of her performance shortcomings, Spivak was demoted in 2011 by a female Vice President. Spivak does not claim that demotion was discriminatory. Following that demotion, Spivak's performance has generally met expectations, albeit on the low end at times, which at one point resulted in her being placed on a Performance Improvement Plan, which she satisfied.

Spivak disagrees with her "meets expectations" rating and believes she should be rated as "exceeds expectations." Spivak has not received that higher rating because she continues to

demonstrate the same shortcomings that resulted in her demotion and PIP: namely, she fails to build good working relationships with too many of her peers and fails to consistently produce the written documentation and analysis expected to drive new product development. These concerns continue to be shared by male and female employees. They have nothing to do with her gender, and they do not qualify as adverse employment actions.

Spivak complained about alleged gender discrimination for the first time on February 2, 2015. Her timing was noteworthy. Just days before her complaint, she launched into a profanity-laced tirade at her manager. She then openly bragged about it. What prompted Spivak's tirade? Her manager simply shared his view that her performance was meeting (not exceeding) expectations and requested that she provide advance notice of and record her time off.

Spivak must have come to realize how unprofessional her conduct had been. Within days of her tirade, Spivak complained about alleged discrimination because – in her words – she believed such a complaint would make her "unfireable." This is not conduct that Title VII was intended to protect, and Spivak has received a written warning for her misconduct. Her unprofessional conduct (directed toward her manager, a peer, and even HR) is a further example of her failure to build productive work relationships.

At the same time Spivak made her strategically-timed complaint, Google was finalizing a decision to relocate five projects from Seattle to Los Angeles. The primary leader for these projects is located in Los Angeles and the two local leaders in Seattle had decided to transfer to a new project. As a result, the decision was made to centralize the work in Los Angeles. This decision impacted 3 Product Managers (including Spivak) and 31 Software Engineers, all of whom were provided an opportunity to transfer to Los Angeles. Google did not, as Spivak now alleges, relocate 5 projects and impact 34 employees because Spivak made a carefully-timed complaint about discrimination which, as described below, has no merit.

Because Spivak's claims have no factual nor legal merit, the EEOC should issue a no cause determination.

## I. FACTUAL BACKGROUND[1]

### A. Background on Google.

Google is a technology company specializing in Internet-related services and products, including online advertising technologies, search, cloud computing, and software. It is an equal opportunity employer and committed to workplace diversity. Google has a comprehensive policy prohibiting

[1] The information contained in this position statement includes private and confidential employment information. Google respectfully requests that the EEOC preserve the confidentiality of this information and not disclose it to any third party without prior written consent from Google.

harassment, discrimination, and retaliation against employees and takes allegations of discrimination seriously. (*See* Exhibit 1.) This policy is accessible to all employees on the company's intranet.

Google is proud to be part of *FORTUNE* Magazine's prestigious "100 Best Companies to Work For." For the sixth consecutive year, Google has achieved the top ranking as the number one best company. Culture, flexibility, and the opportunity to pursue big ideas are just a few of the attributes that have continued to earn Google this recognition.

**B. 2010 -2013: Spivak Joins Google As A Senior Product Manager In New York.**

In April 2010, Spivak began working at Google as a Senior Product Manager in New York. Spivak was a Level 7 Product Manager (PM). As a Senior Product Manager, Spivak was responsible for driving projects from conception to launch. This work is inherently collaborative. It required her to work closely with other employees, such as engineers and sales operations employees, to help design and develop technologies that improve access to information.

Product managers like Spivak are responsible for guiding products through the execution cycle, focusing on analyzing, positioning, packaging, promoting and tailoring solutions to the markets where Google does business. To help organize and drive their work, Product Managers regularly draft Product Requirements Documents (PRDs). These PRDs are designed to allow other employees (particularly engineers) to understand what a product should do and how it should work. In short, a PRD is a product preview and roadmap.

One of the biggest challenges and rewards with being a Product Manager is that employees have to learn to lead without having any direct authority over their team or over other projects and teams on which they are highly dependent. To do this, employees have to learn how to influence employees and various team priorities as well as shape strategies in a culture where "bottom up" innovation is highly valued.

**C. 2010: Spivak's Performance Meets Expectations, Though She Is Coached To Improve In Several Key Areas.**

Google schedules performance reviews twice a year, one major one toward the end of the year and a smaller one mid-year. The end of year review consists of a self-assessment and a set of peer and manager reviews. In the self-assessment, employees summarize their major accomplishments and contributions since the last review. They also are asked to describe their strengths and areas for improvement. For peer reviews, employees are expected to choose around 3-8 peers (fellow product managers, engineers, or others that can comment on their work) to write peer reviews. Often, managers will also ask additional individuals to write peer reviews for one of their reports. Peers comment on employees' projects and contributions, strengths, and areas for improvement. Groups of managers then meet and review all their employees' tentative ratings

together. This calibration process helps ensure rating consistency and fairness. There are five possible ratings (from lowest to highest): needs improvement; meets/consistently meets expectations; exceed expectations, strongly exceed expectations, and superb.

Spivak's rating in the fall of 2010 was "meets expectations." (Exhibit 2). Spivak's manager, John Hanke, noted that she had done some good work on local search projects. Her review, however, noted some important development areas that would become themes throughout her employment. Both Spivak's peers in engineering and her manager noted her need to improve her communications, work relationships, and the thoroughness of her product implementation plans, including PRDs. One of her peers noted that "she seems to shy away from really getting her hands dirty writing a detailed PRD, coming up with success metrics, doing detailed market analysis, and so on."

Another one of her peers noted that he wanted "less arguing, more action … too often we end up ratholed in arguments, often between Rivka and the team. I don't think it's a matter of a lone voice of reason against convention." Another employee, a female Director in Software Engineering, noted that:

> Rivka feels like there's a lot of hostility around her. There isn't nearly as much as she thinks there is, and I think if she could get past that to some degree, it would help her settle in more effectively, but I haven't figured out to help her do that.
>
> It's true that Patrick in particular is very frustrated that she won't do the hands on PMing that he's expecting, and that all of us would like to see more of this. But that doesn't mean we hate her or have given up on her. It's just frustration as PMs (like eng managers) can be single point of failures, and so when you get stuck not getting what you think you need out of a PM, it can become a problem.
>
> I think the conversations do get exacerbated because Rivka tends to early on say 'I'm happy to learn how to do things at Google and if it means X, then that's fine,' seeming to agree, but then proceeds to argue her point of view for the next 20 minutes with the same exact arguments and getting increasingly defensive for it. I believe she really feels like she's trying to listen and learn, but it doesn't come across that way.

Another peer, this time a male employee, noted that "I work with a dozen PMs up and down the ladder and none have been as challenging to get work done with as Rivka. The L4s I work with outperform her, and are far more googley in terms of team dynamics." The term "googley" is a reflection of Google's culture, which includes being collaborative with colleagues.

**D. 2011: Spivak Is Demoted One Level By A Female Vice President Of Engineering.**

In the first quarter of 2011, Spivak had another substantive review. She had a new manager at this time, Jen Fitzpatrick, a female Vice President of Engineering. Spivak was rated "occasionally misses expectation," which is one step below "meets expectations." (Exhibit 3). Her manager noted that she was "really struggling. Not performing at a T7 level. Will get feedback and a tough message from Jen/Marissa."

In Spivak's review, Fitzpatrick noted some positives, including that she had strong product insight, good long-term and big picture thinking, passion and energy, and could act fast. The development areas previously noted, however, continued to be real issues. One peer noted that Spivak was "very hard to work with. She doesn't listen. She locks onto a position (which is always 2 dimensional, not innovative) and won't break out of it no matter how many of us explain a more googley, user-centered solution. She's mistaken obstinacy for tenacity."

Fitzpatrick concluded that "Rivka is well aware that she hasn't been performing at level. My recommendation is to downslot her at Level 6 / PM III to reinforce this message, give her some (more) tough feedback, and then reevaluate (once again) her role (including whether there is one)." Fitzpatrick subsequently lowered Spivak from Level 7 to Level 6 and hoped that she would meet expectations in this new role with reduced expectations. Spivak never complained about that demotion, which was a decision made by a senior female leader.

In July 2011, Spivak sought to transfer to another team. Given her performance history, many managers would be reluctant to bring Spivak onto their team. Scott Spencer, a Director in Product Management, however, wanted to give Spivak a fresh start.

In Spivak's new role, she continued to work as a Product Manager, now with a focus on advertising projects. In her first review in her new role (fall of 2011), Spivak was rated as "meets expectations." (Exhibit 4). Spencer complimented Spivak on getting up to speed quickly and her contributions were well regarded. Spencer stated that she was "very smart and able to dig into the weeds with engineering. She has unblocked some very technically thorny issues. Rivka is liked by engineering for her ability to ensure development is focused on impactful changes."

Spencer also noted some development areas for Spivak. He stated that she needed to drive "improved communication about priorities, what projects she is working on, and where she needs clarification." In sum, although Spivak was off to a solid start working on new products, reporting to a new manager, and working against the expectations of a Level 6 (which was still a senior role) instead of Level 7 Product Manager, she still had important development areas. Spivak was rated "meets expectations" again at the end of 2011, where it was noted that she "had a challenging Q3 but is gaining traction in Q4." (Exhibit 5).

**E. 2012: Spivak's Performance Continues To Meets Expectations; She Takes & Returns From Maternity Leave.**

In the first and second quarters of 2012, Spivak was rated as "meets expectations." She began a maternity leave in August 2012 and her manager, Spencer, noted that "she did a great job tying up all loose ends before going on leave" in her fall 2012 rating. (Exhibit 6).

**F. 2013: Spivak's Performance Meets Expectations, Though Even She Admits She Was Not Ready To Be Promoted.**

Spivak returned from maternity leave at the end of 2012. Spencer complimented her in her initial review back because she "managed a difficult transition with engineering well where an engineering loved feature was not getting sufficient uptake in the market and was able to get engineering to let go." (Exhibit 7). Her rating for the spring and fall of 2013 was again "meets expectations." (*Id*; Exhibit 8).

Spivak's rating in the fall 2013 noted that she was looking to move to Seattle for personal reasons. Spencer supported Spivak's efforts to transfer. He noted that "Rebecca has had a relatively strong 6 months, steadily improving in her output and engagement. While earlier, many engineers were frankly unimpressed with her output, she has stepped up her work effort and brought key projects significantly forward." (Exhibit 8). Significantly, in this review, even Spivak agreed that she was not ready to be promoted. (*Id.*)

**G. 2014: Spivak Begins Working In Seattle And Previously Identified Development Areas Continue To Be A Real Concern.**

In January 2014, Spivak began working for Google in Seattle. She continued to work as a Product Manager and now reported to Jens Skakkebaek, a Group Product Manager, who is based in Google's headquarters in Mountain View, California. Skakkebaek interviewed and recruited Spivak to the role. Two engineering leaders (Doug Bengston and Barbara Stanley) also interviewed Spivak and supported an offer. In terms of subject matter, Spivak continued to work on advertisement-based products.

Spivak initially worked on Quicksilver, a data analytics tools for display advertisements. She worked hard to understand customer needs and proposed a new direction, which came to be known as Interactive Benchmarks, that would empower the sales team to interact more with the data. This was a good idea, but like all ideas, it required thorough analysis, vetting, and PRDs. As with her prior work, Spivak was required to interact heavily with the engineering team. Unfortunately, and as with a number of her prior interactions, this did not go well, particularly at the outset.

**H. April 2014: Spivak's Q1 Review.**

In connection with her first review in her new role, two engineers raised serious concerns working with Spivak. (Exhibit 9). First, Doug Bengtson, an Engineering Manager, reported that Spivak "needs to be able to multitask more; needs to start writing things down; she generalizes and forms her opinion from 2-3 data points; poor judgment/intuition on when to share – vet stuff before showing to Joerg; bias: leads people to solution that she has." This feedback is consistent with the feedback that Spivak had previously received from other male and female engineering employees. Bengtson has worked for Google since 2007 and is very familiar with the product management process.

Second, Michael English, a Technical Lead in Engineering, reported that Spivak was "very reluctant or unwilling to produce documentation / work product associated with her findings and proposed direction for resolution. Hard to judge the quality / coherence for proposed direction for change since it's not documented." This feedback also is consistent with the feedback that Spivak had previously received from other male and female engineering employees. English has worked for Google since 2005 and is also very familiar with the product management process.

Skakkebaek was fair and balanced in his overall assessment. On the positive side, he noted that "Rebecca transitioned over from AdX on Jan 1st. Since coming on board, she's done a great job in identifying and championing transparency as a product direction." He also stated that:

> Rebecca has good ideas, passion, and ability to synthesize it into a new product direction. For instance, in her work on Frontline in Q1, she has been driving towards more interactive GDN benchmarks that allows the Sales user to explore and understand that estimates the client can realistically get. This is in contrast to more automated estimates that AMP has today. Keep up your passion for the user!

At the same time, Skakkebaek noted several areas for improvement:

- It's been rocky working with Engineering – she still needs to build a good relationship with the eng folks. There's some level of trust missing.

- Communication / Org: You have lost trust with the engineering team and need to turn it around. Verbal communication with other PMs and the engineering team needs to be clear and compelling, accurate and complete. Your ideas need to be documented better. Bring well-founded data to the table. Be fully engaged in every meeting.

- Execution: you need to take complete ownership of the team's activities and drive them forward – even if you don't agree. If you disagree, you need argue to change direction. Disengaging is not the right approach.

- Leadership: I expect you to be observed as being proactive by Engineering and Cross-Functional team members and be seen as the clarifying leader who solves problems and defines a path forward without need to escalation.

- Googleyness: Listen more and expect to learn from your colleagues. Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve.

Spivak's rating for the first quarter of 2014 was "consistently meets expectations." This rating was "arrived at by weighing her positive performance on AdX [her prior role in New York] with her lower performance on Frontline [her current role in Seattle]." Her prior manager, Spencer, believed that Spivak had been meeting expectations that quarter, believing that she oscillated between doing great things and doing things in a way that required management, which he had previously mentioned to her.

Skakkebaek was familiar with Spivak's mixed performance history and wanted Spivak to turn around (very quickly) the major development issues he and others observed, especially for a Level 6 Product Manager. For Spivak to succeed in her senior role, it was crucial that she improve these performance areas and her relationship with engineering. As a result, Skakkebaek concluded that "I will be working to help Rebecca make these improvements according to a performance improvement plan that I will share with her. A PM3 is expected to be well rounded and function independently." At the same time, however, Skakkebaek supported Spivak's new project and a team of engineers was sectioned off to staff it, which Spivak believed was a positive development. In short, Skakkebaek wanted her to succeed.

### I. May 2014 - July 2014: Spivak Is Placed On A PIP And, While She Claims It Is Unfair, Her Performance Improves.

On May 1, 2014, Spivak was placed on a Performance Improvement Plan (PIP), which ran through June 30, 2014. (Exhibit 10). The PIP tracked the development areas identified in Spivak's performance review (communication, execution, leadership, and Googleyness). The PIP also set forth specific objectives within each of these areas. To evaluate her progress, Skakkebaek stated that he would ask key members of the Product Management, Engineering, and Sales Operations teams how they observed Spivak's performance. All of these groups were key stakeholders with whom Spivak was expected to interact regularly.

Within a week, Spivak complained about the fairness of the PIP. She spoke with Cindy Treloar, a Human Resources Business Partner. Spivak claimed that Engineering was retaliating against her for her new sales tool ideas by requesting more written guidance and data from her. The truth is that Engineering should not have had to ask for data because it was part of Spivak's job to supply it as part of her product analysis. At no time during her meeting with Treloar did Spivak

complain that she believed that Bengtson, English, Skakkebaek, or anyone else had discriminated against her because of her gender, or that the PIP was motivated by her gender.

During her conversation with Treloar, Spivak acknowledged that she did not have the strongest performance record, though claimed that the current issues were different than prior ones. The truth is that Spivak's lack of documentation was identified as a major developmental area in her very first review. Treloar concluded that there were legitimate concerns with Spivak's performance and that the PIP did not result from her raising concerns about the effectiveness of one engineering tool versus another. Treloar did not address any alleged gender discrimination because Spivak never made such a complaint.

While Spivak believed the PIP was unfair, she noticeably improved her performance while on it. Both Bengtson and English (Engineering) believed that Spivak did very well while on the PIP. Similarly, Judy Hsu (Sales Operations) confirmed that Spivak was documenting more and doing more rigorous research. All of these key stakeholders shared their view of Spivak's improved performance with Skakkebaek.

On July 8, 2014, Skakkebaek congratulated Spivak on successfully completing the PIP. (Exhibit 11). He noted that she had been clearer in her communications with the engineering team, providing regular email updates, documenting her work in PRDs, and listening more and being receptive to ideas and suggestions from engineering. He further noted "your peers recognize that you are no longer making bold statements without having evidence and having high confidence in the evidence." He also noted input from Sales Operations that Spivak was more organized with incremental communication.

Further, with regard to written PRDs, Skakkebaek noted "Big improvement. Eng likes the system you put in place with a master PRD and links to sub PRDs. Your documentation is go-link and each document has the necessary level of granularity and accuracy," that "engineers feel like you are now the go-to person for questions," and that "eng feels that there has been a significant change to the better – you are listening more to your colleagues and are receptive to their ideas/suggestions."

Skakkebaek was happy that Spivak improved her performance and wanted her to sustain it and keep growing. He noted that there were other areas like leadership and accepting constructive criticism where Spivak needed to continue to grow her skills, and that Spivak would need to maintain her improvement in all areas outlined in the PIP.

That same July, Aaron Rothman transferred to Skakkebaek's team. Rothman was a L7 Product Manager, whereas Spivak was a L6. Rothman was to take the day-to-day lead in managing three employees: Spivak, Vince Lacey, and Rod Lopez. This was a new role for Rothman as he had not previously been a people manager, though it was a lateral move (not a promotion) because his level and compensation remained the same. To the extent Spivak claims she should have

received this role in July 2014, there is no basis for her claim. She was new to the group, just getting off a PIP, and was plainly not going to be elevated to L7 or a people manager at this time. Just six months earlier, she had acknowledged she was not ready for a promotion, and her performance had worsened – not improved – since that time.

### J. September 2014: Spivak Presents As Part Of A Broader Team To Senior Management.

In September 2014, Spivak was part of a team that made product presentations to more senior management. A female employee in Sales Operations, Judy Hsu, believed that Spivak's presentation used strong, declarative language and portrayed everything as great, when she could have enhanced her credibility if she identified the current challenges. In Hsu's view, doing so would not be a sign of weakness and instead would be a sign of good judgment.

Rothman was part of that same presentation team and shared his positive feedback with Spivak. He did note some concern that Spivak seemed to trumpet the greatness of her own ideas by insulting the work of others, when in fact everyone was part of the same team. Spivak rejected Rothman's feedback and then brought up the unfairness of the prior PIP, which Rothman played no part in. Spivak threatened to leave the team or Google unless the wrongs of the PIP were corrected through compensation and that her next rating be "exceeds expectations."

Shortly thereafter, Spivak had a meeting with Skakkebaek. She reiterated that she did not deserve the PIP and claimed that it was motivated by Engineering (Bengtson) feeling threatened by a new project (again never mentioning her gender). Spivak also stated that she wanted something to "negate the PIP," such as an acknowledgement that it was a mistake. She emphasized that she wanted an "exceeds expectations" rating and a bonus. Skakkebaek said that he believed that her work on Interactive Benchmark was going well and that, if it launched with success, it would be a big plus for her. He also explained that he could not promise any rating in advance.

### K. November 2014: Spivak Is Rated Consistently Meets Expectations.

In November 2014, Spivak received a performance evaluation, her first substantive evaluation since coming off the PIP. Skakkebaek rated her as "consistently meets expectations" though noted that Spivak was a "solid meets. Upward trending. No full release yet but a prototype milestone (M1) completed in Q2. **Could be exceeds next round if Interactive Benchmarks becomes a big success when it launches in Q1.** She still has soft skills to work on and gets defensive with criticism." (Exhibit 12) (emphasis added).

Skakkebaek complimented Spivak's performance, stating that "Rebecca is great at getting deep in her subject matter, setting a good vision for where it should go, and communicating this. An example of this was in the Frontline Brainstorm in October, where Rebecca did a great job." Rothman stated that she "[e]ffectively prioritizes tasks/features. I think Rebecca has done a

good job at understanding what key workflows need from a benchmarking solution and making sure those features are appropriately bundled/prioritized."

The November 2014 review continued to identify soft skills as a development area for Spivak. In particular, two female employees expressed concern. Judy Hsu, a Sales Operation Partner, stated that Spivak's areas for improvement are to "build soft skills to bring people along on the journey with her (and don't assume it's her vs the world" and "work on packaging of her messages and comms to build trust and credibility. Right now she tends to use hyberbole." Separately, Barbara Stanley, a Senior Staff Engineer, noted that "I think things are going well for Rebecca now – at least we seem to be over the martyrdom hurdle, but she hasn't spoken to me much since my blunt feedback for 'I don't want to hear more woe is me stories.'" Spivak was so negative in response to informal feedback provided by Ms. Stanley and Ms. Hsu that they asked Rothman to continue to work with her on improving her soft skills.

Skakkebaek similarly identified "communications" as an ongoing development area for Spivak. He observed that "to be an effective product leader and influence others, negotiate well, and be the product leader Rebecca needs to be sensitive to the audience and tailor the message accordingly." Rothman similarly noted that Spivak needed to improve her "presentation and packaging of ideas. I believe Rebecca has good ideas but often positions these ideas as 'I'm right and everyone else is wrong,' when the situation is often more complex and the data doesn't necessarily align with her views."

On balance, however, Spivak's review was positive in tone, as confirmed by Skakkebaek:

> Things are on the up and going well on the project. Over the past 5 months, Rebecca has gotten Interactive Benchmarks really going in development and set a great vision for the use of Benchmarks within Sales, and Sales Ops is excited about the prospects of getting these capabilities in the hands of AMs. A sign of this is that Interactive Benchmarks is a candidate as an anchor tool in the future sales tools landscape. She has a close working relationship with Sales Ops, has established herself as a credible partner and thought leader with them, and is getting good input from them.
>
> Rebecca has earned the trust of engineering, which is great. Eng likes her insights, vision, and ability to work at a detailed technical level as well (e.g., pulling together a future-system architecture drawing). The team is executing well now – is working closely with engineering to push things forward and has good deliverables. We look forward to seeing IB Launch in Q1!
>
> To be effective in collaboration within the cross-functional team and with other teams, Rebecca still needs to work on her soft-skills (in particular around communication) and her ability to receive and synthesize constructive feedback.

As Spivak headed into 2015, she was poised for greater recognition assuming her main product, Interactive Benchmark, fully launched and was well received, and so long as she continued to improve her communications with her peers and other soft skills.

### L. 2015: Spivak Cusses Out Her Manager And Then Complains About Alleged Discrimination.

#### 1. Early January: Spivak Takes The Time Off She Requested.

Spivak had given notice in mid-December that she would be out in early January 2015 for her daughter's surgery. Spivak took this time off and was not criticized in any respect for doing so. There was never any issue with Spivak requesting time off. Rather, she often failed to give advanced notice and communicate with her co-workers that she would be out or the dates and length of time she would be out. She also had to be reminded to enter her time off in Workday, which is how all employees log this information.

#### 2. January 29, 2015: Spivak's Profanity Tirade Toward Her Manager.

On January 29, 2015, Spivak had a performance check in with her manager, Rothman. He shared his view that she was performing at a consistently meets expectations level, that she needed to do more PRD and documentation, and requested that she provide advanced notice of and record her time off moving forward. Spivak called his perspective of her performance "retarded." She swore a lot and repeatedly used the word "fuck." She told Rothman that he had no place giving her feedback and stated that he was not qualified to be her manager or evaluate her performance. She claimed his behavior was idiotic.

Spivak then sent an email bragging about her unprofessionalism:

> I told my boss off today. And not in a glory-filled comedy way, but at the same time, probably in the stuff people dream off … I mean, really, really told him off. As in, some direct quotes:
>
>> Oh, just shut up and stop making an idiot of yourself;
>>
>> You are a horrible manager and incompetent as a PM;
>>
>> I'm glad I haven't submitted googlegeist yet, because I'm going to skewer you; and
>>
>> I have nothing else to say to you – you're not worth my time – just go to your next meeting.

(Exhibit 13). Spivak admitted that "I really said enough to warrant getting fired for insubordination or something. Every third word was 'fuck.'" And getting fired might still happen I suppose." (*Id*).

Later that same day, Spivak told friends that she was afraid to leave Google because:

> I make north of $300K. I probably work a 30 hour week at most, because the bulk of my work is in communicating strategic direction that I know is right. In April I will hit my 5-year tenure and then have 5 weeks vacation in addition to company holidays.
>
> My organization sucks. The politics suck. My biggest battle involves things like "no fucktards – I'm not going to position things about how we can reduce the sales staff by 10% even though that's easy to measure."

(Exhibit 14). The next day, Spivak spoke with Lauren Thomas Ewing (HRBP) and Nina Sakellariou (HRBP). During that conversation, Spivak expressed concerned with receiving a meets expectations performance rating. Spivak never mentioned anything about any alleged discrimination.

### 3. February 2, 2015: Spivak Complains For The First Time About Alleged Gender Discrimination, Admitting She Did So Because She Believed It Made Her "Unfireable."

On Monday, February 2, 2015, Spivak complained for the first time about alleged gender discrimination. (Exhibit 15). In doing so, she threw many successful women at Google under the bus by claiming that they "were rewarded for being submissive or coy." She then went on to fault HR saying "I know that HR's first reaction is likely to be to discredit this assertion rather than consider it."

Why did Spivak complain at this time? The answer is in a separate email that Spivak wrote that same day she complained. Spivak wrote that her discrimination complaint "makes me unfireable long enough for me to interview and get hired at facebook." (Exhibit 16). Spivak's candor reveals her bad faith.

Human Resources (through Ariana Tortorici) investigated Spivak's allegations. Tortorici met with Spivak once to gather information, but Spivak did not want to share any alleged specifics. Tortorici attempted to meet with Spivak on several additional occasions to get more information but Spivak refused to meet.

Based on the information available after reading Spivak's complaint and speaking with her once, Tortorici investigated her concerns. She reviewed performance documentation and spoke with witnesses who provided further background information. She concluded that Spivak has

legitimate performance issues which are appropriate for management to address, which have been identified by a number of male and female employees, and are not motivated by Spivak's gender.

**4. February 11, 2015: Google Announces A Work Relocation Impacting 31 Software Engineers and 3 Product Managers (Including Spivak).**

By the time Spivak raised her purported concerns, the business leaders for her project had already been finalizing a plan to transfer the work performed by Spivak, 2 other Product Managers, and 31 Software Engineers from Seattle to Los Angeles. This transfer impacted 5 different projects. The business leaders for this work, Scott Silver and Dustin Jackson, wanted the work located in Los Angeles (where Jackson is based) after two Seattle leaders (Doug Bengtson and Barbara Stanley) decided to join Google's Cloud initiative.

