The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| RIVKA ("REBECCA") SPIVAK, | ) | No. 2:20-cv-01480-MJP |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | DEFENDANT BAYERN'S RESPONSE |
| ALPHABET, INC., *et al.*, | ) | TO SPIVAK'S "MOTION TO DISMISS |
| | ) | BAYERN AS A DEFENDANT" |
| Defendants. | ) | |
| _____ | ) | |

Rebecca Spivak's present request to dismiss Shawn Bayern ("Defendant") as a defendant is apparently brought under Fed. R. Civ. P. 42(a)(2).  A dismissal under Fed. R. Civ. P. 41(a)(1) is not available because Defendant has already filed an answer (Dkt. #12).  Defendant does not oppose dismissal but requests that it be with prejudice and that he be awarded his costs.

## I.      DISMISSAL WITH PREJUDICE IS WARRANTED

Spivak's request does not specify whether the dismissal she seeks is with or without prejudice.  Dismissal with prejudice is available under Fed. R. Civ. P. 42(a)(2).  Sacchi v. Levy, No. CV 14-08005 MMM (FFMx), 2015 U.S. Dist. LEXIS 188921, at *4 (C.D. Cal. Oct. 30, 2015) ("'When confronted with a motion for voluntary dismissal pursuant to Rule 41(a)(2), the

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A DEFENDANT" - 1

1    [c]ourt must determine: (1) whether to allow dismissal; (2) whether the dismissal should be with

2    or without prejudice; and (3) what terms and conditions, if any, should be imposed.'") (quoting

3    Fraley v. Facebook, Inc., No. 11-CV-01726-LHK, 2012 U.S. Dist. LEXIS 34477, at *6 (N.D.

4    Cal. Mar. 13, 2012)).  For the following reasons, the dismissal should be with prejudice:

5    *First*, and most significantly, Spivak's complaint against Defendant was frivolous on its

6    face.  For the purpose of establishing that no injustice will result from a dismissal with prejudice

7    of Spivak's bizarre claims against Defendant, Appendix A (which follows this response) lays out

8    the argument that the complaint is factually and legally frivolous.

9    *Second*, Spivak has demonstrated a tendency to multiply proceedings in this action (even

10   in a short period of time) and in past legal proceedings.  After filing her complaint, Spivak filed

11   several frivolous challenges to Defendant's answer, making (for example) patently implausible

12   arguments that her complaint's allegations should be "deemed admitted" (Dkt. #21 at 3–4).

13   Defendant was forced to respond fully to those arguments (*e.g.*, Dkt. #23).  Spivak has been

14   sanctioned in legal proceedings previously for raising irresponsible and time-wasting arguments

15   (Dkt. #4 at 8–9).  For reference, though acting *pro se*, Spivak is a member of the State Bar of

16   California (Dkt. #3 at 4).

17   *Third*, Spivak has engaged in an unlawful course of conduct since August 2019 that has

18   disrupted Defendant's life significantly.  After receiving death threats and an onslaught of

19   communications with extraordinarily violent imagery from Spivak (*e.g.*, Dkt. #12, Exhibit A at

20   17–27; Dkt. #12 ¶¶ 379 ("If I had a gun to your head, I would pull the trigger, even if the

21   cameras were rolling, even if your parents were standing there begging me not to."), 380 ("I no

22   longer fantasize about the meatgrinder. Now, in my dreams, you are strapped to a cutting board,

23   and I have my mallet/meat-tenderizer and pound you until you are uniformly 1-inch-thick and

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A
DEFENDANT" - 2

ready for stir fry."); *see generally id.* ¶¶ 371–396), Defendant obtained a restraining order against

her (Dkt. #12, Exhibit A at 42).  Undeterred, Spivak violated that restraining order, leading at

first to misdemeanor charges (Dkt. #22, Exhibit A at 4–5) and then, when she issued threats

against Defendant's university (Dkt. #12, Exhibit B at 3), to felony charges (Dkt. #22, Exhibit A

at 2–3).  She remains a fugitive from those charges. (*See* Dkt. 22 for discussion.)

*Fourth*, Spivak has inexplicably but persistently expressed improper motivations to harm

Defendant.  In February 2020, more than three months after the restraining order was issued, she

wrote to many recipients: "Shawn. I hate you. I wish you were dead. Really. Really and truly.

Suffering and death. That's what I want for you. It won't change. Ever. This will never change.

