UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

Rivka Spivak,

Plaintiff,

v.

Alphabet Inc., et al.,

Defendants.

Case No. 2:20-cv-01480-MJP

EXHIBIT 6

October 2018 eDiscovery Letter from Rivka Spivak

Filed in Support of Plaintiff's Motion to Vacate

Judgment Under Rule 60(d)(3)

Rebecca Spivak

rebeccaspivak@outlook.com

617.519.1100

VIA ELECTRONIC DELIVERY

Hon. Robert Baines (Ret.)

October 11, 2018

Re: e-Discovery Brief - JAMS Ref. No. 1110018238

Dear Judge Baines,

To frame my position on the open discovery issues, feel compelled to provide context on why I am here in the first place. This case has always been about the truth and reclaiming a life, a purpose, and a professional identity that Google took from me. This has never been, and never will be, about maximizing a monetary award. This is why having discovery that matches the truth of my case is so important to me and why everything breaks without this. I would rather lose on the truth than win on a fiction because the case is about the truth. I beg to share some background on why this is so important to me and the path that led me here.

I was born in 1976 and grew up in a working-class family of Hassidic Jews. Our community was homogeneous, insular and strictly gender-segregated in all areas of life. In the required daily morning prayers the boys said "Blessed is God for not making me a woman" while the girls were required to say "Blessed is God for making me according to his will." Secular education was minimal, and poverty was common. Arranged marriages happened by age 18 or so, and attending college was unthinkable.

Always curious, I was seven when I found my mom's old Encyclopedia set gathering dust on a shelf in the basement and began to read it. I discovered that the world was bigger and more interesting than I was meant to know. As I got older, I bought used textbooks at yard sales on the outskirts of our community. I was a tinkerer … taking things apart and putting them back together in different ways. I'd raid my brother's toybox to play with the construction toys that I'd never have a chance of owning. I wanted to build and invent and do something big with my life -- although I wouldn't have known how to put that in words at the time.

When I was 17, as preparations were made for me to start meeting with matchmakers, I was gripped by a sense of urgency. I could not stay in this world where I was so marginalized and miserable. I had to make it to college, so I left. I left everything behind and lost everything and

everyone I knew. I relied on the kindness of distant relatives and the shelters of public train stations and set out to figure out my future.

I sent a first round of college applications out and was rejected everywhere. I spent the next year trying to find my footing in a world that still felt foreign. I landed as a volunteer for multiple political campaigns in the 1994 election. It was a way to spend my days indoors with safe people, and I was learning and growing.

I self-studied for, and passed, multiple Advanced Placement exams. I had additional cognitive testing to build the case that I deserved a chance even without a high school record to show for it. Although I had no high school degree, I sent my testing, along with a more introspective essay, as part of my application to Yale. This time I was accepted and I could see the path forward to the future I imagined for myself. I worked two campus jobs – in the dining halls and in the computer lab. My summers were spent interning at Microsoft. I won a grant to study international cryptography laws across Europe. I was active in a political debating club. I made wonderful friends. Because my coursework came easy to me, I was able to complete the requirements for both the Bachelor's and Master's degrees in Computer Science. I was president of the engineering Honor Society and graduated first in the computer science department. I was ambitious and had every reason to feel hopeful about my future, and excited for all the big things I was going to get to do.

After Yale, I joined Microsoft and helped found Expedia.com. I invented the systems used to sell hotel rooms online. I pioneered a dynamic pricing system that set the standards across the industry. I also redesigned the entire geographic search infrastructure. My products were groundbreaking and successful, and I had great working relationships with my coworkers. Despite my lack of tenure relative to others on the team, I was rapidly promoted to manager and then to a director-level role – where I earned multiple management awards. At age 27 my compensation was $1.5 million.

I was headed towards the executive level on a fast track and believed that it would serve me well to round out my technical skills with a formal business education. With strong recommendations from Microsoft and Expedia executives, I was accepted to Harvard Business School. After Harvard I worked for a startup and then as Vice President of Product Management for an economics information company – successfully rebuilding their entire product line and business model to serve global institutions during the 2008 financial crisis.

