UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

Rivka Spivak,

Plaintiff,

v.

Alphabet Inc., et al.,

Defendants.

Case No. 2:20-cv-01480-MJP

EXHIBIT 12

Google’s Opposition to Spivak’s Sanctions Motion

Filed in Support of Plaintiff’s Motion to Vacate

Judgment Under Rule 60(d)(3)

# CURLEY, HURTGEN & JOHNSRUD LLP

**COUNSELORS AT LAW**
**4400 BOHANNON DRIVE, Suite 230**
**MENLO PARK, CA 94025**
**www.chjllp.com**

**Brian L. Johnsrud**
**650.600.5310**
**bjohnsrud@chjllp.com**

**Telephone: 650.600.5300**
**Facsimile: 650.899.1998**


December 10, 2018

**VIA ELECTRONIC DELIVERY**

Hon. Robert Baines (Ret.)

Re: *Spivak v. Google* - JAMS Ref. No. 1110018238
**Google's Letter Brief In Opposition to Spivak's Motion for Sanctions;**
**Google's Request For Monetary Sanctions**

Dear Judge Baines:

Ms. Spivak's motion for sanctions makes false accusations against Google and its counsel. She offers unsupported conspiracy theories, not evidence. She has not established that Google violated any of the Arbitrator's orders under JAMS Rule 29. Nor has she identified any sanctionable conduct under any other JAMS Rule or Rule of Civil Procedure. Spivak advances six primary arguments for sanctions, each of which fails for the reasons set forth below.

*First*, Spivak seeks sanctions based on Google filing a petition to compel arbitration in federal court some three years ago. Google filed that petition because Spivak refused to honor the forum selection provision in her arbitration agreement. The authority quoted in the very petition she criticizes holds that a refusal to arbitrate in the agreed-upon location is a refusal to arbitrate, making a petition ripe for adjudication. Even after Google filed its petition, Spivak continued to try to negotiate the terms under which she would honor her arbitration agreement, further confirming that the petition was necessary and appropriate. Her prior legal counsel never raised sanctions because there was no basis to seek them three years ago, just as there is not now.

*Second*, Spivak accuses Google of altering evidence and lying about it. That is a serious accusation that demands real proof. Spivak offers none. The true facts are that one or more of Spivak's "friends" (or possibly Spivak herself) forwarded what appeared to be Spivak's Plusmail emails to Spivak's manager, Jens Skakkebaek, who provided them "as is" to Google's HR department. Any excising of Spivak's emails was done by **one of Spivak's friends (or Spivak) <u>before</u>** they were forwarded to Skakkebaek.

*Third*, Google did not "fabricate" evidence. During the EEOC proceedings, Spivak argued that Skakkebaek singled her out by asking for "completely honest" performance feedback about her. At the EEOC's request, Google produced many emails showing that Skakkebaek made the exact same request for "completely honest" feedback about many other employees. Apparently stunned that her manager made the same request about male and female employees, Spivak now asserts (with no evidence) that Skakkebaek somehow intercepted her Plusmail emails about "completely honest" feedback, and then created a paper trial in real time by sending the same

request for "completely honest" feedback about others. Her theory fails because Skakkebaek did not even learn about the existence of any of Spivak's Plusmail emails until months after Spivak claims that he "fabricated" emails soliciting "completely honest" feedback.

*Fourth*, Spivak asserts that, by quoting the specific "Personal Investments" subsection of its Code of Conduct, Google has made misrepresentations. Spivak's million dollar option trading in one of Google's largest competitors violated the applicable Code. If there was any doubt in Spivak's mind, the Code mandates that "if you face a potential conflict of interest, review the situation with your manager and Ethics & Compliance and get their approval." Spivak never did so. Her tortured misreading of the general "preamble" of the Code defies common sense and demonstrates her desperation on this issue. More fundamentally, this is the discovery phase, not the ultimate adjudication phase, and Spivak's continued refusal to "come clean" on her substantial Facebook trading records should result in the compelled disclosure of them.

*Fifth*, Spivak asserts that Google abused the protective order by including Paul McClinton on the list of people who did not want to be contacted by Spivak. Mr. McClinton asked to be put on that list, by Spivak's own admission. But as per usual, Spivak could not help herself and decided to contact Mr. McClinton with a provocative and misleading message in violation of the Arbitrator's Order. Spivak says that she "intended to comply with the order to not contact individuals on the list, but Paul was my facebook friends [sic]." It is amazing that Spivak attempts to turn her violation of the Arbitrator's Order into sanctionable conduct by Google.

*Sixth*, Spivak argues that all of her former managers were in a part of the organization headed by Neal Mohan, so therefore Mohan must be a single decision-maker as to her performance and compensation. Mohan manages a massive organization. There is no evidence that he played any role in the adverse employment actions that Spivak complains about in her Amended Notice of Claim. There, she specifically attributes at least six different decisions, including her performance ratings and compensation, to Skakkebaek and Rothman by name. Spivak's speculation and argument is not evidence of any kind, and in any event does not support her request for sanctions.