On February 11, 2015, the employees impacted by this relocation – including Spivak – were notified. The plan was to find suitable projects for all impacted employees. All three impacted Product Managers were given six months either to have either (1) move to Los Angeles or (2) find a new project in Seattle or Mountain View. All 31 impacted software engineers were provided less time (30 days) to decide whether to move to Los Angeles and 60 days thereafter to find a new project in Seattle if they decided not to move to Los Angeles. Spivak decided not to relocate.

Spivak claims that HR made this relocation decision because of her internal complaint. There is no basis for her assertion. HR does not make those relocation decisions, business leaders make those decisions. Moreover, the decision had been in the planning stage for some time when it was announced on February 11, 2015. Nevertheless, Spivak attacked Paul Higson, a Human Resources Business Partner, in late February 2015, stating:

> This complete bs you've pulled in the re-org … you are a bad person. How simplistic – not sure I've ever said that to anyone before. But, seriously. You have no ethics. I don't care if you were 'following orders': I understand that we each have professional responsibility … but you take it to the extreme. Your actions are not defensible. You have no morality – you are a puppet of a system that will hurt people without regard for what's right. If my entire career depended on it, I would never, ever do what you've done.
>
> Stop and think if this is who you wanted to be when you were a kid. I think young paul would be ashamed of now-paul.
>
> You are hurting people who don't deserve to be hurt. You are just … bad. I will spend the rest of like [sic] knowing this.

(Exhibit 17). This unprofessional tirade was part of the basis for Spivak receiving a written warning, which also addressed her unprofessional conduct toward her manager. (Exhibit 18.)

After being notified of the relocation, Ms. Spivak requested to work from home. She was permitted to work at home for a short period of time though asked to comply with leave and accommodation policies to the extent she did not want to work at the office.

**5. April 2015: Spivak Is Rated Consistently Meets Expectations.**

In April 2015, Spivak had another performance review and was rated consistently meets expectations. (Exhibit 19). Her top accomplishment was her work on Interactive Benchmarks. Her peers and managers identified serious issues with her interactions with them. Barbara Stanley identified 5 separate issues that "would need to change with her performance to make me feel more comfortable:"

1. A clear, consistent, sane vision. Every product we have, she has a different vision for the product

2. More open, transparent communication about the project. Some time ago, Doug requested bi-weekly updates. Those only lasted for a short time. She seems to like creating mystery about what IB is doing and where it's going. PRDs. Some PRDs (M3) were late in coming. She either shares way too early (before there is substantial content) or much too late.

3. Less open transparent communication about her personal issues.

4. She is volatile. When someone gives her negative feedback, she gets reeeally [sic] mad and will not show up at work for a week or so.

5. In the transition meetings, she had a clear and strong underlying agenda that she wanted to continue being the PM for IB. She made people (me for sure!) feel uncomfortable talking about how LAX was taking our "baby" and references to "baby adoption," etc.

This is pointed feedback from a long-term Google engineering leader, who happens to be female. Dustin Jackson, a male Engineering Director, candidly shared his views on Spivak:

> Smart and motivated. Very passionate about her project. But entirely unable to manage the human side of execution. Created conflict with every single person she worked with. Frequently misrepresents (intentionally or unintentionally) the facts. Not someone I could trust to run a project in good conscience.

At present, Spivak is on a personal leave of absence and expected to return to work on Monday, September 21.

## II. LEGAL ARGUMENT

### A. Spivak's Discrimination Claim Has No Merit.

On her discrimination claim, Spivak bears the burden of establishing that she suffered a materially adverse employment decision because of her gender. *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 142–43 (2000) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."). She cannot meet her burden.

First, Spivak cannot establish that her performance ratings ("meets expectations") or the short-term PIP constitute a "materially adverse change" in the terms or conditions of her employment. Indeed, "an employee's placement on a PIP does not itself constitute an adverse employment action where no demotion, reduction in pay, or significant modification of responsibility occurs." *Erickson v. Fisher Commc'ns, Inc.*, 150 Wash. App. 1003 (2009) (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224–1225 (10th Cir. 2006); *Hutchinson v. Seagate Tech.,* 147 F. App'x 647, 648 (9th Cir. 2005) (affirming summary judgment on discrimination and retaliation claims where "evidence fails to create a triable issue as to whether [the employee] suffered an adverse employment action as a result of an alleged negative evaluation."); *Agnew v. BASF Corp.,* 286 F.3d 307, 310 (6th Cir.2002) (the possibility of termination mentioned in the plaintiff's PIP "was contingent on future developments, rather than being a present plan or decision" and therefore did not constitute an adverse employment action supporting a constructive discharge claim). In this case, Spivak was placed on a short PIP after receiving a "meets expectations" performance rating. Her pay was not reduced, she was not demoted, and her responsibilities were not reduced. These performance reviews have not disqualified Spivak from any particular promotion; she simply has to do a better job in her role if she wants to advance back to the level from which she was previously demoted (by a female Vice President).

Second, Spivak cannot prove that any alleged adverse employment action was motivated by her gender. Both Spivak's current manager, Skakkebaek, and her prior manager, Spencer, hired Spivak onto their teams and thus the "same actor" inference of no discrimination applies. *Coghlan v. American Seafoods Co. LLC*, 413 F3d 1090, 1096-1097 (9th Cir. 2005) (holding that the "same actor" inference of no discrimination applies to cases challenging alleged adverse employment actions short of termination). Moreover, the reviews that she received reflect the input of several employees, male and female, who share similar concerns with Spivak's performance. They have identified real concerns with Spivak's product documentation efforts, communication, and work relationships. Spivak disagrees with those ratings and holds herself in much higher regard, and seems unable or unwilling to accept constructive feedback. The areas where Spivak has failed to perform consistently (thorough documentation and analysis, communication, and relationships) are key traits for the Product Manager role at Google. It is not enough to have what you believe is a "great idea" because in all fairness there are many of those at Google (and many other companies). Instead, Product Managers have to socialize, develop,

and build that idea into a product, which requires close collaboration with others. Because Spivak has not done so in an above average manner, she has never received a rating better than "meets expectations." That has nothing to do with her gender.

### B. Spivak's Retaliation Claim Has No Merit.

On her retaliation claim, Spivak bears the burden of proving that she (1) engaged in a protected activity; (2) Google subjected her to an adverse employment action; and (3) causal link exists between the protected activity and the employer's action. *Stegall v. Citadel Broadcasting Co.*, 350 F3d 1061, 1065 (9th Cir. 2003). Spivak cannot establish any of the foregoing elements.

First, opposition to discrimination is "protected activity" only if the employee had a reasonable and good-faith belief the employer's action was unlawful. *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise. *Matima v. Celli*, 228 F.3d 68, 81 (2nd Cir. 2000) (discharge was not retaliation where plaintiff "repeatedly confronted and antagonized his supervisors in inappropriate contexts in a way that was designed to force the company's hand or make it pay a price in reduced productivity, focus and morale").

In this case, Spivak has not complained in good faith. She admitted (in writing) that she complained about discrimination in early February 2015 because she believed it made her "unfireable," shortly after she swore repeatedly during a meeting with her manager. Spivak is thus attempting to use Title VII as a shield to protect her from discipline instead of actually believing there had been gender discrimination. Spivak's subsequent misconduct toward Paul Higson ("you are a bad person, "you have no ethics," "you have no morality," "you are a puppet of a system," and "I think young paul would be ashamed of now-paul") reveals that Spivak apparently believes she can say or do anything because she complained (in bad faith) about alleged discrimination. Realizing her bad faith, Spivak now tries to claim that she complained about gender discrimination in May 2014. That claim is false. The only thing Spivak complained about in May 2014 was her conspiracy theory that engineering wanted to request for more data and analysis from her because it did not like her new idea. It was Spivak's responsibility to provide this data to support her idea in the first place and Engineering was correct to request it when she failed to provide it.

Second, Spivak cannot establish that the "meets expectations" rating she received after her internal complaint was a "materially adverse" employment action. The anti-retaliation provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, (2006). Where, as here, the employee "was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was

not denied any raises, and was not reduced in salary or in any other benefit," there is no adverse employment action. *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir.2000); *Givens v. Cingular Wireless,* 396 F.3d 998, 998 (8th Cir.2005) ("[P]lacing [an employee] on a 'performance improvement plan,' without more, did not constitute an adverse employment action."). Here, Spivak is complaining about receiving a "meets expectations" rating, which is not even a "negative" job review; she simply believes she should be rated as "exceeding expectations." Receiving an average performance review is not a materially adverse employment decision.

Finally, while Google's decision to relocate five projects (including Spivak's) to Los Angeles may be an adverse employment action, Spivak cannot establish that Google did so "because of" her contemporaneous complaint. *Clark County School Dist. v. Breeden* 532 U.S. 268, 273, (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). In this case, Google was planning on relocating 5 projects from Seattle to Los Angeles, impacting 34 employees, before Spivak made her complaint. While the decision was announced very shortly after she complained, there is no basis for her to assert that it was a retaliatory decision.[2]

## III. CONCLUSION

Google trusts that this position statement provides the EEOC with all the information it needs to issue a "no cause" determination with respect to Spivak's discrimination and retaliation allegations. To the extent the EEOC requires further information, please let me know.

Very truly yours,

CURLEY, HESSINGER & JOHNSRUD LLP

Brian L. Johnsrud

Enclosures

---

[2] By responding fully to Spivak's allegations, Google does not waive its defense that many of her allegations are time barred. Spivak filed her charge on June 17, 2015, and all allegations arising more than 300 days before that date are time barred. 42 U.S.C. § 2000e-5(e)(1).

EXHIBIT 1

MyGoogle Help

MYGOOGLE CONTACT US

# Policy Against Harassment, Discrimination and Retaliation (US)

Google's employment philosophy is that all employees are entitled to a positive work environment where everyone can be a successful contributor. To that end, all employees are entitled to a culture of mutual respect free of harassment, intimidation, bias and discrimination.

Google is committed to maintaining a workplace environment free from discrimination and harassment. In keeping with this policy, Google strictly prohibits unlawful discrimination or harassment of any kind, including discrimination or harassment on the basis of race, creed, color, religion, gender, national origin, sexual orientation, gender identity/expression, national origin, disability, medical condition, age, genetic information, military/veteran status, marital status, pregnancy or related condition (including breastfeeding), or any other basis protected by law.

We strictly prohibit all forms of unlawful harassment or discrimination by or against any employee, TVC, professional service provider or visitor. We prohibit unlawful harassment in any form, including verbal, physical or visual harassment.

Sexual harassment includes, but is not limited to, making unwanted sexual advances and requests for sexual favors where (1) submission to such conduct is made an explicit or implicit term or condition of employment; (2) submission to or rejection of advances is used as the basis for employment decisions affecting an individual; or (3) unwanted conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment, even if it does not lead to tangible or economic job consequences.

Too often one hears stories of employees who were harassed, often for long periods of time, but didn't feel comfortable coming forward. We want to make entirely clear that Google is not, and never will be, the kind of company in which any employee should ever feel that way.

If you believe you've been harassed or discriminated against by anyone with whom you come into contact at Google, you must immediately report the incident to your manager, your Human Resources Business Partner (HRBP), or another member of your management team or HR. You can also make a complaint via the Ethics & Compliance Helpline . Managers and supervisors who become aware of any such untoward conduct must immediately report the harassment to Human Resources. Google will promptly and thoroughly investigate any complaints and take appropriate corrective action as warranted. Employees who are found to have violated this policy are subject to discipline up to and including termination.

Retaliation for reporting any incidents of actual or perceived discrimination or harassment, or for participating in any investigation of such incidents, is strictly prohibited. Likewise, Google also prohibits retaliation for raising any other legally-protected workplace concerns. If a complaint of retaliation is substantiated, appropriate disciplinary action, up to and including termination, will be taken.

EXHIBIT 2

**Rebecca Spivak (rivka)** | 7/DNU (4) - Product Manager Feedback for 2010 Q3

**Rating**

Meets Expectations

**Compare Googlers**

All numbers below represent job level

More effective

- / **Ethan Russell (erussell)** Product Manager

- / **Matthew Leske (mleske)** Product Manager

- / **Carter Maslan (carterm)** Director, Product Management

- / **Shalini Agarwal (shalinia)** Product Manager

7/ **Rebecca Spivak (rivka)** DNU (4) - Product Manager

Less effective

**Ari Bezman (abezman)**
Product Manager

More effective

- / **Carter Maslan (carterm)** Director, Product Management

- / **Dave Barth (barth)** Product Manager

- / **Jacqueline Bavaro (jackiebo)** Product Manager

- / **Kei Kawai (kero)** Product Manager

- / **Andrew Silverman (andrewsi)** Product Manager

- / **Taj Campbell (taj)** Product Manager

- / **Lior Ron (lior)**

- / Group Product Manager

7 / **Rebecca Spivak (rivka)**
DNU (4) - Product Manager

Less effective

**Bernhard Seefeld (seefeld)**
Group Product Manager

More effective

- / **Bernhard Seefeld (seefeld)**
Group Product Manager

- / **Jeremy Sussman (jsussman)**
Product Manager

7 / **Rebecca Spivak (rivka)**
DNU (4) - Product Manager

Less effective

**Michelle Lee (mosh)**
4 /UI Designer

More effective

- / **Avni Shah (Stocky) (avni)**
Group Product Manager

- / **Bernhard Seefeld (seefeld)**
Group Product Manager

- / **Carter Maslan (carterm)**
Director, Product Management

- / **Ethan Russell (erussell)**
Product Manager

- / **Jeremy Sussman (jsussman)**
Product Manager

- / **Lior Ron (lior)**
Group Product Manager

- / **Arnaud Sahuguet (sahuguet)**
Product Manager

- / **Fernando Delgado (fdelgado)**
Product Manager

- / **Dylan Myers (dylanm)**
GIS Data Engineer

7 / **Rebecca Spivak (rivka)**

Rebecca Spivak (rivka)
7 / DNU (4) - Product Manager

Shalini Agarwal (shalinia)
- / Product Manager

Less effective

**Elizabeth Hamon Reid (ehamon)**
Director, Software Engineering

More effective

**Avni Shah (Stocky) (avni)**
- / Group Product Manager

**Marcelo Quintella (quintella)**
- / Product Manager

**Andrew Foster (andrewf)**
- / Product Manager

**Thor Mitchell (thor)**
- / Google for Work, Staff Technical Solutions Engineer - Spec

**Smita Hashim (smita)**
- / Group Product Manager

**Rebecca Spivak (rivka)**
7 / DNU (4) - Product Manager

Less effective

**Carter Maslan (carterm)**
Director, Product Management

More effective

**Stephan Seyboth (sseyboth)**
- / Product Manager

**Bernhard Seefeld (seefeld)**
- / Group Product Manager

**Ari Bezman (abezman)**
- / Product Manager

**Ethan Russell (erussell)**
- / Product Manager

**Avni Shah (Stocky) (avni)**
- / Group Product Manager

**Taj Campbell (taj)**
- / Product Manager

- / Lior Ron (lior)
Group Product Manager

7/ Rebecca Spivak (rivka)
DNU (4) - Product Manager

Less effective

**Scott Lederer (lederer)**
5 /UI Designer

More effective

- / Ethan Russell (erussell)
Product Manager

- / Bernhard Seefeld (seefeld)
Group Product Manager

- / Jeremy Sussman (jsussman)
Product Manager

7/ Rebecca Spivak (rivka)
DNU (4) - Product Manager

Less effective

**Gregory Donaker (gdonaker)**
6 /Staff Software Engineer

More effective

- / Ari Bezman (abezman)
Product Manager

- / Matthew Leske (mleske)
Product Manager

7/ Rebecca Spivak (rivka)
DNU (4) - Product Manager

Less effective

**Patrick Leung (puiwah)**
7 /Mgr, Software Engineering III

**Promotion Committees**

**Committee Notes**

**Decision:** DEFER (DEFINITIVE)
**Decision by:**Jack Menzel (jmenzel)
**Decision date:** Oct 18, 2010 12:00:00 AM
**Decision notes:**T7 Day 1 Committee, notes taken by Jack Menzel
Defer Slotting to Spring Cycle per manager and VP recommendation.

**Work Relationship**

| Reviewer/Role | Choice |
| --- | --- |

| | |
|---|---|
| **Carter Maslan** (PEER) Director, Product Management | I worked very closely with this person during this perf period |
| **Dan Cath** (PEER) Associate Partner Manager | I worked fairly closely with this person during this perf period |
| **Radhika Lakshmanan** (PEER) Software Engineer | I worked fairly closely with this person during this perf period |
| **Sam Mardanbeigi** (PEER) Software Engineer | I worked fairly closely with this person during this perf period |

**Accomplishments**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) DNU (4) - Product Manager | WHAT HAS RIVKA SPIVAK DONE?<br><br>Project: Vertical Local Search \| Role: PM \| Rating: See Later Section<br><br>Work across teams, including VLS team, Sentiment, Local Rank, SPD/SPM, Place Page, LU/LM, UX, Structured Data to bring projects together and rally support for prioritization of features that will have vertical specific impact. This involves everything from working with SPD to get the right partner relationships to figuring out the small wins, big wins, and short and long terms goals to bring a holistic experience to local search for specific verticals.<br><br>Project: Local Enhanced Content \| Role: PM \| Rating: See Later Section<br><br>Work heavily with the SPD/SPM team to prioritize new partnerships, analyze existing partnership data quality, and determine gaps in coverage.<br><br>HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER? |
| **John Hanke** (MANAGER) VP, Product Management | Q3 was Rivka's first full quarter at Google, and she's iteratively adjusting quickly to feedback as she ramps up on two big challenges:<br><br>1) familiarizing herself with Search Quality and the related data/eng/eval culture at Google<br>2) driving vertical search scenario experiences across multiple independent, horizontal teams<br><br>Rivka has defined high-level priorities for vertical local search and a clear set of target improvements for Restaurants centered on know-for refinements, menu links, pricing, and smarter snippets. She has also familiarized herself with basic analysis and research tools like szl, dremel and mfe monkeys. Her charter is particularly challenging because she has only 3 eng directly on her vertical initiative and must secure commitments from a variety of other eng teams to effect the UX she wants (across schultzville, MFE, Maps, LEC, Ranking, evals etc...). This model of executing across horizontal teams to accomplish a particular UX is a key challenge for us to overcome as Geo; so I view this VLS setup as an experimental hope that Rivka can make it work. The key is to iterate quickly and adjust based on feedback from teams. In particular, her teammates ask that Rivka become more data-oriented: it's OK to start with a Product hypothesis, but then support it with detailed assessment of feasibility/attractiveness based what we can achieve in data quality and search quality. That means that she needs to dig-in to flesh out very specific launch targets and metrics (i.e. exactly what Precision is |

required to launch known-for for Restaurants? What Coverage is required to offer price refinements? Where can we get that coverage? etc... Matching her well-articulated goals with specific implementation steps/owners will boost the impact she'll have across Google. We're lucky to have Rivka joining us.

**Ari Bezman**
(PEER)
Product Manager

Frequency of Interaction: SOMEWHAT WELL

WHAT HAS RIVKA SPIVAK DONE?

---

Project: Vertical Local Search | Role: PM | Rating: See Later Section

---

No Comment

---

Project: Local Enhanced Content | Role: PM | Rating: See Later Section

---

No Comment

HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?

Rivka's still onboarding, so it's difficult to comment on her performance in some ways. She's meeting many teams, understanding priorities, and trying to craft a unified vision for vertical local. I'm excited that she sees LEC as key to this effort, and that she's trying to push for increased resources (including eng) for that team. I thought that the VLS summit that she helped organize was interesting, though I'd like to better understand the concrete outcomes. On a more personal note, she was a very, very helpful mentor to me this year, especially in Q2. She has a lot of experience navigating organizations, and I think it'll serve her well at Google.

**Bernhard Seefeld**
(PEER)
Group Product Manager

Frequency of Interaction: VERY WELL

WHAT HAS RIVKA SPIVAK DONE?

---

Project: Vertical Local Search | Role: PM | Rating: See Later Section

---

An enormous task for a Noogler, Rivka embarked on coordinating teams across all functions into successful vertical local search.

In the broader dialog, we ended up with a good philosophy and strategy, but at times to concrete outcomes and tasks for some of the auxiliary teams aren't yet clear enough. I'm sure that will happen over the next two quarters, though.

Her small eng team has been ramping up on launching crucial features like restaurant prices on Maps, GWS and GMM.

---

Project: Local Enhanced Content | Role: PM | Rating: See Later Section

---

This area has been traditionally lacking in attention and with Rivka's extensive experience in the area, we're now in much better shape in prioritizing the right deals and actually making sure of the data we get.

HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?

It hasn't been the easiest start for a Noogler, with a project that consists mainly of coordinating other teams with their PMs and few own engineers. The impact of that work will be great, as Rivka is bringing in a unique perspective into a large fraction of geo projects. But it's clear that we're not there yet.

Her industry knowledge and quick grasp of things gains her respect with peers. But to fully gain the respect of others, especially the senior TLs in other local search teams, I'd recommend a deeper dive into Sawzall and other data analysis tools and dabbling into monkeys for quick demos and an opportunity to touch the data at all stages in the pipeline.

| | |
|---|---|
| | A bigger focus on vertical-specific metrics that allow other teams to measure their impact specific to verticals would be very powerful.<br><br>At the beginning, I was a bit worried about the PM-style and use of language, but that greatly improved over the last months. |
| **Carter Maslan**<br>(PEER)<br>Director, Product Management | Q3 was Rivka's first full quarter at Google, and she's iteratively adjusting quickly to feedback as she ramps up on two big challenges:<br>1) familiarizing herself with Search Quality and the related data/eng/eval culture at Google<br>2) driving vertical search scenario experiences across multiple independent, horizontal teams<br><br>Rivka has defined high-level priorities for vertical local search and a clear set of target improvements for Restaurants centered on know-for refinements, menu links, pricing, and smarter snippets. She has also familiarized herself with basic analysis and research tools like szl, dremel and mfe monkeys. Her charter is particularly challenging because she has only 3 eng directly on her vertical initiative and must secure commitments from a variety of other eng teams to effect the UX she wants (across schultzville, MFE, Maps, LEC, Ranking, evals etc...). This model of executing across horizontal teams to accomplish a particular UX is a key challenge for us to overcome as Geo; so I view this VLS setup as an experimental hope that Rivka can make it work. The key is to iterate quickly and adjust based on feedback from teams. In particular, her teammates ask that Rivka become more data-oriented: it's OK to start with a Product hypothesis, but then support it with detailed assessment of feasibility/attractiveness based what we can achieve in data quality and search quality. That means that she needs to dig-in to flesh out very specific launch targets and metrics (i.e. exactly what Precision is required to launch known-for for Restaurants? What Coverage is required to offer price refinements? Where can we get that coverage? etc... Matching her well-articulated goals with specific implementation steps/owners will boost the impact she'll have across Google. We're lucky to have Rivka joining us. |
| **Dan Cath**<br>(PEER)<br>Associate Partner Manager | I began working with Rivka in May of this year when I joined the Local Enhanced Content team.<br><br>Since then, our interactions are primarily in weekly meetings, group email threads, and on occasional partner phone calls together. As Rivka is the lead Product Manager for LEC, and I'm the SPM for LEC in North America, I consider most of the work I perform to ultimately roll-up to Rivka as my OKRs are structured around successfully managing the book of business of LEC Partners and completing improvements to LEC features and systematic processes.<br><br>Rivka is a very interesting person; when I am able to get her attention she has tremendous insight and passion for LEC. Other times when she has alot on her plate, and it can be challenging to gain her input unless she's individually addressed. |
| **Elizabeth Hamon Reid**<br>(PEER)<br>Director, Software Engineering | Frequency of Interaction: SOMEWHAT WELL<br><br>WHAT HAS RIVKA SPIVAK DONE?<br><br>____________________________________<br>Project: Vertical Local Search \| Role: PM \| Rating: See Later Section<br>____________________________________<br>- Rivka's been working with the various teams to come up with a holistic plan around local search for verticals, particularly for restaurants. We now have a clear set of features we want to do to make the restaurant experience compelling. She's also brainstormed some ideas around services like her googledex idea.<br><br>____________________________________<br>Project: Local Enhanced Content \| Role: PM \| Rating: See Later Section<br>____________________________________<br>Rivka's worked closely and, afaict, very effectively with SPD to better prioritize our partners and find out gaps. For instance, we're going back to some of our partners and asking them for additional data based on Rivka's work.<br><br>HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?<br><br>No Comment |
| | Frequency of Interaction: SOMEWHAT WELL |

| | |
|---|---|
| **Gregory Donaker** (PEER) Staff Software Engineer | WHAT HAS RIVKA SPIVAK DONE?<br><br>Project: Vertical Local Search \| Role: PM \| Rating: See Later Section<br><br>Rivka has been working to define the mission of the VLS team, and get them on their way. This is a tough effort, as it has a huge amount of overlap with other projects and the two engineers on her team are new to Geo.<br><br>Project: Local Enhanced Content \| Role: PM \| Rating: See Later Section<br><br>No Comment<br><br>HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?<br><br>I've TLMed one of the teams with goals and projects that share goals with the VLS, so have observed and interacted with Rivka in her exploration of the space. She's had to face the challenge of absorbing Google's engineering culture, and understanding the goals of each individual team in the space - and has taken those on with a very positive and determined attitude. This is further complicated by varying priorities between eng managers, PMs of the different parts of Geo and Search and the pressure to excel in local.<br><br>The team is still working to define the charter, and to deliver on their initial goal of getting restaurant price data out the door - though I understand Rivka has a bunch of other things in the pipeline by figuring out what data is out there we can get our hands on.<br><br>I'm really looking forward to seeing upcoming achievements in this space, and working with Rivka to deliver a useful, compelling, seamless product. |
| **Michelle Lee** (PEER) UI Designer | Frequency of Interaction: SOMEWHAT WELL<br><br>WHAT HAS RIVKA SPIVAK DONE?<br><br>Project: Vertical Local Search \| Role: PM \| Rating: See Later Section<br><br>I was the UX Designer working most directly w/ Rivka as she came up to speed at Google & prepared for the first vertical search product review.<br><br>During the ~4 weeks we worked together, she quickly came up to speed on the needs of verticals, actively sought institutional knowledge from formal research reports & informal chats with peers. I was impressed that, despite being tasked w/ improving verticals, Rivka showed great holistic judgement found ways to do that w/o compromising the holistic Maps experience.<br><br>Project: Local Enhanced Content \| Role: PM \| Rating: See Later Section<br><br>No Comment<br><br>HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?<br><br>Rivka brings unique industry knowledge, an ability to understand complex problems, and a great sense of humour to her role. She's been tasked with an interesting and challenging project, and I look forward to seeing her work continue. |
| | Frequency of Interaction: VERY WELL<br><br>WHAT HAS RIVKA SPIVAK DONE? |

Project: Vertical Local Search | Role: PM | Rating: See Later Section

Rivka has built working relationships with many of the teams associated with Vertical Local Search such as Sales, DuperRoot/Schultzville, Place Page, Local Ranking. She has prepared some documents that describe our overall approach to Vertical Local Search - see the Geo review presentation at go/verticallocalsearch and a prioritized list of VLS related features at go/vlspriorities. She also along with Scott Lederer organized a two day summit that brought together many leads to discuss VLS strategy.