You say 'I didn't hurt you, I just talked to you.' Well, you fucking threw me in jail for a text

message. I truly hate you. I genuinely would prefer your death to getting tens of millions of

dollars. All I want is to destroy you because money can't fix what you did to me. I hate you. It is

the most intense emotion I have ever felt in my life.  My hatred for you.  In 43+ years of life,[ ] I

haven't felt anything as strongly as that" (Exhibit C at 28) (paragraph spacing omitted).  Filing a

nuisance Section 1985 and RICO complaint against Defendant and challenging his answer on

frivolous grounds was just the latest step in a 15-month course of conduct aimed at unlawfully,

maliciously, and significantly disrupting Defendant's life.  Spivak's baseless and irresponsible

accusations continue even through her present motion requesting that her claims against

Defendant be dropped (Dkt. #24 at 1); there, with no evidence, she unnecessarily asserts that

Defendant "caused much of her trauma," evidently because he encouraged to her seek mental-

health treatment for depression, anxiety, and delusions in July 2019 (*e.g.*, Dkt. #3 at p. 54–55).

Defendant requests a dismissal with prejudice and any other relief within the Court's

power to discourage or prevent Spivak from filing nuisance litigation against him in the future.

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A
DEFENDANT" - 3

## II.    DEFENDANT'S COSTS SHOULD BE AWARDED UPON DISMISSAL

In ordering dismissal, the Court has the discretion to impose appropriate terms and conditions.  *See* Sacchi v. Levi, *supra* p. 1, at *6 (courts "must determine . . . what terms and conditions, if any, should be imposed").

Given the egregiousness of this case, it is appropriate for Spivak to pay for the costs she has imposed on Defendant.  "[T]hough attorneys' fees and costs are typically not awarded when a matter is voluntarily dismissed with prejudice, we conclude that such an award may be granted when exceptional circumstances exist. Exceptional circumstances include a litigant's failure to perform a meaningful pre-suit investigation . . . ."  Carroll v. E One Inc., 893 F.3d 139, 141 (3d Cir. 2018).  The circumstances here are among the most exceptional:  not only was the complaint objectively frivolous and founded on no investigation (see Appendix A), but it was also part of an ongoing pattern of stalking by Spivak entered into while fleeing from an outstanding arrest warrant (Dkt. #3 ¶ 305; Dkt. #16 at 7) arising from her earlier conduct against Defendant.

Moreover, "[u]nder its inherent powers, a district court may also award sanctions in the form of attorneys' fees against a party or counsel who acts in bad faith, vexatiously, wantonly, or for oppressive reasons. Before awarding such sanctions, the court must make an express finding that the sanctioned party's behavior constituted or was tantamount to bad faith. A party demonstrates bad faith by delaying or disrupting the litigation . . . ."  Leon v. IDX Sys. Corp., 464 F.3d 951, 961 (9th Cir. 2006) (quotation marks and internal citations omitted).  Sanctions under the Court's inherent powers are available against *pro se* litigants.  *See* Gurvey v. Legend Films, Inc., No. 3:09-cv-00942 AJB (BGS), 2013 U.S. Dist. LEXIS 100477, at *15 (S.D. Cal. Apr. 8, 2013) (imposing sanctions on *pro se* litigant who filed motions "for an improper purpose, caused unnecessary delay and needlessly increased the costs of this litigation for Defendants").

And "[f]ees to pro se litigants are awardable under the court[']s inherent power. 'Failure to do so would place a pro se litigant at the mercy of an opponent who might engage in otherwise sanctionable conduct.'" Jacobs v. Scribner, No. 1:06-cv-01280-AWI-GSA-PC, 2011 U.S. Dist. LEXIS 4297, at *2-3 (E.D. Cal. Jan. 11, 2011) (quoting Pickholtz v. Rainbow Technologies, Inc., 284 F.3d 1365, 1377 (Fed. Cir. 2002)).  Defendant does not request freestanding sanctions at this stage; his request is simply, as a term of his dismissal as a defendant under Rule 41(a)(2), that he be compensated for the significant costs that Spivak has imposed upon him in forcing him to respond to her frivolous complaint and follow-up motions.

Defendant is the Larry & Joyce Beltz Professor and the Associate Dean for Academic Affairs at the Florida State University College of Law. He was forced to take significant time (in excess of 40 hours) to answer Spivak's complaint and to research and prepare responses to her various frivolous motions. Accordingly, costs of $20,000 are appropriate—a small step up from Spivak's previous sanctions of $12,500, awarded as costs in favor of a corporate party preparing a single responsive motion (Dkt. #4 at 8–9). Spivak is not a typical *pro se* plaintiff. She is not helpless; she has significant financial and other resources at her disposal (*e.g.*, Exhibit B at 16–17); and she has suggested she will continue to use them to harass others, both specifically (*e.g.*, Exhibit B at 18) and through her general course of conduct.  She also knows she is acting wrongfully, as the arbitrator who awarded sanctions against her found (Dkt. #4 at 9).