In 2010 Google offered me an L7 role – which I accepted, even though it was a step down. Google was a great company and I was proud to join. However, when I arrived, I was given no team and no resources to work with. There was no plan for me. On top of that, my manager was on the other coast. It was a bad organizational setup and I repeatedly asked for some resources so I could get things done. I tried to help influence other teams, but they already had priorities and there seemed to be no sense of urgency to connect me with a project or team. Giving me a title without any team set me up for failure. This problem was broadly recognized

by peers who voiced concerns that I was being slotted without being given a chance to show my work. I was unhappy with the situation and began to feel despondent.

I transferred to Google Ad Exchange and things were better. I joined as one of the few Product Managers on the team under Scott Spencer. Drew Bradstock, an L6 PM, was my teammate. I was able to get a lot done and help the business grow by billions of dollars by helping the engineering teams work on the things that actually mattered. My work was exceptional, but Scott always chose Drew to present my work, both internally and externally. I was never included in or invited to these events. Drew regularly asked me to share my work with him so he could showcase it (as his own) at his next presentation.

Still, since my work was good (even if I wasn't allowed to present it), I was offered the opportunity to lead the integration of AdMeld - a company we had just acquired. I was excited, since I had done exceptionally well with other company acquisitions earlier in my career and knew this could help prove my leadership in a visible role – and get me back to where I belonged and where I could do my best work.

I was also newly pregnant, but there were still 7 months until the baby was due. Scott had two small children of his own, and I didn't think twice about telling him. I was surprised (and gutted) when he laughed and told me that once I looked into the baby's eyes, I'd never come back to work. I protested. Scott had no idea the efforts I had taken in my life to build up a professional career and identity. He also seemed to not even consider that I might be the primary – and only – breadwinner at home. Of course I was coming back! Yet, from that point on, I found myself with nothing to do, as I found other people suddenly leading meetings that I had prepared to lead. I was again disempowered, with no way to show what I was capable of. I was insecure and anxious and stressed about receiving a paycheck and not having a chance to earn it. I complained about this to Drew Bradstock over chat, and Drew told me that Scott was fine with me having nothing to do, and that I should focus on decorating the baby's room. I told Drew I would rather own a project and get stuff done.

I came back from maternity leave, as scheduled, but Scott had not prepared for my return. Nothing was carved out for me to own or lead. I had to fight to invent projects. But there was enough need and I had earned enough trust from the engineers that I was able to launch extremely successful products for AdX. These launches solved the biggest pain points for AdX and took on the biggest opportunities to grow the business. Their successes were wildly praised in my reviews and over email. Advertising money came rushing in. Despite these projects being unambiguously my own work – as acknowledged by Scott and many others - Drew put them on his performance review and was promoted for them. I received no stock grants the entire time I worked for Scott – despite there being a target stock grant for each employee. Managers may, at their discretion, reallocate stock grants based on their perception of an employee's "Long term potential" (as compared to perceptions of current performance). I received the baseline target bonuses, but the compensation for "long term potential" was reallocated to the men on the team. Those grants would have been worth millions of dollars today.

Sometimes even the smaller things were incredibly demoralizing in the moment. At the holidays, Scott handed a bottle of whiskey to each of the men, but handed a picture frame to me. We were all parents. It was another depressing reminder that Scott saw me primarily though the mommy lens – and different from the rest of the team.

I was proud of the products I launched for Adx and wanted to keep working on them, but the experience of being mommy-tracked, undervalued, and underestimated left a bitter taste in my mouth. Nearly every L6 man (engineer or PM) who I worked with in NY was promoted and went on to earn close to/more than $1 million per year at Google as well as company and industry recognition for work that I had done.