In short, there is no factual or legal basis for Spivak's motion. It is time for Spivak's baseless accusations of misconduct to stop. For having to oppose this baseless motion, and to deter further misconduct, Google requests monetary sanctions against Spivak for failing to perform a reasonable investigation prior to making her extremely serious and false accusations. Google and its counsel do not seek sanctions lightly. For context, in over 35 years of combined employment practice, Google's counsel cannot recall ever seeking sanctions under FRCP 11 or any parallel state rule, and it has never had such sanctions awarded against the firm or any of its clients. But an award of monetary sanctions against Spivak is fully warranted here. She is no ordinary pro per; she passed the California bar exam (including its substantial focus on ethics), and she has failed to substantiate any of her serious allegations.

## I. FACTUAL BACKGROUND

Ms. Spivak begins her motion by attempting to leverage a newspaper story about arbitration and settlement of disputes involving alleged sex harassment. Spivak does not allege sex harassment.

And obviously, cases are decided on their actual facts, not on newspaper stories about other employees that are intended to generate page views and further a popular narrative.

Here, the facts show that Spivak worked as a Product Manager at Google. Her job was to develop new products by teaming with software engineers (who build the products) and sales operations employees (who rely on the products). Her performance was inconsistent. She too often failed to build productive relationships with engineers and sales operations employees. Spivak thinks she was a “star,” but she was not even close. She had some good ideas, but Google is full of good ideas. It takes collaboration and teamwork to turn a good idea into a great product. In this regard, Spivak had detractors in engineering and sales. Senior female leaders like Barbara Stanley (engineering) and Judy Hsu (sales) were just some of the employees who raised serious concerns with Spivak.

After being (1) demoted by a female Vice President; (2) placed on a PIP; and (3) launching into a profanity-laced tirade toward her manager, Spivak complained for the first time about alleged gender discrimination on February 2, 2015.[1] She did so because she believed that it made her “unfireable.” After making her bad faith complaint, she then “went off” on an HR professional and received a written warning for it.

Spivak lost her job at Google because she decided not to relocate and she did not find an alternative role in Seattle. Google did not, as Spivak alleges, relocate five projects and impact some 34 employees because she made a strategically-timed bad faith complaint of gender discrimination.

Spivak has now filed a sanctions motion against Google. She insisted on doing so before receiving and reviewing Google’s ediscovery production which, among other things, would have further debunked her accusation that Google altered evidence.

## II. THE POTENTIALLY APPLICABLE STANDARDS FOR AWARDING SANCTIONS

### A. JAMS Rule 29

JAMS Employment Rule 29 is the only JAMS Rule that authorizes an award of sanctions. It authorizes the Arbitrator to award sanctions against a party “for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator.” Spivak does not identify any failure by Google to comply with its obligations under any of the JAMS Rules, nor does she identify any failure by Google to comply with any order of the Arbitrator.

---

[1] At page 10 of Spivak’s Motion, she vaguely asserts: “Throughout the Spring and Summer of 2014, I had complained of unfair treatment and gender discrimination in various forums.” The true fact is that she did not make any complaint about gender discrimination to anyone at Google until February 2, 2015, and only did so then after engaging in misconduct.

### B. Various Rule 11 Provisions And Other Sanctions Standards.

Spivak also purports to seek sanctions under Rule 11 of the Federal Rules of Civil Procedure, Washington Civil Rule 11, New York Civil Rule 11 (which does not exist), 28 U.S.C. § 1927, and "other ABA or other ethics rules, as appropriate." Each is discussed below, and each provides a firm basis upon which the Arbitrator may impose monetary sanctions against Spivak.[2]

#### 1. FRCP 11

Rule 11 is "designed to deter attorneys **and unrepresented parties** from violating their certification that any pleading, motion or other paper presented to the court is supported by an objectively reasonable legal and factual basis; no showing of bad faith or subjective intent is required." *Truesdell v. Southern Cal. Permanente*, 209 F.R.D. 169, 173-74 (C.D. Cal. 2002). A court considering a request for Rule 11 sanctions should consider whether a position taken was "frivolous," "legally unreasonable," or "without factual foundation, even if not filed in subjective bad faith." *Id. quoting Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986) (emphasis added). Rule 11 authorizes the imposition of monetary and nonmonetary sanctions. Fed. R. Civ. Pro. 11(c)(2); *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1198 (9th Cir.1999). Monetary sanctions may include reasonable attorneys' fees to the opposing party for those "fees and other expenses incurred as a direct result of the violation." Fed. R. Civ. Pro. 11(c)(2).

#### 2. Washington Civil Rule 11

Washington CR 11 largely tracks FRCP 11, and like FRCP 11, it applies both to attorneys and pro per litigants. Thus, a pro per litigant may be sanctioned for the same reasons and to the same extent as an attorney. *See e.g. West v. Washington Assn. of County Officials*, 162 Wash. App. 120 (2011) (pro per plaintiff sanctioned for submitting declaration that made baseless allegations of fraud against opposing counsel); *Harrington v. Pailthorp*, 67 Wash. App. 901 (1992) (pro per plaintiff held to objective, reasonable attorney standard); *Trohimovich v. State*, 90 Wash. App. 554 (1998) (pro per party who signed and advanced complaint without factual support subject to imposition of CR 11 sanctions of $3,500).