**Patrick Leung**
(PEER)
Mgr, Software Engineering III

Project: Local Enhanced Content | Role: PM | Rating: See Later Section

I have a lot less exposure to Rivka's work on the LEC side but I know it is a big area of focus for her and there have been several conversations with the SPM team obtaining pricing info from various partners.

HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?

I think that Rivka is still getting up to speed as a PM here at Google. She brings extensive vertical local search experience to the company
Rivka did a decent job planning the Vertical summit in Q3 with Scott Lederer. There were a lot of interesting discussions although I wish there had been more organized followup afterward to process all the input we'd obtained. We discussed the event a little but then moved on with other things.
Rivka presented a high level overview of the vertical features we should be pursuing to John and others that set the stage for the team's charter. I would like to see a more detailed exposition of how we will make restaurant, hotel, and other verticals the best local search experiences in the world.
I would like to see more PM motive force in general on the team. We have an overview of the VLS team's roadmap at go/vlspriorities but this needs to be fleshed out, especially the areas for the VLS team where there is no other PM input.

---

**Radhika Lakshmanan**
(PEER)
Software Engineer

Frequency of Interaction: SOMEWHAT WELL

WHAT HAS RIVKA SPIVAK DONE?

Project: Vertical Local Search | Role: PM | Rating: See Later Section

The challenge of vertical local search is that several teams are working on features that impact the space, but no one was working on identifying and prioritizing those features. Rivka's job has been this – working with several teams to develop the core vertical local search effort. Rivka has written several design docs around this effort, has helped us prioritize features for the effort, and has contributed valuable expertise and opinions to our meetings.

— Additional Notes —
She also helped us fine tune our eval parameters and language and has been working with various teams to handle the problem of attribution in our UI. This is a challenging prospect because partners are very sensitive about us using their data with or without attribution, because they what they want is basically to get more traffic to their sites.

Project: Local Enhanced Content | Role: PM | Rating: See Later Section

No Comment

HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?

I think Rivka is performing well at her level.

---

I've worked with Rivka on the Vertical Local Search (VLS) team since the end of Q2 2010. VLS is a particularly interesting team in that the engineering portion of VLS covers only a portion of all the product-level requirements for the team. Rivka's responsibilities cover not only the work that the two engineers do, but also covers many other teams in Local Search. This is departure from every other team I've worked on at Google, and makes

| | |
|---|---|
| **Sam Mardanbeigi**<br>(PEER)<br>Software Engineer | Rivka's work different than your normal PM; on top of that, this is Rivka's first project at Google.<br><br>One of the hardest things about Rivka's position is to promote consensus from all the other PMs that have an overlapping commitment with VLS. VLS spans across most of LocalSearch, from various frontends (Place Page, Maps Frontend search results, Websearch/Local Universal), products (Schultsville/Geo Refinements, Hotpot), and even vertical-specific teams (Product, Travel Ads/Hotel, Menu Dishes/restaurants). This can be an especially daunting task for someone who is (relatively) new to Google, but Rivka has started putting the pieces together and getting people to agree on things. |
| **Scott Lederer**<br>(PEER)<br>UI Designer | Frequency of Interaction: VERY WELL<br><br>WHAT HAS RIVKA SPIVAK DONE?<br><br>Project: Vertical Local Search \| Role: PM \| Rating: See Later Section<br><br>Rivka dove right into one of the more challenging PM roles I can think of at Google. VLS is extremely horizontal: it's not a specific product, but more of a tight coordination across products, teams, backends. She's brought tenacity, vertical experience, and technical knowledge to bear on a tough problem.<br><br>Project: Local Enhanced Content \| Role: PM \| Rating: See Later Section<br><br>No Comment<br><br>HOW WELL DOES RIVKA SPIVAK PERFORM AS A PRODUCT MANAGER?<br><br>Rivka has assembled an excellent team and has the pieces in place to make VLS a success. I think her biggest challenge remains adjusting to how things get done at Google. |

**Strengths**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak**<br>(SELF)<br>DNU (4) - Product Manager | - Ability to understand core technical issues and complexities involved and consider ways to get things done despite blockers. Able to understand perspectives of different teams and work for common solutions.<br>- Ability to influence prioritize and find consensus without formal authority<br>- Stray on track on multiple projects across the company. There is tremendous complexity involved in the interactions with all the different teams needed to come together, but I was able to get well versed in many projects<br>- Stay well informed on industry needs and trends for verticals that are high priority. Identify industry leaders |
| **John Hanke**<br>(MANAGER)<br>VP, Product Management | vision/insight: Rivka is outspoken and advocates for ways to improve search/discovery tasks that are not served well by today's UI and Ranking.<br><br>communication: connects with people across teams and forms relationships that get discussions started.<br><br>skills in role: got up and running with the scripting, query, eval, and UI tools that are the "tools of the trade" for her search quality work. |
| **Ari Bezman**<br>(PEER)<br>Product Manager | Vision. Rivka's long term vision for vertical local search makes sense to me, and I agree with her prioritization of key verticals. |
| **Bernhard Seefeld**<br>(PEER)<br>Group Product Manager | see above |

| | |
|---|---|
| **Carter Maslan** (PEER) Director, Product Management | vision/insight: Rivka is outspoken and advocates for ways to improve search/discovery tasks that are not served well by today's UI and Ranking.<br><br>communication: connects with people across teams and forms relationships that get discussions started.<br><br>skills in role: got up and running with the scripting, query, eval, and UI tools that are the "tools of the trade" for her search quality work. |
| **Dan Cath** (PEER) Associate Partner Manager | Vision - Rivka possesses and communicates a clear vision where the Local Enhanced Product should evolve in the short, mid, and long term. Earlier in the summer, Rivka created a superb document titled "Vertical Local Search" to describe her vision for LEC. This thought-paper goes beyond a standard PRD and has been extremely helpful to me on an individual level as I understand what I am working towards within this product, but also on a broader, partner-centric level where I am able to answer critical partner questions with clarity and authority about how LEC perceives itself within the broader Local/Maps marketplace. Having been at Google for 4.5 years and worked on AdWords, AdSense, GDN/Display, and YouTube, I can say this is the first genuine "vision" paper I've seen that wasn't written by a VP or higher-level Googler. Great work Rivka.<br><br>Motivation - Rivka has genuine empathy for the relationship that Google/LEC has with our partners. She understands the delicate balance we must maintain in order to retain partner trust (and their data) while also pushing the boundaries and evolution of our own products to increase user adoption. There have been other PMs that haven't been as sensitive to this delicate balance, but Rivka's innate understanding and consideration of how our partner's perceive us are truly invaluable as LEC continues to develop.<br><br>Insight - Coming from the Local web industry before entering Google, Rivka has a deep understanding of the business models, needs, and goals of our LEC partners. This hyper-relevant background experience really adds a lot when Rivka has been on partner calls with me for MenuPages, DinnerBroker, and OpenTable. She speaks like an industry insider (because she is) which adds weight and brings respect to Google when we discuss LEC with our partners. She knows many important people in the industry, and has pre-existing contacts or relationships with multiple LEC Partners. |
| **Elizabeth Hamon Reid** (PEER) Director, Software Engineering | - works very effectively with SPD<br>- great at figuring out which additional sources of data we want to get<br>- has a strong knowledge of the industry and where they are going, what data is available, etc<br>- is prepared to coordinate across several teams and PMs to make vertical search work |
| **Gregory Donaker** (PEER) Staff Software Engineer | - stayed well informed on a ton of projects in the company and industry<br>- garnering influence without any formal authority<br>- has a good understanding of the product space<br>- fun to work with<br>- not afraid to dig into using tools |
| **Michelle Lee** (PEER) UI Designer | - Insight into industry trends - This is an area of missing expertise at Google and Rivka could establish herself as an expert and share this knowledge with others in her FA, especially in identifying where Google should follow, build upon, or buck industry trends. She has already brought several insights from her background in travel to geo teams.<br>- Ability to understand perspectives and motivations of different teams. |
| **Patrick Leung** (PEER) Mgr, Software Engineering III | Communication - when she presents to larger groups Rivka does a good job engaging with her audience, presenting her material effectively and encouraging further discussion. This was in evidence at the vertical local summit where there was a lot of lively debate around different aspects of vertical local search.<br><br>Relationships - Rivka is personable and knows how to put people at ease. This was a factor in one of the engineers joining the vertical local search team. She has built working relationships with many people in the extended local search leadership team.<br><br>Reflective - Rivka openly seeks feedback from people in an attempt to improve her effectiveness |

| | |
|---|---|
| | Expertise - Rivka has a lot of domain expertise from her years at Expedia and other places. This shows during discussions where we ask ourselves "what would restaurants or hotels want?" and Rivka usually has an answer. |
| **Radhika Lakshmanan** (PEER) Software Engineer | Low noise to work ratio: Rivka is good at bringing up only relevant issues to engineers and she does not exhibit the constant panic my last PM exhibited when any minor bugs were reported. She is calm and easy to work with. |
| **Sam Mardanbeigi** (PEER) Software Engineer | - vision and insight<br>Rivka has a good understanding of what features are important to make Google perform better in the vertical search space, leveraging her past experience (such as her previous work on travel sites). She's not afraid to come up with a decision on how to move forward with a given task or problem, but at the same time does not tyrannically dictate how things are to be done. |
| **Scott Lederer** (PEER) UI Designer | Grokking our content strategy. Rivka has developed a good understanding of what it means to be a search engine that thinks it's a content provider. She gets the partner and attribution issues, and she knows our challenge is making sure the user doesn't get caught in the middle.<br><br>Understanding the market. Rivka brings very useful and relevant vertical experience to the table.<br><br>Complexity. There's a mind-bogglingly complex ecology of infrastructures, regulations, partnerships, and user needs at play in vertical/local search. Rivka has been ramping up to this well. |

**Areas for Development**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) DNU (4) - Product Manager | - Adjusting style to switch between the cultures of different engineering teams. Each has a different preferred style (often based on historical involvement) for PM interaction, but my role requires, as I work with so many teams, that I need to shift style quickly from one meeting to the next<br>- Continue to become more integrated into the Google approach to product management<br>- Learned Sawzall, Ewok, Dremel, monkeys, etc and produced working/useful versions of each in first 4-5 months at Google (with help from the engineering team) but would like to be more well versed. |
| **John Hanke** (MANAGER) VP, Product Management | execution: complete the analysis and leg-work needed to identify specific implementation plans and launch criteria across teams. Socialize the problems to solve and secure commitments from teams that understand how their work fits into the overall plan. For example, ensure that known-for Precision and Coverage targets are aligned with LEC Coverage/Precision targets with Eval plans that both teams can use for launch.<br><br>org/relationships: keep stakeholders informed of key outcomes, action items and dependencies. Especially given the difficulty of executing across multiple teams, over-communicate plans in notes/sites to help teams execute together.<br><br>communication: when navigating variable needs across different eng teams, ask open-ended questions that identify the specific deliverables most needed from PM. |
| **Ari Bezman** (PEER) Product Manager | Communication. Especially being in NYC, it's important to very visibly communicate what you're working on, what decisions are being made (and why), and what's blocked and needs help. Rivka was one of the people who taught me the importance of this, and I encourage her to do more of it with her own teams as well.<br><br>Execution. Detailed roadmaps that lead to near-term, achievable launches that show clear wins. |
| **Bernhard Seefeld** (PEER) Group Product Manager | see above |
| | execution: complete the analysis and leg-work needed to identify specific implementation plans and launch criteria across teams. Socialize the problems to solve and secure commitments from teams that understand how their work fits into the overall plan. For example, ensure that known-for Precision and Coverage targets are |

| | |
|---|---|
| **Carter Maslan** (PEER) Director, Product Management | aligned with LEC Coverage/Precision targets with Eval plans that both teams can use for launch.<br><br>org/relationships: keep stakeholders informed of key outcomes, action items and dependencies. Especially given the difficulty of executing across multiple teams, over-communicate plans in notes/sites to help teams execute together.<br><br>communication: when navigating variable needs across different eng teams, ask open-ended questions that identify the specific deliverables most needed from PM. |
| **Dan Cath** (PEER) Associate Partner Manager | Initiative and Motivation - The LEC Specification update project would have occurred more efficiently and rapidly if Rivka had taken a more proactive role. Sometimes Rivka needs to be individually addressed in group threads in order to solicit her opinion, and given the scope and technical nature of this project, it would have been helpful to reduce the load on non-technical teams had she followed the discussions more closely. When I would specifically address her within the group discussion she would respond with useful input, but it adds another layer to project management which I would rather not be necessary.<br><br>Relationships - From what I've perceived Rivka has good working relationships with her Geo Product Manager counterparts in the Zurich office, but there have been several occasions when significant amounts of work is created for the Partnerships team when she doesn't connect with other Geo-related product groups before making new data requests to existing partners. Rivka and I have had an ongoing dialogue about Zagat and which of their ratings we (Google) want them to add into their feed. Rivka and I had a great discussion and reached consensus on what we wanted. I then contacted the partner and started requesting the data from them. After the Zurich PlacePage team was added to the discussion, it turned out they and other folks in NYC felt the opposite way about Zagat Ratings. This culminated in a very awkward interaction with Zagat as we make requests and then change our minds on the request. I understand this can be the nature of our evolving LEC product and can't always be predicted beforehand, but I would appreciate if there was more unified discussions within Geo PM about partner data before the Partnerships team is requested to acquire the data.<br><br>Organization - I am happy to perform partner outreach to acquire new types of data, (and see it as a core part of my job), but need Rivka to fully research the data being scrutinized before the request is made. We set an OKR in Q3 around acquiring ratings from Gayot after Rivka made a request. When I approached Gayot for this, they were confused and said they already do include those ratings in their feed. When I asked Rivka, she performed a deeper-dive and learned that we already get this data, just not comprehensively. If this background research had been performed beforehand, it would have saved ~10 email back-and-forth replies between several internal folks and reduced tension with the partner. This leaves me in a position where I need to question her data requests, which I would prefer not to do as I trust Rivka and do not in any way wish to second guess her. |
| **Elizabeth Hamon Reid** (PEER) Director, Software Engineering | - grow in versatility of sawzall and dremel particularly. Rivka's done a few scripts on this, but metric calculations and analyses that are needed still often seem to be done by the engineers. It would be great if Rivka could do more of these, as it'd give her a stronger sense of what our data actually looks like and it would save a lot of the back and forth between rivka and the engineers on to what exactly the scripts say and should say.<br>- in general grow in being more of a joint player with the rest of the team. My sense is Rivka's past background is a bit more in the style of an executive who delegates most of the tasks. This doesn't always work well with engineers who are expecting to have the freedom to decide how to build something and to share in the discussion about what to do. They also expect Rivka to deliver some things more hands on, for instance a PRD. I know Rivka started working on one PRD, but it seemed like once we hit the point where she got some push back on parts of the PRD, the rest of the PRD never materialized. Doing more of these things that the team (both eng and ux) seems as helping them will help her develop a better overall sense of how things work and create a better working relationship with her team, helping her to do more influence.<br>- become more comfortable being in tough arguments. Google has a habit of having folks engaging hard in arguments and pushing back heavily. People intend to push back heavily on the ideas and will argue the ideas are all wrong, but they aren't trying to say anything about the individual. My sense is Rivka feels personally attacked on these, which is not actually the case. |
| **Gregory Donaker** (PEER) Staff Software Engineer | - Continue to clearly define the charter for her team. For this piece in the localsearch space, it requires her to continue to understand the other teams in the space and potential overlaps and work very closely to get agreement on concrete plans with other PMs and managers<br><br>- Convincing others by example/doing: gathering and sharing concrete numbers on usage/impact, getting hands dirty to show others the benefit of her plans, being explicit with mocks (even sketches) to make sure everybody in a discussion is on the same page. |

| | |
|---|---|
| | - Continue to adapt to the 'googley' approaches to problems, and the requirements of sustainability and scale. |
| **Michelle Lee**<br>(PEER)<br>UI Designer | - Continue to work on building relationships across Google. This is challenging since, as described in self assessment, team styles vary widely. One way to approach this may be to seek advice from small groups of others so explicit differences can be aired and discussed. Build relationships with both individual contributors and team leaders.<br>- Continue to learn to manage churn and lead team to specific milestones |
| **Patrick Leung**<br>(PEER)<br>Mgr, Software Engineering III | Vision/Insight - I'd like to see clearer more detailed product plans that answer the question, "what will it take for us to be the best restaurant / hotel / store / services local search experience". I think we have the raw materials in terms of feature ideas, we need to pull it together into concept mocks and PRD's that describe our vision in detail.<br><br>Initiative and Execution - Don't wait to be told what to do by engineering, lead the way with product plans, objectives, experiments, whatever it takes for us to move forward. We still find ourselves asking "what does it mean for us to be successful" - figure this out for us.<br>We talk about things like biasing snippets and search in place but we need to iron out the details of what these features really mean, what the P1 vs P2 functionality is, what the success criteria are, etc. |
| **Radhika Lakshmanan**<br>(PEER)<br>Software Engineer | Organization/Relationships: Rivka probably needs to make stronger connections with project managers in related teams so that we can make fast progress in working with those teams to prioritize work.<br>UI: Rivka should go ahead and feel free to influence UI decisions and get her opinions out more.<br>Industry info: Rivka should feel free to contribute her industry knowledge to our weekly meetings and dicussions. |
| **Sam Mardanbeigi**<br>(PEER)<br>Software Engineer | - getting lots of people on the same page<br>As stated in the General Info section, there are many teams (and many PM's, and many engineers) that are affected by the scope of VLS. As Rivka gets more comfortable with the lay of the land and understands stakeholders and peoples' responsibilities, she will be able to better drive people towards a common idea and agreement. I think this is something that just takes time.<br><br>- bridging the gap between product and engineering<br>Slightly different than above, Rivka can augment her consensus driving skills by having a good understanding of the technical limitations in the current Local Search system, including how these play into product requirements and the general scope involved with making changes to various engineering components. |
| **Scott Lederer**<br>(PEER)<br>UI Designer | Less arguing, more action. Rivka has a phenomenal team of engineers and UX with a great deal of experience in Local and Google. But too often we end up ratholed in arguments, often between Rivka and the team. I don't think it's a matter of a lone voice of reason against convention. This is a team you can trust. I'd like to see Rivka defer to the team's judgment more, harness its expertise.<br><br>Less delegation, more doing. Rivka seems to err towards delegating: notetaking, scheduling, coordinating events, maintaining the team site. I don't know if this is due to more executive-like roles in previous companies, or to unfamiliarity with our internal systems, or to lighten the load, or what. I think everyone is a team player and naturally does their part to help out. The fact is PMs have a lot of dirty work to do.<br><br>More coordination. In principle I'd like to see a sort of chess board or risk board or map with pieces representing our goals and the obstacles in their way and the progress we're making. As it stands, we were without a PRD when the eng team all but demanded it, and eng is handling most team coordination. |

**Notes For Manager**

| Reviewer/Role | Feedback |
|---|---|
| | Rivka feels like there's a lot of hostility around her. There isn't nearly as much as she thinks there is, and I think if she could get past that to some degree, it would help her settle in more effectively, but i haven't figured out how to help her do that. It's true that Patrick in particular is very frustrated that she won't do the hands on PMing that he's expecting, and that all of us would like to see more of this. But that doesn't mean we hate her or have given up on her. It's just frustration as PMs (like eng managers) can be single point of failures, and so when you get stuck not getting what you think you need out of a PM, it can become a problem. I think the conversations do get |

| | |
|---|---|
| **Elizabeth Hamon Reid** (PEER) Director, Software Engineering | exacerbated because Rivka tends to early on say "i'm happy to learn how to do things at Google and if it means X, then that's fine", seeming to agree, but then proceeds to argue her point of view for the next 20 minutes with the same exact arguments and getting increasingly defensive for it. I believe she really feels like she's trying to listen and learn, but it doesn't come across that way often.<br><br>It would be really great if she could become more hands on, not so much talking to more folks directly and telling them what to do, but better grasping the state of things and doing tasks like PRDs, data analysis, and brainstorming with the eng. This is the biggest case of frustration with Patrick as far as I can tell, and Paul has similarly indicated that he's not sure he can work with Rivka on ps-local integration as Rivka isn't getting involved and detailed enough to be helpful here, and he wants to work with another PM. I don't think just giving him another PM is the right solution necessarily, but it's a warning sign that Paul all on his own is coming to the same point. |
| **Michelle Lee** (PEER) UI Designer | Since I only worked w/ Rivka during initial her initial couple of months at Google, I did not fill in the "overall performance" slider. |
| **Patrick Leung** (PEER) Mgr, Software Engineering III | I see Rivka comfortable operating at a high level but not really diving into details. She seems to shy away from really getting her hands dirty writing a detailed PRD, coming up with success metrics, doing detailed market analysis, and so on. Maybe she is used to having a team under her to do these things? I'm trying to figure out what sort of a PM Rivka will evolve into - it doesn't seem the heavy duty analytical Ethan style PM is her thing. She also doesn't seem super detailed working side by side with engineers on thorny problems like Ari does. That leaves the visionary Bernie type of PM who leads with new ideas which I don't see evidence of yet, or the business planning Diane Westgate style of PM. The latter seems plausible although I haven't seen her business modeling skills in action. FWIW she seems to really identify with partners and working with Krista Campbell to keep them happy; maybe there is some substantial analysis work there which she can excel at. |

**Promotion**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Rebecca Spivak** (SELF) DNU (4) - Product Manager | | THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE PEERS.<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: LARGE<br>- Project: LOCAL ENHANCED CONTENT Contribution: LARGE |
| **Ari Bezman** (PEER) Product Manager | | Based on her performance so far, Rivka does not seem to have the organizational impact and leadership skills that I'd expect from a senior PM. I have some reservations about this assessment, since she's still a little bit of a Noogler.<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Below Expectations<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM<br>- Project: LOCAL ENHANCED CONTENT Contribution: MEDIUM |
| | | I'd vote for postponing slotting. She has the potential for a Sr PM / PM III, but this is a exceptionally hard project to ramp up in, there are some cultural differences she is only beginning to adapt to and I see enough positive signals of learnings yet to be fully applied, |

that I believe we'll be in a much better position to slot Rivka in six months than now.

**Bernhard Seefeld**
(PEER)
Group Product Manager

THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.

— Overall Performance —

Meets Expectations

— Contributions To Activities And Projects —

- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM
- Project: LOCAL ENHANCED CONTENT Contribution: LARGE

---

**Elizabeth Hamon Reid**
(PEER)
Director, Software Engineering

If possible, I'd recommend that we defer Rivka's slotting, as I think she's still settling in. In terms of her background, she probably is a senior PM. But she's not really performing at that level yet. I'd hate to downslot her after just a few months because she hasn't settled in yet. In some sense my feeling is she's a senior PM who is not meeting expectations at the moment.

The biggest issue I see is that Rivka hasn't actually learned how to build consensus and influence without authority at Google yet. We're struggling to have her settle in at the moment, and it's definitely creating friction with several of the teams. Her style seems to be used to making a much wider set of decisions than we'd expect, and one not doing any of the individual work. Examples of this are things like dictating what the algorithm is for prices, but not writing up a PRD that discusses what the goals coverage and precision wise are. It's true the teams are not all identical in what they want, but I don't think what they are hoping for is actually that different from each other - it's more that some are more frustrated by the attempts to dictate and others more frustrated by the lack of 'get things done' and hands-on style. I haven't figured out how to get Rivka to see these as not being mutually incompatible, but actually pointing in the same direction.

THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.

— Overall Performance —

Don't know

— Contributions To Activities And Projects —

- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM
- Project: LOCAL ENHANCED CONTENT Contribution: LARGE

---

**Gregory Donaker**
(PEER)
Staff Software Engineer

I think it is probably too soon for slotting, as I believe that the impact of her efforts have yet to reach our users. The product team job-description site doesn't give a huge amount of detail on the various levels, which makes it tough to determine an appropriate place at this point (and I'm not super calibrated on PM levels).

But - when forced to make a recommendation, I think PM 2 is probably in the right ballpark with my limited visibility into her current accomplishments. She is working on difficult, important projects, but has yet to deliver the results or really run with the scope that I imagine is necessary for the higher levels. I also haven't seen her rallying other PMs behind her in the way implied by the job descriptions for PM III or above.

Though to repeat - I think it's too early in her tenure to make a real slotting decision.

THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.

— Overall Performance —

Don't know

— Contributions To Activities And Projects —

- Project: VERTICAL LOCAL SEARCH Contribution: LARGE
- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW

**Michelle Lee**
(PEER)
UI Designer

My recommendation here is based on my interactions w/ this person during her initial couple of months at Google. Relative to other Nooglers, she has spent more time getting up to speed and I believe could have been faster to build relationships w/ teams (specifically individuals beyond team leaders), etc. However, she was tasked with a very challenging initial project without an established team.

Overall, I feel the time since start date may be too short for accurate slotting.

THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.

— Overall Performance —

Don't know

— Contributions To Activities And Projects —

- Project: VERTICAL LOCAL SEARCH Contribution: CRITICAL
- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW

**Patrick Leung**
(PEER)
Mgr, Software Engineering III

This is really tough as in many ways Rivka suffers in comparison to PM's much more junior than she is. I think she needs some pretty close mentoring to be an effective Google PM - she may still be suffering from culture shock adjusting to this company's culture. I put Business Product Manager because maybe there is a different sort of PM role which doesn't involve sweating all the details of product features that she might be more comfortable with?

THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.

— Overall Performance —

Below Expectations

— Contributions To Activities And Projects —

- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM
- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW

**Radhika Lakshmanan**
(PEER)
Software Engineer

THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.