Respectfully submitted on October 27, 2020,

s/Shawn Jason Bayern   (pro se)

Shawn Jason Bayern
494 Frank Shaw Road
Tallahassee, FL 32312

Telephone:      516-510-3798
Email:            bayern@gmail.com

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A DEFENDANT" - 5

## <u>APPENDIX A:  FRIVOLOUSNESS OF COMPLAINT</u>

This appendix to Defendant's response lays out his argument for the frivolousness of Spivak's claims against him, mainly for the purpose of demonstrating that no injustice will result from a dismissal of those claims with prejudice.  At least as to Defendant, Spivak's *pro se* complaint has no basis in fact or law, and it is exceedingly unlikely that Spivak could have found another member of the bar to file it for her.

## I.      BACKGROUND

Spivak and Defendant are college acquaintances with no close relationship; for example, they have never been romantically involved, and they have seen each other in person perhaps five times, always in group settings, since their graduation from college around 20 years ago.  In early 2019, Spivak began to send unusual emails to Defendant and others suggesting paranoid and delusional tendencies.  (*See, e.g.*, Dkt. #3 ¶ 236 and images reproduced therein.)  In July 2019, Spivak urgently wrote to Defendant complaining of serious depression, suicidal thoughts, persecution, hypertensive crisis, distress over her career problems and related employment arbitration, and other concerns.  (Exhibit A at 2–4, 8–9, 11–13, 30, and *passim*.)  Over the next few weeks, Defendant tried to help her in text-message conversations (he was teaching a course in Oxford, UK, at the time, so he was unavailable by phone except for one or two quick calls), mainly by suggesting she seek medical treatment and by attempting to relieve her anxiety and depression through friendly advice. (Exhibit A.)  On July 26, 2019, Spivak apparently began to believe that Defendant was part of a conspiracy pursuing her and began to threaten him.  (Exhibit A at 21–25.)  From that baseless inference, more than a year's worth of graphic death threats, defamation, and other harassment followed, culminating (so far) in this frivolous lawsuit for

$360 million for an alleged conspiracy to interfere with Spivak's civil rights and alleged

violations of RICO.

Just before she filed this lawsuit, Spivak sent an email to Diana Sherman, one of the

defendants, stating: "I wish I had stainless-steel fingernails, and 60 seconds in a room with your

face." (Exhibit B at 7.)  She also sent an email to multiple recipients, some of whom are

defendants in this action, taunting them with the possibility of this lawsuit and adding, "I love to

imagine Shawn being served while he's teaching a class."  (Exhibit B at 8.)  As the cited sources

show, those are among the mildest of Spivak's harassing emails and expressions of improper

motives over the last year.

## II.    FRIVOLOUS FACTUAL CONTENTIONS IN THE COMPLAINT

Spivak's complaint is a collection of paranoid fantasies and inflammatory allegations

with no plausible or actual factual basis.  The complaint does little more than derive sweeping

and entirely unjustified legal conclusions from ungrounded and unreasonable supposition based

on innocuous facts.

The allegations against Defendant in Spivak's complaint rest almost entirely on a series

of text messages between the parties in July 2019 (*e.g.*, Exhibit A), as well as several emails

between the parties or on an email distribution list (*e.g.*, Exhibit B at 10–11).  That record

provides a sufficient basis to evaluate the objective frivolousness of Spivak's claims.

The complaint makes three broad classes of allegations against Defendant.  First, Spivak

alleges that Defendant, in collaboration with Google, manipulated her into dropping her

arbitration against Google by making her afraid for her life.  (Dkt. #3 ¶¶ 195–225.)  The

complaint bases this collection of allegations on text messages Defendant sent to her in July

2019 while he was trying to encourage her to seek medical help and not to commit suicide.  (*See*

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A
DEFENDANT" - 7

Exhibit A.)  Nothing that Defendant texted her was ever inappropriate or ill-intentioned, much less unlawful.  A few fragments from the complaint itself are sufficient to demonstrate the point.  For example, the complaint alleges Defendant "repeatedly tried to induce Plaintiff to give him power of attorney over her estate by proactively offering to help her with paperwork that would have required it" (Dkt. #3 ¶ 220).  To establish this proposition, Spivak quotes a text message from Defendant in which Defendant offers to help Spivak fill out employment paperwork that Spivak said she was psychologically unable to fill out.  (Indeed, Spivak at one point asked Defendant, explicitly, "can you do my amazon paperwork for me?" (Exhibit A at 12.))  Perhaps it is true that no good deed goes unpunished.