I prepared a roadmap and vision for the AdX engineering teams to move forward with even as I planned to move on. My vision and documents drove the direction of the team long after I left. Drew continued to get credit and be promoted for my work until he finally left Google to join another company in an executive role. (While Google may claim Drew was a superstar, he has been the single person at the center of a major advertiser fraud scandal at his new company. The scandal at his new company is the kind of scandal I repeatedly prevented at Google.)

From AdX, I transferred to Seattle with the hopes of having similar impact on another Ads team. I sold everything in New York and gave up my apartment. After arriving in Seattle in January 2014 with my 17-month-old daughter, I went straight to work on meeting with Sales and Engineering, understanding customer needs, thinking of strategies to address them, and documenting my findings. I produced many documents well before April 2014. The tone of my documents was respectful, professional, and deferential. The response from Doug Bengtson was hostile and unwarranted. I didn't even work with Doug. I worked with Michael English – an L6 engineering manager – and he and I were getting along well and making a lot of progress on a big idea that I had pitched. But Doug demanded I speak less and defer more. I asked Jens for help to meet to go over a document I had prepared with my concerns. There was no response. I went to HR for help to complain about the hostile dynamic.

A few days after I went to HR, Jens told me to take a 2-week leave so he could work on my PIP which would be waiting for me when I got back. I had been in Seattle for just 3 months, and I was in temporary housing with my toddler. This hit me like a brick. There was no warning. I was suddenly facing the possibility of being unemployed and having to live out of a motel. Nothing made sense and it was clear to me that this was retaliatory.

I filed a complaint with the Ethics Hotline. I was contacted by Cindy Treloar, who claimed to be from Employee Relations, and "neutral." My meetings with Cindy felt like interrogations, and I raised this concern with her at the time. She continued to insist that she was neutral. Cindy's Resume tells a different story [Exhibits 1a and 1b]. She runs the program and trainings on how to manage poor performers out, and brags on her resume about increasing "Non-Regretted attrition" 1% year over year.

The next year was a spiral that would fill another 20 pages if I recounted them here. Google's version of these events is based on blatantly false and fabricated claims and evidence. I got along well with sales and engineering and they ranked me high. They gave me peer bonuses (which Google has removed from my personnel record). Their stack-rankings are absent from my performance reviews. I launched a product that grew Google's advertising business by billions of dollars. The outcome should have been much different. But HR and my management chain were biased, brutal and endlessly retaliatory when faced with a potential gender bias complaint. Despite this, I stuck with the team because I loved what I was doing, enjoyed my coworkers, and was holding on for the validation and recognition of my accomplishments. Michael kept promising me this would come eventually. That what we were doing was so big, that it was bigger than any of that nonsense. But that's not what happened. Google finally pushed me out by relocating my project and then closing out all other Seattle opportunities.

It was over. Everything that started with my opening an encyclopedia at age 7 and deciding to find a way to pursue what I loved doing and leave my mark in the world is over.

I have been unable to explain away my stagnant trajectory at Google. I cannot discuss my accomplishments without this seeming like deluded exaggeration. If I had done what I claimed to have done, I would have progressed and been given credit. I am 42 years old and companies look at my trajectory and slot me into junior roles. It would be one thing if I could build myself up from these roles, but it's not how things work. There is an expectation that if you are in a junior role at mid-career /in middle-age, you've topped out there. Despite what I have accomplished both before Google and while at Google, Google branded me as middling and mediocre and expendable. And it seems that with this branding, the industry demands that I internalize it and conform to it. But I cannot. I could find ways to accept the low pay and deflated titles if I could still be given the chance to do my best work. Like the highest paid men in tech, I'm an inventor and innovator and creative visionary. I see business opportunities and customer needs and technical complexity, and my strengths are in bringing these all together to drive a strategy forward. If I were a man, I'd be running a tech company – or at least be in a high executive role. I simply don't know how to "clock it in." But now, with my Google track record, those small maintenance-work roles are the only roles for which I'm considered. I'm blocked from the roles where I would thrive, and pushed into roles where I cannot. I can't escape this. I want my life back. I want the chance to contribute to the industry, use my strengths, do work that I'm proud of and find meaningful and rebuild my reputation. But there's no way back. The doors have all shut.