#### 3. New York's Rule 11 Equivalent

Spivak's motion references "New York Civil Rule 11." There is no such law or rule. Google assumes that Ms. Spivak intended to reference the New York equivalent of FRCP 11, which is codified at 22 NYCRR 130-1.1. As with the other rules cited above, 22 NYCRR 130-1.1(a) provides: "By signing a paper, an attorney or party certifies that, to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, (1) the presentation of the paper or the contentions therein are not frivolous as defined in section

---

[2] Pre-Hearing Order One provides: "the laws of the state of New York shall be applied to the events occurring there, and the laws of the state of Washington applied to events occurring in that state. Federal law, including Title VII, shall also be applied to all events….Pursuant to the Agreement at Section 15(a), the JAMS Employment Arbitration Rules & Procedures ('Rules') will be applied…. Pursuant to the Agreement at Section 15(b), the procedural laws of the applicable states shall also be applied, with the JAMS rules taking precedence in the event of a conflict with these provisions."

130-1.1(c) . . . ." (Emphasis added). In addition to or in lieu of awarding costs, "the court, in its discretion may impose financial sanctions upon any party or attorney in a civil action or proceeding who engages in frivolous conduct . . . ." 22 NYCCR 130-1.1(a). These monetary sanctions may amount up to "$10,000 for any single occurrence of frivolous conduct." 22 NYCCR 130-1.2. A court may additionally "consider what remedy is dictated by considerations of fairness and equity." *Levy v. Carol Mgmt. Corp*., 260 A.D.2d 27, 34 (1999).

**4. 28 U.S.C. § 1927**

Spivak's motion also seeks sanctions based on the inherent powers of the Arbitrator. While there does not appear to be any specific JAMS Rule on point, the federal court equivalent source of that authority is 28 U.S.C. § 1927. Sanctions may be awarded under 28 U.S.C. § 1927 if a party or lawyer acted in bad faith, or at least engaged in "conduct tantamount to bad faith," which can include "a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 993-994 (9th Cir. 2001); *accord Gomez v. Vernon*, 255 F.3d 1118, 1133-34 (9th Cir. 2001).

**5. The ABA Ethics Rules**

Spivak also seeks sanctions under the ethics rules. ABA Model Rule 3.3 addresses an attorney's duty of candor to a tribunal. It provides that "a lawyer shall not knowingly… make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

## III. SPIVAK HAS NOT CARRIED HER BURDEN TO PROVE ANY SANCTIONABLE CONDUCT BY GOOGLE OR ITS COUNSEL, AND HER UNSUBSTANTIATED ALLEGATIONS SHOULD RESULT IN MONETARY SANCTIONS AGAINST HER.

### A. Google's Petition To Compel Arbitration Was Not Sanctionable; It Was Justified Based On Case Citations Which Spivak's Counsel Did Not Contest, And Which Spivak Has Not Addressed.

More than three years ago, Spivak sent an inflammatory $10 million demand letter to Google, and closed that demand letter by stating that she would not honor her written agreement to arbitrate in Santa Clara County. Ms. Spivak's counsel wrote:

> Our position is that the Agreement does not comply with JAMS Minimum Standards Nos. 1 and 6 because it requires my client to arbitrate in Santa Clara County instead of King County, Washington, provides for an award of attorney fees to the prevailing party, and requires Ms. Spivak to pay any fees or costs of the arbitrator (not including the initial filing fee). We will raise these issues with

the arbitrator.[3]

Google reasonably construed that letter as a refusal to honor the forum selection provision in Spivak's arbitration agreement. Google was **not** required to wait for Spivak to bring an action in Washington, which could have had important consequences under the federal first-filed rule. *See Google v. Microsoft*, 415 F.Supp.2d 1018 (N.D. Cal. 2005) (granting Microsoft's motion to stay or dismiss an employment case filed by Google in California based on Microsoft filing first in Washington). In short, Google was not under any obligation to wait for Spivak to initiate proceedings in the wrong forum, and it was fully within its rights to file its petition to compel arbitration in the correct forum.

Google's petition to compel arbitration quoted the following authority:

> If the written agreement contains a place-of-arbitration clause, then logically, **a party's attempt to arbitrate elsewhere is a refusal to arbitrate under the agreement**. This interpretation is also more consistent with the Supreme Court's admonition that private agreements to arbitrate should be enforced according to their terms.... Accordingly, the Court finds that Respondents have refused to arbitrate within the meaning of section 4 of the FAA. *In re Cintas Corp. Overtime Pay Arbitration Litig.*, 2007 U.S. Dist. LEXIS 5479, *43-44 (N.D. Cal. Jan. 9, 2007) (emphasis added).