— Overall Performance —

Meets Expectations

— Contributions To Activities And Projects —

- Project: VERTICAL LOCAL SEARCH Contribution: LARGE
- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW

| | |
|---|---|
| **Scott Lederer**<br>(PEER)<br>UI Designer | I work with a dozen PMs up and down the ladder and none have been as challenging to get work done with as Rivka. The L4 PM's I work with outperform her, and are far more googley in terms of team dynamics.<br><br>Rivka understand verticals and local reasonably well, but hasn't been able to apply that knowledge in a productive way. She's progressing, albeit slowly.<br><br>Rivka appears to be accustomed to a top-down approach to teams, but so far has not exhibited leadership. She circled unproductively the first few months because she didn't have a team to execute on proposals, but she shouldn't have needed one at that stage. The role required lots of independent, horizontal coordination and getting buy-in from other teams to share VLS priorities and allocate eng time to them. This could have worked with the right person but Rivka just stalled: she doesn't know how to operate without directing people and assigning tasks. Assertive and resourceful (as a PM should be), she did scramble and assemble a team to lead. But as it stands the team is really running itself (thanks to excellent Eng leadership and talent) and has to stay on top of Rivka to deliver her AIs. To garner healthy respect, Rivka will need to get her hands dirty. She appears to be slowly acclimating, under steady pressure from the team.<br><br>An example of her topdown approach occurred recently, when Rivka defined an "open issue" as open until a product decision is made, and once closed is merely a UX design and Eng implementation problem. This is one example of, in my view, a sort of solipsism, a failure to see things from others' points of view. For the team to build something together, they must work together.<br><br>This is the harshest assessment I've written. It's honest because I want to provide rationale for my slotting recommendation. I do believe Rivka can succeed, but she may need to let go of preconceived notions of leadership first.<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Below Expectations<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM<br>- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW |

**Promotion**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Rebecca Spivak**<br>(SELF)<br>DNU (4) - Product Manager | | THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE PEERS.<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: LARGE<br>- Project: LOCAL ENHANCED CONTENT Contribution: LARGE |
| | | Based on her performance so far, Rivka does not seem to have the organizational impact and leadership skills that I'd expect from a senior PM. I have some reservations about this assessment, since she's still a little bit of a Noogler. |

| | |
|---|---|
| **Ari Bezman**<br>(PEER)<br>Product Manager | THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Below Expectations<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM<br>- Project: LOCAL ENHANCED CONTENT Contribution: MEDIUM |
| **Bernhard Seefeld**<br>(PEER)<br>Group Product Manager | I'd vote for postponing slotting. She has the potential for a Sr PM / PM III, but this is a exceptionally hard project to ramp up in, there are some cultural differences she is only beginning to adapt to and I see enough positive signals of learnings yet to be fully applied, that I believe we'll be in a much better position to slot Rivka in six months than now.<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Meets Expectations<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM<br>- Project: LOCAL ENHANCED CONTENT Contribution: LARGE |
| **Elizabeth Hamon Reid**<br>(PEER)<br>Director, Software Engineering | If possible, I'd recommend that we defer Rivka's slotting, as I think she's still settling in. In terms of her background, she probably is a senior PM. But she's not really performing at that level yet. I'd hate to downslot her after just a few months because she hasn't settled in yet. In some sense my feeling is she's a senior PM who is not meeting expectations at the moment.<br><br>The biggest issue I see is that Rivka hasn't actually learned how to build consensus and influence without authority at Google yet. We're struggling to have her settle in at the moment, and it's definitely creating friction with several of the teams. Her style seems to be used to making a much wider set of decisions than we'd expect, and one not doing any of the individual work. Examples of this are things like dictating what the algorithm is for prices, but not writing up a PRD that discusses what the goals coverage and precision wise are. It's true the teams are not all identical in what they want, but I don't think what they are hoping for is actually that different from each other - it's more that some are more frustrated by the attempts to dictate and others more frustrated by the lack of 'get things done' and hands-on style. I haven't figured out how to get Rivka to see these as not being mutually incompatible, but actually pointing in the same direction.<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Don't know<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM<br>- Project: LOCAL ENHANCED CONTENT Contribution: LARGE |

| | |
|---|---|
| **Gregory Donaker**<br>(PEER)<br>Staff Software Engineer | I think it is probably too soon for slotting, as I believe that the impact of her efforts have yet to reach our users. The product team job-description site doesn't give a huge amount of detail on the various levels, which makes it tough to determine an appropriate place at this point (and I'm not super calibrated on PM levels).<br><br>But - when forced to make a recommendation, I think PM 2 is probably in the right ballpark with my limited visibility into her current accomplishments. She is working on difficult, important projects, but has yet to deliver the results or really run with the scope that I imagine is necessary for the higher levels. I also haven't seen her rallying other PMs behind her in the way implied by the job descriptions for PM III or above.<br><br>Though to repeat - I think it's too early in her tenure to make a real slotting decision.<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Don't know<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: LARGE<br>- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW |
| **Michelle Lee**<br>(PEER)<br>UI Designer | My recommendation here is based on my interactions w/ this person during her initial couple of months at Google. Relative to other Nooglers, she has spent more time getting up to speed and I believe could have been faster to build relationships w/ teams (specifically individuals beyond team leaders), etc. However, she was tasked with a very challenging initial project without an established team.<br><br>Overall, I feel the time since start date may be too short for accurate slotting.<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Don't know<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: CRITICAL<br>- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW |
| **Patrick Leung**<br>(PEER)<br>Mgr, Software Engineering III | This is really tough as in many ways Rivka suffers in comparison to PM's much more junior than she is. I think she needs some pretty close mentoring to be an effective Google PM - she may still be suffering from culture shock adjusting to this company's culture. I put Business Product Manager because maybe there is a different sort of PM role which doesn't involve sweating all the details of product features that she might be more comfortable with?<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Below Expectations |

| | |
|---|---|
| | — Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM<br>- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW |
| **Radhika Lakshmanan**<br>(PEER)<br>Software Engineer | THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Meets Expectations<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: LARGE<br>- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW |
| **Scott Lederer**<br>(PEER)<br>UI Designer | I work with a dozen PMs up and down the ladder and none have been as challenging to get work done with as Rivka. The L4 PM's I work with outperform her, and are far more googley in terms of team dynamics.<br><br>Rivka understand verticals and local reasonably well, but hasn't been able to apply that knowledge in a productive way. She's progressing, albeit slowly.<br><br>Rivka appears to be accustomed to a top-down approach to teams, but so far has not exhibited leadership. She circled unproductively the first few months because she didn't have a team to execute on proposals, but she shouldn't have needed one at that stage. The role required lots of independent, horizontal coordination and getting buy-in from other teams to share VLS priorities and allocate eng time to them. This could have worked with the right person but Rivka just stalled: she doesn't know how to operate without directing people and assigning tasks. Assertive and resourceful (as a PM should be), she did scramble and assemble a team to lead. But as it stands the team is really running itself (thanks to excellent Eng leadership and talent) and has to stay on top of Rivka to deliver her AIs. To garner healthy respect, Rivka will need to get her hands dirty. She appears to be slowly acclimating, under steady pressure from the team.<br><br>An example of her topdown approach occurred recently, when Rivka defined an "open issue" as open until a product decision is made, and once closed is merely a UX design and Eng implementation problem. This is one example of, in my view, a sort of solipsism, a failure to see things from others' points of view. For the team to build something together, they must work together.<br><br>This is the harshest assessment I've written. It's honest because I want to provide rationale for my slotting recommendation. I do believe Rivka can succeed, but she may need to let go of preconceived notions of leadership first.<br><br>THIS SECTION CONTAINS THE RATINGS AND COMMENTS ENTERED IN YEL! THAT SHOULD NOT BE VISIBLE TO THE EMPLOYEE.<br><br>— Overall Performance —<br><br>Below Expectations<br><br>— Contributions To Activities And Projects —<br><br>- Project: VERTICAL LOCAL SEARCH Contribution: MEDIUM<br>- Project: LOCAL ENHANCED CONTENT Contribution: DON'T KNOW |

EXHIBIT 3

**Rebecca Spivak (rivka)** | 7/DNU (4) - Product Manager

Feedback for 2011 Q1

**Rating**

Occasionally Misses Expectations

**Compare Googlers**

All numbers below represent job level

More effective

6/ **Michael Siliski (msiliski)** Product Manager

6/ **Arnaud Sahuguet (sahuguet)** Product Manager

7/ **Bernhard Seefeld (seefeld)** Group Product Manager

7/ **Rebecca Spivak (rivka)** DNU (4) - Product Manager

Less effective

**Jeremy Sussman (jsussman)**
6 /Product Manager

More effective

6/ **Marcelo Quintella (quintella)** Product Manager

6/ **Arnaud Sahuguet (sahuguet)** Product Manager

4/ **Stephan Seyboth (sseyboth)** Product Manager

7/ **Rebecca Spivak (rivka)** DNU (4) - Product Manager

Less effective

**Carter Maslan (carterm)**

Director, Product Management

More effective

4/ **Stephan Seyboth (sseyboth)** Product Manager

4/ **Emmet Connolly (emmet)** UI Designer

3/ **Haroon Baig (haroon)** UI Designer

5/ UI Designer

5/ Sam Mardanbeigi (smardan)
Software Engineer

7/ Rebecca Spivak (rivka)
DNU (4) - Product Manager

Less effective

**Scott Lederer (lederer)**
5 /UI Designer

More effective

7/ **Avni Shah (Stocky) (avni)**
Group Product Manager

7/ **Bernhard Seefeld (seefeld)**
Group Product Manager

6/ **Ethan Russell (erussell)**
Product Manager

7/ **Lior Ron (lior)**
Group Product Manager

6/ **Jeremy Sussman (jsussman)**
Product Manager

6/ **Arnaud Sahuguet (sahuguet)**
Product Manager

4/ **Amanda Leicht Moore (aleicht)**
Product Manager

7/ **Rebecca Spivak (rivka)**
DNU (4) - Product Manager

Less effective

**Elizabeth Hamon Reid (ehamon)**
Director, Software Engineering

**Calibration Notes**

Has not adapted to the Google culture. Really struggling. Not performing at a T7 level. Will get feedback and a tough message from Jen/Marissa.

**Promotion Committees**

**Committee Notes**

**Decision:** SLOT (DEFINITIVE)

**Slotted to:** 6 / 5005 / Product Manager III
**Decision by:**Richard Holden (richard)
**Decision date:** Apr 19, 2011 9:21:25 AM
**Decision notes:**4/19/10 T7-A Day 1 Promo Committee (Notes take by richard)
Downslot one level – broad feedback not performing at SPM level
Recommend a PIP to get on track

**How well do you know Rebecca Spivak's work?**

| Reviewer/Role | Choice |
|---|---|
| **Avni Shah (Stocky)** (PEER) Group Product Manager | Somewhat Well |
| **Carter Maslan** (PEER) Director, Product Management | Very Well |
| **Dan Cath** (PEER) Associate Partner Manager | Somewhat Well |
| **Gregor Rothfuss** (PEER) Staff Software Engineer | Somewhat Well |
| **Lior Ron** (PEER) Group Product Manager | Very Well |
| **Raoul-Sam Daruwala** (PEER) Software Engineer | Somewhat Well |
| **Scott Lederer** (PEER) UI Designer | Very Well |
| **Stephan Seyboth** (PEER) Product Manager | Somewhat Well |

**What has Rebecca Spivak done?**

1

**Organized Google's Review Information**

Product Manager
**Impact:** Large

**Summary of key contributions:**
I was tasked with looking throughout the review ecosystem to find the moving parts and come up with a consolidated strategy for google reviews.

I reached out to multiple teams - reviews, conops, zipit, parallel products like photos and obtained a history and understanding of this complex space that we've not had clarity on for a number of years. I distilled it all into an overview that obtained the buy in of most/all stakeholders, and was a good basis for moving forward and a GPR review.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Carter Maslan** (PEER) Director, Product Management | | | Large | Rivka reviewed a pre-GPR draft of her Review strategy with me, and she highlighted well the problems and conflicts in Review strategy. She was driving towards clarifying a desirable end point for our Reviews product. At the time I saw it, the strategy was divorced from the "how"; so it was hard to evaluate whether there was a particular sequence of steps that could feasibly get us to that end point. |

2

**Google Review Policy**

Policy Expert
**Impact:** Medium

**Summary of key contributions:**
Over this period I received multiple requests for clarity on google review policy. I was quick with answers that were consistent with our existing policy or that distinguished new nuances not yet encountered. I made difficult calls on which reviews to keep up or remove, and these were put into action. I am a reliable go-to person on this.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Carter Maslan** (PEER) Director, Product Management | | | Large | Rivka provided good clarification of policy and ensured that specific takedowns complied with policy and did not set bad precedent for editorial control/censorship of results. Rivka is sometimes too slow/quiet on email threads on topics for which she's the authority. If email delays are in part due to the need for clarification research tasks that may take a while, then replying with "I understand that issue X requires clarification of Y, and I'll publish clarification in Z days" would help coworkers. |

3

**General local PM/ Place Page**

contributor
**Impact:** Small

**Summary of key contributions:**
I participated in various brainstorms and contributed good idea and feedback to the larger efforts of what to do with search, place page, ES etc within the local space.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

Can't find matching template for feedback type TemplateScore.

**Strengths**

| Reviewer/Role | Feedback |
|---|---|
| | 1. Seeing big picture possibilities and strategies and understanding how we can get there. |

| | |
|---|---|
| **Rebecca Spivak** (SELF) DNU (4) - Product Manager | Since arriving at Google I have always thought at the big picture level. I have been able to build excitement around ideas like appointments and yield management |
| **Jen Fitzpatrick** (MANAGER) VP, Engineering | Strong product insight<br>Good long term / big picture thinking<br>Passion and energy<br>Can act fast / make quick decisions, think on her feet. |
| **Avni Shah (Stocky)** (PEER) Group Product Manager | Passionate about the space: Rivka's background is heavily in local, and she comes with a lot of insights and excitement about this area. She was willing to jump right in and tackle difficult problems.<br><br>Pushes for what she believes in: Rivka has strong opinions on feature ideas and things that we should / shouldn't do, and is willing to push for those ideas. For example, with Reviews, she been advocating for a long time that we should have voting and "most helpful", and we're now looking to see where that experience could fit in.<br><br>Willing to work with others: All of Rivka's projects thus far (Reviews, LEC, Verticals) have required her to work with other teams, many of whom had their own opinion of what she should be focused on. Rivka took the time to meet with everyone, understand their viewpoint, and then come up with her own analysis / opinion of the most impt. things to focus on. |
| **Carter Maslan** (PEER) Director, Product Management | - communication: you can't lead silently observing form the sidelines, and Rivka is vocal and opinionated about the things she'd like to see happen. Rivka dives into brainstorming sessions and PM meetings and provokes discussion that challenge assumptions.<br><br>- action-oriented: Rivka acts immediately. She regularly fires-off emails, IMs, and document revisions in real-time during discussions to resolve outstanding issues. She jumps-in. |
| **Dan Cath** (PEER) Associate Partner Manager | Vision - When we worked together, Rivka possessed a clear vision where the Local Enhanced Product should evolve in the short, mid, and long term. We collaborated on building a Quality Test for Local Enhanced Content data. During that project Rivka was very helpful in determining what data was most important, and how we should quantify attributes that were qualitative in nature.<br><br>Insight - Coming from the Local web industry before entering Google, Rivka has a deep understanding of the business models, needs, and goals of our LEC partners. This hyper-relevant background experience really added a lot when Rivka was on partner calls with me for MenuPages, DinnerBroker, and OpenTable, and other. She speaks like an industry insider (because she is) which adds weight and brings respect to Google when we discuss LEC with our partners.<br><br>Motivation - Rivka has genuine empathy for the relationship that Google/LEC has with our partners. She understands the delicate balance we must maintain in order to retain partner trust (and their data) while also pushing the boundaries and evolution of our own products to increase user adoption and maintain our Maps/Local competitive advantage. |
| **Lior Ron** (PEER) Group Product Manager | Product/Strategy - Rivka is able to think about overall product strategy from end to end - mixing partner, product and eng insights |
| **Raoul-Sam Daruwala** (PEER) Software Engineer | Not afraid to appear cynical. Rivka has so far been immune to some of the group think I see at Google.<br><br>Great command of legal issues. Due to her legal background it's great to have someone like Rivka who understands what can and can't be implemented from a Legal standpoint.<br><br>She has no trouble diving in and learning even though she knows it may take her 10x longer than the engineer sitting next to her.<br><br>She's a very clear thinker and is a pleasure to work with. |

**Areas for development**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) DNU (4) - Product Manager | 1. Working cross-team without a dedicated team. In my time at Google I have struggled with having no dedicated engineering team. I am improving in this area as I have developed trusted relationships with engineers on other teams - this has been wonderful to have stronger engineering relationships. I think that finally having a dedicated team and time will allow me to navigate across teams better. |
| **Jen Fitzpatrick** (MANAGER) VP, Engineering | Rivka has by everyone's admission been put in a tough spot, with too long in roles that were cross-cutting in nature and particularly tough for a noogler to get traction on. Having said that, I would have liked to see Rivka be more proactive about either a) adjusting course as needed or b) reaching out to her peers for advice on how to get things done. Rivka desperately wants a dedicated eng team to work with, and there's no question life would be easier for her that way. Having said that, there are other ways to have impact, that are much more about asking the right questions, shedding light on important but unanswered questions, contributing positively to existing projects/teams, and digging into the data to provide helpful insights. Rivka, I know you want your ultimate impact to be in a "large visionary project" and it's been a struggle to find that. You may need to reset your expectations and plan to simply get your hands dirty for a while and let the right opportunity emerge. Both Carter's and Avni's observations on areas for development are also spot-on. |
| **Avni Shah (Stocky)** (PEER) Group Product Manager | Managing without authority: One of the most difficult things about being a PM at Google is that you have to learn to lead without any direct authority over your team, or over other projects and teams that you're highly dependent on. To do this, you have to learn how to influence people and team's priorities, strategies, etc. in a culture where "bottom's up" innovation is highly valued. This can be daunting for any new PM, but it's a skill that is critical to being successful here.<br><br>Technical depth: Rivka, I feel like you sometimes shy away from diving into the technical aspects of your projects and really getting your hands dirty. In an engineering culture and a data-driven company, this is often required to help move projects forward and convince people of the right thing to do, and to gain the credibility of the engineering teams. I would embrace this and take the time to understand your projects end-to-end and go into "eng mode" when needed.<br><br>Building strong relationships: As part of being able to "manage without authority", PMs need to build credibility and ties to all part of the organization – cross-functionally, outwards, and upwards. Rivka, especially in a role like yours where you're working with so many different teams, I would encourage you to build strong(er) relationships with the those you work most closely with. E.g., setting up regular 1:1s with relevant PMs and TLs can go a long way in helping exchange information and build ties. |
| **Carter Maslan** (PEER) Director, Product Management | - organization: I've seen lack of buy-in from designers, engineers, and other product managers on Rivka's initiatives. So trying out other approaches to influencing coworkers - based on defining problems, asking questions, and doing research legwork - could help her work across the organization more effectively. |
| **Dan Cath** (PEER) Associate Partner Manager | Relationships - Rivka has improved at coordinating globally with Geo PMs/Eng to unify data requests to the Partnerships team. As she takes on ever increasing responsibility at Google this is a crucial component of executing flawless feature launches. One particular challenge area related to ATM data where different PMs/Eng across regions had differing perspectives on it's relative importance. While it was a complex discussion with ~20+ individuals, I could have envisioned Rivka driving it more directly from a strategic level.<br><br>Projects - During our Quality Test project Rivka went above and beyond to learn some Python scripts to pull the right kind of data by working with an Engineer. (Awesome!!) In the end, the data-pull was more time intensive than we anticipated, and in hindsight it would have been more efficient if we had done more initial analysis on the time commitment needed to pull such data. If we had done so maybe we could have brought Eng into the project sooner rather than place the data-pull burden solely on Rivka.<br><br>Initiative and Motivation - Since coming to Google, Rivka improved her responsiveness within email threads. This was originally an area for development, but the need to individually ping her decreased over the past several quarters. Nice work. |
| | find an area you can own and shape |

| | |
|---|---|
| **Gregor Rothfuss** (PEER) Staff Software Engineer | in the past there were some challenges around projects with unclear owners, making life for rivka and her teams harder than necessary. work with your manager to find an area that everyone understands that you own. |
| **Lior Ron** (PEER) Group Product Manager | Execution<br>To progress in Google Rivka need to create of a reputation of someone who can make things happen - this adds up from small things to bigger launches. I understand the environment Rivka have been operating since she joined was resource-starved so this was difficult, but there's still a lot to be accomplished by improvising, taking mini steps, leveraging local opportunities, engaging with individual engineers and many more things that can create momentum to push things forward, we want PMs in Google to be able to generate momentum to their products in parallel to any executive support.<br>Relationship building - Rivka can be more effective by building the right ties in the geo organization and getting to know some of the key PMs/TLs better - she started on an effort by travelling to Zurich few weeks ago and I encourage her to do much more<br>Technical - not being technical limits Rivka's effectiveness - she need to be in a position to get stats and analysis via dremel and other tools as her work is very numbers-driven |
| **Raoul-Sam Daruwala** (PEER) Software Engineer | Although she'd never say it out loud Rivka appears to be between a rock and a hard place. She has no engineers and no clear product mandate (yet). Until this situation is resolved it's hard to assess her effectiveness in the typical Google PM sense. I will say the following however, Rivka should take charge of the Geo product for reviews. Her views are good. She is an advocate for Google's own user contributed review site with a diminished role for third party reviews. I'm not sure if this is a Geo specific product yet.<br><br>Rivka should throw up more strawman proposals and iterate until we have a strategy that makes sense for Google.<br><br>Rivka should set herself a deadline to advance or shift. If the Geo world stays in it's current turmoil and, truth be told, state of absolute confusion and cruftiness she should find another job within Google. Without the run of other PMs, Engineers, etc Rivka cannot make progress for the organization. |

**Notes for manager**

| Reviewer/Role | Feedback |
|---|---|
| **Gregor Rothfuss** (PEER) Staff Software Engineer | i am afraid that rivka might leave if she gets the news that she was totally overslotted. i can't say that she has been happy since she joined because the tasks were beyond her. depending on what goes on now with the reviews effort the same thing could happen again :(<br><br>so please tread carefully. |
| **Raoul-Sam Daruwala** (PEER) Software Engineer | Rivka has been here too long without focus and it's not good for her career. There's nothing wrong with her except she's been placed in fairly difficult positions. I've seen this happen in Geo before where a PM has a destaffed projects and no clear mandate. It causes frustration and we end up losing a capable mind. Rivka has great product intuition and has a feel for what users like and don't.<br><br>I think a bit more guidance on the kinds of analysis and product steering that needs to go on would be in order.<br><br>I can't say anything about slotting. She hardly seems like she's in a position to be slotted. This appears to be more of an organizational failing than one of RIvka's. I would have preferred to write feedback for her once she had a team and I knew what she was really capable of. |
| **Stephan Seyboth** (PEER) Product Manager | The self assessment was not available to me at the time of writing and I have only worked with Rivka for 2 months. Therefore I don't feel I'm in a position to provide detailed feedback on her performance. |

**Promotion/Slotting**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Rebecca Spivak**<br>(SELF)<br>DNU (4) - Product Manager | | I think slotting this quarter may be difficult because I still have not had a chance to develop a vision and execute on it with a team. I believe I am extremely effective at large visionary projects, and have proven myself at this in other companies. As reviews gets off the ground, I am certain I will prove myself to be at least at the SPM level or above. |
| **Jen Fitzpatrick**<br>(MANAGER)<br>VP, Engineering | | Rivka has by everyone's admission been put in a tough spot, with too long in roles that were cross-cutting in nature and particularly tough for a noogler to get traction on. Having said that, she hasn't been nearly as proactive as I would expect of someone with her seniority on either a) adjusting course as needed or b) reaching out to her peers for advice on how to get things done. She believes she needs a dedicated eng team in order to have an impact - I think life would be easier for her that way, but there are other ways to have impact, and she hasn't been proactive about finding them. She needs to admit that her first "success" at Google may not be in the "large visionary project" that she aspires to. Both Carter's and Avni's observations on areas for development are spot-on.<br><br>Rivka is well aware that she hasn't been performing at level. My recommendation is to downslot her at Level 6 / PM III to reinforce this message, give her some (more) tough feedback, and then reevaluate (once again) her role (including whether there is one). |
| **Avni Shah (Stocky)**<br>(PEER)<br>Group Product Manager | | I realize this is a harsh statement, but I don't think Rivka has been performing in a Sr. PM capacity thus far. To be fair, I think she's been put in a tough position ever since joining Google. First, with the Verticals and LEC projects, her charter was ill-defined, and the project scope required her to have product influence across all of Geo without any direct authority. Also, her small Eng team was very junior and had difficultly gaining credibility within the org. Now, with the Reviews project, she's in the middle of a very contentious area, this time with 0 engineers and no direct ownership of the projects involved. That said, at a Sr. PM level, I would have expected her to better integrate herself and her teams into the existing efforts in Geo, and find a way to meaningfully contribute. There were many instances in which she had the opportunity to make an impact (e.g., defining the high priority verticals and the core attributes for each), but she neglected to step up and deliver at these times. With the Reviews project, her initial strategy wasn't very well thought-through, and it wasn't until she worked closely with Stephan and Marcelo, that her preso conveyed a coherent strategy that was eventually agreed on.<br><br>I think the best step for Rivka would be to put her on something well-defined, with a set of dedicated engineers, where she has direct ownership and responsibility for the project and its charter. Then, she will be able to build a foundation of being a PM at Google and hopefully eventually work her way into a more senior role. |
| **Carter Maslan**<br>(PEER)<br>Director, Product Management | | I don't want to down-slot Rivka, but I have not yet seen Rivka perform at the level of other Sr PMs and would stack rank several other PM III/6 above her. |
| **Gregor Rothfuss**<br>(PEER)<br>Staff Software Engineer | | i don't think rivka was slotted right. she has been given tasks commensurate with her slot (t7) and hasn't succeeded at them, making her and her teams unhappy. looking at other PMs, she operates at about t4. it will be awkward for the committee to handle this case but she is certainly no t7 and also not a t6. |
| | | I'm sorry for being harsh here, but after working with Rivka closely for the past year - I will slot her between PM I and PM II - she is def. far from the bar her current potential slotting is set. specifically:<br>- she hasn't been able to execute on anything meaningful from my perspective in the last year - neither local vertical search nor Google reviews in nyc are going anywhere and if they were it was due to mostly eng effort. Rivka has a lot of good will to help but have a hard time translating this to actionable progress.<br>in VLS - the team has been running around in circles for 6+ months, ended up launching few minor features and disassemebeled - at least partly for Rivka not being able to create a clear roadmap and excited her eng. |

| | |
|---|---|
| **Lior Ron**<br>(PEER)<br>Group Product Manager | in zipit - the team is operating but I believe Rivka's help is marginal. For the reviews project that Jen asked her to do I wasn't impressed from her ability to define a vision/roadmap or work with colleagues - even though there were months to generate PM momentum it boiled down to the last second before a planned geo product review that Rivka clarified what she's trying to do with others. There were a lot of opportunities along the way to push things forward (get some eng. excited on building prototypes, a UX designer to help start building mocks etc) but Rivka wasn't able to capture those. In tactical tasks, even some I suggested and prepped for her to just do simple execution on (zipit widgets etc) Rivka wasn't able to follow up and make it happen, I'm also getting the impression she consider herself perhaps too senior to do some of the mundane tasks of a PM.<br>Her lack of technical abilities is also a barrier for her being effective.<br><br>Overall, I think she is mislotted, my advice will be to get her a close mentor asap and put her on a very defined tactical plan of deliverables she need to execute on, as a step pre PIP. |
| **Scott Lederer**<br>(PEER)<br>UI Designer | In my last review of Rivka, I slotted her at level 4. I'll grant now that 5 would be reasonable. Nonetheless, she simply hasn't found traction at Google. She's smart and honest and direct and driven and funny. But she's generally very hard to work with. She doesn't listen. She locks onto a position (which is always 2-dimensional, not innovative) and won't break out of it no matter how many of us explain a more googley, user-centered solution. She's mistaken obstinacy for tenacity.<br><br>As an example, she was asked to figure out Local Reviews strategy but her deck was a mess. It was incoherent, the ideas were old school, and it seemed to ignore all the serious, quality work that her predecessors had done to move Reviews forward. It's as if she didn't do the research and just came up with a solution in a bubble and then put her hands over her ears.<br><br>I have a lot of sympathy for Rivka. She's in a tough situation here. But I would not work with her again under any conditions. |