As another example, the complaint alleges Defendant did not genuinely believe Spivak was delusional when he encouraged her to seek psychiatric care, and to justify that proposition it quotes a text message in which Defendant wrote:  "I mean, say hypothetically you are delusional."  (Dkt. #3 ¶ 222.)  This language follows a conversational style that Defendant, who is not a psychologist or psychiatrist, learned from a technical research handbook he read that lays out ways to talk to people with resistant delusions.  *See* Aaron T. Beck et al., *Schizophrenia* 216 (2011) ("Susan, can you imagine for a moment that you are not the Poet Laureate. If this were, by chance, true—how would you feel?").  To be clear, Defendant never attempted to provide medical care or advice himself; his goal was only, under emergency circumstances, to encourage Spivak to seek it.  Defendant's text messages quoted in the complaint are self-evidently innocuous, and it is frivolous to infer from them an illegal conspiracy.

The main theme running through the complaint's examples is that any fears of conspiracies or plots against Spivak, for which she assigns responsibility to Defendant, were initiated only by Spivak herself (*e.g.*, Dkt. #3 ¶¶ 218–19).  In trying to help her, Defendant did

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A DEFENDANT" - 8

his best to avoid directly challenging Spivak's beliefs only because he had seen her react badly to such direct challenges and thought, based on advice from mental-health charities he had researched in an effort to help her, that such direct challenges would not be a productive way to encourage her to seek treatment.[1]  Defendant was simply trying to provide emergency support to Spivak, a person whom in truth he never regarded fondly—but he felt he could not look the other way while she suffered and contemplated suicide.  (Exhibit A at 4, 30.)

The second broad category of allegations against Defendant is that he sought an anti-stalking injunction against Spivak despite not having a genuine fear of her.  All Defendant can say is that Spivak's emails to him and to others (Exhibit B; Dkt. #12, Exhibit A at 14–27; Dkt. #12, Exhibit D) speak for themselves, as they spoke to the judge at the injunction hearing (Dkt. #12, Exhibit C at 8), the police officers who independently decided to file charges (Dkt. #12, Exhibit B at 3–5), and the prosecutors who independently brought those charges. (Exhibit C at 35.)  In fact, Defendant still fears that Spivak is likely to try to engage in physical violence against him, and based on the cited documents those fears are manifestly reasonable.

## III.    FRIVOLOUS APPLICATIONS OF LAW IN THE COMPLAINT

The complaint's third broad category of contentions against Defendant is that he purportedly lied about the degree of their friendship in his petition for an anti-stalking injunction against her.  (Dkt. #3 ¶¶ 239–52.)  Defendant did not lie, but the legal arguments and conclusions that Spivak draws from these factual allegations are frivolous for two separate reasons: (1)

---

[1] *E.g.*, "Paranoia: What Can Friends and Family Do to Help?", Mind (a mental-health charity in England and Wales), https://www.mind.org.uk/information-support/types-of-mental-health-problems/paranoia/for-friends-and-family/ (prominently quoting a patient who said:  "The most helpful thing for me is to be taken seriously. On some level I know my beliefs can't be real, yet to me they are utterly terrifying. Treating the fear as very real, even if you can't go along with my reasons for the fear, is so important.").

Spivak specifically raised these arguments at the injunction hearing (Dkt. #12, Exhibit C at 5–6) and the judge granted the restraining order over Spivak's vigorous objections, so her argument has already been litigated; (2) regardless, the precise degree of acquaintance or friendship between the parties is not material to any legal conclusion.  This part of Spivak's complaint is a frivolous challenge to an injunction that already has been granted (Dkt. #12, Exhibit A at 42 *et seq.*) and indeed violated, leading to felony charges against Spivak in Florida. (Exhibit C; Dkt. #12, Exhibit B.)  The proper legal approach if Spivak disagreed with the factual contentions in Defendant's petition for the injunction was to appeal the award of the injunction and, now, is to defend herself against the criminal charges rather than fleeing from them; instead, the complaint attempts to sidestep those forums (and the restraining order, which is still in effect) by making outrageous allegations of "perjury" against Defendant.  (Dkt. #3 ¶¶ 304, 346.)