I don't go to college reunions. I avoid people I knew long ago so that I don't have to face the questions of "what happened." I wake up most mornings in a fog, wondering how everything broke. But I have two children who depend on me, so I have to wake up.

I throw what I can into work … trying to find ways to use my talents in a way that doesn't upset anyone's world view. I supplement my income with my savings, but they are running out. At work I hear people brainstorming ways solve problems that I solved for Google years ago. To

say "that was my work – and I could solve the same problems here if given a chance" would be unbelievable. I tried a few times before giving up. Again, I wouldn't be where I am if that was true. History is re-written and I can't argue otherwise. Or, I thought this arbitration was my chance.

That's what this arbitration is about. It is not about trying to maximize an award. It's about my life and what gives me purpose. I did not have expectations on what the financial outcome of this process would be, but I never questioned that I would be able to tell my story and have it judged on the truth and the merits. Instead I find myself trapped in an Orwellian nightmare where Google lies and fabricates and there seems to be nothing I can do about it. Google provided the EEOC with substantial fabricated and altered evidence on material issues. Google has submitted equally false and fabricated evidence in this arbitration process. I find myself trying to address accusations built on a tower of provably false evidence and claims.

Please give me the chance to argue my case on the merits rather than on a fiction. There's no point to any of this otherwise.

----------------
To address the two open Issues:

**<u>On the issue of Comparators:</u>**

My claims are based on the argument of disparate treatment. This was something noticed by my peers as well[Exhibit 2 – Declaration of Matt Jones]

**Payam Shodjai** and **Drew Bradstock** were less qualified that I was and had far less impact than I did. Still, their compensation would be telling. **Aaron Rothman** and **Jens Skakkebaek** were also less qualified and less accomplished - but far better rewarded. The requested comparators start with them.

I also request as comparators individuals in product management who match all of the following very narrowly defined criteria:

+ Product Manager

+ Computer Science degree (from Ivy League + Stanford + MIT +Carnegie Mellon + Berkeley)

+ MBA from (Harvard, Stanford, Booth, Wharton, Kellog, MIT/Sloan, Haas, Columbia, NYU)

+ started at Google between 2007 and 2013

+ graduated from business school between 2002 and 2008.

**On the issue of Facebook Trading Activity**

This element in pre-hearing order #6 was based on fraudulent and misleading evidence. I cannot sign a stipulation based on this order because I believe that will be interpreted as a waiver of my rights to challenge the order or the falsification of evidence that led to this order.

Google has had no policy prohibiting investments in a competitor – yet in its brief, Google asserted that this was "plainly" the policy. Google supported this with snippets of text that allegedly came from the applicable Code of Conduct.

Google does not shy away from using Exhibits in briefs. Yet Google did not include the actual code of conduct in its brief. Why not? Why would Google use only snippets of text in isolation for something this material? It is so material that Google believes it sufficient to block me from more $10 million in front-pay damages. Does this not justify including the Code of Conduct as an Exhibit?

If one were to look at the Code of Conduct from which Google snipped this text [Exhibit 4], or from the one that I actually signed [Exhibit 3], one would find that Google's policy is that if someone is in a position at Google whereby they can benefit an investment at Google's expense, it presents a conflict of interest. This is true in either version. In order for "daytrading" in Facebook options to be a conflict of interest, Google would have to first establish that I was empowered at Google to cause Facebook stock to skyrocket at Google's expense, and that it was reasonable to believe I might do so. It would be impossible for me to do anything at Google that could benefit Facebook stock options at Google's expense. What could I have done to make Facebook stock leap in value overnight? It would be impossible, and also absurd for anyone to believe otherwise.

This was no accident. The rule is clear. The snipped text presented completely out of context and with a false explanation, along with the failure to include the full document as an exhibit could only have been intentional.