At the time Google filed its petition to compel arbitration, Spivak was represented by experienced and well-regarded employment litigators.[4] Spivak did not oppose Google's petition or claim that it was frivolous or without merit. Instead, Spivak's counsel entered into negotiations with Google, seeking concessions from Google in exchange for Spivak honoring her agreement to arbitrate in Santa Clara. (Johnsrud Decl., ¶ 3, Ex. B.) The fact that Spivak and her counsel continued to try to negotiate the forum issue **after** Google filed its petition to compel arbitration further confirms that Google had a valid basis for filing the petition. (*Id.*)

Now, some three years and two law firms later, Spivak seeks sanctions over a properly filed petition to compel arbitration. Spivak makes no attempt to address or distinguish the authority cited above, or any of the other authorities cited and quoted in Google's petition to compel arbitration and supporting papers. Spivak's request for sanctions should be summarily denied.

---

[3] Spivak's demand letter was labelled as a settlement communication under Rule of Evidence 408, but it is not "confidential" for all purposes. FRE 408 makes settlement communications inadmissible for the purposes of establishing liability, but they are admissible to establish, among other things, the amount in controversy. *See Cohn v. Petsmart*, 281 F.3d 837, 840 (9th Cir. 2002) (upholding admission of settlement offer to establish amount in controversy, rejecting the argument that it was inadmissible under Rule 408).

[4] Ms. Spivak's lead counsel in 2014, Steve Frank, was named to the Washington Super Lawyers list for employment litigation, and co-counsel Jillian Cutler was named a Rising Star by the same publication.

**B. There Was And Is No Basis Upon Which To Seal Google's Petition To Compel Arbitration; The Fact That Neither Of Spivak's Two Different Law Firms Sought Any Sealing Confirms As Much.**

Citing no authority, Spivak argues Google's petition to compel arbitration should have been sealed. Google did not file it under seal because that motion would have been rejected out of hand. The fact that neither of Spivak's two prior law firms sought to seal the petition confirms that conclusion.

There is a "strong presumption" in favor of public access to judicial records. *Kamakana v. Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Kamakana*, 447 F.3d at 1179. "A possibility of future adverse impact on employment … is not a 'higher value' sufficient to overcome the presumption of access to judicial documents." *Bernsten v. O'Reilly*, 307 F.Supp.3d 161, 169 (S.D.N.Y. 2018).

Spivak appears to argue that Google's inclusion of her compensation and other information about her employment, including her own allegations regarding her PIP and emotional distress, should not have been included in Google's petition to compel arbitration. Google included that information to satisfy the amount in controversy requirements for federal court diversity jurisdiction, and to establish that the petition to compel arbitration was in fact ripe for adjudication. None of that information would be sealed. *Goehle v. Fred Hutchinson Cancer Research*, 100 Wash. App. 609, 623 (2000) (affirming decision to admit employee's diaries in employment lawsuit and rejecting employee's privacy argument because the employee "fails to demonstrate that her constitutional rights were violated here or that she has a constitutional right to prohibit relevant evidence from admission in a civil suit that she initiated.")

If Spivak wanted to attempt to seal any portion of the petition to compel arbitration or the supporting documents, her proper recourse was to file a motion to seal with the Northern District of California over three years ago when Google filed its petition. She did not do so. If Spivak had filed such a motion to seal with the Northern District, it would have been summarily denied given the strong public policy in favor of open access to judicial records. *Lawson v. Grubhub, Inc.*, 2017 WL 2951608, at *10 (N.D. Cal. 2017) (declining to seal an exhibit discussing the plaintiff's termination and the fact that plaintiff did not perform deliveries during his scheduled blocks); *Barnes v. Hershey Company*, 2015 WL 1814293, at *2 (N.D. Cal. 2015) (declining to seal performance reviews and termination decision documentation).

Google's petition to compel arbitration was dismissed (not stayed) pursuant to a stipulation. Spivak's former counsel did not even raise the issue of sealing in connection with the stipulated dismissal, presumably because there was no factual or legal basis to seal the petition. (Johnsrud Decl., ¶ 4). Spivak's suggestion that the petition is impacting her employment prospects lacks evidentiary support. She quickly obtained a job at Amazon once she started looking, and she recently turned down a higher paying job. (Johnsrud Decl., ¶ 11, Exh.'s H and I). Finally, if Spivak wants to file a motion to seal aspects of a dismissed case, she can do so at her own time and expense, as apparently her former legal counsel were not willing to do so.

### C. Google Did Not Alter Evidence, And Spivak's Repeated False Allegations On That Serious Issue, Despite Google's Prior Truthful Explanations, Justify An Award Of Monetary Sanctions Against Her.

With no supporting facts, Spivak has repeatedly and falsely accused Google and its attorneys of altering her Plusmail emails by excising portions of them. Spivak claims that:

- "Google Altered Emails, Submitted Them in Signed Pleadings, and Falsely Denied Doing So." (Motion at 6).
- "Google and Google's Attorneys submitted material altered evidence, and subsequently attempted to cover up the misconduct by blaming an anonymous source." (Motion at 6).
- "By removing selected sentences from the middle of paragraphs, Google completely changed the content and meaning of the message I sent." (Motion at 7).
- "Google has submitted altered evidence **and directly lied about doing so**." (Motion at 8).
- "There can be no fair adjudication of a case where Google brazenly alters evidence in this way." (Motion at 9).