**Promotion/Slotting**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Rebecca Spivak**<br>(SELF)<br>DNU (4) - Product Manager | | I think slotting this quarter may be difficult because I still have not had a chance to develop a vision and execute on it with a team. I believe I am extremely effective at large visionary projects, and have proven myself at this in other companies. As reviews gets off the ground, I am certain I will prove myself to be at least at the SPM level or above. |
| **Jen Fitzpatrick**<br>(MANAGER)<br>VP, Engineering | | Rivka has by everyone's admission been put in a tough spot, with too long in roles that were cross-cutting in nature and particularly tough for a noogler to get traction on. Having said that, she hasn't been nearly as proactive as I would expect of someone with her seniority on either a) adjusting course as needed or b) reaching out to her peers for advice on how to get things done. She believes she needs a dedicated eng team in order to have an impact - I think life would be easier for her that way, but there are other ways to have impact, and she hasn't been proactive about finding them. She needs to admit that her first "success" at Google may not be in the "large visionary project" that she aspires to. Both Carter's and Avni's observations on areas for development are spot-on.<br><br>Rivka is well aware that she hasn't been performing at level. My recommendation is to downslot her at Level 6 / PM III to reinforce this message, give her some (more) tough feedback, and then reevaluate (once again) her role (including whether there is one). |
| | | I realize this is a harsh statement, but I don't think Rivka has been performing in a Sr. PM capacity thus far. To be fair, I think she's been put in a tough position ever since joining Google. First, with the Verticals and LEC projects, her charter was ill-defined, and the project scope required her to have product influence across all of Geo without any direct authority. Also, her small Eng team was very junior and had difficultly gaining credibility within the org. Now, with the Reviews project, she's in the middle of a very contentious area, this time with 0 |

| | |
|---|---|
| **Avni Shah (Stocky)**<br>(PEER)<br>Group Product Manager | engineers and no direct ownership of the projects involved. That said, at a Sr. PM level, I would have expected her to better integrate herself and her teams into the existing efforts in Geo, and find a way to meaningfully contribute. There were many instances in which she had the opportunity to make an impact (e.g., defining the high priority verticals and the core attributes for each), but she neglected to step up and deliver at these times. With the Reviews project, her initial strategy wasn't very well thought-through, and it wasn't until she worked closely with Stephan and Marcelo, that her preso conveyed a coherent strategy that was eventually agreed on.<br><br>I think the best step for Rivka would be to put her on something well-defined, with a set of dedicated engineers, where she has direct ownership and responsibility for the project and its charter. Then, she will be able to build a foundation of being a PM at Google and hopefully eventually work her way into a more senior role. |
| **Carter Maslan**<br>(PEER)<br>Director, Product Management | I don't want to down-slot Rivka, but I have not yet seen Rivka perform at the level of other Sr PMs and would stack rank several other PM III/6 above her. |
| **Gregor Rothfuss**<br>(PEER)<br>Staff Software Engineer | i don't think rivka was slotted right. she has been given tasks commensurate with her slot (t7) and hasn't succeeded at them, making her and her teams unhappy. looking at other PMs, she operates at about t4. it will be awkward for the committee to handle this case but she is certainly no t7 and also not a t6. |
| **Lior Ron**<br>(PEER)<br>Group Product Manager | I'm sorry for being harsh here, but after working with Rivka closely for the past year - I will slot her between PM I and PM II - she is def. far from the bar her current potential slotting is set. specifically:<br>- she hasn't been able to execute on anything meaningful from my perspective in the last year - neither local vertical search nor Google reviews in nyc are going anywhere and if they were it was due to mostly eng effort. Rivka has a lot of good will to help but have a hard time translating this to actionable progress.<br>in VLS - the team has been running around in circles for 6+ months, ended up launching few minor features and disassemebeled - at least partly for Rivka not being able to create a clear roadmap and excited her eng.<br>in zipit - the team is operating but I believe Rivka's help is marginal. For the reviews project that Jen asked her to do I wasn't impressed from her ability to define a vision/roadmap or work with colleagues - even though there were months to generate PM momentum it boiled down to the last second before a planned geo product review that Rivka clarified what she's trying to do with others. There were a lot of opportunities along the way to push things forward (get some eng. excited on building prototypes, a UX designer to help start building mocks etc) but Rivka wasn't able to capture those. In tactical tasks, even some I suggested and prepped for her to just do simple execution on (zipit widgets etc) Rivka wasn't able to follow up and make it happen, I'm also getting the impression she consider herself perhaps too senior to do some of the mundane tasks of a PM.<br>Her lack of technical abilities is also a barrier for her being effective.<br><br>Overall, I think she is mislotted, my advice will be to get her a close mentor asap and put her on a very defined tactical plan of deliverables she need to execute on, as a step pre PIP. |
| **Scott Lederer**<br>(PEER)<br>UI Designer | In my last review of Rivka, I slotted her at level 4. I'll grant now that 5 would be reasonable. Nonetheless, she simply hasn't found traction at Google. She's smart and honest and direct and driven and funny. But she's generally very hard to work with. She doesn't listen. She locks onto a position (which is always 2-dimensional, not innovative) and won't break out of it no matter how many of us explain a more googley, user-centered solution. She's mistaken obstinacy for tenacity.<br><br>As an example, she was asked to figure out Local Reviews strategy but her deck was a mess. It was incoherent, the ideas were old school, and it seemed to ignore all the serious, quality work that her predecessors had done to move Reviews forward. It's as if she didn't do the research and just came up with a solution in a bubble and then put her hands over her ears. |

I have a lot of sympathy for Rivka. She's in a tough situation here. But I would not work with her again under any conditions.

EXHIBIT 4

**Rebecca Spivak (rivka)** | 6/Product Manager III | Feedback for 2011 Q3

**Rating**

Meets Expectations

**What have you done?**

1

## Adx Ramp-up

New Team Member
**Impact:** Medium

**Summary of key contributions:**
Moved from consumer into Display at the start of this quarter.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | | | | Rivka has gotten up to speed on the AdX product fairly well with a tight focus on specific functionality (reporting, optimization) |
| **Drew Bradstock** (PEER) Product Manager | | | | - Rvika quickly got up to speed on AdX and the display advertising market. She spent a lot of time meeting with eng and product to find out what challenges AdX faces and how we can beat our competitors. |
| **Martin Pal** (PEER) Staff Research Scientist | | | | Welcome Rivka! |

2

## Min CPM Optimization

Product Manager
**Impact:** Large

**Summary of key contributions:**
- Worked with the eng team and POEM/Account Manager to optimize the feature functionality
- Helped unblock a significant feature (anon CPM on mixed slots) by finding a compromise that satisfied two reasonable but opposing concerns. Prior to this, anonymous CPM on mixed slots ** had been stalled for 2 months. With the new solution, the feature shipped within 1 week. **
- Helped the Eng team work through general policy issues and philosophies

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | | | | Rivka is owning the min CPM optimization project and has done well navigating the complexities of the features as well as the specific engineers.<br><br>Much of her work is unseen and needs more visibility. Specifically, more outward communication of development changes, status and evangelization of the functionality. |
| **Drew Bradstock** (PEER) Product Manager | | | | - Rivka did a great job bringing together an eng team that often had fairly significant disagreements over ideas and implementation.<br>- She delved very deeply into how the feature worked and earned the trust and respect of the engineering |

| | | | | |
|---|---|---|---|---|
| | | | | team. This helped her have greater influence on future feature directions.<br>- Delivered the features on time and integrated sales feedback quickly. |
| **Eyal Manor**<br>(PEER)<br>Director, Software Engineering | | | | Rivka has been a key member of the team, jumping into product and team questions and thoughtfully making progress. She is well respected by the eng team and her opinion is widely valued. I might add that the Opt team had delivered above and beyond our best expectations, well done Rivka! |
| **Martin Pal**<br>(PEER)<br>Staff Research Scientist | | | | I am happy to have Rivka taking on PM responsibilities for our project. She is new on the job, taking over from a PM who has left Google 5 months ago. Rivka has participated in mtgs, helped moderate discussions, offering reasonable and defensible solutions we could agree on. |
| **Yufan Zhu**<br>(PEER)<br>Staff Software Engineer | | | | Rivka has an amazing understanding about engineers details and algorithms. She is very good at negotiating, and bring opposing parties to find compromise and move forward to launch. I learned quite a few from her. |

3

**Reporting / Multi Dimensional Reporting**

Product Manager
**Impact:** Large

**Summary of key contributions:**
- Focused on prioritization with "new eyes." Talked with clients to vett the need/prioritization of already scheduled features, such as reporting by unique viewers - previously assumed to be high priority. Based on proactive research I successfully recommended we ** cut the entire project which was at least a quarter's worth of work for multiple engineers, freeing up significant reporting team bandwidth **
- Led Product side of the marketing rollout of multidimensional reporting - a top customer request

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Scott Spencer**<br>(MANAGER)<br>Director, Product Management | | | | Rivka got the backend of reporting moving very well. She took a critical perspective of each ask and really honed in on features that would matter. This is incredibly powerful as it ensures the development work done will have a real impact when released.<br><br>Unfortunately, due to dependencies on the London team, many of the changes have not yet been released. Rivka's next challenge is to drive development end to end from concept through commercialization. |
| **Drew Bradstock**<br>(PEER)<br>Product Manager | | | | - Rivka based her decisions on customer feedback rather than just listening to internal teams. This lead to some smart decisions on what we report on and avoided a knee jerk reaction to an internal request.<br>- She has also passionately debated with engineering and sales on what would best help AdX publishers.<br>- She has also been heavily customer driven versus looked at what was technically easiest. This will lead to reporting being more usable and more effective. |
| | | | | Reporting is a key initiative, AdX built a new team and infrastructure this year moving from a weak |

| | | | | |
|---|---|---|---|---|
| **Eyal Manor** (PEER) Director, Software Engineering | | | | solution to a better place with a long roadmap ahead. Rivka's role is critical in making this happen. I', glad she is on top of things driving innovation forward and coordinating all requirements. |
| **Vartika Bhandari** (PEER) Software Engineer | | | | Rivka has been very quick in getting fully engaged in all reporting related discussions after she joined AdX relatively recently. She is a good communicator and as she has pointed out, she has a great approach to prioritization...she puts in effort to understand what value a feature will really bring and whether it is worth the time/effort by eng to implement it. |

4

**XFP Rampup**

Product Manager
**Impact:** Small

**Summary of key contributions:**
Very new to this role - General information ramp up with team.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | | | | Rivka has jumped into the XFP world and will be a great contributor in the integration work that is upcoming. This is a complex area (politically and technically) that will need some mentoring. |

5

**Planning/ Project Management**

Product Manager/ Team Member
**Impact:** Medium

**Summary of key contributions:**
- Client Calls helped bring new clarity to product prioritization - the ones that mattered (NBC, others)
- Collated multiple projects into a unified Q4 Project list

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | | | | Rivka is starting to pick up the critical non development roles of being a PM. It's great to see this work increasing. |

**Strengths**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) Product Manager III | - Results driven - quick to identify alternative solutions to seemingly hard problems / identify that "low hanging fruit" actually solves the problem<br>- On the other end, Identify work underway that hasn't gone through proper prioritization and justification, and can refocus initiative<br>- Identify the right questions to ask to uncover issues or opportunities that are not at the surface<br>- Intermediation within eng teams where individuals have different philosophical approaches - help move things forward |
| **Scott Spencer** (MANAGER) Director, Product Management | • Rivka is very smart and able to dig into the weeds with engineering. She has unblocked some very technically thorny issues.<br>• Rivka is liked by engineering for her ability to ensure development is focused on impactful changes |

| | |
|---|---|
| **Drew Bradstock**<br>(PEER)<br>Product Manager | - Customer and fact driven: makes her decision based on facts and direct feedback rather than just listening to Googlers. She has actively searched out our more difficult clients to get honest feedback, such as NBC, to ensure that she doesnt make decisions based on just the pubs who love AdX<br><br>- Relationship builder with engineering: works hard to be respected by engineering. Rivka then leverages that respect to improve how effectively the engineering team she works with operate such as team fixes she made with the minCPM engineering group.<br><br>- Deals with problems head: Rivka doesnt shirk away from issues that face at AdX and instead works on correcting them. The front end and back end teams have not always executed well together, such as dates slipping on reporting without notification. Rivka has been working more with the London FE team to improve this and keep everyone on one timeline and a common launch goal. |
| **Eyal Manor**<br>(PEER)<br>Director, Software Engineering | Agree with Rivka's notes. In addition:<br><br>- Rivka is a doer, she is focused on things that matter and drives forward. She is transparent and smart thus quickly gained the trust and appreciation of her TL partners.<br><br>- Thoughtful/Detailed - Rivka is clearly very smart and experienced lead PM. She is careful to get the data right and dive to the core issue. She does not jump to conclusions. |
| **Martin Pal**<br>(PEER)<br>Staff Research Scientist | Rivka has good mathematical/technical background and is happy to apply it to understanding and solving technical problems – e.g. in our very first meeting she had quickly grasped how the reserve price pipeline works, had plenty of excellent comments based on her experience doing yield management in other contexts.<br><br>+1 to being no big deal, let's not kill more time arguing than absolutely necessary and focus on the important stuff kind of person. |
| **Vartika Bhandari**<br>(PEER)<br>Software Engineer | 1. Makes an active effort to have broad interaction with all relevant engineers, e.g., Rivka is a regular attendee of the AdX reporting weekly eng sync and has good interaction with all engineers that work on reporting.<br><br>2. Takes a careful and well-thought approach to feature prioritization instead of rushing to add potentially low impact requests. Tries to fully understand impact and implications.<br><br>3. Communicates well. |
| **Yufan Zhu**<br>(PEER)<br>Staff Software Engineer | -ask excellent questions during meetings to help team member to reach consensus<br>-quick to understand issues and quick to make decision |

**Areas for development**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak**<br>(SELF)<br>Product Manager III | - Additional industry knowledge, including deeper reach into XFP<br>- Still need to learn more of the right people to be talking to about various issues |
| **Scott Spencer**<br>(MANAGER)<br>Director, Product Management | • Owning a feature from vision through development through commercialization - Need to get features out to customers in such a way that the clients, sales, services and engineering see it as Rivka's project and success<br>• Improved communication about priorities, what projects she is working on, and where she needs clarification.<br>• More focus on the sales / service side of product management - when there is a question raised about a feature that Rivka owns she should be the first responder on email with a response or pointing to someone that can respond. In meetings, anytime there is a discussion on a feature that Rivak is working on, she should be the one to step up and own the conversation. |
| | - Ads contacts: Rivka needs to increase her knowledge of both the other Google ads products as well as the |

| | |
|---|---|
| **Drew Bradstock** (PEER) Product Manager | product management leaders in the other areas<br>- Industry knowledge: Rivka needs to increase her knowledge of both the AdX and the competitive products in the publisher market. |
| **Eyal Manor** (PEER) Director, Software Engineering | Agree with Rivka's notes. I think she has done very well so far and i'm certain she will be successful and more vocal as she ramps up industry knowledge and interface customers. |
| **Martin Pal** (PEER) Staff Research Scientist | Engineers (myself definitely included) generally like working with product managers. We need Rivka's time and her attention. In general, my most productive collaboration with a PM happened when the PM was actually sitting with my engineering team. Rivka has multiple fish to fry so I know I'm not going to get 100% of her time, but doing things here and there to be interact with the engs more would be nice.<br><br>Another gripe of mine is the division of PM responsibilities. Our feature has a frontend component that is owned by an eng in London, has a UX guy in Chicago (I think) and is the responsibility of a London PM, while Rivka is in charge of whatever my backend team does. It would be sooo cool to have one PM responsible for the whole feature. This division of labor obviously predates Rivka and is totally not her fault but I'm allowed to complain nevertheless. |
| **Vartika Bhandari** (PEER) Software Engineer | 1. Rivka is already doing a very good job given the brief period she has been with AdX, but going forward it would help her be much more effective if she develops a good understanding of the various cross-team dependencies relevant to AdX and the dynamics thereof, which become important in many product-level discussions she is or will be a part of.<br><br>2. She should consider being more proactive in sharing insights gleaned from customer interaction with eng in the course of regular meetings. |

EXHIBIT 5

**Rebecca Spivak (rivka)** | 6/Product Manager III Feedback for 2011 Q4

**Rating**

Meets Expectations

**Compare Googlers**

All numbers below represent job level
There is no relevant data.

**Calibration Notes**

Rivka had a challenging Q3 but is gaining traction in Q4.

Charged with AdX reporting, min CPM optimization and traditional yield management, Rivka is in the thick of the Admeld acquisition integration. For reporting, in Q4 she delivered advertiser reporting, additional metrics, and more dimensions. For min CPM optimization, we launched optimization for branded as well as anonymous ad units and have made great progress on the more complicated contingent optimization solution.

Rivka did have a unique challenge in Q3, sitting between two directors giving her different projects and goals. This issue has been resolved and Rivka is now executing much better on her tasks. She has also increased communications out to the broader team on progress and gets very strong marks from engineering for understanding the complexity of the auction and system - even resolving tough issues with intra engineering debates.

Create Short Link X

EXHIBIT 6

**Rebecca Spivak (rivka)** | 6/Product Manager III

Feedback for 2012 Q3

**Compare Googlers**

All numbers below represent job level

More effective

7/ **Drew Bradstock (dbradstock)**
Product Manager

3/ **Jarid Maged (jarid)**
Product Associate

5/ **Ilia Malkovitch (imalkovitch)**
Product Manager

5/ **Ari Feldman (arifeldman)**
Business Product Manager

6/ **Rebecca Spivak (rivka)**
Product Manager III

5/ **Atul Bhandari (atul)**
Product Manager

Less effective

**Jason Solinsky (jsolinsky)**
5 /Software Engineer

More effective

7/ **Drew Bradstock (dbradstock)**
Product Manager

3/ **Jarid Maged (jarid)**
Product Associate

5/ **Atul Bhandari (atul)**
Product Manager

6/ **Rebecca Spivak (rivka)**
Product Manager III

5/ **Ari Feldman (arifeldman)**
Business Product Manager

Less effective

**Scott Spencer (scottspencer)**
Director, Product Management

More effective

3/ **Jarid Maged (jarid)**
Product Associate

7/ **Drew Bradstock (dbradstock)**
Product Manager

5/ **Ari Feldman (arifeldman)**
Business Product Manager

5/ **Atul Bhandari (atul)**
Product Manager

6/ **Rebecca Spivak (rivka)**
Product Manager III

Less effective

**Ilia Malkovitch (imalkovitch)**
5 /Product Manager

**Calibration Notes**

On maternity leave. She did a great job in tying up all lose ends before going on leave.

Can't find matching template for feedback type TemplateScore.

**Promotion/Slotting**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | No | |

**Promotion/Slotting**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | No | |

EXHIBIT 7

**Rebecca Spivak (rivka)** | 6/Product Manager III

Feedback for 2013 Q1

**Rating**

Meets Expectations

**Compare Googlers**

All numbers below represent job level

More effective

7/ **Drew Bradstock (dbradstock)**
Product Manager

5/ **Ari Feldman (arifeldman)**
Business Product Manager

4/ **Jarid Maged (jarid)**
Business Product Manager

6/ **Maksim Kalashnikov (kalashnikov)**
Product Manager

6/ **Rebecca Spivak (rivka)**
Product Manager III

6/ **Atul Bhandari (atul)**
Product Manager

Less effective

**Scott Spencer (scottspencer)**
Director, Product Management

More effective

-/ **Rany Ng (rany)**
Group Product Manager

6/ **Marcel Gordon (marcelg)**
Product Manager

6/ **Nick Radicevic (nickrad)**
Product Manager

4/ **Florent de Gantès (degantes)**
Product Manager

5/ **Matt Goodridge (mgoodridge)**
Product Manager

4/ **Jonathan Lee (jonlee)**

4/ Product Manager

6/ **Rebecca Spivak (rivka)**
Product Manager III

Less effective

**Jonathan Bellack (jbellack)**
Director, Product Management

**Calibration Notes**

Back from maternity leave. Rivka is taking on a new area in AdX owning the buy-side. No major deliverables yet. Managed a difficult transition with engineering well where an engineering loved feature was not geting sufficient uptake in the market and was able to get engineering to let go.

EXHIBIT 8

**Rebecca Spivak (rivka)** | 6/Product Manager III Feedback for 2013 Q3

**Rating**

Meets Expectations

**Compare Googlers**

All numbers below represent job level

More effective

4/ **Tobias Maurer (tmaurer)** Product Manager

6/ **Rebecca Spivak (rivka)** Product Manager III

6/ **Atul Bhandari (atul)** Product Manager

Less effective

**Aparna Pappu (apappu)**
Director, Software Engineering

More effective

- / **Drew Bradstock (dbradstock)** Product Manager

5/ **Ari Feldman (arifeldman)** Business Product Manager

6/ **Rebecca Spivak (rivka)** Product Manager III

6/ **Maksim Kalashnikov (kalashnikov)** Product Manager

6/ **Atul Bhandari (atul)** Product Manager

Less effective

**Scott Spencer (scottspencer)** **Create Short Link X**

Director, Product Management

More effective

5/ **Rebecca Collins (collinsr)** Software Engineer

5/ **Jeanne Williams (jwilliams)** Program Manager

- / **Shannon Bayley (bayley)** Product Specialist

/ Product Specialist

- / **Alex Strittmatter (astrittmatter)**
Senior Solutions Consultant

4/ **Kelly Jensen (jensenk)**
Software Engineer

4/ **Kelly Brandi (kbrandi)**
Technical Writer

- / **Nicolas El-Hage (nicolaselhage)**
Senior Solutions Consultant

4/ **Thomas Hazel (thazel)**
Software Engineer

6/ **Payam Ahdout (payama)**
Mgr, Software Engineering II

6/ **Arun Mathew (mathewar)**
Staff Software Engineer

4/ **David Ramos Ricaurte (dramos)**
Software Engineer

4/ **J.J. Sestrich (jsestrich)**
Software Engineer

4/ **Peter McCusker Jr (pmccusker)**
Software Engineer

3/ **Vijay Balasubramanian (vbala)**
Software Engineer

5/ **Zuri Kemp (zurikemp)**
Program Manager

5/ **Tamara Olson (tamiam)**
UI Designer

5/ **Alex Garcia (agarc)**
UI Designer

4/ **Stacy Saabye (ssaabye)**
UX Researcher

4/ **Laura Krotowski (lkrotowski)**
UI Designer

4/ **Josh Philip Ross (joross)**
Technical Writer

6/ **Rebecca Spivak (rivka)**
Product Manager III

Less effective

**Chealsea Conroy (cwierbonski)**
5 /Business Product Manager

**Calibration Notes**

Doing better (launched AdX alerts system, building out inventory discovery / forecasting.
Looking to move to Seattle for personal reasons.

**Contributions**

1

**Extensive Buyer research and client calls**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

2

**Buyside Vision and strategy**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

3

**AdX migration to Display Planner and sunset of Placement Tool**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

4

**Buyside Alerts Initiative**

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

5

**Inventory Discovery** **Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

**How well does Rebecca Spivak perform as a Product Manager III**

| Reviewer/Role | Feedback |
|---|---|
| **Scott Spencer** (MANAGER) Director, Product Management | Rebecca has had a relatively strong 6 months, steadily improving in her output and engagement. While earlier, many engineers were frankly unimpressed with her output, she has stepped up her work effort and brought key projects significantly forward. |

**What's one thing Rebecca Spivak does really well that he / she should continue doing?**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) Product Manager III | I don't just shepherd existing ideas - I bring big original ideas to the table and convince others that they're the right things to do.<br><br>- Buyer Alerts as a primary interface was a new idea I developed after proactive research, and is now broadly accepted as the right direction<br>- Focus on RTB and spend, not on "fixing" the UI<br>- Inventory discovery instead of forecasting as the primary use for the system |
| **Scott Spencer** (MANAGER) Director, Product Management | Rebecca did much better when she took a step back and looked at the problems to be solved. For example, when looking at the buy-side UI, she did not take the conventional view that static buying needed to be maintained (a controversial view) and, based on her research and discussions, this is now a view widely held by the team. In addition, Rebecca put in the time to meet with clients and gather fundamental feedback that has significantly impacted the buy-side roadmap and features – many of which she devised. |

**What's one thing Rebecca Spivak could improve on to have more impact?**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) Product Manager III | I would like to improve on promoting my projects<br><br>- Send out more status emails, more PR<br>- Overall be more visible to Eng Leads |
| **Scott Spencer** (MANAGER) Director, Product Management | Rebecca can get emotional about certain situations and can sometimes miss-communicate / misinterpret other's communications. She is overly reliant on IM and email communications rather than speaking with people face to face. More joint meetings to get people on the same page would improve her ability to create consensus and avoid confusion. |

**Promotion**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|

| | |
|---|---|
| **Rebecca Spivak** (SELF) Product Manager III | No |

**Promotion**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Rebecca Spivak** (SELF) Product Manager III | No | |

EXHIBIT 9

**Rebecca Spivak (rivka)** | 6/Product Manager III | Feedback for 2014 Q1

**Rating**

Consistently Meets Expectations

**Compare Googlers**

All numbers below represent job level

More effective

4/ **Tobias Maurer (tmaurer)** Product Manager | 5/ **Johan Land (johanland)** Product Manager

5/ **Chealsea Conroy (cwierbonski)** Product Manager

6/ **Michael Smith (mdsmith)** Product Manager

5/ **Ari Feldman (arifeldman)** Product Manager

5/ **Fiona Herring (fionaherring)** Product Manager

7/ **Kurt Spoerer (kspoerer)** Product Manager

6/ **Maksim Kalashnikov (kalashnikov)** Product Manager

6/ **Rebecca Spivak (rivka)** Product Manager III

Less effective

**Drew Bradstock (dbradstock)**
7 /Product Manager

More effective

6/ **Yan Huang (huangy)** Staff Software Engineer

7/ **David Mitby (dmitby)** Product Manager

7/ **Jens Skakkebaek (jskakkebaek)** Group Product Manager

6/ **Omry Pruzan (opruzan)**

| | | |
|---|---|---|
| | 6/ Product Manager | |
| | 5/ **Ash Ahluwalia (ashsa)** Product Manager | |
| | 5/ **Vincent Lacey (vincel)** Product Manager II | 5/ **Carlos Facanha (cfacanha)** Product Manager |
| | 6/ **Roy Baharav (royba)** Product Manager | |
| Less effective | 6/ **Rebecca Spivak (rivka)** Product Manager III | 5/ **Deepti Bhatnagar (deeptib)** Product Manager |

**Kathryn Shih (kshih)**
5 /Product Manager

| | | |
|---|---|---|
| More effective | 7/ **Payam Shodjai (pshodjai)** Product Manager | 7/ **Drew Bradstock (dbradstock)** Product Manager |
| | 4/ **Tobias Maurer (tmaurer)** Product Manager | 6/ **Michael Smith (mdsmith)** Product Manager |
| | 6/ **Rebecca Spivak (rivka)** Product Manager III | 7/ **Sean Harvey (sharvey)** Business Product Manager |
| Less effective | 5/ **Ari Feldman (arifeldman)** Product Manager | 7/ **Kurt Spoerer (kspoerer)** Product Manager |

**Kim Burchett (kburchett)**
7 /Mgr, Software Engineering III

**Calibration Notes**

Rebecca transitioned over from AdX on Jan 1st. Since coming on board, she's done great job in identifying and championing transparency as a product direction.