For clarity, the statements by Defendant that Spivak challenges (*e.g.*, Dkt. #3 ¶ 251) as part of the foundation for her alleged conspiracy are specifically (1) "The respondent and the petitioner are college acquaintances with no other relationship." (Dkt. #12, Exhibit B at 8); and (2) "Rebecca and I were not close friends, but I was concerned about her mental state and wanted at least to make sure she was not suicidal."  These statements were entirely true, but regardless, they were simply part of Defendant's contextual framing of Spivak's stalking and death threats in the restraining-order case.[2]  They were never material to his petition for an anti-stalking injunction:  The distinction between "friend" and "acquaintance" is not an element or a relevant fact under any part of Fla. Stat. § 784.0485 (under which the injunction was granted).  Nor it is

---

[2] In Leon County, Florida, anti-stalking injunctions are requested on a "Family Law Form" (Dkt. #12, Exhibit A at 4), and the intended and reasonable meaning of Defendant's factual statements was that the case was not a family-law case or a domestic stalking-injunction case.

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A DEFENDANT" - 10

material to Spivak's legal conclusions now.  As an argument that it justifies civil-conspiracy or RICO liability (see Dkt. #3 ¶ 346), it is clearly frivolous.

Most or all claims in the complaint against Defendant rest on two alleged harms:  (1) based on the text messages she quotes in the complaint, Spivak alleges that Defendant prevented her from prevailing in an employment claim against Google (Dkt. #3 ¶ 209–28); and (2) Spivak alleges a speculative fear that she will be "disqualified as a future witness in a federal prosecution of obstruction of justice" because others have declared her mentally ill. (*E.g.*, Dkt. #3 ¶¶ 316, 347.)  The foregoing discussion sufficiently shows the frivolousness of the first of these alleged legal harms as a factual matter.  As a legal matter, Defendant had no duty to Spivak and caused her no legally cognizable harm.  Even if—counterfactually—Defendant had been unreasonable in encouraging Spivak to prioritize medical treatment (because of her self-professed extreme distress, "mini strokes," and risk of suicide (Exhibit A at 2–4, 9, 30)) over her employment claim against Google, such inappropriateness would not be a legal wrong.  (In any event, Spivak's own doctor at the time was, according to Spivak, "not a fan of me continuing in" the Google arbitration. (Exhibit A at 9.))

As to the second of these allegations—witness tampering—Spivak (1) provides no indication of any current, pending, or future "federal prosecution of obstruction of justice" (Dkt. #3 ¶ 316), despite the fact that she has been reporting Defendant and others to state and federal authorities for most of 2020 (Exhibit B at 10–15); (2) incorrectly supposes that the stigma of

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A DEFENDANT" - 11

mental illness would cause her to be "disqualified" as a witness, a legally frivolous claim;[3] and (3) fabricates from this frivolous legal proposition a conspiracy by others to impugn her sanity.

## IV.   CONCLUSION

Spivak's complaint, with its inflammatory contentions and groundless speculations, is entirely frivolous, given (1) that Spivak has no reasonable basis for believing most of her allegations against Defendant are grounded in fact, (2) that her legal claims make no sense, and (3) that the main function of this lawsuit appears to be to harass the defendants.

s/Shawn Jason Bayern   (pro se)

Shawn Jason Bayern
494 Frank Shaw Road
Tallahassee, FL 32312

Telephone:      516-510-3798
Email:            bayern@gmail.com

---

[3] Fed. R. Evid. 601 ("Every person is competent to be a witness unless these rules provide otherwise.") & note ("A witness wholly without capacity is difficult to imagine."); *see, e.g.*, United States v. Lightly, 677 F.2d 1027, 1028 & n.1. (4th Cir. 1982) (holding it was error to disqualify a witness who believed "that 'Star Child' told him to kill"). This approach long predates the Federal Rules; for historical background, see District of Columbia v. Armes, 107 U.S. 519, 521–22 (1882) ("The general rule, therefore, is, that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath."); Carter v. United States, 332 F.2d 728, 729 (8th Cir. 1964) ("The opinion in [Armes] is *so definitive and comprehensive that no problem has existed in relation to it* . . . and there has not been need since for the Supreme Court to speak upon the question.") (emphasis added); Shibley v. United States, 237 F.2d 327, 334 (9th Cir. 1956) ("Of course, the rule of law is quite contrary" to the proposition that one who is "adjudicated insane" cannot testify).

DEFENDANT BAYERN'S RESPONSE TO SPIVAK'S "MOTION TO DISMISS BAYERN AS A DEFENDANT" - 12