**Motions**

1. I move that the order related to my Facebook stock trades be vacated, as this order was based on Google's fraudulent claims and misleading evidence
2. I move that Google's claims of affirmative defense with respect to Conflict of Interest be disposed
3. I move that all available sanctions be considered for this material falsification of evidene
4. I move that I be given the chance to present evidence of Google's ongoing fraud to date, as it is material to all matters of eDiscovery and potential sanctions and default judgments. Specifically, I request the opportunity to provide strong evidence that:
    - Google presented the EEOC with materially altered emails under oath – and I can prove the alteration because I have the originals

- Google presented the EEOC with a Fabricated Email Chain to cover up materially-relevant retaliation
- Google provided false evidence in this Arbitration regarding the applicable Code of Conduct in attempt to unjustly block the recovery of more than $10 million damages
- Google has made materially false claims in this Arbitration with respect to what documentation it has already provided the EEOC
- Google has materially altered and omitted documents in the personnel and performance record that it presents as authentic

Exhibit 1a – email exchange with Cindy Treloar

------------------------------------------------
On Fri, May 9, 2014 at 10:53 AM, Cindy Treloar <cindyt@google.com> wrote:

Hi Rivka,

I JUST read this email a minute ago.

As we discussed yesterday, our team's mission is to look into concerns raised by Googlers, which is why we reached out to you. We are not aligned with any business organization i.e. Tech, Sales, etc., which enables us to be an impartial third party.

We discussed your performance yesterday including both high and low points. I also asked you who we could talk to that could speak to your performance history at Google. If you would like to provide any additional names of people who know your strengths and weaknesses in your role, please feel free to send them to us.

We are responding to the compliance concern that you had raised and as I mentioned in my previous email this morning, will be getting back in touch with you to inform you of our findings.

I'm hoping this puts you at ease.

---

On Fri, May 9, 2014 at 8:01 AM, Rebecca Spivak <rivka@google.com> wrote:
Good Morning --

I hope you can help me understand the process from here as I am feeling very uneasy about our meeting.

I felt you asked pointed questions about my weaknesses, but not strengths.
You asked about when I've been a weaker performer in the past but not about my contributions.
I felt like I ended up backed into saying negative things about myself that weren't even true.
The conversation seemed to be focusing on an overall history rather than the specifics of this situation.

At the moment I am not feeling like this is neutral based on the questioning. But I would like to get to that point if possible.
----------------------------------------------------------------------------

Exhibit 1b – Cindy Treloar's internal Google Resume

**CINDY TRELOAR**

Human Resources Business Partner ● Supported client group of over 400 Googlers in 8 locations

**Employee Relations / Investigations**

- ● Consultant for HRBPs and managers worldwide on tough employee relations & conduct issues
- ● Lead investigations into allegations of harassment, discrimination, & retaliation
- ● Certificate in Interview & Interrogation Techniques from WicklanderZulawski & Assoc.

**Program Manager for global "Managing Low Performance" program**

- ● Created "Managing Low Performance" management training and have facilitated in over 20 Google locations in 10 countries
- ● Creator of content such as PIP FAQ, templates, videos for go/ManagingPerformance
- ● Initiated & managing global program across all orgs, increasing nonregretted attrition 1% year over year
- ● Coordinated with Analytics to build the Taillights tool to track and report on our progress
- ● Consultant for HRBPs and managers on individual low performance cases

**Management Training / Coaching**

- ● "Managing Low Performance" – Creator / Facilitator
- ● "Fostering High Achievement" – Creator / Facilitator
- ● Completed coaching program with Results Coaching Systems including master class with founder, David Rock
- ● Served as internal 1:1 coach for Googlers in Mars & Flagship management programs
- ● "Low Performance Management Best Practices" Creator / Facilitator
- ● "Handling Policy Violations & Misconduct" – Creator / Facilitator
- ● Certified MBTI (Myers Briggs Type Indicator) Facilitator
- ● Facilitator of "Managing Talent" – part of "Essentials for People Managers"