The true facts (not Spivak's reckless allegations) show that:

- In late January and early February 2015, Spivak sent various inflammatory emails about her Google employment to an unidentified group of her friends at an anonymous "Plusmail" group email list.
- On February 12-13, 2015, one or more of Spivak's friends, or perhaps Spivak herself, anonymously forwarded some of Spivak's Plusmail messages to Spivak's manager, Jens Skakkebaek, in a modified form. (Skakkebaek Decl., ¶ 3, Exh. D).
- On February 13, 2015, Mr. Skakkebaek forwarded the unusual emails he received to Human Resources. (Skakkebaek Decl., ¶ 3). Mr. Skakkebaek did not alter the messages he received. (*Id*.)

Google later included copies of the Plusmail emails received by Skakkebaek as part of a preservation request to Spivak's counsel, including a copy of the email that Spivak claims was altered by having a portion excised. Spivak and her counsel did not respond with any assertion that any of the messages had been altered, and did not dispute that Spivak was the author. (Johnsrud Decl., ¶ 5).

Two months later, Google included these same messages as part of its EEOC charge response because it shows that Spivak's allegations were made in bad faith, *i.e*., her admission that she made her complaint because it "makes me unfireable long enough for me interview and get hired at facebook." (Skakkebaek Decl. ¶ 3, Exh. D). Google did not purport to authenticate the underlying content of Spivak's emails because Google did not draft them and did know who

forwarded them to Skakkebaek. All Google knows is that one of the recipients (or Spivak) anonymously forwarded Spivak's emails to Skakkebaek. Google could not have provided the original messages that Spivak sent to the EEOC because it did not have them; they were stored in Spivak's personal Plusmail account, and there is no evidence that anyone other than Spivak was reviewing her personal Plusmail account.

Spivak's assertion that Google's submission of her emails to the EEOC somehow resulted in their "no cause" finding is also baseless. As Spivak knows, her counsel sent copies of the full emails to the EEOC, **without** copying Google or its counsel. (Johnsrud Decl., ¶ 7, Exh. D). That was **over one year before the EEOC closed its** file. (Johnsrud Decl., ¶ 9, Exh. F).

Relative to this arbitration, the first time that Spivak claimed that portions of two of her emails had been excised was in connection with her opposition to Google's motion to stay. Google responded promptly with the facts:

> Finally, and contrary to Spivak's assertion, there is no risk of Google altering or destroying evidence in the event of a stay. As Spivak's declaration confirms, she sent her unpleasant emails to an email alias, identified as "Plusmail." One or more of the individuals on her email alias forwarded some of Spivak's attacks to Google on an anonymous basis. And, if Spivak was in fact troubled by one of her recipients allegedly omitting text, she could have raised this with Google several months ago when Google issued a preservation letter attaching the identical email, and she did not do so.

(Johnsrud Decl., ¶10, Exh. G). Once those facts were provided, Spivak's legal counsel dropped the allegation. Her repeated and extremely serious allegations are based on her own incorrect assumptions, not evidence, and are false. Spivak's false allegations, including that "Google brazenly alters evidence" and "directly lied about doing so" justifies monetary sanctions against her.

**D. Google Did Not Engage In "Fabrication Of Evidence" In The EEOC Proceedings, And Spivak Should Be Sanctioned For Her False Allegations.**

During the EEOC proceedings, Spivak alleged that Jens Skakkebaek retaliated against her by asking potential peer reviewers to provide "completely honest" feedback about her during a performance review cycle in September 2014. (Johnsrud Decl. ¶ 8). Specifically, Spivak claimed that she was singled out by Skakkebaek and his request for "completely honest" feedback.

To test Spivak's theory, the EEOC investigator asked Google whether Mr. Skakkebaek sent similar emails requesting "completely honest" feedback about other employees during that same September 2014 performance review cycle. (*Id.*) At the EEOC's request, Google pulled numerous other instances of Mr. Skakkebaek requesting "completely honest" feedback about Spivak and several other employees, thwarting yet another of Spivak's baseless allegations. (*Id.*, Exh. E).

Since Spivak's theory that she was singled out by the request for "completely honest" feedback was debunked, Spivak now asserts a new theory based on the timing of the emails requesting "completely honest" feedback. Specifically, Spivak now claims that Mr. Skakkebaek sent emails requesting "completely honest" feedback about her on September 24, 2014, then somehow learned about Spivak's timing theory (before she even concocted that theory herself, years later, after the EEOC process had concluded) and sent emails requesting "completely honest" feedback about other employees less than a week later, on September 30, 2014, to create a paper trail. Where is the evidence to support this conspiracy theory? The absurdity of it is shown by the fact that Mr. Skakkebaek did not even learn of the existence of Spivak's Plusmail account until some six months later, in February 2015 or her EEOC charge until months later. (Skakkebaek Decl., ¶ 3.)