However, it's been rocky working with Engineering - she still needs to continue to build a good relationship with the eng folks. There's some level of trust missing.
She also needs to take responsibility for the full scope of the team and establish herself.

From Doug Bengtson, Eng Mgr, SEA
* needs to be able to multitask more
* needs to start writing things down
* She generalizes and forms her opinion from 2-3 data points
* Poor judgment/intuition on when to share - vet stuff before showing to Joerg
* Bias: Leads people to solution that she has.

From Michael English, TL
- Did a very good job coming into a new situation and working with users to uncover some major areas for improvement that are very high priority and previously not fully understood.
- Seems very reluctant or unwilling to produce documentation / work product associated with her findings and proposed direction for

resolution. Hard to judge the quality / coherence for proposed direction for change since it's not documented.

ACCOMPLISHMENTS

Q4: Led Three Major Launches for AdX

Envisioned and initiated these projects. The prioritization and focus was exactly right, so that the launches were high impact, but did not slip or suffer feature bloat. It was a legendary quarter for AdX Buyside and energized sales and engineering!

The Q4 launches also validated work I did in Q2/Q3 which had not yet been proven.
* Launched Inventory Discovery - Immediately impactful as a high-priority sales tool and also laid the foundation for AdX's core marketplace strategy.
* Launched RTB Graphs - Functionality that shifts up to 20% of GTech support load to Self-Service. This launch enabled customers to troubleshoot their own bidders which was the top support case.
* Launched AdX Alerts V2 - Second successful launch in the "be proactive for the buyer" initiative I set out in a prior quarter. This launch was based on a rapid launch and iterate approach that I championed for the functionality.
Q4: Successful Transition of AdX Responsibilities

My handoff and transition was seamless - with full signoff from all involved AdX PMs that they had everything they needed.

Q1: Joined PIE team and identified new vision/prioritization (with broad buy-in)
* New to team: I ramped up to understand specific customer need and use cases
* Extensive customer research, I also built quick javascript prototypes to test ideas with sales (lean approach - test early!)
* Identified transparency and control as the core opportunity for 2014. This is a big idea that will have large impact. Sales doesn't want an algorithm in a black box - they have expertise and want levers and empowerment.
* I championed this new vision supported by customer data and I eventually achieved broad buy-in
* I set a long term vision that is big, but not pie-in-the-sky. We are taking a lean approach and have a plan for incrementally launching and iterating in Q2.

**Project/Achievement**

1

**Launched AdX Inventory Discovery**

PM
**Impact:** Critical

**Summary of key contributions:**
This was a great launch of something that was immediately impactful as a much-needed sales tool, but also foundational for the core marketplace strategy and vision.

* Conducted thorough research on use cases
* Set product vision and priorities according to impact
* Shifted focus from "Forecasting" to "Discovery"
* When the project kept slipping to Q1, I helped maintain focu so we could cut functionality without cutting usefulness
* Created popular tutorial and documentation
* Helped set the vision for discovery as the foundation of Marketplace

As much as this launch exceeded expectations and delighted sales, it was also energizing for engineering the sit in on user testing and see that the product had been built to exactly anticipate the use cases. There was a substantial eng-initiated element to this initiative and those projects can often become science experiments not vetted with real world cases. Here, I was most impactful by directing without controlling. It was a great and productive dynamic that would do well across google!

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Ari Feldman** (UNSOLICITED) Product Manager | | | Critical | This was a huge initiative that could not have been realized without Rebecca's involvement. Although not directly involved with the project, I shared an office with her and recall all of the buyer calls she had to obtain the necessary research and inputs. Her push to change the focus of the project from forecasting to discovery was just short of genius. |

| | | | | |
|---|---|---|---|---|
| | | | | The alpha version she shipped at the end of Q4 was incredibly refined given its nascency and the quality of her training materials was simply top-notch. |
| **Jacob Baskin** (UNSOLICITED) Senior Staff Software Engineer | | | Large | Rivka made many critical contributions to the vision and design of AdX inventory discovery. She gained a deep understanding of the needs of our buyers and of our sales team in order to push eng to build the right product, and she framed the work in a way that really helped everyone involved to understand the value we were adding for our customers and to stay on track in the face of incipient feature creep. Ultimately, this launch delighted sales and is sure to delight customers when it launches next week. |
| **Jeremy Woodlee** (UNSOLICITED) Sales Manager | | | Critical | Rivka was a great partner with sales on defining the real needs of sales and our clients for this product. There were a lot of preconceptions about what Inventory Discovery should be, and she really dug into the details to understand what was really required. And then she did a great job getting that developed and into the commercialization process. She was interested in meeting regularly to gather sales feedback and provide updates. Really a very very good partner for sales. |

2

**Launched RTB Graphs**

PM

**Impact:** Large

**Summary of key contributions:**
* Successful Rapid Launch ahead of Schedule
* Addressed Top gTech Need - 20% of support load shifted to Self-Service!
* Repeatedly focused project to keep it from slipping from Q4
* Impactful release with no feature bloat

This project was repeatedly pushed from Q4 because we were already doing so much on AdX Buyside! The Eng and Ux leads were both Nooglers. I championed to keep this project prioritized given the impact I knew it would have. I worked closely with engineering and UX so that we wouldn't slip. I worked within the resource constraints and helped strip the project down to something immensely useful but still valuable.

The launch was not seen at all as a stripped down version - it was more than anyone expected. It addressed the core needs and delivered before anyone believed it could. It was a rockstar team of Eng and UX nooglers, and we made a great team!

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Ari Feldman** (UNSOLICITED) Product Manager | | | Critical | This feature was another major boon for the AdX buy-side by providing buyers with crucial diagnostic information that can help them troubleshoot and diagnose issues that they could not do before. Furthermore, she cleverly integrated this feature with her Buyer Alerts initiative, which helped drive end-to-end usage. In talking with buyers for my own projects, I learned that this feature is very well regarded by them. |

3

**Launched AdX Alerts V1 & V2**

PM
**Impact:** Critical

**Summary of key contributions:**
* Major Self-Service Launch
* I did research and discovered a core issue - Buyers are reactive but we expected otherwise
* Buyer unawareness of issues was causing loss of ~10% of total spend
* I proposed vision and we launched useful functionality in just 1 quarter!
* We actually launched twice (both times useful!) in Q4
* Launch and Iterate/Lean --> V2 was based on the feedback from V1
* Product was very well received by customers

This project was born out of customer research I did in prior quarters where I discovered the opportunity we had to be *proactive* on behalf of our customers. It was not easy to shift general perceptions.("I have a great idea! Let's build an email alert system") but this eventually found broad buy-in and was a successful launch - from idea to launch in 1 quarter! We launched very quickly and used feedback from that launch to guide future direction and launch again.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Ari Feldman** (UNSOLICITED) Product Manager | | | Critical | This feature addresses a major need in unblocking buyer spend by helping buyers become of aware of issues and anomalies that could impact their buying on the AdX platform. Some of our biggest buyers are currently beta users and virtually all beta participants are universally positive in their feedback on this feature.<br><br>In addition to realizing this feature, Rebecca also invested a considerable effort into devising a solid vision and product roadmap, which if executed successfully, will dramatically increase AdX serviceability and increase the volume of spend on the exchange. |
| **Jacob Baskin** (UNSOLICITED) Senior Staff Software Engineer | | | Critical | Rivka was the driving force behind alerts, which launched remarkably quickly and to great fanfare. I am very excited to see the benefits this brings to the AdX buy side. |

4

**Set Vision/Priorities for Quicksilver Estimates**

PM
**Impact:** Critical

**Summary of key contributions:**

* Set a compelling product strategy within first 2 months in the role
* Ramped up quickly with direct customer research
* Identified gaps and a big opportunity for impact!
* Championed a shift in focus and vision - "Empower sales with transparency and interaction"
* Achieved general buy-in (Eng, PM, and Sales Ops) for this new direction
* Set actionable plan for useful launches in Q2 in the path to long term vision
* This new approach resolves most of the Tea vs Quicksilver "duplication of effort" concerns and distraction
* (Tested ideas with sales by coding lightweight clickable prototypes)

As I joined the PIE team in January, I set about understanding the customer needs and use cases. After substantial iterative research, I came to believe that empowering the sales team to interact with the data was our most powerful opportunity for real business impact.

I shared this knowledge and vision across teams, and proposed a shifted focus. Interactive estimates, with transparency and controls that support (rather than replace) the existing sales estimation process will help the modeling work done by the team reach its full potential. The next step in the model is to let the sales team be an input to it.

I championed the vision and achieved general buy-in. We also have a good plan for how to launch incrementally and quickly on a path towards the broader vision. Furthermore, with this new charter, some of the distractions and noise around duplicate efforts and "Tea vs Quicksilver" have become irrelevant. An interactive model is impactful and also distinct.

Shifting priorities can be challenging, but there is now broad buy-in around the new idea and approach. It has only been one quarter (and part of that was ramping up) but I am very excited about what we can do here. I believe that sales interaction with the data behind estimates is the right approach and that it can have huge impact. We can launch powerful and useful products in the coming quarters.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

5

**Successful Transition of AdX Responsibilities**

PM
**Impact:** Critical

**Summary of key contributions:**

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Ari Feldman** (UNSOLICITED) Product Manager | | | Large | I inherited Rebecca's Buyer Alerts project when she transitioned off AdX. She supplied me with complete documentation and made herself available to me with any questions. The collateral and product vision were clear, which made is very easy for me to pick up this project from where she left off. |

**Googlers who have the most knowledge of Rebecca Spivak's work.**

| Suggested Googlers | Number of times suggested | Status of review | Suggested by |
|---|---|---|---|
| **Noam Wolf** (nwolf) | 1 | Not requested | Ari Feldman (arifeldman) |
| **Jacob Baskin** (jbaskin) | 1 | SUBMITTED | Ari Feldman (arifeldman) |
| **Nathan Bullock** (nathanbullock) | 1 | Not requested | Ari Feldman (arifeldman) |

**How well does Rebecca Spivak perform in their role (Product Manager III)?**

| Reviewer/Role | Feedback |
|---|---|
| **Jens Skakkebaek** (MANAGER) Group Product Manager | Rebecca was on the AdX team throughout Q4 until she joined my Frontline team in early January. So the feedback is split in two parts for this reason.<br><br>On AdX, Rebecca had a great quarter with the multiple launches mentioned above.<br><br>On Frontline, she has done less well so far and overall, her performance needs improvement. In fact, I will be working to help Rebecca make these improvements according to a performance improvement plan that I will share with her. A PM3 is expected to be well rounded and function independently.<br><br>Overall for this cycle, her performance bucket "meets expectations" was arrived at by weighing her positive performance on AdX with her lower performance on Frontline. |

**What's one thing Rebecca Spivak does really well and should continue doing?**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak** (SELF) Product Manager III | I understand the customer and will take initiative, even when risky, to shift strategy and prioritize/launch products with real impact. I can launch substantial functionality quickly by staying focused and stripping down products to what is most impactful.<br><br>Examples:<br>ADX Alerts: I began my role as PM on Buyside by getting to know customers. I discovered that unlike sell-side customers, buyers are reactive and not motivated to live within the tool. A proposed a proactive alert system. This was a new idea at the time and controversial ("let's build email"). I also set out for a simplified first launch - alerting buyers when their creatives failed. The initiative went from idea to launch in one quarter! Although it seemed like a small launch, the impact was large and it addressed the biggest issue. And it validated the idea. Buyers were receptive, and the priorities for the next quarter were shaped by feedback from the first launch.<br><br>2. Inventory Discovery: This project began as Forecasting, and I redirected it to be about understanding inventory and changes over time. I understood the direct use cases and refocused the priorities. When this launched, it was very well received, as it exactly addressed all the important use cases. The user testing was great for everyone involved because it showed the the product was truly built to anticipate all the user needs (and no one asked about the things we cut).<br><br>3. Deprecating Static Buying on AdX: Static buying did not just take up eng time - it limited new functionality as we always had to consider this limited (and decreasing) use case. I initiated the conversation (also originally controversial) and eventually it became the accepted idea. |
| **Jens Skakkebaek** (MANAGER) Group Product Manager | Rebecca has good ideas, passion, and ability to synthesize it into a new product direction. For instance, in her work on Frontline in Q1, she has been driving towards more interactive GDN benchmarks that allows the Sales user to explore and understand what estimates the client can realistically get. This is in contrast to more automated estimates that AMP has today. Keep up you passion for the user! |
| **Ari Feldman** (UNSOLICITED) Product Manager | She should continue believing in herself and her abilities! Rebecca took over the AdX buy-side product from another PM that left a big mess. Once she found her footing, she shipped a lot of high-impact features in a very short amount of time, which is a testament to her Product Management prowess. In short, she's a strong PM with amazing potential to do big things. |
| **Jacob Baskin** (UNSOLICITED) Senior Staff Software Engineer | Rivka does a great job of gaining a clear-eyed and comprehensive understanding of any area she works in. When she started working on AdX inventory discovery, this was not an area that she was previously familiar with, yet she quickly became a domain expert, and learned more about our buyers in a few weeks than some PMs have learned ever. This allowed her to develop insights and plans that led to a much more useful finished product than we would otherwise have built. |

| | |
|---|---|
| | Rivka also speaks her mind clearly and persuasively. This has helped her, and the engineers who work with her, build successful and helpful products rather than engage on Quixotic campaigns to build systems that may be very pretty and fun to work on but that are ultimately of marginal benefit. |
| **Nir Margalit**<br>(UNSOLICITED)<br>Software Engineer | Rivka is a true visionary - Rivka's vision is still guiding us in what we do, although she is no longer on AdX. For example, when Rivka envisioned the Inventory Discovery Tool and the Alerts project, one of the things that she kept telling us was that we have to be proactive with our users, and that the next step will be discovery alerts. That was in Q4 2013 and we are still using that as a guideline.<br><br>Rivka encouraged us to release and iterate - I find that approach super useful as in AdX we have savy users and their feedback makes a difference. By releasing and iterating we were able to get solid feedback from our buys and shift our prioritize.<br><br>Both the merits mentioned above led to an epic Q4 - we had 3 product releases (BuySide alerts, RTB graphs and inventory discovery), all for the BuySide and all with an impact on our buyers spend. |

**What's one thing Rebecca Spivak could improve in order to have more impact?**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak**<br>(SELF)<br>Product Manager III | I need to believe I can make a difference in order to stay engaged, so I will continue with my recent commitment to takes risks when needed. I haven't always done this.<br><br>A few years ago I was the PM for AdX Reserve Price Optimization. I did not believe the project could have impact (it was counter to the way publishers wanted to run their business), but it was an established project with a large senior engineering team. I spent my entire time on that project uninspired, which wasn't good for anyone - especially me. I don't know if I would have been successful attempting to deprioritize it, but I wish I had tried.<br><br>I've committed to taking whatever risks are needed to believe that the work I'm doing will have impact. This is nearly impossible to do painlessly. It ultimately worked very well for AdX in Q3/Q4 where I drove the new vision for AdX Buyside with great launches. Nearly every initiative I took was controversial and I was tempted to back down, but they were all eventually successful.<br><br>This may seem idealistic, and it's often exhausting. But I will continue to take risk when needed so that I never find myself uninspired and disengaged again. I so |
| **Jens Skakkebaek**<br>(MANAGER)<br>Group Product Manager | A number of areas need improvement. The details can be found in the Performance Improvement Plan, but the big picture is here:<br><br>Communication / Org: You have lost trust with the engineering team and need to turn it around. Verbal communication with other PMs and the engineering team needs to be clear and compelling, accurate and complete. Your ideas need to be documented better. Bring well-founded data to the table. Be fully engaged in every meeting.<br><br>Execution: you need to take complete ownership of the team's activities and drive them forward - even if you don't agree. If you disagree, you need argue to change direction. Disengaging is not the right approach.<br><br>Leadership: I expect you to be observed as being proactive by Engineering and Cross-Functional team members and be seen as the clarifying leader who solves problems and defines a path forward without need for escalation.<br><br>Googleyness: Listen more and expect to learn from your colleagues. Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve. |
| **Ari Feldman**<br>(UNSOLICITED)<br>Product Manager | She should communicate more with different stakeholders. Rebecca does not grandstand so some engineers and sales people can sometimes confuse her approach and visibility with lack of progress, which is definitely not the case. If she over communicates, she can avoid any such confusion in the future. |

| | |
|---|---|
| **Jacob Baskin** (UNSOLICITED) Senior Staff Software Engineer | Sometimes, being right isn't the most important thing. In particular, even if an engineering team is building the wrong thing, it can be very demotivating for them to hear about the ways in which they are building the wrong thing without hearing a vision or a path forward towards a better state.<br><br>I noticed this in particular with Rivka's work with the AdX reserve price optimization team -- she had a clear and persuasive argument that they were building the wrong feature, but because she didn't give them a motivating vision to build something better, the team wound up languishing and ultimately building more of the same thing, only slower. There's nothing like telling a positive and motivating story to make a team build something great – even if you're not 100% sure yet that it's the right story. |

**Should Rebecca Spivak be considered for promotion at this time?**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Jens Skakkebaek** (MANAGER) Group Product Manager | No | |

EXHIBIT 10

**Performance Improvement Plan**

***Confidential***

Date: May 1, 2014
To: Rebecca Spivak
From: Jens Skakkebaek
CC: Caroline Bremner, Paul Higson
Re: Improvement Plan

**Summary & Background**

As mentioned in our recent discussion on April 11, 2014 your performance needs improvement on the Frontline team. This letter is to recap our subsequent conversation on May 1, 2014, where I summarized the areas where your performance needs to improve: communication/org, execution, leadership, and Googleyness and the need to initiate a performance improvement plan. Your current trajectory and impact is not acceptable and we need to work together to raise your performance level. Expectations for a PM III (L6) can be found at go/pmcareerladder.

**Areas of Improvement/Expectations**

Performing the tasks below will require significant work from you and result in full support of the Frontline engineering team in your efforts and vision.

| Area of Improvement | Action | Due Date | Method of evaluation |
|---|---|---|---|
| Communication / Org | - Verbal communication with other PMs and the engineering team needs to be clear and compelling, accurate and complete. Make statements that are based on thorough understanding and well-founded in use cases that are backed by more than just a few data points. In conversations, make sure that you represent other peoples' opinions/actions accurately without interpretation. Effective communication is needed to build trust and credibility within the team.<br><br>- Be transparent in your thinking by keeping key stakeholders in the loop.<br><br>- You need to document your ideas, results, requirements in PRDs for use by engineering. The portfolio of documents needs to be logically consistent.<br><br>- In situations where your opinions are different than others on important topics, you should be persistent and bring data to the | throughout the plan | I will ask key members of the PM and Engineering team how they have observed your performance over the period of the performance improvement plan. In parallel, I will review what I have observed over the duration of the plan. |

| | | | |
|---|---|---|---|
| | table to convince your team members. Make sure that you are specific in your arguments. If you reach agreement, communicate and trust that your team members are aligned. If you are still not able to reach agreement, escalate. Don't give up and position yourself as being in opposition.<br><br>Be fully engaged in team meetings instead of being on your laptop.<br>In Account Manager interviews, do not provide your own opinion, as you risk biasing the conversation and hearing only what you want to hear. | | |
| Execution | Ownership: take complete ownership of the PIE team's responsibilities and be proactive in driving its activities incl. Interactive Benchmarks, even if you don't agree with the direction on some of them. It's not enough to just own part of the activities.<br><br>- Do what you promise to do, incl. administrative tasks<br><br>- Engage and lead the core team meetings | throughout plan | We will ask key members of the PM, Engineering and Sales Ops teams how they have observed your performance over the period of the PIP days. In parallel, I will review what I have observed over the duration of the plan. |
| Leadership | - I expect you to be observed as being proactive by Engineering and Cross-Functional team members and be seen as the clarifying leader who solves problems and defines a path forward without need for escalation. | by end of plan | We will ask key members of the PM, Engineering and Sales Ops teams how they have observed your performance over the period of the PIP days. In parallel, I will review what I have observed over the duration of the plan. |
| Googleyness | Listen more and expect to learn from your colleagues.<br><br>Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve. | throughout plan | We will ask key members of the PM, Engineering and Sales Ops teams how they have observed your performance over the period of the PIP days. In parallel, I will review what I have observed over the duration of the plan. |

**Success criteria**
The goal of this plan is to demonstrate your ability to deliver results and raise your contributions to the level expected. This includes owning and delivering significant features with a significant impact on the product, working in harmony

with the rest of engineering team with minimal supervision, or need for escalation, and communicating effectively with the team and third parties.

**Plan Duration**

This performance improvement plan will last for 60 days, effective May 1, 2014 through July 1, 2014

**Conclusion**

I hope this action will result in the required improvement in your performance. I am here to support you in your development and your team lead or I will meet with you periodically during the plan to discuss your progress and provide feedback. Please note that the expectations stated above need to be met during the plan period and sustained after the successful completion of the plan. Failure to correct this unsatisfactory performance now and in the future may result in further corrective action, up to and including termination without the need to undertake a further plan. A higher level of performance is expected now as well as going forward.

**Manager Signature**

**Employee Signature**

**HR Signature**

Manager: Please return this completed form to your HR Business Partner, and keep a copy for your records.

Employee: Please keep a copy for your records.

EXHIBIT 11

# Rebecca Spivak Successful Completion of PIP

***Confidential***

Date: July 8, 2014
To: Rebecca Spivak
From: Jens Skakkebaek
CC: Caroline Bremner, Paul Higson
Re: PIP Completion

Congratulations on having successfully completed your PIP.

A summary of this follows:

| Area of Improvement | Item Needing Improvement | Status |
|---|---|---|
| **Communication / Org** | | |
| | - Verbal communication with other PMs and the engineering team needs to be clear and compelling, accurate and complete. Make statements that are based on thorough understanding and well-founded in use cases that are backed by more than just a few data points. In conversations, make sure that you represent other peoples' opinions/actions accurately without interpretation. Effective communication is needed to build trust and credibility within the team. | Since the April summit, you have been clearer in your asks/status communication with eng, incl. in regular updates in core team meetings.<br><br>Your peers recognize that you are no longer making bold statements without having evidence and having high confidence in the evidence.<br><br>It's positive that you are no longer taking over/dominating meetings, as I understand there were instances of that before, where you were perceived as doing so.<br><br>Input from Sales Ops that you are more organized and with incremental communication. They appreciate a central document to keep track of information.<br><br>Remaining concern: representing other people's opinions accurately. |
| | - Be transparent in your thinking by keeping key | The regular email updates that you |

| | | |
|---|---|---|
| | stakeholders in the loop. | started have been effective at keeping stakeholders up to speed. Also, the regular 1:1s you have with Eng, PM, and Sales Ops have had good effect as well. |
| | - You need to document your ideas, results, requirements in PRDs for use by engineering. The portfolio of documents needs to be logically consistent. | Big improvement. Eng likes the system you put in place with a master PRD and links to sub PRDs. Your documentation is well organized in go-link and each document has the necessary level of granularity and accuracy. |
| | - In situations where your opinions are different than others on important topics, you should be persistent and bring data to the table to convince your team members. Make sure that you are specific in your arguments. If you reach agreement, communicate and trust that your team members are aligned. If you are still not able to reach agreement, escalate. Don't give up and position yourself as being in opposition. | No significant disagreements since summit to test this.<br><br>Your ability to properly manage disagreement and conflict is a concern that remains for me and an important area for you to master and work on going forward. |
| | Be fully engaged in team meetings instead of being on your laptop. | In the PIE team meetings, you are engaging appropriately and letting people have their sections. Your status updates are fine.<br><br>In the Display Workflow summit, you engaged well in the broader session with good comments and similarly in the breakout session. It felt like you were a part of the team. |
| | In Account Manager interviews, do not provide your own opinion, as you risk biasing the conversation and hearing only what you want to hear. | No customer interviews during the period to test this<br><br>Interviewing customers/users in an unbiased way is a key PM skill. In this area, it's particularly important, since there's high degree of variability of the AM use cases. Until proven otherwise, it still remains a concern to work on. |
| **Execution** | | |
| | Ownership: take complete ownership of the PIE team's responsibilities and be proactive in driving its activities incl. Interactive Benchmarks, even if you don't agree with the direction on some of them. It's not enough to just own part of the activities. | With reduced scope (QuickSilver moved out), you have taken full ownership of Peer Sets and compliance issues around size of peer sets across all products (not just for your own), in addition Interactive Benchmarks. Great.<br><br>As you get your current projects |

| | | |
|---|---|---|
| | | under way, we should make sure to keep an eye on your scope and expand appropriately. |
| | - Do what you promise to do, incl. administrative tasks. | No situations observed here for feedback.<br><br>Make sure that this does not come up again. This should be an easy one to work on. |
| | - Engage and lead the core team meetings. | You are driving your section of PIE leads meetings well with preset agenda and letting team members own their sections appropriately. By doing this, your PM leadership is manifesting itself.<br><br>If you haven't already, you should step up and drive the full leads meeting (agenda, etc), not just a section. |
| **Leadership** | | |
| | - I expect you to be observed as being proactive by Engineering and Cross-Functional team members and be seen as the clarifying leader who solves problems and defines a path forward without need for escalation. | Engineers feel like you are now the go-to person for questions.<br><br>You need to keep building your leadership in your team and area. Being proactive is a core part of that. |
| **Googleyness** | | |
| | Listen more and expect to learn from your colleagues. | Eng feels that there has been a significant change to the better -- you are listening more to your colleagues and are receptive to their ideas/suggestions. |
| | Constructive criticism is offered to make you stronger. When you are receiving feedback, try not to be defensive, and utilize the information to improve. | No observations here during the period.<br><br>This is a core skill that's truly important to growing. The concern remains valid – it's up to you to demonstrate improvements in this area going forward. |

I must caution you that any recurrences of unsatisfactory performance in the future may result in further corrective action up to and including termination without the need to undertake a further plan. Please note that the expectations from the PIP need to be met and sustained after the successful completion of the plan. A higher level of performance is expected now and going forward in the

future.