**Rewards / Recognition**

- ● Recipient of 11 peer bonuses for counsel provided to Googlers & coaching HRBPs & managers on difficult low performance situations
- ● Received spot bonuses for work on Managing Low Performance & Fostering High Achievement programs

Exhibit 2 – Declaration of Matt Jones re: Disparate Treatment

**DECLARATION OF MATT JONES**

I, Matt Jones, declare and state as follows based on my personal knowledge:

1. I worked as a Product Manager at Google from January 2014 until August 2015. I was assigned to the Content Ad Words Front End ("CAWFE") team and reported to Sales Tools Manager Jens Skakkebaek.

2. I have known, and worked closely with, Rebecca Spivak since I joined Google in January 2014. We both reported to Mr. Skakkebaek. Ms. Spivak and I were working on designing complementary systems. Ms. Spivak was developing Interactive Benchmarks ("IB") and I was developing a product called Display Planner. Although she was located in Seattle and I was in Los Angles, we had weekly one-on-one meetings (via video conferencing) to discuss our work and share ideas. I also traveled to Seattle on a regular basis to meet with Ms. Spivak and related engineering teams in person.

3. Ms. Spivak and I participated in all-team video conferences approximately once per week. Mr. Skakkebaek, ~~Aaron Rothman,~~ and the PMs who reported to Mr. Skakkebaek participated in these weekly calls.

4. Google Product Managers are expected to generate innovative ideas, prove the need for, and value of the idea, navigate the organization and develop support for the idea, work with engineering to test and execute the product. Based on my observations and experiences working with her, Ms. Spivak did an excellent job conceptualizing IB and executing at each of these

stages. She has great ideas, supports them with data, and is detail oriented when implementing them.

5. Google routinely encouraged its Product Managers to speak up and share bold ideas. Ms. Spivak did so. She is very smart, had valuable ideas and contributions, and was not afraid to speak up about them. Ms. Spivak had strong opinions and expressed them in the same strong tone as her male colleagues.

6. In team meetings, I observed that some male PMs were well-received when they expressed strong opinions, but Ms. Spivak was not. Ms. Spivak often had the best ideas in the group, but she was stonewalled. Indeed, I participated in meetings in which Mr. Skakkebaek or Mr. Rothman rejected an idea when it was expressed by Ms. Spivak but then accepted the very same idea when it was raised by a male PM or Technical Lead.

7. I observed that Ms. Spivak received negative reactions from Mr. Skakkebaek and Mr. Rothman. It seemed as though no matter what she said to them, it was the wrong thing. Mr. Rothman was especially dismissive of Ms. Spivak and her ideas. He told me and other PMs that Ms. Spivak was "throwing a tantrum."

8. In approximately Q2 2014, I was asked to give performance feedback on Ms. Spivak as part of Google's 360 performance review process. My feedback was positive.

9. In June or July 2014, Mr. Skakkebaek and I met to discuss my own performance review. In that meeting, Mr. Skakkebaek expressed displeasure

that I had given Ms. Spivak a positive review. I told him I thought Ms. Spivak was performing well in her role and had really good ideas. Mr. Skakkebaek insisted that her ideas were "off-base" and not supported with data. I told him I disagreed.

10. After I defended Ms. Spivak's performance, my relationship with Mr. Skakkebaek cooled markedly. Mr. Skakkebaek began soliciting negative feedback about me from my peers, stopped meeting with me, and placed me on a PIP even though I fulfilled all of the work goals that were identified for me. I told Mr. Skakkebaek and Google Human Resources that I was concerned that I was placed on the PIP because I defended Ms. Spivak. Google never responded to my concerns.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

11/17/18
Dated

[signature]
Matt Jones

Exhibit 3 – Relevant sections of Code of conduct – version that I signed

## III. Avoiding Conflicts of Interest

A conflict of interest occurs when, because of your role at Google, you are in a position to influence a decision or situation that may result in personal gain for you or your friends or family at the expense of the company or our users. All of us at Google should avoid situations that present actual or apparent conflicts of interest; it is our responsibility to act at all times with the best interests of Google and our users in mind. In no way should you personally profit from transactions based on your relationship with Google if it harms the company.