**E. Google Did Not Commit Any "Fraud" By Quoting The Plain Language From The Code Of Conduct Subsection That Specifically Addresses "Personal Investments;" Spivak's Tortured Argument Reveals That She Desperately Wants To Avoid Producing Her Facebook Trading Records.**

**1. Google Followed The Arbitrator's Order On Its After-Acquired Evidence And Mitigation Defenses.**

Within weeks of Spivak's termination, Google discovered after-acquired evidence of Spivak's serious misconduct during her employment that should cut off her alleged frontpay damages, which she claims are ongoing since she claims to make less at Amazon than at Google.

Specifically, during Spivak's employment with Google, she made substantial sums of money by day-trading Facebook stock and options, with the value of Spivak's Facebook holdings exceeding $1 million. Facebook is identified by name as one of Google's biggest competitors in each of its SEC Annual Reports since at least 2010.[5]

During Spivak's employment, Google's Code of Conduct contained specific language regarding personal investment in competitors. The "Personal Investments" follows immediately after the introduction, reflecting the primacy and importance of avoiding conflicts in the area of personal investments. That specific section provides:

> a. Personal Investments
>
> A common conflict of interest involves a Googler's personal investment in a customer, supplier, partner or competitor of Google, where the investment is significant enough (either in absolute value or in relation to the Googler's net worth) that someone might reasonably think it could cause the Googler to act in a way that benefits that personal investment at the expense of Google. When considering whether such an investment creates a conflict of interest, ask yourself:

---

[5] Spivak is financially sophisticated. Prior to joining Google, Spivak earned an MBA from Harvard and worked at Roubini Global Economics (of "Black Swan" fame), reporting to the firm's CEO.

- Is the investment in a competitor?
    - If the answer is yes, the investment creates a conflict of interest.

That subsection goes on to instruct employees as follows:

> **<u>If you are considering making an investment that creates a conflict of interest, don't make the investment</u>**. If you already have an investment that creates a conflict of interest, or are unsure whether an existing or contemplated investment is a conflict of interest, you should contact Ethics & Compliance. (Emphasis added).

In light of the Code of Conduct, and in light of Spivak's substantial workday trading in one of its largest competitors, Google asserted an after-acquired evidence defense. When Spivak refused to produce her Facebook trading records, the Arbitrator ordered the parties to meet and confer on a stipulation on the underlying facts. Specifically, in Pre-Hearing Order No. 6, the Arbitrator ordered that:

> Google propose to Claimant a stipulation of facts in lieu of the eDiscovery details. If agreement on such a stipulation cannot be reached, Google may renew its request to discover that information.

Google then sent Spivak a draft stipulation. The stipulation tracked the provisions of the "Personal Investments" section of the Code of Conduct, providing:

1. During Spivak's employment with Google, and during her work hours, Spivak made personal trades and investments in the stock and options of Facebook.

2. At the time of Spivak's Facebook trades and investments, Facebook was a competitor of Google.

3. Spivak's Facebook trades and investments were significant in absolute value.

4. Spivak's Facebook trades and investments were significant in relation to her net worth.

5. From January 1, 2013 to the termination of Spivak's Google employment on November 20, 2015, the overwhelming majority of Spivak's stock and options trading and investment activity was in Facebook, and not in the stock or options of other companies.

6. From January 1, 2013 to the termination of Spivak's Google employment on November 20, 2015, the total annual increases in the value of Spivak's trades and investments in the stock and options of Facebook exceeded her annual Google salary.

7. Spivak did not disclose her Facebook trading and investment activity to her manager, to Google's Legal Department, or to Google's Ethics & Compliance Department.

8. Spivak did not obtain approval for her Facebook trading from her manager, Google's Legal Department, or Google's Ethics & Compliance Department. (Johnsrud Decl., ¶ 12, Exh. J)

On August 18, 2018, Spivak mocked Google's proposed stipulation, though she admitted that she did not have any "real objections" to its contents:

> It's not that I have any real objections to content of the stipulation -- but it's just full of stupid. If you're trying to propose an alternative to getting my financial record, the stipulation should be limited to that which my financial record might otherwise uncover. I have no problem agreeing that Facebook and Google were competitors ... but it offends me from a perspective of basic competence. **Like, whoever drafted this stipulation is just not smart and competent enough to understand how a stipulation works. Was it you, Patrick? Or Brian? This is a big fail ... and mock-worthy.** (Johnsrud Decl., ¶ 12, Exh. J) (emphasis added).