I'll wrap this up by saying I'm happy to see the improvements you've made, and I'm excited that we are moving forward in a positive manner.

Jens

EXHIBIT 12

**Rebecca Spivak (rivka)** | 6/Product Manager III Feedback for 2014 Q3

**Rating**

Consistently Meets Expectations

**Compare Googlers**

All numbers below represent job level

More effective

6/ **Rebecca Spivak (rivka)** Product Manager III

5/ **Vincent Lacey (vincel)** Product Manager II

Less effective

**Michael English (menglish)**
6 /Staff Software Engineer

More effective

5/ **Kathryn Shih (kshih)** Product Manager

5/ **Vincent Lacey (vincel)** Product Manager II

6/ **Rebecca Spivak (rivka)** Product Manager III

Less effective

**Aaron Rothman (aarothman)**
7 /Sr Product Manager

More effective

5/ **Vincent Lacey (vincel)** Product Manager II

5/ **Matt Jones (mjjones)** Product Manager

6/ **Rebecca Spivak (rivka)** Product Manager III

Less effective

**Patrick Davin (pdavin)**
5 /Software Engineer

More effective

5/ **Kathryn Shih (kshih)** Product Manager

5/ **Vincent Lacey (vincel)** Product Manager II

Less effective

6/ **Rebecca Spivak (rivka)**
Product Manager III

**Doug Bengtson (dbengtson)**
7 /Mgr, Software Engineering III

More effective

5/ **Deepti Bhatnagar (deeptib)**
Product Manager

6/ **Geoff Menegay (menegay)**
Product Manager

5/ **Vincent Lacey (vincel)**
Product Manager II

6/ **Rebecca Spivak (rivka)**
Product Manager III

5/ **Jane Kim (janeki)**
Product Manager

Less effective

**Dustin Jackson (dustin)**
Director, Software Engineering

More effective

7/ **David Mitby (dmitby)**
Product Manager

5/ **Kathryn Shih (kshih)**
Product Manager

5/ **Vincent Lacey (vincel)**
Product Manager II

6/ **Rebecca Spivak (rivka)**
Product Manager III

Less effective

**Barbara Stanley (bstanley)**
7 /Senior Staff Software Engineer

**Calibration Notes**

Solid meets. Upward trending. No full release yet but a prototype milestone (M1) completed in Q2. Could be exceeds next round, if Interactive Benchmarks becomes a big success when it launches in Q1. She still have soft-skills to work on and gets defensive with criticism.

The good
- execution going well now
- she's developed a great vision for the area: https://docs.google.com/a/google.com/presentation/d/1Cv-3U7_FNAN-FISsEn4i9BeqWoOmynTMeKP3MO5yJho/edit#slide=id.p
- Eng likes her insights, vision, and ability to work at a detailed technical level as well (e.g., pulling together a future-system architecture

drawing)

Needs improvement: Soft skills
- receiving feedback, without being defensive
- feedback from peers: she pushes her own ideas in discussions/presentations so much that she dominates discussions and loses credibility. To influence others, negotiate well, and be the product leader she needs to be sensitive to the audience, tailor the message.
- a too strong belief that her own ideas are the best. While healthy self-confidence is important, too much confidence for a PM creates the risk of blindness to end-user needs. E.g., in Media Review deck she was originally talking down estimates.
- she keeps brings up the past (PIP) in her meetings (until a few weeks ago, at least). There have been discussions with HR on this.

Manager-only feedback from Aaron Rothman, now her manager (since July):
Rebecca continues to dwell in the past about how she has always been right and everyone else is wrong (this has been 90% of our 1:1s). She often positions herself as the victim. She makes claims (e.g. "people only want IB and not AMP") even though there is clear evidence against this. Additionally, she is unreceptive to constructive feedback, making excuses that leave her blameless.

Doug, Barbara and Judy have all tried to give Rebecca constructive feedback on her presentation style / communication, and she has been incredibly defensive. Both Judy and Barbara felt so uncomfortable after giving Rebecca feedback, that they told me they'd like me to work on this with her.

Feedback from peers that she did not include as peer reviewers is included below.

dbengtson@ - Frontline Eng Mgr
Rebecca has been doing better over the last 2 quarters and seems to be executing well on Interactive Benchmarks. Overall, she is being effective but she still seems to require more direction than I would like. I still have some questions on her ability to drive larger projects across teams. For instance, it seemed to take a lot of pushing to get her to start a discussion with the Wildcat team. This was something that Dustin mentioned was important to him 2 months ago, and having a good agreed upon plan for how to handle Search data in IB was supposed to be part of the IB product review next week. She couldn't even name the PM that owned Wildcat in our Frontline 2015 planning meeting on 9/18. So it was pretty obvious to me that she hadn't really started a conversation. The first time that a Wildcat discussion appeared in the weekly PIE updates was the update on 9/26. That worries me, because I'm not sure if that discussion would have happened if I didn't bring it up as something that needed to happen.

From bstanley@, Uber TL
I think things are going well for Rebecca now – at least we seem to be over the martyrdom hurdle, but she hasn't spoken to me much since my blunt feedback for "I don't want to hear more 'woe is me' stories."

One concern is that still hear (e.g., yesterday) caveats on docs and decks not ready for the masses for lengthy periods of time. E.g., she has a Frontline preso on Monday, the doc is not ready for critical review yet. And there still is a bit more hand waving re: how details will be handled in Interactive Benchmarks (e.g., data sparsity).

Other than that, all good! Please note I've been OOO for almost all of August and 1/2 of Sept.

From judyhsu@ - Sales Ops partner for Frontline
- Her work is solid. She brings technical competence to each conversation and passion I like to see
Example: She is leading developing an integration / deprecation strategy and plan for Interactive benchmarks. She's the first PM we've worked with who is willing to roll up her sleeves and expand her scope to not only creating a great product, but also coming up with a plan to deprecate other tools in her space. This is an area where I'd like to see all of our PMs get to, and Rebecca is leading the way here.

- Her areas of improvement are:
* build to soft skills to bring people along on the journey with her (and don't assume it's her vs. the world)
Example: When she as advocating for interactive benchmarks as the key to improve quality of AMP estimates, Engineering was initially skeptical and wanted more data/user research. She interpreted this as "Eng doesn't want to believe that what they've done to date is wrong", instead of seeing this as a reasonable ask to make a data-driven recommendation. It took our team partnering with Rebecca to structure & conduct ~20-25 user interviews on this topic to get full fact base on what users really need – it convinced Eng to come around, but also Rebecca learned about user requirements she didn't realize before. Bottom line: don't assume that decisions or actions of others are taken personally against you, in fact, it's not about you at all. Believe that people are on your side and just want more information.

* work on packaging of her messages and comms to build trust and credibility. Right now she tends to use hyperboles ("everything is great! Nothing is behind!"). Would serve her better to be transparent about what's going well and what's not. Example: In Neal's Media Reviews, her deck used strong language that was pretty declarative ("Estimates are not what sales needs" etc) and her tone in the presentation was to show that everything was going great, look at this slick demo, etc. I am not criticizing her work – things are generally

going great. But she'll earn more credibility with folks if she also admits what are current challenges / issues. That's not a sign of weakness, but rather a sign of good judgment and honesty.

**Achievement/Project**

**Interactive Benchmarks**

Originator / Lead
**Impact:** Critical

**Summary of key contributions:**
What is it?
Understanding ad and inventory performance is fundamental - For the account managers who are trying to sell the ads, to the tools that could offer insights and suggestions, to anyone trying to set an ad product strategy. This project (which I devised) is the data platform to understand historical ad inventory and performance across advertisers, verticals, and any relevant dimensions. It has many applications - from internal pitching and planning to insights in user-facing tools. Although still quite new, this project has already been proven in concept through an AMP prototype, has proactive interest coming in from many other teams, and is now widely considered the primary viable candidate for substantial sales tool consolidation.

History
As a new member of the team, I quickly developed domain expertise and conducted user research. I identified many underserved (yet critical) business needs. I synthesized these needs into a new product vision and strategy - and started laying a foundation which eventually became Interactive Benchmarks. Although this was a shift in existing strategy, I achieved broad buy-in within just a few months. I did this by working closely with engineering and sales ops to document the research, the opportunity, the product vision, and an achievable set of meaningful and useful milestones laid on a clear path forward

Specific Accomplishments
* Conducted unprecedented user research, bringing in sales ops, to fully document and reference the opportunity and need
* Synthesized the need into product strategy
* Developed and championed the vision and new product direction, navigating the natural resistance to strategic shifts, and energized many teams around this project
* Brought the team to full buy-in and excitement in less than one quarter
* Created strong shared repository of documentation
* Worked closely with engineering through all stages of execution
* Collaborated with and presented vision/plan to cross functional teams (they're all on-board and want involvement)
* Presented to cross functional Senior leadership - receiving strong positive feedback
* Helped support the onboarding of 4 new engineers for this project
* With a milestone approach, we have already launched a functional prototype (on a real infrastructure) that continues to _prove_ out the approach and product. Initial feedback on the prototype exceeds all expectations

With Quicksilver being deprecated, this project has been an energizing source of excitement across engineering.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|
| **Aaron Rothman** (PEER) Sr Product Manager | | | Critical | Benchmarking is a key piece in the pitching process and Rebecca has produced a solid set of milestones to deliver a first version. There are many complexities involved (data sparsity, compliance, etc.) that Rebecca has clearly thought through and (so far) effectively incorporated into her product plan. |
| **Dustin Jackson** (PEER) Director, Software Engineering | | | Critical | There's no question that IB is filling a significant product gap and has produced a great deal of excitement both within sales and the engineering team. Rebecca has done an impressive job turning this from an idea to a real project in a short amount of time. |

| | | | |
|---|---|---|---|
| **Michael English** (PEER) Staff Software Engineer | | Critical | Rebecca originally came in as PM to help my team with the "Pitchable Insights" idea. After talking with users and understanding the domain she recognized that there was actually a much more fundamental and far reaching need that wasn't being met. This is pretty significant to uncover a need this big, as Sales Tools is a well trodden area. She formulated a product vision and strategy from these fundamental needs and managed to work with Sales Ops and Eng to align on this new product vision, now what we call Interactive Benchmarks. This new promising direction has really helped the team's morale recover from the low created by the Quicksilver bake-off. |

2

**PM for Benchmarks and Peer Set Policy**

PM
**Impact:** Critical

**Summary of key contributions:**
Google places high value on protecting our customer data, and on ensuring that we don't release company sensitive data.

But having clear product direction on policy is hard, because policy application is complex.

Both the peer sets and Benchmarks projects generated concerns over policy issues. I took this over and led it from a point of substantial Fear/Uncertainty/Doubt and brought it to a point of shared understanding and clarity.

Worked cross team with legal and policy
Identified parallel use cases in similar products to set precedence
Unblocked major functionality by removing policy confusion
Worked closely with engineering on details and design docs

We have clear answers and direction for all policy related issues now, and the FUD is gone.

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

3

**PM For Peer Sets**

PM
**Impact:** Critical

**Summary of key contributions:**
This project was blocked for many quarters over some tricky cross team issues
* The project (conceived 2 years ago) assumed a dependency on GreenTea
* However GreenTea's priorities do not align with our timeline
* Rather than let cross-team frustration build and have the project stall, I set an alternate plan
* achieved buy-in on the alternate approach - from the Frontline and GreenTea teams
* The project is now UNBLOCKED and progressing

Set the PRD and short/long term plans
Coordinated across MIS, Wildcat, and Athena
Worked Closely with _Engineering_ on all details and assisted in development of design doc

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

4

**PIE PM Lead**

PM
**Impact:** Critical

**Summary of key contributions:**
Domain expert for multi-faceted group of products
Collaborate with and maintain relationships across teams, including
* Video Reservation (ZRH)
* CAWFE / AWFE
* MIS
* Search
* GreenTea
Maintain Close and Collaborative working relationship with my TLM and a growing engineering team
Helped onboard and inspire new Eng team membersLead team direction, help keep engineering inspired, make the right calls on priorities
Maintain centralized repository of documentation
Keep stakeholders informed with clear status updates
Set clarity around intersecting PM Roles
Set clarity around Unified Estimates/ Interactive Benchmarks interactions

| Reviewer/Role | Role | Familiarity | Impact | Feedback |
|---|---|---|---|---|

**Googlers who have the most knowledge of Rebecca Spivak's work.**

| Suggested Googlers | Number of times suggested | Status of review | Suggested by |
|---|---|---|---|
| **Michael English** (menglish) | 2 | SUBMITTED | Aaron Rothman (aarothman), Gautam Sawhney (sawhney) |
| **Serhiy Tykhanskyy** (tykhansk) | 1 | Not requested | Michael English (menglish) |
| **David Norelius** (dnorelius) | 1 | Not requested | Michael English (menglish) |
| **Gautam Sawhney** (sawhney) | 1 | SUBMITTED | Michael English (menglish) |
| **Amanda Nowak** (akohen) | 1 | Not requested | Gautam Sawhney (sawhney) |
| **Judy Hsu** (judyhsu) | 2 | Not requested | Aaron Rothman (aarothman), Gautam Sawhney (sawhney) |
| **Doug Bengtson** (dbengtson) | 1 | Not requested | Aaron Rothman (aarothman) |

**What's one thing Rebecca Spivak does really well and should continue doing?**

| Reviewer/Role | Feedback |
|---|---|
| | Great vision and insight - I increase the impact of Google engineering teams by helping them work on the things that matter most.<br><br>I am able to do this as I enter a new space by quickly developing domain expertise, *focusing on the user*, identifying product challenges and opportunities, setting achievable and high-impact product strategies, partnering across teams and functions, and driving through successful execution.<br><br>To connect this strength to something specific on the PM ladder, this strength most closely matches this (level 7) PM description:<br><br>"Has product insight and vision about where the product should go, what's going to be successful, and has a record of making good bets on the future of a product"<br>(go/pmladder) |

**Rebecca Spivak**
(SELF)
Product Manager III

Although I am a level 6, that is where I excel most. This strength has been repeatedly recognized throughout my career and consistently throughout my 4+ years at google.

For the current period, I propose Interactive Benchmarks quickly after developing domain expertise. Even though it included a substantial shift in direction, I was able to achieve broad buy-in and excitement. In a short period of time, we have already launched an impressive prototype (on real data), presented it to senior leadership, and now have this same senior leadership across functional and product groups joining in on the big bet.

Interactive Benchmarks is one data point, though many are noted in perf in my 4 years here. To support the trend, see below for prior peer feedback taken directly from past reviews.
.....

"Rivka is a doer, she is focused on things that matter and drives forward."
(Director of Engineering)

"Liked by engineering for her ability to ensure development is focused on impactful changes"
(Director of PM)

"Does a great job of gaining a clear-eyed and comprehensive understanding of any area she works in ... this was not an area that she was previously familiar with, yet she quickly became a domain expert, and learned more about our buyers in a few weeks than some PMs have learned ever. This allowed her to develop insights and plans that led to a much more useful finished product than we would otherwise have built. Rivka also speaks her mind clearly and persuasively. This has helped her, and the engineers who work with her, build successful and helpful products rather than engage on Quixotic campaigns to build systems that may be very pretty and fun to work on but that are ultimately of marginal benefit."
(Senior Staff Engineer/ L7)

"A true visionary - Rivka's vision is still guiding us in what we do, although she is no longer on AdX. ... encouraged us to release and iterate ... we were able to get solid feedback from our buyers and shift our priorities ... led to an epic Q4 - we had 3 product releases ... all with an impact on our buyers spend."
(Eng TL)

"Vision - Rivka possesses and communicates a clear vision where the Local Enhanced Product should evolve in the short, mid, and long term ... goes beyond a standard PRD and has been extremely helpful as I understand what I am working towards within this product ... also on a broader, partner-centric level where I am able to answer critical partner questions with clarity and authority ... Having been at Google for 4.5 years and worked on AdWords, AdSense, GDN/Display, and YouTube, I can say this is the first genuine "vision" paper I've seen that wasn't written by a VP or higher-level Googler. Great work Rivka."
(Strategic Partner Manager)

Strength: "Vision/insight: Rivka is outspoken and advocates for ways to improve"
(Vice President of PM)

Strength: "Strong product insight Good long term / big picture thinking Passion and energy"
(Another Vice President of PM)

Strength: "Product/Strategy - Rivka is able to think about overall product strategy from end to end - mixing partner, product and eng insights"
(Group PM)

Strength: "You can't lead silently observing from the sidelines ... Rivka dives into brainstorming sessions and PM meetings and provokes discussion that challenge assumptions."
(Director of PM)

"She did not take the conventional view .... [Now] based on her research and discussions, this is now a view widely held by the team ... put in the time to meet with clients and gather fundamental feedback that has significantly impacted the buy-side roadmap and features – many of which she devised."
(PM Director)

| | |
|---|---|
| | "There were a lot of preconceptions ... She really dug into the details to understand what was really required. And then she did a great job getting that developed and into the commercialization process ... Really a very very good partner for sales"<br>(Head of Sales)<br><br>"heavily customer driven versus look[ing] at what was technically easiest ... This will lead to reporting being more usable and more effective."<br>(Senior PM) |
| **Jens Skakkebaek**<br>(MANAGER)<br>Group Product Manager | Rebecca is great at getting deep in her subject matter, setting a good vision for where it should go, and communicating this. An example of this was in the Frontline Brainstorm in October, where Rebecca did a great job. |
| **Aaron Rothman**<br>(PEER)<br>Sr Product Manager | Effectively prioritizes tasks/features. I think Rebecca has done a good job at understanding what key workflows need from a benchmarking solution and making sure those features are appropriately bundled/prioritized. |
| **Dustin Jackson**<br>(PEER)<br>Director, Software Engineering | Rebecca's assessment is consistent with my observations thus far. She is very focused on building the products that matter for our users and using her own knowledge and investigations to decide on exactly what that is (rather than relying solely on the opinions of others). |
| **Gautam Sawhney**<br>(PEER)<br>Sales Operations Manager | Setting Vision – Rebecca has amazing ability to visualize the success of a product from an end user's perspective and works backwards to outline the path and vision towards making that a reality. She brings forward creative and bold ideas to help solve problems and up-level solutions that have been tried and tested in the past. For example, during a recent discussion around benchmarking tools defragmentation, Rebecca brought forth great insights and a clear vision for how Interactive Benchmarks could succeed at consuming / deprecating the many other tools currently out there. She was also quick to realize the risks of recommending deprecation of certain large and very popular tools and put forth a plan that balanced these risks, while still helping achieve an ideal longer term vision in this area. |
| **Michael English**<br>(PEER)<br>Staff Software Engineer | I agree with the Rebecca's self-assessment about vision and insight (see section on IB), she has strong insight and sets good product direction. However, I would like to call out a different strength which I have found to be surprisingly rare at Google.<br><br>Rebecca has shown that she can follow complex and detailed discussions of data / backend issues and formulate a good resolution to product questions which is coherent within the larger context of the product vision. Recently we had such a discussion about how to capture geo dimensions. The product decision she arrived at allowed us to narrow down our handling of geo from a potentially huge cross-product of 4 different features to only 4 total options. The larger context that she couched her decision in was that users want to see both "what advertisers were trying to do" and "what happened in specific locations". The combination of being able to work through the low level details with the engineers and contextualize those discussions within the larger product vision is very valuable to my teams success. |
| **Paul McClinton**<br>(PEER)<br>Principal Account Manager | One thing that has plagued the sales/services org at Google is the need for accurate and insightful projections and benchmarks. While a few product folks would say "eh, it's good enough", Rebecca came into her role and said "how do we make the best possible tool for our sales teams that exceeds all expectations?". She met with me on a weekly basis to discuss my pain points and to better understand how I use our internal tools to build proposals or provide insights to my clients. I learned quickly how smart and forward thinking she was. Within each of those meetings, Rebecca would hear my concerns and then make suggestions that were 10x what I could ever think of. It has been a real pleasure collaborating with her.<br><br>Large companies need people like Rebecca who continually push for "better than good". She doesn't want to meet expectations, she wants to blow your mind. And quite frankly, the work she's done is doing just that. The sales org is lucky to have her. |

**What's one thing Rebecca Spivak could do to have more impact?**

| Reviewer/Role | Feedback |
|---|---|
| **Rebecca Spivak**<br>(SELF)<br>Product Manager III | The PM Ladder lists "Good Relationships and Comfortable working with VPs" as part of the requirements for the next level.<br><br>With the growing scope of Interactive Benchmarks and with a goal of achieving the next PM level, I plan to develop stronger relationships with Senior Leadership by finding opportunities for more direct interaction, including quarterly check-ins with relevant VPs. |
| **Jens Skakkebaek**<br>(MANAGER)<br>Group Product Manager | Communication:<br>To be an effective product leader and influence others, negotiate well, and be the product leader Rebecca needs to be sensitive to the audience and tailor the message accordingly. This is equally true within the core team (peer feedback below) as well as with other teams in the PA, to negotiate and get buy-in for her ideas.<br><br>Rebecca tends to strongly push the merit of her own ideas and use (what is perceived as) hyperboles by peers. An example I received was in Neal's media review, her deck used strong language that was pretty declarative ("Estimates are not what sales needs" etc) and her tone in the presentation was to show that everything was going great. By making sure that she's being more transparent about what's going well and what's not, she can build more trust and credibility. Admitting issues/challenges is not a sign of weakness, but rather a sign of good judgment and honesty - and strength.<br><br>All of this is important to bring bring people along on the journey with her (rather than assume that they are not interested and have other motives).<br><br>* Ability to receive feedback without being defensive: personal growth comes from being able to take feedback and get stronger. Use this also as a powerful tool to help understand how you are perceived by others and think about what you can change in the personal interactions to avoid these perceptions. |
| **Aaron Rothman**<br>(PEER)<br>Sr Product Manager | Presentation and packaging of ideas. I believe Rebecca has good ideas but often positions these ideas as 'I'm right and everyone else is wrong', when the situation is often more complex and the data doesn't necessarily align with her views. This makes it difficult to get support/consensus from peers and leadership. For example, she positioned her work (draft of her Media Reviews presentation) on Interactive Benchmarks (IB) as the answer to how estimations are a failed product. She also used selective customer feedback to drive this point. The reality is that IB seems ideal for some use cases but estimates is better for others. Both peers and senior team members had a negative reaction to this positioning, which required some serious edits before the actual Media Reviews event.<br><br>Strategy. Recently, Rebecca has stepped-up this effort, but I think she needs to flesh this out more, specifically in the areas of consolidation and integration.<br><br>Receiving feedback: I've attempted to provide feedback, especially on presentation and packaging of ideas, and I found Rebecca to be very defensive and not open to receiving it. |
| **Dustin Jackson**<br>(PEER)<br>Director, Software Engineering | Rebecca is in a tricky position on a project outside of MTV with a lot of internal stakeholders (sales, in particular). Political savvy is going to be a real asset.<br><br>Rebecca should try to operate with a long-term plan and modulate her message to the appropriate audience. With IB, for example, while there may be wide-ranging applications down the road it's going to be more effective to message one particular use case you're going after for now. That's sufficient to get the necessary funding in the near-term. And you'll find the audience much more receptive to widening the scope once the team has proven to be a capable owner within the domain. |
| **Gautam Sawhney**<br>(PEER)<br>Sales Operations Manager | Rebecca has really great ideas and often delivers them to the team with conviction and passion. On certain occasions, I have noticed that her passion and opinions can overwhelm the group during discussions. Rebecca would greatly benefit from more actively recognizing the mood in the room and tailoring her delivery accordingly to help make more of an impact from her messages. Her creative ideas would be extremely well received via a combination of presentation, influencing, and persuasion abilities / styles. |
| | Rebecca has shared ideas about a larger vision for Interactive Benchmarks which includes sell side and business |

| | |
|---|---|
| **Michael English** (PEER) Staff Software Engineer | analyst users. In our discussions about this she has been cautious about sharing these ideas more widely. I think our team can have even more impact if she pursues these ideas more fully. |

**Overall how has Rebecca Spivak performed in their role (Product Manager III) since their last review?**

| Reviewer/Role | Feedback |
|---|---|
| **Jens Skakkebaek** (MANAGER) Group Product Manager | Things are on the up and going well on the project. Over the past 6 months, Rebecca has gotten Interactive Benchmarks really going in development and set a great vision for the use of Benchmarks within Sales, and Sales Ops is excited about the prospects of getting these capabilities in the hands of AMs. A sign of this is that Interactive Benchmarks is a candidate as an anchor tool in the future sales tools landscape. She has a close working relationship with Sales Ops, has established herself as a credible partner and thought leader with them, and is getting good input from them.<br><br>Rebecca has earned the trust of engineering, which is great. Eng likes her insights, vision, and ability to work at a detailed technical level as well (e.g., pulling together a future-system architecture drawing). The team is executing well now - is working closely with engineering to push things forward and has good deliverables. We look forward to seeing IB launch in Q1!<br><br>To be effective in collaboration within the cross-functional team and with other teams, Rebecca still needs to work on her soft-skills (in particular around communication) and her ability to receive and synthesize constructive feedback. |

**[OPTIONAL] Private feedback to manager**

| Reviewer/Role | Feedback |
|---|---|
| **Aaron Rothman** (PEER) Sr Product Manager | Rebecca continues to dwell in the past about how she has always been right and everyone else is wrong (this has been 90% of our 1:1s). She often positions herself as the victim. She makes claims (e.g. "people only want IB and not AMP") even though there is clear evidence against this. Additionally, she is unreceptive to constructive feedback, making excuses that leave her blameless.<br><br>Doug, Barbara and Judy have all tried to give Rebecca constructive feedback on her presentation style / communication, and she has been incredibly defensive. Both Judy and Barbara felt so uncomfortable after giving Rebecca feedback, that they told me they'd like me to work on this with her. |

**Should Rebecca Spivak be promoted at this time?**

| Reviewer/Role | Promote? | Feedback |
|---|---|---|
| **Gautam Sawhney** (PEER) Sales Operations Manager | No | Having not been through an entire product development cycle / launch with Rebecca, I don't feel that I am in a good position to offer a recommendation here in the context of the Product Manager track. However, I do think there are areas where Rebecca will need to aspire for growth and personal development / improvement in order to be successful at the next level – for example; softer communication, diplomacy, influencing, and negotiation skills. |

EXHIBIT 13

From: Rebecca Spivak <rspivak@gmail.com>
Date: Thu, 29 Jan 2015 20:24:07 -0800
Message-ID: <CAGPcRB94ocpLio5GwV1StkhmGDYEM3vmR+Baso=jS8H_jTo_zQ@mail.gmail.com>
Subject: Re: Ah, Google
To: Plusmail <+@essentially.net>

I told my boss off today. And not in a glory-filled comedy way, but at the same time, probably in the "stuff people dream of saying" way. I wasn't planning on it, and don't mean to be melodramatic, but losing the baby and all has also made me go more into "not gonna deal with shit" mode. I mean, really, really told him off. As in, some direct quotes

'Oh, just shut up and stop making an idiot of yourself."
"You are a horrible manager and incompetent as a PM"
"I'm glad I haven't submitted googlegeist yet, because I'm going to skewer you"
"I have nothing else to say to you - you're not worth my time - just go to your next meeting"

His response was "Well I really respect you and want you to be happy, if you want to reorg, let's discuss that. Would you rather report to X or Y (1 level up). We can make that happen if it's what you want. Tell me what you want."