Being open and honest about the possibility of a given conflict of interest is the key to ensuring that it doesn't become a problem. If you're ever in doubt about whether a given action or decision would or wouldn't represent a conflict of interest, please consult your manager or Google's Compliance Program Management Office beforehand.

### a. Openness

You should consider it your responsibility to promptly disclose any interest you may have that could conflict with the interests of Google. For example, if one of your family members (including your parents, siblings, children, or in-laws) is or becomes a Google supplier, customer, partner, or competitor, that may not necessarily represent a conflict of interest, but, nonetheless, the right thing to do is to let your manager know about the situation immediately.

One way to consider whether a given action, relationship, gift, etc. constitutes a conflict of interest is to imagine you are at a company meeting. Could you justify your actions in front of your peers? The answer to that question should help you evaluate the situation.

### b. Personal Investments

You should not invest, without approval from the Audit Committee of our Board of Directors, in a Google customer, supplier, partner, or competitor if it's at all likely that your investment could compromise the fulfillment of your responsibilities as a Googler. As a general rule, the greater your responsibilities at Google, the more they relate to the relationship between Google and the customer, supplier, partner, or competitor and the larger the amount of the desired investment, the more likely it is that you're doing something that actually or apparently conflicts with the company's interests. When in doubt about whether a personal investment creates an actual or apparent conflict of interest, you should always discuss the situation with your manager or Google's Compliance Program Management Office before making the investment.

Exhibit 4 –Relevant sections of Code of Conduct – Version Referenced by Google

### III. Avoid Conflicts of Interest

In working at Google, we have an obligation to always do what's best for the company and our users. When you are in a situation where competing loyalties could cause you to pursue a personal benefit for you or your friends or family at the expense of Google or our users, you may be subject to a conflict of interest. All of us should avoid circumstances that present even the appearance of such a conflict.

When faced with a potential conflict of interest, ask yourself:

- Would this relationship or situation embarrass me or Google if it showed up on the front page of a newspaper or the top of a blog?
- Am I reluctant to disclose the relationship or situation to my manager, Legal or Ethics & Compliance?
- Could the potential relationship or situation create an incentive for me, or be perceived by others to create an incentive for me, to benefit myself, my friends or family or an associated business, at the expense of Google?

If the answer to any of these questions is 'yes,' the relationship or situation is likely to create a conflict of interest, and you should avoid it.

Below we provide guidance in six areas where conflicts of interest often arise:

- personal investments
- outside employment and inventions
- outside board memberships
- business opportunities found through work
- personal relationships at work, and
- accepting gifts and other business courtesies

In each of these situations, the rule is the same - you must avoid conflicts, and if you face a potential conflict of interest, review the situation with your manager and Ethics & Compliance and get their approval.

*Personal Investments*

A common conflict of interest involves a Googler's personal investment in a customer, supplier, partner or competitor of Google, where the investment is significant enough (either in absolute value or in relation to the Googler's net worth) that someone might reasonably think it could cause the Googler to act in a way that benefits that personal investment at the expense of Google. When considering whether such an investment creates a conflict of interest, ask yourself:

- Is the investment in a competitor?
  - If the answer is yes, the investment creates a conflict of interest.
- If the investment is not in a competitor, but is in a customer, supplier, or partner of Google, do you have a job or responsibilities at Google that let you affect Google's actions in ways that could help your investment at the expense of Google? (Google officers -- VP and above -- have particularly broad influence in this regard.)
  - If the answer is yes, the investment creates a conflict of interest.

If you are considering making an investment that creates a conflict of interest, don't make the investment. If you already have an investment that creates a conflict of interest, or are unsure whether an existing or contemplated investment is a conflict of interest, you should contact Ethics & Compliance.