On August, 20, 2018, Google's counsel explained that "the contents of the declaration are directly relevant to Google's affirmative defense regarding after-acquired evidence. If you don't have any real objection to the content of the declaration, as you state below, we would expect you to sign it." (*Id.*, ¶ 11, Exh. I). Google's counsel further noted: "If we cannot reach a stipulation on these basic points, then we will need to take the discovery on them, and get to the bottom of your actual Facebook equity gains while employed at Google." (*Id.*) That same day, Spivak reversed course and agreed to sign the stipulation, writing:

> I will sign the stipulation as proposed. Would you like a hard copy, or will a digital version suffice? (*Id.*)

Google requested an electronic copy with the hard copy in the mail. (*Id.*) Spivak never sent it. Spivak now claims that she is objecting to the "discovery order" as having been "based on misleading and altered evidence regarding the Google's actual code of conduct." (*Id.*) Spivak fails to explain how Google "altered" its Code of Conduct or identify any objectionable part of the declaration, which literally tracks the language of the Code.

**2. Spivak Is Making False Allegations Against Google To Attempt To Shield Her Substantial Investment Activity In Facebook.**

After reviewing the declaration, and even agreeing to its contents, Spivak now apparently realizes the magnitude of her misconduct and its impact on her case. So, she now falsely accuses Google of misrepresenting its Code of Conduct. Spivak focuses on the general introduction to "Section III. Avoid Conflicts of Interest." The introduction states in part:

> When you are in a situation where competing loyalties could cause you to pursue a personal benefit for you or your friends or family at the expense of Google or our users, you may be subject to a conflict of interest.

Nothing in this general introduction makes Google's reliance on the specific "investment conflict" language a misrepresentation. Nor does this introductory preamble even help Spivak.

*First*, Spivak traded in the stock and options of Google's largest competitor, Facebook, for her own benefit, during the workday. She thus pursued a personal benefit for herself at the expense of Google.

*Second*, Spivak's argument ignores the very next sentence of the general introduction she is relying on, which provides:

> All of us should avoid circumstances that present even the appearance of such a conflict.

There can be no serious dispute that making seven-figure workday trades in the stock and options of one of Google's largest competitor presents, at a bare minimum, "the appearance of such a conflict."

*Third*, the introductory section on which Spivak relies sets forth a broad set of questions, each of which compelled her to either refrain from the trading or "**<u>review the situation with your manager and Ethics & Compliance and get their approval"</u>**:

- Would this relationship or situation embarrass me or Google if it showed up on the front page of a newspaper or the top of a blog?
- Am I reluctant to disclose the relationship or situation to my manager, Legal or Ethics & Compliance?
- Could the potential relationship or situation create an incentive for me, or be perceived by others to create an incentive for me, to benefit myself, my friends or family or an associated business, at the expense of Google?

*Finally*, Spivak's tortured argument ignores the fact that we are at the **discovery** phase, not the **adjudication** phase. By quoting the exact text of the its Code of Conduct, and the underlying background facts, Google has established a strong basis for the discovery it seeks. Courts routinely permit discovery for after-acquired evidence so long as the defendant has a reasonable basis for believing that the requested discovery will unearth such after-acquired evidence. *See e.g. Awosika v. Target Corp.*, 2011 WL 13048452, at *3 (W.D. Wash. 2011) (denying plaintiff employee's motion for protective order as to subpoena to prior employer regarding the reasons why her employment ended, where defendant had reason to believe plaintiff had not been honest about why she left a prior job). This discovery is relevant not only to Google's after-acquired evidence, but also to Spivak's mitigation, since she continued trading in Facebook equity for several months after her termination from Google instead of getting a new job. In short, unlike most employees, Spivak was sophisticated enough to day trade for a living after her employment ended, and the nest egg she developed while doing while employed at Google only furthered her ability.

Spivak is free to argue for her tortured reading about the Code of Conduct at the actual arbitration, but she cannot overcome the specific provision addressing the investment in competitors for this discovery. Nor has she established her accusation that "Google Committed a Fraud Upon the Court with Respect to the Code of Conduct in order to illegally prevent the arbitrator from exercising the power to adjudicate my claim of frontpay damages."

**3. The Arbitrator Should Compel Full Disclosure Of Spivak's Trading Activity In Facebook.**

Google followed the Arbitrator's Order regarding Spivak's Facebook trading. Spivak said she had no objection to the draft declaration. But since she has changed her mind and now will not sign it, Google now renews its requests that Spivak be compelled to produce evidence relating to her voluminous Facebook trading. Specifically, Google asks that the Arbitrator order Ms. Spivak to produce all of the following:

1. All brokerage account statements and trading records for any month in which Spivak held any Facebook stock or options or engaged in any Facebook stock or options trading activity, from May 18, 2012 through April 1, 2017 (when she commenced employment with Amazon).

2. All documents regarding or reflecting communications regarding Spivak engaging in any Facebook stock or option trading activity, from May 18, 2012 to April 1, 2017, including requests or instructions to buy or sell.

3. All documents referring to or evidencing Spivak's income from any source, including any sign-on bonus, bonus, equity, salary and other earnings and compensation from Amazon, as well as any self-employment income, including but not limited to stock or options trading income, since May 18, 2012.