I really said enough to warrant getting fired for insubordination or something. Every third word was "fuck" And getting fired might still happen I suppose.

And yes, it felt good to do the epic telling off of my manager, even though I should be too old to care about that shit.
I still give a ~20% chance of getting fired over this.

EXHIBIT 14

From: Rebecca Spivak <rspivak@gmail.com>
Date: Thu, 29 Jan 2015 21:11:53 -0800
Message-ID:
<CAGPcRB_ckoFowWNn5nb7sSyZMg4C9WPoWMdo_k1dVPa6H1Vxwg@mail.gmail.com>
Subject: Re: Ah, Google
To: Plusmail <+@essentially.net>

So .... if you consider why I'm "afraid" to leave Google ...

I make north of $300k. I probably work a 30 hour week at most, because the bulk of my work is in communicating strategic direction that I know is right. In april I will hit my 5-year tenure and then have 5 weeks vacation in addition to company holidays.

My organization sucks. The politics suck. My biggest battle involves things like "No fucktards - I'm not going to position things about how we can reduce the sales staff by 10% even though that's easy to measure

EXHIBIT 15

---------- Forwarded message ----------
From: **Craig Hazenfield** <hazenfield@google.com>
Date: 2015-02-03 8:13 GMT-08:00
Subject: Re: Prescriptive Gender Discrimination at Google
To: Rebecca Spivak <rivka@google.com>
Cc: Lauren Thomas Ewing <laurenth@google.com>, "Nina R. Sakellariou" <ninarc@google.com>, Becky Bucich <beckybucich@google.com>, Rebecca Spivak <rspivak@gmail.com>

Rebecca -

Thank you for sending this and sharing your concerns. Let us discuss, and we'll get back to you as soon as possible.

Craig

Craig Hazenfield I People Operations I hazenfield@google.com I 617-777-2200

On Mon, Feb 2, 2015 at 11:26 PM, Rebecca Spivak <rivka@google.com> wrote:

> This is a follow up email to a meeting I had with Lauren and Nina in HR. For context, I am a PM at google (BS/MS Yale, MBA Harvard, senior leadership positions at prior companies) with 5-year history at Google, where I have been praised for strategy and impact, but marginalized for being "too assertive."

I recently launched a sales platform that is proving to be a powerhouse against facebook, with measurable revenue impact ... but it doesn't seem to matter ... as I am still being dinged for being too disruptive/assertive. And had my performance nitpicked ... despite very real impact on Google revenue, my performance is "low meets" because I didn't send out 3 notices for my absence related my daughter's recent surgery (now ... I did send out broad advance notice, calendar tracking, and also offered a surgeon's note ... it just wasn't "enough"). It doesn't matter that that the functionality has gone viral across sales ... that Unilever is increasing display spend by 10% because of my launch. Because ... I was disruptive ... and I sent 2, rather than 3, notices that I would be out for a week my daughter's surgery.

**The Elephant in the Room**

This is my Google Performance History:

"Smart, Customer-Focused, Strategic, and Impactful but too pushy/emotional/ assertive"

Otherwise known as this

As much as I knew the prescriptive gender bias to be at play, I have avoided calling it out directly because it felt like career suicide. And because I believed so much that I was doing what was best for Google and that merit would overcome all obstacles. But recent events post-launch makes it clear that that isn't true. So I'm not sure what I'm afraid of losing by speaking up.

My perf history is practically a cliche. This is what happens to smart women in tech. If they are assertive (rather than coy) they get pushed down or pushed out. Yes, there are successful women at google ... and many were rewarded for being submissive or coy. A female coworker on the team advised me that my best chances "as a woman" were to not voice any opinions for a full quarter on a new team. A male coworker on the team told me that he's sure the negative reaction to my strategic shift had to do with me being a woman, "but life isn't fair and you can either work with the system or fight it and lose." I have to believe that isn't the HR stance. Is it? Should women accommodate the bias ... compromise with it ... find a middle ground? Or would HR rather assert that it isn't even at play here - even though my perf history reads straight out of the various case studies making the rounds in the media. "It looks like a duck and sounds like a duck, but in this case ... and we know this sounds sexist, but ... she really is too assertive despite being impactful .... no, really ... "

I know that HR is about protecting the organization and management - as it should, in most cases. So I know that HR's first reaction is likely to be to discredit this assertion rather than consider it. "How can we disarm this claim with a paper trail ... " I wish that this was not the inevitable path ... that Google would decide that maybe honestly exploring this hard issue ... and even validating it and adjusting for it ... maybe that *is* in the best interests of Google. Because retaining talented and effective women like me is important. The truth is, I frequently forget that I'm a woman when I'm in a room with men. I always have. So I don't accommodate it or adjust my tone for it ... And I don't want to. And I don't want to teach my daughter to do that. I will always believe that "talk like a girl" means to be smart ... and to speak confidently and assertively. So while I do often embrace pragmatism, in this situation, it's more than I can manage. There are many talented women who have the same struggle ... who don't know how to be pragmatically coy. Google (and the tech industry) has lost so many of them.

So here we are. I am the record here. I am raising this as an issue and asking HR to address it.

**Pregnancy, etc**

So this came up in the most recent meeting with HR. It's raw for me, having had a recent loss. I never wanted to bring up the recent pregnancy stuff because I expected that wouldn't help either. When I was first pregnant in 2012, my prior manager assured me I wouldn't be coming back once I looked into my baby's eyes (seriously, that was an active debate). And when I did return, he eventually supported my transition to the current team, saying "Sales tools is a great team for you ... no one cares about it much." I said "Why is that something I want? ... to work on something no one cares about?" He said "Because then you can focus on your kid and your work will be under anyone's radar." I didn't want to be under the radar. I want to have huge impact for Google! But I certainly got the message that moms shouldn't be on important things. Insanity, honestly. I love my daughter more than anything, and I know that dads at google love their kids too,

and being a parent inspired me to not waste my time. Few people want to work on something unimportant. It is because I love my daughter that I need to make sure that the hours I spend away from her are impactful and important. She makes me more motivated to make a difference at work. Otherwise, what a waste it would be to be missing so much of her childhood.

And ... my family isn't complete. There's an unfilled spot for another child ...[redacted]needs a partner in crime. I don't think my attempts to help my daughter become a big sister have had any impact on my work, but I can't say that the reverse isn't true. I have been working with a fertility clinic since April, as I was hoping to be on this team for a year before taking a maternity leave (and April was the earliest timing for that). My manager was aware of my attempts and prior loss (as I had told him), although he did not know of my latest attempt or that it had worked. This was the primary reason I previously requested time off, and why I didn't leave Google despite the strong "encouragement" to do so. In addition to truly believing in the work I was doing and that it would make a difference, I needed the employment, health insurance, and maternity leave. I am also a year away from turning [redacted] and concerned about the general employment landscape if I were to switch companies or have an extended gap at my age. It has been my plan to stay at Google long term. That is what I want.

But it can't continue under such unfairness and discrimination. I need HR to help fix the dynamic. So I am asking HR to take this seriously - with the consideration and gravity justified. This is not a situation where "work it out amongst yourselves" is right. Please help.

Please fix this. It's unfair and discriminatory and Google can do better. I need HR to do better - and not just for my sake. For Google. Please try to forget about the legal paper trail. That's not what I'm after. I just want fairness and employment. This is a real issue that affects many companies, including Google. But it does affect Google. And Google can do the right thing.

I've written this email a dozen times in the last year. But this time I'm going to hit "send"

--

Nina R Sakellariou I HRBP - Ads & Commerce I 650-214-2634

--
Thanks so much,

Kitt Shute
Director, Employee Relations and Investigations
Google Inc.
(650) 214-3588
kitt@google.com

Have an ER issue? Contact er-investigations@google.com
Have a reorg issue? Contact reorg@google.com
Need time on Kitt's calendar? Contact merry@google.com

EmployeeRelations

EXHIBIT 16

From: Rebecca Spivak <rspivak@gmail.com>
Date: Mon, 2 Feb 2015 23:59:53 -0800
Message-ID: <CAGPcRB8wRsL3GGmT3R9f14eb0T5SmhNDgmsXQ_7mKn1hDp=7iQ@mail.gmail.com>
Subject: Re: Talk me out of sending this (was re: Ah Google)
To: Plusmail <+@essentially.net>

On Mon, Feb 2, 2015 at 11:58 PM, Max Cho <maxrcho@gmail.com> wrote:

> What do you think is a possible good outcome from a situation like this? I
> ask because I think I'd never ask HR for anything unless my manager was
> violating the law.
>
>

well, first, it makes me unfireable long enough for me interview and get
hired at facebook.

Second ..., wait, what?

EXHIBIT 17

From: **Rebecca Spivak** <rivka@google.com>
Date: Fri, Feb 27, 2015 at 10:18 PM
Subject: Paul
To: Paul Higson <paulhigson@google.com>, Rebecca Spivak <rspivak@gmail.com>

Paul - I want to tell you this directly -

If and when HR comes to me with an offer, I will want to turn it down only to be able to discuss the things you've done.

Last year, when I told you the PIP was unfair and tried to explain why, you shut that down and instead told me that if I stuck around long enough to be fired, you would forcefully take my laptop from my hands regardless of whether I had personal things on it, and I would be escorted out the door in front of everyone.

Yes, you scared me. But I hadn't done anything wrong. And you are horrible. That scare tactic certain terrified me, but it also made me want to tell the world. Because ... how many people did you unleash your scare tactic on who also didn't deserve it, but were too scared .... I want to fight for them as well as for me.

This complete bs you've pulled in the re-org ... you are bad person. How simplistic --- not sure I've ever said that to anyone before. But, seriously. You have no ethics. I don't care if you were "following orders: ... I understand that we each have professional responsibility ... but you take it to the extreme. Your actions are not defensible. You have no morality - you are a puppet of a system that will hurt people without regard for what's right. If my entire career depended on it, I would never, ever do what you've done.

Stop and think if this is who you wanted to be when you were a kid. I think young paul would be ashamed of now-paul.

You are hurting people who don't deserve to be hurt. You are just ... bad. I will spend the rest of my like knowing this.

In many ways, I hope HR gives me a reason to talk about the things you've done. Because it's not fair that it goes unacknowledged.

EXHIBIT 18

Date: 07/20/2015
To: Rebecca Spivak
From: Ariana Tortorici
CC: Lauren Thomas Ewing
File
Re: Written Warning

**Confidential**

Rebecca, we have learned that you engaged in inappropriate behavior in the past several months. Specifically, we have determined that you used profanities, told your manager to shut up, and called him an idiot during a meeting with him. Following that meeting you sent emails that (1) confirmed you engaged in this behavior; and (2) indicated that you knew your behavior violated Google policies. In addition, we also determined that you sent other inappropriate emails to and about co-workers which made them feel uncomfortable.

The following email excerpts reflect this inappropriate behavior during the meeting with your manager:

- January 29, 2015 - The excerpt from this email recaps a recent meeting with your manager and your actions during that meeting. This includes using profanities, telling him that he's an idiot, calling him incompetent, telling him to shut up, and saying that you would skewer him when you submitted your Googlegeist feedback. Additionally, you state in your email that you understood this to be insubordination and that your behavior could warrant you being fired.

> "I told my boss off today. And not in a glory-filled comedy way, but at the same time, probably in the "stuff people dream of saying" way... I mean, really, really told him off. As in, some direct quotes
>
> 'Oh, just shut up and stop making an idiot of yourself."
> "You are a horrible manager and incompetent as a PM"
> "I'm glad I haven't submitted googlegeist yet, because I'm going to skewer you"
> "I have nothing else to say to you - you're not worth my time - just go to your next meeting"
>
> I really said enough to warrant getting fired for insubordination or something. Every third word was "fuck" And getting fired might still happen I suppose.
>
> And yes, it felt good to do the epic telling off of my manager, even though I should be too old to care about that shit.

I still give a ~20% chance of getting fired over this."

- January 30, 2015 - You sent a follow up email stating that you told off your manager during a recent performance conversation.

> "Also - for reference, the reason I told him off is because he sat me down to tell me that my recent absences [redacted] tonsilectomy and my disneyland trip) were a performance problem and he was going to dock me on the next performance review for them."

The behavior you demonstrated during the meeting with your manager is inappropriate and in violation of Google's conduct policies.

You also sent the following inappropriate emails to and about colleagues:

- February 27, 2015 - You sent an email to your HRBP after he communicated that there were no long term remote work arrangements (longer than 6 months) for PMs in the reorg. Your email is inappropriate in tone and includes several personal attacks toward your HRBP. You state, "you are horrible", "you are a bad person", "you have no ethics", "you have no morality", "you are just...bad", "Stop and think if this is who you wanted to be when you were a kid. I think young Paul would be ashamed of now-Paul"

- March 1, 2015 - You sent an email describing a co-worker as "young" and "political" and that she is "good at being cute" to get people to tell her stuff. Specifically you said that she can "flirt out information" that you can't get. The general tone of the email and how you talk about your co-worker throughout is disrespectful and some of the comments are gender based. This is concerning as you are making comments about your co-workers that could have gender connotations. Your co-worker found out about this email and was upset by it.

These emails are inappropriate and in violation of Google's conduct policies.

As you know, pursuant to Google's Code of Conduct, Google is committed to providing a supportive work environment where each Googler is expected to do his or her utmost to create a respectful culture that is free of harassment, intimidation or unlawful discrimination of any kind. In addition, Google's Appropriate Conduct policy prohibits disorderly or disruptive conduct including derogatory name-calling, abusive or profane language, intimidation or coercion of coworkers or any "un-business-like" behavior toward coworkers, TVCs, clients or visitors. We also found you demonstrated poor judgment in relation to our Employee Communication Guidelines. Section 2 - Real-world, real-time communications states, "Always consider the impact of your words on others who work here or don't, particularly when it comes to how your comments might reverberate around the web. While this policy isn't intended to prohibit legitimate discussion or criticism among employees relating to their job or employment at Google, we can discipline employees who engage in taunting, ridicule, harassment, or other conduct on social networks that goes beyond complaints about work. Discriminatory remarks,

obscenities or threats, statements meant to intentionally harm someone's reputation or similar inappropriate or unlawful conduct are never OK."

This Written Warning is to remind you that as a Google employee, you are expected at all times to act in a way that ensures you are doing your part to behave in a professional and respectful manner to your co-workers at all times. A copy of the relevant portions of Google's Code of Conduct, as well as the Appropriate Conduct policy and Employee Communications Guidelines are attached, all of which you have previously received, and to which you have access. Please read these and ensure that you are clear on what is required to comply with them going forward.

In addition, you understand that if you engage in any inappropriate conduct in the future, you could be subject to additional disciplinary action up to and including termination of employment.

Please let me know what questions you may have, and know that your HRBP (Lauren Thomas Ewing) and I are available to meet whenever the need arises.

ACKNOWLEDGMENT:
I acknowledge that I have read the above memo and have received a copy.

________________________________________ ____________
Rebecca Spivak Date

## Appropriate conduct (US)

Google holds employees to the highest standards of ethics and conduct to maintain a healthy, fun and supportive environment. We expect everyone to treat fellow Googlers, TVCs, clients and visitors with the utmost respect and dignity.

Google encourages employees to voice questions, complaints and suggestions about their job, work group or general work conditions. Please reach out to your Human Resources Business Partner (HRBP) if you have something to share.

Certain prohibited behaviors could result in immediate dismissal without warning, including:

Theft, stealing or removing without express permission any property you do not own.
Dishonesty or falsification of any records, forms or reports.
Accessing user, employee or customer data in violation of privacy, security or other policies.
Insubordination, including refusal of a work assignment or improper language toward a manager or management representative.
Disorderly or disruptive conduct, including derogatory name-calling, abusive or profane language, intimidation or coercion of co-workers or any "un-businesslike" behavior toward co-workers, TVCs, clients or visitors.
Repeated unwanted solicitations to other Googlers, TVCs or clients at any time.
Excessive absenteeism, including being absent for three or more days in a row without notice.
Creating a significant safety or health hazard, intentionally or unintentionally.
Unethical behavior or any other conduct that compromises or undermines the reputation of Google.
Engaging in or threatening to engage in violent behavior.
Possession of weapons and/or any type of firearms on Google premises.
Misusing or destroying company property.
Conducting non-business activity during time for which you are being paid, including excessive or unreasonable use of corporate services for personal purposes or to conduct outside activities.
Possession, sale and/or use of controlled substances.
Conviction of a felony that might impact the business and/or company, such as fraud or theft.
Violation of any other company policies, including the harassment and discrimination policy.

Google wants all of its employees to succeed. If an employee's performance lags or there are other workplace issues, Google reserves right to impose discipline as it sees fit. Discipline may include verbal or written warnings, suspensions with or without pay or other forms up discipline, up to termination.

# Code of Conduct

## II. Respect Each Other

We are committed to a supportive work environment, where employees have the opportunity to reach their fullest potential. Each Googler is expected to do his or her utmost to create a respectful workplace culture that is free of harassment, intimidation, bias and unlawful discrimination of any kind.

Please read the Employee Handbook relevant to your locale. Located in the HR section of our internal corporate site, the Handbook covers in greater detail how we should conduct ourselves at work.

Positive Environment
Google prohibits unlawful harassment in any form – verbal, physical or visual. If you believe you've been harassed by anyone at Google, or by a Google partner or vendor, you should immediately report the incident to your supervisor, Human Resources or both. Similarly, supervisors and managers who learn of any such incident should immediately report it to Human Resources. HR will promptly and thoroughly investigate any complaints and take appropriate action.

# Employee Communications Guidelines

## Introduction

As Googlers, we have a unique opportunity to make a big difference in the world. Along with that opportunity comes an important requirement: that we always represent our company responsibly. This guide is to help you navigate the best ways to communicate with non-Googlers about your own work, our collective work, and how we operate. Remember that as long as you are employed here, others may assume you represent Google in its entirety. And they may associate you directly with Google when you're not working: when you travel, go to parties, or use your own social media.

Please read through and follow these guidelines. Depending on the circumstances, failing to follow these guidelines may have consequences for your employment with Google, up to and including termination. If you have questions, there are contacts at the end to help you.

### Part 2 – Real-world, real-time communications

The fact is, all public expression requires your good judgment, including when you're posting on social networks, participating at trade shows or conferences, or socializing with partners, reporters, or industry bloggers.

### Rules of thumb

Keep these basic guidelines in mind whether you're posting on your personal social media profile, staffing a Google event or talking to friends and family. Failing to follow these guidelines

could result in Google taking disciplinary action against you, regardless of whether this happens during working hours or whether it happens whilst you are using our equipment or facilities.

**Respect your subjects, whether they are Googlers or not**

Always consider the impact of your words on others who work here or don't, particularly when it comes to how your comments might reverberate around the web. While this policy isn't intended to prohibit legitimate discussion or criticism among employees relating to their job or employment at Google, we can discipline employees who engage in taunting, ridicule, harassment, or other conduct on social networks that goes beyond complaints about work. Discriminatory remarks, obscenities or threats, statements meant to intentionally harm someone's reputation or similar inappropriate or unlawful conduct are never OK. Social media should never be used in a way that breaches any of Google's employment practice policies and guidelines. And as a Googler, you're responsible for complying with this standard.

EXHIBIT 19

**Rebecca Spivak (rivka)** 6/Product Manager III Feedback for 2015 Q1

**Rating**

Consistently Meets Expectations

**Compare Googlers**

All numbers below represent job level

More effective

| | |
|---|---|
| 7/ **Drew Bradstock (dbradstock)** Group Product Manager | 5/ **George Levitte (glevitte)** Product Manager |
| 5/ **Krish Sundaresan (krishs)** Product Manager | 4/ **Tom Bender (tbender)** Product Manager |
| 6/ **Chealsea Conroy (cwierbonski)** Product Manager | |
| 6/ **Rebecca Spivak (rivka)** Product Manager III | |

Less effective

**Nir Margalit (nirm)**
5 /Software Engineer

More effective

- 5/ **Vincent Lacey (vincel)** Product Manager II
- 5/ **Emily Rapp (emilyrapp)** Product Manager II
- 6/ **Rebecca Spivak (rivka)** Product Manager III

Less effective

**Barbara Stanley (bstanley)**
7 /Senior Staff Software Engineer

**Calibration Notes**

Summary

Instrumental in alpha and expected launch of Interactive Benchmarks v1 (+90% CSAT alpha feedback) but struggled with delivering timely documentation (PRDs, roadmap, vision) and issues with communication.

Top accomplishments

Interactive Benchmarks v1
Complete Display and Video (auction) support, AMP integration, 2 years of data, peer sets
Expected 20 FTE savings when 100% adoption (multiple quarters after launch)
Incorporation of alpha feedback into launch
Expected to launch end of March

Interactive benchmarks alpha
100 LCS testers (word of mouth leading to 550 users total)
Gathered feedback and addressed bug and feature prioritization
+90% CSCAT score
2015 IB milestone presentation
Presented to Eng Dir Dustin Jackson, and Jens
Feedback

[ENG DIR] dustin@ "Smart and motivated. Very passionate about her project. But entirely unable to manage the human side of execution. Created conflict with every single person she worked with. Frequently misrepresents (intentionally or unintentionally) the facts. Not someone I could trust to run a project in good conscience."

[ENG 7] bstanley@ "My previous feedback on Rebecca: She has strong biases when presenting info about IB, and those biases change often. LAX Eng picked up on this right away. Her underlying agendas hurt her presentations. On the positive side, I'm impressed with IB – especially the speed and the UI. What would need to change with her performance to make me feel more comfortable:

1) A clear, consistent, sane vision. Every product review we have, she has a different vision for the product:
Provides benchmarks for Display
Wildcat for Display
Provides all Ads benchmarks
Supporting all of Google -- including pub-side, and saving mobile revenue from going to Facebook
Since she doesn't usually send out her slides in advance, we have no idea what her latest story will be. Months ago, Dustin requested that slides be sent out at least 2 days in advance. The meetings are more productive when we all come prepared.

2) More open, transparent communication about the project:
Some time ago, Doug requested bi-weekly updates. Those only lasted for a short time. She seems to like creating mystery about what IB is doing and were it's going.
PRDs: Some PRDs (M3) were late in coming. She either shares way too early (before there is substantial content) or much too late.
3) Less open, transparent communication about her personal issues
4) She is volatile. When someone gives her negative feedback, she gets reeeeally mad and will not show up at work for a week or so. For example:
after a meeting with Aaron where Aaron supposedly did not rank her as high as she thought she deserved,
she got reeeeally mad at me when I told her I didn't want to her any more "woe is me talk"; after not speaking to me for a couple of months (which was FINE with me), she continued complaining about her manager.
5) In the transition meetings, she had a clear & strong underlying agenda that she wanted to continue being the PM for IB. She made people (me for sure!) feel uncomfortable talking about how LAX was taking our "baby" and references to "baby adoption", etc."

[ENG TL 6] menglish@
"- Good job socializing alpha launch, gathering feedback and incorporating results into V1 launch (see: modeling feature)
- Alpha users seem to really like the product. High usage and high repeat usage across limited population of users it was given to. Would have loved to be able see how her 2015 vision is received.
- Reasonable job helping with transition, and good plans for measuring impact post launch.
- HR related issues seemed to always be taking up some of her time."

[GPE L5] sawhey@
Strengths
User-first mindset – she thinks about what users want and does not get bogged down by political battles and the current state (e.g. Defrag agendas) – this is the right mindset PMs should have
Good forward-looking vision and strategic thinking skills (but unable to effectively articulate / generate support)
Opportunities
Building more effective articulation skills and ability to bring people onboard with her ideas / vision
Improve interpersonal skills (reading situations and reacting in ways that help not hurt)
Tactical PM skills (e.g. documentation, day-to-day tracking of things, removing roadblocks etc.)
Attitude (being a team player sometimes requires personal sacrifice)

**What's one thing Rebecca Spivak does really well and should continue doing?**

| Reviewer/Role | Feedback |
| --- | --- |
| | Technical knowledge: Rebecca has demonstrated a good understanding of the infrastructure and the way IB |

| | |
|---|---|
| **Aaron Rothman** (MANAGER) Sr Product Manager | operates to more effectively contribute to product design and decisions. Given that IB works with many different product data sources, this is a critical skill. |

**What's one thing Rebecca Spivak could do to have more impact?**

| Reviewer/Role | Feedback |
|---|---|
| **Aaron Rothman** (MANAGER) Sr Product Manager | Clear/consistent vision: It is understandable that visions evolve over time, but Rebecca has made quite diverse claims about the direction of IB. For example, she claimed it was going to be the pitch tool (like AMP) and then went back to just being the ads benchmarking solution, but for all of Google (now including Pub).<br><br>Communication/Documentation: Rebecca continues to make hand-wavy claims and withholds documentation which should be reviewed prior to development. For example, the M3 PRD was only partially complete well into the development of the release. |

**Overall how has Rebecca Spivak performed in their role (Product Manager III) since their last review?**

| Reviewer/Role | Feedback |
|---|---|
| **Aaron Rothman** (MANAGER) Sr Product Manager | I do think there are areas where Rebecca has excelled, such as better cross-team collaboration (e.g. engaging with the Wildcat team) but elements key to productivity: clear, well-documented, and vetted plans/PRDs/presentations, should be priorities and need more focus. These elements are both important to the team and getting leadership support. I know there was a lot of pressure to get the M3 launch to happen this cycle, but future success depends on Rebecca's focus on key product skills and and stepping-up her productivity. |