**F. Google Did Not "Abuse" The Protective Order Entered Regarding Ms. Spivak's Contact With Google Employees.**

On August 20, 2018, the Arbitrator issued Pre-Hearing Order No. 8, which provided that Google must "furnish Claimant a list of those current and former employees who have requested not to be contacted by Claimant, and Claimant is to honor those requests." The propriety of this Order was confirmed when Google asked employees if they did not want to be contacted and another female employee (Emily Rapp) reported a sickening message from Spivak. Spivak told Rapp that she "cannot wait to connect with you in deposition …. Oh Emily. Emily. Emily. Good luck to you really. You will need it. Blocking this account will do nothing more than give you a false sense of security that I can't see your account …." (Johnsrud Decl., ¶ 13, Exh. K).

Google provided Spivak with a list of individuals who indicated they did not want to be contacted by Spivak. That list included Paul McClinton (and Emily Rapp). (Johnsrud Decl., ¶ 13, Exh. L). Spivak's motion confirms that McClinton asked not to be contacted when he told her that he would "prefer to not be involved with any of the legal stuff (given that I don't know anything about it)."

Spivak, however, could not help herself, purporting to rely on a "Facebook friend exception" that does not exist under the Protective Order. Spivak claims that "I intended to comply with the order to not contact individuals on the list, but Paul was my facebook friends [sic]." (*Id.*) What good is the Arbitrator's Order if Google follows it and Spivak flaunts it? Especially since Spivak

misrepresented Google's motion, claiming that:

> I've been told by your lawyers that you want a **restraining order** against me [and that] I'm just clueless and surprised to hear from your lawyers that you want this **restraining order.** (Emphasis added).

Google never sought a "restraining order," which is an inflammatory mischaracterization. Google sought a "protective order" against Spivak's unprofessional communication and conduct with several Google employees. Spivak is certainly capable of understanding the difference between a restraining order and a protective order. Spivak's email to Mr. McClinton is an unusual mix of direct confrontation and attempted guilt trip, and she successfully baited Mr. McClinton into responding. None of this changes the fact that the Arbitrator issued an Order, Google followed it, and Spivak violated it.

### G. Spivak's Single Decision-Maker Theory Is Not Supported By Any First Hand Knowledge Or Admissible Evidence; Her Speculation And Argument Is Not Evidence Of Any Kind, And In Any Event Does Not Support Sanctions.

In Spivak's final argument, she alleges that: "Google is concealing key facts on how performance decisions are made a Google in attempt to deny fair adjudication of my specific bias claims." (Motion at 23). Spivak claims that "Google repeatedly argues case law based on asserting as factual that my claims fall under 3 different managers. Through sleight-of-hand, Google equates this with the 'decision maker' standard in the case law." (*Id*.)

There is no basis for Spivak to attempt to turn Google's legal argument (based on her allegations) into sanctionable conduct. Spivak's Amended Notice of Claims alleges that it was her specific managers (not Neal Mohan) who took adverse action against her. By way of example, Spivak alleges that Google discriminated against her by:

- "Through the conduct of Jens Skakkebaek, Ms. Spivak's supervisor, promoting a less qualified male"
- "In May 2014, through the conduct of Skakkebaek and Engineering Manager Doug Bentson, Engineering Manager for Frontline, by placing her on a Performance Improvement plan (PIP) and giving her a poor performance review"
- "Through the conduct of Skakkebaek, by promoting Aaron Rothman, a less qualified male, over her in July 2014"
- "Through Mr. Rothman, limiting her presentation of Interactive Benchmarks"
- "Through the conduct of Rothman, in February 2015, downgrading Ms. Spivak's performance rating to 'Low Meets'"
- "Through Mr. Rothman, in May 2015, by giving Ms. Spivak another negative performance review" (Amended Notice of Claims).

She has provided no evidence to suggest that Mr. Mohan was a decision maker in the adverse employment actions about which she complains. She is desperate to target him so she can attempt to justify organization-wide discovery, which was an issue already litigated in this case in connection with her omnibus electronic discovery demands. She is thus simply attempting to re-litigate an issue she already lost. Unless and until she establishes some facts connecting Mr. Mohan to her alleged adverse employment actions, discovery should be tailored accordingly. All of this, of course, is beside the point that Spivak has offered no evidence that Google has engaged in any misconduct in making its argument about relevant comparators based on Spivak's own allegations in her Amended Notice of Claims.

## III. CONCLUSION

When things are not going her way, or when she disagrees, Spivak attacks. She attacks coworkers, managers, human resources, and now her opposing counsel. But this arbitration is not some online social media rant where Spivak can say whatever she wants without repercussion. This arbitration is about the facts and law. Her sanctions motion has not one ounce of merit. It is time for Spivak to be sanctioned monetarily in the sum of $12,500 for filing a baseless motion and to deter further misconduct. (Johnsrud Decl., ¶ 14). *West v. Washington Assn. of County Officials*, 162 Wash. App. 120 (2011) (pro per plaintiff sanctioned for submitting declaration that made baseless allegations of fraud against opposing counsel).

Respectfully submitted,

CURLEY, HURTGEN & JOHNSRUD LLP

**Brian L. Johnsrud**

Brian L. Johnsrud

cc: Claimant Spivak